

**09 CV 9783**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| BNP PARIBAS MORTGAGE CORPORATION,<br><br>          Plaintiff,<br><br>    v.<br><br>BANK OF AMERICA N.A.,<br><br>          Defendant | Civil Action No.: |



### COMPLAINT

Plaintiff BNP Paribas Mortgage Corp. ("BNPP" or "Plaintiff") for its Complaint against Bank of America, N.A. ("Defendant" or "Bank of America") alleges, upon information and belief, as follows:

### SUMMARY OF CLAIMS

1.      This is an action for breach of contract and indemnification resulting from Bank of America's: (i) refusal to pay BNPP the outstanding principal amount and accrued interest on $480.7 million of secured notes that became due and payable on August 10, 2009; and (ii) failure to secure and protect over $480.7 million of collateral, in the form of cash and mortgage loans, that it was obligated to secure on behalf of BNPP.

2.      On June 30, 2008, BNPP purchased $480.7 million of short-term, interest-bearing, secured notes (the "Secured Notes") issued by Ocala Funding, LLC ("Ocala"). Ocala is a mortgage warehousing facility created to provide short-term liquidity funding to Taylor, Bean & Whitaker Mortgage Corp. ("TBW") pending the sale of mortgages originated by TBW to the Federal Home Loan Mortgage Corporation ("Freddie Mac") and others. Upon receipt of

payment for the loans, Ocala was to use the loan sale proceeds to either repay BNPP (whose money financed the purchase) or purchase additional loans from TBW.

3.      The governing contracts required that the Secured Notes be over-collateralized at all times.  Put simply, Ocala was required to hold at least $500 million of cash and mortgage loans as collateral for the $480.7 million of outstanding Secured Notes.  To guarantee the existence and maintenance of such security, Ocala contracted with Bank of America to serve as collateral agent, custodian, depositary and trustee of the Ocala facility.  As of June 2008, Bank of America held an investment grade credit rating (Aa2 (Moody's) and AA- (S&P)) and was one of the largest mortgage lenders and loan servicers in the United States.

4.      Bank of America was contractually required to, among other things:  (i) secure and protect the cash and mortgage loans collateralizing the Secured Notes; and (ii) make certain that the Secured Notes were, in fact, over-collateralized, *i.e.*, that Bank of America held collateral in the form of cash or mortgage loans of at least $500 million, before issuing new Secured Notes or purchasing new mortgage loans.

5.      Bank of America's performance of its contractual obligations was an essential condition to BNPP's willingness to purchase the Secured Notes.  Indeed, BNPP's reliance on Bank of America was confirmed by Bank of America itself in a letter to BNPP dated March 27, 2009 (the "March Letter Agreement").  The March Letter Agreement expressly acknowledges that – as an "inducement to BNP Paribas [] to enter into, and/or continue its participation in" the Ocala facility – Bank of America would indemnify BNPP against losses stemming from any failure by Bank of America to meet its contractual obligations.  The March Letter Agreement highlights Bank of America's obligation to certify the over-collateralization of the Secured Notes as a core contractual obligation.  Bank of America further recognized in the March Letter

Agreement that "the duties it performs under the Depositary Agreement . . . play an important role in mitigating the risks that BNPP would otherwise incur" through participation in the Ocala transaction.

6.      On August 3, 2009, federal agents raided TBW's offices.  The next day, TBW was delisted as an approved seller of mortgage loans to Freddie Mac.  This triggered an Event of Default under the Ocala facility rendering the Secured Notes immediately due and payable. In the aftermath of the Event of Default, BNPP has learned that rather than being fully secured, its investment is significantly under-collateralized.  Specifically, BNPP has learned that at least 1,837 mortgage loans with a face amount of $374.9 million were not, as Bank of America represented, owned by Bank of America on behalf of BNPP and that Bank of America held only $1.9 million of cash in the segregated collateral account that it was required to maintain on behalf of BNPP.

7.      Bank of America breached its contractual obligations to BNPP and others by, among other things:  (i) improperly transferring over $2.1 billion in cash from Ocala's collateral account at Bank of America to unauthorized accounts at Colonial Bank and Bank of America; (ii) purchasing mortgage loans without authorization; (iii) commingling funds in contravention of the Ocala facility documents; and (iv) failing to secure the mortgage loans it held on behalf of BNPP.

8.      As part of Bank of America's breach of its contractual obligations, Bank of America sent BNPP hundreds of false reports that inflated the number of loans that Ocala owned and misrepresented the amount of collateral, primarily mortgage loans, that Bank of America held on behalf of BNPP.

9.      Bank of America also regularly falsely certified the borrowing base supporting the Secured Notes.  Bank of America was contractually required to certify that Ocala's assets exceeded its liabilities and that BNPP was appropriately collateralized, *i.e.*, that Bank of America was holding, on behalf of BNPP, mortgage loans and cash worth at least $500 million.  The contractually required certification was memorialized in the form of a Certificate of Authorized Issuer Agent Concerning Short Term Note Issuance (the "Borrowing Base Certificate").  Representations and calculations in the Borrowing Base Certificate were required to be certified by Bank of America prior to the issuance or "roll" of the Secured Notes.

10.     Bank of America's certifications of the Borrowing Base Certificate were demonstrably false.  By way of example, on July 20, 2009, the Secured Notes matured and BNPP rolled its investment into a new issuance of Short Term Notes.  As required by the facility documents, Bank of America reviewed and certified the July 20, 2009 Borrowing Base Certificate, which states that Bank of America was holding over $502 million of collateral in the form of mortgage loans ($473 million) and cash (over $28 million).  This certification was false.  As evidenced by Bank of America's own documents, as of July 20, 2009, Bank of America was holding less than $100 million of mortgage loans and only $1.7 million of cash in the BNPP account.

11.     Had Bank of America adequately performed its contractual obligations under the Ocala transaction, BNPP's Secured Notes would be fully secured by $500 million of cash and mortgage loans.  As a direct and proximate result of Bank of America's breach of its contractual duties and its failure to protect and secure BNPP's collateral, BNPP's Secured Notes are significantly under-collateralized and Bank of America has failed to make payment to BNPP for its Secured Notes.  Moreover, as a direct and proximate result of Bank of America's breach of its

4

contractual duties, BNPP purchased new issues of Secured Notes at intervals of approximately thirty days or less. Had BNPP known that the new issues of Secured Notes were under-collateralized it would not have purchased the new Secured Notes and would not have been injured.

## PARTIES

12.     BNP Paribas Mortgage Corporation is a Delaware corporation with its principal place of business in New York, New York. BNP Paribas Mortgage Corporation is a wholly-owned subsidiary of Paribas North America Inc., which is wholly owned by BNP Paribas, a multi-national bank with a presence in eighty five countries and more than 205,000 employees worldwide.

13.     Bank of America N.A. is a National Banking Association with its principal place of business located in Charlotte, North Carolina. Bank of America is the successor in interest through merger to LaSalle Bank N.A. ("LaSalle Bank") and LaSalle Global Trust Services ("LaSalle Trust"). Bank of America is authorized to engage in the business of banking in the State of New York. Bank of America has done and is doing business in the State of New York.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

15.     This Court has personal jurisdiction over Bank of America by virtue of its business activity in this jurisdiction.

16.     Venue in this district is proper under 28 U.S.C. §§ 1391(a) because a substantial part of the events or omissions giving rise to the claim occurred here, the defendant is found in

this district, and Bank of America has waived any objections to the laying of venue in the Southern District of New York.

     17.    The forum consent clause for the Second Amended & Restated Security Agreement provides in relevant part:

> THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. EACH PARTY HERETO HEREBY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN NEW YORK CITY FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

The Series 2005-1 Amended & Restated Depositary Agreement contains a substantially similar forum consent clause.

## FACTUAL ALLEGATIONS

**I.**    **Taylor, Bean & Whitaker Mortgage Corp.**

     18.    Until it filed for bankruptcy on August 24, 2009, TBW was the largest non-depositary mortgage lender in the United States. Headquartered in Ocala, Florida, TBW and its various subsidiaries had approximately 4,000 employees and were responsible for originating approximately $30 billion in new loans in 2008. As of June 2009, TBW serviced mortgages with unpaid principal balances in excess of $80 billion.

     19.    TBW's core business was: (i) originating, underwriting, processing and funding conforming conventional, government-insured residential mortgage loans; (ii) the sale of

mortgage loans into the "secondary market" to government-sponsored enterprises such as Freddie Mac; and (iii) mortgage payment processing and loan servicing.

20.     TBW originated loans through mortgage brokers and purchased loans from correspondents. TBW financed its loan originations with money obtained through "wet funding" credit lines maintained at Colonial Bank, as well as with other institutions. Wet funding is the financing of mortgages before the mortgage note has been received and reviewed by the lender (*i.e.*, when the ink on the mortgage note is still "wet"). In contrast, dry funding is the financing of mortgages after the mortgage note has been received and reviewed by the lender (*i.e.*, after the ink on the mortgage note has "dried").

21.     TBW customarily sold the loans it originated and used the proceeds of those sales to pay down the wet funding credit line associated with the originated loans. This, in turn, would allow TBW to originate new loans using the wet funding credit line. Because TBW could not originate new loans until its wet funding credit line was paid down, TBW's mortgage origination capacity was constrained by the length of time it took to receive payment on the sale of its originated loans.

22.     TBW usually sold its originated mortgage loans to Freddie Mac in return for either cash or marketable mortgage-backed securities ("MBS") issued by Freddie Mac. As a general rule it took between 30 and 60 days for TBW to receive payment from Freddie Mac.

## II.    Ocala Funding, LLC

23.     In January 2005, TBW organized Ocala as a special-purpose, bankruptcy remote investment vehicle to provide liquidity funding for TBW's mortgage origination business. Ocala purchased loans originated by TBW pending the sale of those loans to Freddie Mac, thereby enabling TBW to reduce the payment time between origination and sale. This allowed TBW to

maximize its utilization of its wet lending credit lines from Colonial Bank. By way of example, Ocala might purchase a TBW-originated loan within approximately 15 days after origination as compared to the typical 30 to 60 day wait for Freddie Mac to purchase a TBW-originated loan, permitting TBW to increase the utilization of its wet funding credit lines from Colonial Bank.

24.     The Ocala facility that BNPP was invested in was only permitted to purchase dry, high quality Freddie Mac conforming mortgages. Ocala was not permitted to fund or purchase wet loans (*i.e.*, loans for which the mortgage note had not yet been reviewed) or sub-prime mortgages.

25.     In June 2008, to make the Ocala facility more attractive to potential investors, including BNPP, the facility was restructured to reduce or eliminate the note purchaser's exposure to a variety of risks, including counterparty risk, interest rate risk, take out risk and underwriting risk. Central to this effort was the role of Bank of America, one of the largest banks and mortgage lenders in the world, as collateral agent, custodian, depositary and trustee for the Ocala facility.

26.     The service of Bank of America in these roles was necessary to eliminate Ocala and BNPP's counterparty risk to TBW, which did not have an investment grade credit rating, and to qualify Ocala's Short-Term Notes for an A-1+ rating from Standard & Poor's Ratings Services and a P-1 rating from Moody's Investors Service, Inc. ("Moody's").

27.     The significance of Bank of America's responsibilities in connection with the Ocala facility was noted by Moody's, which stated that the administration risk associated with the Secured Notes was "mitigated by the resources, capability and credit strength of Bank of America Corporation as the trustee, collateral agent, depositary and custodian to provide critical program support services, including: certifying the borrowing base and checking the

8

delinquency triggers before the issuance of [Secured Notes and callable notes]; checking in the loan files and creating a collateral transmittal report; and managing the orderly wind-down of the program." Moody's ABCP Market Review (July 13, 2009).

28.     In its various roles as Ocala's collateral agent, custodian, depository and trustee, Bank of America was responsible for, among other things:  (i) maintaining and securing the cash and mortgages owned by Ocala; (ii) certifying Ocala's borrowing base, *i.e.,* certifying that Ocala had collateral in excess of its outstanding commercial paper obligations, before Ocala could issue new commercial paper; and (iii) testing Ocala's borrowing base before it purchased new mortgage loans from TBW.

29.     The typical Ocala transaction was intended to operate as follows:

(a)     TBW lent money to a homeowner by borrowing funds from its wet funding credit line with Colonial Bank.  In exchange, TBW received a note and mortgage from the homeowner.  At this point in the transaction, Colonial Bank's wet funding was secured by the mortgage note that TBW received (which was still wet because it had not yet been reviewed by Colonial Bank or any other lender).

(b)     TBW (through Colonial Bank) shipped the mortgage loan file to Bank of America where it was reviewed and verified to confirm that it met Ocala's purchase requirements.  While Bank of America was reviewing the mortgage loan file, Colonial Bank retained its security interest in the mortgage loan and Bank of America held the mortgage loan under a bailee letter.

(c)     Once Bank of America established that the mortgage loans conformed with the requirements of the Ocala facility and that the Ocala facility

was sufficiently collateralized, *i.e.*, that Ocala held sufficient cash and mortgage loans to repay its outstanding commercial paper including the Secured Notes, Bank of America paid for the mortgage loans by depositing funds in a designated TBW account at Colonial Bank (Account No. 8026069354). At that point Colonial Bank's lien on the mortgage loans was released and Ocala took ownership of the mortgage loans, subject to the security interest of BNPP.

      (d)     When a sale to Freddie Mac was arranged, Bank of America shipped the mortgage loans to Colonial Bank – in its capacity as custodian for Freddie Mac – for inspection and certification. Bank of America sent the loans to Colonial Bank under a bailee letter that required the loans be paid for or returned to Bank of America within 15 days. Under the terms of the bailee letter, Bank of America, as custodial agent for Ocala, retained ownership of the loans until it received payment for them.

      (e)     If the mortgage loans were approved for purchase by Freddie Mac, Freddie Mac purchased the mortgages by wiring funds or delivering MBS to accounts designated by Bank of America.

      (f)     Once Bank of America received payment for the mortgages, it was required to deposit the funds in a segregated collateral account. The deposited funds then became available to repay Ocala's outstanding commercial paper or to purchase additional mortgage loans.

30.     At all times, Bank of America was responsible for securing and protecting BNPP's collateral as it cycled from cash to mortgages and back to cash. Bank of America was thus necessarily responsible for tracking the cash in Ocala's accounts and the mortgage loans

Ocala owned to make sure that, at all times, Ocala owned sufficient cash and mortgage loans to fully collateralize BNPP's Secured Notes.

## III.   BNPP Purchases Ocala-Issued Notes

31.     On June 30, 2008, Ocala issued $1.6825 billion of commercial paper in the form of asset backed short-term notes. The notes were issued in two series of senior notes consisting of the: (i) Series 2005-1 Short-Term Notes in the amount of $480.7 million (the "2005-1 Notes") and (ii) Series 2008-1 Short-Term Notes in the amount of $1,201.8 billion (the "2008-1 Notes"). The $1.6825 billion of commercial paper issued by Ocala was senior to $67.5 million of subordinated term notes for a total facility of $1.75 billion.

32.     On June 30, 2008, BNPP purchased the entire Series 2005-1 Short-Term Notes with a face amount of $480.7 million from Bank of America as depositary for Ocala. The Secured Notes purchased by BNPP on June 30, 2008 matured on July 21, 2008, and were subsequently rolled into another note issuance with a maturity date of August 20, 2008.

33.     Since June 30, 2008, Bank of America as depositary for Ocala issued 15 Series 2005-1 Short Term Notes with maturity dates of July 21, 2008; August 20, 2008; September 22, 2008; October 20, 2008; November 20, 2008; December 22, 2008; December 30, 2008; January 16, 2009; February 20, 2009; March 20, 2009; April 20, 2009; May 20, 2009; June 22, 2009; July 20, 2009 and August 20, 2009. BNPP purchased the entirety of each of the 15 Series 2005-1 Short Term Notes issued by Bank of America on behalf of Ocala.

34.     BNPP's Secured Notes were secured by a perfected first-priority security interest in certain collateral (*i.e.,* cash and mortgages) owned by Ocala and secured and maintained by Bank of America (the "2005-1 Collateral"), as collateral agent on behalf of BNPP. The 2005-1 Collateral included, among other things: (i) cash held by Bank of America in a segregated 2005-

1 collateral sub-account; and (ii) mortgage loans assigned to the 2005-1 Series owned by Ocala that were pending sale to Freddie Mac.

35.     BNPP's Secured Notes were further protected by an over-collateralization requirement that prevented Bank of America from purchasing mortgages for Ocala or issuing new notes if Bank of America did not hold 2005-1 Collateral worth at least $500 million.

36.     In connection with its purchase of the Secured Notes, BNP Paribas simultaneously entered into various swap transactions with Ocala and TBW to hedge certain risks associated with its Ocala investment.

IV.     **Bank of America's Contractual Obligations Under the Ocala Agreements**

37.     Beginning on June 30, 2008, Bank of America, through LaSalle Bank and LaSalle Trust, entered into a series of contracts with Ocala and BNPP.  These contracts govern the responsibilities of Bank of America as collateral agent, custodian, depositary and indenture trustee for the Ocala facility.

A.     **The Security Agreement**

38.     Ocala, Bank of America (through LaSalle Bank) as indenture trustee, and Bank of America (through LaSalle Bank) as collateral agent entered into a Second Amended and Restated Security Agreement dated as of June 30, 2008 (the "Security Agreement').  The stated purpose of the Security Agreement was to secure Ocala's obligations to BNPP and others under the Base Indenture including, without limitation, the payment in full of principal and interest on the 2005-1 Notes.

39.     Under the terms of the Security Agreement, Bank of America was obligated to open and maintain certain segregated accounts for the 2005-1 Collateral and to otherwise secure Ocala's assets for the benefit of the Series 2005-1 Noteholders.  Importantly, Section 5.03 of the

Security Agreement prohibits the expenditure of any cash collateralizing the 2005-1 Notes unless Bank of America has first determined that the 2005-1 Notes are fully secured by cash and mortgages worth at least $500 million.

40.     Bank of America agreed to indemnify BNPP against any and all claims, losses, penalties, fines, forfeitures, reasonable legal fees and related costs, judgments, and any other costs, fees and expenses BNPP may sustain to the extent attributable to the collateral agent's negligence, fraud, bad faith or willful misconduct in the performance of its duties under the Security Agreement. *See* Security Agreement, § 8.05.

41.     BNPP is a third-party beneficiary to the Security Agreement and is entitled to the rights and benefits under that agreement and may enforce the provisions of that agreement as if it were a party. *See* Security Agreement, §§ 10.08 and 10.18.

**B.     The Custodial Agreement**

42.     Ocala, TBW, Bank of America, through LaSalle Bank, as custodian, and Bank of America, through LaSalle Bank, as collateral agent entered into a Second Amended and Restated Custodial Agreement dated as of June 30, 2008 (the "Custodial Agreement"). Under the terms of the Custodial Agreement, Bank of America was responsible for taking possession of, examining and securing the mortgages owned by Ocala.

43.     Pursuant to Section 8 of the Custodial Agreement, Bank of America, at the direction of Ocala, was authorized to deliver the mortgage files to Freddie Mac or its agent provided that any such delivery was accompanied by a transmittal letter to be executed by Freddie Mac or its agent substantially in the form set forth as Exhibit E to the Custodial Agreement. The transmittal letter permitted the prospective purchaser to take possession of the mortgage file for inspection, and required such purchaser to acknowledge the security interest

granted to Bank of America for the benefit of BNPP.  The prospective purchaser had 15 days to either remit the required sale proceeds to an identified account at Bank of America or return the mortgage file.

44.     Bank of America agreed to indemnify BNPP against any and all claims, losses, liabilities, obligations, damages, payments, costs and expenses resulting from the Custodian's negligence, lack of good faith or willful misconduct in the performance of or breach of its obligations under the Custodial Agreement.  *See* Custodial Agreement, § 17.

**C.     The Depositary Agreement**

45.     Ocala and Bank of America, through LaSalle Bank, as depositary, entered into the Series 2005-1 Amended and Restated Depositary Agreement dated as of June 30, 2008 (the "Depositary Agreement").

46.     The Depositary Agreement required Bank of America to certify the borrowing base, *i.e.*, that Bank of America held cash and mortgages in excess of the outstanding 2005-1 Notes, before issuing new notes.  Specifically, the Depositary Agreement (§ 4(d)) provided that Bank of America "shall not issue or deliver any Short Term Note unless it shall have received a completed certificate from an Issuer Agent on the Issuance Date, each in the form of <u>Exhibit C</u> attached hereto by 11:00 a.m. (New York City time) and the Depositary, upon review, determines that it can (and it does) certify as to items (1) and (2) therein."  Critically, in "item 2" Bank of America certifies that the Secured Notes owned by BNPP were over-collateralized as of the date of the certification.

47.     Under the terms of the Depositary Agreement (§ 8(g)), Bank of America agreed to "indemnify and hold harmless the Secured Parties" against any and all claims and losses "that

the Issuer may sustain to the extent attributable to the Depositary's negligence, fraud, bad faith or willful misconduct in the performance of its duties hereunder."

**D.      The March Letter Agreement**

48.      On March 27, 2009, BNPP and Bank of America entered into a written agreement regarding Bank of America's role as depositary.

49.      In the March Letter Agreement, Bank of America expressly recognized that its duties under the Depositary Agreement, including its certification of the Borrowing Base Certificate, "play an important role in mitigating the risks that BNPP would otherwise incur through the Related Transactions."

50.      Bank of America also agreed to indemnify BNPP against losses caused by Bank of America's negligence as a depositary, including in the certification of the Borrowing Base Certificate.

**E.      Indenture Trustee**

51.      Ocala and Bank of America, through LaSalle Bank, as indenture trustee, entered into a Second Amended and Restated Base Indenture ("Base Indenture") dated as of June 30, 2008.  Ocala and Bank of America, through LaSalle Bank, as indenture trustee and paying agent, also entered into a Second Amended and Restated Series 2005-1 Short Term Note Supplement to the Second Amended And Restated Base Indenture ("Indenture Supplement") dated as of June 30, 2008.

52.      Section 13.20 of the Base Indenture specifically provides that BNPP "is a third-party beneficiary to this Base Indenture and is entitled to the rights and benefits hereunder and may enforce the provisions hereof as if it were a party hereto."

53.    The Indenture Supplement also makes clear that the "proceeds from the sale of the Series 2005-1 Notes shall be used by the Issuer to acquire Series 2005-1 Mortgage Loans from [TBW] and to pay any amounts due and owing on the Issuer's outstanding obligations in accordance with the Facility Documents."

**F.    The May Letter Agreement**

54.    On May 5, 2009, Bank of America, in its capacities as collateral agent and trustee, sent a letter to BNPP, Ocala and TBW (the "May Letter Agreement"). The May Letter Agreement recognized that, in connection with the sale of loans to Freddie Mac, Bank of America was "required to execute and deliver" a Freddie Mac Form 996E (Warehouse Lender Release of Security Interest), in which it "agrees to relinquish any and all right, title or interest that it may have in" the mortgage loans.

55.    The May Letter Agreement went on to "confirm that, notwithstanding the execution and delivery by the Collateral Agent or the Indenture Trustee of a Form 996E or any similar document, the Collateral Agent and the Indenture Trustee do not intend to release, and are not releasing, the proceeds of the sale of the related Sale Assets [*i.e.*, the mortgage loans] from the lien of the Security Agreement, and such proceeds shall be subject to the lien of the Security Agreement."

56.    The May Letter Agreement thus confirms BNPP's perfected first-priority security interest in the cash proceeds of any mortgages sold by Ocala to Freddie Mac and evidences Bank of America's understanding that it was responsible for securing BNPP's collateral as it cycled from cash to mortgages and back to cash.

V.     **An Event of Default Occurs Under the Ocala Facility**

57.     On August 3, 2009, agents from the Federal Bureau of Investigation's Office of
the Special Inspector General for the Troubled Asset Relief Program and the Inspector General of
the Department of Housing and Urban Development ("HUD") raided the offices of Colonial
Bank and TBW.  At that time, Colonial Bank was also the subject of a criminal probe by the
Department of Justice, at least in part due to accounting irregularities related to its mortgage
warehouse lending division.

58.     Pursuant to certain HUD regulations as well as agreements with Ginnie Mae,
Freddie Mac and other lenders, TBW was required to deliver year-end audited financial
statements to these agencies and lenders.  Deloitte LLP served as TBW's auditor.  According to
the Federal Deposit Insurance Corporation (the "FDIC"), Deloitte uncovered evidence of
possible fraud and expressed concerns to TBW regarding TBW's failure to provide information
and documentation.  Deloitte thereafter ceased its audit.

59.     On August 4, 2009, HUD suspended TBW's HUD/FHA origination and
underwriting approval.  In a press release announcing this suspension, HUD stated that this
action was taken as a result of, among other things, its discovery that TBW's auditor ceased its
financial examination after discovering certain irregular transactions that raised concerns of
fraud, and that TBW failed to disclose, and falsely concealed, that it was the subject of two
examinations into its business practices in the past year.

60.     In addition, on or about August 4, 2009, Freddie Mac terminated TBW's
eligibility to sell loans and service over $50 billion of Freddie Mac loans.

61.     The suspension and terminations by these agencies made it impossible for TBW
to continue in business and on August 5, 2009 TBW closed its mortgage-lending operations.

62.     On August 5, 2009, BNPP provided notice to Ocala, TBW, Bank of America and others that, because TBW had ceased to be an approved seller with Freddie Mac, an Automatic Termination Event had occurred under the June 30, 2008 Second Amended and Restated Mortgage Loan Purchase and Servicing Agreement, which prohibited Ocala from purchasing additional loans from TBW.  BNPP further instructed Bank of America to take note of the Termination Event and "to perform its respective duties as Collateral Agent, Custodian, Indenture Trustee and Paying Agent accordingly."

63.     On August 10, 2009, Bank of America sent Ocala, TBW, BNPP and others a Notice of Potential Indenture Event of Default, Indenture Event of Default and Acceleration that "(i) declare[d] the principal and premium (if applicable) and accrued or accreted interest in respect of the Notes to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Issuer, anything contained in the Base Indenture or Series Supplements or in any Note to the contrary notwithstanding; (ii) instruct[ed] the Issuer to cease purchasing Mortgage Loans; (iii) instruct[ed] the Issuer and the Depositary to cease issuing Short Term Notes; and (iv) notifie[d] the Servicer and the Seller that an Indenture Event of Default has occurred."

64.     On August 11, 2009, the FDIC issued a Temporary Order to Cease and Desist requiring Colonial to obtain prior written approval from the Regional Director of the Atlanta Regional Office of the FDIC before engaging in any transaction with TBW.  Three days later, Colonial was closed and the FDIC was appointed receiver.

65.     Also on August 11, 2009, Bank of America provided Colonial Bank with a Demand for Documents and Proceeds, which revoked any outstanding bailee letters and

18

terminated all of Colonial Bank's rights to hold possession of the mortgage loan in trust and as custodian, agent, and bailee on behalf of BNPP.

66.    On August 12, 2009, Bank of America filed suit against Colonial Bank in the Southern District of Florida seeking, among other things, to recover: (i) "the proceeds paid by Freddie Mac to Colonial Bank" for mortgage loans owned by Ocala; and (ii) mortgage loans delivered to Colonial Bank that were not purchased by Freddie Mac. Shortly thereafter, Bank of America at the direction of the Secured Noteholders (including BNPP) obtained a temporary restraining order enjoining Colonial Bank from disposing of the mortgages or their proceeds.

67.    On August 14, 2009, the Alabama State Banking Department closed Colonial and appointed the FDIC as its receiver.

68.    On August 24, 2009, TBW filed a voluntary petition for bankruptcy in the Middle District of Florida under chapter 11 of the Bankruptcy Code.

## VI.    **Bank of America Refuses to Make Payment or Provide Information**

69.    On August 14, 2009, BNPP demanded that Ocala immediately pay the outstanding principal amount of the 2005-1 Notes plus accrued or accreted interest and demanded that Bank of America in its various capacities apply "all funds and any other amount or property held for, whether as collateral or otherwise, or otherwise attributable to the Series 2005-1 Notes" in accordance with the payment priorities specified in the Security Agreement.

70.    To date, Bank of America has refused to make payments to BNPP as required by the Security Agreement. Although over four months have passed since Bank of America declared an Event of Default, Bank of America still claims that it is "in the process of determining the appropriate next steps in light of the occurrence of an Indenture Event of

Default." *See* Bank of America's Notice Regarding Monthly Noteholders' Statement and Distribution of Funds.

71.     Since August 2009, BNPP repeatedly requested access to Bank of America's records, which under the Ocala facility BNPP is entitled to review and inspect. Bank of America has provided BNPP a limited number of documents, including Bank of America's bank statements for the Ocala facility from June 30, 2008 to August 28, 2009 (the "Bank of America Bank Records"), but Bank of America has refused to provide BNPP documents relating to the instructions under which Ocala purportedly purchased loans from TBW and Bank of America transferred funds to TBW's accounts at Colonial Bank.

72.     On September 14, 2009, David B. Rich, III, Bank of America's Assistant General Counsel – Corporate Law, confirmed to BNPP that "less than US$75 million remains on account" in the Ocala facility and "less than US$1.9 million, only, is contained in BNP Paribas' collateral sub-account."

## VII.    Bank of America's Breaches Of Its Contractual Obligations

73.     Bank of America breached its contractual obligations to BNPP by, among other things: (i) improperly transferring over $2.1 billion from Ocala's account at Bank of America to unauthorized accounts at Colonial Bank and Bank of America; (ii) purchasing mortgage loans without authorization; (iii) commingling funds in contravention of the Ocala facility documents; and (iv) failing to secure the mortgage loans it held on behalf of BNPP. As a result of these breaches, the Secured Notes were under-collateralized resulting in significant losses to BNPP.

### A.    Bank of America's Improper Fund Transfers

74.     In its role as collateral agent, Bank of America was charged with protecting the cash and mortgages in which BNPP held a security interest. Section 5.03 of the Security

Agreement provides a specific and limited list of permitted "Withdrawals and Transfers from the Collateral Account." Specifically, Section 5.03 allows Bank of America to withdraw and transfer funds from the collateral account, under certain circumstances, for payment on its hedging transactions, to Bank of America as depositary and for the purchase of additional Series 2005-1 mortgage loans.

75.     The limited internal Bank of America documents that BNPP has received reflect that Bank of America regularly breached its obligations and responsibilities under the Security Agreement by: (i) transferring funds to accounts at Colonial Bank established for purposes other than purchasing Series 2005-1 mortgage loans; and (ii) transferring funds from Ocala accounts at Bank of America to a TBW account at Bank of America.

(1)     Bank of America's Improper Fund Transfers to TBW
        Accounts at Colonial Bank

76.     A review of Bank of America's Bank Records shows that, since June 30, 2008, Bank of America improperly transferred over $2.1 billion from the Ocala collateral account (Account No. 722493.4) and subaccounts (Account Nos. 722493.15 and 722493.17) at Bank of America to accounts at Colonial Bank other than TBW's mortgage warehouse account designated in the bailee letters under which Bank of America received the mortgage loans.

77.     The over $2.1 billion of improper fund transfers to Colonial Bank include:

(a)     Over $830 million that was improperly transferred from the Ocala collateral account to a restricted TBW account titled "FHLMC P&I Custodial Account," which was used to accumulate principal and interest for loans serviced by TBW for Freddie Mac.

(b)     Approximately $675 million that was improperly transferred from the Ocala collateral account to a restricted TBW account titled "Colonial

Custodial Funds Clearing Account," which was used for the initial deposit of funds relating to mortgages serviced by TBW.

        (c)     Over $445 million that was improperly transferred from the Ocala collateral account to a TBW account titled "Colonial Master Account," which was used to fund loans made to settlement agents (*i.e.*, the title company or attorney closing the loan for TBW).

        (d)     Over $58 million that was improperly transferred from the Ocala collateral account to a TBW account titled "Colonial Operating," which was used to fund TBW's operating expenses.

        (e)     $2.5 million that was improperly transferred from the Ocala collateral account to a restricted TBW account titled "Colonial ITF Henley Holdings Account," which was used to accumulate principal and interest relating to loans serviced by TBW for Henley Holdings LLC.

78.     Bank of America's Bank Records also show that between June 30, 2008 and August 28, 2009, Bank of America wired over $1 billion from Ocala's collateral account to Colonial Bank and other banks in whole dollar amounts (*e.g.*, $5,000,000) that bear no relationship or correlation to mortgage loans purportedly purchased by Bank of America. These wire transfers include $50 million transferred to Platinum Bank, a bank owned by TBW, and transfers of several hundred million dollars to restricted servicing accounts that TBW maintained at Colonial Bank.

        (2)     Bank of America's Improper Fund Transfers to a TBW
                   <u>Account at Bank of America</u>

79.     Bank of America's Bank Records also show that beginning in early July 2008, Bank of America improperly transferred over $1.7 billion of cash from Ocala-related collateral

accounts to a TBW account at Bank of America identified on the Bank of America Bank Records as Acct. No. 722347.2 ("the 722347.2 Account").

80.    Of the $1.7 billion of cash that was improperly transferred from the Ocala-related accounts at Bank of America to the TBW account at Bank of America, over $465 million was improperly transferred from the 2005-1 Collateral subaccount.

81.    A review of the 722347.2 Account bank statement provided to BNPP by TBW indicates that this account was used to fund or purchase mortgage loans in violation of the Ocala facility documents.  Moreover, many of the mortgages that were improperly funded or purchased by TBW with Ocala funds were subsequently sold to Ocala and according to Bank of America's reports paid for by Ocala a second time.

82.    By way of example:

(a)    On April 17, 2009, Bank of America improperly transferred $501,140.97 from the 2005-1 Collateral subaccount to TBW's 722347.2 Account at Bank of America.

(b)    On that same day (April 17, 2009), TBW used the $501,140.97, that was improperly transferred by Bank of America to the 722347.2 Account, to purchase two loans:  (i) loan no. 3054299 with a face amount of $400,000 was purchased for $402,725.34; and (ii) loan no. 3162664 with a face amount of $98,000 was purchased for $98,415.63.

(c)    On that same day (April 17, 2009), TBW sent loan nos. 3054299 and 3162664 to Bank of America for purchase by Ocala.  According to Bank of America's records, Ocala purchased those loans from TBW for $399,712.50 (loan no. 3054299) and $97,505.10 (loan no. 3162664).

(d)    As a result of Bank of America's improper fund transfers, Ocala paid twice for the same mortgage loans.  In the first instance TBW used Ocala's funds from the 722347.2 Account to purchase mortgage loans.  Those loans were then resold to Ocala, at which time Ocala paid for the loans a second time.

83.    Bank of America's improper withdrawals and transfers from the Ocala accounts breached its contractual obligations and directly and proximately caused BNPP's losses by, among other things, causing the 2005-1 Notes to be under-collateralized.

**B.**    **Bank of America's Improper Purchase of Mortgage Loans**

84.    Pursuant to the Security Agreement, Bank of America was only authorized to purchase additional mortgage loans on behalf of Ocala after it tested the borrowing base and determined that BNPP's 2005-1 Notes were properly collateralized.

85.    Section 5.03 of the Security Agreement provides that "no withdrawals from the Collateral Account shall be made on any day" (emphasis added) for the purposes of purchasing additional mortgage loans unless the borrowing base test has been satisfied such that the 2005-1 Notes were secured by cash and mortgages worth at least $500 million.  Thus, Bank of America was contractually required to ensure that no money ever left the collateral accounts unless and until it confirmed that the collateral supporting BNPP's Secured Notes totaled at least $500 million.

86.    Bank of America regularly breached this requirement by transferring funds to Colonial Bank and other banks when the borrowing base test was not satisfied and when BNPP's 2005-1 Notes were not secured by sufficient collateral to meet the requirements of Section 5.03 of the Security Agreement.

87.     Bank of America's Bank Records and Forms 996 show that, at least since March 2009, the 2005-1 Notes were under-collateralized by hundreds of millions of dollars and that Bank of America misrepresented to BNPP that the borrowing base test was satisfied.

88.     Bank of America's improper purchase of mortgage loans breached its contractual obligations and directly and proximately caused BNPP's losses by, among other things, causing the 2005-1 Notes to be under-collateralized.

**C.      Bank of America's Co-Mingling of Collateral**

89.     The Depositary and Security Agreement require Bank of America to establish and maintain segregated accounts for the 2005-1 Notes.  Specifically, Section 2 of the Depositary Agreement requires Bank of America to "establish for the benefit of the Short Term Note holders a segregated, non-interest-bearing trust account, No. 710400.3 designated as the 'Series 2005-1 Short Term Note Account.'"  The Security Agreement also required Bank of America to establish and maintain a "special purpose trust account in the name of and under the control of, the Collateral Agent on behalf of the Secured Parties."  The account is specifically referenced in the Security Agreement as Account No. 722493.4.  Bank of America was also required to establish separate sub-accounts for funds securing the 2005-1 Collateral and funds securing the 2008-1 Collateral.  *See* Security Agreement at § 5.01.

90.     Bank of America was required to deposit into the 2005-1 Collateral sub-account, among other funds, "the net proceeds from the sale of the Series 2005-1 Short Term Notes" and "all monies received by or on behalf of [Ocala] as proceeds from the sale or securitization of Series 2005-1 Mortgage Loans."  Security Agreement at § 5.01.

91.    Bank of America's Bank Records show that it failed to segregate the 2005-1 Collateral into the 2005-1 subaccount and that Bank of America regularly commingled the 2005-1 Collateral with other monies.

92.    Moreover, Bank of America's Bank Records show that Bank of America failed to deposit the proceeds of its sale of the 2005-1 Notes, *i.e.,* the $480.7 million face amount purchased by BNPP, into either the 2005-1 Collateral sub-account or the Series 2005-1 Short Term Note Account as required by the Depositary and Security Agreements.

93.    Bank of America's improper commingling of funds breached its contractual obligations and directly and proximately caused BNPP's losses by, among other things, causing the 2005-1 Notes to be under-collateralized.

**D.    Bank of America's Failure to Secure the Mortgage Loans**

(1)    Bank of America's Duty to Secure The Mortgage Loans

94.    As collateral agent and custodian, Bank of America was charged with protecting the mortgage loans and cash securing BNPP's Secured Notes.  Central to this responsibility is the duty to know what mortgage loans are owned by Ocala, when those mortgages were purchased by Ocala and when the mortgages were sold and no longer owned by Ocala.

95.    The Ocala facility has detailed requirements for how mortgages were to be transferred and purchased by Bank of America, how those mortgages are sold and how monies received from the sale of the mortgages were to be maintained.  The facility documents also require Bank of America to comply with various reporting requirements to confirm the identity, value, ownership and location of the mortgage loans.

96.    For example, the Custodial Agreement requires that all loans purchased by Bank of America be accompanied by a Transfer Supplement containing detailed information about the

particular mortgage loans. Bank of America was also required to provide (upon request) a List of Loans reflecting "a list of all Mortgage Loans with respect to which the Custodian holds Mortgage Notes, Mortgages and Assignments of Mortgages" and denoting "any Mortgage Loans paid off, repurchased, sold or otherwise released by the Custodian" since June 30, 2008. Custodial Agreement § 9.

97.    Moreover, the Custodial Agreement requires any mortgage loans released to Freddie Mac or other purchasers to be accompanied by a bailee letter in the form of Exhibit E to the Custodial Agreement. The bailee letter used by Bank of America provided that within 15 days of Colonial Bank's receipt of a loan and its corresponding loan documents, Colonial Bank was obligated to either: (i) remit to Bank of America the proceeds of the loans purchased by Freddie Mac; or (ii) return to Bank of America all loans that Freddie Mac declined or refused to purchase.

98.    Thus, Bank of America was obligated to keep track of which mortgage loans it owned, which mortgage loans were purchased by Freddie Mac, when those mortgage loans were purchased by Freddie Mac (*i.e.*, when did Bank of America receive the proceeds of the loans from Freddie Mac) and whether any loans remained at Colonial Bank for more than 15 days without being purchased by Freddie Mac.

99.    Bank of America breached its duty to secure the mortgage loans by failing to correctly record which loans it owned on behalf of Ocala and when mortgages were sold to Freddie Mac and no longer owned by Ocala. This breach is underscored by Bank of America's regular issuance of reports falsely misrepresenting the loans owned by Ocala on behalf of BNPP.

(2)     Bank of America Misrepresented The Collateral It Held For BNPP

100.     Bank of America generated regular reports about the mortgage loans and cash it purportedly held on behalf of BNPP.  These reports were intended to assure BNPP that Bank of America held sufficient collateral to repay the 2005-1 Notes.

101.     One of the reports that Bank of America regularly provided to BNPP was titled "Shipped Report and Tracking" and contained a list of mortgage loans owned by Bank of America that were shipped to Freddie Mac's agent (Colonial Bank) for review pending their purchase by Freddie Mac (the "Shipped Report").  On any given day, the Shipped Report contained more than 2,000 loans with a face amount in excess of $400 million and represented the vast majority of the collateral purportedly securing BNPP's Secured Notes.

102.     Since December 2008, Bank of America created and sent the Shipped Report directly to BNPP on a daily basis.  These reports were sent directly from Bank of America to BNPP via email and were copied to Matthew Smith, Assistant Vice President at Bank of America.

103.     Many of the Shipped Reports that Bank of America sent to BNPP misrepresented the collateral securing BNPP's Secured Notes by including mortgage loans that were no longer owned by Ocala.  For example, the August 4, 2009 Shipped Report provided by Bank of America to BNPP listed 2,043 loans with a face amount of $417.7 million that Bank of America purportedly owned.  However Bank of America's internal documents (executed by Matthew Smith) establish that 90% of those loans (1,837 mortgages with a face amount of $374.9 million) were previously purchased by Freddie Mac and were no longer owned by Bank of America.

104.     A review of Bank of America's Shipped Reports going back to December 2008 indicates that each of the approximately 160 Shipped Reports provided to BNPP falsely

misrepresented the loans owned by Bank of America thereby overstating the collateral securing BNPP's Secured Notes.

105.   Bank of America's misrepresentations in the Shipped Reports and other documents breached its contractual obligations and directly and proximately caused BNPP's losses by, among other things, causing the 2005-1 Notes to be under-collateralized.

## VIII.   Bank of America Falsely Certifies the Borrowing Base

106.   Under the terms of the Depositary Agreement, before issuing or delivering any 2005-1 Notes, Bank of America was required to review and certify Ocala's borrowing base by certifying various items on the Borrowing Base Certificate.

107.   The Borrowing Base Certificate certified that "the assets of Ocala Funding LLC exceed its liabilities and that Ocala Funding LLC is in compliance with the terms specified in the Depositary Agreement." Bank of America was specifically required to certify items (1) and (2) on the Borrowing Base Certificate, which were the amounts of outstanding Secured Notes and Ocala-owned collateral that secured the outstanding Secured Notes.

108.   To certify the Borrowing Base Certificate, Bank of America by necessity had to certify the amount of funds on deposit in the collateral account and other accounts it maintained and the outstanding purchase price of the mortgage loans held by Bank of America on behalf of BNPP.

109.   Bank of America had possession of the information required to accurately certify the borrowing base. Cash was deposited in an account at Bank of America and the mortgage notes were either held in Bank of America's vaults or listed on the schedule accompanying Bank of America's bailee letters to Colonial Bank. Bank of America knew or should have known which loans it owned and which loans were sold to Freddie Mac because Freddie Mac required

Bank of America to sign a document (Form 996E) relinquishing Bank of America's rights to mortgage loans upon payment by Freddie Mac, and Bank of America received payment from Freddie Mac for the loans it purchased.

110.   Notwithstanding that Bank of America had possession of all the information necessary for it to determine the accuracy of the information contained in the Borrowing Base Certificate, Bank of America's certifications of the Borrowing Base Certificates were false.

111.   By way of example, Bank of America's final certification was on July 20, 2009. In that certification (signed by Matthew Smith) Bank of America certified that as of July 20, 2009, it held mortgage loans worth over $473 million and $28 million of cash on behalf of BNPP.  In reality, as of July 20, 2009, Bank of America's own internal documents, also executed by Matthew Smith, show that over $374.9 million of mortgage loans purportedly owned by Ocala had already been sold to Freddie Mac and, accordingly, Bank of America was holding mortgage loans with a value of less than $100 million on behalf of BNPP.  Moreover, Bank of America's Bank Records show that as of July 20, 2009, Bank of America was holding only $1.7 million in the segregated 2005-1 Collateral account.

112.   A review of Bank of America's Bank Records and Forms 996 signed by Matthew Smith reflects that Bank of America's Borrowing Base Certifications for June 22, 2009; May 20, 2009; April 20, 2009; and March 20, 2009 were similarly false.

113.   As expressly recognized by Bank of America in the March Letter Agreement, Bank of America's certification of the borrowing base was an "inducement to BNP Paribas [] to enter into, and/or, to continue its participation" in the Ocala transactions.  Had BNPP known that Bank of America's certification of the borrowing base was false or that its 2005-1 Notes were not secured by the 2005-1 Collateral, it would neither have purchased the 2005-1 Notes nor,

thereafter, would it have continued its participation in the Ocala facility.  By executing a false certification of the Borrowing Base Certificate, Bank of America breached its contractual obligations and proximately caused BNPP's injuries.

### FIRST CAUSE OF ACTION
**(Breach of Contract:  Depositary Agreement and March Letter Agreement)**

114.    BNPP repeats and realleges paragraphs 1 through 113, above, as if set forth here in full.

115.    Before issuing or delivering the Secured Notes, Bank of America was obligated to review and certify that the assets of Ocala exceed its liabilities and that Ocala was in compliance with the terms specified in the Depositary Agreement.

116.    Under the express terms of the Depositary Agreement, Bank of America is liable for negligence, fraud, bad faith or willful misconduct in the performance of its duties.

117.    Bank of America is also contractually responsible for negligence, fraud, bad faith or willful misconduct in the performance of its duties under the terms of the March Letter Agreement with BNPP.

118.    Bank of America expressly recognized the importance that BNPP placed on the proper function of the Depositary.

119.    Bank of America falsely certified the Borrowing Base Certificate and falsely inflated Ocala's collateralization.  Had Bank of America not been negligent in failing to check its own internal records before certifying the Borrowing Base Certificate, Bank of America would have realized that the Ocala facility contained insufficient mortgage loans and cash as collateral and would not have issued new Secured Notes.

120.    By executing a false certification of the Borrowing Base Certificate, Bank of America breached its contractual obligations to BNPP.

31

121.    Under the terms of the Depositary Agreement, Bank of America was required to establish and maintain a segregated Series 2005-1 Short Term Note Account for the proceeds of the Series 2005-1 Notes.  As evidenced by Bank of America's Bank Records, Bank of America failed to maintain the funds paid by BNPP for the 2005-1 Notes in a segregated account.

122.    Had Bank of America adequately performed its contractual obligations under the Ocala transaction, BNPP's Secured Notes would be fully secured by $500 million of cash and mortgage loans.  As a direct and proximate cause of Bank of America's breach of its contractual duties and its failure to protect and secure BNPP's collateral, BNPP's Secured Notes are significantly under-collateralized and Bank of America has failed to make payment to BNPP for its Secured Notes.  Moreover, as a direct and proximate result of Bank of America's breach of its contractual duties, BNPP purchased new issues of Secured Notes every month (or less), most recently on July 20, 2009.  Had BNPP known that the new issue of Secured Notes was under-collateralized, it would not have purchased the new Secured Notes and would not have been injured.

## SECOND CAUSE OF ACTION
### (Breach of Contract:  Security Agreement)

123.    BNPP repeats and realleges paragraphs 1 through 113, above, as if set forth here in full.

124.    By the terms of the Security Agreement, Bank of America was required to establish and maintain a collateral account on behalf of the secured parties, including BNPP. Bank of America was also required to establish a sub-account that held collateral securing BNPP's Secured Notes.

125.    By the terms of the Security Agreement, Bank of America was only permitted to withdraw or transfer funds from the collateral account for certain specified purposes and was not

permitted to withdraw funds for the purchase of additional mortgage loans unless the borrowing base test was satisfied, such that the Secured Notes were secured by cash and mortgages worth at least $500 million.

126.    Under the express terms of the Security Agreement, Bank of America is liable for negligence, fraud, bad faith or willful misconduct in the performance of its duties.

127.    Under the express terms of the Security Agreement, BNPP is a third-party beneficiary of the Security Agreement.

128.    Bank of America breached the Security Agreement by:  (i) improperly transferring funds from Ocala's account at Bank of America to unauthorized accounts at Colonial Bank and Bank of America; (ii) purchasing mortgage loans without authorization; (iii) commingling funds; and (iv) failing to adequately secure the mortgage loans it owned on behalf of BNPP.

129.    Had Bank of America adequately performed its contractual obligations under the Ocala transaction, BNPP's Secured Notes would be fully secured by $500 million of cash and mortgage loans.  As a direct and proximate cause of Bank of America's breach of its contractual duties and its failure to protect and secure BNPP's collateral, BNPP's Secured Notes are significantly under-collateralized and Bank of America has failed to make payment to BNPP for its Secured Notes.

### THIRD CAUSE OF ACTION
### (Indemnification)

130.    BNPP repeats and realleges paragraphs 1 through 113, above, as if set forth here in full.

131.    Under the express terms of the Security Agreement (§8.05) and Custodial Agreement (§ 17), Bank of America agreed to indemnify BNPP against losses that BNPP may

sustain to the extent attributable to Bank of America's "negligence, fraud, bad faith or willful misconduct" in the performance of its duties.

132.    In the March Letter Agreement, Bank of America "agree[d] to indemnify and hold harmless BNPP, its officers, directors, controlling persons and affiliates (collectively, the 'Indemnified Persons') against any and all claims, losses, penalties, fines, forfeitures, reasonable legal fees and related costs and judgments, and any other costs, fees and expenses that any Indemnified Person may sustain to the extent attributable to the Depositary's negligence, fraud, bad faith or willful misconduct in the performance of its duties under the Depositary Agreement (including, without limitation, its duties under Section 4(d) thereof.)"

133.    Bank of America is therefore obligated to indemnify BNPP from and against any and all loss it suffered attributable to Bank of America's negligence in performing its obligations under the Depositary Agreement, Security Agreement and Custodial Agreement.

134.    Bank of America has failed and refused to compensate BNPP for the losses it suffered due to Bank of America's negligence in the performance of its obligations under the Depositary Agreement, Security Agreement and Custodial Agreement.

135.    By reason of the foregoing, BNPP has been damaged by Bank of America in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, BNPP demands judgment in its favor against Bank of America as follows:

A.    An award of damages and other compensatory or other damages available by law in an amount to be determined at trial, with interest, at the maximum amount permitted by law;

B.    An award of attorneys fees, costs and other expenses as permitted by law; and

C.      Such other and further relief as the Court may deem just and proper.

November 24, 2009
Armonk, New York

BOIES, SCHILLER & FLEXNER LLP

Robin A. Henry (RH 6781)
Motty Shulman (MS 0351)
Jack Wilson (JW 0506)
333 Main Street
Armonk, New York 10504
Telephone:  914.749.8200
Facsimile:  914.749.8300
rhenry@bsfllp.com
mshulman@bsfllp.com
jwilson@bsfllp.com
*Attorneys for Plaintiff BNP Paribas Mortgage
Corporation*