**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

BNP PARIBAS MORTGAGE
CORPORATION and BNP PARIBAS,
                                    Plaintiffs,

                                                                    Civil Action No. 09-CV-9783-RWS

            -against-

BANK OF AMERICA, N.A.,


                                    Defendant.

-------------------------------------------------------------------x
-------------------------------------------------------------------x

DEUTSCHE BANK AG,



                                    Plaintiff,

                                                                    Civil Action No. 09-CV-9784-RWS

            -against-

BANK OF AMERICA, N.A.,


                                    Defendant.

-------------------------------------------------------------------x

<u>**MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**BANK OF AMERICA'S MOTIONS TO DISMISS AMENDED COMPLAINTS**</u>

MUNGER, TOLLES & OLSON LLP
Marc T.G. Dworsky
Kristin Linsley Myles
Gregory Weingart
Richard St. John
355 South Grand Avenue, Thirty-Fifth Floor
Los Angeles, California 90071-1560
(213) 683-9100

KING & SPALDING LLP
Richard T. Marooney
1185 Avenue of the Americas
New York, New York 10036
(212) 556-2100

*Attorneys for Defendant Bank of America, N.A.*

10576546.3

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     SUMMARY OF CLAIMS AND OF ARGUMENTS SUPPORTING
        DISMISSAL ...................................................................................................... 5

III.    FACTUAL BACKGROUND ............................................................................. 9

        A.      TBW's Mortgage Operations ................................................................. 9

        B.      Ocala's Operation and the Relevant Facility Documents ..................... 9

                1.      Ocala's Short-Term Note Financing and Repayment of Notes ............... 9

                2.      The Ocala Facility ..................................................................... 11

                3.      The Purchase Agreement—Ocala's Purchase of Mortgages from
                        TBW ......................................................................................... 11

                4.      The Role of Colonial Bank ....................................................... 12

        C.      Plaintiffs' Multiple, Central Roles in TBW's Mortgage Finance
                Operations ............................................................................................ 12

                1.      Plaintiffs' Role As Swap Counterparties ................................. 12

                2.      Plaintiffs' Other Roles ............................................................. 15

        D.      BoA's Purely Ministerial Role As Indenture Trustee, Collateral Agent,
                Depositary, and Custodian……. ......................................................... 15

                1.      Indenture Trustee—Base Indenture ......................................... 15

                2.      Collateral Agent—Security Agreement ................................... 18

                3.      Depositary—Depositary Agreement ........................................ 19

                4.      Custodian—Custodial Agreement ........................................... 20

        E.      TBW's Pervasive Control Over Ocala's Operations ........................... 20

        F.      TBW As the Source for the Key Information About Ocala ................. 22

        G.      Exposure of TBW's Fraud and Its Resulting Failure ......................... 22

IV.     ARGUMENT ................................................................................................... 23

        A.      Applicable Legal Standards Governing This Motion to Dismiss Contract
                Claims .................................................................................................. 23

        B.      Plaintiffs' Breach of Contract Claims Under the Base Indenture and Their
                Claims for Breach of Fiduciary Duty Fail As a Matter of Law .......... 24

# TABLE OF CONTENTS
## (continued)

Page

1. Plaintiffs' Claims Under the Indenture Fail Because the Indenture Expressly Precludes Liability Absent Written Notice of an Event of Default ............................................................................................... 25

2. As a Matter of Law, the Borrowing Base Certificates Did Not Constitute "Written Notice." ........................................................................ 30

3. Plaintiffs' Claims for Breach of Fiduciary Duty Also Are Precluded by the Terms of the Indenture ................................................. 34

C. Plaintiffs' Claims Under the Security Agreement Are Precluded by the Express Contract Terms ........................................................................................ 36

   1. The Security Agreement Refutes the Claim That BoA Was Required to Monitor the Use of Funds by Ocala or Ocala's Compliance with Its Obligations ............................................................. 37

      a. The Purported Duty to Monitor the Purpose of Withdrawals ...... 38

      b. The Purported Duty to "Match" Withdrawals and Transfers with the Purchase of Mortgages or to Initiate Funding Requests ...................................................................................... 42

      c. The Purported Duty to Transfer Funds Only to a Particular Account ........................................................................................ 43

   2. The Security Agreement Did Not Require BoA to Evaluate Ocala's Assets and Liabilities Before Complying with Withdrawal Instructions from Ocala ............................................................................. 44

   3. The Security Agreement Did Not Require BoA to Ensure Segregation of Loans and Cash Collateral ................................................ 47

   4. The Security Agreement Does Not Require BoA to Perfect Security Interests in Mortgage Loans ....................................................... 49

   5. Plaintiffs Fail to Allege How Acceptance of Instructions from Non "Issuer Agents" Was a Material Breach or Caused Any Injury ............... 51

   6. Plaintiffs' Claims That BoA Failed to Conduct Itself As Though an Event of Default Had Occurred Prior to August 5, 2009 Fail Under the Express Terms of the Agreements ....................................................... 53

   7. Plaintiffs' Attempt to Create a Separate Contractual Claim for Negligence Is Contrary to Law ................................................................ 54

D. The Claims for Breach of the Depositary Agreement, Custodial Agreement, and March 2009 Letter Must Be Dismissed for Lack of Standing ...................................................................................................... 57

# TABLE OF CONTENTS
## (continued)

Page

1.    Plaintiffs Lack Standing to Sue for Breach of the Depositary Agreement ................................................................ 57

    a.    Plaintiffs' Various Theories of Standing Are Meritless ............. 57

    b.    BNP Cannot Establish Standing Through the March 2009 Letter ................................................................ 62

2.    Plaintiffs Lack Standing to Sue for Breach of the Custodial Agreement ................................................................ 63

E.    Plaintiffs' Indemnification Claims Fail to State a Claim ..................................... 66

1.    Indemnification Clauses Are "Strictly Construed" to Cover Only Parties Expressly Identified, and to Extend Only to Third-Party Claims ................................................................ 67

2.    Plaintiffs' Indemnification Claim Under the Custodial Agreement Fails As a Matter of Law ................................................................ 69

3.    DB's Depositary Agreement Indemnification Claim and BNP's Claim Under the March 2009 Letter Must Be Dismissed ...................... 71

    a.    DB's Depositary Agreement Claim Fails As a Matter of Law ................................................................ 72

    b.    BNP's Indemnification Claim Under the March 2009 Letter Also Must Be Dismissed ................................................................ 73

4.    The Indemnification Clause in the Security Agreement Does Not Cover Claims Between the Indemnitor and the Indemnitee ................... 75

F.    In Any Event, DB and BNP Cannot Pursue Any Claims for Events or Injuries Occurring Prior to July 20, 2009, When They Purchased the Notes at Issue ................................................................ 75

G.    DB's Claims Under Superseded and Restated Versions of the Applicable Contracts Fail As a Matter of Law ................................................................ 77

H.    The Newly-Added Plaintiff, BNP Paribas, Is Not a Proper Party to This Action Because It Has Alleged No Injury to Itself and Therefore Lacks Standing ................................................................ 80

V.    CONCLUSION ................................................................ 83

# TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Aon Fin'l Prods., Inc. v. Societe Generale,*
   476 F.3d 90 (2d Cir. 2007)..................................................................23, 24

*Argonaut P'ship v. Bankers Trustee Co. Ltd.,*
   No. 96 Civ. 1970, 2001 WL 585519 (S.D.N.Y. May 30, 2001)...........................29, 30, 31, 35

*Ashcroft v. Iqbal,*
   --- U.S. ----, 129 S. Ct. 1937 (2009) ...............................................51

*Banco Espanol de Credito v. Security Pacific Nat'l Bank,*
   763 F. Supp. 36 (S.D.N.Y. 1991), *aff'd*, 973 F.2d 51 (2d Cir. 1992)................41, 43

*Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.,*
   No. 03 Civ. 1537, 2003 WL 23018888 (S.D.N.Y. Dec. 22, 2003)....................55, 59

*Bank of Lexington v. Jack Adams Aircraft Sales, Inc.,*
   570 F.2d 1220 (5th Cir. 1978)....................................................76

*Banque Nationale de Paris v. Batmanghelidj,*
   108 F.3d 1369 (2d Cir. 1997)....................................................80

*Bayerische Hypo-Und Vereinsbank AG v. Banca Nazionale Del Lavoro, S.p.A. (In re Enron Corp.),* 292 B.R. 752 (Bankr. S.D.N.Y. 2003) ............................41

*Bourne Co. v. MPL Commc'ns, Inc.,*
   751 F. Supp. 55 (S.D.N.Y. 1990)..............................................68, 71, 72

*Bridgestone/Firestone, Inc., v. Recovery Credit Servs., Inc.,*
   98 F.3d 13 (2d Cir. 1996) .................................................... *passim*

*C3 Media & Mktg. Group, LLC, v. Firstgate Int'l, Inc.,*
   419 F. Supp. 2d 419 (S.D.N.Y. 2005)..........................................78, 79

*Coalition of 9/11 Families, Inc. v. Rampe,*
   No. 04 Civ. 6941, 2005 WL 323747 (S.D.N.Y. Feb. 8, 2005) ......................61

*Commerce Fed. Sav. Bank v. FDIC,*
   872 F.2d 1240 (6th Cir. 1989) ..................................................77

*Compania De Vapores Arauco Panamena S.A. v. Moore-McCormack Lines,*
   91 F. Supp. 545 (E.D.N.Y. 1950) ..............................................66, 70

*Consol. Edison, Inc. v. Northeast Utils.,*
   426 F.3d 524 (2d Cir. 2005)....................................................60

*Control Data Sys., Inc. v. Computer Power Group, Ltd.,*
   No. 94 Civ. 5396, 1998 WL 178775 (S.D.N.Y. Apr. 15, 1998)....................59, 63, 73, 74

*Cortec Indus., Inc. v. Sum Holding L.P.,*
   949 F.2d 42 (2d Cir. 1991)......................................................9

*County of Suffolk v. Long Island Lighting Co.,*
   728 F.2d 52 (2d Cir. 1984)......................................................56, 57

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Deutsche Bank AG v. JPMorgan Chase Bank*,
  No. 04 Civ. 7192, 2007 WL 2823129 (Sept. 27, 2007)...................................................62, 63

*Deutsche Bank Sec., Inc. v. Rhodes*,
  578 F. Supp. 2d 652 (S.D.N.Y. 2008)..........................................................................56

*Diesel Sys., Ltd. V. Yip Shing Diesel Eng'g Co., Ltd.*,
  861 F. Supp. 179 (E.D.N.Y. 1994) .............................................................................80

*Dolphin Direct Equity Partners, LP v. Interactive Motorsports & Entm't Corp.*,
  No. 08 Civ. 1558, 2009 WL 577916 (Mar. 2, 2009) ....................................................71

*Dupler v. Costco Wholesale Corp.*,
  249 F.R.D. 29 (E.D.N.Y. 2008)...................................................................................63

*E*Trade Fin'l Corp. v. Deutsche Bank*,
  631 F. Supp. 2d 313 (S.D.N.Y. 2009)..........................................................................71

*Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*,
  838 F.2d 66 (2d Cir. 1988)..........................................................................................35

*Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*,
  111 F.3d 284 (2d Cir. 1997)........................................................................................78

*GEM Advisors, Inc. v. Corporación Sidenor, S.A.*,
  No. 06 Civ 5693, 2009 WL 3459187 (S.D.N.Y. Oct. 27, 2009) .........................68, 71, 72, 74

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
  17 F. Supp. 2d 275 (S.D.N.Y. 1998)............................................................................52

*Grant v. Nat'l Eng'g Search*,
  No. 01-CV-6610, 2002 WL 31012152 (W.D.N.Y. Aug. 19, 2002) ......................................79

*Green v. Foley*,
  856 F.2d 660 (4th Cir. 1988) ) .....................................................................................75

*Harris v. Mills*,
  572 F.3d 66 (2d Cir. 2009)..........................................................................................51

*Haynes v. Kleinewefers and Lembo Corp.*,
  921 F.2d 453 (2d Cir. 1990)........................................................................................67

*Health-Chem Corp. v. Baker*,
  915 F.2d 805 (2d Cir. 1990)....................................................................................78, 80

*Hudson Optical Corp. v. Cabot Safety Corp.*,
  162 F.3d 1148 (2d Cir. 1998)...................................................................................81, 82

*In re Gildan Activewear, Inc. Sec. Litig.*,
  636 F. Supp. 2d 261 (S.D.N.Y. 2009)............................................................................9

*In re Musicland Holding Corp.*,
  386 B.R. 428 (S.D.N.Y. 2008)....................................................................................24

*In re Spaniak*
  221 B.R. 732 (Bankr. W.D. Mich. 1998)......................................................................76

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*India.Com, Inc. v. Dalal*,
  412 F.3d 315 (2d Cir. 2005)................................................................................58, 59, 60

*John Street Leasehold LLC v. F.D.I.C.*,
  196 F.3d 379 (2d Cir. 1999)...........................................................................................63, 73

*Kirby v. Coastal Sales Ass'n, Inc.*,
  82 F. Supp. 2d 193 (S.D.N.Y. 2000).............................................................................66

*Labajo v. Best Buy Stores, L.P.*,
  478 F. Supp. 2d 523 (S.D.N.Y. 2007)...........................................................................56

*Landmark Land Co., Inc. v. Sprague*,
  529 F. Supp. 971 (S.D.N.Y. 1981), *aff'd*, 701 F.2d 1065 (2d Cir. 1983)...............76

*Madeira v. Affordable Hous. Found., Inc.*,
  323 Fed. Appx. 89 (2d Cir. 2009)...................................................................................69

*Manley v. AmBase Corp.*,
  337 F.3d 237 (2d Cir. 2003)...........................................................................................66, 81

*Meckel v. Cont'l Res. Co.*,
  758 F.2d 811 (2d Cir. 1985)...........................................................................................35

*Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*,
  418 F.3d 168 (2d Cir. 2005)...........................................................................................71

*Mid-Island Hosp., Inc. v. Empire Blue Cross Blue Shield)*,
  276 F.3d 123 (2d Cir. 2002)...........................................................................................83

*Morse/Diesel, Inc. v. Trinity Indus., Inc.*,
  859 F.2d 242 (2d Cir. 1988)...........................................................................................58

*Nathan v. Cooper*,
  No. 06 Civ. 5973, 2007 WL 4352705 (S.D.N.Y. Dec. 12, 2007).............................71

*Nationwide Auction Co. v. Lynn*,
  No. 90 Civ. 7643, 1996 WL 148489 (S.D.N.Y. Apr. 1, 1996)..................................61

*Pfizer, Inc., v. Stryker Corp.*,
  348 F. Supp. 2d 131 (S.D.N.Y. 2004)...........................................................................71

*Piccoli A/S v. Calvin Klein Jeanswear Co.*,
  19 F. Supp. 2d 157 (S.D.N.Y. 1998).............................................................................59

*Promuto v. Waste Mgmt., Inc.*,
  44 F. Supp. 2d 628 (S.D.N.Y. 1999).............................................................................71

*RLI Ins. Co. v. King Sha Group*,
  598 F. Supp. 2d 438 (S.D.N.Y. 2009)...........................................................................56

*RSM Prod. Corp. v. Fridman*,
  643 F. Supp. 2d 382 (S.D.N.Y. 2009)...........................................................................52

*Re-Alco Indus., Inc. v. Nat'l Ctr.  for Health Educ., Inc.*,
  812 F. Supp. 387 (S.D.N.Y. 1993) ...............................................................................83

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Sazerac Co., Inc. v. Falk,*
    861 F. Supp. 253 (S.D.N.Y. 1994) ................................................................. 58

*Semi-Tech Litig., LLC, v. Bankers Trust Co.,*
    353 F. Supp. 2d 460 (S.D.N.Y. 2005) ............................................................ 53

*Sequa Corp. v. Gelmin,*
    851 F. Supp. 106 (S.D.N.Y. 1994) ........................................................ *passim*

*Sudul v. Computer Outsourcing Services, Inc.,*
    917 F. Supp. 1033 (S.D.N.Y. 1996) ........................................................ 78, 79

*Tecnoclima, S.p.A., v. PJC Group of N.Y., Inc.,*
    No. 89 Civ. 4337, 1995 WL 390255 (S.D.N.Y. June 30, 1995) ..................... 71

*UBS Capital Americas II, Inc. v. Highpoint Telecomm. Inc.,*
    No. 01 CIV. 8113, 2002 WL 377537 (S.D.N.Y. Mar. 8, 2002) ...................... 31

*United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.,*
    988 F. Supp. 367 (S.D.N.Y. 1997) ................................................................. 58

*United States v. McKeon,*
    738 F.2d 26 (2d Cir. 1984) ............................................................................. 13

*Wolff v. Rare Medium, Inc.,*
    210 F. Supp. 2d 490 (S.D.N.Y. 2002) ................................................. 24, 37, 50

### State Cases

*805 Third Ave. Co. v. M.W. Realty Assocs.,*
    58 N.Y.2d 447, 461 N.Y.S.2d 778 (1983) ...................................................... 23

*Alexander & Alexander of N.Y. v. Fritzen,*
    495 N.Y.S.2d 386 (1985), *aff'd* 68 N.Y.2d 968 (1986) ................................ 81

*Bank of New York v. River Terrace Assocs., LLC,*
    23 A.D.3d 308, 804 N.Y.S.2d 728 (2005) ....................................... 66, 68, 70, 72

*Binghamton Masonic Temple Inc. v. City of Binghamton,*
    213 A.D.2d 742, 623 N.Y.S.2d 357 (1995) .................................................... 60

*Board of Educ. of Hudson City School Dist. v. Sargent, Webster, Crenshaw & Folley,*
    71 N.Y.2d 21, 523 N.Y.S.2d 475 (1987) .................................................. 66, 83

*Caplan v. Unimax,*
    188 A.D.2d 325, 591 N.Y.S.2d 28 (1992) .................................................. 76, 77

*Chimart Assocs. v. Paul,*
    66 N.Y.2d 570, 498 N.Y.S.2d 344 (1986) ...................................................... 60

*Citigifts, Inc. v. Pechnik,*
    492 N.Y.S.2d 752 (1985), *aff'd mem.*, 67 N.Y.2d 774 (1986) ..................... 78

-vii-

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Clark-Fitzpatrick, Inc. v. L.I.R.R. Co.*,
  70 N.Y.2d 382, 521 N.Y.S.2d 653 (1987) ............................................................56

*Cohen v. Employers Reins. Corp.*,
  117 A.D.2d 435, 503 N.Y.S.2d 33 (1986) ............................................................70

*Daly v. Kochanowicz*,
  67 A.D.3d 78, 884 N.Y.S.2d 144 (2009) ..............................................................83

*Denburg v. Park Chapin Flattau & Klimpl*,
  82 N.Y.2d 375, 604 N.Y.S.2d 900 (1993) ............................................................78

*Digital Broad. Corp. v. Ladenburg, Thalmann & Co.*,
  63 A.D.3d 647, 883 N.Y.S.2d 186 (2009) ............................................................55

*Fetner v. Fetner*,
  293 A.D.2d 645, 741 N.Y.S.2d 256 (2002) ..........................................................24

*Gordon v. Dino De Laurentiis Corp.*,
  141 A.D.2d 435, 529 N.Y.S.2d 777 (1988) ....................................................51, 52

*Great Western Bank v. Kong*,
  90 Cal. App. 4th 28 (Cal. App. 2001) ..................................................................76

*Hamilton v. Hertz Corp.*,
  130 Misc. 2d 1034, 498 N.Y.S.2d 706 (1986) ......................................................56

*Hooper Assocs., Ltd. v. AGS Computer, Inc.*,
  74 N.Y.2d 487, 549 N.Y.S.2d 365 (1989) ..................................................*passim*

*Joseph v. Creek & Pines, Ltd.*,
  217 A.D.2d 534, 629 N.Y.S.2d 75 (1995) ............................................................46

*JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*,
  69 A.D.3d 802, 893 N.Y.S.2d 237 (2010) ............................................................82

*In re Paradis' Estate*,
  186 A. 672 (Me. 1936).........................................................................................76

*Litwak v. Wolkenberg*,
  130 A.D.2d 630, 515 N.Y.S.2d 559 (1987) ..........................................................76

*Magten Asset Mgmt. Corp. v. Bank of N.Y.*,15 Misc. 3d 1132(A), 841 N.Y.S.2d 219, 2007
  WL 1326795 (May 8, 2007) ..........................................................31, 32, 34, 35

*Marraccini v. Bertelsmann Music Group Inc.*,
  221 A.D.2d 95, 644 N.Y.S.2d 875 (1996) ............................................................56

*Mas v. Two Bridges Assocs.*,
  75 N.Y.2d 680, 555 N.Y.S.2d 669 (1990) ............................................................68

*Nepco Forged Prods., Inc. v. Consol. Edison Co. of N.Y., Inc.*,
  99 A.D.2d 508, 470 N.Y.S.2d 680 (1984) ......................................................60, 61

*Nichols v. Nichols*,
  306 N.Y. 490 (1954)............................................................................................24

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Pile Found. Constr. Co., Inc. v. Berger, Lehman Assocs., P.C.*,
253 A.D.2d 484, 676 N.Y.S.2d 664 (1998) ................................................................57

*Putnam High Yield Trust v. Bank of New York*,
7 A.D..3d 439, 776 N.Y.S.2d 796 (2004) ...............................................................29

*Rhode Island Hosp. Trust Co. v. Claude Neon, Inc.*,
109 N.Y.S.2d 834 (1951), aff'd 112 N.Y.S.2d 800 (1952) ....................................81

*Slamow v. Delcol*,
174 A.D.2d 725, 571 N.Y.S.2d 335 (1991), *aff'd* 79 N.Y.2d 1016 (1991) ......................24, 56

*Syvertsen v. Great American Ins. Co.*,
267 A.D.2d 854, 700 N.Y.S.2d 289 (1999) .............................................................70

*TIC Holdings, LLC v. HR Software Acquisitions Group, Inc.*,
301 A.D.2d 414, 755 N.Y.S.2d 19 (2003) ........................................................68, 70

*Trump Village Section 3, Inc. v. New York State Housing Fin. Agency*,
292 A.D.2d 156, 739 N.Y.S.2d 37 (2002) ...............................................................55

*Ultimate Connection v. Friedfertig*,
12 Misc. 3d 1175(A), 824 N.Y.S.2d 767, 2006 WL 1887459 (2006) ....................29

*Weiner v. Hershman & Leicher, P.C.*,
248 A.D.2d 193, 669 N.Y.S.2d 583 (1998) .............................................................52

*Weissman v. Sinorm Deli, Inc.*,
88 N.Y.2d 437, 646 N.Y.S.2d 308 (1996) ...............................................................68

### TREATISES

70 C.J.S. PAYMENT § 32 (2009) ...............................................................................75

83 N.Y. JUR. 2D, PAYMENT AND TENDER § 141 .................................................76, 77

96 N.Y. JUR. 2D, SECURED TRANSACTIONS § 302 ...................................................76

RESTATEMENT (2D) OF CONTRACTS ....................................................................66, 78

W.M. Fletcher, CYCLOPEDIA OF THE LAW OF CORPORATIONS (updated April, 2010) ............76, 81

### OTHER AUTHORITIES

*Caplan v. Unimax Holdings Co.*, 8/21/91 N.Y.L.J. 22 .................................................76

# I.   __INTRODUCTION__

This case arises from the multi-billion dollar failures of Taylor, Bean & Whitaker Mortgage Corp. ("TBW"), a home mortgage originator and servicer, and its bank, Colonial Bank. Although many details remain obscure, TBW and Colonial's demise appears to have resulted from a complex fraudulent scheme in which they contrived ways to double- and triple-pledge mortgages and steal assets in order to conceal their declining financial condition following the implosion of the real estate "bubble."

TBW accomplished this fraud through, among other vehicles, its wholly-owned subsidiary, Ocala Funding, LLC ("Ocala"), an entity that TBW formed for the sole purpose of financing TBW's mortgage originations. Ocala issued short-term notes and used the proceeds to purchase TBW-originated mortgages; Ocala then would sell the mortgages and use the proceeds to pay off the notes as they came due or to purchase additional mortgages from TBW. Plaintiffs Deutsche Bank AG ("DB") and BNP Paribas Mortgage Corporation ("BNP") were purchasers of the notes, which, with the exception of notes issued on July 20, 2009, were all timely paid off by Ocala. In the wake of TBW's failure, it now is clear that Ocala cannot repay the July 2009 notes in full because TBW stole its assets.

Given the obstacles to recovering from the obvious candidates—the obligor on the notes (Ocala) and the perpetrator of the fraud (TBW)—Plaintiffs cynically trained their sights on Bank of America, N.A. ("BoA"), which in 2007 acquired LaSalle Bank National Association and thereby took over certain ministerial functions that LaSalle performed for the Ocala facility. The cynicism behind Plaintiffs' strategy is twofold.

First, it resides in the fact that Plaintiffs knowingly invested in a facility structured, with Plaintiffs' active participation, to give TBW plenary control over all aspects of Ocala's operation, yet now are asking the Court to rewrite the operative contracts to transfer TBW's duties to BoA. Plaintiffs' pleadings reflect a studied effort to invent obligations BoA never assumed in the governing contracts, including that of a guardian or "cop on the beat" for the Ocala facility with responsibility to "secure and protect" its assets against any and all forms of risk, including fraud by

10576546.3

TBW and Ocala.  *See, e.g.,* BNP First Amended Complaint ("FAC") ¶¶ 1, 6, 8, 9, 32, 47, 99; DB FAC ¶¶ 6, 40-42, 44-45.  But BoA did not serve as an investment banker, insurer, or auditor for the facility; it was not the manager of the facility; nor did it even earn fees based on the success of the program.  Rather, it performed a limited set of ministerial functions defined by the contracts that created and governed the Ocala facility (collectively, the "Facility Documents").  The striking disparities between the actual contract terms and Plaintiffs' fictionalization of those terms in the Amended Complaints taints each of Plaintiffs' purported causes of action.

But these lawsuits are rendered doubly cynical by Plaintiffs' continued failure to disclose the multifarious central and lucrative roles that they played in this drama—roles that, while not necessary to the disposition of this motion to dismiss, provide essential context for the Court's understanding of the transaction and mock Plaintiffs' revisionist thesis that they depended on BoA to protect them from fraud by TBW.

To begin with, Plaintiffs served as "Swap Counterparties" under the Facility Documents, in which capacity they (and not BoA) effectively guaranteed TBW/Ocala's payment obligations to the noteholders by contracting to make Ocala whole even if TBW could not perform its corresponding swap obligations.  Indeed, Plaintiffs appear to have garnered tens of millions of dollars for providing this protection (in contrast to the relatively trifling fees BoA was paid for its ministerial roles).  It is no wonder that, despite trying to use their status as Swap Counterparties to manufacture standing under agreements that do not provide such rights to noteholders, Plaintiffs now have all but deleted from their Amended Complaints even the self-consciously muted references in their prior pleadings to their Swap Counterparty roles.

Second, affiliates of DB and BNP, namely, BNP Paribas Securities Corp. and Deutsche Bank Securities Inc., served as the exclusive "Qualified Counterparties" under Ocala's loan sale agreements—another role elided by the Amended Complaints.  When TBW sold Ocala's mortgage loans to third parties, TBW often would receive payment in the form of mortgage-backed securities, which it would then need to liquidate.  DB's and BNP's affiliates agreed, in a series of forward trades with TBW, to purchase and convert into cash any mortgage-backed securities Ocala

received as payment for loans.  This exclusive arrangement was designed to give BNP and DB yet another profitable entanglement in TBW's operations—indeed, in a part of the operations (mortgage sales) that now seems to have been central to TBW's fraud.

Third, these same DB and BNP entities also were the "Short-Term Note Dealers" charged with marketing and selling Ocala's short-term notes to investors through a Private Placement Memorandum ("PPM") that described the facility (and some of Plaintiffs' various roles) in detail. *See* St. John Decl., Ex. L at (i), 8, 13, 78.[1]  DB and BNP ultimately bought the notes from themselves, most likely because the market for such notes had evaporated by mid-2008 and they did not want to surrender their stream of lucrative fees.  Presumably, they performed the due diligence of Ocala necessary to discharge their Note Dealer role and endorse the representations in the PPM, and they appear to have received fees for selling the notes—albeit, as it turned out, to themselves.  Indeed, had they succeeded in selling the notes to anyone *other* than themselves, they—as Swap Counterparties and Note Dealers—would be the prime defendant candidates in any suit by injured investors.

Fourth, as Swap Counterparties, Qualified Counterparties, Note Dealers, and noteholders, DB and BNP were intimately involved in the 2008 amendment and restatement of the Facility Documents and had access to information about Ocala—including audit rights—that dwarfed BoA's access.

Finally, Plaintiffs' ties to the principals ran deeper still, with each serving as TBW's investment banker and DB, in the months before TBW failed, even heading up TBW's desperate attempt to raise cash to purchase Colonial Bank (whose cooperation appears to have been central to TBW's fraud) and Colonial's related attempt to access funds from the government's Troubled Asset Relief Program to plug its growing deficits.  And after TBW's effort to buy Colonial failed, DB switched sides and represented BB&T in its acquisition of Colonial Bank.  DB in particular

---

[1] All "Ex." references are to exhibits to the Declaration of Richard St. John, filed herewith.  The full title of each document is set out in the corresponding paragraph of the Declaration.

thus knew TBW and Colonial Bank very well, and adeptly fanned their dying embers long enough to extract one last infusion of investment banking fees from them before they failed.

In these multiple profitable roles, Plaintiffs played a central part in designing, implementing, and presenting to potential investors the very structure they now want to pretend did not exist—*i.e.*, one that not only left control in the hands of the very actors against whom they now claim BoA should have "secured and protected" them, but placed the risk inherent in such a structure squarely on Plaintiffs themselves.  Nowhere is this reality better stated than in the PPM that Plaintiffs' Note Dealer affiliates used to solicit investors for the notes.  It describes this very allocation of risk, stating that the risk of nonperformance by TBW—including that TBW might sell Ocala improper loans and then fail to repurchase them—would be protected against by the swap transactions, *i.e.*, by DB and BNP as Swap Counterparties.  Ex. L at 13.  It then cautions would-be investors that the swaps will *not* protect against TBW's failure to deliver mortgages sold to Ocala "because of fraud, negligence or otherwise," and that such risk instead will be borne by "*investors in the Notes.*" *Id*. at 13; *id*. at (iii)-(iv).[2]  So, to the extent the risk built into the Ocala facility was not borne by Plaintiffs as Swap Counterparties, it was borne by Plaintiffs as noteholders—*not* by BoA in its various ministerial roles.

But over a billion dollars in unpaid notes provides a strong incentive to rewrite history. Three months after TBW's demise, Plaintiffs filed Complaints seeking to remedy TBW's fraud by forcing BoA to pay Ocala's debts.  The Complaints were an extended exercise in legerdemain, in which Plaintiffs (1) studiously avoided mentioning the one contract under which BoA *did* owe limited obligations to noteholders, the Trust Indenture—an unsurprising choice given that the Indenture carefully limits BoA's liability to narrowly defined circumstances and insulates BoA from *post hoc* efforts, like Plaintiffs' here, to cast it as the last line of defense against fraud by TBW; (2) distorted the other Facility Documents under which Plaintiffs purported to sue, including by substituting the name "Bank of America" for those of "TBW" and "Ocala" as the subject of

---

[2] Throughout this brief, any emphasis in quotations is added, and any internal quotation marks, citations, footnotes, brackets, and ellipses are omitted unless otherwise indicated.

almost every verb where responsibility to perform major functions of the facility was assigned; and (3) flatly misdescribed the contracts at issue where Plaintiffs' allegations were contradicted by the plain language of those contracts.

All of these flaws were laid bare in BoA's initial motion to dismiss, filed in early February 2010, in which BoA demonstrated that each of Plaintiffs' claims invoked contracts under which Plaintiffs had no rights, or sought to rewrite the contracts to impose upon BoA duties that the contracts either specifically assigned to TBW or Ocala or, in some instances, did not mention at all. Plaintiffs took a full two months to respond to this motion and then—rather than try to defend their claims—elected to file Amended Complaints asserting even more far-fetched and indefensible theories.  But neither the old claims, which Plaintiffs for the most part have simply repeated, nor any of Plaintiffs' second-generation theories, states a claim upon which relief may be granted.

BoA appreciates that this motion is lengthy and complex, and will require significant time and attention from the Court.  But the Court's role as gatekeeper is especially critical in a case such as this, where Plaintiffs seek to impose billions of dollars of liability based on demonstrably meritless claims that would require the Court to revive debt instruments that have been fully paid, extend third party status under contracts that expressly preclude such status, write entirely new obligations into the underlying contracts, delete from those contracts language expressly precluding liability for BoA, and resurrect contracts that are no longer in existence.  This is improper, and Plaintiffs' claims should be dismissed with prejudice.

## II.        SUMMARY OF CLAIMS AND OF ARGUMENTS SUPPORTING DISMISSAL

DB now asserts eight causes of action for breach of contract, alleging that BoA breached the current and prior versions of the Security Agreement, the Depositary Agreement, the Custodial Agreement, and the Indenture.  In addition, DB now adds a claim for breach of fiduciary duty.  DB also seeks "indemnification" under the current and superseded versions of the Depositary, Security and Custodial Agreements, even though it does not claim to have been sued by any third party or subjected to a judgment.  BNP does not bring any claims under superseded versions of the Facility Documents, but otherwise echoes DB's claims, with the addition of a claim for "Breach of

Contract/Indemnification" under a March 27, 2009 side letter ("March 2009 Letter").  BNP also adds a new Plaintiff to its Amended Complaint—its parent company, BNP Paribas.

None of these claims—either carried over from the original pleadings, or added in the Amended Complaints—states a claim upon which relief can be granted.  For example, both Amended Complaints for the first time assert a claim under the Indenture, but that claim is predictably and deeply flawed.  Plaintiffs' new theory is that BoA, as Indenture Trustee, bears liability for not declaring an Event of Default and shutting down the Ocala facility long before TBW's fraud came to light, and long before BoA received written notice of any Event of Default.  This theory is flatly barred by the Indenture, which states, in words that could not be clearer, that BoA shall have "*no liability*" for "*any action or inaction taken, or not taken,*" in connection with a deemed Event of Default unless it received "*written notice*" of such Event of Default.  *See* Ex. F1, § 10.1 at 54.  Plaintiffs do not and cannot allege that BoA received any such written notice until August 2009, when DB and BNP Paribas, as Swap Counterparties, notified BoA in writing that there had been an Event of Default or Potential Event of Default and instructed BoA to declare the notes due (which BoA promptly did).  It is no wonder Plaintiffs thought better than to plead this frivolous theory in their original Complaints, and did so only when their hand was forced by BoA's exposure of the insurmountable defects in the claims they did plead.

Plaintiffs also have done virtually nothing to cure these other flawed claims.  They continue to try to attribute to BoA under the Security Agreement a myriad of loftily-described guardianship duties—such as strict duties to examine and limit the purpose of transfers from Ocala's Collateral Account, to reconcile the amount of funds removed with the price of mortgages purchased, to ensure the segregation of facility funds, to perfect security interests in the underlying mortgages, and to furnish detailed financial data about Ocala's assets and liabilities—that the Facility Documents either assign solely to TBW and Ocala or do not require at all.

None of these claimed duties finds any support in the actual language of the Security Agreement.  As BoA showed in its earlier motion, it was TBW and Ocala—and not BoA in any of its capacities—that under the Facility Documents controlled the origination of mortgage loans, the

facility's selection of mortgages for sale, the movement of mortgages and funds in and out of collateral accounts, the use of cash or collateral to purchase new mortgages, the transfer of mortgage files, the reconciliation of assets and liabilities, and the disposition of mortgages to be considered for purchase by third parties.  Likewise, it was TBW and Ocala—and not BoA—that were bound by contractual controls that Plaintiffs now claim were designed to "protect and secure" Ocala's collateral, including restrictions on the types of mortgages that could be purchased with Ocala funds, the obligation to perfect security interests in the mortgages, and procedures for monitoring Ocala's assets and liabilities before withdrawing facility funds for new mortgages.  And contrary to Plaintiffs' suggestion that BoA had a duty to *monitor* TBW's or Ocala's performance of these duties, the contracts expressly stated that BoA "shall not have any duty" to "ascertain or to inquire as to the performance" of TBW and Ocala or to ensure that they complied with their duties (*see*, *e.g.*, Ex. A, § 8.01 at 37), and expressly required BoA to follow Ocala's directions (*id.* § 5.03(a) at 20 & (b) at 26).  BoA's purported failure to guarantee or monitor TBW's performance could not be a breach of the Facility Documents because BoA never had any such duty, or any of the other purported duties Plaintiffs invent in their pleadings.

Plaintiffs' Amended Complaints adds a particularly absurd new theory in the hope of salvaging their claims under the Security Agreement, namely, that BoA wrongfully complied with emailed wire instructions sent by "unauthorized persons"—identified by Plaintiffs as five TBW employees whose names were not listed as "Issuer Agents" on a certificate provided by TBW to BoA.  As is evident from the description of this certificate in the Security Agreement, it is a vehicle by which TBW may unilaterally identify those of its employees who will act on Ocala's behalf— thus making the inclusion of particular names a purely ministerial and entirely discretionary act *within TBW*.  Even assuming that the names of the six TBW employees mentioned by Plaintiffs were not included on any such certificate, Plaintiffs have not even tried to allege facts to show how anything would have been different if they had been included, or even if the instructions instead had been given personally by the TBW employees whose names Plaintiffs admit were so listed— individuals who happen to be among those identified as the ringleaders of the fraud—instead of

through their subordinates.  Because Plaintiffs have not pled, and cannot plausibly plead, the elements of materiality or causation, their new "Issuer Agent" theory fails as a matter of law.

Plaintiffs also have carried over from their earlier pleadings without substantive change their claims under the Custodial and Depositary Agreements and their claims for what Plaintiffs persist in calling "indemnification" (even though they still do not allege that anyone has sued them or otherwise pressed claims for which indemnification might be needed).  These claims fail because noteholders such as Plaintiffs are neither parties to, nor third-party beneficiaries of, the Custodial and Depositary Agreements, and because the contract provisions under which they seek "indemnification" cover only claims *against* the indemnified parties—not claims, such as those here, *by* the indemnified parties (Plaintiffs) for their own investment losses.

Quite apart from these fatal flaws, there are several additional bases for dismissal.  First, even if *any* of Plaintiffs' claims survive dismissal on the foregoing grounds, Plaintiffs' admission that they received *full payment* on their notes for all but the last issuance in July 2009 means that they cannot recover for alleged breaches before that time, because the payment of the earlier notes extinguished any related contract claims as a matter of law.  Accordingly, all of Plaintiffs' claims must be dismissed to the extent they assert breaches occurring before July 20, 2009, the date the last of the now-extinguished notes were fully paid and Plaintiffs acquired their current notes.

Second, DB has now pled *five new counts* (Counts I, III, V, VII, and IX of its Amended Complaint) under versions of the Facility Documents that were *superseded* in 2008 by the existing versions.  Even apart from the inconvenient fact that the extant notes at the time of these earlier versions of the contracts were paid off and extinguished, how does DB expect the Court to adjudicate claims under contracts that no longer exist?  The answer is that the Court cannot do so, and these new claims must be dismissed, because the law does not allow a party to sue on superseded versions of contracts.

Finally, the new claims by BNP's parent company, BNP Paribas, must be dismissed because BNP Paribas alleges no damage whatsoever to itself, and the only theory of injury it does allege, damage to its subsidiary, is foreclosed by New York law.

For these reasons and the reasons set forth below, the First Amended Complaints should be dismissed in their entirety.

## III.   FACTUAL BACKGROUND

### A.   TBW's Mortgage Operations.

TBW, while in operation, was "the largest non-depository residential mortgage lender in the United States" and the "twelfth-largest mortgage originator."  BNP FAC ¶ 25; DB FAC ¶ 2.[3]  Its core business was "(i) originating, underwriting, processing and funding conforming, conventional, government-insured residential mortgage loans; (ii) the sale of mortgage loans into the 'secondary market' to government-sponsored enterprises such as Freddie Mac; and (iii) mortgage payment processing and loan servicing."  BNP FAC ¶ 26.  In 2008 alone, TBW was responsible for originating approximately $30 billion in new loans.  *Id.* ¶ 25.  As of June 2009, TBW was servicing mortgages with unpaid principal balances in excess of $80 billion.  *Id.*

### B.   Ocala's Operation and the Relevant Facility Documents.

#### 1.   Ocala's Short-Term Note Financing and Repayment of Notes.

TBW's financing arrangements included Ocala, as well as other funding facilities provided by Colonial Bank.  TBW established Ocala in 2005 as a special purpose, bankruptcy-remote subsidiary to provide liquidity to TBW's mortgage origination business by purchasing mortgages

---

[3] In addition to the Amended Complaints, this summary is based on the Facility Documents and other judicially-noticeable documents, attached to the St. John Declaration.  "In deciding a motion to dismiss, a court may consider documents attached as exhibits to the complaint or incorporated into the complaint by reference, documents that are integral to the plaintiff's claims, even if not explicitly incorporated by reference, and matters of which judicial notice may be taken."  *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 268 n.3 (S.D.N.Y. 2009); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 44, 47-48 (2d Cir. 1991).  The submitted documents are integral to Plaintiffs' claims or otherwise subject to judicial notice, and include the contracts and the letter upon which Plaintiffs purport to sue (*see* St. John Decl. ¶¶ 2-9, 19 & Exs. A-H, R); other "Facility Documents" governing the Ocala facility, which bear directly upon Plaintiffs' contract claims (*id.* ¶¶ 10-12, 18 & Exs. I-K, Q); a Private Placement Memorandum the authenticity of which Plaintiffs cannot dispute because their affiliates relied upon it in marketing the notes at issue (*id.* ¶ 13, Ex. L); other foundational documents for the Ocala facility (many of which are referenced in the Complaints) (*id.* ¶¶ 14-17, 20 & Exs. M-P, S); a Moody's report that Plaintiffs cite and rely upon in their Complaints (*id.* ¶ 21 & Ex. T); a government press release referred to in the Complaints (*id.* ¶ 22 & Ex. U); an unpublished New York Superior Court opinion that is a matter of public record (*id.* ¶ 23 & Ex. V); and public filings relating to DB's corporate structure (*id.* ¶ 24 & Exs. W & X).

from TBW and holding them pending their ultimate sale to Freddie Mac, thereby allowing TBW to use those immediate proceeds to originate more mortgage loans.  BNP FAC ¶ 30; DB FAC ¶ 32.  Ocala funded its operations by issuing debt, including short-term notes, secured by the underlying mortgage loans and other facility assets.  DB FAC ¶¶ 1, 3-5, 32; BNP FAC ¶¶ 2, 39-44.  Affiliates of Plaintiffs—BNP Paribas Securities Corp. and Deutsche Bank Securities Inc.—were the Note Dealers for these notes, and earned placement fees in that role.  *See* PPM, Ex. L at 8-9, 78; Short Term Note Dealer Agreement, Ex. J, § 6 at 5.  For reasons not explained in the Complaints, the notes as periodically issued by Ocala ultimately were purchased by DB and BNP, rather than by third party investors.  DB FAC ¶¶ 1, 36; BNP FAC ¶¶ 39-44.

The debt instruments that DB and BNP purchased between December 2007 and July 2009 were "short-term notes"; each matured in 30 days or less, becoming due and payable at that time.  DB FAC ¶ 5; BNP FAC ¶¶ 40-41.  Plaintiffs concede that all of the short-term notes prior to the final issuance in July 2009 were paid off by Ocala and thereby extinguished on the maturity date of the notes.  *See, e.g.*, BNP FAC ¶ 42 ("On each maturity date through July 20, 2009, Ocala *repaid* BNPP $480.7 million for the Secured Notes maturing that day"); DB FAC ¶ 5.  Plaintiffs reinvested in Ocala's short-term notes each time their prior notes were paid off and cancelled.  *See, e.g.*, BNP FAC ¶ 42 (on each occasion its note was repaid, "[o]n that same day, in a separate transaction, BNPP purchased the entirety of each new Series 2005-1 Short Term Notes"); DB FAC ¶ 5 ("DB purchased Ocala ABCP on at least thirty-eight separate occasions.").  Thus, by Plaintiffs' own admission, they received full payment upon maturity for all of their short-term notes except the last issuance on July 20, 2009.  BNP FAC ¶¶ 40-42; DB FAC ¶ 5.

Also significant was the Private Placement Memorandum ("PPM") that Plaintiffs' affiliates used to sell the notes.  The PPM expressly cautioned that "investors in the Notes"—and not BoA— "would bear losses resulting from the failure of the Seller [TBW] to deliver Mortgage Loans, whether because of fraud, negligence or otherwise."  Ex. L at 13.  *See also id.* at (iii)-(iv).  And as *buyers* of the notes, Plaintiffs expressly represented that they understood the risks of the

investment, had conducted their own due diligence, and were not relying on any statements or representations by BoA in making the purchase. Ex. K, §§ 2(d) & (e) at 3.

**2.        The Ocala Facility.**

Ocala's operations were governed by a set of agreements called the "Facility Documents," under which TBW controlled all major decisions and actions for Ocala's operation. TBW was Ocala's sole manager and agent, and expressly undertook "to carry out and perform, as agent on behalf of the Company [Ocala], the daily business activities of the Company *and the obligations of the Company under the Facility Documents*," as well as it own obligations under those Documents. LLC Agt., Ex. Q, §§ 4.1(b) at 11, 3.2(vii) at 7. TBW was Ocala's 100% owner, its only member with an economic interest, and the servicer of Ocala's loans. *Id.* § 6 at 13; Purchase Agt., Ex. I, § 4.1(a)(i) at 32-35. Notices provided to Ocala were to be sent to TBW. *See, e.g., id.* § 12.5(ii) at 63; Ex. A, Schedule I-1; Ex. F1, § 13.1(a) at 65-66. TBW even signed the Facility Documents on Ocala's behalf. *See, e.g.*, Exs. I, F1 & A (execution pages).

**3.        The Purchase Agreement—Ocala's Purchase of Mortgages from TBW.**

Under the Purchase Agreement—a critical document that Plaintiffs virtually ignore—TBW sold the mortgages it originated to Ocala, and controlled the purchase of the mortgages by Ocala. *See* Ex. I, § 2.1 at 2-4. The parties to the Purchase Agreement were TBW and Ocala. DB and BNP's parent company, BNP Paribas, explicitly acknowledged and consented to the Purchase Agreement in their capacity as Swap Counterparties. *See* Ex. I (execution pages). BoA was not a party to, and was not required to sign or consent to, the Purchase Agreement. *Id.*

The Purchase Agreement required that TBW sell to Ocala, and that Ocala buy from TBW, "dry"-funded mortgage loans that met Freddie Mac "guides" and had been approved by the lender, as opposed to "wet"-funded mortgages that were funded (in this case, by Colonial Bank) before receiving lender approval, *i.e.*, while the ink on the loan was still "wet." Ex. I, § 2.1(a) at 2; § 3.2(a) at 13; *see also id.* § 1.1 at 2 (incorporating Definitions from Indenture); Schedule I to Base Indenture, Definitions List, Ex. F2 at 10 ("Eligible Loans") and 9, subd. (v) ("Eligibility Criteria"). This prohibition was expressly undertaken by Ocala and TBW, not BoA.

Under the Purchase Agreement, TBW also controlled the removal of mortgage loans from the facility's accounts at BoA for sale to third parties, principally Freddie Mac, as well as the transfer of resulting proceeds back to the relevant accounts to fund additional mortgage purchases. *See* Ex. I, § 4.2 at 36-39.  *See also* LLC Agt., Ex. Q, §§ 3.2 at 7, 4.1(a) at 10.  TBW and Ocala were required to perfect Ocala's security interests in the underlying mortgages that were part of the collateral for the facility.  *See* Ex. I, § 2.1(b) at 4; § 3.2(c) at 14, & Sched. A § 12.  The Purchase and Security Agreements required TBW and Ocala to allocate funds deposited into, or withdrawn from, the Collateral Account to or from the "applicable sub-account."  Ex. I, § 4.2(a) at 37; Ex. A, § 5.03(b) at 21.  Again, these documents placed responsibility for these functions (and the contractual controls on their exercise) squarely on TBW and Ocala—not BoA.

### 4.   The Role of Colonial Bank.

Colonial Bank was active on both sides of Ocala: on the front-end, it "wet-funded" TBW's loans before they were purchased by Ocala, and in this capacity was the primary recipient of the funds Ocala paid for its mortgages; on the back-end, it acted as custodian for Freddie Mac when Ocala's mortgages were sold to Freddie Mac.  Thus, Ocala, in different capacities, would receive mortgages from Colonial and soon afterward deliver them back to Colonial.  BNP FAC ¶ 37; DB FAC ¶¶ 49-56. All of these activities were directed by TBW under the Purchase Agreement.  Ex. I, §§ 2.1 at 2-4, 2.2 at 4-5, 4.2 at 36-39; LLC Agt., Ex. Q, §§ 3.2 at 7, 4.1(a) at 10.

## C.   Plaintiffs' Multiple, Central Roles in TBW's Mortgage Finance Operations.

Although Plaintiffs take great pains to elide this important reality, Plaintiffs themselves were intimately involved in all aspects of TBW's mortgage operations, not just as holders of Ocala's short-term notes, but also as Swap Counterparties, Note Dealers, Qualified Counterparties, and investment bankers for TBW.

### 1.   Plaintiffs' Role As Swap Counterparties.

An important set of agreements to which BoA was *not* a party were the swap agreements under which DB and BNP's parent company, BNP Paribas—which now seeks to join as a Plaintiff—served as "Swap Counterparties."  Through the swap transactions, certain of Ocala's

risks were transferred to the Swap Counterparties and from them onto TBW—with the result that the risk of TBW's *failure* to fulfill its obligations fell in large part upon the Swap Counterparties. *See* BNP FAC ¶ 45.  *See also* DB Cplt. ¶ 41; BNP Cplt. ¶ 36.[4]  PPM, Ex. L at 7; DB Swap Documents, Exs. M & O; BNP Swap Documents, Exs. N & P.

For reasons that become apparent upon review of the swap agreements, Plaintiffs have assiduously avoided describing the terms of the swap transactions themselves—which allowed Plaintiffs to reap enormous rewards in their role as Swap Counterparties, and also reveal that the Swap Counterparties assumed the very role of "guarantor" that they have tried to attribute to BoA. *See* DB Cplt. ¶ 41.  Indeed, despite BoA's making these points in its first motion to dismiss, and taking Plaintiffs to task for their lack of candor respecting their Swap Counterparty roles, Plaintiffs carefully *deleted* in their Amended Complaints what few references to the swap transactions they had offered in their original pleadings.

The Swap Counterparties had two swaps:  a "front swap" with Ocala and a "back swap" with TBW.  Under the front swap, the Swap Counterparties agreed (1) to pay to Ocala the interest cost of its debt in exchange for the interest income Ocala earned on its mortgage loans and (2) to reimburse Ocala for any losses on the sale of its mortgage loans in exchange for receiving from Ocala any profits it earned on its loan sales.  DB Cplt. ¶ 42(c); Ex. N2 §§ 3 & 4 at 4-7; Ex. M3, §§ 3 & 4 at 4-6.  *See also* Ex. L at 13, 62-64.  The back swaps mirror the front swaps.  Under normal operations, if the Swap Counterparties *received* money from Ocala under the front swaps, they would forward that money to TBW; conversely, if they *paid* a net amount to Ocala under the front swaps, they would be reimbursed by TBW.  *See* Ex. P2, §§ 3A & 3B at 2-8; Ex. O, §§ 3a & 3b at 3-9; *see also* Ex. L at 62-64.  The only funds not "round-tripped" between Ocala and TBW

---

[4] BoA has cited relevant allegations from DB's and BNP's *original* Complaints, which were somewhat more forthcoming about the swap agreements.  The Court may consider these earlier allegations.  *See United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984) (allegations of earlier complaint remain admissions that may be used against the plaintiff; a party "cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories").

10576546.3

via the Swap Counterparties were the millions of dollars in fees that DB and BNP Paribas retained for serving as Swap Counterparties. *See* Ex. P2, § 3B at 4-8; Ex. O, § 3b at 5-9 (formula yielding annual swap fees to BNP of $5.6 million and to DB of $9.4 million at maximum program size).

Why would TBW pay significant swap fees to the Plaintiffs for a mirror swap arrangement that did little more than shuttle Ocala's risks to TBW? The answer is that Plaintiffs, as Swap Counterparties, would remain obligated to Ocala under the front swaps *even if* TBW were unable to perform its obligations under the back swaps.[5] In other words, the Swap Counterparties were required to pay Ocala the interest costs on Ocala's debt and to reimburse Ocala for any losses on the sale of its mortgage loans, *whether or not* TBW remained able to reimburse the Swap Counterparties for payments they made to Ocala. The Swap Counterparties thus helped insulate Ocala from the risk of a TBW insolvency by placing themselves between TBW and Ocala and ensuring that Ocala's front swap would be performed even if TBW were unable to perform its back swap. For this reason, the Moody's report that Plaintiffs quote for other purposes emphasizes that the credit rating for the Ocala facility turned primarily on the credit rating assigned to *Plaintiffs* (DB and BNP Paribas) as Swap Counterparties—*not* that assigned to TBW (much less BoA):

> Ocala's Prime-1 rating is not highly correlated to TB&W, which is unrated. Rather, Ocala relies on funds obtained under the market value swap and from the committed buyer to repay the notes. *As a result, there is a high degree of correlation between the rating assigned to Ocala's SLNs [i.e., the notes at issue in this litigation] and the ratings of the swap counterparties, BNP Paribas and Deutsche Bank AG.* If one of these entities loses its Prime-1 rating, Ocala's rating may also be negatively affected.

Moody's ABCP Market Review, Ex. T at 4, cited in BNP FAC ¶ 34 and DB Cplt. ¶ 12. The PPM Plaintiffs used as Note Dealers makes the same point—that Ocala's ability to pay on the notes "is in large part dependent upon the performance of the Swap Counterparties under the Interest Rate

---

[5] Under the front swaps, neither the Swap Counterparties nor Ocala may be relieved of their obligations if the other party defaults on its other obligations. *See* Ex. M2, § 1(c) (noting that the Master Agreement's "Cross-Default" provision applies to neither party) and Ex. N1 § 1(c) (same). The back swap documents, by contrast, state that if TBW defaults on any of its debt obligations in excess of $20 million, the Swap Counterparties could terminate the back swap. *See* Ex. P1, § I(H)(vi). Thus, if TBW could not pay its other creditors, the back swaps could be terminated, but the front swap commitments would remain in place, requiring Plaintiffs to pay interest on Ocala's debt to the noteholders and to reimburse Ocala for any losses on the sales of its mortgage loans.

Swaps" and that, "[i]n the event the Swap Counterparties fail to meet their obligations under the Interest Rate Swaps, the Issuer [Ocala—and hence, noteholders] would be exposed to the risk of loss on sales or securitizations of its Mortgage Loans." Ex. L at 62.  In effect, DB and BNP Paribas were paid substantial fees to absorb TBW's credit risk under the Ocala program by agreeing to pay on the front swaps *even if* TBW failed to pay Ocala for its own obligations.  In light of the "guarantor" function of the Swap Counterparties and the fees they earned in that role, it is not surprising that Plaintiffs try to avoid any discussion of their role as Swap Counterparties.

        **2.**    **Plaintiffs' Other Roles.**

Plaintiffs or their affiliates also served other critical roles in the Ocala facility —roles that gave them significant control over, and information about, Ocala's operations.  Plaintiffs' affiliates, BNP Paribas Securities Corp. and Deutsche Bank Securities Inc., acted as Short-Term Note Dealers to market and sell the notes to investors—which ended up being their own affiliates, the Plaintiffs here.  Plaintiffs' affiliates also were intimately involved in TBW's sale of Ocala's mortgage loans by serving as the exclusive "Qualified Counterparties" under Ocala's loan sale agreements, which means they had the sole right to purchase mortgage-backed securities that TBW received in payment for Ocala's mortgage loans.

As noted, Plaintiffs' ties to TBW ran even deeper than their involvement with Ocala.  Both served as TBW's investment bankers.  In fact, in the months before the FBI raids shut TBW down, TBW was trying desperately to raise the $300 million it needed to purchase Colonial Bank and bail itself out with federal TARP money, and DB represented it in that effort.

**D.**    **BoA's Purely Ministerial Role As Indenture Trustee, Collateral Agent, Depositary, and Custodian.**

In contrast to the multiple, economically substantive, and central roles played by TBW and the Plaintiffs in connection with the Ocala facility, BoA served several narrowly-circumscribed ministerial functions, all set out specifically in the Facility Documents.

        **1.**    **Indenture Trustee—Base Indenture.**

BoA served as Indenture Trustee under the Indenture for the Ocala facility.  Ex. F1 at 1; *id.* Art. X at 54-61.  The Base Indenture generally provided for the issuance of notes by Ocala, and

provided that additional terms for each Series of notes would be provided for in Supplements to the Base Indenture—which, along with other documentation supporting each new Series, would be provided to BoA by Ocala, through TBW, and would provide specific terms for the accrual and payment of interest and principal for that Series. *Id*. §§ 2.1, 2.2, 2.3, 2.18 at 3-6, 28. The relevant Supplements also required Ocala to use the proceeds from each such Series only for specified purposes—specifically, to acquire from TBW mortgage loans designated for that Series, to pay amounts owing on maturing notes of that Series, and to make other payments "as required or permitted by the Facility Documents." Ex. G, § 2.6 at 12; Ex. H, § 2.6 at 12-13.

The Base Indenture defines various Events of Default. One such Event of Default would occur if TBW failed to comply with its covenants or agreements under the Purchase Agreement, described below, and that failure was not cured within a specified time period. Ex. F1, § 9.1(c) at 48. Another type of Event of Default, under Section 9.1(f), would occur upon "an Event of Bankruptcy." *Id*. § 9.1(f) at 48. Section 9.1 provided that, upon an Event of Default, the Indenture Trustee would give notice to Ocala declaring the principal and premium of the notes to be immediately due and payable and instructing Ocala to cease purchasing mortgage loans and to cease issuing new notes. *Id*. § 9.1 at 50. If the Event of Default was of the sort specified in Section 9.1(f)—*i.e.*, an Event of Bankruptcy—this acceleration of obligations under the notes would occur without notice from the Indenture Trustee. Section 9.1 reiterated Ocala's duty to notify BoA (both as Indenture Trustee and as Collateral Agent under the Security Agreement, discussed below) and Plaintiffs (as Note Dealers and Swap Counterparties) with "prompt written notice" of any Indenture Event of Default. *Id*. § 9.1 at 50.

The Base Indenture set forth representations and warranties of the Issuer (Ocala), including specific representations and warranties that, both before and after the transactions contemplated by the Base Indenture and the other Facility Documents, the Issuer was solvent within the meaning of the Bankruptcy Code and no Event of Bankruptcy had occurred. *Id*. § 7.12 at 39. Ocala also covenanted in the Base Indenture that, promptly upon becoming aware of a Potential Event of Default or an Event of Default, or any default under any other Facility Document, it would notify

-16-

BoA and other parties, including Plaintiffs in their capacity as Note Dealers and Swap

Counterparties.  *Id.* § 8.10.  The Supplements to the Base Indenture expressly renewed these

representations and warranties and specified that they were true with respect to the Series of notes

to which each such Supplement related, including the representation that there had been no Event

of Default.  *See* Ex. G, § 2.3(b) & (c) at 9-10; Ex. H, § 2.3(b) & (c) at 10.  Ocala was required to

renew these representations each time a new issuance of short-term notes was proposed—that is,

approximately once each month.  *See* Exs. B & C (Ex. C thereto at item 4).  BoA was not required

to investigate or certify these representations by Ocala, under the Borrowing Base Certificate or

otherwise; on the contrary, BoA was expressly authorized to rely "conclusively" upon Ocala's

representations.  *See* Ex. F1, §§ 10.2(a)&(f) at 56; *see also* 10.1(c)(iv) at 55.

The Base Indenture contains extensive provisions protecting the Indenture Trustee in the

performance of its specified functions.  Section 10.1 states that the Indenture Trustee, prior to an

Event of Default, undertakes to perform only those duties set out in the Facility Documents,

including the Indenture, and that no implied covenants or obligations shall be imposed against the

Indenture Trustee.  *Id.* § 10.1(b) at 54.  Section 10.1 states that, after an Event of Default, the

Indenture Trustee would exercise the rights and powers granted to it by the Base Indenture and

other Facility Documents using the "same degree of care and skill in their exercise" as a "prudent

person" would use—but immediately follows that statement with a proviso specifying that the

Indenture Trustee shall have "no liability in connection with any action or inaction taken, or not

taken, by it upon the deemed occurrence of an Event of Default" of which a Trust Officer of BoA

"has not received written notice." *Id.* § 10.1(a) at 54.  Section 10.1(c) goes on to state that the

Indenture Trustee "shall not be charged with knowledge of any default under any Facility

Documents, unless a Trust Officer of the Indenture Trustee receives written notice of such default."

*Id.* § 10.1(c)(iv) at 55.  Additional exculpatory provisions establish, among many other protections,

that the Indenture Trustee "may conclusively rely" on documents and other evidence provided to it,

and "shall not be bound" to make any investigation into facts or information provided to it.  *Id.*

§§ 10.2(b) at 54 & (f) at 56.  *See generally id.* § 10.2 at 56-57.

10576546.3

Finally, the Base Indenture provides for the performance by the Indenture Trustee of certain specified duties, both before and after an Event of Default. Among other things, Section 10.4 of the Base Indenture states that, if an Indenture Event of Default or Potential Event of Default occurs and is continuing, and if a Trust Officer of the Indenture Trustee receives "written notice or has actual knowledge" thereof, the Indenture Trustee shall promptly provide notice to other parties, including noteholders. Ex. F1, § 10.4 at 57. Once again, however, Section 10.1 makes clear that the Indenture Trustee shall have "no liability" for action or inaction in connection with an Event of Default unless a Trust Officer receives "written notice"—thus making clear that the reference to "actual knowledge" in Section 10.4 cannot provide a basis for charging the Indenture Trustee with liability before formal written notice of an Event of Default has been provided to the Trustee.

**2.   Collateral Agent—Security Agreement.**

BoA served as Collateral Agent under a Facility Document called the Security Agreement, pursuant to which BoA opened and maintained Collateral Accounts to hold Ocala's assets. *See* Ex. A, § 5.01 at 13. The Security Agreement gave Ocala, through TBW, authority to instruct that funds and other assets be withdrawn or transferred from the Collateral Account for certain purposes, including the funding of new mortgages. *See* Ex. A, § 5.03(a) at 16 & § 5.03(b) at 21.

Both DB and BNP assert that BoA breached myriad duties under that Agreement—including to ensure that all monies withdrawn from the Collateral Account were used for proper purposes, as well as to "match" funds disbursed from the Collateral Account with the precise dollar amount of mortgages purchased on any given day. But the Security Agreement did not impose any of these duties on BoA; on the contrary, it imposed such duties, if at all, upon TBW and Ocala. Indeed, some of these duties exist only in the parallel universe created by Plaintiffs' Complaints. The Security Agreement also made clear that BoA "shall not have any duty" to monitor compliance by other parties—including TBW or Ocala—with their duties under the Agreement or other Facility Documents, and, on the contrary, shall be "entitled to rely, and ... be fully protected in such reliance," upon directions from Ocala. *Id*. § 8.01 at 37.

Nor does the Security Agreement contain any requirement that BoA evaluate Ocala's assets and liabilities before allowing withdrawals, or ensure that funds are deposited in the accounts in a way that segregates them according to series of notes, as Plaintiffs allege.  Section 5.03 does establish as a condition to withdrawals that a certain relationship of assets to liabilities exist, but it was TBW, and not BoA, that was required to make that determination before instructing the withdrawal of funds.  *See* Ex. A, § 5.03(a) at 16, 20 & § 5.03(b) at 20, 25.  And Section 5.01, although it requires BoA to *establish* separate sub-accounts for each series of notes, does not require it to trace withdrawal instructions from TBW to ensure that the funds withdrawn from a particular sub-account are used to purchase mortgages for that series of notes.  *See* Ex. A, § 5.01 at 13-15.  Again, any such obligation to allocate funds by sub-account is placed squarely upon TBW and Ocala under the Purchase Agreement.  *See* Ex. I, § 4.2(a) at 37.  The Amended Complaints describe a fantasy agreement that never existed.

### 3.      **Depositary—Depositary Agreement.**

BoA served as Depositary under the Depositary Agreement between itself and Ocala, and in that capacity handled the back-office mechanics of note issuances, such as establishing and maintaining the bank accounts needed for the issuance and payment of Ocala notes.  Exs. B & C,[6] § 2 at 1.  The Depositary Agreement precludes Ocala from issuing new notes until Ocala provides BoA with a certificate containing certain information about Ocala's assets and liabilities and BoA certifies certain of that information.  Exs. B & C, § 4(d) at 6.  The Agreement protects BoA in its certification by allowing it to rely "conclusively" on information provided by TBW and Ocala.  Exs. B & C, § 11(c) at 13; *see also* §§ 4(h) at 7, 9(c) at 12, 11(e) at 13.  The Agreement also confirms that BoA has no duty to segregate funds held as Depositary, and is not accountable for the use by Ocala of any of the proceeds of the notes.  *Id*. §§ 11(l) & (j) at 14.

---

[6] The two Depositary Agreements, Exs. B & C, are identical in all material respects.  Where pagination differs between them, the exhibits and corresponding page numbers are cited separately; otherwise, they are cited with a single section and page reference.

Plaintiffs have sued BoA under the Depositary Agreement, alleging a breach of its obligation to certify information provided by Ocala before the issuance of new notes.  But, as Plaintiffs acknowledge, only Ocala and BoA are parties to the Depositary Agreement, and only BoA as Indenture Trustee is a named third-party beneficiary.  As a result, the Plaintiffs have no right to sue BoA under this Agreement.

### 4. Custodian—Custodial Agreement.

Under the Custodial Agreement, BoA agreed to perform certain roles with respect to the maintenance of physical mortgage loan files as the mortgages were purchased and sold by Ocala. Among other things, it performed a limited review of the loan files to ensure they did not have missing signatures or other "manifest errors."  Ex. D, § 4 at 3.  As with the Security Agreement, TBW and Ocala had the right to remove mortgage files from the Custodial Account in order to facilitate their sale to third parties such as Freddie Mac.  *See id*. § 6(c) at 4-5.  The Custodial Agreement protected BoA by, among other things, providing that it had no duties except those explicitly set forth in the Agreement; had no responsibility for mortgage loans not in its possession as long as it followed TBW's or Ocala's instructions; was entitled to rely "conclusively" on directions and instructions so received; had no duty to examine documents for authenticity; and had no duty to perfect any security interests or ensure the validity of the mortgage loans, including to determine whether payment of any amount was received for such loans or to reconcile funds.  *Id*. §§ 19(a) at 9, (d) at 10, (g) at 11, (i) at 11, (j) at 11, & (k) at 12.

Plaintiffs have sued BoA under the Custodial Agreement, claiming that it failed to maintain sufficient controls over loans removed by Ocala for potential sale to Freddie Mac.  But, again, the Custodial Agreement does not confer third-party beneficiary status upon noteholders, so the Plaintiffs have no right to bring any claims against BoA under the Custodial Agreement.

### E. TBW's Pervasive Control Over Ocala's Operations.

Plaintiffs' depiction of BoA as their protector or "guarantor" against misconduct by TBW or Ocala is a fabrication.  Although the functions that BoA undertook to perform protected against certain forms of harm—such as theft by those not a party to the facility—they decidedly were *not*

designed to protect against misconduct by the principals themselves, namely TBW and, through it, Ocala.  On the contrary, the documents gave TBW and Ocala control over the operation and assets of the Ocala facility and required BoA to follow their directions.

That said, the sort of protective structure Plaintiffs contrive by their mischaracterization of the governing documents is not unheard of:  there certainly are transactions where the parties insist on an escrow or "lockbox" arrangement to protect against malfeasance by preventing the principals from controlling the program's assets.  But Ocala was not such a program.  On the contrary, the Plaintiffs allowed TBW to control the assets every step of their way through the program:

- *TBW* decided which mortgage loans to place in the program, Ex, I, § 2.1(a) at 2-3;
- *TBW* serviced the loans held by the program, *id*. § 4.1(a)(i) at 32-33;
- *TBW* decided when to sell the loans out of the program, *id*. § 4.2(a) at 36-37;
- *TBW* decided to whom to sell the loans, *id*. § 4.2(a) at 36-37; Ex. D, § 8 at 5;
- *TBW* decided at what price to sell the loans, Ex. I, 4.2(a) at 36-37; Ex. D, § 8 at 5; and
- *TBW* decided when to issue notes, Ex. C, § 4(a) at 4-5.

This structure was hardly surprising, given that it was TBW that bore the losses, and reaped the gains, from the sale of loans out of Ocala—as DB itself acknowledged in its original Complaint before self-consciously excising these admissions in its recent amendments.  *See* DB Cplt. ¶ 41 ("DB's participation in these two agreements was part of an arrangement that served to transfer all market risk regarding the value of mortgages from Ocala to DB, and then from DB to TBW."); *id*. ¶ 43(c) ("As 'Back Swap Counterparty,' TBW took on all market risk related to DB's investment by agreeing to absorb various types of potential losses on the mortgages.  By the same token, TBW would receive any potential profits on the mortgages.").  With so much at stake in the program, from loan origination through loan servicing to loan sales, it is understandable that TBW would want to control every aspect of its program, *and that Plaintiffs would agree—and receive massive fees in their many capacities for this concession—to allow it to do so*.  Only in retrospect is it clear that Plaintiffs should have insisted on the lock-box program they describe in their Amended Complaint but neglected to require in their agreements.

**F.    TBW As the Source for the Key Information About Ocala.**

As one would expect from the party controlling every aspect of Ocala, TBW also was the exclusive source of information about the program.  The Facility Documents require TBW to prepare and disseminate, to Plaintiffs and others, numerous periodic reports, including the Daily Report ( Ex. I, § 4.24 at 49), the Monthly Facility Content Report (*id.* at Ex. H), the Servicer Report (*id*. § 4.18 at 49), the Servicer Advance Report (*id*. § 4.22 at 49), the Secondary Market Trading Report (*id*. § 4.23 at 49), the Qualified Counterparty Report (*id*. § 4.25 at 49-50), and others.  All of these reports were to be prepared by or at the direction of TBW.  *None* was to be prepared by BoA.

Plaintiffs, in their various capacities, were empowered under the Facility Documents to monitor TBW's performance of its obligations, and had ample incentive to do so, given their guarantees of TBW's performance under the swaps and their substantial credit exposure to TBW and Ocala.  The Facility Documents empowered Plaintiffs (or, in BNP's case, its parent) to *audit and inspect* TBW's books and records (Ex. I, § 6.6(a) at 52) and loan files (*id*. § 2.6 at 8), and to request from TBW all manner of additional financial information (*id* § 8.1 at 53) to ensure TBW was honoring its obligations.  Armed with this stream of financial data, Plaintiffs were far better able, and better motivated, than any other party (and certainly than BoA) to protect against malfeasance by TBW and Ocala.  And with the Facility Documents filled with protective provisions confirming that BoA had no duty to review or evaluate information produced by TBW, Plaintiffs could not have reasonably expected BoA to perform the very functions that the provisions expressly stated it would not be performing.

**G.    Exposure of TBW's Fraud and Its Resulting Failure.**

TBW's mortgage operations, including Ocala, ceased shortly after federal law enforcement raided TBW's offices on August 3, 2009.  BNP FAC ¶¶ 83-87; DB FAC ¶¶ 207-08.  Colonial's offices also were raided, and it announced that it was the target of a criminal investigation by the DOJ relating to its mortgage lending unit and related accounting irregularities.  Colonial later was placed into FDIC receivership.  DB FAC ¶¶ 209-10; BNP FAC ¶¶ 83, 90.  HUD suspended TBW's

approval to originate and underwrite mortgages because of concerns of fraud, and Freddie Mac terminated TBW's eligibility to sell and service over $50 billion of Freddie Mac loans.  BNP FAC ¶¶ 85-86.  These regulatory actions "made it impossible for TBW to continue in business and on August 5, 2009, TBW closed its mortgage-lending operations."  *Id*. ¶ 87.

Also on August 5, 2009, DB and BNP Paribas, as Swap Counterparties, provided formal written notices to BoA—as well as to TBW, Ocala, and others—that an "Indenture Event of Default" under Section 9.1 of  the Indenture, and a "Termination Event" under the Purchase Agreement, had occurred.  BNP FAC ¶ 88; *see also* Ex. S.  In addition, DB's letter instructed BoA, as Indenture Trustee, to declare the notes to be due, instruct Ocala to cease purchasing mortgage loans, and notify TBW that such Events of Default had occurred.  Ex. S1.  On August 10, 2009, BoA sent Ocala, TBW, the Swap Counterparties, and others a Notice of Potential Indenture Event of Default, Indenture Event of Default, and Acceleration that implemented these instructions.  BNP FAC ¶ 89; Ex. S3.  Later that month, TBW filed for bankruptcy.  *Id*. ¶ 94; DB FAC ¶ 213.

As a result of TBW's fraud, Ocala lacks sufficient assets (either mortgage loans or cash) to pay off the short-term notes it issued on July 20, 2009.  On August 12, 2009, following BNP's "Automatic Termination Event" notice, BoA, in its capacity as Indenture Trustee under the Indenture, commenced suit against Colonial and others to recover mortgage loans and other assets belonging to Ocala.  BoA, as Indenture Trustee, also is pursuing recovery in the TBW bankruptcy, and from other potential sources.

## IV.     ARGUMENT

### A.     Applicable Legal Standards Governing This Motion to Dismiss Contract Claims.

Plaintiffs do not dispute that New York law controls the outcome of this motion, which rests upon the plain language of the underlying agreements.  In New York, "[i]nterpretation of the contract is a legal matter for the court and its provisions establish the rights of the parties and prevail over conclusory allegations of the complaint."  *805 Third Ave. Co. v. M.W. Realty Assocs.*, 58 N.Y.2d 447, 451, 461 N.Y.S.2d 778, 780 (1983).  If the "parties' intent is unambiguously conveyed by the plain meaning of the agreements, then interpretation is a matter of a law."  *Aon*

*Fin'l Prods., Inc. v. Societe Generale*, 476 F.3d 90, 95-96 (2d Cir. 2007).  "[W]here the contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument."  *Fetner v. Fetner*, 293 A.D.2d 645, 646, 741 N.Y.S.2d 256, 258 (2002) (citing *Nichols v. Nichols*, 306 N.Y. 490, 496 (1954)).

As shown below, dismissal is appropriate here because the plain terms of the applicable contracts show that Plaintiffs' claims lack merit.  *See In re Musicland Holding Corp.*, 386 B.R. 428, 437 (S.D.N.Y. 2008) (Sweet, J.).  Indeed, in many instances, Plaintiffs have failed even to point to actual contract terms, but have simply fabricated duties from thin air.  This itself warrants dismissal, for in order to state a contract claim, "Plaintiffs must identify *what provisions of the contract [were] breached* as a result of the acts at issue."  *See Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 496 (S.D.N.Y. 2002).  In other instances, Plaintiffs have simply plucked from the operative contracts provisions that impose duties on TBW and Ocala, and magically transposed the language of those provisions to refer to BoA instead of TBW and Ocala.  But, again, courts may not rewrite the contract "under the guise of construction."  *Slamow v. Delcol*, 174 A.D.2d 725, 727, 571 N.Y.S.2d 335, 336 (1991), *aff'd* 79 N.Y.2d 1016, 1017 (1991).  Plaintiffs' claims all fail as a matter of law, as shown in detail below.

**B.   <u>Plaintiffs' Breach of Contract Claims Under the Base Indenture and Their Claims for Breach of Fiduciary Duty Fail As a Matter of Law.</u>**

Plaintiffs' Amended Complaints add to their already-convoluted array of claims the novel theory that BoA breached the Base Indenture by not unilaterally declaring an Event of Default many months before it received written notice of an Event of Default in August 2009.  Plaintiffs had assiduously avoided any claim under the Indenture in their original Complaints—no doubt due to the numerous barriers to liability created by the Indenture itself.  Having now seen BoA's first motion to dismiss, including its exposure of the deep flaws in Plaintiffs' other claims, Plaintiffs have been driven to proceed under the Indenture—but their claims are barred for the obvious reasons that no doubt deterred them from making such claims in the first place.

1.      **Plaintiffs' Claims Under the Indenture Fail Because the Indenture Expressly Precludes Liability Absent Written Notice of an Event of Default.**

Plaintiffs contend that BoA is liable for breach of contract and breach of fiduciary duty under the Indenture for not declaring an Event of Default and shutting down the Ocala facility *before* BoA received written notice of an Event of Default.  This theory is refuted by the plain language of the Base Indenture itself, which expressly provides that BoA shall have "no liability" for such actions or inactions unless and until it receives "written notice" of an Event of Default. *See* Ex. F1, § 10.1(a) at 54.  This unequivocal language is dispositive here.

Plaintiffs admit that BoA was provided formal written notice of an Event of Default on August 5, 2009.  BNP FAC ¶ 88; *see also* Ex. S.  In fact, this was the only Event of Default that Plaintiffs identified in their original Complaints.  *See* BNP Cplt. ¶¶ 6, 57-68.  Plaintiffs further admit that BoA, consistent with its responsibilities as Indenture Trustee under the Base Indenture, *see* Ex. F1, § 9.1 at 50,  took prompt action in response to that notice—including issuing, on August 10, 2009, a formal Notice of Default (1) declaring the notes due and payable; (2) instructing Ocala to cease purchasing mortgages; and (3) instructing Ocala and the Depositary to cease issuing Short Term Notes.  BNP FAC ¶¶ 88-89.  *See also* Ex. S3.  Plaintiffs do not allege that any formal written notice was sent to BoA before August 5, 2009—by Ocala or anyone else.  Nor do they allege that the August 10 notice issued by BoA was defective or that BoA should have taken other action upon receipt of the August 5 notice.

What Plaintiffs do allege, for the first time, is that BoA should have *unilaterall*y initiated these same actions—declaring principal and interest due and payable, and instructing Ocala and other parties not to purchase mortgage loans or issue new notes—long before it received the August 5 written notice.  They claim that certain accounting information that TBW provided as part of a series of Borrowing Base Certificates under the Depositary Agreement, and that Plaintiffs allege BoA was required to certify, should have put BoA on notice of an "Event of Default"— defined in the Facility Documents to include an "Event of Bankruptcy," which in turn is defined to include "insolvency."  Based on this "should have known" syllogism, Plaintiffs allege that BoA—

long before it received express written notice of an Event of Default on August 5, 2009—should have unilaterally "shut down the Ocala facility," notified all parties, and directed the payment of all assets in the Collateral Account to the payment of notes.  BNP FAC ¶¶ 202, 204; DB FAC ¶¶ 33,103, 104, 218, 221, 222.  Plaintiffs also assert that these same circumstances triggered the higher standard of care that the Indenture imposes only after declaration of an Event of Default.  BNP FAC ¶¶ 209-12; DB FAC ¶¶ 282-85.

Not surprisingly, given the extraordinary implications of this theory, it finds no support in the Facility Documents, and in fact is barred by the plain language of the Indenture.  Section 10.1 of the Indenture expressly states that BoA "shall have no liability" for any "action or inaction" in connection with the deemed occurrence of an Event of Default unless one of its Trust Officers receives "written notice" thereof.  Ex. F1, § 10.1(a) at 54.  This limitation is repeated later in the same section, under Section 10.1(c), which specifies that "[t]he Indenture Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, *except that* … (iv) The Indenture Trustee *shall not be charged with knowledge* of *any* default under *any* Facility Document unless a Trust Officer of the Indenture Trustee receives *written notice* of such default."  *Id*. § 10.1(c) at 55.  These provisions make clear that BoA cannot be liable under the theory that Plaintiffs espouse here—*i.e.*, that it failed unilaterally, without having received written notice of an Event of Default, to investigate and determine whether there might have been an Event of Default, in the form of an Ocala insolvency, an Event of Bankruptcy, or otherwise, or to take specific action based upon such an Event of Default, such as shutting down the Ocala facility, directing the notes to be immediately due and payable, directing the cessation of mortgage purchases or note issuances, or other similar actions.

The requirement of written notice to BoA before it can be liable for inaction is reinforced by the other provisions of the Indenture requiring *Ocala* to notify BoA of the occurrence of any Event of Default.  The Indenture expressly required Ocala, as Issuer, to provide the Indenture Trustee, BoA, with prompt notice of any Event of Default or Potential Event of Default, "together with a certificate of the Issuer setting forth the details thereof and any action with respect thereto

10576546.3

-26-

taken or contemplated to be taken by the Issuer." Ex. F1, § 8.10(a) at 43; *see also id*. § 8.3(c) at 42. This obligation to provide notice was repeated in Section 9.1 of the Indenture, which specifically singled out defaults under Section 9.1(f)—on which Plaintiffs rely here—as requiring "written notice" to BoA. Ex. F1, § 9.1 at 50. Ocala's obligation to provide such notice ran not only to BoA, but also to the Note Dealers, the Swap Counterparties, and Rating Agencies. *Id.*

The Facility Documents also required Ocala, not BoA, to make specific representations attesting to Ocala's own solvency and the absence of any Event of Default or Event of Bankruptcy, and required Ocala, and not BoA, to certify to the same. BoA was expressly authorized to rely upon Ocala's representations. *See* Ex. F1, §§ 10.2(f) at 56, 10.1(c)(iv) at 55. One of Ocala's critical representations for present purposes was in Section 7.12 of the Indenture, entitled "Solvency," where Ocala expressly represented that:

> Both before and after giving effect to the transactions contemplated by this Base Indenture and the other Facility Documents, *the Issuer is solvent within the meaning of the Bankruptcy Code* and the Issuer is not the subject of any voluntary or involuntary case or proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy or insolvency law and no Event of Bankruptcy has occurred with respect to the Issuer.

*Id.* at 39. Consistent with this representation, the Supplements to the Indenture that authorized the notes at issue here expressly provided that "[t]he right of the Issuer"—Ocala—"to issue any class of Series 2008-1 Short Term Notes" was subject to the condition that, on the Issuance Date and after giving effect thereto, "[n]o event of default under any Facility Document and no Event of Default shall have occurred and be continuing and the Issuer shall have made a determination that no event of default under any Facility Document and no Event of Default will result from the issuance of such Series 2008-1 Short Term Notes." *See* Ex. G, § 2.3 at 9; Ex. H, § 2.3(b) at 10. These representations were repeated for each note issuance through Ocala's formal certification under Exhibit C of the Depositary Agreement. Significantly, only Ocala—and not BoA—was required to certify to the continued existence of these conditions, including the absence of any Event of Default and the continued solvency of Ocala. *See* Exs. B & C (Ex. C thereto at item 4).

10576546.3

Plaintiffs ignore all of the provisions narrowly containing BoA's liability for determining Events of Default, and point exclusively to Section 10.4 of the Indenture, which states that if a Trust Officer of BoA receives written notice "or has actual knowledge" of an Event of Default or Potential Event of default, BoA shall notify the other parties. Ex. F1, § 10.4 at 57. Apparently Plaintiffs' theory is that some form of "actual knowledge" can substitute for "written notice" and trigger the litany of Event of Default consequences, including acceleration, payment of notes, and a "shutdown" of the Ocala facility, among other things. But whatever "actual knowledge" may mean, Section 10.1 makes clear that there shall be *no liability*, and that knowledge *shall not be imputed*, absent "written notice" of the relevant Event of Default to BoA. In other words, BoA has certain responsibilities and can take certain actions under the Base Indenture as information comes to its attention, including under Section 10.4, but it shall not be liable for action or inaction in connection with the litany of consequences that an Event of Default entails unless it receives "written notice thereof." *Id*. § 10.1(a) at 54.

Plaintiffs also repeatedly refer to the alleged Events of Default here as "automatic," as though that somehow might eliminate the requirement of prior written notice to BoA, or negate the express provisions stating that BoA shall have "no liability" absent such written notice. In fact, the Indenture provision on which Plaintiffs rely—Section 9.1—does not make *any* type of Event of Default "automatic" in the sense that BoA must divine that the Event of Default has occurred without being notified thereof. The provision Plaintiffs cite does not even address the issue of notice *to* the Trustee, but rather identifies situations where notice *by* the Trustee is or is not required to trigger certain consequences, such as acceleration. *See* Ex. F1, § 9.1 at 50. This type of provision—common in trust indentures—simply means that if the company goes into bankruptcy, no formal action *by* the Indenture Trustee is required to trigger acceleration of the Issuer's note obligations or the parties' payment or liquidation preferences. It in no way dispenses with the requirement of written notice *to* the Indenture Trustee before the Indenture Trustee may be held *liable* for action or inaction in connection with an Event of Default. Ex. F1, § 10.1 at 54. Indeed, the very same paragraph in the Indenture that Plaintiffs cite for the "automatic" Event of Default

reiterates—to remove any doubt—that Ocala shall provide "written notice" to BoA of *any* Event of Default, "automatic" or otherwise. See Ex. F1, § 9.1 at 50.

Courts repeatedly have recognized that "written notice" and exculpatory provisions such as these are critical given the drastic and irreversible consequences of an Event of Default under an Indenture, and the need for a high level of formality to place the Indenture Trustee and others on notice of the need to initiate and execute in an orderly and coordinated fashion the acceleration of the notes, payment under the payment "waterfall," and cessation of mortgage purchase activities and note issuances triggered by an Event of Default. These extreme consequences and the need for coordinated action mandate clear provisions regarding the triggering of such actions, as well as any heightened duties for the trustee. *See*, *e.g.*, *Putnam High Yield Trust v. Bank of N.Y.*, 7 A.D.3d 439, 776 N.Y.S.2d 796 (2004) (dismissing investors' claims against Indenture Trustee due to the absence of any allegation that indenture trustee had received written notice of a default); *Argonaut P'ship v. Bankers Trustee Co. Ltd.*, No. 96 Civ. 1970, 2001 WL 585519, at *2 (S.D.N.Y. May 30, 2001); *cf. Ultimate Connection, Inc. v. Friedfertig*, 12 Misc.3d 1175(A), 824 N.Y.S.2d 767, 2006 WL 1887459, at *2 (N.Y. Sup. 2006) (dismissing claim where contract required written notice of default as a condition precedent to guarantor's liability and no such notice was provided).

In *Argonaut*, for example, the court dismissed claims against an Indenture Trustee—an affiliate of DB now known as Deutsche Bank National Trust Co.[7]— for failing to act upon a

---

[7] The cynicism behind this lawsuit surfaces again here. DB knows of the implications of a "written notice" requirement, and the rule that an indenture trustee's duties are limited to those expressly delineated in the operative contracts, because DB helped shape the law on these very points. The indenture trustee in *Argonaut* was Bankers Trustee Company Limited—now known as Deutsche Trustee Company Limited, a DB affiliate. *See* Ex. W at 19, 365 & Ex. X. Bankers Trustee ("BT") secured dismissal of all claims, including a claim asserting a duty to monitor the Servicer's conduct, "because the applicable sections of the Indenture impose no duty upon BT either to perform those activities or to monitor those parties." *See* 2001 WL 585519, at *1; *see also* Ex. V, *Nacional Financiera, S.N.C., v. Bankers Trustee Co. Ltd.*, Index No. C121131/98, at 1, 12-14 (N.Y. Sup. Ct. Nov. 17, 2000) (dismissing claims against Bankers Trustee after the collapse of "seriously flawed investment transactions" involving "problematic loans," including dismissing claims that BT failed to ensure documents it received were correct and complete, and failed "to compare them to the list of Receivables contained in other documents that it had received"; even if the investigation "might have been an 'inordinately simple' one to perform ... BT had no express or implied duty to investigate").

claimed event of default and to take enforcement action on plaintiffs' behalf.  The court found the absence of prior written notice to the Indenture Trustee dispositive under the Indenture:

> It is reasonable for the Indenture to specify a particular single act (here, written notice of an Event of Default from [certain investors]) which must occur before the [indenture trustee] is charged with knowledge of the default or obliged to exercise any remedies, *rather than leaving questions of the timing and amount of its knowledge (and hence its obligation to act) to the uncertainties of later litigation over when such knowledge should be imputed.*

*Id.* at *2.

This reasoning applies here.  Plaintiffs' theory is that BoA should have appreciated that certain information in its possession might call into question Ocala's solvency and unilaterally implemented Event of Default procedures.  But as in *Argonaut*, the parties unequivocally agreed in Section 10.1 of the Indenture that BoA would have no liability for its actions or inactions before it received *written notice* of an Event of Default, which it did not receive here prior to the August 5, 2009 notices, upon which it in fact acted.

Of course, there are billions of good reasons why an Indenture Trustee such as BoA would insist on such strong protections, and why TBW, Ocala and the Plaintiffs agreed to give them:  No rational entity would agree to earn relatively tiny fees for ministerial services (e.g., $8.00 per loan file, as was the case here) for a multibillion dollar facility without insisting on airtight provisions precluding it being rendered a guarantor for the facility.  And as much as Plaintiffs ignore them, the Facility Documents here are replete with exculpatory provisions that expressly and conclusively bar Plaintiffs' claims.

### 2.      As a Matter of Law, the Borrowing Base Certificates Did Not Constitute "Written Notice."

Anticipating these serious problems with Plaintiffs' newly-hatched "Event of Default" theory, DB (but not BNP) halfheartedly asserts that BoA received early "written notice" of Ocala's insolvency through the same "Borrowing Base Certificates"—Exhibit C to the Depositary Agreement—on which Plaintiffs rest their "should have known" arguments.  DB FAC ¶ 110.  But such a "should have known" theory does not and cannot constitute "written notice" as that term is understood in the case law, which makes clear that "written notice" must be notice, in writing, of

the event of default itself—not writings containing information from which that fact, with the clarity of hindsight, might or should or could have been inferred or pieced together. As the court in *Argonaut* recognized, a contrary conclusion would subvert the whole point of formal written notice—certitude for all parties, and protection against hindsight-based litigation—and permit disappointed investors in every failed asset-backed facility (all of which have "written notice" provisions) to bring litigation against their indenture trustee in the hope of converting the written notice requirement into a factual free-for-all about actual, or even constructive, knowledge *simpliciter*. *See* 2001 WL 585519, at *1.

Other case law is in accord. In *UBS Capital Americas II, LLC v. Highpoint Telecomm. Inc.*, No. 01 CIV. 8113, 2002 WL 377537, at *1 (S.D.N.Y. Mar. 8, 2002), for example, the defendant was required to provide the plaintiff with "written notice" when a "purchase event" generated "excess cash"—a requirement intended to allow plaintiff to decide whether to exercise a repurchase right. Defendant conceded it did not comply with the "strict letter" of the notice requirement, but argued that it provided written notice when it sent plaintiffs (1) press releases announcing transactions that it claimed were "purchase events" and (2) financial statements showing receipt of funds that it claimed qualified as "excess cash." *Id.* at *4. The court disagreed, holding as a matter of law that receipt of the press releases and financial statements did not satisfy the written notice requirement because they did not *specifically inform* the plaintiffs that a purchase event had occurred or that excess cash had been generated. *Id.* In other words, writings containing facts from which the recipient might itself reach the necessary conclusion did not suffice; "written notice" meant a writing stating the *actual conclusion or fact* of which notice was to be provided. *Id.*

*Magten Asset Mgmt. Corp. v. Bank of New York*, 15 Misc. 3d 1132(A), 841 N.Y.S.2d 219, 2007 WL 1326795, at *2 (May 8, 2007), also is instructive. The notice requirement there called for a written "admission" of an inability to pay debts as they came due before action based on "insolvency" would be triggered. The investors argued that the company's securities filings constituted such an admission because the filings conceded the company might need additional

funding to pay its substantial debt coming due the next year. *Id.* at *4. The court disagreed, noting that BNY, as Indenture Trustee, "was expected to perform significant acts in response to an event of default" by the company, and that the requirement of an unambiguous formal writing therefore must be given effect. *Id.* at *6. As the court noted in reasoning applicable here: "Language that is meant to stir action must be clear and unequivocal. [The company's] financial reports did not clearly inform BNY that it was time to take action." *Id.*

The same analysis applies here. DB's claim that the allegedly faulty Borrowing Base Certificates that BoA received from TBW placed it on "written notice" of Ocala's insolvency is wrong as a matter of law. Not only did these Certificates *not* state on their face that Ocala was insolvent,[8] or that there had been an Event of Default or an Event of Bankruptcy (the definition of which, under the Base Indenture, incorporates the concept of insolvency), but, as noted above, the Certificates were required to and did contain an express certification from Ocala—not required to be endorsed or examined by BoA—that Ocala was *not* insolvent, and that there had *not* been any Event of Default or Event of Bankruptcy.[9]

---

[8] Although the point is not necessary for the present motion, Plaintiffs' theory that the Borrowing Base Certificates, provided by TBW in the form of Exhibit C to the Depositary Agreement, showed on their face that Ocala was "insolvent" is mistaken. As the Exhibit C form itself shows, and as Plaintiffs concede, the Certificates set out a formula comparing certain assets of Ocala with certain liabilities. Exs. B & C (Exs. C thereto); DB FAC ¶ 78. They did not purport to portray Ocala's entire financial status. For instance, as Plaintiffs knew better than anyone knew, TBW clearly disclosed in its April 30, 2008 audited financial statements—months *before* Plaintiffs decided to enter into their current arrangement with TBW—that Ocala's largest single asset at that time was a $642.7 million receivable from TBW, which, together with other assets that Exhibit C did not address, purportedly gave Ocala, on April 30, 2008, a positive net worth of $107.4 million. Further, as discussed in the text above, Exhibit C expressly included Ocala's representation of *solvency*, and did not purport to state any conclusions supporting the usual tests for *insolvency*.

[9] The Borrowing Base Certificate in the Depositary Agreement calls for an express representation by Ocala, *not* certified to by BoA, that: "All of the conditions precedent to issuance specified in Section 2.3 of the Series 2008-1 Supplement to the Base Indenture are satisfied." Exs. B & C (Ex. C thereto at item 4). Section 2.3 of the Supplement in turn includes Ocala's representations that there is no "event of default under any Facility Document and no Event of Default shall have occurred and be continuing" (Ex. G, § 2.3(b) at 9), and that Ocala's prior representation that it is "solvent" and that there is "no Event of Bankruptcy" shall remain true (*id.* § 2.3(c) at 9-10) (incorporating representations from Base Indenture, *see* Ex. F1, § 7.12 at 39 ("Solvency")).

Perhaps the best indication of what *would* constitute proper written notice under the Base Indenture are the notices that Plaintiffs themselves provided to BoA on August 5, 2009. The notice from DB perfectly embodied the level of formality, clarity, and unequivocal direction that one would expect for "written notice" that would trigger the drastic consequences of acceleration, payment of notes, and cessation of all mortgage activities, and the imposition of fiduciary-like duties upon BoA. DB's notice, directed to LaSalle (BoA), TBW, and Ocala, is worth reading in full as a model of what one would expect such "written notice" to be:

> Ladies and Gentlemen:
>
> The undersigned, as the Series 2008-1 Swap Counterparty, under that certain Second Amended and Restated Base Indenture (the "Base Indenture"), dated as of June 30, 2008 between Ocala Funding, LLC, as Issuer (the **"Issuer"**), and LaSalle Bank National Association, as Indenture Trustee (the **"Indenture Trustee"**), as supplemented by the Series 2008-1 Supplement, dated as of June 30, 2008 (the **"Series Supplement"**), between the Issuer and the Indenture Trustee, hereby notifies you that it believes that Indenture Events of Default have occurred pursuant to (i) Section 9.1(b) of the Base Indenture resulting from a material misrepresentation under Section 3.1(a)(viii) of the Mortgage Loan Purchase Agreement and (ii) Section 9.1(m) of the Base Indenture resulting from the revocation by each of FHLMC (Freddie Mac) and GNMA (Ginnie Mae) of the Approved Seller Status.
>
> Pursuant to Section 9.1 of the Base Indenture, the undersigned, as the Series 2008-1 Swap Counterparty, hereby instructs the Indenture Trustee to:
>
> > (i)     declare the principal and premium (if applicable) of and accrued or accreted in respect of the Notes to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Issuer, anything contained in the Base Indenture or Series Supplement to the contrary notwithstanding; and
> >
> > (ii)    instruct the Issuer to cease purchasing Mortgage Loans and the Issuer and the Depositary to cease issuing Short Term Notes; and
> >
> > (iii)   notify the Servicer and the Seller that such Indenture Events of Default have occurred.

> All capitalized terms not otherwise defined herein shall have the meanings set forth in the Base Indenture or the Series Supplement, if applicable.
>
> Very truly yours,
>
> DEUTSCHE BANK AG, LONDON BRANCH, as Series 2008-1 Swap Counterparty.

*See* Ex. S1.

This model of written notice provided by DB itself clearly was given with the usual understanding of the function such notice is to perform: "Language that is meant to stir action must be clear and unequivocal." *Magten*, 2007 WL 1326795, at *6. DB's newly-hatched theory that BoA should have pieced together such formal notice and instructions from accounting information in its possession, and taken action based on such a hair-trigger to "shut down the facility" and accelerate the notes, among other actions, is wrong as a matter of law because such information simply does not constitute "written notice" of an Event of Default.

### 3. <u>Plaintiffs' Claims for Breach of Fiduciary Duty Also Are Precluded by the Terms of the Indenture.</u>

Plaintiffs' claims for breach of fiduciary duty also fail as a matter of law because they are barred by the plain terms of the Indenture for the same reasons as are Plaintiffs' contract claims under the Indenture—the absence of "written notice" to BoA of an Event of  Default—and because, under the specialized law relating to Indenture Trustees, no fiduciary duties can be implied outside the terms of the Indenture.

The Indenture makes clear that BoA does not assume heightened duties until there is an Event of Default, and shall have no liability until it receives written notice of such an Event of Default. Ex. F1, § 10.1(a) at 54. The limitation on liability in Section 10.1 follows immediately from the provision in Section 10.1 setting out the heightened duties that arise after an Event of Default, and makes clear that "no liability" of any kind—including, necessarily, under the heightened standards just referenced—shall follow from a deemed Event of Default absent "written notice" thereof.

This comports with a consistent body of caselaw holding that duties of Indenture Trustees are strictly limited by contract, and do not include implied fiduciary duties of the sort that apply to trustees in other contexts, such as corporate directors or trustee of testamentary trusts—despite the use of the word "trustee" in the title. *See Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71 (2d Cir. 1988) (noting "well-established" New York law "that the duties of an indenture trustee are strictly defined and limited to the terms of the indenture"). Rather, the duties of an Indenture Trustee before a declared Event of Default are exclusively contractual. *See Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985).

For this reason, provisions such as the present one precluding fiduciary duties for Indenture Trustees absent "written notice" are common, and are routinely upheld by the courts. In *Argonaut*, for example, the court found that the parties' agreement to limit the Indenture Trustee's liability applied to *all* claims, and that, absent express provision therefor, "no fiduciary relationship" could be implied under the contract terms. *See* 2001 WL 585519, at *3 (under clear New York law, "a conventional business relationship, without more, does not become a fiduciary relationship by mere allegation"). *See also Magten*, 2007 WL 1326795, at *7 (prior to receipt of contractually-sufficient notice of Event of Default, Indenture Trustee subject only to contractual duties).

The parties' agreement to limit BoA's liability absent written notice of a default makes eminent sense in light of the other contractual provisions that bear upon the issue. Nowhere in any of the numerous provisions of the Facility Documents did the parties impose upon BoA fiduciary obligations of any sort—except for the heightened duties provided for in Indenture Section 10.1 and immediately qualified by the "no liability" without "written notice" language. *See*, *e.g.*, Security Agt., Ex. A, § 8.01 at 36; Depositary Agts., Exs. B & C § 11(b) at 13; Custodial Agt., Ex. D § 19(a) at 9-10. Further, and consistent with BoA's limited and clearly-defined roles, the parties expressly stated that they were not relying on BoA to monitor Ocala's financial circumstances; that, to the contrary, *Ocala* would certify to its own solvency and the absence of any Event of Default or Bankruptcy, and also would have broad obligations to inform Plaintiffs and BoA if any such Event occurred; and that BoA could "conclusively rely" upon documents received from Ocala

and had no obligation "to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request … unless requested in writing to do so by the Required Senior Noteholders."  *See*  Ex. F1, §§ 8.3(c) at 42, 8.10(a) & 8.10(b) at 43, & 10.2(a) & (f) at 56.  Because BoA did not receive written notice of an Event of Default until August 5, 2009, and because Plaintiffs do not allege any breaches of any duties after that date, Plaintiffs' claim for breach of fiduciary duty fails as a matter of law.

**C.    Plaintiffs' Claims Under the Security Agreement Are Precluded by the Express Contract Terms.**

Central to Plaintiffs' case is their claim that BoA breached its duties as Collateral Agent under the Security Agreement by failing to "secure and protect" the Ocala assets in which BoA held a security interest on behalf of the noteholders.  Plaintiffs recite a litany of purported duties that they claim were assigned to BoA under the Security Agreement.

- A duty to examine and verify the specific *purpose* for which funds were withdrawn by Ocala from the Collateral Account to ensure that the funds were used to purchase only "dry" mortgage loans and sent only to a certain account to be used for that purpose, *see* BNP FAC ¶ 156(i); DB FAC ¶ 238;

- A duty to examine the *amount* of each regulated withdrawal or transaction to verify that funds withdrawn or transferred from the account on a given day precisely matched the aggregate purchase price of mortgage loans actually purchased by Ocala on that day, *see* BNP FAC ¶ 156(i); DB FAC ¶ 238;

- A duty to evaluate Ocala's *assets and liabilities* with respect to each requested withdrawal before complying with any request for withdrawals from the accounts, *see* BNP Cplt. ¶ 128(ii); BNP FAC ¶ 156(ii); DB Cplt. ¶ 140; DB FAC ¶ 239;

- A duty to audit TBW's and Ocala's withdrawals from and deposits to the separate sub-accounts for each series of notes to ensure strict segregation of funds between the series, *see* BNP FAC ¶ 156(iii); DB FAC ¶ 240; and

- A duty to perfect security interests in the underlying mortgage loans, *see* BNP FAC ¶ 156(iv); DB FAC ¶ 237.

But the fundamental and fatal problem with these claimed duties is that neither the Security Agreement nor any other Facility Document assigns *any* of them to BoA.  To the extent the Facility Documents recognize such duties at all—such as the requirement that the Ocala facility purchase only "dry" mortgages, the requirement to perfect security interests, and the requirement to evaluate

Ocala's assets before any withdrawal—those duties are assigned squarely to either Ocala or TBW, and BoA expressly has *no duty* to monitor TBW's or Ocala's compliance with these requirements. *See* Security Agt., Ex. A, § 8.01 at 37.  As for the other so-called duties that Plaintiffs try to assign to BoA and charge it for not fulfilling—such as the claimed duty to send funds only to a particular account—they do not exist at all in the Facility Documents.  Plaintiffs' only new theory under the Security Agreement—that BoA should not have honored wire instructions from TBW employees for whom it did not have names on file—fails as a matter of law because Plaintiffs have not alleged, nor could they plausibly allege, that TBW's failure to perform the purely ministerial act of placing the additional names on file or to issue its instructions through individuals whose names *were* on file was material in any respect, or caused Plaintiffs any harm whatsoever.

1.    **The Security Agreement Refutes the Claim That BoA Was Required to Monitor the Use of Funds by Ocala or Ocala's Compliance with Its Obligations.**

Plaintiffs' thesis under the Security Agreement appears to be that BoA was required to monitor all aspects of the use of funds by TBW and Ocala.  As an initial observation, Plaintiffs' claims here are remarkable for the degree to which they purport to allege highly specific duties assigned to BoA without citing any contractual language to support such duties—a defect that alone mandates dismissal.  *See Wolff*, 210 F. Supp. 2d at 496 (plaintiff alleging breach of contract "must identify what provisions of the contract [were] breached as a result of the acts at issue").  For example, Plaintiffs assert that BoA had a duty to examine the *purpose* of each proposed withdrawal or transfer instruction on any given day before allowing it, and also specifically to monitor the *use* of any funds so withdrawn or transferred—yet Plaintiffs do not cite a single contract provision that assigns these duties to BoA.  DB FAC ¶¶ 131-48; BNP FAC ¶¶ 98-109.  Even more specifically, but still without contractual support, they allege that in order to ensure that funds were used only for "dry" mortgages, BoA was obliged to transfer funds *only* to a specific account at Colonial that purportedly was designated for "dry" mortgage purchases, and, apparently, to refuse any instruction from Ocala to transfer money to any other account.  BNP FAC ¶¶ 37(c), 101, 102, 105; DB FAC ¶¶ 51, 142, 143.  They go on to allege, still with no support, that BoA had an obligation

each day to *match* funds being transferred out of the Collateral Account with Ocala's actual purchase of loans that day to ensure that the amounts equaled the amounts used to purchase "dry" loans, and also to question withdrawal requests in "whole dollar" amounts.  BNP FAC ¶ 104; DB FAC ¶¶ 152-53.  And DB goes still further, asserting that BoA had a duty to *initiate* withdrawals to ensure that enough funds were withdrawn on any given day to cover the purchase price of loans purchased by Ocala that day.  DB FAC ¶ 154.  With due respect to Plaintiffs' creativity, these purported obligations are not only utterly absent from, but flatly negated by, the Security Agreement and other Facility Documents.

### a.    The Purported Duty to Monitor the *Purpose* of Withdrawals.

Although Plaintiffs repeatedly claim that BoA had a duty to *monitor the purpose* of TBW's withdrawals for compliance with the Purchase Agreement, they do not cite any contract provision that contains or even remotely suggests such a duty for BoA.  On the contrary, the Facility Documents make clear that Ocala, not BoA, was responsible for considering the purpose for which transfers were to be made and for using any transferred funds for proper purposes.  Under the Facility Documents, only Ocala (through TBW, as the sole Manager of Ocala under the LLC Agreement, *see* Ex. Q, § 3.2 at 7 & § 4.1(a) at 10-11), and not BoA or any other party, was authorized to and did arrange the *purchase* of new loans under the Facility Documents, *see* Ex. I, § 2.1 at 2-4.  Plaintiffs acknowledge this fact (*see* DB FAC ¶¶ 7, 40; BNP FAC ¶¶ 3, 31, 74, 107, 108), but then seem to ignore it elsewhere when they claim that *BoA* "purchased" mortgages, was responsible for "paying for" the mortgages, or made "improper purchase" of mortgages (*see*, *e.g.*, DB FAC ¶¶ 23, 153-55; BNP FAC ¶¶ 6, 11, 44, 98, 114, 123, 124)—all functions indisputably performed by TBW and Ocala, not by BoA.  *See*, *e.g.*, Ex. I, §§ 2.1 at 2-4, 3.2(a) at 13.[10]

---

[10]   Section 5.01 likewise expressly recognizes that Ocala may request withdrawals from the Collateral Account pursuant to the procedures set forth in Section 5.03.  *See* Ex. A, § 5.01 at 15 ("the Issuer [Ocala], the Indenture Trustee, the Series 2005-1 Depositary and the Series 2008-1 Depositary may request withdrawals from the Collateral Account in accordance with the terms of Section 5.03 hereof").  The Purchase Agreement confirms that it is *Ocala* (rather than BoA) that is responsible for effectuating payment when TBW sells mortgage loans to Ocala.  *See* Ex. I, § 2.4 at 7 ("The Purchaser [Ocala] shall pay to the Seller [TBW] the Original Purchase Price of each

Indeed, it is precisely because only *Ocala* was the purchaser and *TBW* was the seller that *only TBW and Ocala* were expressly limited in the *types* of mortgage loans that could be purchased.  Most prominently, as Plaintiffs acknowledge, it was Ocala and TBW that were contractually required to ensure that Ocala did not use the funds invested by noteholders to purchase "wet" mortgages and that any mortgages so purchased met Freddie Mac's guidelines.  DB FAC ¶¶ 7; BNP FAC ¶ 31.  The Base Indenture expressly states that Ocala "shall use the proceeds of Notes solely for one or more of the following purposes: (a) to pay the Issuer's Obligations when due, in accordance with the Security Agreement; and (b) to acquire Mortgage Loans from the Seller."  Ex. F1, § 8.28 at 47.  The Purchase Agreement, to which BoA was not a party,[11] expressly requires TBW to sell to Ocala only "Eligible Loans," defined as *not* including any "Wet Funded Loan" and as conforming to "FHLMC Guides."  *See* Ex. I, §§ 2.1(a) at 2-4, 3.2(a) at 13.[12]  And, under the express terms of the LLC Agreement defining the relationship between Ocala and TBW, TBW—as Ocala's sole manager—expressly undertook "to carry out and perform, as agent on behalf of the Company [Ocala], the daily business activities of the Company *and the obligations of the Company under the Facility Documents*."  Ex. Q, § 4.1(b) at 11.

Nor does Section 5.03 of the Security Agreement require BoA to police Ocala's use of funds.  It states that the Issuer (Ocala) "shall ... instruct according to the Facility Documents the Collateral Agent [BoA] to withdraw, or order the transfer of, Deposited Funds … for the following purposes and in the following order of priority."  Ex. A, § 5.03(a) at 16 & § 5.03(b) at 21.  It goes on to state that "[a]ny instruction delivered by the Issuer [Ocala]... pursuant to the provisions of the

---

Mortgage Loan purchased by it hereunder in immediately available funds no later than 6:00 P.M., New York City time, on the applicable Closing Date.").

[11]  BoA was not a party to the Purchase Agreement in any capacity.  Perhaps for this reason, Plaintiffs highlight language in the Indenture—a Facility Document to which BoA was a party, and which requires Ocala to use the note proceeds solely to pay obligations under the notes and "to acquire Mortgage Loans from the Seller."  DB FAC ¶ 135 (quoting Ex. F1, § 8.28 at 47).  But if Plaintiffs mean by this reference to suggest a prohibition on "wet" mortgages in the Indenture itself, the effort fails, because the definition of "Mortgage Loan" is not limited to "wet" mortgages (*see* Ex. F2 at 19); that limitation is imposed on Ocala by the Purchase Agreement itself.  *See* Ex. I, §§ 2.1(a) at 2-4, 3.2(a) at 13, 1.1 at 2 (incorporating Definitions from Base Indenture).

[12]  *See also* Ex. I, § 1.1 at 2; Ex. F2 at 10 ("Eligible Loan") and 9 ("Eligibility Criteria").

foregoing paragraph" for withdrawal of funds, including for the purchase of mortgage loans, "shall be effective upon receipt of written, electronic or telephonic instructions (confirmed promptly in writing) from an Issuer Agent," and that BoA, as Collateral Agent, "shall promptly comply with any such approved instructions made by the Issuer … in accordance with the provisions of the foregoing paragraphs." *See id.* § 5.03(a) at 20 & § 5.03(b) at 26.  It nowhere states or suggests that BoA must inquire as to the purpose of each wire transfer instruction or withdrawal request, nor does it even provide a mechanism for making such a request.  Rather, it is Ocala, not BoA, that must observe the limitations on purposes to which funds may be directed, as it "shall … instruct" BoA "to withdraw or order the transfer of" funds from the Collateral Account in accordance with Section 5.03, and BoA must treat instructions from Ocala as "effective upon receipt" and follow them "promptly."

Nor is there any support in the Security Agreement for Plaintiffs' implicit suggestion that BoA had a duty to *monitor* TBW's and Ocala's uses of funds or particular withdrawals to ensure they were employed for a proper purpose.  Not only does the Agreement not impose any affirmative duty (or even an authorization) to monitor the uses of funds by TBW and Ocala, but it contains *none* of the procedures that would be necessary if BoA were to have such an obligation.  Nowhere does it require, for example, that Ocala, in making instructions for the withdrawal or transfer of funds under Section 5.03, certify or even indicate to BoA the *uses* to which the withdrawn or transferred funds would be directed.  Nor is there any process built into the Agreement—such as a procedure setting aside a time for BoA to analyze the requests, or even a built-in delay in execution—consistent with BoA having any duty to examine each withdrawal instruction to ensure it was for a proper purpose.

Indeed, the suggestion that BoA had a duty to monitor withdrawal instructions prior to a declared Event of Default is expressly refuted by multiple provisions of the Agreement:

- BoA "shall not have any duty" to "ascertain or to inquire as to" performance or compliance by other parties, including TBW, with their obligations under the Facility Documents, and shall have no duty to "inspect any books and records relating to the Assigned Collateral."  Ex. A, § 8.01 at 37.

- BoA "shall be entitled to rely, and shall be fully protected in such reliance" on "any communication [or] direction" that it reasonably believes to be genuine, including a direction issued by TBW, and that BoA "shall not be responsible to any Secured Party for any statements, warranties or representations made in or in connection with this Agreement or any other document relating to the Assigned Collateral." *Id*. § 8.01 at 37.

- BoA is granted only such powers as are "specifically authorized to be exercised," and nothing in the Agreement "shall be deemed to constitute the Collateral Agent a trustee for any Secured Party or impose on the Collateral Agent any obligations other than those for which express provision is made herein." *Id*. § 8.01 at 35-36.

These provisions, far from constituting BoA a guardian against malfeasance by TBW and Ocala or a monitor to police compliance with restrictions on *their* use of funds, make clear that Section 5.03 *cannot* be read to create any duty on the part of BoA to ensure that monies withdrawn upon instructions by Ocala complied with TBW's and Ocala's own contractual obligations.

Courts have construed provisions nearly identical to Section 8.01 to confine the limited duties of a bank in similar transactions.  In *Banco Espanol de Credito v. Security Pacific Nat'l Bank*, 763 F. Supp. 36, 39 (S.D.N.Y. 1991), *aff'd*, 973 F.2d 51, 56 (2d Cir. 1992), for example, the plaintiff banks purchased participations in short-term loans that Security Pacific had made to one of its regular banking customers and was continuing to administer.  763 F. Supp at 37-38.  When the customer defaulted, plaintiffs sued Security Pacific, claiming it had a contractual duty to inform them of the customer's deteriorating financial condition.  *Id.* at 37-39.  The agreement, like Section 8.01 here, stated that Security Pacific "shall not be responsible for performance or observance" of the Agreement by other parties and "shall not have any duty" to inspect the books and records of any institution to which it was loaning money.  *Id*. at 38.  Judge Pollack held that, through this explicit limitation of liability, Security Pacific "adopted no responsibilities" regarding the repayment of the loans; the plaintiffs' purchase was "fully without recourse."  *Id.* at 39; *see also Bayerische Hypo-Und Vereinsbank AG v. Banca Nazionale Del Lavoro, S.p.A.*, 292 B.R. 752, 770 (Bankr. S.D.N.Y. 2003) (agreement disclaiming any duty to inspect Enron's books and records barred claim that bank should have discovered and disclosed Enron's financial problems). Likewise here, Section 8.01 explicitly precludes *post hoc* efforts to imply duties not expressly

agreed to by BoA by establishing, in effect, its own internal rule of construction governing the Security Agreement: "[N]othing herein shall be deemed to constitute the Collateral Agent [BoA] a trustee for any Secured Party or impose on the Collateral Agent *any obligations other than those for which express provision is made herein*."  Ex. A, § 8.01 at 36.

In short, the litany of wrongful dispositions of funds that Plaintiffs allege are all claims of wrongdoing by *TBW or Ocala*, not BoA.  There is no contractual support for Plaintiffs' attempt to assign these various duties *to BoA*.

### b. The Purported Duty to "Match" Withdrawals and Transfers with the Purchase of Mortgages or to Initiate Funding Requests.

The same analysis applies to Plaintiffs' theory that BoA had a duty to *control the amount* of withdrawals and transfers from the Collateral Account—specifically, to *match* TBW's instructions for funds to be transferred or withdrawn from the Collateral Account on any given day with Ocala's actual purchases of mortgage loans on that day to ensure that all of the amounts reconciled, as well as the even more far-fetched suggestion, advanced only by DB, that BoA had a duty to *initiate* funding requests and breached that duty when it "failed to transmit the funds to the Colonial IFA necessary to complete the purchase" of certain mortgages.  DB FAC ¶ 154.  As regards the latter claim, DB asserts that, for example, on one day, "*BOA transmitted* only $8.9 million to Colonial despite the fact that BOA's records indicated that $54.3 million in mortgages were acquired from Colonial that day," and that "[b]y failing to transmit payment for the mortgages, *BOA prevented* Ocala from perfecting the security interests in those mortgages that were intended to serve as the primary collateral for DB's investment."  *Id.*

This claimed duty to monitor the amounts of each withdrawal or transfer instruction and match it with mortgage purchases is even more far-fetched than the duty to monitor the purpose of each withdrawal, which at least purported to be grounded in restrictions imposed on TBW and Ocala (but not on BoA).  The duty to match funds exists *nowhere* in the Facility Documents, and certainly as against BoA it is created out of thin air.  Even if such a duty could be inferred *for Ocala* from the requirement that Ocala use facility funds for the purchase of mortgage loans, the Security Agreement expressly disclaims any duty on BoA's part to monitor compliance by Ocala.

Ex. A, § 8.01 at 37.  Again, this provision is fatal to Plaintiffs' "duty to monitor" theory.  *See Banco Espanol*, 763 F. Supp. at 39.

      **c.**      **The Purported Duty to Transfer Funds Only to a Particular Account.**

Having invented the alluring theme of BoA's duty to monitor Ocala's use of funds, Plaintiffs offer the theme in yet another form:  that BoA had a duty to permit transfers of funds only *to a particular account* at Colonial, and that transfers to any other "unauthorized accounts" were a breach of contract.  Given the high level of specificity of Plaintiffs' allegations on this point, one would think that Plaintiffs were quoting or paraphrasing some specific language of the Security Agreement or another Facility Document that specifically required BoA to execute only transfer requests designated for the specified account—identified in the Amended Complaints as "a designated TBW account at Colonial Bank (Account No. 8026069354)."  BNP FAC ¶ 37(c).  Plaintiffs go on to allege a long list of transfers to "unauthorized accounts"—*i.e.*, specific accounts *other than* Colonial Bank Account No. 8026069354—and claim that the transfers to *these* accounts constituted a breach of contract by BoA.  *See* BNP FAC ¶¶ 11, 101-02; DB FAC ¶¶ 142-43.

Once again, these remarkably specific claims of duty find no basis in the operative contracts, including the Security Agreement.  There is not a single provision in that document that states, or even suggests, that BoA *must* transfer funds *only* to Colonial Account No. 8026069354.  Section 5.03 of the Security Agreement, the only provision that even addresses the general subject matter of withdrawals and transfers, simply states that Ocala shall request withdrawals or transfers of funds and that BoA shall comply with such requests.  Ex. A, § 5.03(a) & § 5.03(b).  Although Plaintiffs try to imply a "one account only" rule into the Security Agreement by pointing to TBW's separate obligation to sell only "dry" mortgages to Ocala, combined with the fact that Colonial Bank Account Number 8026069354 is referenced in the separate "Bailee Letters" provided by Colonial, *see* DB FAC ¶ 51; BNP FAC ¶ 101, nothing in the Security Agreement itself provides that BoA had a duty to allow TBW and Ocala to transfer funds only to that specific account, and Plaintiffs have not even purported to allege, nor could they conceivably allege, that they have contractual rights *under the Colonial Bailee letters themselves*.  Plaintiffs' suggestion that BoA

*should have known* from the various limitations on TBW's use of funds that transfers to accounts

other than Colonial Account No. 8026069354 might be a violation of *TBW's* duties, *see* DB FAC

¶¶ 142-43, 144-45, is negated by the Security Agreement's express disclaimer of any such implied

duties for BoA, or any duty to monitor TBW's compliance.  Ex. A, § 8.01 at 36-37.  Again, the

alleged duties for BoA to police and monitor TBW and Ocala are simply nonexistent and are

negated by the express protective provision of the operative contract.

> **2.     The Security Agreement Did Not Require BoA to Evaluate Ocala's Assets and Liabilities Before Complying with Withdrawal Instructions from Ocala.**

Plaintiffs next assert that BoA breached Section 5.03 of the Security Agreement by

transferring funds or purchasing mortgages without first verifying that the value of the collateral

held or owned by Ocala was sufficient to cover Ocala's obligations under the notes.  *See* BNP FAC

¶¶ 114-16, 156(ii); DB FAC ¶¶ 159, 239.  This allegation, like the assertion requiring Ocala to

purchase only "wet" loans, does purport to *begin* with a duty that exists in the Facility

Documents—in this case, an assets/liabilities formula set out in Section 5.03 of the Security

Agreement.  But, as with the "wet" mortgage prohibition, the duty to apply this formula rests with

Ocala and TBW, not BoA.

Section 5.03 of the Security Agreement states that, with respect to funds for the purchase of

new mortgages, "no withdrawals from the Collateral Account shall be made *on any day*" unless,

giving effect to the issuance of and payment on specific notes on that day and the purchase of

additional Mortgage Loans on that day, the sum of the aggregate principal amount of the

outstanding notes and certain other amounts would not exceed the value of mortgage loans and

other assets owned or held "by the Issuer [Ocala] *on such day*."  Ex. A, § 5.03(a) at 20 & § 5.03(b)

at 26.  Plaintiffs allege that this provision prohibited BoA from complying with instructions to

withdraw funds without first examining whether the value of the collateral held or owned by Ocala

at the time of the instruction was sufficient to cover Ocala's obligations under the notes.  DB FAC

¶ 159; BNP FAC ¶¶ 115-16.  But, as with their arguments concerning the *use* of funds withdrawn

from the Collateral Account, Plaintiffs fail to identify any language indicating that it was *BoA's*

responsibility—as opposed to the responsibility of TBW or Ocala—to ensure that the specified conditions existed before a fund withdrawal request could be made.

As noted, the Security Agreement and the other Facility Documents make clear that it is *Ocala*, and not BoA, that is to "purchase" new mortgage loans.  *See, e.g.*, Purchase Agt., Ex. I, § 2.1 at 2-4.  And Section 5.03 of the Security Agreement places squarely upon Ocala the responsibility to instruct BoA to withdraw funds for such purchases, stating that Ocala "shall on any given day … instruct according to the Facility Documents the Collateral Agent to withdraw, or order the transfer of, Deposited Funds" for the purchase of additional mortgage loans.  Ex. A, § 5.03(a) at 16 & § 5.03(a)(vii) at 20; *see also id.* § 5.03(b) at 21 & § 5.03(b)(ix) at 25.  It is in this context of *Ocala-requested* withdrawals for the purchase of new mortgages that Section 5.03 states that "no withdrawals from the Collateral Account shall be made on any day" unless the specified conditions exist, and then goes on to state that the instructions from Ocala "shall be effective upon receipt" and that BoA "shall promptly comply with any such approved instruction made by the Issuer [Ocala]."  Ex. A, § 5.03(a) at 20 & 5.03(b) at 26.

Plaintiffs' assertion that *BoA* was required to conduct an analysis of certain assets and liabilities of Ocala each time BoA received a funding request from Ocala is not supported by any plausible reading of the Security Agreement.  Most prominently, Section 5.03 of the Agreement does not expressly place this responsibility on BoA, and any retrospective effort to *imply* duties that BoA did not expressly assume is precluded by the explicit internal rule of construction that nothing in the Agreement shall be deemed to "impose on the Collateral Agent [BoA] *any obligations other than those for which express provision is made herein*."  Ex. A, § 8.01 at 36.  Moreover, given that Ocala had the prerogative to direct withdrawal or transfers, the Agreement can only be read to place the responsibility on Ocala or its manager, TBW, to ensure the asset/liability test is met before Ocala makes such an instruction.  "[W]hen interpreting a contract, the court should arrive at a construction which will give fair meaning to all of the language employed by the parties to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized."  *Joseph v. Creek & Pines, Ltd.*, 217 A.D.2d 534,

535, 629 N.Y.S.2d 75, 76 (1995).  Here, the only fair construction of the clear contractual language is to limit BoA's responsibilities.

The structure of the Security Agreement and the other Facility Documents confirms that it was Ocala, and not BoA, that was to ensure the formula in Section 5.03 was satisfied before instructing withdrawals.  Once again, the Agreement contained no process or procedure whatsoever—either in Section 5.03 or anywhere else in the Agreement—for BoA, upon receipt of a transfer instruction, to undertake the analysis and calculations that would be required to determine whether the formula in Section 5.03 was satisfied before BoA complied with the instruction.  The Agreement does not include provisions by which Ocala would provide the necessary information to BoA to make that determination, or even a waiting period in which BoA could conduct the analysis.  On the contrary, the specification that the instruction is "effective on receipt" and must be complied with "promptly" (Ex. A, § 5.03(a) at 20 & § 5.03(b) at 26) makes clear that the Section 5.03 condition must be evaluated *before* Ocala issues the instruction—and thus, necessarily, must be evaluated by Ocala or TBW, as its sole manager.

Moreover, as the Facility Documents are structured, only TBW and Ocala could know, on any given day, precisely what assets were owned by Ocala on that date and the precise status of the outstanding mortgage loans.  For example, the Facility Documents contemplated that, at TBW's direction, mortgages routinely would be transferred out of the program for possible purchase (*see* Ex. D, § 6(c) at 4-5), so at any time, by design, some of Ocala's mortgages would not be in BoA's custody.  BoA necessarily would have to rely on TBW and Ocala to tell it which of these loans out for sale had been sold and which remained in the program.  Because TBW and Ocala were the only entities that had that information, the Agreement can only reasonably be read to require TBW and Ocala to ensure that Ocala's funding requests were in compliance with Section 5.03.

Once again, this conclusion is confirmed by the express contractual provisions delineating the respective roles of TBW, Ocala, and BoA.  Not only does BoA have no responsibilities *other* than those expressly imposed by the Agreement (*see* Ex. A, § 8.01 at 36), but it expressly has no duty to monitor or even "inquire" as to the performance of TBW's or Ocala's duties under the

Agreement or any Facility Document, or to "inspect any books and records relating to the Assigned Collateral" (*id.* § 8.01 at 37).  Rather, BoA "shall be entitled to rely, and shall be fully protected in such reliance" on any "communication" or "direction" that it reasonably believes to be genuine— including communications or directions from TBW.  *Id.*  By contrast, TBW, as Ocala's sole manager and agent, expressly undertook to comply with Ocala's contractual duties, as well as to perform its own.  LLC Agt., Ex. Q, § 4.1(b) at 11.  These provisions confirm that the Agreement did not require BoA, as a condition to its affirmative duty to comply with withdrawal requests, either to police TBW's or Ocala's compliance with their own contractual obligations or to examine Ocala's records and perform its own accounting.  *See Banco Espanol*, 763 F. Supp. at 39.

### 3.     The Security Agreement Did Not Require BoA to Ensure Segregation of Loans and Cash Collateral.

Equally flawed is Plaintiffs' assertion that the Security Agreement imposed on BoA the duty to ensure that "mortgages *it* purchased and funds *it* received from the sale of such mortgages" (note again, the freewheeling substitution of BoA's name for Ocala) were rigorously segregated as between the two collateral sub-accounts set up for the benefit of the Secured Parties.  *See* DB FAC ¶ 240; *see also* BNP FAC ¶ 156(iii).  Although Plaintiffs attempt to locate such a duty within Sections 5.01 and 5.03 of the Agreement (*see* DB FAC ¶ 185; BNP FAC ¶ 119), no such duty exists there or anywhere else in the Facility Documents.

Section 5.01 merely charges BoA with the responsibility of *opening* and *maintaining* sub-accounts.  Plaintiffs do not allege that BoA failed to *open or maintain* the sub-accounts or even that it erroneously *closed* them.  Rather, they contend that funds from the DB sub-account were used to purchase loans for the benefit of BNP, and *vice versa*.  DB FAC ¶ 190; BNP FAC ¶ 121.  Further, they allege that when loans were *sold,* proceeds from the sale of DB loans might be deposited in the account of BNP, and *vice versa*.  *Id.*  They conclude that "BOA acted in disregard of its contractual duty to maintain the DB and BNP Sub-Accounts separately, and to withdraw from and deposit into the DB and BNP Sub-Accounts the appropriate funds."  DB FAC ¶ 190.

But nothing in the Agreement charges BoA with a duty to monitor Ocala's deposits and withdrawals to ensure they are made to and from the appropriate sub-accounts.  Again, Plaintiffs'

effort to plead such a duty would require the Court to rewrite the very contract language on which they purport to rely.  BNP misleadingly alleges, quoting selectively from Section 5.01, that "Bank of America was required to deposit into the 2005-1 Collateral sub-account … 'the net proceeds from the sale of the Series 2005-1 Short Term Notes' and 'all monies received by or on behalf of [Ocala] as proceeds from the sale or securitization of Series 2005-1 Mortgage Loans.'"  BNP FAC ¶ 120.  *See also* DB FAC ¶ 190.  But what Section 5.01 *actually says* is not that BoA "was required to deposit" funds into the separate accounts but simply that "[i]t is understood and agreed by the Issuer [Ocala], the Collateral Agent [BoA], and the Indenture Trustee [BoA] that *there shall be deposited* in the sub-accounts the proceeds from the sale of notes and monies received from the sale or securitization of Mortgage Loans.  Ex. A, § 5.01 at 13 & 14.  This says *nothing* about *who* shall do the depositing—thus again triggering the provision by which the parties disclaimed any intent to impose on BoA duties not expressly assumed by it.  *Id*. § 8.01 at 36.

Nor can the "there shall be deposited" language in Section 5.01 reasonably be construed as creating an affirmative duty of segregation on the part of BoA.  On the contrary, the only affirmative obligation to segregate deposited funds was set out in the Purchase Agreement (to which BoA was not a party), which placed that duty squarely on TBW/Ocala:  "The proceeds of sale of any … loan will be *remitted directly to the applicable sub-account* of the Collateral Agent *at the direction of the Servicer [TBW]*…."  Ex. I, § 4.2 at 37.  This allocation made eminent sense given that it was *Ocala, acting at TBW's direction*, and not BoA, that was directing the sale of Ocala's mortgage loans, so that only TBW would be in a position to know the source of the sale proceeds.  And, again, BoA had no duty to monitor TBW's or Ocala's compliance with their obligations under the Facility Documents.  *See* Ex. A, § 8.01 at 37.

The same analysis applies to *withdrawals* from the sub-accounts.  As shown above, Section 5.03 of the Security Agreement provided that *Ocala* had both the prerogative to instruct withdrawals and the duty to ensure that the conditions for withdrawals were met.  Indeed, it was Ocala that was to "instruct … the Collateral Agent to withdraw, or order the transfer of, Deposited Funds … *from the applicable sub-account* of the Collateral Account."  Ex. A, § 5.03(b) at 21.  And

BoA had neither a duty to monitor the propriety of such requests, nor even the temporal opportunity.  The instructions were "effective upon receipt"; BoA was required to comply with them "promptly"; and BoA was expressly absolved of any duty to monitor the compliance by Ocala or TBW with *their* obligations.  *See* Ex. A, § 8.01 at 37; *id.* § 5.03(a) at 20 & 5.03(b) at 26.

Finally, to the extent that Plaintiffs are trying to suggest an *implied* duty to segregate funds, any such effort would run afoul not only of the provision of the Security Agreement stating that BoA has no duties except those "for which express provision is made," but also the more specific language of Section 8.01 stating that "[t]he Assigned Collateral held by the Collateral Agent in trust hereunder *need not be segregated from other collateral except to the extent required by law or the specific provisions hereof.*"  Ex. A, § 8.01 at 37.  Accordingly, Plaintiffs' "no segregation" claim fails under the plain terms of the Agreement.

### 4. The Security Agreement Does Not Require BoA to Perfect Security Interests in Mortgage Loans.

In yet another iteration of their "duty to monitor" theme, Plaintiffs assert that BoA had a duty under the Security Agreement to ensure that security interests were perfected in mortgages sold to Ocala.  *See* BNP FAC ¶ 156(iv); DB FAC ¶ 237.  They assert that BoA breached this putative obligation in two ways:  (1) by "[f]ailing to ensure that the security interest it held on behalf of [DB and BNP] was perfected by obtaining written confirmation from Colonial that it had released any security interest in mortgages for which BOA paid Colonial" and (2) by "[f]ailing to keep accurate and adequately detailed records sufficient to permit BOA to establish and prove with specificity the security interest it held on behalf of [DB and BNP]."  DB FAC ¶ 237; *see also* BNP FAC ¶ 56(iv).  Notably, Plaintiffs offer no citation to any provision of the Security Agreement requiring BoA to undertake such obligations.  Nor can they, because none exists.[13]

---

[13] BNP fails even to identify what *contract* it claims was breached by purported inaccuracies in certain reports from BoA, *see* BNP FAC ¶¶ 128-33.  The Amended Complaint states only that the "misrepresentations ... breached ... contractual obligations" without identifying them.  These claims should be dismissed for this reason alone.  *See Wolff*, 210 F. Supp. 2d at 496.

The Security Agreement—like the other Facility Documents—makes crystal clear that only TBW and Ocala are responsible for perfecting security interests in loans assigned to the facility. TBW expressly represented in the Purchase Agreement that it was passing a "first priority perfected security interest" in the loans.  Ex. I, § 2.1(b) at 4; *accord id.* § 3.2(c) at 14; *id.* at Schedule A § 12.  Ocala, in turn, conclusively represented and warranted in the Security Agreement that *it* was responsible for all actions necessary to ensure the perfection of the relevant security interests in favor of the Secured Parties:

> [T]he *Issuer* will warrant and defend, *and take all actions necessary or appropriate to perfect*, the Collateral Agent's right, title and interest in and to the Assigned Collateral … for the benefit of the Collateral Agent and the Secured Parties … against the claims and demands of all Persons whomsoever.

Ex. A, § 3.02(e).  Virtually identical undertakings appear in the Indenture—again, undertakings *by* Ocala *to* BoA and the Secured Parties.  *See* Ex. F1, § 7.14(a) at 40 (representation from Ocala that "[a]ll action necessary ... to protect and perfect the Collateral Agent's security interest in the Collateral … has been duly and effectively taken"); *accord id.* § 7.14(e) at 40; *see also id.* § 2.2(j) at 5 (requiring Ocala to furnish evidence that security interests "of the Collateral Agent in the Collateral" are perfected as a condition to issuance of any new series of notes).  The Security Agreement provides that Ocala "reaffirms and repeats" its representations and warranties from the Indenture and "agrees that the Collateral Agent, the Indenture Trustee and the other Secured Parties [including Plaintiffs] may rely on such representations and warranties as though set forth herein in full."  Ex. A, § 3.01(a) at 5.  It also states that BoA shall not be liable to any Secured Party (including Plaintiffs) for "the validity, effectiveness, value, priority, sufficiency or enforceability" of "the Assigned Collateral (or any part thereof), the Eligible Investments (or any part thereof) or the Deposited Funds (or any part thereof)."  *Id.* § 8.01 at 37.  And in stark contrast to *TBW*'s express undertaking, as sole manager and agent of Ocala, to ensure Ocala's compliance with its obligations under the Security Agreement and other Facility Documents (LLC Agt., Ex. Q, § 4.1(b) at 11), the Agreement expressly relieves BoA of any such obligation—stating, as noted above, that BoA has no duty to monitor TBW or Ocala's compliance with their duties under the Facility

10576546.3

Documents, may rely upon representations and warranties from TBW and Ocala, and has no duties other than those expressly assigned to it.  *See* Ex. A, § 8.01 at 36-37.

### 5. Plaintiffs Fail to Allege How Acceptance of Instructions from Non "Issuer Agents" Was a Material Breach or Caused Any Injury.

In what can only be described as a "Hail Mary" maneuver designed to salvage their Security Agreement claims, Plaintiffs' Amended Complaints include the new allegation that BoA breached the Agreement by acting upon emailed wire instructions from "unauthorized persons"— defined to mean five TBW employees whose names were not included on the Incumbency Certificate that TBW provided for the Ocala facility.  BNP FAC ¶ 153; DB FAC ¶¶ 141, 241. Plaintiffs allege that, under Sections 3.03 and 5.03 of the Security Agreement, the only persons from whom BoA could accept wire transfer instructions were those identified as "Issuer Agents" on an Incumbency Certificate.  BNP FAC ¶ 110; DB FAC ¶ 141.  Plaintiffs name five employees at TBW whom they allege transmitted wire instructions to BoA, but were not listed on an Incumbency Certificate, and generally aver that this alleged breach directly and proximately caused their losses.  BNP FAC ¶¶ 113, 110; DB FAC ¶¶ 141, 157. But Plaintiffs fail to allege any facts showing that this claimed breach was material, or that it caused any loss to Plaintiffs.  BNP FAC ¶ 157; DB FAC ¶ 243.

The Second Circuit has made clear, after *Ashcroft v. Iqbal*, --- U.S. ----, 129 S. Ct. 1937, 1949-50 (2009), that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," cannot survive a motion to dismiss.  *See Harris v. Mills*, 572 F.3d 66, 71-72 (2d Cir. 2009).  "[O]nly a complaint that states a *plausible claim* for relief survives a motion to dismiss"—a determination that requires the court "to draw on its judicial experience and common sense."  *Id.*

Causation is a required element of a breach of contract action; a claim is "fatally deficient" if it "does not demonstrate *how* the defendant's alleged breach of the ... agreement caused plaintiffs any injury."  *Gordon v. Dino De Laurentiis Corp.*, 141 A.D.2d 435, 436, 529 N.Y.S.2d 777, 779 (1988); *see also Weiner v. Hershman & Leicher, P.C.*, 248 A.D.2d 193, 193, 669 N.Y.S.2d 583, 584-85 (1998) (dismissing claim where complaint failed to allege facts showing causation).

Analyzing this substantive rule under federal pleading standards, a conclusory allegation that an alleged breach was the direct and proximate cause of losses is insufficient to withstand a motion to dismiss.  *See RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 410 (S.D.N.Y. 2009); *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 293-94 (S.D.N.Y. 1998) (Sweet, J.) (dismissing claim absent facts supporting conclusory allegation of causation).

Plaintiffs' "Issuer Agent" claim rests upon Section 3.03(a) of the Security Agreement (which first mentions and defines "Issuer Agents").  Section 3.03(a) provides that, along with the delivery of the Security Agreement, TBW was to provide BoA with an Incumbency Certificate identifying the names of, and providing specimen signatures for, "Issuer Agents" who would be "authorized to act, and to give instructions and notices, on behalf of the Issuer."  Ex. A., § 3.03(a).  Plaintiffs admit that TBW provided an Incumbency Certificate dated June 30, 2008, with the names and signatures of three senior executives of TBW—Lee Farkas (Chairman of TBW), Paul Allen (CEO of TBW) and Ray Bowman (President of TBW).  BNP FAC ¶ 110, DB FAC ¶ 141.

Plaintiffs do not, and cannot, allege facts to show that anything would have happened differently had BoA insisted on receiving emailed wire instructions only from the three TBW officers whose names and signatures were on file, rather than their subordinates.  (Note that the *signatures* obviously are immaterial, as Plaintiffs do not contend that *emailed* instructions were unacceptable.)  In fact, the Security Agreement expressly provides that the Issuer at any time may provide BoA with additional Incumbency Certificates identifying additional Issuer Agents.  Ex. A, § 3.03(a) at 7.  Thus, the certification of additional *subordinate* employees at TBW was simply a ministerial act *within TBW*.  Plaintiffs do not even try to allege—and could not plausibly allege— that BoA's insistence that TBW's Incumbency Certificate include the names of the five subordinates somehow would have halted TBW's fraud, averted Plaintiff's losses, or resulted in anything other than the perfunctory issuance of a Certificate that included those names.  *See, e.g.*, *Semi-Tech Litig., LLC, v. Bankers Trust Co.*, 353 F. Supp. 2d 460, 482-83 (S.D.N.Y. 2005) (noteholder must show trustee's breaches were both proximate and but-for cause of losses).

Not only is there no allegation to connect Plaintiffs' alleged breach and any injury, but, if anything, the judicially-noticeable materials expose Plaintiffs' new theory as facially *im*plausible. Plaintiffs cite a HUD press release announcing FHA's suspension of TBW.[14]  That same release reports that the TBW executives accused of orchestrating TBW's fraud are the very individuals who Plaintiffs admit *were* listed as Ocala's Issuer Agents, and thus were empowered not only to issue wire instructions personally, but to authorize any of their TBW subordinates to do so by *sua sponte* deeming them "Issuer Agents."  Ex. A, § 3.03(a) at 7.  Plaintiffs' theory, laid bare, is that if only the wire instructions had been given by the evil masterminds themselves, rather than their subordinates, or if only the evil masterminds had been forced to assume the burden of signing a single document appointing those subordinates "Issuer Agents," all would have been well. Because this is not a logical, much less a "plausible" inference, this claim, too, must be dismissed.

**6.**      **Plaintiffs' Claims That BoA Failed to Conduct Itself As Though an Event of Default Had Occurred Prior to August 5, 2009 Fail Under the Express Terms of the Agreements.**

In a claim that parallels their claim under the Indenture, Plaintiffs assert that BoA breached the Security Agreement by not unilaterally implementing post-Event of Default procedures provided for in that Agreement—mainly, the process of paying out all collateral to interested parties, including noteholders.  *See generally* BNP FAC ¶¶ 11, 117-18; DB FAC ¶ 242.  This claim fails for the same reasons as those under the Indenture.  Unless and until BoA as Indenture Trustee received written notice of an Event of Default, it could not be charged with knowledge of such an Event of Default, nor could it be held liable "in connection with any action or inaction taken, or not taken, by it upon the deemed occurrence of an Event of Default."  Ex. F1, § 10.1(a) at 54 & § 10.1(c)(iv) at 55.  Plaintiffs do not allege that BoA received written notice of an Event of Default prior to August 5, 2009, and BNP affirmatively concedes that when BoA *did* receive this written

---

[14] *See, e.g.*, BNP FAC ¶ 85; DB FAC ¶ 207 (referencing August 4, 2009 U.S. Dep't of Housing and Urban Development News Release, "FHA Suspends Taylor, Bean & Whitaker Mortgage Corp. and Proposes To Sanction Two Top Officials," which reports that, in connection with the suspension of TBW, HUD proposed disbarment for *Ray Bowman* for submitting false certifications and *Paul Allen* for submitting false and/or misleading information).  *See* Ex. U.

notice, it immediately took the requested actions.  *See* BNP FAC ¶ 88.  Plaintiffs' claims that BoA

breached the Security Agreement by failing unilaterally to initiate post-Default duties are meritless.

### 7.   Plaintiffs' Attempt to Create a Separate Contractual Claim for Negligence Is Contrary to Law.

In an apparent effort to paper over the absence of any contractual terms that support their

claims under the Security Agreement, Plaintiffs resort to a "negligence" or "should have known"

theory—*i.e.*, that information available to BoA "should have set off warning bells" that something

was amiss.  DB FAC ¶ 149.  This appears to be the gist of Plaintiffs' allegations that some of the

transfer instructions were made in amounts that BoA should have divined were inconsistent with

the purchase of mortgage loans, because they were in round numbers (*see* DB FAC ¶ 152; BNP

FAC ¶ 104) or they reflected amounts either larger or smaller than the accumulated loans that

Ocala purchased on that day (*see* DB FAC ¶¶ 153-55), or they were matched on any given day by

incoming transfers (DB FAC ¶ 150), or they were directed to "improper accounts" (DB FAC

¶¶ 145, 148; BNP FAC ¶¶ 101-03, 105-06)—as well as Plaintiffs' more general suggestion that

BoA should have known that Ocala or TBW were not complying with contractual limitations on

the use of funds.  *See* BNP FAC ¶ 156(i); DB FAC ¶¶ 139, 149, 151.  Plaintiffs appear to assert

that, apart from any express contractual duties, BoA had a generalized duty under the contract not

to be negligent.  Plaintiffs' sole basis for this theory is the contractual liability limitations contained

in Sections 4.10 and 8.01, but, as the text of these provisions confirms, their function is to *limit*

liability with specified exceptions—not to create new contractual rights or duties not otherwise

specified in the Agreement.  The liability-limiting provisions state:

> Section 4.10:  <u>No Liability</u>.  Neither the Collateral Agent, nor any director,
> officer, employee, agent or stockholder of the Collateral Agent, shall be liable for
> any action taken or omitted to be taken by it or them relative to any of the
> Assigned Collateral, *except for its or their own negligence, fraud, bad faith or
> willful misconduct*….
>
> * * *
>
> Section 8.01:  <u>Appointment and Powers of the Collateral Agent</u>.  .…  Neither the
> Collateral Agent, nor any of its respective directors, officers, employees,
> affiliates or agents, shall be liable to any Secured Party or the Issuer for any
> action taken or omitted to be taken by it or them hereunder, or in connection
> herewith, *except for its own negligence, fraud, bad faith or willful misconduct*…..

Ex. A, § 4.10 at 13 & § 8.01 at 36-37.  For several reasons, Plaintiffs' "should have known" musings (best directed at themselves) do not support a claim for breach of the Security Agreement.

First, by their plain terms, the liability-limiting provisions cited by Plaintiffs do not create a new contractual cause of action for negligence separate from any claim of actual breach.  They state that BoA "shall not be liable" under the contract, *except* for acts of negligence, fraud, and the like.  New York courts consistently construe liability limiting provisions such as Sections 4.10 and 8.01 to *preclude* liability *even for breach of the existing contract terms* unless there is a breach *and* it is caused by defendant's negligence or other wrongful conduct.  In other words, the provision does not create a new cause of action for negligent performance of a contract apart from any breach of the express contract terms, but rather imposes an additional requirement that a plaintiff prove *both* a breach of an express contractual duty, *and* that the breach resulted from the defendant's negligence.  *See*, *e.g.*, *Digital Broad. Corp. v. Ladenburg, Thalmann & Co.,* 63 A.D.3d 647, 647, 883 N.Y.S.2d 186, 187 (2009) (dismissing breach of contract claim where plaintiffs failed to prove breach *and* that conduct was grossly negligent, pursuant to an exculpatory provision); *accord Trump Vill. Section 3, Inc. v. New York State Housing Fin. Agency*, 292 A.D.2d 156, 739 N.Y.S.2d 37 (2002).  This reading is consistent with the purpose of such provisions to *preclude* or *limit* otherwise valid causes of action, not to create new rights or duties.  *See, e.g.*, *Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, No. 03 Civ. 1537, 2003 WL 23018888, at *9 (S.D.N.Y. Dec. 22, 2003) (Mukasey, J.) (liability-limiting provision did not create a cause of action because "the plain intent of the parties to the contract" was "to limit duties rather than to generate an additional duty").  Plaintiffs' effort to use these provisions to create a new cause of action where none otherwise exists would turn the provisions on their head.

Second, Plaintiffs' theory is expressly precluded by a separate clause of Section 8.01 of the Security Agreement, which expressly states that "nothing herein shall be deemed … to impose on the Collateral Agent any obligations other than those for which *express* provision is made herein." Ex. A, § 8.01 at 36.  This precludes reading the *express* liability-*limiting* provision as *implicitly creating* new obligations not specified in the Agreement.  Plaintiffs' claims also would require the

Court to cabin other broad exculpatory provisions of the Agreement, which allow BoA to rely upon statements and representations made by TBW and Ocala, state that BoA has no duty to examine Ocala's books and records, and generally provide that BoA may perform its contractual functions based upon information and actions provided by others. *See* Ex. A, § 8.01 at 36-37. Plaintiffs' suggestion that an amorphous, free-floating "negligence" standard somehow qualifies all of these provisions even where there is no breach of any express contract term would improperly require the Court to rewrite the Agreement—and also would impose impermissibly vague standards to which the parties never agreed. *See Slamow v. Delcol*, 174 A.D.2d at 727. *See also Marraccini v. Bertelsmann Music Group Inc.*, 221 A.D.2d 95, 97, 644 N.Y.S.2d 875, 877 (1996) (court will not recognize alleged contract terms that are too indefinite to be enforced). It is for this reason that New York courts, sensibly, do not recognize a contractual cause of action for "negligent" performance of a contract. *See RLI Ins. Co. v. King Sha Group*, 598 F. Supp. 2d 438, 444 (S.D.N.Y. 2009); *Clark-Fitzpatrick, Inc. v. L.I.R.R. Co.*, 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 656 (1987) (breach of contract cannot be asserted as a tort unless a legal duty independent of the contract has been violated); *Hamilton v. Hertz Corp.*, 130 Misc. 2d 1034, 1037, 498 N.Y.S.2d 706, 709 (1986) (claim for "negligent performance" of a contract "simply does not exist at law"). Accordingly, Plaintiffs' "negligence" theory should be rejected.[15]

**D.**   **The Claims for Breach of the Depositary Agreement, Custodial Agreement, and March 2009 Letter Must Be Dismissed for Lack of Standing.**

Both Plaintiffs assert claims for breach of the Depositary Agreement, and now both Plaintiffs also assert claims for breach of the Custodial Agreement. BNP also argues that the March 2009 Letter confers standing upon it to pursue a claim for breaches of the Depositary

---

[15] Plaintiffs have not tried to plead a tort claim for negligence, nor could they. Where the contracting parties are sophisticated entities and the losses are only economic, a negligence claim is not cognizable. *See, e.g.*, *County of Suffolk v. Long Island Lighting Co.*, 728 F.2d 52, 62 (2d Cir. 1984) ("New York law holds that a negligence action seeking recovery for economic loss will not lie."); *Deutsche Bank Sec., Inc. v. Rhodes*, 578 F. Supp. 2d 652, 670 (S.D.N.Y. 2008) ("in actions involving the contractual duties of corporations and financial institutions, a negligence action may not be maintained and parties must proceed under a contract theory"); *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 529 (S.D.N.Y. 2007) (New York "follow[s] the economic loss doctrine, which bars the recovery of economic loss in negligence cases.").

Agreement, but, in fact, Plaintiffs lack standing under both of these agreements.  Plaintiffs are neither parties to, nor third-party beneficiaries of, the Depositary Agreement, which contains an express provision disclaiming any intent by the contracting parties to permit enforcement by non-parties.  Likewise, Plaintiffs' claims under the Custodial Agreement fail because neither DB nor BNP is a party to that Agreement and noteholders such as DB and BNP are not intended third-party beneficiaries.  BNP's claim under the March 2009 Letter fails because that letter is not a valid amendment to the Depositary Agreement and does not, in any event, confer standing on BNP to sue as a noteholder.  For these reasons, the claims should be dismissed.

**1.      Plaintiffs Lack Standing to Sue for Breach of the Depositary Agreement.**

Plaintiffs allege that BoA breached the Depositary Agreement by certifying documents that it received from TBW on Ocala's behalf and that allegedly contained false statements of Ocala's collateral and by issuing new notes pursuant to such documents.  DB FAC ¶¶ 120-30; 254; BNP FAC ¶¶ 134-46.  Once again, Plaintiffs misconstrue the relevant provisions, but this Court need not reach the merits of Plaintiffs' claims because they fail at the threshold for lack of standing.

To state a claim for breach of the Depositary Agreement, Plaintiffs must establish either that they are parties to the Agreement or that the contracting parties intended them to be third-party beneficiaries.  *See, e.g.*, *Pile Found. Constr. Co. v. Berger, Lehman Assocs., P.C.*, 253 A.D.2d 484, 486, 676 N.Y.S.2d 664, 665 (1998); *see also Long Island Lighting Co.*, 728 F.2d at 63 (it is "ancient law in New York that to succeed on a third-party beneficiary theory, a non-party must be the intended beneficiary of the contract").  Neither of the Plaintiffs can make such a showing.

**a.      Plaintiffs' Various Theories of Standing Are Meritless.**

DB and BNP are not, nor do they claim to be, party to the Depositary Agreement, which is between Ocala and BoA, as Depositary.  Rather, their sole theory is that they are a third-party beneficiary of the Depositary Agreement.  *See* DB FAC ¶¶ 251-52; BNP FAC ¶ 167.  But the provision on which they rely, Section 15 of the Agreement, not only does not identify DB or BNP (or noteholders generally) as third-party beneficiaries, but expressly states that only the Indenture Trustee is such a beneficiary and that no other person shall have that status.  Section 15 states:

Section 15. <u>Successors and Assigns; Benefit of Agreement</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that (a) except for the assignment by the Issuer [Ocala] of its right, title and interest hereunder to the Collateral Agent [BoA] pursuant to <u>Section 4.0l(ii)</u> of the Security Agreement and (b) except as provided in Section 16 hereof, *no party hereto may assign any of its rights or obligations hereunde*r unless such party shall have obtained (i) the prior written consent of all parties hereto and (ii) the written confirmation of each of the Rating Agencies that such assignment will not result in a reduction or withdrawal of its then current rating, if any, of the Short Term Notes. *This Agreement shall also inure to the benefit of the Indenture Trustee [BoA], which is hereby expressly declared to be a third-party beneficiary hereof. Subject to the foregoing, no Person not a party to this Agreement shall be deemed to be a third-party beneficiary hereof nor shall any Person be empowered to enforce the provisions of this Agreement, except as set forth in the preceding sentence and to the extent such Person becomes a permitted successor or assign hereunder.*

Ex. B, § 15 at 18; *see also* Ex. C, § 15 at 17-18 (identical language except referring to "Rating Agency" rather than "Ratings Agencies," as in Ex. B). This provision, by naming one third-party beneficiary but expressly excluding all others, and by prohibiting assignment without written consent of parties other than Plaintiffs, definitively precludes third-party beneficiary status for noteholders such as DB and BNP.

New York law holds that a contractual provision expressly negating an intent to permit enforcement by third parties is "decisive." *See, e.g.*, *India.Com, Inc. v. Dalal*, 412 F.3d 315, 321 (2d Cir. 2005) (citing authorities); *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 859 F.2d 242, 249 (2d Cir. 1988). The preclusive effect of such a clause is strengthened by a clause, present in Section 15, prohibiting assignment of rights and obligations without consent. *See Sazerac Co. v. Falk*, 861 F. Supp. 253, 258 (S.D.N.Y. 1994) (Sweet, J.) (contract clause prohibiting assignment without written consent bars third-party beneficiary claim).[16] It also is confirmed by the express provision in Section 15 specifying the parties to whom the benefits of the Agreement inure—a listing that does not include DB or BNP specifically or noteholders in general. *See Banco Espirito*, 2003 WL 23018888, at *10 (following *Sazerac* and holding that contract language "specifying to whose benefit the agreement inured and prohibiting assignment" precludes claim by purported third-party

---

[16] That Section 15 contemplates the possibility of assignment by written consent does not weaken its preclusive effect on third-party beneficiary claims. *See United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 988 F. Supp. 367, 373 (S.D.N.Y. 1997) (Sweet, J.).

10576546.3

beneficiary); *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 163 (S.D.N.Y. 1998) ("The prohibition on assignments and the specification that the contract inures to the benefit of and binds the parties ... makes plain the parties' intention to preclude third-party enforcement.").

DB tries to avoid this problem by asserting that the indemnification clause in Section 8(g) of the Depositary Agreement—which provides for indemnification of "Secured Parties," defined to include noteholders—gives it third-party beneficiary rights, despite the express preclusion of such rights in Section 15.  Ex. B, § 8(g) at 11; DB FAC ¶ 251.  New York courts have rejected similar attempts by non-party indemnitees and other incidental beneficiaries to enforce contracts that contain express provisions negating third-party beneficiary rights.

In *Control Data Systems, Inc. v. Computer Power Group, Ltd.*, No. 94 Civ. 5396, 1998 WL 178775 (S.D.N.Y. Apr. 15, 1998), for example, the district court rejected precisely this argument. There, the Second Circuit had remanded to allow the district court to "resolve the tension" between a provision denying third-party beneficiary rights and a clause indemnifying the plaintiff.  *See id.* at *1.  Judge Martin found no tension between the provisions because, under New York law, the obligation to indemnify could be enforced by one of the contracting parties and thus was consistent with the clause negating any intent to create third-party rights.  *Id.* at *2-*3.  Similarly here, the fact that Plaintiffs are potential indemnitees or even that they might receive a direct or indirect benefit under other contract provisions, does not overcome the "decisive" effect of the no-third-party-beneficiary clause.  *See India.Com*, 412 F.2d at 321.

This analysis comports with the well-established New York rule that a third party seeking to enforce a contractual promise must show not only that the parties intended to confer a benefit or right upon that third party, but also that the parties intended to permit that third party to *enforce* the promise—a showing that cannot be made where the parties expressly precluded third-party beneficiary status.  *See Binghamton Masonic Temple Inc. v. City of Binghamton,* 213 A.D.2d 742, 745-46, 623 N.Y.S.2d 357, 360-61 (1995) (contract must "evince an intent to permit enforcement by a third party"); *Nepco Forged Prods., Inc. v. Consol. Edison Co. of N.Y., Inc.*, 99 A.D.2d 508, 508, 470 N.Y.S.2d 680, 681 (1984) (provision "expressly negating an intent to permit enforcement

by third parties" controls).  Under New York law, just as the contracting parties may elect to confer a benefit or right upon a third party, they may elect to limit that right, including by limiting the third party's enforcement powers.  *See, e.g., Consol. Edison, Inc. v. Ne. Utils.*, 426 F.3d 524, 528 (2d Cir. 2005) (although contract "clearly created a third-party right" inuring to the benefit of shareholders, that right was limited by other express terms—including one restricting third-party enforcement).  It is for this reason that an express provision barring third-party enforcement of a contract is "decisive"—even where the contract also contains a promise clearly conferring a benefit on a third party.  *India.Com*, 412 F.3d at 321.

Plaintiffs' final theory is that they can simply step into the shoes of the Indenture Trustee, which is an express third-party beneficiary of the Depositary Agreement.  DB FAC ¶ 252; BNP FAC ¶ 167.  This claim is meritless as well.  The parties knew how to confer standing on both the Indenture Trustee and the noteholders when they wished to:  Section 10.08 of the Security Agreement, for example, does just that, providing that "the Indenture Trustee *and the holders of the Notes*" are "expressly declared to be third-party beneficiaries hereof."  *See* Ex. A, § 10.08 at 43. *See also* Ex. F1, § 9.7 at 51-52 (creating limited remedies for "Noteholder[s]").  And elsewhere in the Facility Documents—including the corresponding provision of the Depositary Agreement—the parties took pains to distinguish between the Indenture Trustee and the noteholders and to treat them separately.  *See* Ex. B, § 15 at 18; Ex. C, § 15 at 17-18.  Such deliberate choices on the part of "sophisticated, counseled parties dealing at arm's length" in a "multimillion dollar transaction" must be given effect, *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 574-75, 498 N.Y.S.2d 344, 347 (1986), particularly in an agreement that contains an integration clause specifying that the written document is the "entire agreement" between the parties on the subject.  Exs. B & C, § 23 at 19.

In any event, even if Plaintiffs could cast themselves as third-party beneficiaries of the Depositary Agreement, they would lack standing for a separate reason.  Status as a third-party beneficiary does not imply standing to enforce every promise within a contract, including those not made for that party's benefit.  *See Coalition of 9/11 Families, Inc. v. Rampe*, No. 04 Civ. 6941, 2005 WL 323747, at *2 (S.D.N.Y. Feb. 8, 2005) ("third parties may sue to enforce rights or obtain

-60-

benefits under a contract only to the extent that the contracting parties specifically intended to provide the third parties with such rights or benefits"); *Nationwide Auction Co. v. Lynn*, No. 90 Civ. 7643, 1996 WL 148489, at *11 (S.D.N.Y. Apr. 1, 1996) (although plaintiff might be a third-party beneficiary of provision relating to auction commissions, there was "no basis to infer" that it was a third-party beneficiary of an attorney's fees provision; "[t]o allow a third party to enforce a promise of which it was not an intended beneficiary would run contrary to well-settled law"). A critical factor is whether, with respect to a particular contractual promise, "performance is to be made directly to a third-party." *Nepco*, 99 A.D.2d at 508; *see also Coalition*, 2005 WL 323747, at *2 (plaintiffs clearly not intended beneficiaries of a provision that "does not mention [them] at all"). Here, performance was not directly rendered to Plaintiffs, as BoA contracted only with Ocala under the Depositary Agreement. *See* Exs. B & C at 1.

Thus, even if Plaintiffs had a limited right to enforce the *indemnification* provision in Section 8(g) of the Depositary Agreement, that would not give them standing to enforce the other provisions of the Depositary Agreement that they claim were breached, including Section 4(d) relating to certification of certain financial information for Ocala. *See* Exs. B & C, § 4(d) at 6. Similarly, even if Plaintiffs could stand in the shoes of the Indenture Trustee, the Court still would have to determine that Section 4(d) is a provision that the parties intended to be enforced *by the Indenture Trustee*—a conclusion simply not borne out by the Depositary Agreement itself.[17] Thus, even if Plaintiffs could step into the shoes of the Indenture Trustee—which, under the plain language of the Depositary Agreement, they cannot—they still would lack standing to enforce Section 4(d) because the Indenture Trustee is not a third-party beneficiary of that provision.

---

[17] Although a handful of provisions specifically reference the Indenture Trustee and promise performance directly to it, the Trustee is not a beneficiary of, or even mentioned in, the vast majority of the provisions of the Depositary Agreement, including those that DB seeks to enforce—most notably, Section 4(d). *Compare, e.g.*, Ex. B, § 2(a) at 2; Ex. C, § 2(a) at 2-3 ("The Depositary agrees to give the Issuer, the Collateral Agent, the Short Term Note Dealers and the Indenture Trustee, as soon as practicable, written notice that the Short Term Note Account or any funds on deposit in the Short Term Note Account have become subject to any writ, judgment, warrant of attachment, execution or similar process to the actual knowledge of an officer of the Depositary assigned to the Depositary's corporate trust department.") *with* Exs. B & C, § 4(d) at 6.

b.     **BNP Cannot Establish Standing Through the March 2009 Letter.**

Presumably recognizing the absence of enforceable rights running to it as a noteholder under the Depositary Agreement, BNP relies primarily upon the March 2009 Letter.  *See* Ex. E. For two reasons, this letter does not cure BNP's lack of standing.

First, the March 2009 Letter—to the extent that BNP seeks to use it to avoid the express limitations on standing or create new rights under the Depositary Agreement—is legally ineffective to that end because it does not comply with either of the two requirements contained in that Agreement for a valid amendment to the contract.  Section 13 of the Agreement states that "[n]o amendment, modification, termination or waiver of any provision of this Agreement shall be effective unless the same shall be (i) in writing and signed by all of the parties hereto and (ii) accompanied by the written confirmation of each Rating Agency that same will not result in a reduction or withdrawal of its then current rating, if any, of the Short Term Notes."  Exs. B & C, § 13 at 16.  BNP has not alleged that either condition to the effectiveness of the March 2009 Letter was satisfied; not only is there no showing of any sign-off by the Rating Agencies, but it is clear on the face of the Letter that it was not signed by Ocala, which is a party to the Agreement.

Where a contract provides a procedure for amending contract provisions, that procedure must be followed to execute a valid amendment.  For example, in *Deutsche Bank AG v. JPMorgan Chase Bank*, No. 04 Civ. 7192, 2007 WL 2823129, at *23-*24 (S.D.N.Y. Sept. 27, 2007) (Stein, J.), *aff'd*, 331 Fed. Appx. 39 (2d Cir. 2009)—a case coincidentally involving both Plaintiffs here— the contract term relating to amendments provided that no amendment purporting to change certain contract provisions would be valid "unless in writing and signed" by certain required parties.  *Id.* at *23.  Both DB and BNP Paribas were deemed by the court to be required parties, but neither had signed the letter.  DB argued that the absence of those signatures invalidated the purported amendment, and the court agreed.  *Id.* at *24.  *See also John Street Leasehold LLC v. F.D.I.C.*, 196 F.3d 379, 382 (2d Cir. 1999) (New York law enforces contractual requirements that amendments be in writing and signed by the parties).  Here, because BNP has not alleged, and cannot allege, that the March 2009 Letter was a valid contract amendment, its claim fails as a matter of law.  *See*

10576546.3

*Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 46 (E.D.N.Y. 2008) (existence of valid contract is an essential element of a contract claim).

Second, even if it were a proper amendment, the March 2009 Letter does not purport to alter the provisions in the Depositary Agreement disclaiming any intent to create third-party beneficiary rights and prohibiting assignment, nor does it purport to elevate BNP to the status of a third-party beneficiary of that Agreement. On its face, it merely expands *indemnification* coverage for BNP in that, as discussed below, BoA purportedly agreed to indemnify for losses sustained by *BNP*, as opposed to losses suffered only by *Ocala*. *Compare* Ex. E *with* Exs. B & C, § 8(g) at 11. Because the letter does not expand the limited list of entities that may enforce the Depositary Agreement as third party beneficiaries to include BNP, any claim for indemnification arising under the Agreement and the March 2009 Letter would have to be brought by a party that did have enforcement rights. *See Control Data*, 1998 WL 178775, at *2-*3.

## 2.    Plaintiffs Lack Standing to Sue for Breach of the Custodial Agreement.

Plaintiffs allege that BoA breached the Custodial Agreements by failing to maintain adequate controls over loans removed from Ocala's Custodial Account. BNP FAC ¶¶ 187-89; DB FAC ¶¶ 266-68. Once again, Plaintiffs ignore the critical role of TBW and Ocala—including that, under the Agreement, TBW had the right to remove mortgage files from the Custodial Account in order to facilitate their sale to third parties. *See* Ex. D, § 6(c) at 4-5 (loans released to TBW as Servicer). But, again, the Court need not reach the merits of Plaintiffs' claims because, as with the Depositary Agreement claims, the claims fail at the threshold for lack of standing.

Plaintiffs do not, and cannot, allege that they are parties to the Custodial Agreement, so again their sole theory of standing can only be that they are third-party beneficiaries. In its original complaint, DB asserted two bases for such standing: Sections 17 and 25 of the Agreement. *See* DB Cplt. ¶ 38(c); Ex. D, §§ 17 & 25 at 9, 17. DB appears to rely on the same theories this time, but it now has removed the specific reference to Section 25, while leaving the balance of the standing allegation unchanged. DB FAC ¶ 264. But the window dressing does not matter, for neither Section 17 nor Section 25 affords DB standing—and neither would afford BNP standing for

the same reasons, although BNP appears to eschew both arguments in favor of variation of the theory that it can stand in the shoes of a collateral agent who has a conflict of interest.  BNP FAC ¶ 191.  BNP's "stand in the shoes of" argument fares no better under the Custodial Agreement than it does under the Depositary Agreement, failing for all the same reasons.

Returning to the two standing theories presented by DB, Section 25 is limited to Swap Counterparties—not noteholders, which is the only capacity in which DB (or BNP) claims to have suffered loss and is suing.  It states that: "*[t]he Swap Counterparties* are third-party beneficiaries to this Agreement and are entitled to the rights and benefits hereunder and may enforce the provisions hereof as if they were a party hereto."  Section 17, the indemnification provision, likewise states that the Custodian will indemnify "each Swap Counterparty."  Ex. D, § 17 at 9.

DB seeks to cure this discrepancy by sleight of hand, by invoking its status as Swap Counterparty (*see* DB FAC ¶ 257), and BNP, to the same end, has added as a new Plaintiff its parent company, BNP Paribas—the Swap Counterparty on BNP's side.  But Plaintiffs' effort to use their Swap Counterparty status to manufacture standing to pursue claims as noteholders fails as a matter of law.  The Facility Documents contemplate entirely different roles for noteholders and Swap Counterparties, and the parties knew how to specify *noteholder* standing when they wished to do so.  *See*, *e.g.*, Ex. A, § 10.08 at 43-44, Ex. F1, § 9.7 at 51-52.  Although Plaintiffs or their affiliates ended up filling both sets of shoes at various points, this was not a function of the Facility Documents, but rather of DB's and BNP's separate decisions—presumably informed (and driven) by their many other relationships with TBW and Colonial Bank—to become investors in the facility.  Plaintiffs have not alleged *any injury* that they suffered as Swap Counterparties, nor could they, given the significant rewards that they received for that role.

This conclusion is confirmed by the role of the Swap Counterparties in the Ocala facility.  As discussed above, the interest rate swaps allowed Ocala to hedge its risk by shifting to DB and BNP's parent company, as Swap Counterparties, the risk that TBW might be unable to perform its obligations—so it was the Swap Counterparties that, in many ways, had the role of protecting the economic security of Ocala and, in turn, the noteholders.  The Facility Documents recognized the

very different economic interests and roles of the Swap Counterparties and noteholders by consistently treating them as separate and distinct groups of entities—including assigning them different roles in the transaction and different sets of rights and obligations. *See, e.g.*, Ex. A, § 2.01 at 2-4. Indeed, the Facility Documents clearly anticipate not only different *roles* for Swap Counterparties and noteholders, but different *actors* playing those roles; it appears to have been the fortuity of Plaintiffs' inability to sell the notes that led to their being both Swap Counterparties and noteholders. That fortuity certainly does not reflect any intention on the part of the contracting parties that a party's status as a noteholder would give it rights as a Swap Counterparty—a construction that would introduce numerous absurdities into the core provisions of the documents that distinguish carefully between these two groups, including the post-Default payout provisions, which provide that the Swap Counterparties have certain payout and liquidation rights and noteholders have distinct and different rights in the same hierarchy.[18] Thus, it is not surprising that the Custodial Agreement and the other Facility Documents likewise treat the Swap Counterparties as separate and distinct from the noteholders, including by specifying that "Swap Counterparties" are third-party beneficiaries of the Custodial Agreement, but not noteholders.

It is clear from these provisions of the Custodial Agreement and the other Facility Documents that the contracting parties carefully distinguished noteholders and Swap Counterparties when drafting the Custodial Agreement, because they knew well how to designate an intent to benefit a party in both capacities. *See, e.g.*, Ex. A, § 10.08 at 43-44; § 10.18 at 46 (separately designating "holders of the Notes" and each "Swap Counterparty" as third-party beneficiaries). As Judge Kennedy noted in *Compania De Vapores Arauco Panamena S.A. v. Moore-McCormack Lines*, 91 F. Supp. 545, 549 (E.D.N.Y. 1950): "The very fact that two contracts were made, and that [respondent] assumed two capacities, is evidence of an intention to keep its functions separate—to indemnify under one set of circumstances but not under another."

---

[18] *Compare, e.g.*, Ex. A, § 2.01 (Second) (payout rights for Swap Counterparties) *with* § 2.01 (Third) (payout rights for Noteholders) *with* § 2.01 (Fourth) (additional payout rights for Swap Counterparties) *with* § 2.01 (Seventh) (additional rights for Swap Counterparties after satisfaction of other payment categories).

This conclusion is consistent with the fundamental rule in New York that parties can be beneficiaries of or stand in privity to a contract in one, but not all, capacities.  *See*, *e.g.*, *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003) (clause indemnifying attorney in his professional capacity does not apply to claims against him in his individual capacity); *Kirby v. Coastal Sales Ass'n, Inc.*, 82 F. Supp. 2d 193, 197 (S.D.N.Y. 2000) (a party that signs a contract in his capacity as corporate officer may not sue on the contract in his individual capacity); *Bank of New York v. River Terrace Assocs., LLC*, 23 A.D.3d 308, 310, 804 N.Y.S.2d 728, 730 (2005) (bank could not sue under an indemnity agreement where its losses were incurred in its individual capacity and the agreement indemnified only for acts undertaken as agent); *see also Banco Espirito*, 2003 WL 23018888, at *9.  Similarly, it is an axiom of contract law that parties are liable only for foreseeable damages.  *See*, *e.g.*, *Bd. of Educ. of Hudson City Sch. Dist. v. Sargent, Webster, Crenshaw & Folley*, 71 N.Y.2d 21, 28, 523 N.Y.S.2d 475, 479 (1987); Restatement ( 2d) of Contracts § 351 (1981).  By specifying the limited capacity in which they intended to benefit Plaintiffs in their capacity as Swap Counterparty, the contracting parties did not reasonably expect to assume losses and liabilities suffered by noteholders that also happened to be Swap Counterparties.  For all of these reasons, Plaintiffs' status as Swap Counterparty does not give them standing here.

## E.    Plaintiffs' Indemnification Claims Fail to State a Claim.

Plaintiffs purport to bring "indemnification" claims for the same first-party investment losses that are the subject of their contract claims, *i.e.*, losses they suffered as noteholders by virtue of alleged breaches of duty by BoA.  *See* DB FAC ¶¶ 274-75, 279-80 (alleging BoA caused "the loss of a substantial portion of DB's investment" through its alleged breaches of contract alleged earlier in the Amended Complaint and "is required to indemnify DB for this loss"); BNP FAC ¶¶ 163, 173, 175, 198 (alleging BoA has failed "to compensate BNPP for the losses it suffered due to [BoA's] negligence in the performance of its obligations" under the same Agreements of which BNPP alleges breach "under the Depositary Agreement").

Significantly, Plaintiffs do not allege that any claims or losses have been asserted against them by another party, much less that they have been subject to any judgment of liability in favor of such third parties.  Rather, they sue for "indemnification" for the same investment losses that they seek through their breach of contract claims.  These "indemnification" claims—which are asserted under clauses in the Security, Collateral, and Depositary Agreements, and in the March 2009 letter specific to BNP—must be dismissed because those clauses do not support indemnification for the claims asserted here.  As shown below, the clause in the Custodial Agreement does not extend to noteholders such as Plaintiffs, and the Depositary Agreement clause covers only losses suffered *by Ocala*, not losses suffered by Plaintiffs or other noteholders.  More generally, *none* of the clauses contains language demonstrating, as they must for Plaintiffs' theory to prevail, an "unmistakably clear" intent to cover *first-party* losses of the sort that Plaintiffs allege here—as opposed to covering liabilities or losses from claims that others might bring *against* Plaintiffs.  The absence of such "unmistakably clear" language means that the clauses cover only losses and liabilities from third-party claims.  *Bridgestone/Firestone, Inc., v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20-21 (2d Cir. 1996); *see also Hooper Assocs., Ltd. v. AGS Computer, Inc.*, 74 N.Y.2d 487, 492, 549 N.Y.S.2d 365, 367 (1989).  Finally, the March 2009 Letter does not properly amend the Depositary Agreement and in any event does not support the claim here.

## 1.     Indemnification Clauses Are "Strictly Construed" to Cover Only Parties Expressly Identified, and to Extend Only to Third-Party Claims.

Under New York law, a contractual indemnification clause must be "construed so as not to read into it any obligations the parties never intended to assume."  *Haynes v. Kleinewefers and Lembo Corp.*, 921 F.2d 453, 456 (2d Cir. 1990); *see also Hooper*, 74 N.Y.2d at 491.  This rule includes two more specific principles of construction that compel dismissal here.

First, a party seeking contractual indemnification must show a specific intent to allow *that party* to recover under the clause.  *See Bank of New York*, 23 A.D.3d at 310.  Similarly, where the indemnity clause extends only to a plaintiff's actions in a specific capacity, or to specific *types* of losses, that limitation will be given effect.  *Id.*; *see also TIC Holdings, LLC v. HR Software Acquisitions Group, Inc.*, 301 A.D.2d 414, 415, 755 N.Y.S.2d 19, 20 (2003).

Second, indemnification clauses are not construed to cover first-party claims—that is, claims between indemnitor and indemnitee, as opposed to those arising from third-party claims *against* the indemnitee—unless the contract makes it "unmistakably clear" that the parties intended so to provide. *See Bridgestone*, 98 F.3d at 21 (absent "unmistakably clear" language extending indemnification to claims between indemnitor and indemnitee, provision must be construed as limited to actions brought by third parties against the indemnitee, following *Hooper*, 74 N.Y.2d 491). Unless the indemnification clause refers "exclusively or unequivocally" to claims between the indemnitor and indemnitee, the court "must find the agreement to be lacking evidence of the required intent" to cover such claims. *Sequa Corp. v. Gelmin*, 851 F. Supp. 106, 110-11 (S.D.N.Y. 1994) (Haight, J.) (dismissing first-party "indemnity" claims); *Bourne Co. v. MPL Comm., Inc.*, 751 F. Supp. 55, 57-58 (S.D.N.Y. 1990) (Sprizzo, J.) (same). *See also GEM Advisors, Inc. v. Corporación Sidenor, S.A.*, No. 06 Civ. 5693, 2009 WL 3459187, at *15-*16 (S.D.N.Y. Oct. 27, 2009) (Sullivan, J.) (indemnification clause will not be construed to cover suits between indemnitor and indemnitee unless the parties "explicitly provide" such coverage).

This rule is consistent with the general New York view of indemnity as a mechanism to allow a party held liable on a third-party claim brought against the indemnitee to *shift* that loss to another. *See Mas v. Two Bridges Assocs.*, 75 N.Y.2d 680, 690, 555 N.Y.S.2d 669, 674 (1990) (indemnity means that "a party held legally liable to plaintiff shifts the entire loss to another"); *Weissman v. Sinorm Deli, Inc.*, 88 N.Y.2d 437, 446, 646 N.Y.S.2d 308, 312 (1996) ("[i]n an indemnification the entire loss is shifted from the person who has been compelled to pay (the indemnitee) to another upon the imposition of a contingent liability"). Under that framework, New York courts generally treat indemnification as involving liabilities, losses, or claims associated with third-party suits—not contractual damages or losses *between* the contracting parties themselves. *See, e.g.*, *Madeira v. Affordable Hous. Found., Inc.*, 323 Fed. Appx. 89, 91 (2d Cir. 2009) (contractual right to indemnification accrues only when the "indemnified party has satisfied the judgment, *i.e.*, suffered a loss").

As shown below, the specific provisions of the indemnification clauses invoked by Plaintiffs do not support their claims.  Certain of the clauses do not even extend indemnity coverage to noteholders or purport to cover *any* of their losses or liabilities.  Moreover, nothing in *any* of the clauses suggests—much less makes it "unmistakably clear"—that the parties intended for BoA to indemnify Plaintiffs for first-party losses of the sort Plaintiffs allege here.  *See Hooper*, 74 N.Y.2d at 492.  Accordingly, the "indemnification" claims should be dismissed.

> **2.    Plaintiffs' Indemnification Claim Under the Custodial Agreement Fails As a Matter of Law.**

Plaintiffs rely upon Section 17 of the Custodial Agreement to support their claim for "indemnification" for their investment losses.  As discussed above, DB lacks standing to enforce the Custodial Agreement in its capacity as noteholder, and cannot bring a claim for breach of contract or indemnification under this Agreement.  The same standing arguments apply to BNP suing in its capacity as noteholder and bar BNP's indemnification claim.  Moreover, Plaintiffs' indemnification claims are not covered by Section 17, which provides:

> Section 17.  Indemnification of the Issuer, the Seller, the Servicer, the Swap Counterparty by the Custodian.  The Custodian hereby agrees to indemnify the Issuer, the Seller, each Swap Counterparty, their respective Affiliates, their respective directors, officers, trustees, employees and agents and their respective successors and assigns (each, an "Indemnified Party") against, and agrees to hold them harmless from, any and all claims, losses, liabilities, obligations, damages, payments, costs and expenses (including, without limitation, reasonable legal fees and expenses arising in connection therewith) which may be imposed on, incurred by or asserted against any Indemnified Party and resulting from the Custodian's negligence, lack of good faith or willful misconduct or the performance of or other breach of its obligations hereunder; *provided* that the Custodian shall not be liable for any portion of any such amounts resulting from the negligence or misconduct of the Issuer.  The indemnifications contained herein survive any termination of this Agreement….

Ex. D, § 17 at 9.

For two reasons, this clause does not support Plaintiffs' claim for indemnification.  First, the clause extends indemnity rights only to "the Issuer, the Seller, the Servicer, and each Swap Counterparty," as well as their respective affiliates, directors, officers, and other employees and agents.  Although Plaintiffs apparently seek to invoke their status (or, in the case of BNP, its parent's status) as "Swap Counterparty," that plainly is insufficient to give them indemnification

rights here because, as shown above, they are not suing in their capacity as Swap Counterparties and are not seeking losses sustained in that capacity.  Under New York law, and the plain language of the Agreement, Plaintiffs may not invoke their status in one capacity (as Swap Counterparties, or, in BNP's case, as a subsidiary of a Swap Counterparty) to seek indemnification for losses they incurred in another capacity (as noteholders).  *See Bank of New York*, 23 A.D.3d at 310 (clause allowing indemnity for claims against bank in one capacity could not support indemnity for claims against it in another capacity); *TIC Holdings*, 301 A.D.2d at 415 (clause indemnifying for liability for acts of plaintiff's manager held not to cover liability for manager's acts in another capacity).[19] Again, the separate treatment in the Facility Documents of Plaintiffs (or their affiliates) in different capacities "is evidence of [the] intention to keep its functions separate—to indemnify under one set of circumstances but not under another."  *Compania De Vapores*, 91 F. Supp. at 549.

Second, the clause does not demonstrate an "unmistakably clear" intent to cover first-party losses, as distinguished from losses Plaintiffs might sustain if sued *by a third party* based on BoA's acts.  To the contrary, Section 17 provides that the Indemnified Parties shall be indemnified for "claims, losses, liabilities, obligations, damages, payments, costs and expenses ... which may be *imposed on, incurred by or asserted against* any Indemnified Party and resulting from the Custodian's negligence ... or other breach of its obligations ...."  Ex. D, § 17 at 9.  The description of claims and losses "imposed on, incurred by or asserted against" an Indemnified Party most naturally refers to third-party claims asserted against the Indemnified Party—and certainly cannot be read to refer "exclusively or unequivocally" to losses suffered directly *by* Indemnified Parties, as is required to overcome the strong presumption *against* such coverage established by *Hooper*. Courts have held similar language to be consistent with coverage for third-party claims and have applied the *Hooper* rule to preclude coverage for claims between the parties themselves.  *See*

---

[19] *See also Cohen v. Employers Reins. Corp.*, 117 A.D.2d 435, 437, 503 N.Y.S.2d 33, 34 (1986) (indemnification provision covering plaintiff in his capacity as a lawyer did not cover claims against him in his capacity as trustee); *Syvertsen v. Great Am. Ins. Co.*, 267 A.D.2d 854, 857, 700 N.Y.S.2d 289, 292-93 (1999) (insurer's indemnity obligation for acts of corporate officers did not extend to claims brought against them in their individual capacities).

*Bridgestone*, 98 F.3d at 21 (similar language "may easily be read as limited to third party actions" and thus would not be construed as extending to first party claims); *Bourne*, 751 F. Supp. at 58 (dismissing indemnification claim because contract provision did not reflect parties' unmistakably clear intent to cover first-party claims); *Sequa Corp.*, 851 F. Supp. at 110-11 (same).[20]  Plaintiffs' claims for indemnity under the Custodial Agreement fail as a matter of law.

### 3.   DB's Depository Agreement Indemnification Claim and BNP's Claim Under the March 2009 Letter Must Be Dismissed.

As noted, only DB brings an indemnification claim under the Depository Agreement, whereas BNP asserts a right to indemnification under the March 2009 Letter that it contends expands the indemnity rights conferred by the Depository Agreement.  Both claims fail as a matter of law.

### a.   DB's Depository Agreement Claim Fails As a Matter of Law.

DB's claim for indemnification under the Depository Agreement rests on Section 8(g), but that clause—in addition to other limitations—provides only for losses sustained by Ocala, which was the "Issuer" under the Facility Documents:

> The Depositary agrees to indemnify and hold harmless the Secured Parties and the Issuer against any and all claims, losses, penalties, fines, forfeitures,

---

[20] *See also Hooper*, 74 N.Y.2d at 490; *GEM Advisors*, 2009 WL 3459187, at *16; *Dolphin Direct Equity Partners, LP v. Interactive Motorsports & Entm't Corp.*, No. 08 Civ. 1558, 2009 WL 577916, at *10 (S.D.N.Y. Mar. 2, 2009); *Nathan v. Cooper*, No. 06 Civ. 5973, 2007 WL 4352705, at *4 (S.D.N.Y. Dec. 12, 2007); *Tecnoclima, S.p.A., v. PJC Group of N.Y., Inc.*, No. 89 Civ. 4337, 1995 WL 390255, at *1-*2 (S.D.N.Y. June 30, 1995).  A few courts have found evidence of a "clear or unequivocal intent" to cover claims by the indemnitee against the indemnitor from specific language clearly indicating such an intent.  *See, e.g., Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 178 (2d Cir. 2005) (where contract contained two nearly identical indemnity provisions, and only the first contained language limiting indemnity to losses from indemnitor's negligence, the clear intent of the second was to make no such exceptions); *E*Trade Fin'l Corp. v. Deutsche Bank AG*, 631 F. Supp. 2d 313, 391-92 (S.D.N.Y. 2009) (indemnification provision covers claims between parties because another provision "unambiguously contemplate[d] direct actions between the parties" and directed that all such claims "be resolved within the framework" of indemnification provision).  Other courts have found that the presence of certain notice provisions may suggest an intent to provide for *attorneys' fees* in claims between indemnitor and indemnitee.  *See, e.g., Promuto v. Waste Mgmt., Inc.*, 44 F. Supp. 2d 628, 651-52 (S.D.N.Y. 1999); *Pfizer, Inc., v. Stryker Corp.*, 348 F. Supp. 2d 131, 145-46 (S.D.N.Y. 2004).  The better-reasoned authority has found this latter line of cases "unpersuasive," particular where there is no other unmistakable express intent to cover suits between indemnitor and indemnitee.  *Sequa Corp.*, 851 F. Supp. at 111 n.7.  In any event, there is no indication of any clear intent to cover such claims here.

> reasonable legal fees and related costs, judgments, and any other costs, fees and expenses *that the Issuer may sustain* to the extent attributable to the Depositary's negligence, fraud, bad faith or willful misconduct in the performance of its duties hereunder.

Exs. B & C, § 8(g) at 11.

DB's indemnification claim fails at the threshold because it does not purport to assert—nor could it—indemnification for claims, liabilities, or other losses *sustained by Ocala*.  On the contrary, the clear import of DB's claim is that it suffered its *own* investment losses *by virtue of TBW's and Ocala's wrongdoing*, which it alleges BoA should have prevented.  Because the clause by its express terms does not extend to losses suffered by noteholders such as Plaintiffs, the claims fail on this basis alone.  *See Bank of New York*, 23 A.D.3d at 310 (clause that limited indemnity to certain types of losses could not be construed to cover other types of losses).

DB's claim also fails under *Hooper*, because the coverage language of Section 8(g), like Section 17 of the Custodial Agreement, Ex. D, § 17 at 9, is consistent with coverage of claims brought by third parties against the indemnitees, and thus cannot be extended to claims between the parties absent "unmistakably clear" language not present in Section 8(g).  *Hooper*, 74 N.Y.2d at 491.  Nothing in Section 8(g) specifically refers to claims *between* the parties, and, in fact, the reference to "claims, losses, penalties, fines, forfeitures, reasonable legal fees and related costs, judgments, and any other costs, fees and expenses that the Issuer may sustain" confirms that this language refers to claims that might be brought *against* the indemnitee. Exs. B & C, § 8(g) at 11.  Accordingly, under *Hooper*, the language—which sophisticated parties can be presumed to have intended to be given effect—should not be construed as extending beyond such claims.  *See Bridgestone*, 98 F.3d at 21; *GEM*, 2009 WL 3459187, at *16; *Bourne*, 751 F. Supp. at 58; *Sequa*, 851 F. Supp. at 110; *Hooper*, 74 N.Y.2d at 491.

Finally, because DB does not have standing to enforce the Depositary Agreement, it also cannot enforce Section 8(g).  Courts have reached this result even where (unlike here) the indemnification clause expressly covered losses sustained by the plaintiff:  the clause precluding third-party enforcement still must be given effect.  *See Control Data Sys.*, 1998 WL 178775, at *2-

*3.  Even in that circumstance, it is only the contracting parties who may bring suit (if they so choose) to seek damages on the indemnitee's behalf.  *Id.*

> ### b.     <u>BNP's Indemnification Claim Under the March 2009 Letter Also Must Be Dismissed.</u>

As noted, BNP does not assert a claim for indemnification directly under the Depositary Agreement but rather invokes the March 2009 Letter it claims to have obtained from BoA, and which it contends expanded the indemnity rights contained in the Depositary Agreement.  BNP FAC ¶¶ 177-82; Ex. E.  The letter states:

> As an inducement to BNP Paribas ("<u>BNPP</u>") to enter into, and/or to continue its participation in, the Related Transactions (as defined below), the Depositary hereby agrees to indemnify and hold harmless BNPP, its officers, directors, controlling persons and affiliates (collectively, the "<u>Indemnified Persons</u>") against any and all claims, losses, penalties, fines, forfeitures, reasonable legal fees and related costs and judgments, and any other costs, fees and expenses that any Indemnified person may sustain to the extent attributable to the Depositary's negligence, fraud, bad faith or willful misconduct in the performance of its duties under the Depositary Agreement (including, without limitation, its duties under Section 4(d) thereof).

Ex. E at 1.  The letter goes on to state that "[f]or the avoidance of doubt, the Depositary's undertakings *herein,*" *i.e.*, in the letter itself, "extend to BNPP [BNP's parent company, BNP Paribas] in its individual capacity, as Series 2005-01 Swap Counterparty and (as applicable) as a holder of Series 2005-1 Short Term Notes."  *Id*. at 2.[21]  For two reasons, the March 2009 Letter does not support BNP's indemnification claim here.

First, as shown above, the Letter is not a valid amendment to the Depositary Agreement, so it cannot be used to expand rights already provided for in that Agreement in connection with an alleged breach of that Agreement.  *See John Street*, 196 F.3d at 382.  Nor can it be cast as a separate agreement on the same subject matter, because any such construction would violate the "Entire Agreement" provision, which states that "[t]his Agreement and the Facility Documents constitute the entire agreement among the parties hereto with respect to the Short Term Notes and any Extended Notes and Non-Called Notes."  *See* Exs. B & C, § 23 at 19.  The March 2009 Letter

---

[21] As the letter indicates, the BNP party to which it was addressed is actually BNP's parent company, which, as discussed above, was a Swap Counterparty, and not a Noteholder.

does not purport to be a Facility Document, nor, as already shown, was it signed by Ocala or accompanied by the requisite writing from the rating agencies.  *Id*. § 13 at 16.  It therefore cannot be used to expand BNP's indemnification rights.

Second, even if the March 2009 Letter were valid, it would not support indemnification here.  The Letter appears to be a self-conscious attempt to cure the most glaring problem with the Depositary Agreement, namely, that its indemnity provision covers only losses suffered by "the Issuer."  Indeed, one cannot but marvel at the timing with which BNP procured this Letter, which certainly suggests consciousness of a problem rather than innocent prescience.  But the Letter still does not confer a right to indemnification for alleged violations of the Depositary Agreement because it does not purport to cure the underlying defects in BNP's *standing* to enforce the terms of the Depositary Agreement.  *See Control Data Sys.*, 1998 WL 178775, at *2-*3.  Certainly, the statement that the letter applies to BNP in its different capacities does not make BNP a third-party beneficiary with standing to enforce the terms of the Depositary Agreement itself, and the Letter does not create any substantive rights beyond those contained in the Depositary Agreement. Accordingly, BNP's lack of standing precludes it from seeking indemnity for breaches of the Depositary Agreement just as does DB's lack of standing.  *Id*.

Finally, the reference in the March 2009 Letter to "any and all claims, losses, penalties, fines, forfeitures, reasonable legal fees and related costs and judgments, and any other costs, fees and expenses that any Indemnified person may sustain" may be read to cover only third-party claims, and thus is not an "unmistakably clear" reference to first-party losses allegedly suffered by BNP as a result of BoA's alleged breaches of the Depositary Agreement.  *See* Ex. E at 1; *Sequa*, 851 F. Supp. at 110; *Bridgestone*, 98 F.3d at 21; *GEM*, 2009 WL 3459187, at *16.

### 4.    The Indemnification Clause in the Security Agreement Does Not Cover Claims Between the Indemnitor and the Indemnitee.

Plaintiffs assert indemnification claims under Section 8.05 of the Security Agreement, which provides:

> Section 8.05  *Indemnification of Third-Party Claims.* [22]  The Collateral Agent agrees to indemnify and hold harmless the Secured Parties and the Issuer against *any and all claims, losses, penalties, fines, forfeitures, reasonable legal fees and related costs, judgments, and any other costs, fees and expenses that the Issuer or the Secured Parties may sustain* to the extent attributable to the Collateral Agent's negligence, fraud, bad faith or willful misconduct in the performance of its duties hereunder.

Ex. A, § 8.05 at 40.  This claim fails because, again, the coverage language referring to "any and all claims, losses, penalties, fines, forfeitures, reasonable legal fees and related costs, judgments, and any other costs, fees, and expenses that the Issuer or the Secured Parties may sustain" can be read to cover third-party claims and thus, under the logic of *Hooper*, cannot be read to express an exclusive and unequivocal intent to cover first party claims.  *See* Ex. A, § 8.05 at 40.

**F.      In Any Event, DB and BNP Cannot Pursue Any Claims for Events or Injuries Occurring Prior to July 20, 2009, When They Purchased the Notes at Issue.**

Even if any of Plaintiffs' claims could survive despite the serious deficiencies identified above, Plaintiffs have vastly overpled to allege breaches that occurred, if at all, long before Plaintiffs purchased the unpaid notes issued on July 20, 2009.  Plaintiffs admit that for all the short-term Ocala notes they purchased *prior* to July 20, 2009, they received *full payment* upon their maturity.  BNP FAC ¶ 42; *accord* DB FAC ¶ 5.  This full payment effected a complete discharge and extinguishment of those earlier notes.

As a matter of law, the payment of a note at maturity extinguishes the note and any right to sue under or on the basis of the note.  *See generally Green v. Foley*, 856 F.2d 660, 665-66 (4th Cir. 1988); 70 C.J.S. PAYMENT § 32 (2009).  After full payment, the note provides no legal ground for suing as a noteholder under any related contract, because the payment not only extinguishes the debt itself, but also "discharges from further operation any collateral undertakings that are given for the better security of the creditor."  83 N.Y. JUR. 2D PAYMENT & TENDER § 141 (2010).  *See also* 6A W. Fletcher, CYCLOPEDIA OF THE LAW OF CORPORATIONS § 2728 (updated April, 2010) § 2728 (payment of bond extinguishes holders' collateral rights under the instrument); *Bank of*

---

[22] Although headings do not themselves constitute contract terms that can bear upon construction, *see* Ex. A, § 10.11 at 44, the heading for Section 8.05 confirms the parties' manifest intent.

*Lexington v. Jack Adams Aircraft Sales, Inc.*, 570 F.2d 1220, 1225 (5th Cir. 1978) (satisfaction of debt obligation extinguishes any related security interest).[23]   As one court put it long ago, "[w]hen commercial paper is paid by the party whose debt it appears to be, it becomes *functus officio*, commercially dead."  *In re Paradis' Estate*, 186 A. 672, 675 (Me. 1936).  *See also Great Western Bank v. Kong*, 90 Cal. App. 4th 28, 32 (Cal. App. 2001) (no action could be brought on a note that had been fully paid).  Here, the discharge of the notes eliminated any right to sue under contracts where Plaintiffs' standing, if it existed at all, derived solely from their status as holders of the notes—including the Indenture and the other Facility Documents on which Plaintiffs purport to sue.[24]

The facts and holding of *Caplan v. Unimax*, 188 A.D.2d 325, 325, 591 N.Y.S.2d 28, 29 (1992), confirm this conclusion. There, holders of notes that had been redeemed sued the Indenture Trustee, claiming a breach of the covenant of good faith and fair dealing under the Indenture.  The court dismissed, holding that plaintiffs had "received all the promised benefits under the Indenture upon redemption of the debenture," and thus could not state a further claim under the Indenture. *Id.  See also Caplan v. Unimax Holdings Co.*, 8/21/91 N.Y.L.J. 22, col 3.  Similarly here, Plaintiffs purport to assert breaches of agreements that they claim made them third-party beneficiaries in their capacity as noteholders.  To the extent Plaintiffs had such enforceable rights as noteholders at any given time, those rights necessarily were extinguished upon the payment and discharge of the

---

[23]  *Accord Landmark Land Co., Inc. v. Sprague*, 529 F. Supp. 971, 979 (S.D.N.Y. 1981) *aff'd in relevant part*, 701 F.2d 1065, 1070 (2d Cir. 1983); *In re Spaniak* 221 B.R. 732, 735 (Bankr. W.D. Mich. 1998).  Indeed, under New York law, even where payment is tendered but not completed, the mere offer of payment "operates to terminate all incidents of the obligation."  *Litwak v. Wolkenberg*, 130 A.D.2d 630, 632, 515 N.Y.S.2d 559, 560 (1987).  *See also* W.H. Danne, *et. al.*, 96 N.Y. Jur. 2d Secured Transactions § 302 (2010) (tender "operates as a discharge or extinguishment of obligations that are incidental to the principal obligation").  Here, there was not only tender of payment, but actual payment on the notes.

[24]  *See* Indenture, Ex. F1, §13.8 at 68, Security Agt., Ex. A, § 10.08 at 43-44; BNP FAC at ¶ 206.  BNP also claims that, in addition to noteholder standing under the Indenture, BNP also has standing under that agreement as Swap Counterparty.  BNP FAC at ¶ 206.  For the reasons discussed in the text above, that assertion lacks merit.  Further, as noted above, Plaintiffs are simply wrong in asserting that noteholders were beneficiaries under the Custodial and Depositary Agreements.

notes.  *Caplan*, 188 A.D. 2d at 325.  See *also* 83 N.Y. JUR. 2D PAYMENT AND TENDER § 141

(extinguishing the note extinguishes all related obligations).  Although the later purchase of new

notes as part of a "separate transaction" (see BNP FAC at ¶ 42) conferred standing as of that time,

that would not permit the new noteholders to revive the old, extinguished notes to capture alleged

breaches predating the new note issuance.  *See Commerce Fed. Sav. Bank v. F.D.I.C.*, 872 F.2d

1240, 1244-45 (6th Cir. 1989) (FDIC could not claim that a "second promissory note" was secured

by a prior deed of trust because "as a matter of law, [the prior deed of trust] had been extinguished

upon the payment [of the original note]").

In sum, Plaintiff cannot recover for alleged breaches occurring during the tenure of

extinguished notes.  To the extent they have standing under "collateral undertakings" such as the

Indenture or the other agreements on which Plaintiffs have sued, that standing is limited to the

rights conferred upon them by their only extant notes (*i.e.*, the notes issued on July 20, 2009).

**G.     DB's Claims Under Superseded and Restated Versions of the Applicable Contracts Fail As a Matter of Law.**

For reasons that are unclear, DB has added to its Amended Complaint purported claims

under earlier, superseded versions of the Facility Documents, in addition to its claims under the

current versions of those same documents.[25]  These new claims are not cognizable, not just

because, as shown, the full payment of the notes extant at the time of the earlier agreements

eliminates any claim under those agreements, but also because the parties' execution of *amended

and restated* agreements in June 2008 rendered any claim under the superseded agreements a legal

impossibility.

---

[25] *See* DB FAC, Count I (breach of the 2006 Base Indenture); Count III (2006 Security
Agreement); Count V (2005 Depositary Agreement); Count VII (2006 Custodial Agreement);
Count IX (indemnification under the 2005 Depositary Agreement and the 2006 Security
Agreement).

Under New York law, a "substituted agreement" or novation[26] "immediately discharge[s]" previous obligations and replaces them with obligations under the new agreement. *See Denburg v. Park Chapin Flattau & Klimpl*, 82 N.Y.2d 375, 383-84, 604 N.Y.S.2d 900, 906 (1993). Thereafter, a party may not sue for breach of the old agreement. *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 287 n.1 (2d Cir. 1997) ("a substitute agreement extinguishes a claimant's prior claims upon execution of the agreement"); *Health-Chem Corp. v. Baker*, 915 F.2d 805, 811 (2d Cir. 1990) (when a new agreement supersedes an older one, "the previous agreement is extinguished, thereby reducing the remedy for breach to a suit on the new agreement"); *Citigifts, Inc. v. Pechnik*, 112 A.D.2d 832, 834, 492 N.Y.S.2d 752, 753 (1985), *aff'd mem.*, 67 N.Y.2d 774, 500 N.Y.S.2d 643 (1986) (novation "reduc[es] the remedy for breach to a suit on the new agreement"). As the court in *Citigifts* explained, "[i]f the plaintiffs were truly aggrieved by the alleged breach of the first contract, they gave up their rights by signing [the new contract]."[27]

Where a new agreement contains express integration language stating that it supersedes all prior agreements and understandings, that creates a new and superseding agreement that precludes suit on the earlier agreement. *Health-Chem*, 915 F.2d at 811 ("supersede" means "set aside, annul, displace, make void, and repeal"); s*ee also C3 Media & Mktg. Group, LLC, v. Firstgate Internet, Inc.*, 419 F. Supp. 2d 419, 434 (S.D.N.Y. 2005) (substitute agreement may be evidenced by language indicating that it "supersedes and supplants the previous contract, completely replacing an old relationship with a new one"). Other contractual language, such as an integration clause or a clause specifying an effective date for the agreement, also can indicate that a new agreement substitutes for an earlier one. *See* RESTATEMENT (2D) OF CONTRACTS § 213(2) (1981) ("A binding

---

[26] The elements of a novation are: (1) a previously valid obligation; (2) agreement of all parties to extinguish the old contract; (3) agreement of the parties to a new contract; and (4) a valid new contract. *Sudul v. Computer Outsourcing Servs., Inc.*, 917 F. Supp. 1033, 1047 (S.D.N.Y. 1996). No party here contends that the old or new agreements were invalid, and all of the parties to the 2008 agreements agreed, by signing the amended and restated agreements, to extinguish the 2005 and 2006 agreements.

[27] In an executory accord, by contrast, the parties agree that a stipulated performance will be accepted in the future, in lieu of an existing claim, and the old obligation is not discharged until performance of the new obligation is tendered. *Denburg*, 82 N.Y.2d at 383.

completely integrated agreement discharges prior agreements to the extent that they are within its scope."); *Grant v. Nat'l Eng'g Search*, No. 01-CV-6610, 2002 WL 31012152, at *5 (W.D.N.Y. Aug. 19, 2002) (integration and "superseding" clauses indicate substitute agreement); *Sudul*, 917 F. Supp. at 1048 (language making contract changes effective on a certain date evinces intent to substitute new agreement for old).  Only language preserving existing claims until performance is rendered under the new agreement shows an intent to form an executory accord.  *See C3 Media*, 419 F. Supp. 2d at 434.

Here, it is clear from the face of the 2008 agreements that they were intended to and did replace the 2005 and 2006 versions of the same agreements under which DB purports to sue:

- The June 2008 Second Amended and Restated Security Agreement contains both an integration clause stating that it is the "entire agreement" between the parties and a clause stating that it "supersedes all prior agreements and understandings" regarding matters covered by it.  Ex. A § 10.14 at 45.  It also provides that the 2006 Security Agreement—on which DB purports to base its new Count III—was to remain in full force only "until the occurrence of the [closing date for the 2008 agreement]," at which time the Second Amended and Restated Security Agreement would become "immediately effective."  *Id.* § 1.02 at 2.

- The June 2008 Second Amended and Restated Custodial Agreement likewise contains an integration clause and "superseding" clause noting that it "supersedes all proposals, oral or written, and all other communications, oral or written," between the parties on the subject matter addressed by the Custodial Agreement.  Ex. D § 21(e) at 15.  It also states in its recitals that the parties "desire to amend and restate the Amended and Restated Custodial Agreement [from 2006] in its entirety."  *Id.* at 1.

- The Second Amended and Restated Base Indenture provides that the 2006 Base Indenture—on which DB relies in its Count I—remains in effect only until the closing date for the 2008 agreements, or June 30, 2008.  After that date, the 2008 Base Indenture was to "become immediately effective without further action by any party."  Ex. F1, § 1.5 at 3.

- The June 2008 Series 2005-1 Amended and Restated Depositary Agreement states that it "amends and restates in its entirety the Depositary Agreement, dated as of April 5, 2005," *i.e.*, the earlier version of the same agreement on which DB relies in its Count V.  *See* Ex. C § 1 at 1.

The only reasonable reading of these provisions is that the parties—sophisticated banking entities—intended for the 2008 agreements to replace the older set of agreements.  There is no language in any of the 2008 agreements preserving any rights under the earlier agreements; on the contrary, the relevant provisions all speak in terms of replacing the earlier agreements.  Indeed, that

-79-

these documents were amended and restated in their entirety speaks volumes, as the parties could have chosen to modify the 2005 and 2006 documents, rather than entering into entirely new agreements, or to indicate explicitly that the 2008 agreements were not to be construed as novations. *Cf. Banque Nationale de Paris v. Batmanghelidj*, 108 F.3d 1369, 1997 WL 138944, at *2 (2d Cir. 1997) (clause stating that a new contract is not to be construed as a novation indicates that it is a modification of an earlier agreement, rather than a substitute agreement).

In sum, any claims for breach of the 2005 and 2006 agreements expired when the agreements were amended and restated in June 2008. *See, e.g., Health-Chem*, 915 F.2d at 811. DB's Claims I, III, V, VII, and IX must be dismissed.[28]

**H.    The Newly-Added Plaintiff, BNP Paribas, Is Not a Proper Party to This Action Because It Has Alleged No Injury to Itself and Therefore Lacks Standing.**

In its Amended Complaint, original Plaintiff BNP Mortgage Corporation (referred to in this section as BNPP) has added its parent company, BNP Paribas, as a new plaintiff. The Amended Complaint asserts that BNPP is a wholly-owned subsidiary of BNP Paribas North America, Inc., which is in turn wholly owned by new Plaintiff BNP Paribas. BNP FAC ¶ 19. The Amended Complaint further states that, although it was BNPP that purchased short-term notes issued by Ocala, BNP Paribas participated in the Ocala facility in its capacity as Swap Counterparty—that is, by engaging in the above-described swap transactions with Ocala and TBW "to hedge certain risks

---

[28] Even if DB's Claims under the superseded contracts were not barred by New York law, they would fail for the same reasons as do the parallel claims under the operative versions of the contracts. As DB concedes, the material differences between the superseded agreements and the 2008 Agreements are limited. DB FAC ¶¶ 116-19. As also evidenced by DB's own allegations, what material differences do exist serve only to limit, not expand, DB's potential claims under those agreements. Thus, although DB alleges six breaches under the 2008 Security Agreement, it alleges only three under the superseded 2006 Security Agreement. *Compare* DB FAC ¶¶ 237-42 *with* ¶¶ 228-30. Specifically, DB concedes that there is no duty to segregate funds under the superseded agreement. DB FAC ¶ 119. It also concedes that any prohibition against Ocala's purchase of "wet" mortgages appeared only in the 2008 Security Agreement. DB FAC ¶ 119. DB does not assert a "failure to monitor" claim under the 2006 Security Agreement, and also does not allege any Issuer Agent claim under the 2006 Security Agreement. One additional material change that does exist between the superseded contracts and the 2008 Agreements concerns DB's claim for indemnification under the 2006 Security Agreement. The indemnification provision in that version of the Agreement contains the same prohibitive language that the 2008 *Custodial* Agreement currently has limiting indemnification to losses sustained by the *Issuer*. Ex. R1, § 8.05 at 32. The significance of this provision is discussed in Section Part IV.E.2 above.

associated with its Ocala investment."  BNP FAC ¶¶ 42, 45.  BNP Paribas, the corporate parent, has joined in the indemnification and contract claims asserted by BNPP under the Custodial Agreement and the March 2009 Letter, and in the contract and breach of fiduciary duty claims under the Indenture.

BNP Paribas' claims fail as a matter of law because BNP Paribas does not allege that it suffered any injury in its capacity as Swap Counterparty or otherwise.  BNP Paribas apparently is trying to assert standing for alleged injuries to its second-tier subsidiary, BNPP—in effect to loan its status as a contractual counterparty to its subsidiary—but this tactic is precluded by New York law prohibiting a corporate parent from suing for injuries suffered by its subsidiary.

Turning first to BNP Paribas' claim for indemnification under the Custodial Agreement, BNP Paribas has not alleged facts showing injury to itself or entitling it to indemnification.  Under New York law, indemnification clauses are "strictly construed."  *Manley*, 337 F.3d at 245.  Although Swap Counterparties (among other entities) are covered for losses "imposed on, incurred by, or asserted against" them, Ex. D, § 17 at 9, this language by its terms encompasses only *losses actually incurred by, imposed upon, or asserted against* the indemnified party.  Here, BNP Paribas has not alleged any such losses in any capacity, much less as Swap Counterparty.

It also is hornbook law that BNP Paribas may not assert its subsidiary's injury as its own.  A claim for an injury to a corporation must be brought by the real party in interest—*i.e.*, the corporation itself.  *See* 1 W. Fletcher, CYCLOPEDIA OF THE LAW OF CORPORATIONS § 36 (2010).  New York courts consistently have held that a parent corporation lacks standing to sue for injuries allegedly sustained by its subsidiary.  *See, e.g.*, *Hudson Optical Corp. v. Cabot Safety Corp.*, 162 F.3d 1148, 1998 WL 642471, at *3 (2d Cir. 1998).[29]  New York also prohibits a related corporation that is not the real party in interest to a contract from suing under that contract.  *See*

---

[29] *See also Alexander & Alexander of N.Y. v. Fritzen*, 495 N.Y.S.2d 386, 388 (1985) ("one corporation will generally not have the legal standing to exercise the rights of other associated corporations"), *aff'd* 68 N.Y.2d 968 (1986); *Rhode Island Hosp. Trust Co. v. Claude Neon, Inc.*, 109 N.Y.S.2d 834, 837 (1951) (parent company "has no independent cause of action merely because it was the parent of the subsidiary"), *aff'd* 112 N.Y.S.2d 800 (1952).

*Diesel Systems, Ltd. v. Yip Shing Diesel Engineering Co., Ltd.*, 861 F. Supp. 179, 181 (E.D.N.Y. 1994) ("A corporation does not have standing to assert claims belonging to a related corporation, simply because their business is intertwined.").

BNP Paribas's claim for indemnification under the Custodial Agreement fails for the same reason. This claim alleges only that BoA "has refused to compensate BNPP [*i.e.*, the subsidiary] for the losses it suffered." BNP FAC ¶ 198. In the next paragraph, it concludes that, "[b]y reason of the foregoing[!], BNPP and BNP Paribas have been damaged" by BoA. BNP FAC ¶ 199. As already noted, New York law precludes such an effort by a parent to recover for damages allegedly sustained by its subsidiary. *Diesel Systems*, 861 F. Supp. at 181.

BNP Paribas' claim for indemnification under the March 2009 Letter also is barred. In that Letter, BoA agreed to indemnify BNP Paribas against losses it "may sustain" to the extent such losses are attributable to BoA's negligence. Ex. E at 1. BNP Paribas alleges no injury sustained by it, save for the conclusory allegation that it has been damaged by BoA "in an amount to be determined at trial." BNP FAC ¶ 182. Although BNP Paribas again tries to piggyback on the allegations that BoA "failed to make payment *to BNPP* for its Secured Notes and *BNPP* has been damaged," *id*. ¶ 181, such allegations cannot confer standing on BNP Paribas, the corporate parent, to assert its indemnification claim. *See, e.g., Hudson*, 1998 WL 642471, at *3.

BNP Paribas attempts the same tactic with its contract claim under the Indenture. To state a claim for breach of contract, a plaintiff must allege damages resulting from the breach. *See JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*, 69 A.D.3d 802, 803, 893 N.Y.S.2d 237, 238 (2010). Although BNP Paribas alleges that it was not given notice of an event of default, it nowhere mentions any distinct injury caused to itself by that alleged lack of notice. *See* BNP FAC ¶ 202. Again, such an allegation likely would be impossible here because the Swap Counterparty arrangement richly compensated BNP Paribas over the lifetime of the Ocala facility.

BNP Paribas's allegation that actions by BoA "have injured or may injure *BNPP and the other Noteholders*," BNP FAC ¶ 205, also is insufficient to show that BNP Paribas suffered any harm. The conclusory allegation that "BNPP and BNP Paribas have been damaged," BNP FAC

¶ 207, does not suffice.  Without alleged facts constituting injury or damages sustained by itself—as opposed to its subsidiary—BNP Paribas' claim for breach of the Indenture fails.

Finally, BNP Paribas' claim for breach of fiduciary duty fails because it does not allege any fiduciary duty owed to BNP Paribas by BoA, a breach of any such duty, or damages directly caused by such a breach.  *See Daly v. Kochanowicz*, 67 A.D.3d 78, 95, 884 N.Y.S.2d 144, 156 (2009).  The Amended Complaint merely states that "Bank of America owed *BNPP and the other Noteholders*" a duty to act as a prudent person would in the conduct of his own affairs.  BNP FAC ¶ 209.  There is no allegation that BoA owed a similar fiduciary duty to the *parent* of BNPP—BNP Paribas—and none may be implied under New York law.  *See Mid-Island Hosp., Inc. v. Empire Blue Cross Blue Shield*, 276 F.3d 123, 130 (2d Cir. 2002) (no fiduciary relationship will be implied in an arms-length commercial transaction).

BNP Paribas also has not pled that it has been damaged by any breach of fiduciary duty by BoA.  Its allegation that BoA failed to declare and notify BNP Paribas of an event of default (*see* BNP FAC ¶ 210) is purely a contractual claim, not a fiduciary claim, and in any event fails because it does not allege injury flowing to BNP Paribas from the alleged breaches.  As explained above, BNP Paribas cannot rely on allegations of injury to its subsidiary to establish its own standing.

## V.     <u>CONCLUSION</u>

BoA respectfully requests that these actions be dismissed in their entirety with prejudice. Plaintiffs took the opportunity to amend their pleading in light of BoA's initial motion to dismiss explaining in detail the defects in all of their claims.  Plaintiffs' amended pleadings fail to cure these defects.  Further leave to amend would be futile.  *See Re-Alco Indus., Inc. v. Nat'l Ctr.  for Health Educ., Inc.*, 812 F. Supp. 387, 396 (S.D.N.Y. 1993) (Mukasey, J.) (dismissing plaintiff's amended complaint "in its entirety with prejudice" where plaintiff "already had one opportunity to replead" prior to the filing of and ruling on defendant's motion to dismiss).

10576546.3

Dated: April 30, 2010

Respectfully submitted,

MUNGER, TOLLES & OLSON LLP
Marc T. G. Dworsky
Kristin Linsley Myles
Gregory Weingart
Richard St. John
355 South Grand Avenue, Thirty-Fifth Floor
Los Angeles, CA  90071-1560
(213) 683-9100

By: _/s/  Marc T.G. Dworsky_
    Marc T. G. Dworsky

KING & SPALDING LLP
Richard T. Marooney, Jr.
1185 Avenue of the Americas
New York, NY  10036
(212) 556-2242

*Attorneys for Defendant Bank of America, N.A.*