**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BNP PARIBAS MORTGAGE CORP. and BNP PARIBAS<br><br>        Plaintiffs,<br><br>    v.<br><br>BANK OF AMERICA, N.A.,<br><br>                Defendant | Civil Action No. 09-CV-9783-RWS<br>Honorable Robert W. Sweet |



**FIRST AMENDED COMPLAINT**

Plaintiffs BNP Paribas Mortgage Corp. ("BNPP") and BNP Paribas for their First Amended Complaint against Bank of America, N.A. ("Bank of America") allege, upon information and belief, as follows:

**SUMMARY OF CLAIMS**

1.      This is an action for breach of contract, indemnification and breach of fiduciary duty resulting from Bank of America's repeated improper issuance of $480.7 million of senior secured notes to BNPP, and Bank of America's failure to secure and protect over $480.7 million of collateral, in the form of cash and residential mortgage loans, which it was obligated to secure on behalf of BNPP.

2.      On June 30, 2008, Ocala Funding, LLC ("Ocala") issued a total of $1.75 billion of short-term, interest-bearing, secured notes (the "Secured Notes").  On that same day, BNPP purchased Secured Notes with a face amount of $480.7 million.

3.      Ocala is a mortgage warehousing facility created to provide short-term liquidity funding to Taylor, Bean & Whitaker Mortgage Corp. ("TBW") pending the sale of mortgages

originated or purchased by TBW to the Federal Home Loan Mortgage Corporation ("Freddie Mac") and others. Upon receipt of payment for the loans, Ocala was to use the loan sale proceeds to either repay BNPP and the other noteholders (whose money financed the purchase) or to purchase additional loans from TBW.

4.     The governing contracts required that the Secured Notes be over-collateralized at all times. Put simply, Ocala was required to hold at least $500 million of cash and mortgage loans as collateral for BNPP's $480.7 million of outstanding Secured Notes, and at least $1.75 billion of cash and mortgage loans as collateral for all the outstanding Secured Notes.

5.     To ensure the existence and maintenance of such security, Ocala contracted with Bank of America's LaSalle Global Trust Services division to serve as collateral agent, custodian, depositary and indenture trustee of the Ocala facility. In March 2008, Bank of America's marketing materials touted "LaSalle Global Trust Services [as] an industry-leading trustee, third party agent, and securities custodian with experience on more than $1.9 trillion in assets."

6.     As collateral agent, custodian, depositary and indenture trustee, Bank of America served as a gatekeeper for the Ocala facility and was charged with, among other things:  (i) securing and protecting the cash and mortgage loans collateralizing the Secured Notes; (ii) making certain that the Secured Notes were, in fact, over-collateralized, i.e., that Bank of America held collateral in the form of cash or mortgage loans of at least $1.75 billion, before issuing new Secured Notes or purchasing new mortgage loans; and (iii) shutting down the Ocala facility and promptly notifying BNPP if at any time Bank of America became aware that the Ocala facility was under-collateralized and therefore insolvent.

7.     Bank of America's performance of its contractual obligations was an essential condition to BNPP's willingness to purchase and subsequently reinvest in the Secured Notes.

Indeed, BNPP's reliance on Bank of America was confirmed by Bank of America itself in a letter to BNP Paribas dated March 27, 2009 (the "March Letter Agreement"). The March Letter Agreement expressly acknowledges that – as an "inducement to BNP Paribas [] to enter into, and/or continue its participation in" the Ocala facility – Bank of America would indemnify BNPP against losses stemming from any failure by Bank of America to meet its contractual obligations. The March Letter Agreement highlights Bank of America's core contractual obligation to certify the over-collateralization of the Secured Notes prior to the issuance of the Secured Notes. Bank of America further recognized in the March Letter Agreement that "the duties it performs under the Depositary Agreement (including its duties under Section 4(d)) play an important role in mitigating the risks that BNPP would otherwise incur" through participation in the Ocala transaction.

8.      On August 3, 2009, federal agents raided TBW's offices. The next day, TBW was delisted as an approved seller of mortgage loans to Freddie Mac, which triggered a shut-down of the Ocala facility and rendered the Secured Notes immediately due and payable.

9.      Since August 2009, BNPP has learned that – in direct violation of its express contractual obligations – Bank of America failed to secure and protect BNPP's collateral, and instead allowed the vast majority of that collateral to leave the Ocala facility. Moreover, BNPP has recently discovered that documents certified by Bank of America reflect its actual knowledge that the Ocala facility was insolvent even prior to, as well as at, the time of BNPP's investment. Yet, despite this knowledge, Bank of America continued to issue Secured Notes and failed to shut down the facility or otherwise inform BNPP of Ocala's insolvency as required by the governing contracts.

10.     Specifically, BNPP has learned that as of August 5, 2009, when Ocala was finally shut down, at least 1,837 mortgage loans with a face amount of $374.9 million were not, as Bank of America had previously represented, held by it as collateral for BNPP's $480.7 million of Secured Notes and further that Bank of America held only $1.9 million of cash in the segregated collateral account that it was required to maintain on behalf of BNPP.

11.     Bank of America breached its contractual obligations to BNPP by, among other things: (i) improperly transferring over $3.8 billion in cash from Ocala's collateral account at Bank of America to entirely unauthorized accounts, including to Freddie Mac and Ginnie Mae custodial accounts that had no connection to Ocala; (ii) purchasing mortgage loans without authorization; (iii) commingling funds in contravention of the Ocala facility documents; (iv) failing to secure the mortgage loans it held on behalf of BNPP; (v) improperly issuing new Secured Notes when Ocala was insolvent; and (vi) failing both to declare an Event of Default in the Ocala facility and to promptly inform BNPP of Ocala's insolvency.

12.     Among Bank of America's contractual duties was the certification of the collateral supporting the Secured Notes.  Under the Depositary Agreement, Bank of America was required to certify that Ocala's assets exceeded its liabilities and that the facility was appropriately collateralized, i.e., that Bank of America was holding, on behalf of BNPP and other noteholders, mortgage loans and cash worth at least $1.75 billion.  The contractually required certification was memorialized in the form of a Certificate of Authorized Issuer Agent Concerning Short Term Note Issuance (the "Borrowing Base Certificate").  Representations and calculations in the Borrowing Base Certificate were required to be certified by Bank of America prior to the issuance or "roll" of the Secured Notes.

4

13.     On each date that Secured Notes were issued, Ocala prepared and Bank of America certified a Borrowing Base Certificate. BNPP did not receive a copy of the Borrowing Base Certificate certified by Bank of America on June 30, 2008, nor did it receive copies of the Borrowing Base Certificates prepared by Ocala and certified by Bank of America for the roll dates prior to the end of December 2008. Each of these certificates showed that Ocala had collateral, in the form of cash and mortgages, worth only approximately $1 billion. Thus, on their face the Borrowing Base Certificates certified by Bank of America prior to December 2008 showed the Ocala facility to be insolvent and under-collateralized by over $700 million. Although Bank of America knew – indeed it certified – that the Ocala facility was insolvent, it nonetheless failed to shut down the Ocala facility or inform BNPP of Ocala's insolvency as was contractually required under the Ocala facility documents.

14.     On December 12, 2008, BNPP asked Bank of America to begin sending it copies of the Borrowing Base Certificates. Bank of America began providing the Borrowing Base Certificates directly to BNPP in February 2009.

15.     Unlike the Borrowing Base Certificates executed by Bank of America between June and December 2008, which showed only approximately $1 billion of collateral and thus on their face reflected the insolvency of the Ocala facility and thus the existence of an Event of Default, the Borrowing Base Certificate executed by Bank of America on December 30, 2008 suddenly showed collateral, in the form of cash and mortgages, valued at approximately $1.85 billion. Moreover, each of the Borrowing Base Certificates executed by Bank of America in 2009, after BNPP requested copies of the certificates, showed collateral of between $1.75 billion and $1.85 billion.

16.     At no point did Bank of America inform BNPP that the pre-December 2008 Borrowing Base Certificates, which had not been shared with BNPP, showed the facility to be insolvent. Nor did Bank of America alert BNPP to the fact that over $800 million of collateral inexplicably appeared on the Borrowing Base Certificate in the last two weeks of December 2008 (after BNPP asked for copies of the Borrowing Base Certificate).

17.     Documents obtained by BNPP after August 2009 reveal that the Borrowing Base Certificates certified by Bank of America and provided to BNPP in 2009 were false. In truth, the Ocala facility was grossly under-collateralized and thus insolvent. By way of example, the first Borrowing Base Certificate given by Bank of America to BNPP was for the February 20, 2009 roll of Secured Notes. It certifies that Bank of America is holding $510 million of collateral for BNPP's $480 million of Secured Notes comprised of mortgage loans ($479 million) and cash ($31 million). This certification was false. As evidenced by contemporaneous Bank of America documents, as of February 20, 2009, it was holding less than $35 million of mortgage loans and less than $300,000 of cash in the BNPP collateral account.

18.     Had Bank of America adequately performed its contractual obligations: (i) BNPP would not have purchased the Secured Notes on June 30, 2008, or on any of the subsequent roll dates; or (ii) BNPP's Secured Notes would be fully secured by $500 million of cash and mortgage loans as required by the facility documents. As a direct and proximate result of Bank of America's breach of its contractual duties, BNPP's Secured Notes are significantly under-collateralized and Bank of America has failed to make payment to BNPP for its Secured Notes.

## PARTIES

19.    BNP Paribas Mortgage Corp. is a Delaware corporation with its principal place of business in New York, New York. BNP Paribas Mortgage Corp. is a wholly-owned subsidiary of Paribas North America Inc., which is wholly owned by BNP Paribas.

20.    BNP Paribas is a bank organized under the laws of France, with its headquarters in Paris, France. BNP Paribas is a multi-national bank with a presence in eighty-five countries and more than 205,000 employees worldwide.

21.    Bank of America, N.A. is a National Banking Association with its principal place of business located in Charlotte, North Carolina. Bank of America is the successor in interest through merger to LaSalle Bank N.A. ("LaSalle Bank") and LaSalle Global Trust Services ("LaSalle Trust"). Bank of America is authorized to engage in the business of banking in the State of New York. Bank of America has done and is doing business in the State of New York.

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

23.    This Court has personal jurisdiction over Bank of America by virtue of its business activity in this jurisdiction.

24.    Venue in this district is proper under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claim occurred here, the defendant is found in this district, and Bank of America has waived any objections to the laying of venue in the Southern District of New York.

## FACTUAL ALLEGATIONS

### I.   Taylor, Bean & Whitaker Mortgage Corp.

25.    Until it filed for bankruptcy on August 24, 2009, TBW was the largest non-depository residential mortgage lender in the United States.  Headquartered in Ocala, Florida, TBW and its various subsidiaries had approximately 4,000 employees and were responsible for originating approximately $30 billion in new loans in 2008.  As of June 2009, TBW serviced mortgages with unpaid principal balances in excess of $80 billion.

26.    TBW's core business was:  (i) originating, underwriting, processing and funding conforming, conventional, government-insured residential mortgage loans; (ii) the sale of mortgage loans into the "secondary market" to government-sponsored enterprises such as Freddie Mac; and (iii) mortgage payment processing and loan servicing.

27.    TBW originated loans through mortgage brokers and purchased loans from correspondents.  TBW financed its loan originations with money obtained through "wet funding" credit lines maintained at Colonial Bank, as well as with other institutions.  Wet funding is the financing of mortgages before the mortgage note has been received and reviewed by the lender (i.e., when the ink on the mortgage note is still "wet").  In contrast, dry funding is the financing of mortgages after the mortgage note has been received and reviewed by the lender (i.e., after the ink on the mortgage note has "dried").

28.    TBW customarily sold the loans it originated and used the proceeds of those sales to pay down the wet funding credit line associated with the originated loans.  This, in turn, would allow TBW to originate new loans using the wet funding credit line.  Because TBW could not originate new loans until its wet funding credit line was paid down, TBW's mortgage origination

capacity was constrained by the length of time it took to receive payment on the sale of its originated loans.

29.     TBW usually sold its originated mortgage loans to Freddie Mac in return for either cash or marketable mortgage-backed securities ("MBS") issued by Freddie Mac. As a general rule, for MBS transactions, it took up to 30 days for TBW to receive payment from Freddie Mac.

## II.     Ocala Funding, LLC

30.     In January 2005, TBW organized Ocala as a special-purpose, bankruptcy remote investment vehicle to provide liquidity funding for TBW's mortgage origination business. Ocala purchased loans originated by TBW pending the sale of those loans to Freddie Mac, thereby enabling TBW to reduce the payment time between origination and sale. This allowed TBW to maximize the utilization of its wet lending credit lines from Colonial Bank. By way of example, Ocala might purchase a TBW-originated loan within approximately 15 days after origination as compared to the typical 30 day wait for Freddie Mac to purchase a TBW-originated loan and deliver a MBS. This permitted TBW to increase the utilization of its wet funding credit lines from Colonial Bank.

31.     The Ocala facility in which BNPP invested was only permitted to purchase dry, high quality Freddie Mac conforming mortgages. Ocala was not permitted to fund or purchase wet loans (i.e., loans for which the mortgage note had not yet been reviewed) or sub-prime mortgages.

32.     In June 2008, to make the Ocala facility more attractive to potential investors, including BNPP, the facility was restructured to reduce or eliminate the note purchaser's exposure to a variety of risks, including counterparty risk (the risk of Ocala or TBW not living

9

up to its contractual obligations), interest rate risk (the risk of the mortgages changing in value because of interest rate movement), take out risk (the risk of not being able to sell Ocala-owned mortgages to Freddie Mac) and underwriting risk (the risk of the mortgages being less valuable than expected because of faulty underwriting). Central to this effort was the role of Bank of America, one of the largest banks and mortgage lenders in the world, as collateral agent, custodian, depositary and indenture trustee for the Ocala facility.

33.     Bank of America was granted exclusive possession and control of Ocala's cash and mortgages to give BNPP and the other Noteholders comfort that an investment grade commercial bank, and not TBW, was securing and protecting the Noteholders' collateral. This service was necessary to eliminate Ocala and BNPP's counterparty risk to TBW, which did not have an investment grade credit rating, and to qualify Ocala's Short-Term Notes for an A-1+ rating from Standard & Poor's Ratings Services and a P-1 rating from Moody's Investors Service, Inc. ("Moody's").

34.     The significance of Bank of America's responsibilities in connection with the Ocala facility was noted by Moody's, which stated that the administration risk associated with the Secured Notes was "mitigated by the resources, capability and credit strength of Bank of America Corporation as the trustee, collateral agent, depositary and custodian to provide critical program support services, including: certifying the borrowing base and checking the delinquency triggers before the issuance of [Secured Notes and callable notes]; checking in the loan files and creating a collateral transmittal report; and managing the orderly wind-down of the program." Moody's ABCP Market Review (July 13, 2009).

35.     In addition to Bank of America's experience with mortgage warehousing facilities, Bank of America was also familiar with TBW and its operations. A Bank of America

affiliate and TBW were parties to a Master Securities Forward Transaction Agreement dated June 19, 2008, and Bank of America and TBW were parties to various mortgage warehousing agreements completely separate from Ocala, including a Master Loan Participation and Sales Service Agreement and a MBS Custodial Agreement (the "Mortgage Relationship").

36.     In its various roles as Ocala's collateral agent, custodian and depositary, Bank of America was responsible for, among other things: (i) maintaining and securing the cash and mortgages owned by Ocala; (ii) certifying Ocala's borrowing base, i.e., certifying that Ocala had collateral in excess of its outstanding commercial paper obligations, before Ocala could issue new Secured Notes; and (iii) testing Ocala's borrowing base before it purchased new mortgage loans from TBW. As indenture trustee, Bank of America was also responsible for, among other things, declaring an Event of Default and shutting down the Ocala facility if Bank of America became aware of Ocala's insolvency or a failure of various parties to abide by the terms of the facility documents.

37.     The typical Ocala transaction was intended to operate as follows:

(a)     TBW lent money to a homeowner by borrowing funds from its wet funding credit line with Colonial Bank. In exchange, TBW received a note and mortgage from the homeowner. At this point in the transaction, Colonial Bank's wet funding was secured by the mortgage note that TBW received (which was still wet because it had not yet been reviewed by Colonial Bank or any other lender).

(b)     TBW (through Colonial Bank) shipped the mortgage loan file to Bank of America where it was reviewed and verified to confirm that it met Ocala's purchase requirements. While Bank of America was reviewing the

mortgage loan file, Colonial Bank retained its security interest in the mortgage loan and Bank of America held the mortgage loan under a bailee letter.

(c)     Once Bank of America established that the mortgage loans conformed with the requirements of the Ocala facility and that the Ocala facility was sufficiently collateralized, i.e., that Ocala held sufficient cash and mortgage loans to repay its outstanding commercial paper including the Secured Notes, Bank of America paid for the mortgage loans by depositing funds in a designated TBW account at Colonial Bank (Account No. 8026069354). At that point Colonial Bank's security interest in the mortgage loans was released and Ocala took ownership of the mortgage loans, subject to the security interest of BNPP.

(d)     When a sale to Freddie Mac was arranged, Bank of America shipped the mortgage loans to Colonial Bank – in its capacity as custodian for Freddie Mac – for inspection and certification. Bank of America sent the loans to Colonial Bank under a bailee letter that required the loans be paid for or returned to Bank of America within 15 days. Under the terms of the bailee letter, Bank of America, as collateral agent for Ocala, retained ownership of the loans until it received payment for them.

(e)     If the mortgage loans were approved for purchase by Freddie Mac, Freddie Mac purchased the mortgages by wiring funds or delivering MBS to accounts designated by Bank of America.

(f)     Once Bank of America received payment for the mortgages, it was required to deposit the funds in a segregated collateral account. The deposited

funds then became available to repay Ocala's outstanding Secured Notes or to purchase additional mortgage loans.

38.     At all times, Bank of America was responsible for securing and protecting BNPP's collateral as it cycled from cash to mortgages and back to cash. Bank of America was thus necessarily responsible for tracking the cash in Ocala's accounts and the mortgage loans Ocala owned to make sure that, at all times, Ocala owned sufficient cash and mortgage loans to fully collateralize BNPP's Secured Notes.

## III.    BNPP Purchases Ocala-Issued Notes

39.     On June 30, 2008, Ocala issued $1.6825 billion of Secured Notes in the form of asset backed short-term notes. The notes were issued in two series of senior notes consisting of the: (i) Series 2005-1 Short-Term Notes in the amount of $480.7 million (the "2005-1 Notes") and (ii) Series 2008-1 Short-Term Notes in the amount of $1,201.8 billion (the "2008-1 Notes"). The $1.6825 billion of commercial paper issued by Ocala was senior to $67.5 million of subordinated term notes for a total facility of $1.75 billion.

40.     On June 30, 2008, BNPP purchased the entire Series 2005-1 Short-Term Notes with a face amount of $480.7 million from Bank of America as depositary for Ocala. The Secured Notes purchased by BNPP on June 30, 2008, matured on July 21, 2008, and were subsequently rolled into another note issuance with a maturity date of August 20, 2008.

41.     Since June 30, 2008, Bank of America as depositary for Ocala issued an additional 15 Series 2005-1 Short Term Notes with maturity dates of August 20, 2008; September 22, 2008; October 20, 2008; November 20, 2008; December 22, 2008; December 30, 2008; January 16, 2009; February 20, 2009; March 20, 2009; April 20, 2009; May 20, 2009; June 22, 2009; June 30, 2009; July 20, 2009; and August 20, 2009.

42.    On each maturity date through July 20, 2009, Ocala repaid BNPP $480.7 million for the Secured Notes maturing that day.  On that same day, in a separate transaction, BNPP purchased the entirety of each new Series 2005-1 Short Term Notes issued by Bank of America on behalf of Ocala.

43.    BNPP's Secured Notes were secured by a perfected first-priority security interest in certain collateral (i.e., cash and mortgages) owned by Ocala and secured and maintained by Bank of America (the "2005-1 Collateral"), as collateral agent, on behalf of BNPP.  The 2005-1 Collateral included, among other things:  (i) cash held by Bank of America in a segregated 2005-1 collateral sub-account and in a commingled collateral account; and (ii) mortgage loans assigned to the 2005-1 Series owned by Ocala that were pending sale to Freddie Mac or other purchasers.

44.    BNPP's Secured Notes were further secured by an over-collateralization requirement that prevented Bank of America from purchasing mortgages for Ocala or issuing new notes if Bank of America did not hold 2005-1 Collateral worth at least $500 million.

45.    In connection with its purchase of the Secured Notes, BNP Paribas simultaneously entered into various swap transactions with Ocala and TBW to hedge certain risks associated with its Ocala investment.

## IV.    Bank of America's Contractual Obligations Under the Ocala Agreements

46.    Beginning on June 30, 2008, Bank of America, through LaSalle Bank and LaSalle Trust, entered into a series of contracts with Ocala and BNPP.  These contracts govern the responsibilities of Bank of America as collateral agent, custodian, depositary and indenture trustee for the Ocala facility.

A.    **The Security Agreement**

47.    Ocala, Bank of America (through LaSalle Bank) as indenture trustee, and Bank of America (through LaSalle Bank) as collateral agent entered into a Second Amended and Restated Security Agreement dated as of June 30, 2008 (the "Security Agreement"). The stated purpose of the Security Agreement was to secure Ocala's obligations to BNPP and others under the Base Indenture including, without limitation, the payment in full of principal and interest on the 2005-1 Notes.

48.    Under the terms of the Security Agreement, Bank of America was also contractually obligated to open and maintain certain segregated accounts for the 2005-1 Collateral and to otherwise secure Ocala's assets for the benefit of the Series 2005-1 Noteholders. Bank of America was given exclusive dominion and control over these collateral accounts and all mortgages or other assets owned by Ocala. See, e.g., Security Agreement §§ 4.01 and 5.01 et. seq.

49.    To prevent the unauthorized disbursement of Ocala's funds, the Security Agreement provides that "the Issuer [Ocala] agrees that only the Collateral Agent [Bank of America] may make withdrawals from the Collateral Account; provided, however, that the Issuer [Ocala], the Indenture Trustee [Bank of America], the Series 2005-1 Depositary [Bank of America] and the Series 2008-1 Depositary [Bank of America] may request withdrawals from the Collateral Account in accordance with the terms of Section 5.03 hereof." Id. at § 5.01.

50.    Section 5.03 explains that, if there has been no Event of Default, "the Issuer [Ocala] (by an Issuer Agent)" may "instruct according to the Facility Documents the Collateral Agent [Bank of America] to withdraw" funds from the Collateral Account for various enumerated purposes, including for the purchase of new mortgage loans. Section 5.03 continues

15

"provided, however, no withdrawals from the Collateral Account shall be made on any day" for the purchase of new mortgage loans if the 2005-1 Notes are not fully secured by cash and mortgages worth at least $500 million.

51.     Thus, Bank of America could only disburse funds from the collateral account if: (i) there was no Event of Default; (ii) Bank of America received an instruction from Ocala "by an Issuer Agent;" (iii) the withdrawal is for one of the purposes enumerated in § 5.03; and (iv) the Secured Notes are fully collateralized. Id.

52.     Under the terms of the Security Agreement, any instruction delivered by Ocala for the purchase of new mortgage loans "shall be effective upon receipt of written, electronic or telephonic instructions (confirmed promptly in writing) from an Issuer Agent." Id. at § 5.03. Ocala's Certificate of Incumbency dated June 30, 2008, identifies Lee Farkas, Ocala's Chairman; Paul R. Allen, Ocala's CEO; and Ray Bowman, Ocala's President, as the Issuer Agents who were "authorized to act, and to give instructions and notices, on behalf of the Issuer [Ocala] hereunder." Id. at § 3.03.

53.     If Bank of America received authorized instructions from an Issuer Agent, Bank of America was entitled to rely on instructions "reasonably believed by it in its professional judgment to be genuine and correct" and Bank of America was required to "promptly comply with any such approved instructions made by the Issuer [Ocala], the Series 2005-1 Depositary [Bank of America] or the Series 2008-1 Depositary [Bank of America] in accordance with the provisions of the foregoing paragraphs of this Section 5.03." Id. §§ 8.01 and 5.03.

54.     Thus, Bank of America was not permitted – much less required – to blindly accept or follow instructions that it received from Ocala. To the contrary, Bank of America was

required to exercise its independent professional judgment to assess any such request, including whether it was consistent with the governing contracts and should be approved.

55.    BNPP is a third-party beneficiary to the Security Agreement and is entitled to the rights and benefits under that agreement and may enforce the provisions of that agreement as if it were a party. See id. §§ 10.08 and 10.18.

56.    Bank of America also agreed to indemnify BNPP against any and all claims, losses, penalties, fines, forfeitures, reasonable legal fees and related costs, judgments, and any other costs, fees and expenses BNPP may sustain to the extent attributable to the collateral agent's negligence, fraud, bad faith or willful misconduct in the performance of its duties under the Security Agreement.  See id. § 8.05.

**B.    The Custodial Agreement**

57.    Ocala, TBW, Bank of America (through LaSalle Bank), as custodian, and Bank of America (through LaSalle Bank), as collateral agent entered into a Second Amended and Restated Custodial Agreement dated as of June 30, 2008 (the "Custodial Agreement"). Under the terms of the Custodial Agreement, Bank of America was responsible for taking possession of, examining and securing the mortgages owned by Ocala.

58.    Pursuant to Section 8 of the Custodial Agreement, Bank of America, at the direction of Ocala, was authorized to deliver the mortgage files to a third-party purchaser, such as Freddie Mac, or its agent "*provided*  that any delivery of such Mortgage Note, Mortgage and Assignment of Mortgage is accompanied by a transmittal letter to be executed by the third-party purchaser substantially in the form attached hereto as Exhibit E and the Custodian [Bank of America] shall collect all such transmittal letters executed by third-party purchasers." The transmittal letter permitted the prospective purchaser to take possession of the mortgage file for

17

inspection, and required such purchaser to acknowledge the security interest granted to Bank of America for the benefit of BNPP. The prospective purchaser had 15 days to either remit the required sale proceeds to an account identified by Bank of America or return the mortgage file.

59.     In the Custodial Agreement, Bank of America agreed to indemnify BNP Paribas (as Swap Counterparty) and its affiliates against any and all claims, losses, liabilities, obligations, damages, payments, costs and expenses resulting from the Bank of America's negligence, lack of good faith or willful misconduct in the performance of or breach of its obligations under the Custodial Agreement. See Custodial Agreement § 17.

### C.     The Depositary Agreement

60.     Ocala and Bank of America (through LaSalle Bank), as depositary, entered into the Series 2005-1 Amended and Restated Depositary Agreement dated as of June 30, 2008 (the "Depositary Agreement").

61.     The Depositary Agreement required Bank of America to certify the borrowing base, i.e., that Bank of America held cash and mortgages in excess of the outstanding 2005-1 Notes, before issuing new notes. Specifically, the Depositary Agreement (§ 4(d)) provided that Bank of America "shall not issue or deliver any Short Term Note unless it shall have received a completed certificate from an Issuer [Ocala] Agent on the Issuance Date, each in the form of Exhibit C attached hereto by 11:00 a.m. (New York City time) and the Depositary [Bank of America], upon review, determines that it can (and it does) certify as to items (1) and (2) therein." Critically, in "item 2" Bank of America certifies that the Secured Notes were over-collateralized as of the date of the certification.

62.     Under the terms of the Depositary Agreement (§ 8(g)), Bank of America agreed to "indemnify and hold harmless the Secured Parties" against any and all claims and losses "that

the Issuer [Ocala] may sustain to the extent attributable to the Depositary's negligence, fraud, bad faith or willful misconduct in the performance of its duties hereunder."

63.     Bank of America, as indenture trustee, is a third party beneficiary of the Depositary Agreement and may enforce its provisions. See Depositary Agreement at § 15. BNPP, as a beneficiary of the Base Indenture, may enforce the rights of the indenture trustee under the Depositary Agreement because Bank of America, acting as indenture trustee has a conflict of interest that would require it to sue itself.

64.     Under the terms of the Depositary Agreement (§ 2(b)), on any given maturity date, if Ocala did not have sufficient funds to repay BNPP or other Noteholders on the maturing Secured Notes, "the Depositary [Bank of America] may (but shall not be required to)" advance such funds to Ocala "by creating an overdraft in the Short Term Note Account." The Depositary Agreement also provides (§ 2(b)) that:

> the overdraft shall be treated (i) as an advance by LaSalle Bank National Association, in its individual capacity and not as Depositary hereunder, and (ii), for all purposes of this Agreement, the Indenture and the Security Agreement, as Short Term Notes due and payable on the following Business Day. Interest shall accrue and be payable from, and including, the date of the overdraft, until payment in full, at a rate agreed to by the Issuer and LaSalle Bank National Association (or, if no such agreement is reached on the date of the overdraft, at a rate determined by LaSalle Bank National Association consistent with its customary overdraft rate determination practices).

65.     On each roll date beginning on July 21, 2008: (i) Bank of America created an overdraft in the Short Term Note Account, which allowed Bank of America, on behalf of Ocala, to repay the maturing notes owned by BNPP and other Noteholders; and (ii) Bank of America subsequently repaid the overdraft in the Short Term Note Account with funds paid by BNPP and other Noteholders for the newly repurchased Secured Notes.

**D.**   **The March Letter Agreement**

66.   On March 27, 2009, BNP Paribas and Bank of America entered into a written agreement "[a]s an inducement to BNP Paribas [] to enter into, and/or to continue its participation in" the Ocala facility.

67.   In the March Letter Agreement, Bank of America expressly recognized that its duties under the Depositary Agreement, including its certification of the Borrowing Base Certificate, "play an important role in mitigating the risks that [BNP Paribas] would otherwise incur through the Related Transactions."

68.   Bank of America also agreed to indemnify BNP Paribas and its affiliates against losses caused by Bank of America's negligence as a depositary, including in the certification of the Borrowing Base Certificate.

**E.**   **The Base Indenture**

69.   Ocala and Bank of America (through LaSalle Bank), as indenture trustee, entered into a Second Amended and Restated Base Indenture (the "Base Indenture") dated as of June 30, 2008.  Ocala and Bank of America (through LaSalle Bank), as indenture trustee and paying agent, also entered into a Second Amended and Restated Series 2005-1 Short Term Note Supplement to the Second Amended And Restated Base Indenture ("Indenture Supplement") dated as of June 30, 2008.

70.   The Base Indenture provides that Ocala "shall use the proceeds of Notes solely for one or more of the following purposes:  (a) to pay the Issuer's [Ocala's] Obligations when due, in accordance with the Security Agreement; and (b) to acquire Mortgage Loans from the Seller [TBW]."  Id. § 8.28; Indenture Supplement § 2.6.

71.     The Base Indenture further provides that "[i]f an Event of Default or a Potential Event of Default occurs and is continuing and if a Trust Officer of the Indenture Trustee [Bank of America] receives written notice or has actual knowledge thereof, the Indenture Trustee [Bank of America] shall promptly provide" among others, BNPP and BNP Paribas, "with notice of such Event of Default or the Potential Event of Default." Base Indenture at § 10.4.

72.     The Base Indenture enumerates numerous Events of Default, including:  (i) the insolvency of Ocala; (ii) "failure on the part of the Seller [TBW] to observe or perform in any material respect any material covenants or agreements of the Seller [TBW] under the Mortgage Loan Purchase Agreement which failure continues unremedied for a period of fifteen (15) days after written notice or actual knowledge thereof;" and (iii) the failure of Ocala "to comply with any of its other agreements or covenants in, or provisions of, the Notes of a Series or this Base Indenture and the failure to so comply materially and adversely affects the interests of the Noteholders of any Series and continues to materially and adversely affect the interests of the Noteholders of such Series for a period of fifteen (15) days after the earlier of (i) the date on which the Issuer [Ocala] obtains knowledge thereof or (ii) the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Issuer [Ocala] by the Indenture Trustee [Bank of America] or to the Issuer [Ocala] and the Indenture Trustee [Bank of America] by the Required Senior Noteholders, the Series 2005-1 Required Senior Noteholders or the Series 2008-1 Required Senior Noteholders." Id. at § 9.1.

73.     Upon the occurrence of an Event of Default, the indenture trustee is required to "exercise such of the rights and powers vested in it by this Base Indenture and the Facility Documents, and use the same degree of care and skill in their exercise, as a prudent person

would exercise or use under the circumstances in the conduct of such person's own affairs." Id. at § 10.1(a).

74.     Further, in the event of the occurrence of an "Event of Bankruptcy" involving Ocala -- which is defined to include insolvency -- Bank of America was required to, among other things, automatically instruct Ocala to cease purchasing mortgage loans. Id. at 9.1; Definitions List, p. 11.

75.     The Base Indenture specifically provides for the holder of notes to be a beneficiary under the Base Indenture. See Base Indenture at § 13.8. The Base Indenture also provides that BNP Paribas (as Swap Counterparty) "is a third-party beneficiary to this Base Indenture and is entitled to the rights and benefits hereunder and may enforce the provisions hereof as if it were a party hereto." Id. at § 13.20.

**F.     The May Letter Agreement**

76.     On May 5, 2009, Bank of America, in its capacities as collateral agent and indenture trustee, sent a letter to BNP Paribas, Ocala and TBW (the "May Letter Agreement"). The May Letter Agreement recognized that, in connection with the sale of loans to Freddie Mac, Bank of America was "required to execute and deliver" a Freddie Mac Form 996E (Warehouse Lender Release of Security Interest), in which it "agrees to relinquish any and all right, title or interest that it may have in" the mortgage loans.

77.     The May Letter Agreement went on to "confirm that, notwithstanding the execution and delivery by the Collateral Agent or the Indenture Trustee of a Form 996E or any similar document, the Collateral Agent and the Indenture Trustee do not intend to release, and are not releasing, the proceeds of the sale of the related Sale Assets [i.e., the mortgage loans] from

the lien of the Security Agreement, and such proceeds shall be subject to the lien of the Security Agreement."

### G.    The Purchase Agreement

78.    Ocala and TBW entered into the Second Amended and Restated Mortgage Loan Purchase and Servicing Agreement dated June 30, 2008 (the "Purchase Agreement"), which provides for the purchase of mortgage loans by Ocala as well as the management, servicing and control of the mortgage loans owned by Ocala.

79.    Delivery of the Purchase Agreement to Bank of America, as indenture trustee, is a condition precedent to the issuance of the Secured Notes.  Indenture Supplement § 2.1(b).

80.    Section 14.1 of the Purchase Agreement specifically provides that: "Purchaser [Ocala] hereby assigns, conveys, transfers, delivers and sets over unto the Collateral Agent [Bank of America] for the benefit of the Secured Parties [BNPP and the other Noteholders], all of its right, title and interest in, to and under, whether now owned or existing, or hereafter acquired, this Purchase Agreement."

81.    Section 14.1 of the Purchase Agreement also provides that:

the Purchaser [Ocala] and the Seller [TBW] shall each treat the Collateral Agent [Bank of America] as the Purchaser [Ocala] under this Purchase Agreement and each consent to such assignment and acknowledge that the Collateral Agent [Bank of America] shall enjoy the Purchaser's [Ocala's] rights under this Purchase Agreement pursuant to the provisions of this Section 14.1.  Without limiting the generality of the foregoing, the Purchaser [Ocala] and the Seller [TBW] shall each report to and correspond and communicate with the Collateral Agent [Bank of America] and in all other regards treat the Collateral Agent [Bank of America] as the purchaser hereunder with respect to the Mortgage Loans.

82.    Section 14.1 of the Purchase Agreement concludes: "All amounts due the Purchaser [Ocala] under this Purchase Agreement shall be remitted to the Collateral Agent [Bank

of America] in accordance with the Collateral Agent's [Bank of America's] instructions and in accordance with this Purchase Agreement."

## V.  An Event of Default is Declared in the Ocala Facility

83.    On August 3, 2009, agents from the Federal Bureau of Investigation's Office of the Special Inspector General for the Troubled Asset Relief Program and the Inspector General of the Department of Housing and Urban Development ("HUD") raided the offices of Colonial Bank and TBW.  At that time, Colonial Bank was also the subject of a criminal probe by the Department of Justice, at least in part due to accounting irregularities related to its mortgage warehouse lending division.

84.    Pursuant to certain HUD regulations as well as agreements with Ginnie Mae, Freddie Mac and other lenders, TBW was required to deliver year-end audited financial statements to these agencies and lenders.  Deloitte LLP served as TBW's auditor.  According to the Federal Deposit Insurance Corporation (the "FDIC"), Deloitte uncovered evidence of possible fraud and expressed concerns to TBW regarding TBW's failure to provide information and documentation.  Deloitte thereafter ceased its audit.

85.    On August 4, 2009, HUD suspended TBW's HUD/FHA origination and underwriting approval.  In a press release announcing this suspension, HUD stated that this action was taken as a result of, among other things, its discovery that TBW's auditor ceased its financial examination after discovering certain irregular transactions that raised concerns of fraud, and that TBW failed to disclose, and falsely concealed, that it was the subject of two examinations into its business practices in the past year.

86.    In addition, on or about August 4, 2009, Freddie Mac terminated TBW's eligibility to sell loans and service over $50 billion of Freddie Mac loans.

87.     The suspension and terminations by these agencies made it impossible for TBW to continue in business and on August 5, 2009, TBW closed its mortgage-lending operations.

88.     On August 5, 2009, BNPP provided notice to Ocala, TBW, Bank of America and others that, because TBW had ceased to be an approved seller with Freddie Mac, an Automatic Termination Event had occurred under the June 30, 2008 Second Amended and Restated Mortgage Loan Purchase and Servicing Agreement, which prohibited Ocala from purchasing additional loans from TBW.  BNPP further instructed Bank of America to take note of the Termination Event and "to perform its respective duties as Collateral Agent, Custodian, Indenture Trustee and Paying Agent accordingly."

89.     On August 10, 2009, Bank of America sent Ocala, TBW, BNPP and others a Notice of Potential Indenture Event of Default, Indenture Event of Default and Acceleration that "(i) declare[d] the principal and premium (if applicable) and accrued or accreted interest in respect of the Notes to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Issuer, anything contained in the Base Indenture or Series Supplements or in any Note to the contrary notwithstanding; (ii) instruct[ed] the Issuer to cease purchasing Mortgage Loans; (iii) instruct[ed] the Issuer and the Depositary to cease issuing Short Term Notes; and (iv) notifie[d] the Servicer and the Seller that an Indenture Event of Default has occurred."

90.     On August 11, 2009, the FDIC issued a Temporary Order to Cease and Desist requiring Colonial to obtain prior written approval from the Regional Director of the Atlanta Regional Office of the FDIC before engaging in any transaction with TBW.  Three days later, Colonial was closed and the FDIC was appointed receiver.

91.     Also on August 11, 2009, Bank of America provided Colonial Bank with a Demand for Documents and Proceeds, which revoked any outstanding bailee letters and terminated all of Colonial Bank's rights to hold possession of the mortgage loans in trust and as custodian, agent, and bailee on behalf of Ocala.

92.     On August 12, 2009, Bank of America filed suit against Colonial Bank in the Southern District of Florida seeking, among other things, to recover: (i) "the proceeds paid by Freddie Mac to Colonial Bank" for mortgage loans owned by Ocala; and (ii) mortgage loans delivered to Colonial Bank that were not purchased by Freddie Mac. Shortly thereafter, Bank of America at the direction of the Secured Noteholders (including BNPP) obtained a temporary restraining order enjoining Colonial Bank from disposing of the mortgages or their proceeds.

93.     On August 14, 2009, the Alabama State Banking Department closed Colonial and appointed the FDIC as its receiver.

94.     On August 24, 2009, TBW filed a voluntary petition for bankruptcy in the Middle District of Florida under Chapter 11 of the Bankruptcy Code.

## VI.   Bank of America Refuses to Make Payment

95.     On August 14, 2009, BNPP demanded that Ocala immediately pay the outstanding principal amount of the 2005-1 Notes plus accrued or accreted interest and demanded that Bank of America in its various capacities apply "all funds and any other amount or property held for, whether as collateral or otherwise, or otherwise attributable to the Series 2005-1 Notes" in accordance with the payment priorities specified in the Security Agreement.

96.     To date, Bank of America has refused to make payments to BNPP as required by the Security Agreement. Although over seven months have passed since Bank of America declared an Event of Default, Bank of America still claims that it is "in the process of

26

determining the appropriate next steps in light of the occurrence of an Indenture Event of Default." See Bank of America's Notice Regarding Monthly Noteholders' Statement and Distribution of Funds.

97.     On September 14, 2009, David B. Rich, III, Bank of America's Assistant General Counsel – Corporate Law, confirmed to BNPP that "less than US$75 million remains on account" in the Ocala facility and "less than US$1.9 million, only, is contained in BNP Paribas' collateral sub-account."

## VII.   Bank of America's Breaches Of Its Contractual Obligations

98.     Bank of America breached its contractual obligations to BNPP and BNP Paribas by, among other things:  (i) improperly transferring over $3.8 billion from Ocala's account at Bank of America to unauthorized accounts at Colonial Bank and Bank of America; (ii) purchasing mortgage loans without authorization; (iii) commingling funds in contravention of the Ocala facility documents; (iv) failing to secure the mortgage loans it held on behalf of BNPP; (v) improperly issuing new Secured Notes on June 30, 2008 and thereafter when it certified Ocala was insolvent; and (vi) failing to shut down the Ocala facility and promptly inform BNPP, BNP Paribas and others of Ocala's insolvency.  As a result of these breaches, the Secured Notes were under-collateralized, which has resulted in significant losses to BNPP.

### A.     Bank of America's Improper Fund Transfers

99.     In its role as collateral agent, Bank of America was charged with protecting the cash and mortgages in which BNPP held a security interest.  Section 5.03 of the Security Agreement provides a specific and limited list of permitted "Withdrawals and Transfers from the Collateral Account."  Specifically, Section 5.03 allows Bank of America to withdraw and transfer funds from the collateral account, under certain circumstances, for payment on its hedging

transactions, to Bank of America as depositary and for the purchase of additional Series 2005-1 mortgage loans.

100.    Documents received by BNPP after August 2009 reflect that Bank of America regularly breached its obligations and responsibilities under the Security Agreement and Base Indenture by: (i) transferring funds to accounts at Colonial Bank established for purposes other than purchasing Series 2005-1 mortgage loans; and (ii) transferring funds from Ocala accounts at Bank of America to a TBW account at Bank of America; and (iii) transferring funds out of the Ocala facility without approved instructions from Ocala.

(1)    Bank of America's Improper Fund Transfers to TBW<br>Accounts at Colonial Bank

101.    A review of Bank of America's bank records shows that, since June 30, 2008, Bank of America improperly transferred over $3.8 billion from the Ocala collateral account (Account No. 722493.4) and subaccounts (Account Nos. 722493.15 and 722493.17) at Bank of America to accounts at Colonial Bank other than TBW's mortgage warehouse account designated in the bailee letters under which Bank of America received the mortgage loans.

102.    The over $3.8 billion of improper fund transfers to Colonial Bank include:

(a)    Over $830 million that was improperly transferred from the Ocala collateral account to a restricted TBW account titled "FHLMC P&I Custodial Account," which was used to accumulate principal and interest for loans serviced by TBW for Freddie Mac.

(b)    Approximately $675 million that was improperly transferred from the Ocala collateral account to a restricted TBW account titled "Colonial

28

Custodial Funds Clearing Account," which was used for the initial deposit of funds relating to mortgages serviced by TBW.

(c)     Over $445 million that was improperly transferred from the Ocala collateral account to a TBW account titled "Colonial Master Account," which was used to fund loans made to settlement agents (i.e., the title company or attorney closing the loan for TBW).

(d)     Over $58 million that was improperly transferred from the Ocala collateral account to a TBW account titled "Colonial Operating," which was used to fund TBW's operating expenses.

(e)     $2.5 million that was improperly transferred from the Ocala collateral account to a restricted TBW account titled "Colonial ITF Henley Holdings Account," which was used to accumulate principal and interest relating to loans serviced by TBW for Henley Holdings LLC.

103.    The fact that these wire transfers were improper and for purposes other than purchasing mortgage loans was known to Bank of America. On their face, Ocala's wire transfer requests to Bank of America plainly disclosed that the funds were being transferred to improper accounts, including Freddie Mac and Ginnie Mae custodial accounts and were often matched by incoming transfers of the exact or nearly the exact amount of funds.

104.    Moreover, Bank of America's bank records show that between June 30, 2008 and August 4, 2009, Bank of America wired over $1 billion from Ocala's collateral account to Colonial Bank and other banks in whole dollar amounts (e.g., $5,000,000) that bear no relationship or correlation to mortgage loans or groups of mortgage loans purportedly purchased by Ocala. These wire transfers include $50 million transferred to Platinum Bank, a bank owned

by TBW, and transfers of several hundred million dollars to restricted servicing accounts that TBW maintained at Colonial Bank.

        (2)     Bank of America's Improper Fund Transfers to a TBW
                   Account at Bank of America

105.    Bank of America's bank records also show that beginning in early July 2008, Bank of America improperly transferred over $1.7 billion of cash from Ocala-related collateral accounts to a TBW account at Bank of America identified in Bank of America's bank records as Acct. No. 722347.2 ("the 722347.2 Account").

106.    Of the $1.7 billion of cash that was improperly transferred from the Ocala-related accounts at Bank of America to the TBW account at Bank of America, over $465 million was improperly transferred from the 2005-1 Collateral subaccount.

107.    A review of the 722347.2 Account bank statement provided to BNPP by TBW (after August 2009) indicates that many of the mortgages that were purchased by TBW with Ocala funds from this account were subsequently resold to Ocala and paid for by Ocala a second time.

108.    By way of example:

        (a)     On April 17, 2009, Bank of America improperly transferred $501,140.97 from the 2005-1 Collateral subaccount to TBW's 722347.2 Account at Bank of America.

        (b)     On that same day (April 17, 2009), TBW used the $501,140.97 that was improperly transferred by Bank of America to the 722347.2 Account to purchase two loans:  (i) loan no. 3054299 with a face amount of $400,000 was purchased for $402,725.34; and (ii) loan no. 3162664 with a face amount of $98,000 was purchased for $98,415.63.

    (c)     On that same day (April 17, 2009), TBW sent loan nos. 3054299 and 3162664 to Bank of America for purchase by Ocala. According to Bank of America's records, Ocala purchased those loans from TBW for $399,712.50 (loan no. 3054299) and $97,505.10 (loan no. 3162664).

    (d)     As a result of Bank of America's improper fund transfers, Ocala paid twice for the same mortgage loans. In the first instance TBW used Ocala's funds from the 722347.2 Account to purchase mortgage loans. Those loans were then resold to Ocala, at which time Ocala paid for the loans a second time.

109.    Bank of America's improper withdrawals and transfers from the Ocala accounts breached its contractual obligations and directly and proximately caused BNPP's losses by, among other things, causing the 2005-1 Notes to be under-collateralized.

    (3)    <u>Bank of America's Failure To Obtain Approved Instructions</u>

110.    Under the terms of the facility documents, Bank of America was only permitted to transfer funds out of the Ocala collateral accounts upon the "approved instructions" of an Issuer Agent "in accordance with the provisions" of Section 5.03 of the Security Agreement. Security Agreement § 5.03. As of June 30, 2008, the Issuer Agents of Ocala were Lee Farkas, Paul R. Allen and Ray Bowman. <u>See</u> Ocala Funding, LLC Certificate of Incumbency dated June 30, 2008.

111.    On June 30, 2008, at 3:45 pm, Matthew Smith, a Trust Officer at Bank of America, informed Sean Ragland and Desiree Brown of TBW that the funds BNPP paid for the Secured Notes were in Ocala's accounts. Within literally one minute, Desiree Brown sent an email to Mark Medina, a Trust Officer at Bank of America, requesting his "review and approval" of a $76.5 million wire transfer from the 2005-1 subaccount to Colonial Bank. Although Desiree

Brown was not an employee of Ocala or listed as authorized Issuer Agent under the facility

documents signed that very day, Mark Medina responded "Approved," and wired $76.5 million

from the 2005-1 subaccount to Colonial Bank.

112.    Less than two hours later, Desiree Brown sent Mark Medina another email

requesting his "review and approval" for a $236.7 million wire transfer from the 2008-1

subaccount to Colonial Bank. As with the prior transfer, Mark Medina responded "Approved"

and wired the funds.

113.    Since June 30, 2008, Bank of America has transferred billions of dollars out of the

Ocala collateral account at the instruction of various TBW employees, including, but not limited

to, Alicia Ard, Carla Washburn, Donna Skuhrovec, Desiree Brown and Rishi Thakur. None of

these individuals is listed as authorized Issuer Agents in Ocala's Certificate of Incumbency and,

with the exception of Donna Skuhrovec, who was Ocala's Vice President of Shipping, none of

these individuals was even an officer of Ocala. Notwithstanding these facts, Bank of America

"approved" these unauthorized instructions and wired billions of dollars out of the Ocala

collateral account.

**B.      Bank of America's Improper Purchase of Mortgage Loans**

114.    Pursuant to the Security Agreement, Bank of America was only authorized to

purchase additional mortgage loans on behalf of Ocala:  (i) "so long as no Indenture Event of

Default shall have occurred and then be continuing;" and (ii) after it tested the borrowing base

and determined that BNPP's 2005-1 Notes were properly collateralized. Security Agreement §

5.03.

115.    Section 5.03 of the Security Agreement provides that "no withdrawals from the

Collateral Account shall be made on any day" for the purposes of purchasing additional

mortgage loans unless the borrowing base test has been satisfied such that the 2005-1 Notes were secured by cash and mortgages worth at least $500 million. Thus, Bank of America was contractually required to ensure that no money ever left the collateral accounts unless and until it confirmed that the collateral supporting BNPP's Secured Notes totaled at least $500 million.

116.    Bank of America regularly breached this requirement by transferring funds to Colonial Bank and other banks when the borrowing base test was not satisfied and when BNPP's 2005-1 Notes were not secured by sufficient collateral to meet the requirements of Section 5.03 of the Security Agreement.

117.    As discussed below, for the period between June 30, 2008 and December 22, 2008, Bank of America certified on a monthly basis that the Ocala facility was under-collateralized, which would not only forbid Bank of America from purchasing additional mortgage loans but also required Bank of America to automatically declare an Event of Default and shut down the Ocala facility. These certifications were executed by Matthew Smith, a Bank of America Trust Officer. Subsequently, for the period between December 30, 2008 and July 20, 2009, Bank of America's internal bank records and documents show that Bank of America misrepresented to BNPP that the borrowing base test was satisfied when – in fact – the Ocala facility was under-collateralized by hundreds of millions of dollars and therefore insolvent.

118.    Bank of America's approval of the purchase of mortgage loans when an Event of Default was occurring and when the borrowing base test was not met breached its contractual obligations and directly and proximately caused BNPP's losses by, among other things, causing the 2005-1 Notes to be under-collateralized.

### C.   Bank of America's Commingling of Collateral

119.   The Security Agreement requires Bank of America to establish and maintain a "special purpose trust account in the name of and under the control of, the Collateral Agent on behalf of the Secured Parties." Security Agreement § 5.01. The account is specifically referenced in the Security Agreement as Account No. 722493.4. Bank of America was also required to establish separate sub-accounts for funds securing the 2005-1 Collateral and funds securing the 2008-1 Collateral. See id.

120.   Bank of America was required to deposit into the 2005-1 Collateral sub-account, among other funds, "the net proceeds from the sale of the Series 2005-1 Short Term Notes" and "all monies received by or on behalf of [Ocala] as proceeds from the sale or securitization of Series 2005-1 Mortgage Loans." Id. See also Custodial Agreement § 14.1.

121.   Bank of America's bank records show that it failed to segregate the 2005-1 Collateral into the 2005-1 subaccount and that Bank of America regularly commingled the 2005-1 Collateral with other monies.

### D.   Bank of America's Failure to Secure BNPP's Collateral

#### (1)   Bank of America's Duty to Secure The Mortgage Loans

122.   As collateral agent and custodian, Bank of America was charged with protecting the mortgage loans and cash securing BNPP's Secured Notes. Central to this responsibility is the duty to know what mortgage loans are owned by Ocala, when those mortgages were purchased by Ocala and when the mortgages were sold and no longer owned by Ocala.

123.   The Ocala facility has detailed requirements for how mortgages were to be transferred and purchased by Bank of America, how those mortgages are sold and how monies received from the sale of the mortgages were to be maintained. The facility documents also

require Bank of America to comply with various reporting requirements to confirm the identity, value, ownership and location of the mortgage loans.

124.    For example, the Custodial Agreement requires that all loans purchased by Bank of America be accompanied by a Transfer Supplement containing detailed information about the particular mortgage loans. Bank of America was also required to provide (upon request) a List of Loans reflecting "a list of all Mortgage Loans with respect to which the Custodian holds Mortgage Notes, Mortgages and Assignments of Mortgages" and denoting "any Mortgage Loans paid off, repurchased, sold or otherwise released by the Custodian" since June 30, 2008. Custodial Agreement § 9.

125.    Moreover, the Custodial Agreement requires any mortgage loans sent to Freddie Mac or other purchasers to be accompanied by a bailee letter in the form of Exhibit E to the Custodial Agreement. The bailee letter used by Bank of America provided that within 15 days of Colonial Bank's receipt of a loan and its corresponding loan documents, Colonial Bank – in its capacity as custodian for Freddie Mac – was obligated to either: (i) remit to Bank of America the proceeds of the loans purchased by Freddie Mac; or (ii) return to Bank of America all loans that Freddie Mac declined or refused to purchase.

126.    Thus, Bank of America was obligated to keep track of which mortgage loans Ocala owned, which mortgage loans were purchased by Freddie Mac, when those mortgage loans were purchased by Freddie Mac (i.e., when did Bank of America receive the proceeds of the loans from Freddie Mac) and whether any loans remained at Colonial Bank for more than 15 days without being purchased by Freddie Mac.

127.    Bank of America breached its duty to secure the mortgage loans by failing to correctly record which loans it owned on behalf of Ocala and when mortgages were sold to

35

Freddie Mac and no longer owned by Ocala. This breach is underscored by Bank of America's regular issuance of reports falsely misrepresenting the loans owned by Ocala on behalf of BNPP.

      (2)    Bank of America Misrepresented The Collateral It Held For BNPP

128. Bank of America generated regular reports about the mortgage loans and cash it purportedly held on behalf of BNPP. These reports provided assurance to BNPP that Bank of America held sufficient collateral to repay BNPP's Secured Notes.

129. One of the reports that Bank of America regularly provided to BNPP was titled "Shipped Report and Tracking" and contained a list of mortgage loans owned by Ocala that were shipped to Freddie Mac's agent (Colonial Bank) for review pending their purchase by Freddie Mac (the "Shipped Report"). On any given day, the Shipped Report contained more than 2,000 loans with a face amount in excess of $400 million and represented the vast majority of the collateral purportedly securing BNPP's Secured Notes.

130. Since December 2008, Bank of America created and sent the Shipped Report directly to BNPP on a daily basis. These reports were sent directly from Bank of America to BNPP via email and were copied to Matthew Smith.

131. The Shipped Reports that Bank of America sent to BNPP misrepresented the collateral securing BNPP's Secured Notes by including mortgage loans that were no longer owned by Ocala. For example, the August 4, 2009 Shipped Report provided by Bank of America to BNPP listed 2,043 loans with a face amount of $417.7 million purportedly owned by Ocala. However contemporaneous Bank of America documents (executed by Matthew Smith), which BNPP has only recently received, reflect that 90% of those loans (1,837 mortgages with a face amount of $374.9 million) had previously been purchased by Freddie Mac and were no longer owned by Ocala.

132.    A review of Bank of America's Shipped Reports going back to December 2008 indicates that each of the approximately 160 Shipped Reports provided to BNPP falsely misrepresented the loans owned by Ocala, thereby overstating the collateral securing BNPP's Secured Notes.

133.    Bank of America's misrepresentations in the Shipped Reports and other documents breached its contractual obligations and directly and proximately caused BNPP's losses by, among other things, failing to alert BNPP that the Ocala facility was insolvent and that BNPP's Secured Notes were under-collateralized.

## VIII.    Bank of America Falsely Certifies the Borrowing Base

134.    Under the terms of the Base Indenture, Indenture Supplement and Depositary Agreement, before issuing or delivering any 2005-1 Notes, Bank of America was required to review and certify Ocala's borrowing base by certifying various items on the Borrowing Base Certificate.

135.    The Borrowing Base Certificate certified that "the assets of Ocala Funding LLC exceed its liabilities and that Ocala Funding LLC is in compliance with the terms specified in the Depositary Agreement." Bank of America was specifically required to certify items (1) and (2) on the Borrowing Base Certificate, which were the amounts of outstanding Secured Notes and Ocala-owned collateral that secured the outstanding Secured Notes.

136.    To certify the Borrowing Base Certificate, Bank of America by necessity had to certify the amount of funds on deposit in the collateral account and other accounts it maintained, and the outstanding purchase price of the mortgage loans in the custody and control of Bank of America on behalf of BNPP.

137.    Bank of America had possession of the information required to accurately certify the borrowing base. Cash was deposited in an account at Bank of America and the mortgage notes were either held in Bank of America's vaults or listed on the schedule accompanying Bank of America's bailee letters to Colonial Bank acting as Freddie Mac's agent. Bank of America knew or should have known which loans were owned by Ocala and which loans were sold to Freddie Mac because Freddie Mac required Bank of America to sign a document (Form 996E) relinquishing Bank of America's rights to mortgage loans upon payment by Freddie Mac, and Bank of America received payment from Freddie Mac for the loans it purchased.

(1)  The June 2008 – December 22, 2008 Borrowing Base Certificates

138.    On June 30, 2008, and each roll date thereafter, Bank of America was required to certify the Borrowing Base Certificate prior to issuing new Secured Notes. These Borrowing Base Certificates were not provided to BNPP.

139.    The June 30, 2008 Borrowing Base Certificate certified by Bank of America shows that Bank of America was holding only $251.2 million of cash, capitalized interest and mortgages on behalf of Ocala. This is far less than the $1.75 billion of Secured Notes issued by Bank of America on June 30, 2008, even accounting for an additional cash infusion of approximately $780 million that Ocala received from BNPP and another noteholder for the sale of Secured Notes issued on June 30, 2008. Moreover, each of the Borrowing Base Certificates certified by Bank of America between June 30, 2008 and December 22, 2008, showed that Ocala was insolvent insofar as it held significantly less cash and mortgages than the $1.75 billion of outstanding Secured Notes. As shown in the following chart, on each of the note issuance dates between June 30, 2008 and December 22, 2008, Bank of America certified that the Ocala facility was underfunded by between $450 and $700 million.

| Date | Mortgages | Cash and Capitalized Interest | Total Mortgages, Cash and Capitalized Interest | Under Collateralization |
|------|-----------|-------------------------------|------------------------------------------------|--------------------------|
| 6/30/2008 | $173,283,640 | $860,722,813 | $1,034,006,454 | (715,978,546) |
| 7/21/2008 | $679,808,482 | $361,132,174 | $1,040,940,656 | (709,044,344) |
| 8/20/2008 | $907,859,601 | $125,876,842 | $1,033,736,443 | (716,248,557) |
| 9/22/2008 | $802,614,055 | $233,613,949 | $1,036,228,004 | (713,756,996) |
| 10/20/2008 | $902,937,474 | $131,518,778 | $1,034,456,252 | (715,528,749) |
| 11/20/2008 | $946,607,096 | $96,922,679 | $1,043,529,775 | (706,455,225) |
| 12/22/2008 | $970,376,234 | $332,989,841 | $1,303,366,075 | (445,543,515) |

140.    Under the terms of the Depositary Agreement, Bank of America was required to certify the Borrowing Base Certificate before the issuance or roll of new Secured Notes. Additionally, under the Base Indenture, Bank of America was required to automatically shut down the Ocala facility and promptly notify BNPP and the other noteholders if Ocala became insolvent or was under-collateralized.  If Bank of America had performed its contractual duties, and automatically shut down the Ocala facility and promptly notified BNPP as it was contractually required to do, BNPP would not have been harmed.

(2)    The December 30, 2008 – July 2009 Borrowing Base Certificates

141.    On December 12, 2008, in connection with its roll of the Secured Notes, BNPP requested that Bank of America begin providing BNPP with a copy of the Borrowing Base Certificate certified by Bank of America upon the issuance of new Secured Notes.

142.    On December 30, 2008, for the first time since BNPP purchased the Secured Notes on June 30, 2008, Bank of America executed a Borrowing Base Certificate that on its face showed the Ocala facility to be fully collateralized.  Although there were no new investments in the Ocala facility in December 2008, the December 30, 2008 Borrowing Base Certificate shows

that the Ocala facility suddenly had $1.85 billion of cash and mortgages, $546.4 million more than it had only eight days earlier.

143.    The Borrowing Base Certificates certified by Bank of America on subsequent roll dates, and provided by Bank of America to BNPP, also showed the Ocala facility to be fully collateralized. Bank of America's certifications of these Borrowing Base Certificates were false. Moreover, Bank of America had possession of all the information necessary for it to determine the accuracy of the information contained in the Borrowing Base Certificate.

144.    By way of example, Bank of America's final certification was on July 20, 2009. In that certification (signed by Matthew Smith) Bank of America certified that as of July 20, 2009, Bank of America held mortgage loans worth over $474 million and $28 million of cash as collateral for BNPP's $480.7 million of Secured Notes.  In reality, as of July 20, 2009, Bank of America's own internal documents, also executed by Matthew Smith, show that over $290.4 million of mortgage loans purportedly owned by Ocala had already been sold to Freddie Mac and, accordingly, Bank of America was holding mortgage loans with a value of less than $190 million on behalf of BNPP. Moreover, Bank of America's bank records show that as of July 20, 2009, Bank of America was holding only $1.7 million in the segregated 2005-1 Collateral account.

145.    A review of Bank of America's bank records and Forms 996E signed by Matthew Smith reveals that Bank of America's Borrowing Base Certificates for prior months were similarly false.

146.    Bank of America thus certified and provided BNPP with false Borrowing Base Certificates, which Bank of America could and should have checked against its own records prior to certification. Additionally, prior to December 30, 2008, Bank of America certified

Borrowing Base Certificates that on their face reflect the insolvency of the Ocala facility. These actions constitute a breach of the Base Indenture and Depositary Agreement.

147.    As expressly recognized by Bank of America in the March Letter Agreement, Bank of America's certification of the borrowing base was an "inducement to BNP Paribas [] to enter into, and/or, to continue its participation" in the Ocala transactions. Had BNPP known that Bank of America's certification of the borrowing base was false or that its 2005-1 Notes were not secured by the 2005-1 Collateral, it would neither have purchased the 2005-1 Notes nor, thereafter, would it have continued its participation in the Ocala facility. By failing to shut down the Ocala facility upon its insolvency and later executing false certifications of the Borrowing Base Certificate, Bank of America breached its contractual obligations and proximately caused BNPP's injuries.

### FIRST CAUSE OF ACTION
**(Breach of Contract:  Security Agreement)**

148.    BNPP repeats and realleges all prior paragraphs as if set forth here in full.

149.    Under the terms of the Security Agreement, Bank of America was contractually obligated to open and maintain certain segregated accounts for the collateral securing BNPP's Secured Notes.  Security Agreement § 5.01.

150.    Under the terms of the Security Agreement, Bank of America was given exclusive dominion and control over the collateral accounts and all mortgages or other assets owned by Ocala. Id. §§ 4.01 and 5.01 et. seq.

151.    Under the terms of the Security Agreement, Bank of America was only permitted to disburse Ocala's funds "in accordance with the terms of Section 5.03 hereof." Id. § 5.01.

152.    Section 5.03 of the Security Agreement states that "no withdrawals from the Collateral Account shall be made on any day" for the purchase of new mortgage loans if BNPP's

Secured Notes are not fully secured by cash and mortgages worth at least $500 million.  Security Agreement § 5.3.

153.    Under the terms of the Security Agreement, Bank of America was entitled to rely on instructions it received from Ocala only if the instructions were from an Issuer Agent and "reasonably believed by it in its professional judgment to be genuine and correct and to have been signed or sent by the proper Person or Persons." Id. § 8.01.

154.    Under the terms of the Security Agreement, Bank of America was required to "promptly comply with any such approved instructions made by the Issuer [Ocala], the Series 2005-1 Depositary [Bank of America] or the Series 2008-1 Depositary [Bank of America]" only if they were made by an Issuer Agent "in accordance with the provisions of the foregoing paragraphs of this Section 5.03." Id. § 5.03.

155.    Under the express terms of the Security Agreement, Bank of America is liable for negligence, fraud, bad faith or willful misconduct in the performance of its duties. Id. § 8.01.

156.    As set forth in this Amended Complaint, Bank of America breached its obligations under the Security Agreement by, among other things:  (i) improperly transferring funds from Ocala's account at Bank of America to unauthorized accounts at Colonial Bank and Bank of America; (ii) purchasing mortgage loans without authorization; (iii) commingling funds; and (iv) failing to adequately secure the mortgage loans it owned on behalf of BNPP.

157.    Had Bank of America adequately performed its contractual obligations, BNPP's Secured Notes would be fully secured by $500 million of cash and mortgage loans.  As a direct and proximate cause of Bank of America's breach of its contractual duties and its failure to protect and secure BNPP's collateral, BNPP's Secured Notes are significantly under-collateralized and Bank of America has failed to make payment to BNPP for its Secured Notes.

158.   BNPP is a third-party beneficiary to the Security Agreement and is entitled to the rights and benefits under that agreement and may enforce the provisions of that agreement as if it were a party. See id. §§ 10.08 and 10.18.

## SECOND CAUSE OF ACTION
### (Indemnification:  Security Agreement)

159.   BNPP repeats and realleges all prior paragraphs as if set forth here in full.

160.   As set forth in this Amended Complaint, Bank of America breached its obligations under the Security Agreement by, among other things:  (i) improperly transferring funds from Ocala's account at Bank of America to unauthorized accounts at Colonial Bank and Bank of America; (ii) purchasing mortgage loans without authorization; (iii) commingling funds; and (iv) failing to adequately secure the mortgage loans it owned on behalf of BNPP.

161.   As a direct and proximate result of Bank of America's breach of its contractual duties and its failure to protect and secure BNPP's collateral, BNPP's Secured Notes are significantly under-collateralized, Bank of America has failed to make payment to BNPP for its Secured Notes and BNPP has been damaged.

162.   Section 8.05 of the Security Agreement provides that:  "The Collateral Agent [Bank of America] agrees to indemnify and hold harmless the Secured Parties [BNPP and others] and the Issuer [Ocala] against any and all claims, losses, penalties, fines, forfeitures, reasonable legal fees and related costs, judgments, and any other costs, fees and expenses that the Issuer [Ocala] or the Secured Parties [BNPP and others] may sustain to the extent attributable to the Collateral Agent's [Bank of America's] negligence, fraud, bad faith or willful misconduct in the performance of its duties hereunder."

163.    Bank of America has refused to compensate BNPP for the losses it suffered due to Bank of America's negligence in the performance of its obligations under the Security Agreement.

164.    By reason of the foregoing, BNPP has been damaged by Bank of America in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
#### (Breach of Contract:  Depositary Agreement)

165.    BNPP repeats and realleges all prior paragraphs as if set forth here in full.

166.    Section 4(d) of the Depositary Agreement provides that Bank of America "shall not issue or deliver any Short Term Note unless it shall have received a completed certificate from an Issuer [Ocala] Agent on the Issuance Date, each in the form of Exhibit C attached hereto by 11:00 a.m. (New York City time) and the Depositary [Bank of America], upon review, determines that it can (and it does) certify as to items (1) and (2) therein."  In "item 2" Bank of America certifies that the Secured Notes owned by BNPP were over-collateralized as of the date of the certification.

167.    The Depositary Agreement expressly provides that "[t]his Agreement shall also inure to the benefit of the Indenture Trustee [Bank of America], which is hereby expressly declared to be a third-party beneficiary hereof."  Depositary Agreement § 15.  Bank of America, as Indenture Trustee, cannot enforce its rights against itself in its role as Depositary.  Because Bank of America's conflicted role renders it incapable of carrying out its duties as Indenture Trustee, BNPP, as the Secured Noteholder and beneficiary of the Base Indenture, can directly assert the Indenture Trustee's rights under Section 15 of the Depositary Agreement.

168.    Under the terms of the Depositary Agreement, Bank of America is liable for negligence, fraud, bad faith or willful misconduct in the performance of its duties.  Id. § 8(d).

44

169.    As set forth in this Amended Complaint, Bank of America breached its obligations under the Depositary Agreement by falsely certifying the Borrowing Base Certificate on multiple occasions.

170.    Had Bank of America adequately performed its contractual obligations under the Ocala transaction, BNPP's Secured Notes would be fully secured by $500 million of cash and mortgage loans.  As a direct and proximate cause of Bank of America's breach of its contractual duties and its failure to protect and secure BNPP's collateral, BNPP's Secured Notes are significantly under-collateralized and Bank of America has failed to make payment to BNPP for its Secured Notes.  Moreover, as a direct and proximate result of Bank of America's breach of its contractual duties, BNPP purchased new issues of Secured Notes every month (or less), most recently on July 20, 2009.  Had BNPP known that the new issue of Secured Notes was under-collateralized, it would not have purchased the new Secured Notes and would not have been injured.

## FOURTH CAUSE OF ACTION
### (Indemnification:  Depositary Agreement)

171.    BNPP repeats and realleges all prior paragraphs as if set forth here in full.

172.    As set forth in this Amended Complaint, Bank of America breached its obligations under the Depositary Agreement by falsely certifying the Borrowing Base Certificates.

173.    As a direct and proximate result of Bank of America's breach of its contractual duties, BNPP's Secured Notes are significantly under-collateralized, Bank of America has failed to make payment to BNPP for its Secured Notes and BNPP has been damaged.

174.    Section 8(g) of the Depositary Agreement provides that:  "The Depositary [Bank of America] agrees to indemnify and hold harmless the Secured Parties [BNPP and others] and

45

the Issuer [Ocala] against any and all claims, losses, penalties, fines, forfeitures, reasonable legal

fees and related costs, judgments, and any other costs, fees and expenses that the Issuer [Ocala]

may sustain to the extent attributable to the Depositary's [Bank of America's] negligence, fraud,

bad faith or willful misconduct in the performance of its duties hereunder."

175.    Bank of America has failed and refused to compensate BNPP for the losses it

suffered due to Bank of America's negligence in the performance of its obligations under the

Depositary Agreement.

176.    By reason of the foregoing, BNPP has been damaged by Bank of America in an

amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Breach of Contract/Indemnification:  March Letter Agreement)

177.    Plaintiffs repeat and reallege all prior paragraphs as if set forth here in full.

178.    In the March Letter Agreement, Bank of America expressly recognizes that its

duties under the Depositary Agreement, including its certification of the Borrowing Base

Certificates, "play an important role in mitigating the risks that [BNP Paribas] would otherwise

incur through the Related Transactions."

179.    In the March Letter Agreement, Bank of America "agree[d] to indemnify and hold

harmless BNP Paribas, its officers, directors, controlling persons and affiliates [including BNPP]

(collectively, the 'Indemnified Persons') against any and all claims, losses, penalties, fines,

forfeitures, reasonable legal fees and related costs and judgments, and any other costs, fees and

expenses that any Indemnified Person may sustain to the extent attributable to the Depositary's

negligence, fraud, bad faith or willful misconduct in the performance of its duties under the

Depositary Agreement (including, without limitation, its duties under Section 4(d) thereof.)"

46

180.   As set forth in this Amended Complaint, Bank of America breached its obligations under the Depositary Agreement by falsely certifying the Borrowing Base Certificates.

181.   As a direct and proximate result of Bank of America's breach of its contractual duties BNPP's Secured Notes are significantly under-collateralized, Bank of America has failed to make payment to BNPP for its Secured Notes and BNPP has been damaged.

182.   By reason of the foregoing, BNPP and BNP Paribas have been damaged by Bank of America in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
### (Breach of Contract:  Custodial Agreement)

183.   BNPP repeats and realleges all prior paragraphs as if set forth here in full.

184.   Under the terms of the Custodial Agreement, Bank of America was responsible for taking possession of, examining and securing the mortgages owned by Ocala and was authorized to deliver the mortgage files to a third-party purchaser, such as Freddie Mac, or its agent "*provided* that any delivery of such Mortgage Note, Mortgage and Assignment of Mortgage is accompanied by a transmittal letter to be executed by the third-party purchaser substantially in the form attached hereto as Exhibit E and the Custodian [Bank of America] shall collect all such transmittal letters executed by third-party purchasers." Custodial Agreement § 8.

185.   Under the terms of the Custodial Agreement, "[w]hile the Mortgage Loans are owned by the Issuer [Ocala], and subject to the security interest of the Collateral Agent [Bank of America], as the case may be, the Custodian [Bank of America] shall:  i. segregate on the books of the Custodian [Bank of America] and maintain continuous custody and control of the Mortgage Notes, Mortgages and Assignments of Mortgages on behalf of and in trust for the

Issuer [Ocala] subject to the security interest of the Collateral Agent [Bank of America]." Id. § 6(b)(i).

186.   Consistent with Bank of America's duty to "maintain continuous custody and control of the" mortgages on behalf of Ocala, Bank of America provided BNPP with daily reports of the loans that Bank of America held as collateral for BNPP's Secured Notes.

187.   Bank of America failed to collect the bailee transmittal letters executed by third-party purchasers as it was required to under the Custodial Agreement.

188.   Bank of America did not "maintain continuous custody and control of the" mortgages owned by Ocala as required by the Custodial Agreement. Id.

189.   Each of the approximately 160 Shipped Reports provided by Bank of America to BNPP falsely misrepresented the loans owned by Ocala and overstating the collateral securing BNPP's Secured Notes.  Having assumed the duty to provide daily reports of the loans owned by Ocala to BNPP, Bank of America had a duty to do so accurately.

190.   As a direct and proximate cause of Bank of America's breach of its contractual duties and its failure to protect and secure BNPP's collateral, BNPP's Secured Notes are significantly under-collateralized and Bank of America has failed to make payment to BNPP for its Secured Notes.

191.   Bank of America, as collateral agent, cannot enforce its rights against itself in its roles as Custodian.  Because Bank of America's conflicted role renders it incapable of carrying out its duties as collateral agent, BNPP, as the Secured Noteholder and beneficiary of the Security Agreement, can directly assert the collateral agent's rights under the Custodial Agreement.

### SEVENTH CAUSE OF ACTION
#### (Indemnification:  Custodial Agreement)

192.    Plaintiffs repeat and reallege all prior paragraphs as if set forth here in full.

193.    As set forth in this Amended Complaint, Bank of America breached its obligations under the Custodial Agreement by, among other things, failing to "maintain continuous custody and control of the" mortgages owned by Ocala.

194.    As a direct and proximate result of Bank of America's breach of its contractual duties BNPP's Secured Notes are significantly under-collateralized, Bank of America has failed to make payment to BNPP for its Secured Notes and BNPP has been damaged.

195.    Section 17 of the Custodial Agreement provides that:  "The Custodian [Bank of America] hereby agrees to indemnify the Issuer [Ocala], the Seller [TBW], the Servicer [TBW], each Swap Counterparty [BNP Paribas and others], their respective Affiliates, their respective directors, officers, trustees, employees and agents and their respective successors and assigns (each, an "Indemnified Party") against, and agrees to hold them harmless from, any and all claims, losses, liabilities, obligations, damages, payments, costs and expenses (including, without limitation, reasonable legal fees and expenses arising in connection therewith) which may be imposed on, incurred by or asserted against any Indemnified Party and resulting from the Custodian's [Bank of America's] negligence, lack of good faith or willful misconduct or the performance of or other breach of its obligations hereunder; *provided* that the Custodian [Bank of America] shall not be liable for any portion of any such amounts resulting from the negligence or misconduct of the Issuer [Ocala]."

196.    BNP Paribas is a Swap Counterparty under the Ocala facility documents.  BNPP is an affiliate of BNP Paribas.

197. Bank of America, as collateral agent, cannot enforce its rights against itself in its role as Custodian. Because Bank of America's conflicted role renders it incapable of carrying out its duties as collateral agent, BNPP, as the Secured Noteholder and beneficiary of the Security Agreement, can directly assert the collateral agent's rights under the Custodial Agreement.

198. Bank of America has refused to compensate BNPP for the losses it suffered due to Bank of America's negligence in the performance of its obligations under the Custodial Agreement.

199. By reason of the foregoing, BNPP and BNP Paribas have been damaged by Bank of America in an amount to be determined at trial.

### EIGHTH CAUSE OF ACTION
### (Breach of Contract:  Base Indenture)

200. Plaintiffs repeat and reallege all prior paragraphs as if set forth here in full.

201. Under the terms of the Base Indenture, Ocala is required to "use the proceeds of Notes solely for one or more of the following purposes:  (a) to pay the Issuer's Obligations when due, in accordance with the Security Agreement; and (b) to acquire Mortgage Loans from the Seller." Base Indenture § 8.28; Indenture Supplement § 2.6.

202. Under the terms of the Base Indenture, "[i]f an Event of Default or a Potential Event of Default occurs and is continuing and if a Trust Officer of the Indenture Trustee [Bank of America] receives written notice or has actual knowledge thereof, the Indenture Trustee [Bank of America] shall promptly provide" among others, BNPP and BNP Paribas, "with notice of such Event of Default or the Potential Event of Default." Base Indenture § 10.4.

203. Under the terms of the Base Indenture, upon the occurrence of an Event of Default, the indenture trustee is required to "exercise such of the rights and powers vested in it

by this Base Indenture and the Facility Documents, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." Id. at § 10.1(a).

204. Bank of America breached the Base Indenture by among other things failing make sure the Ocala facility satisfied the borrowing base test before issuing new notes, using the proceeds of the Secured Notes for unauthorized purposes, failing to automatically shut-down the Ocala facility upon actual knowledge of Ocala's insolvency and failing to promptly notify BNPP, BNP Paribas and the others of an Event of Default or Potential Event of Default.

205. Moreover, after Ocala was insolvent and an Event of Default had thus occurred, Bank of America breached the Base Indenture by engaging in transactions with Ocala and TBW, which have injured or may injure BNPP and other Noteholders. These transactions include, but are not limited to: (i) Bank of America's repeated extension and repayment of overdraft advances to Ocala when Ocala was insolvent; and (ii) Bank of America's Mortgage Relationship with TBW.

206. BNPP, as a noteholder, is an intended beneficiary of the Base Indenture and is expressly recognized as a third party beneficiary of the Base Indenture. Base Indenture § 13.8. BNP Paribas as a Swap Counterparty of the Ocala facility is recognized as a third-party beneficiary of the Base Indenture. Id. § 13.20.

207. As a direct and proximate cause of Bank of America's breach of its obligations under the Base Indenture, BNPP and BNP Paribas have been damaged in an amount to be determined at trial.

### NINTH CAUSE OF ACTION
**(Breach of Fiduciary Duty)**

208. Plaintiffs repeat and reallege all prior paragraphs as if set forth here in full.

209.    Bank of America owed BNPP and the other Noteholders a duty to act in the best interest of BNPP and the other Noteholders and a duty to exercise the same degree of care and skill that a prudent person would exercise or use in the conduct of such person's own affairs. Bank of America also owed BNPP and the other Noteholders a duty to act free from any conflicting personal interest.

210.    Bank of America breached these duties by among other things failing to make sure the Ocala facility satisfied the borrowing base test before issuing new notes, using the proceeds of the Secured Notes for unauthorized purposes, failing to automatically shut-down the Ocala facility upon actual knowledge of Ocala's insolvency and failing to promptly notify BNPP, BNP Paribas and the others of an Event of Default or Potential Event of Default.

211.    Moreover, after Ocala was insolvent and an Event of Default occurred, Bank of America breached the Base Indenture by engaging in transactions with Ocala and TBW, which have injured or may injure BNPP and other Noteholders.  These transactions include, but are not limited to:  (i) Bank of America's repeated extension and repayment of overdraft advances to Ocala when Ocala was insolvent; and (ii) Bank of America's Mortgage Relationship with TBW.

212.    As a direct and proximate cause of Bank of America's breach of its obligations under the Base Indenture, BNPP and BNP Paribas have been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, BNPP and BNP Paribas demand judgment in their favor against Bank of America as follows:

A.     An award of damages and other compensatory or other damages available by law in an amount to be determined at trial, with interest, at the maximum amount permitted by law;

B.     An award of attorneys fees, costs and other expenses as permitted by law; and

C.     Such other and further relief as the Court may deem just and proper.

March 17, 2009
Armonk, New York

BOIES, SCHILLER & FLEXNER LLP

Robin A. Henry (RH 6781)
Motty Shulman (MS 0354)
Jack Wilson (JW 0506)
333 Main Street
Armonk, New York 10504
Telephone:  914.749.8200
Facsimile:  914.749.8300
rhenry@bsfllp.com
mshulman@bsfllp.com
jwilson@bsfllp.com
*Attorneys for Plaintiffs BNP Paribas Mortgage*
*Corporation and BNP Paribas*