**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BNP PARIBAS MORTGAGE CORP. and BNP PARIBAS | Civil Action No. 09-CV-9783-RWS |
| Plaintiffs, | Honorable Robert W. Sweet |
| v. | |
| BANK OF AMERICA, N.A., | |
| Defendant. | |

## MEMORANDUM OF LAW IN OPPOSITION TO BANK OF AMERICA'S MOTION TO DISMISS

BOIES, SCHILLER & FLEXNER LLP
Robin A. Henry
Motty Shulman
Jack Wilson
333 Main Street
Armonk, New York 10504
Telephone:  914.749.8200

Attorneys for Plaintiffs BNP Paribas Mortgage
Corporation and BNP Paribas

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................... 1

OVERVIEW AND BACKGROUND ........................................................... 2

I.    The Ocala Facility and BoA's Role ............................................. 2

II.   The Role of BNPP and TBW in the Ocala Facility ......................... 3

III.  The Typical Ocala Transaction ................................................... 4

IV.  BoA's Breaches of the Facility Documents ................................. 6

ARGUMENT .................................................................................... 10

I.    ONCE BoA HAD ACTUAL KNOWLEDGE OF OCALA'S INSOLVENCY, IT WAS REQUIRED TO PROMPTLY NOTIFY BNPP ................................... 11

    A.    BoA's Failure to Notify BNPP of a Potential Event of Default Breached the Indenture ............................................................. 12

    B.    BoA's Failure to Declare a Potential Event of Default Breached the Indenture ... 18

    C.    BoA Breached its Fiduciary Duty to BNPP .......................... 20

II.   BoA BREACHED THE SECURITY AGREEMENT ....................... 20

    A.    The Security Agreement Only Permitted BoA to Transfer Funds from the Collateral Account for Approved Purposes ........................ 22

    B.    BoA Had Ample Time to Review and Approve Ocala's Transfer Requests ........ 25

    C.    BoA Failed to Segregate Ocala's Mortgages and Cash ......................................... 29

III.  BNPP HAS STANDING TO SUE FOR BoA'S BREACHES OF THE DEPOSITARY AND CUSTODIAL AGREEMENTS ................................ 30

    A.    BNPP Has Derivative Standing Under the Depositary and Custodial Agreements ................................................... 31

    B.    BNPP and BNP Paribas Have Standing Under the Indemnification Provision of the Custodial Agreement ............................................. 32

    C.    The Indemnification Provision Covers BNPP and BNP Paribas' Claims ............. 35

    D.    As Swap Counterparty BNP Paribas Has Direct Standing to Sue BoA ................ 37

i

## TABLE OF CONTENTS

**Page**

IV.   BNPP HAS STANDING TO SUE UNDER THE MARCH LETTER AGREEMENT ... 38

   A.   The March Letter Agreement is a Separately Enforceable Contract ................... 38

   B.   The March Letter Agreement Confers First-Party Indemnification Rights on BNP Paribas and BNPP for Losses They Sustained ...................................................... 40

V.   THERE IS NO BASIS FOR EXCLUDING EVENTS AND INJURIES PRIOR TO JULY 20, 2009 ................................................................................................................. 43

CONCLUSION ................................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

Argonaut Partnership L.P. v. Bankers Trustee Co. Ltd.,
   No. 96 Civ. 1970, 2001 WL 585519 (S.D.N.Y. May 30, 2001).........................................17

Ashcroft v. Iqbal,
   129 S. Ct. 1937 (2009).................................................................................................10

Banco Espanol de Credito v. Security Pacific National Bank,
   763 F. Supp. 36 (S.D.N.Y. 1991) ................................................................................28

Bank of Lexington v. Jack Adams Aircraft Sales, Inc.,
   570 F.2d 1220 (5th Cir. 1978).....................................................................................44

In re Bankers Trust Co.,
   450 F.3d 121 (2d Cir. 2006) .................................................................................15, 19

Bayerische Hypo-Und Vereinsbank AG v. Banca Nazionale Del Lavoro, S.p.A.,
   292 B.R. 752 (Bankr. S.D.N.Y. 2003)..........................................................................28

Chemical Bank & Trust Co. v. Prudence-Bonds Corp. (New Corp.),
   207 F.2d 67 (2d Cir. 1953) .........................................................................................19

Compania de Vapores Arauco Panamena S.A. v. Moore-McCormack Lines, Inc.,
   91 F. Supp. 545 (E.D.N.Y. 1950) ................................................................................34

Control Data Systems, Inc. v. Computer Power Group, Ltd.,
   No. 94 Civ. 5396, 1998 WL 178775 (S.D.N.Y. Apr. 15, 1998) ................................33, 37

Cruden v. Bank of New York,
   957 F.2d 961 (2d Cir. 1992) .......................................................................................31

E*TRADE Financial Corp. v. Deutsche Bank AG,
   631 F. Supp. 2d 313 (S.D.N.Y. 2009) .....................................................................37, 43

Green v. Foley,
   856 F.2d 660 (4th Cir. 1988).......................................................................................44

Haynes v. Kleinewefers & Lembo Corp.,
   921 F.2d 453 (2d Cir. 1990) .......................................................................................34

International Multifoods Corp. v. Commercial Union Insurance Co.,
    309 F.3d 76 (2d Cir. 2002) ...................................................................................16, 19, 34

Landmark Land Co., Inc. v. Sprague,
    529 F. Supp. 971 (S.D.N.Y. 1981) ....................................................................................44

Landmark Land Co., Inc. v. Sprague,
    701 F.2d 1065 (2d Cir. 1983) ...........................................................................................44

LNC Investments, Inc. v. First Fidelity Bank, N.A.,
    935 F. Supp. 1333 (S.D.N.Y. 1996) .................................................................................20

In re Morgan Stanley ERISA Litig.,
    No. 07 Civ. 11285, 2009 WL 5947139 (S.D.N.Y. Dec. 9, 2009).....................................44

Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.,
    418 F.3d 168 (2d Cir. 2005) .......................................................................................37, 43

In re New York City Housing Development Corp.,
    No. 86-CV-3274, 1987 WL 494921 (S.D.N.Y. May 11, 1987)........................................31

Pan Am Corp. v. Delta Air Lines, Inc.,
    175 B.R. 438 (S.D.N.Y. 1994) ........................................................................................20

Pfizer, Inc. v. Stryker Corp.,
    348 F. Supp. 2d 131 (S.D.N.Y. 2004) ...................................................................... passim

Phillips Petroleum Co. v. Rexene Corp.,
    No. 95-1451, 82 F.3d 435, 1996 WL 137536 (Fed. Cir. Mar. 27, 1996) ..........................17

Profit v. Baum,
    No. 3:96CV1205 JCH, 2000 WL 502697 (D. Conn. Mar. 21, 2000) ...............................26

Promuto v. Waste Management, Inc.,
    44 F. Supp. 2d 628 (S.D.N.Y. 1999) ....................................................................... passim

In re Spaniak,
    221 B.R. 732 (Bankr. W.D. Mich. 1998) .........................................................................44

UBS Capital Americas II, LLC v. Highpoint Telecommunications Inc.,
    No. 01 CIV. 8113, 2002 WL 377537 (S.D.N.Y. Mar. 8, 2002)........................................18

United International Holdings, Inc. v. The Wharf (Holdings) Ltd.,
    988 F. Supp. 367 (S.D.N.Y. 1997) ...................................................................................32

Vysovsky v. Glassman,
    No. 01-Civ-2531, 2007 WL 3130562 (S.D.N.Y. Oct. 23, 2007) .......................................39

## STATE CASES

Bank of New York v. River Terrace Associates, LLC,
    804 N.Y.S.2d 728 (N.Y. App. Div. 2005)......................................................................34

Beck v. Manufacturers Hanover Trust Co.,
    632 N.Y.S.2d 520 (N.Y. App. Div. 1995)................................................................19, 20

Campbell v. Hudson & Manhattan Railroad Co.,
    102 N.Y.S.2d 878 (N.Y. App. Div. 1951)................................................................31, 32

Cohen v. Employers Reinsurance Corp.,
    503 N.Y.S.2d 33 (N.Y. App. Div. 1986)......................................................................34

DFI Communications, Inc. v. Greenberg,
    363 N.E.2d 312 (N.Y. 1977) .......................................................................................39

Fairchild Warehouse Associates, LLC v. United Bank of Kuwait, PLC,
    727 N.Y.S.2d 153 (N.Y. App. Div. 2001).....................................................................39

Frydman & Co. v. Credit Suisse First Boston Corp.,
    708 N.Y.S.2d 77 (N.Y. App. Div. 2000).......................................................................20

Getty Refining & Marketing v. Linden Maintenance Corp.,
    562 N.Y.S.2d 721 (N.Y. App. Div. 1990).....................................................................39

Gould v. J. Henry Schroder Bank & Trust Co.,
    433 N.Y.S.2d 32 (N.Y. App. Div. 1980).......................................................................32

Great Western Bank v. Kong,
    90 Cal. App. 4th 28 (2001).........................................................................................44

Hogeland v. Sibley, Lindsay & Curr Co.,
    366 N.E.2d 263 (N.Y. 1977) .................................................................................36, 42

Hooper Associates, Ltd. v. AGS Computers, Inc.,
    548 N.E.2d 903 (N.Y. 1989) ..........................................................................35, 36, 41

Karel v. Clark,
    514 N.Y.S.2d 766 (N.Y. App. Div. 1987)......................................................................39

Levine v. Shell Oil Co.,
    269 N.E.2d 799 (N.Y. 1971) ...................................................................................37, 42

Litwak v. Wolkenberg,
    515 N.Y.S.2d 559 (N.Y. App. Div. 1987)........................................................................44

L.K. Station Group, LLC v. Quantek Media, LLC,
    879 N.Y.S.2d 112 (N.Y. App. Div. 2009)........................................................................39

Magten Asset Management Corp. v. Bank of New York,
    841 N.Y.S.2d 219, 2007 WL 1326795 (N.Y. Sup. Ct. May 8, 2007)................................18

New York State Medical Care Facilities Finance Agency v. Bank of Tokyo Trust Co.,
    621 N.Y.S.2d 466 (N.Y. Sup. Ct. 1994) ...........................................................................16

In re Paradis' Estate,
    134 Me. 333, 186 A. 672 (1936).......................................................................................44

Perlbinder v. Board of Managers of 411 East 53rd Street Condominium,
    886 N.Y.S.2d 378 (N.Y. App. Div. 2009)........................................................................15

Putnam High Yield Trust v. Bank of New York,
    776 N.Y.S.2d 796 (N.Y. App. Div. 2004)........................................................................17

Riviera Congress Associates v. Yassky,
    223 N.E.2d 876 (N.Y. 1966) ............................................................................................32

Sagittarius Broadcasting Corp. v. Evergreen Media Corp.,
    663 N.Y.S.2d 160 (N.Y. App. Div. 1997)...................................................................36, 43

Sommer v. Federal Signal Corp.,
    593 N.E.2d 1365 (N.Y. 1992) ..........................................................................................16

Syvertsen v. Great American Insurance Co.,
    700 N.Y.S.2d 289 (N.Y. App. Div. 1999)........................................................................34

TIC Holdings, LLC v. HR Software Acquisitions Group, Inc.,
    755 N.Y.S.2d 19 (N.Y. App. Div. 2003)..........................................................................34

## TREATISES

Robert I. Landau & Romano I. Peluso, CORPORATE TRUST ADMINISTRATION & MANAGEMENT
    (6th ed. 2008)...................................................................................................................19

Restatement (Second) of Contracts § 236(a) (1979).................................................................15

**STATUTES**

12 C.F.R. § 9.13(b)......................................................................................................................30

## PRELIMINARY STATEMENT[1]

BoA goes to great lengths to make its motion "lengthy and complex," MTD at 5, but the relevant facts are straightforward and the essential legal issue is a familiar question of contract interpretation.

1.      On June 30, 2008, BNPP purchased $480.7 million of Ocala Secured Notes.

2.      BoA served in several distinct but related capacities for the Ocala Facility:  as Indenture Trustee, Collateral Agent, Depositary and Custodian.

3.      As Collateral Agent, BoA had "exclusive dominion and control" over Ocala's primary account – the Collateral Account.

4.      Since June 30, 2008, BoA transferred billions of dollars, including nearly all of BNPP's $480.7 million, out of the Collateral Account to unauthorized accounts at TBW, for unauthorized purposes at the request of unauthorized personnel.

5.      BoA made these transfers _after_ it had actual knowledge that Ocala was insolvent and that there were multiple Potential Events of Default, and did so without notifying BNPP or the other Noteholders of Ocala's insolvency or any Potential or actual Event of Default.

BoA does not – and cannot – dispute these core factual allegations.  BoA is thus left to argue that:

1.      Even if BoA had actual knowledge of Ocala's insolvency and did not notify BNPP of this Potential Event of Default as required by the Indenture, it has no liability to BNPP.

2.      Despite BoA's repeated "review and approval" of unauthorized and improper fund transfers out of bank accounts under its "exclusive dominion and control," it was powerless to prevent the improper siphoning off of BNPP's assets because it was

---

[1]  For ease of reference, all terms not defined in text follow the abbreviations in BoA's Motion to Dismiss ("MTD").  Citations to exhibits ("Ex.") are to the Declaration of Richard St. John dated April 30, 2010, submitted by BoA.

1

constrained to promptly comply with any and all fund transfer requests relating to Ocala, including those made by unauthorized personnel for unauthorized purposes.

3.      Even though BoA, as Depositary, certified fifteen false Borrowing Base Certificates beginning on June 30, 2008, and despite the fact that a solvency certification from BoA was a contractual precondition to the issuance of the Secured Notes, BNPP lacks standing to bring a claim for this wrong.  BoA contends that only it, in its capacity as Indenture Trustee, or perhaps no one, has standing to sue BoA as Depositary.

BoA's assertion that it lacks any duty or responsibility to BNPP is groundless.  It relies on the contortion of and selective quotation from the Ocala Facility Documents.  As explained below, the Facility Documents require that BoA:  (i) as Indenture Trustee, promptly notify BNPP of Ocala's insolvency and other Potential Events of Default; (ii) as Collateral Agent, secure Ocala's assets; and (iii) as Depositary, accurately certify the borrowing base before issuing Secured Notes.  BoA failed in all of these capacities and in each of these duties.  Its motion should be denied in its entirety.

## OVERVIEW AND BACKGROUND

BoA's abject breach of its contractual duties is evident upon a full reading of key provisions of the Facility Documents:  (i) Section 10.4 of the Indenture; (ii) Sections 5.01, 5.03 (as to which BoA's selective quoting is particularly egregious) and 8.01 of the Security Agreement; and (iii) Section 4(d) of the Depositary Agreement and the March Letter Agreement. See Ex. F1 § 10.4; Ex. A §§ 5.01, 5.03, 8.01; Ex. C § 4(d); Ex. E.

## I.      The Ocala Facility and BoA's Role

Ocala was created to provide short-term liquidity to TBW between the time of TBW's origination or purchase of mortgages and the sale of those mortgages, principally to Freddie Mac.  FAC ¶ 28.  Ocala raised cash by issuing notes, which were, at all times, secured by the

cash proceeds of those notes and – as that money was used to finance mortgages – the mortgages.  Id. ¶¶ 39, 43.  BNPP purchased $480.7 million of Ocala Secured Notes.  Id. ¶¶ 2, 40.

Although Ocala was the issuer of the Secured Notes, it never took possession or had control of the cash or mortgages securing the notes owned by BNPP.  Id. ¶¶ 36, 37.  Instead, BoA was at all times responsible for maintaining possession, custody and control of Ocala's cash and mortgages "for the purpose of, among other things, securing and providing for the repayment of all amounts at any time and from time to time owing by the Issuer [Ocala] to," among others, BNPP.  Ex. A at 1.  Thus, all of Ocala's purchases and sales and all of Ocala's cash and mortgage transfers were conducted through BoA.  FAC ¶¶ 37-38.

BoA repeatedly refers to its role in the Ocala Facility as "purely ministerial," as if its breach of a self-described ministerial role somehow absolves BoA from all liability.  MTD at 1, 2, 4, 7, 15, 30, 37, 52.  Whatever label BoA now uses to characterize its obligations cannot and does not change the fact that it played a central role in administering the Facility, including by securing the collateral.  The importance of BoA's "ministerial" or administrative role in the Ocala Facility is underscored by the July 13, 2009 Moody's ABCP Market Review report that:

> The administration risk is further mitigated by the resources, capabilities and credit strength of Bank of America Corporation as the trustee, collateral agent, depositary and custodian to provide critical program support services, including: certifying the borrowing base and checking the delinquency triggers before the issuance of [Secured and callable notes]; checking in the loan files and creating a collateral transmittal report; and managing the orderly wind-down of the program.

Ex. T at 3.

## II.    The Role of BNPP and TBW in the Ocala Facility

BoA goes on at considerable length about the risks BNPP took in the Ocala transaction, as well as TBW's seemingly improper conduct.  MTD at 3-4, 12-15.  Neither has any relevance to the central question presented by this action:  did BoA comply with its contractual

3

obligations?  BNPP does not deny that it assumed certain risks in the transaction.  For instance,

BNPP took "underwriting risk" – the risk that the underlying mortgage loans may have been

improperly extended under the lending guidelines of the originating bank.  Critically, BNPP took

steps to protect itself against such risks, which were not the cause of its losses.  BNPP did not,

however, accept or protect against the risk that BoA would fail to live up to its obligations under

the contracts.

Similarly, there is no dispute that BNPP and BNP Paribas had contractual obligations to

Ocala in their capacities as a Secured Noteholder (to pay the purchase price of the Notes) and as

the Swap Counterparty (to perform under the relevant agreements).[2]  In the same vein, there is no

dispute that TBW appears to have done things it was not authorized to do.  That is entirely beside

the point, however.  The question presented by this motion is whether – assuming the truth of the

facts pled in the Amended Complaint – the causes of action asserted by BNPP state a claim.

### III.     The Typical Ocala Transaction

The importance of BoA's role in the Ocala Facility and the significance of BoA's

breaches can best be understood in the context of a typical Ocala transaction:

First, Ocala raised cash by issuing Secured Notes through BoA (as Depositary).  FAC ¶¶

39, 41; Ex. C § 4(a)-(h).  Prior to issuing new Secured Notes or rolling the notes (approximately

every thirty days), BoA (as Depositary) was required to certify the Ocala borrowing base – i.e.,

that Ocala's assets exceeded its liabilities (the "Borrowing Base Certificate" or "Certificate").

Id. ¶ 61; Ex. C § 4(d).

---

[2]  BoA accuses BNPP of changing the operative language of its complaint to "all but
delete" any references to BNP Paribas' role as Swap Counterparty.  MTD at 2.  This is untrue.
The relevant paragraph in the amended complaint is word-for-word identical to the original.
Compare FAC ¶ 45, with Compl. ¶ 36.

Second, BoA (as Depositary) transferred the proceeds of the note sales to the Collateral Account, which was maintained by BoA in its capacity as Collateral Agent.  FAC ¶¶ 37(f); Ex. A § 5.01.

Third, using the proceeds of the note sales, Ocala purchased mortgages from TBW. Pursuant to the Security Agreement, the steps in such a purchase were intended to be:  (i) the request to BoA as Collateral Agent by an authorized Ocala agent for the transfer of money to TBW; (ii) the "review and approval" by BoA of any such request; and (iii) the transfer of funds by BoA to TBW with respect to any "approved instructions."  Id. § 5.03; FAC ¶ 112.  Once the purchased mortgages were received by Ocala, BoA took possession of them in its capacity as Custodian.  Ex. D §§ 2-6, 8, 9, 20, Exhibit E; FAC ¶ 57.

Fourth, at such time when the mortgages were sold to Freddie Mac, Ocala requested that BoA (as Collateral Agent) execute the appropriate transfer documents.  Id. ¶ 58; Ex. A §§ 7.01, 7.02.  Freddie Mac would then wire the proceeds of the mortgage sales directly to BoA (as Collateral Agent) and BoA would deposit those funds in a segregated account established by BoA for that particular series of Secured Notes.[3]  Id. §§ 5.01, 5.03; FAC ¶¶ 119-120.

Thus, as reflected in the diagram below, at all times, BoA – not Ocala or TBW – was in possession and control of Ocala's cash and mortgages.

---

[3]  In some transactions Freddie Mac would make payment in mortgage-backed securities instead of cash.  Once these mortgage-backed securities were sold, the cash proceeds would be wired to the Collateral Account at BoA.



## IV.  BoA's Breaches of the Facility Documents

### A.  Indenture

Section 10.4 of the Indenture requires that BoA – as the Indenture Trustee – promptly notify the Secured Noteholders – including BNPP – if it has **"actual knowledge"** of an Ocala Event of Default or Potential Event of Default, which is defined to include insolvency among other events.  Ex. F1 §§ 9.1(f), 10.4.  BoA repeatedly breached that obligation, as a result of which the purportedly Secured Notes purchased by BNPP are now essentially worthless.

The Amended Complaint alleges that BoA had actual knowledge that Ocala was insolvent at least as early as June 30, 2008 – the date on which BNPP first purchased the Secured Notes.  FAC ¶¶ 9, 139-40.  Even without the benefit of any discovery of BoA's documents, the basis for this allegation is concrete (indeed, we submit ultimately unassailable) and, on this motion, incontrovertible.  Each month, BoA was required to – and did – certify the borrowing base.  In the event Ocala had insufficient assets to secure its liabilities, BoA – in its capacity as Depositary – was prohibited from issuing the Secured Notes.  See Ex. H §§ 2.2(a), 2.3(b) & (e);

Ex. C § 4(d) ("The Depositary shall not issue or deliver any Short Term Note unless it shall have received a completed certificate from an Issuer Agent on the Issuance Date, each in the form of Exhibit C attached hereto by 11:00 a.m. (New York City time) and the Depositary, upon review, determines it can (and it does) certify as to items (1) and (2) therein.").[4]

In compliance with its obligation to certify the Ocala borrowing base, BoA certified a Borrowing Base Certificate on June 30, 2008 – the date on which BNPP first purchased its Secured Notes.  FAC ¶¶ 13, 138.  Thereafter, BoA certified the Ocala borrowing base and permitted the issuance of new Notes approximately every thirty days until Ocala was declared in default.  BoA certified seven Borrowing Base Certificates between June 30, 2008 and December 22, 2008.  Id. ¶¶ 139-40.  **On their face, each and every Certificate during this period of time reflected that Ocala's liabilities well exceeded its assets.**  Id. ¶ 139.  **Ocala was insolvent from day one.**  Not only did BoA know it, BoA certified that very fact.  Id. ¶¶ 9, 139-40, 204.  BNPP never received a single one of these Borrowing Base Certificates and BoA kept the information to itself, violating its further duty to notify BNPP of Potential Events of Default or Events of Default under Section 10.4 of the Indenture.  Instead, and in violation of the Indenture and Depositary Agreements, BoA continued to issue purportedly Secured Notes every thirty days.  Id. ¶¶ 165-70, 200-07.

Almost as remarkable is what happened next.  At the end of 2008, BNPP requested that BoA provide it with copies of the Borrowing Base Certificates.  Id. ¶¶ 14, 141.  Due to an

---

[4]  Further, only "Issuer Agents," who were "authorized to act, and to give instructions and notices, on behalf of the Issuer," could provide and sign the certificates BoA used to certify the borrowing base.  Ex. C §§ 3(d).  See id. §§ 4(a) & (d); Ex. A § 3.03(a); Ex. F2 at 17.  Only three Ocala officers – Lee Farkas, Paul Allen and Ray Bowman – were designated Issuer Agents.  See FAC ¶ 110.  In fact, many of the Certificates accepted by BoA were not signed by one of these three individuals, but were signed by unauthorized TBW employees.

idiosyncrasy of year-end accounting, BoA certified two Certificates in an eight-day period:  one

on December 22, 2008, and the second on December 30, 2008.  Id. ¶¶ 139, 142.  The December

22 certificate showed on its face that Ocala was under-collateralized by approximately $450

million, whereas the December 30 certificate reflected that Ocala had miraculously gone from

being woefully under-collateralized to being over-collateralized by $100 million.  Id. ¶¶ 139,

142.  Taken together these two Certificates reflect that $550 million in collateral inexplicably

appeared at Ocala in an eight-day period.  This was all a fiction.  There was no change to the

Ocala Facility during this time period or at any time after BNPP purchased its notes and there is

no explicable reason for a nearly 50 percent increase in Ocala's assets over an eight-day period.

Again, in violation of the clear mandate of Section 10.4 of the Indenture, BoA kept silent and

disclosed nothing to BNPP.

### B.  <u>Security Agreement</u>

There can be no dispute that the Security Agreement prohibits the transfer of funds out of

the Collateral Account if the Notes owned by BNPP are not fully secured.  There similarly can

be no dispute that money that never should have left the Collateral Account did.  Thus, as

detailed in the Amended Complaint, billions of dollars were sent from the Collateral Account

upon the request of unauthorized persons to improper accounts.  FAC ¶¶ 11, 98-113.  The only

dispute is whether, on these facts, BoA has any responsibility to BNPP.  Characterizing its role

as "purely ministerial," BoA says it does not.  The plain terms of the Security Agreement say

otherwise.

Purportedly quoting the Security Agreement, BoA states that:

The Security Agreement also made clear that BoA "shall not have any duty" to
monitor compliance by other parties – including TBW or Ocala – with their duties
under the Agreement or other Facility Documents, and, on the contrary shall be

"entitled to rely, and . . . be fully protected in such reliance," upon directions from Ocala.

MTD at 18.  This selective quotation, which conveniently omits the second half of each quoted sentence, is unabashedly misleading.  Here is what the Security Agreement actually says:  BoA as Collateral Agent "shall not have any duty, **except as expressly provided herein**" and "[t]he Collateral Agent [BoA] shall be entitled to rely, and shall be fully protected in such reliance, on any communication, direction, instrument, resolution, certificate, affidavit, paper or other document **reasonably believed by it in its professional judgment to be genuine and correct and to have been signed or sent by the proper Person or Persons**."  Ex. A § 8.01 at 37 (emphasis added).  Thus, the very provision that BoA claims allowed it to blindly rely on unauthorized wire transfer requests expressly required BoA to exercise its reasonable "professional judgment" in reviewing and approving such requests.

Despite the facts that:  (i) the Security Agreement mandated that BoA exercise its professional judgment in the execution of its duties, id. §§ 5.03, 8.01; (ii) BoA had "exclusive dominion and control" over the Collateral Account such that no one but BoA could withdraw money from that account, id.; and (iii) the Security Agreement required any such withdrawals to be for appropriate purposes and on appropriate documentation, id. §§ 5.01, 5.03, 8.01, BoA nonetheless argues that it somehow was required to "promptly" comply with any Ocala or TBW transfer request, no matter how facially inappropriate.  This position is contrary to the express terms of the Security Agreement and is inconsistent with BoA's actual practice.  As alleged in the Amended Complaint, in practice, TBW would submit wire transfer requests to BoA for its "review and approval" and BoA would transfer funds out of the Collateral Account after sending TBW an email saying its request was "[a]pproved."  FAC ¶¶ 111-12.  And even if BoA felt obligated to "promptly" transfer the funds or mortgages to unauthorized persons for improper

purposes, it still had the obligation under Indenture Section 10.4 to inform BNPP as a Noteholder of all these Potential Events of Default.  It is uncontested that BoA provided no such notice.

### C.     <u>Depositary Agreement and March Letter Agreement</u>

Under the Depositary Agreement, prior to issuing new Secured Notes, BoA was required to certify that Ocala's assets exceeded its liabilities.  Ex. C § 4(d).  As detailed above, BoA certified Ocala Certificates that on their face reflected Ocala's insolvency.  BoA nonetheless issued notes – including to BNPP – in clear breach of the Depositary Agreement.  At least for the purposes of this motion, BoA does not dispute that it had an affirmative obligation under the Depositary Agreement.  Instead, it argues that BNPP does not have standing to assert a claim for breach of that obligation.  Indeed, BoA effectively asserts that only BoA – in its capacity as Indenture Trustee, which is a third-party beneficiary under the Depositary Agreement – has authority to sue BoA in its capacity as Depositary.  Of course, BoA is not inclined to sue itself and so – under its theory of recovery – BNPP is out of luck.

This argument fails for two separate and independent reasons.  <u>First</u>, under New York law, BNPP is permitted to stand in the shoes of BoA (as Indenture Trustee) in its capacity as a third-party beneficiary of the Depositary Agreement.  <u>Second</u>, BoA expressly contracted in the March Letter Agreement to indemnify BNPP for any losses sustained by it due to BoA's negligence in, among other things, certifying the Ocala borrowing base.  For these reasons, BoA's standing argument fails.

## <u>ARGUMENT</u>

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure should be denied where the complaint sets forth facts that "state a claim to relief that is plausible on its face."  <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009).

**I.      ONCE BoA HAD ACTUAL KNOWLEDGE OF OCALA'S INSOLVENCY, IT WAS REQUIRED TO PROMPTLY NOTIFY BNPP**

As detailed above, the Amended Complaint alleges that BoA had actual knowledge of Ocala's insolvency at least as early as June 30, 2008.  See infra § IV.A, FAC ¶¶ 9, 139-40.  BoA argues in two footnotes that the Borrowing Base Certificates certified by BoA from June 30, 2008 to December 22, 2008 do not, on their face, show insolvency.  See MTD at 32 nn.8-9.  BoA is wrong.  Each and every one of the Certificates during this period of time reflected liabilities greater than assets – i.e., insolvency.

BoA claims that "as Plaintiffs knew better than anyone knew, TBW clearly disclosed on its April 30, 2008 audited financial statements—months before Plaintiffs decided to enter into their current arrangement with TBW—that Ocala's largest single asset at that time was a $642.7 million receivable from TBW, which, together with other assets that Exhibit C did not address, purportedly gave Ocala, on April 30, 2008, a positive net worth of $107.4 million."  MTD at 32 n.8.  Of course, this "receivable" – which seemingly was no more than a fraudulent plug number – was nowhere reflected on the June 30, 2008 Borrowing Base Certificate or on any later Certificate certified by BoA.[5]  Moreover, TBW's April 30, 2008 audited financial statements were first published on July 29, 2008, after BoA certified two Certificates and a month after BNPP purchased the Secured Notes not – as BoA claims – "months before Plaintiffs decided to enter into their current arrangement."  BoA's argument is no more than a post-hoc rationalization

_____

[5]  BoA's claim that the Borrowing Base Certificate "did not purport to portray Ocala's entire financial status," MTD at 32 n.8, is contradicted by the actual Certificate, which states "[t]he purpose of this document is to certify that the assets of Ocala Funding LLC exceed its liabilities."  See FAC ¶ 135.

for BoA's manifest breach of its obligations as Depositary.[6]

BoA argues that, even assuming it had actual knowledge of Ocala's insolvency, it had no duty to inform BNPP of that fact because BoA did not have "'written notice' of an Event of Default." MTD at 25. Taking this argument at face value would mean that if the CEO of TBW called a Trust Officer of BoA and confessed Ocala's insolvency, BoA would have no duty to act or inform BNPP because BoA would not thereby have received formal written notice. This interpretation is both illogical and, not surprisingly, contradicted by both the express terms of the Indenture and New York law.

It is undisputed that BoA did not inform BNPP of Ocala's insolvency.

### A.   BoA's Failure to Notify BNPP of a Potential Event of Default Breached the Indenture

Section 10.4 of the Indenture states, in its entirety, as follows:

> Section 10.4   Notice of Indenture Events of Default and Potential Indenture Events of Default. If an Event of Default or a Potential Event of Default occurs and is continuing and if a Trust Officer of the Indenture Trustee receives written notice or has actual knowledge thereof, the Indenture Trustee shall promptly provide the Collateral Agent, the Noteholders, each Swap Counterparty, any Short Term Note Dealers and each Rating Agency with notice of such Event of Default or the Potential Event of Default, if such Notes are represented by a global note, by telephone, facsimile and electronic mail, and, if such Notes are represented by Definitive Notes, by first class mail.

Ex. F1 § 10.4. There can be no dispute that a BoA Trust Officer had actual knowledge of Ocala's insolvency.[7] Matthew Smith, the BoA officer who certified each of the Borrowing Base Certificates at issue, identified himself as a Trust Officer. See, e.g., FAC ¶ 111.

---

[6] Moreover, the "issue" raised by BoA is a quintessential fact question not susceptible of resolution on a motion to dismiss.

[7] The term "Trust Officer" is defined as: "any trust officer, or any officer customarily performing functions similar to those performed by the person who at the time shall be such officers and is assigned to the Corporate Trust Office, or to whom any corporate trust matter is

BoA argues that, assuming it violated the notice requirement of Section 10.4 of the Indenture, Section 10.1 of the Indenture immunizes it from liability because "Section 10.1 makes clear that there shall be <u>no liability</u>, and that knowledge <u>shall not be imputed</u>, absent 'written notice' of the relevant Event of Default to BoA."  MTD at 28.  Thus, BoA appears to argue that although it had a duty to notify BNPP of Ocala's insolvency and it failed in that duty, BoA cannot be held liable because it never received "'written notice' of the relevant Event of Default."  <u>Id</u>.  This argument is wrong for at least ten reasons.

<u>First</u>, it is important to review the entire provision rather than merely the selective portion quoted by BoA.  Section 10.1(a) states <u>in its entirety</u> as follows:

> Section 10.1   <u>Duties of the Indenture Trustee</u>.  (a) If an Event of Default has occurred and is continuing, the Indenture Trustee shall exercise such of the rights and powers vested in it by this Base Indenture and the Facility Documents, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs; *provided, however*, that the Indenture Trustee shall have no liability in connection with any action or inaction taken, or not taken, by it upon the deemed occurrence of an Event of Default of which a Trust Officer has not received written notice; and *provided, further*, that the preceding sentence shall not have the effect of insulating the Indenture Trustee from liability arising out of the Indenture Trustee's negligence or willful misconduct.

Thus, by its own terms, this Section provides that BoA is not insulated "from liability arising out of the Indenture Trustee's negligence or willful misconduct."  Ex. F1 § 10.1(a).  BoA's failure to inform BNPP of Ocala's insolvency and other Potential Events of Default, of which BNPP alleges BoA had actual knowledge, unquestionably constitutes an allegation giving rise to "liability arising out of the Indenture Trustee's negligence . . . ."  <u>Id</u>.  The Amended Complaint thus amply alleges that BoA is liable for its negligent conduct.  FAC ¶¶ 134-46, 200-04.

---

referred because of his knowledge of and familiarity with a particular subject, or any successor thereto responsible for the administration of the Base Indenture."  Ex. F2 at 43.

Second, the written notice provision of Section 10.1(c)(iv) – which states that the Indenture Trustee "shall not be charged with knowledge of any default under any Facility Document, unless a Trust Officer of the Indenture Trustee receives written notice of such a default" – cannot be read in a vacuum.  It must be understood in the context of the Indenture as a whole.  Section 10.1(c)(ii) expressly provides that the Indenture Trustee "may not be relieved from liability for its own negligent action, [or] its own negligent failure to act" where "the Indenture Trustee was negligent in ascertaining the pertinent facts."  Ex. F1 § 10.1(c)(ii).  Indeed, the Indenture is replete with provisions which expressly recognize that the Indenture Trustee shall be held liable for its negligence or willful misconduct.  Ex. F1 §§ 10.1(a), 10.1(b), (c)(i) & (ii).[8]  Again, the Amended Complaint alleges that BoA is liable for its negligent conduct.  FAC ¶¶ 134-46, 200-04.

Third, Section 10.1(a) is limited to circumstances where "an Event of Default has occurred and is continuing."  Ex. F1 § 10.1(a).  Section 10.1(c)(iv) is similarly limited to circumstances where there was a "default under any Facility Document."  Ex. F1 § 10.1(c)(iv).  Neither deals with circumstances prior to the declaration of an Event of Default, when BoA has a duty to inform the Noteholders of a Potential Event of Default.  Ex. F1 § 10.4.

Fourth, BoA's construction would mean that it is only required to provide BNPP with notice of a Potential Event of Default if it receives written notice of an Event of Default.  This is nonsensical.  Potential Events of Default include "any occurrence or event which, with the giving of notice, the passage of time or both, would constitute an Event of Default."  Ex. F2 at 24.  Thus, according to BoA, it is only required to give BNPP notice of a Potential Event of Default,

_____

[8]  The exculpatory provisions cited by BoA in Section 10.2 have no effect on BoA's liability for its negligence or willful misconduct under Section 10.1.  See Ex. F1 § 10.2 (providing for rights of Indenture Trustee "[e]xcept as otherwise provided by Section 10.1").

i.e., an event that with the giving of notice would be an Event of Default, if it receives written

notice of such an event.  Simply put, BoA's position makes no sense.

Fifth, BoA's construction is also contrary to the plain language of the Indenture, which

treats actual knowledge and written notice as two distinct concepts.  See Ex. F1 § 10.4 ("if a

Trust Officer of the Indenture Trustee receives written notice or has actual knowledge")

(emphasis added); § 9.1(a) & (b) ("written notice or actual knowledge thereof") (emphasis

added); see also Ex. A § 8.01 at 37.  If, as BoA argues, actual knowledge also requires written

notice, then there is no distinction between written notice and actual knowledge and the

Indenture's reference to actual knowledge is superfluous.  Clearly, the parties did not intend for

the two terms to be redundant.[9]

Sixth, it would defy common sense if, as BoA contends, the language in Section 10.1

precludes liability where the Indenture Trustee has actual knowledge of a default and fails to act,

but permits liability under identical circumstances where the Indenture Trustee merely is

negligent in ascertaining the facts or receiving written notice of a default.  In either case, BoA

cannot argue that its negligence or failure to act upon obtaining actual knowledge of a Potential

Event of Default absolves it of liability.  See In re Bankers Trust Co., 450 F.3d 121, 127 (2d Cir.

2006) (per curiam) (indenture trustee could not "take advantage of its own wrong" in failing to

take steps required under indenture to learn of defaults, so that it could then claim it lacked

knowledge of the default and therefore had no duty to notify noteholders of the default).

_____

[9]  Construing the Indenture as BoA suggests would also read a conflict into the contract
between Sections 10.1 and 10.4 that need not exist.  "[W]here two seemingly conflicting contract
provisions reasonably can be reconciled, a court is required to do so and to give both effect."
Perlbinder v. Bd. of Mgrs. of 411 E. 53rd St. Condominium, 886 N.Y.S.2d 378, 381 (N.Y. App.
Div. 2009) (internal quotation marks omitted); see also id. ("An interpretation that gives effect to
all the terms of an agreement is preferable to one that ignores terms or accords them an
unreasonable interpretation."); accord Restatement (Second) of Contracts § 236(a) (1979).

Seventh, BoA's interpretation is inconsistent with New York law, in that it would act as an implied release of liability for BoA's negligent, reckless or intentional failure to declare or respond to an Event of Default or Potential Event of Default where it has actual knowledge, but has received no "formal" written notice.  New York courts strictly construe and give no effect to clauses exculpating a party for its willful misconduct or reckless indifference to another party's rights, and clauses exculpating an indenture trustee from its own negligence or lowering the applicable standard of care must be express and unequivocal.  Sommer v. Fed. Signal Corp., 593 N.E.2d 1365, 1370-71 (N.Y. 1992); N.Y. State Med. Care Facilities Fin. Agency v. Bank of Tokyo Trust Co., 621 N.Y.S.2d 466, 469-70 (N.Y. Sup. Ct. 1994).

Eighth, the "written notice" requirement of Section 10.1 of the Indenture does not apply to an Event of Default triggered by actual knowledge of insolvency.  Section 9.1 of the Indenture provides that "[n]otwithstanding anything in this Base Indenture to the contrary, in the event that an Indenture Event of Default" resulting from Ocala's insolvency "occurs and is continuing," the Indenture Trustee is obligated to shut down the Facility and provide the Secured Noteholders with written notice of such an event.  Ex. F1 § 9.1 at 50.  New York law instructs that the language "[n]otwithstanding anything in this Base Indenture to the contrary" trumps all other provisions, including Section 10.1.  See Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 90-91 (2d Cir. 2002) (holding phrase "'[n]otwithstanding anything herein contained to the contrary' . . . overrides any inconsistent language elsewhere" in the contract).

Ninth, BoA did have written notice in the form of Borrowing Base Certificates, which showed on their face that Ocala was insolvent, and which BoA not only received but reviewed and certified on a monthly basis.  Indeed, it was BoA's repeated certification of this document and its failure to notify BNPP of Ocala's insolvency that allowed the fraud to go undetected by

BNPP until August 2009.  There is no requirement in the Indenture that "written notice" must be "formal" or conform to the format and content of the letters BNPP and DB provided in August 2009.  Rather, "written" or "in writing" is defined as "<u>any form of written communication, including, without limitation,</u> by means of telex, telecopier device, computer, telegraph or cable." Ex. F2 at 44 (emphasis added).  Formality is neither required nor even implied by this definition or the parties' prior conduct.  <u>See</u> <u>Phillips Petroleum Co. v. Rexene Corp.</u>, No. 95-1451, 82 F.3d 435, 1996 WL 137536, at *2 (Fed. Cir. Mar. 27, 1996) (unpublished) (holding provision requiring "written notice of . . . default" did not require "formal" or "heightened" notice, references to the agreement or its default provisions, or even the word "default"; refusing to imply such requirements existed in a commercial contract between parties with equal bargaining power, whether based on other contract provisions or extrinsic evidence of prior party conduct).

<u>Finally</u>, BoA's cited authorities are inapposite and involve distinguishable contract language, providing no guidance on whether the plain text of the Indenture triggered BoA's duties upon its actual knowledge of a default.  <u>See</u>, <u>e.g.</u>, <u>Putnam High Yield Trust v. Bank of N.Y.</u>, 776 N.Y.S.2d 796, 796 (N.Y. App. Div. 2004) (indenture explicitly defined "actual knowledge" as requiring written notice and specified the content of a written notice); <u>Argonaut P'ship L.P. v. Bankers Trustee Co. Ltd.</u>, No. 96 Civ. 1970, 2001 WL 585519, at *2 (S.D.N.Y. May 30, 2001) (indenture provided that only "written notice" triggered indenture trustee's duties regarding an event of default; written notice provision applied "for all purposes of this Indenture"; and written notice provision trumped the trustee's liability for any negligence or

willful misconduct);[10] <u>UBS Capital Am. II, LLC v. Highpoint Telecomms. Inc.</u>, No. 01 CIV.

8113, 2002 WL 377537, at *4-*5 (S.D.N.Y. Mar. 8, 2002) (no "actual knowledge" provision;

contract expressly specified content of written notice requiring description of "Purchase

Events"); <u>Magten Asset Mgmt. Corp. v. Bank of N.Y.</u>, 841 N.Y.S.2d 219, 2007 WL 1326795, at

*4-*7 (N.Y. Sup. Ct. May 8, 2007) (no "actual knowledge" provision, case centered on the

meaning of an "admission of inability to pay debts as they became due").   In this case, the

Indenture expressly provides that actual knowledge of even a <u>Potential</u> Event of Default triggers

both BoA's duty to notify BNPP, as well as its post-default duties, and further provides that BoA

is liable for its negligence in performing those duties.   <u>See</u> Ex. F1 §§ 10.1(a), 10.1(c)(ii), 10.4.

Moreover, here, the Borrowing Base Certificates provided BoA with "written notice" of the

Event of Default.   Thus, the cases on which BoA relies are at odds with the authority discussed

above and do not assist in assessing the plain language of the Indenture.

### B.   BoA's Failure to Declare a Potential Event of Default Breached the Indenture

Independent of BoA's duty under Section 10.4 to notify BNPP of a Potential Event of

Default or an Event of Default, BoA was obligated to declare an automatic Event of Default as

soon as it became aware of Ocala's insolvency.  Ex. F1 § 9.1(f) & (h).  As discussed <u>supra</u>, pp.

15-16, Section 9.1 of the Indenture provides that "[n]otwithstanding anything in this Base

Indenture to the contrary, in the event that an Indenture Event of Default" resulting from Ocala's

insolvency "occurs and is continuing," the Indenture Trustee is obligated to shut down the

---

[10]   The distinguishable indenture in <u>Argonaut</u> was also at issue in <u>Nacional Financiera,</u>
<u>S.N.C., v. Bankers Trustee Co. Ltd.</u>, Index No. C121131/98 (N.Y. Sup. Ct. Nov. 13, 2000).   Ex.
V.

Facility and provide the Secured Noteholders with written notice of an Event of Default.[11]  Ex.
F1 § 9.1 at 50.

As the court in <u>Beck v. Manufacturers Hanover Trust Co.</u>, 632 N.Y.S.2d 520, 527 (N.Y.

App. Div. 1995) (emphasis added), explained:

> It simply does not accord with sound public policy or the ostensible purposes for which an indenture is made and relied upon by its beneficiaries, to allow indenture trustees the benefit of broad exculpatory provisions to excuse their failure to exercise those powers they possess pursuant to the indenture prudently in order to mitigate or obviate the consequences of default.  The fundamental and highly salutary purpose of a bond indenture is to secure payment of the underlying obligation.  <u>If, however, an indenture trustee is under no enforceable obligation to act prudently to preserve and manage the trust assets in the event of default, and so to provide some reasonable assurance that the bondholders eventually receive their due, it may be asked whether the indenture does in fact secure the payment of anything</u>.

An indenture trustee who can ignore actual knowledge of an Event of Default or Potential

Event of Default "is under no enforceable obligation to act prudently to preserve and manage the

trust assets in the event of default."  <u>Id</u>.  An indenture trustee facing a Potential Event of Default

should act, particularly where, as here, action is mandated by the Indenture itself.  <u>See</u> Robert I.

Landau & Romano I. Peluso, CORPORATE TRUST ADMIN. & MGMT. 88 (6th ed. 2008) ("If a

situation arises where it is imperative that action be taken, the trustee should consult with

counsel, and every effort should be made to find an indenture provision on which to base such

action."); <u>see also</u> <u>In re Bankers Trust Co.</u>, 450 F.3d at 127; <u>Chem. Bank & Trust Co. v.</u>

<u>Prudence-Bonds Corp. (New Corp.)</u>, 207 F.2d 67, 80-81(2d Cir. 1953) (indenture trustee was

liable for releasing cash from a trust fund where it had "full knowledge" of a default, despite

---

[11]  The language "[n]otwithstanding anything in this Base Indenture to the contrary" trumps all other provisions and renders the exculpatory provisions of Section 10.1 inapplicable. <u>See</u> <u>Int'l Multifoods Corp.</u>, 309 F.3d at 90-91; <u>supra</u>, p. 16.

receiving conforming written notices from the issuer stating that "none of the securities deposited in the Trust Fund are in default").

### C.   BoA Breached its Fiduciary Duty to BNPP

For the same reasons, BoA's argument seeking dismissal of BNPP's breach of fiduciary duty claim fails.  MTD at 34-36.  BoA's post-default duties were triggered by its "actual knowledge" or "written notice," not "formal written notice" of Ocala's insolvency, and BoA remains liable for negligence and willful misconduct in failing to declare and respond to a default.[12]  After an event of default, the indenture trustee's fiduciary duties expand "by operation of New York common law," LNC Invs., Inc. v. First Fid. Bank, N.A., 935 F. Supp. 1333, 1347-48 (S.D.N.Y. 1996), such that "fidelity to the terms of an indenture does not immunize an indenture trustee against claims that the trustee has acted in a manner inconsistent with his or her fiduciary duty of undivided loyalty to trust beneficiaries," and "the indenture trustee's obligations come more closely to resemble those of an ordinary fiduciary, regardless of any limitations or exculpatory provisions contained in the indenture," Beck, 632 N.Y.S.2d at 520, 527-28.

## II.   BoA BREACHED THE SECURITY AGREEMENT

BoA contends that any meaningful duties in the Security Agreement were "assigned squarely to either Ocala or TBW, and BoA expressly has no duty to monitor TBW's or Ocala's compliance with these requirements."  MTD at 37.  This fox-in-charge-of-the-henhouse way of

---

[12]  Language in the Indenture and Security Agreement similarly recognizes the fiduciary nature of BoA's duties, giving rise to fiduciary duties independent of the contracts.  See, e.g., Ex. F1 § 10.1(a); Ex. A § 6.02 at 34; see also Pan Am Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 511 (S.D.N.Y. 1994) ("A fiduciary duty between two parties may exist independent of their contractual relationship."); Frydman & Co. v. Credit Suisse First Boston Corp., 708 N.Y.S.2d 77, 79 (N.Y. App. Div. 2000) (reinstating breach of fiduciary duty claim in connection with investment banking services where agreement provided that "legal obligations would not arise 'by virtue of this agreement' except as specifically agreed to therein" and duty did not exist by virtue of agreement).

thinking may explain why BoA permitted billions of dollars to be siphoned from the Collateral

Account through plainly inappropriate fund transfers and mortgage transactions made by

unauthorized persons, but, unsurprisingly, the Security Agreement expressly requires more from

the Collateral Agent.  Section 5.01 of the Security Agreement gives the Collateral Agent

"complete dominion and control" over the Collateral Account.  Ex. A § 5.01 at 15.  Neither Ocala

nor TBW controlled the Collateral Account, nor would such control make any sense in a Security

Agreement designed to protect the Noteholders' right of repayment.[13]  The remainder of the

Security Agreement, as well as other Facility Documents, confirm BoA's control.[14]  Moreover,

Section 6.02 of the Security Agreement and U.C.C. Section 9-207 – which the Security

Agreement expressly incorporates – require BoA to use reasonable care in the custody and

preservation of the Assigned Collateral and Collateral Account for BNPP's benefit, and thus

obligate BoA to do more than blindly or mechanically process Ocala's requests.  Ex. A § 6.02.

---

[13]  BoA seeks to trivialize its role under the Security Agreement by asserting the self-
evident proposition that it did not serve as investment banker, insurer, auditor or manager of
Ocala.  MTD at 1-2.  BNPP does not contend otherwise.  But BoA did serve as Collateral Agent
among its many roles.  Its obligations in that regard are governed by the Security Agreement,
which states its purpose is to "secur[e] and provid[e] for the repayment of all amounts at any
time and from time to time owing by the Issuer" to BNPP.  Ex. A at 1 (emphasis added).  BoA's
suggestion that only Ocala has duties and obligations under the Security Agreement is absurd on
its face and counter to the core purpose of the Agreement itself.  If – as BoA would have this
court believe – Ocala had the unfettered right to do whatever it wanted with BNPP's money, how
did entering into the Security Agreement with BoA secure the repayment of the Secured Notes?
What protection did it offer in BoA's alternate universe?

[14]  See Ex. A §§ 4.01 at 8 (granting the "Collateral Agent for the benefit of each Secured
Party . . . a security interest in, control over, and lien on" the Assigned Collateral) (emphasis
added), 5.02 at 16 ("[T]he Collateral Agent shall be a pledgee in possession and control of the
Deposited Funds and shall have the sole and exclusive right to . . .  withdraw or order a transfer
of Deposited Funds from the Collateral Account subject to the provisions of Section 5.03")
(emphasis added); see also Ex. F1 § 3.1(a) & Ex. C § 2 (providing Collateral Account "shall be
under the Collateral Agent's exclusive dominion and control") (emphasis added).

**A.      The Security Agreement Only Permitted BoA to Transfer Funds from the Collateral Account for Approved Purposes**

Sections 5.01 and 5.03 of the Security Agreement require BoA to monitor Ocala's requests to ensure they comply with the Security Agreement and Facility Documents.  Section 5.01 exclusively permits the Collateral Agent to "make" withdrawals from the Collateral Account, and merely allows the Issuer, Indenture Trustee or Depositary to "request" withdrawals "in accordance with the terms of Section 5.03."[15]  Ex. A § 5.01 at 15, 16 (emphasis added).  Contrary to BoA's current position, Section 5.01 does not characterize such "requests" as irrefutable orders or instructions that BoA must blindly obey.  Indeed, the requirement that the Collateral Agent first approve instructions stands in stark contrast to the requirement that the Indenture Trustee and Paying Agent must "promptly follow" payment instructions.  Compare Ex. A § 5.01 at 20, with Ex. F1 § 4.1(c) at 33.  Importantly, Section 5.03 of the Security Agreement instructs that payment requests by Ocala may be approved only:  (i) when there is no Event of Default; (ii) where the request is made "according to the Facility Documents" for specifically enumerated "purposes" in the "order of priority" dictated by Section 5.03, which includes the purchase of additional mortgage loans; and (iii) where the borrowing base test is met.  Ex. A §§ 5.01, 5.03 at 16, 20, 21, 26.

First, as discussed above, BoA had actual knowledge of Ocala's insolvency, which is an Indenture Event of Default, at least as early as June 30, 2008, and therefore each of BoA's transfers from the Collateral Account violated Section 5.03.

---

[15]  Section 5.03 of the Security Agreement allows Ocala to "instruct according to the Facility Documents the Collateral Agent to withdraw, or order the transfer of" funds but such instructions must be "approved instructions . . . in accordance with the provisions of" Section 5.03 and must in BoA's "professional judgment" be "genuine and correct."  Ex. A §§ 5.01 & 8.01.

Second, Section 5.03 only allows the disbursement of funds for specifically enumerated purposes, which includes the purchase of new mortgage loans.  BoA's transfer of funds to accounts at TBW for purposes other than the purchase of new mortgages violated this requirement.[16]  FAC ¶¶ 122-27.

Third, BoA improperly transferred cash without taking any steps to verify that the borrowing base test had been met.  The language of Section 5.03 plainly refutes BoA's assertion that it was not required to verify performance of the borrowing base test, providing:  "no withdrawals from the Collateral Account shall be made" unless the ensuing borrowing test is met.  Ex. A § 5.03 at 20 (emphasis added).  This provision does not refer to withdrawals being requested, but to withdrawals being made.  Ocala could request the withdrawal of funds, but only BoA was authorized to "make" withdrawals from the Collateral Account.  See Ex. A §§ 5.01 at 15, 5.03 at 20, 26, 27.  BoA thus had to verify that a borrowing base test was satisfied before disbursing funds.

The Security Agreement also expressly requires BoA to control and reconcile the Collateral Account, even independent of the obligations in Section 5.03.  Section 6.02 of the Security Agreement and U.C.C. Section 9-207, for example, require BoA to use reasonable care in the custody and preservation of the Assigned Collateral and Collateral Account.  See Ex. A § 6.02.  To do so, BoA would have to undertake some form of reconciliation, even if it did not take

_____

[16]  The bailee letters sent by Colonial Bank to BoA included specific account numbers to which funds were to be wired for the purchase of loans for the Facility.  Until funds were wired to those accounts, Ocala did not own the mortgage loans it had received pursuant to the bailee letters.  Thus, by sending funds to the wrong accounts, or accounts not listed in the bailee letters, BoA effectively was disbursing funds for an improper purpose and negating the transaction, insofar as it did not receive new mortgage loans in return for the disbursements.  BoA cannot reconcile its inattention to this critical detail with its obligation to use reasonable care to secure the collateral.

23

the form of a borrowing base test.  Thus, regardless of whether Ocala had a duty to perform a borrowing base test before <u>requesting</u> funds, BoA had a duty to verify the borrowing base test had been met, if not perform the test itself, before <u>disbursing</u> funds.  Section 6.02's requirement of reasonable care in preserving the collateral, and Section 8.01's requirement that BoA comply only with requests BoA "<u>reasonably believed by it in its professional judgment to be genuine and correct</u>," and thus made "in accordance with Section 5.03," thereby mandated that BoA take whatever steps necessary to exercise that reasonable care, including ensuring that no collateral left the Facility without being replaced by other collateral of at least equal value.  Ex. A §§ 5.01 at 15, 6.02 at 34, 8.01 at 37 (emphasis added).  To do that, as Section 5.03 recognizes, BoA had to monitor requests for the release of funds to determine the purposes for which those funds would be used.

BoA was also required to be capable of verifying that such a test was met, if not performing the test itself.  BoA does not dispute that it was required to certify the Borrowing Base Certificate when BNPP rolled its notes.  BoA could simply have used any appropriate method it had in place to comply with its certification of the borrowing base on the roll dates.  Further, contrary to BoA's suggestion that only TBW and Ocala could know "precisely what assets were owned by Ocala on that date and the precise status of the outstanding mortgage loans," MTD at 46, a claim irreconcilable with BoA's certification of the Borrowing Base Certificates, it would have been easier for BoA to perform the borrowing base test than for Ocala to do it.  BoA had the mortgages in its possession and the cash in its accounts.  BoA received detailed reports from TBW about the mortgages that it was holding and BoA had actual control

over the collateral.[17]  And, as discussed next, the Security Agreement provides a minimum

waiting period of four hours, during which time BoA could test the borrowing base using the

exact same information Ocala possessed.[18]

### B.   BoA Had Ample Time to Review and Approve Ocala's Transfer Requests

The Security Agreement deliberately provides BoA ample time to monitor and evaluate

funds transfer requests and, more importantly, it gives BoA the right and obligation to reject

requests made contrary to the purposes presented in Section 5.03.  Section 5.03 provides:  "[t]he

Collateral Agent shall promptly comply with any such approved instructions made by the Issuer

[or Depositary] . . . in accordance with the provisions of the foregoing paragraphs of this Section

5.03; provided that any withdrawal and transfer pursuant to an instruction received prior to 2:00

p.m. New York City time on any day shall be made on such day."  Ex. A § 5.03 at 20, 26

(emphasis added).

Thus, (i) BoA could honor only an "approved" instruction, that is, an instruction in

accord with the purposes of the Ocala Facility and Section 5.03, as confirmed by BoA; and (ii)

---

[17]  To the extent loans were out on bailee letter, BoA had a duty to track those bailee letters under Section 6.02 of the Security Agreement and Sections 6 and 8 of the Custodial Agreement, thus enabling it to perform the borrowing base test.  See Ex. A § 6.02; Ex. D §§ 6(b)(i), 8.

[18]  BoA argues that Section 8.01 of the Security Agreement evidences an intent to exempt it – as opposed to Ocala – from the obligations under Section 5.03.  BoA is wrong.  Section 8.01 provides as follows:

> The Collateral Agent shall be entitled to assume that no Indenture Event of Default under the Indenture shall have occurred and be continuing, **unless an officer of the Collateral Agent charged by the Collateral Agent with the administration of any of its obligations under this Agreement or with knowledge of and familiarity with the Collateral Agent's obligations under this Agreement has actual knowledge thereof** . . . .

Ex. A § 8.01 at 37 (emphasis added).  Thus, where – as here – BoA had actual knowledge of Ocala's insolvency, BoA was not entitled to assume the absence of an Event of Default.

honor the request the same day <u>only</u> where made prior to 2:00 p.m., although, in any event, payment for the purchase of new mortgages was not due until 6:00 p.m.  Ex. I § 2.4.[19]  Contrary to BoA's assertion that it lacked time to determine the propriety of a transfer request, it had a <u>minimum</u> of four hours to confirm the propriety of any request.  That such instructions were "effective upon receipt," <u>see</u> Ex. A § 5.03 at 20, means nothing more than that BoA need not do anything until it receives instructions, <u>see</u>, <u>e.g.</u>, <u>Profit v. Baum</u>, No. 3:96CV1205 JCH, 2000 WL 502697, at *7 (D. Conn. Mar. 21, 2000) ("effective upon receipt" clause determined when receiving party's duty was triggered), but it says nothing about <u>how</u> BoA must respond to such instructions and cannot reasonably be construed as requiring absolute compliance in disregard of other express requirements in Sections 5.01 and 5.03.

The Facility Documents also require TBW to provide BoA with notice of loan purchases and regular reports, which serve no purpose unless BoA was monitoring TBW's compliance with the Security Agreement before releasing funds from the Collateral Account.  <u>See</u> Ex. I § 14.1 at 65 ("[T]he Purchaser and the Seller shall each report to and correspond and communicate with the Collateral Agent and in all other regards treat the Collateral Agent as the purchaser hereunder with respect to the Mortgage Loans."); <u>see</u> <u>also</u> <u>id</u>. §§ 2.1(a) ("The Seller shall provide notice to the . . . Collateral Agent . . . not later than 3:00 P.M. New York City Time on any Closing Date, of its intention to sell a Portfolio to the Purchaser pursuant to a Transfer Supplement. . . .  In such notice, the Seller shall inform the Purchaser of the aggregate principal balance of the Mortgage

---

[19]  BoA observes that it is not a party to the Purchase Agreement.  MTD at 39 n.11.  BoA fails to mention that under Section 14.1 of the Purchase Agreement, all of Ocala's rights in the Purchase Agreement were assigned to BoA, in its capacity as Collateral Agent:  "[T]he Purchaser and the Seller shall each treat the Collateral Agent as the Purchaser under this Purchase Agreement and each consent to such assignment and acknowledge that the Collateral Agent shall enjoy the Purchaser's rights under this Purchase Agreement."  Ex. I § 14.1 at 65.

Loans that it intends to sell on such date."), 4.24 (Daily Report), 4.26 (Repurchase Report), 14.1 at 66 ("All amounts due the Purchaser under this Purchase Agreement shall be remitted to the Collateral Agent in accordance with the Collateral Agent's instructions and in accordance with this Purchase Agreement."); Ex. D §§ 4, 20 & Ex. A (Certification With Respect To The Transfer Supplement), § 9 (List of Loans).

Given the time and information necessary to monitor and evaluate transfer requests, Section 8.01 of the Security Agreement provides BoA with the right and <u>obligation</u> to refuse inappropriate transfer requests from Ocala.  Section 8.01 instructs that BoA may comply with Ocala's requests only where BoA "<u>reasonably believe[s]</u> . . . <u>in its professional judgment</u>" such instructions are "<u>genuine and correct</u>" and "signed or sent by the proper Person or Persons,"[20] necessitating BoA's "professional" and "reasonable" evaluation of all instructions, and barring its compliance with unreasonable, incorrect or unauthorized instructions.  Ex. A § 8.01 at 37 (emphasis added).  Thus, even if BoA was relying on Ocala's certification of the borrowing base, it still could not follow improper instructions from unauthorized persons without incurring liability.  Section 8.01 also gives BoA an out, providing that the "Collateral Agent shall be fully justified in failing or refusing to take any action under this Agreement upon the advice of counsel or unless the Collateral Agent shall be indemnified to its satisfaction against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such

---

[20]  BoA brazenly asserts that its undisputed breach of its duty to comply with transfer requests <u>only</u> from authorized Issuer Agents under Security Agreement Sections 3.03, 5.03 and 8.01 does not matter and caused no "plausible" harm.  MTD at 51-53.  BoA's breach of this duty effectively allowed <u>any</u> person at TBW or Ocala to withdraw funds from the Collateral Account, which is plainly inimical to the purpose and express provisions of the Security Agreement, and <u>in fact</u> drained the collateral account of value and plausibly permitted <u>unauthorized</u> persons to work with <u>authorized</u> persons at TBW to commit the very fraud that destroyed the Facility.  <u>See</u> FAC ¶¶ 110-13, 153, 157.

action."  Id.  Most importantly, Section 8.01's exculpatory provisions, selectively quoted by BoA, see MTD at 40-41, do nothing to diminish these express duties.  Indeed, Section 8.01 renders BoA liable for its negligence in failing to perform these duties, regardless.[21]  See Ex. A § 8.01 at 36-37 (barring implied duties or liability "except as expressly provided herein"; "unless otherwise provided herein"; "other than those for which express provision is made herein" or "[e]xcept as required by the specific terms of this Agreement") (emphasis added).[22]  BoA thus had the time, information and obligation to evaluate and reject inappropriate transfer instructions from Ocala.

Notably, BoA's current position that it had no duty or time to review Ocala's transfer requests to make sure they were for approved transactions is contradicted by Ocala's and BoA's contemporaneous conduct during the existence of the Facility.  As alleged in the Amended Complaint, Ocala initiated a transfer request by requesting BoA's "review and approval" of a wire transfer, which BoA regularly "[a]pproved."[23]  FAC ¶¶ 111-12.

---

[21]  Contrary to BoA's contentions, see MTD at 54-56, the FAC raises no separate or extra-contractual claim for negligence.  The claims are grounded in the Security Agreement, which expressly makes BoA liable for its negligent breach of its express duties.  See Ex. A §§ 4.10, 8.01.

[22]  In light of these exceptions to the exculpatory provisions, Banco Espanol de Credito v. Security Pacific Nat'l Bank, 763 F. Supp. 36, 39 (S.D.N.Y. 1991), and Bayerische Hypo-Und Vereinsbank AG v. Banca Nazionale Del Lavoro, S.p.A., 292 B.R. 752, 770 (Bankr. S.D.N.Y. 2003) are inapposite.  Neither of the provisions BoA quotes from the agreement in Banco Espanol, in particular, exists in Section 8.01, because Section 5.03 expressly obligated BoA to monitor Ocala's compliance with the Security Agreement in performing its own duties.

[23]  The time stamps on the emails between TBW and BoA indicate that it took BoA all of five minutes to review and approve 382 loans worth over $75 million.  On June 30, 2008, at 3:45 p.m. EDST, Desiree Brown of TBW sent a wire request and a detailed list of 382 loans to Mark Medina of BoA for his "review and approval."  FAC ¶ 111.  At 3:50 p.m. EDST, Mark Medina responded "[a]pproved."  Id.  BoA approved the wire transfer in five minutes even though the wire request came after "2:00 p.m. New York City time" and BoA had until the next day to review, approve and transfer the requested funds.  Ex. A. § 5.03(a).

### C.   BoA Failed to Segregate Ocala's Mortgages and Cash

BoA's final argument that it had no duty to segregate loans and cash held as collateral or to transfer funds to or from particular or <u>correct</u> collateral accounts is baffling, but consistent with BoA's theme of being a Collateral Agent with no duties concerning any collateral.  MTD at 43, 47-48.  BoA acknowledges that it was required to open and maintain separate collateral sub-accounts for BNPP and DB, <u>see</u> Ex. A § 5.01 at 13, and that BoA received funds from TBW earmarked for BNPP or DB as payments for loans assigned to BNPP or DB, but then claims that it was <u>not</u> required to take the only reasonable and logical final step in that process, which was to actually deposit the funds into the proper segregated accounts.  MTD at 47.  This contention is wholly inconsistent with BoA's obligations under the Facility Documents.

<u>First</u>, BoA has to be the party responsible for the Section 5.01 "shall be deposited in the sub-account of the Collateral Account" duty because BoA was the only party with control over the Collateral Accounts and was the only party that had authority to transfer funds from the Collateral Account or between the Collateral Account and the subaccounts.  The fact that Ocala may also have a duty to segregate the funds among the sub-accounts does not relieve BoA of its responsibility.

<u>Second</u>, all funds remitted to the Collateral Account and the subaccounts accounts were done according to BoA's instructions.  Section 14.1 of the Purchase Agreement provides that "[a]ll amounts due the Purchaser under this Purchase Agreement shall be remitted to the Collateral Agent in accordance with the Collateral Agent's instructions and in accordance with this Purchase Agreement."  Ex. I § 14.1 at 66.

<u>Finally</u>, BoA claims that Section 5.01 of the Security Agreement only requires that "there shall be deposited" funds in the account without stating which party is responsible for such deposits.  BoA then argues that Section 8.01's bar on any implied duties on BoA means no duty

was breached.  See MTD at 48; Ex. A §§ 5.01 at 14-15, 8.01.  BoA is wrong.  Section 8.01 mandated, not implied, let alone obviated, BoA's duty to deposit funds into appropriate accounts, ("The Assigned Collateral held by the Collateral Agent in trust hereunder need not be segregated from other collateral except to the extent required by law or the specific provisions hereof."), Ex. A § 8.01 at 37 (emphasis added), which was also mandated by federal law.  See 12 C.F.R. § 9.13(b) ("Separation of fiduciary assets.  A national bank shall keep the assets of fiduciary accounts separate from the assets of the bank.  A national bank shall keep the assets of each fiduciary account separate from all other accounts or shall identify the investments as the property of a particular account, except as provided in § 9.18.").  Furthermore, Section 4.2 of the Purchase Agreement expressly requires that the funds "will be deposited into the applicable sub-account of the Collateral Account maintained by the Collateral Agent on the day of receipt," confirming BoA's duty to deposit funds into correct accounts under the Security Agreement.  Ex. I § 4.2 at 37.

In sum, the Security Agreement expressly requires BoA to act as one would reasonably expect a Collateral Agent should, but BoA plainly failed to meet those expectations or its express obligations, and its failure caused the evisceration of the Collateral Account.  Accordingly, BoA's motion to dismiss BNPP's claims under the Security Agreement should be denied.

## III. BNPP HAS STANDING TO SUE FOR BoA'S BREACHES OF THE DEPOSITARY AND CUSTODIAL AGREEMENTS

BoA next argues that even assuming it breached the Depositary and Custodial Agreements, the Noteholders are out of luck because they lack standing to sue BoA.  BoA's argument is wrong because as a matter of law BNPP and BNP Paribas have standing to sue BoA: (i) derivatively, by standing in the shoes of the Indenture Trustee; (ii) directly, under the various

indemnification provisions in the Facility Documents; and (iii) in BNP Paribas' capacity as Swap Counterparty.

### A.     BNPP Has Derivative Standing Under the Depositary and Custodial Agreements

Independent of BNPP's direct standing to sue BoA, see infra, BNPP has derivative standing through BoA, as Indenture Trustee and Collateral Agent, to bring suit against the Depositary and Custodian.  BoA, as Indenture Trustee, is a named beneficiary of the Depositary Agreement and, as Collateral Agent, is a party to the Custodial Agreement.  Ex. C § 15 ("This Agreement shall also inure to the benefit of the Indenture Trustee, which is hereby expressly declared to be a third-party beneficiary hereof"); Ex. D at 1.

In its roles as Indenture Trustee and Collateral Agent, BoA has a duty to "protect, preserve, and recover assets as necessary for Ocala."  BoA's Response to Emergency Motion to Dissolve Temporary Restraining Order dated August 24, 2009, Bank of Am. N.A. v. Colonial Bank, No. 09-14739 (S.D. Fla. 2009), at p. 3.  This duty currently requires BoA to sue itself in its role as Depositary and Custodian for its own breaches of the Depositary and Custodial Agreements.  For obvious reasons BoA has not and will not do so.  New York law is clear that in such circumstances BNPP can bring suit in BoA's stead.[24]  See Cruden v. Bank of N.Y., 957 F.2d

───────────────────

[24]  It is no bar to BNPP's derivative standing that Section 15 purports to prohibit non-parties other than the Indenture Trustee from enforcing the Agreement.  BNPP is suing as Indenture Trustee – a party with express third-party beneficiary status – not as a Noteholder.  New York state and federal courts have upheld derivative suits under these circumstances, and have found that "no-action clauses" like that in Section 15 do not impede actions by trust beneficiaries.  See In re New York City Hous. Dev. Corp., No. 86-CV-3274, 1987 WL 494921, at *8-*9 (S.D.N.Y. May 11, 1987) (clause prohibiting suit unless 25% of bondholders made demand upon bond trustee did not bar plaintiffs' action against bond trustee because fact that trustee ignored one plaintiff's demand for suit demonstrated futility of other plaintiffs making such demand); Campbell v. Hudson & Manhattan R. Co., 102 N.Y.S.2d 878, 881-83 (N.Y. App. Div. 1951) (because no-action clauses "are not imposed on the trustee or on bondholders acting in the status of the trustee," bondholder suit in right of trustee made unnecessary compliance

961, 969 (2d Cir. 1992) ("no action" clause did not bar suit against Indenture Trustees because "it would be absurd to require the debenture holders to ask the Trustee to sue itself"); Gould v. J. Henry Schroder Bank & Trust Co., 433 N.Y.S.2d 32, 34 (N.Y. App. Div. 1980) (holding "'no action' provisions of the indenture agreement . . . are no bar to bondholders' derivative actions arising out of the alleged breach of fiduciary duty by the indenture trustee"); accord Riviera Congress Assocs. v. Yassky, 223 N.E.2d 876, 879 (N.Y. 1966); Campbell, 102 N.Y.S.2d at 881-82; see also United Int'l Holdings, Inc. v. The Wharf (Holdings) Ltd., 988 F. Supp. 367, 373 (S.D.N.Y. 1997) (Sweet, J.).[25]

### B.   BNPP and BNP Paribas Have Standing Under the Indemnification Provision of the Custodial Agreement

The indemnification provision of the Custodial Agreement specifically grants standing to BNPP and BNP Paribas with respect to BoA's negligence in its capacity as Custodian.  This provision states:

> The Custodian hereby agrees to indemnify the Issuer, the Seller, the Servicer, each Swap Counterparty, their respective Affiliates, their respective directors, officers, trustees, employees and agents and their respective successors and assigns (each, an "Indemnified Party") against, and agrees to hold them harmless from, any and all claims, losses, liabilities, obligations, damages, payments, costs and expenses (including, without limitation, reasonable legal fees and expenses

with provisions of indenture requiring that 25% of bondholders request trustee that suit be instituted) (emphasis added).

[25]   BoA argues that "even if [BNPP] could stand in the shoes of the Indenture Trustee, the Court still would have to determine that Section 4(d) is a provision that the parties intended to be enforced by the Indenture Trustee – a conclusion simply not borne out by the Depositary Agreement itself."  MTD at 61.  First, the Depositary Agreement is crystal clear that BoA as Indenture Trustee is a third-party beneficiary of the entire agreement, without limitation.  Ex. C § 15. As BoA observes, the parties knew how to confer standing – including limited standing – when they wanted to.  MTD at 60.  Second, Section 4(d) undeniably inured to the benefit of the Indenture Trustee.  The Indenture Trustee relied on the Depositary's borrowing-base-certification duty as a condition precedent to issuing new notes in order to perform its own duty to monitor for Events of Default or Potential Events of Default.  See Ex. C § 4(d); Ex. H § 2.3(e); Ex. F1 § 9.1(e).

arising in connection therewith) which may be imposed on, incurred by or asserted against any Indemnified Party and resulting from the Custodian's negligence, lack of good faith or willful misconduct or the performance of or other breach of its obligations hereunder; <u>provided</u> that the Custodian shall not be liable for any portion of any such amounts resulting from the negligence or misconduct of the Issuer.

Ex. D § 17.  Although the term "Swap Counterparty" refers to BNP Paribas, and BNPP is an affiliate of BNP Paribas, BoA argues that neither BNPP nor BNP Paribas can sue for indemnification under this provision because BNP Paribas – the Swap Counterparty – has "not alleged <u>any injury</u>" in that capacity.  MTD at 64.  This argument fails under the text of the Custodial Agreement and New York law.

In the Custodial Agreement, BoA expressly and unambiguously agrees to indemnify "<u>each Swap Counterparty, [and] their respective Affiliates</u>" against "<u>any and all claims, losses</u> . . . ."  Ex. D § 17 (emphasis added).  Thus, BNP Paribas is entitled to indemnification as a Swap Counterparty and BNPP is entitled to indemnification as its affiliate.[26]  Furthermore, BNP Paribas is an express third-party beneficiary entitled to "enforce the provisions [of the Custodial Agreement] as if [it] were a party," and may sue under New York law to enforce BoA's indemnification duty to BNPP on BNPP's behalf, regardless.  <u>See</u> Ex. D § 25; <u>Control Data Sys., Inc. v. Computer Power Group, Ltd.</u>, No. 94 Civ. 5396, 1998 WL 178775, at *2-*3 (S.D.N.Y. Apr. 15, 1998).  Section 17 contains no further express or implied reference or limitation based

---

[26]  BoA's contention that the parties never intended to indemnify BNPP in its "capacity" as an "Affiliate" of a Swap Counterparty who was also a Noteholder is, in fact, wrong.  BNPP invested as a Noteholder and BNP Paribas hedged that position as a Swap Counterparty in a deliberate economic decision that reasonably relied on the additional contractual protections afforded to Swap Counterparties and their "Affiliates."  <u>See</u> Ex. D §§ 17 & 25.  This decision cannot be dismissed as fortuitous, since both parties held those roles during contract negotiations and at the Facility's inception in June 2008, and have maintained those roles ever since.

on the "capacity" of any Indemnified Party or their sustained losses, let alone any <u>specific</u>

exclusion relating to "affiliates" who are Noteholders.[27]

Moreover, given Section 17's plain language, BoA's cited cases dealing with the

existence or absence of express or construed "capacity" limitations distinctions are wholly

inapposite.  See <u>Haynes v. Kleinewefers & Lembo Corp.</u>, 921 F.2d 453, 456-57 (2d Cir. 1990)

(indemnification provision limited to liabilities incurred "in the ordinary course of business" did

not include personal injury claims arising from a "negligently modified" product); <u>Compania de</u>

<u>Vapores Arauco Panamena S.A. v. Moore-McCormack Lines, Inc.</u>, 91 F. Supp. 545, 549

(E.D.N.Y. 1950) (no indemnification provision existed in contract governing defendant's

stevedoring operation); <u>Bank of N.Y. v. River Terrace Assocs., LLC</u>, 804 N.Y.S.2d 728, 730

(N.Y. App. Div. 2005) (indemnification agreement spoke "only of losses that BNY incurs in its

capacity as agent"); <u>TIC Holdings, LLC v. HR Software Acquisitions Group, Inc.</u>, 755 N.Y.S.2d

19, 20 (N.Y. App. Div. 2003) (indemnification provision "appear[s]" to apply "only to the

manager's acts taken in his capacity as manager of plaintiff"); <u>Cohen v. Employers Reinsurance</u>

<u>Corp.</u>, 503 N.Y.S.2d 33, 34-35 (N.Y. App. Div. 1986) (indemnification provision expressly

limited to plaintiff's "capacity as a lawyer" and not "his capacity as co-trustee"); <u>Syvertsen v.</u>

<u>Great Am. Ins. Co.</u>, 700 N.Y.S.2d 289, 292-93 (N.Y. App. Div. 1999) (indemnification provision

expressly limited to claims arising out of "an accident . . . which results in bodily injury or

---

[27]  Instead, the Custodial Agreement states that, "<u>[n]otwithstanding anything to the</u>
<u>contrary contained in this Agreement</u>, the Custodian hereby acknowledges and agrees that all the
rights of the Issuer under this Agreement have been assigned to the Collateral Agent <u>for the</u>
<u>benefit of the Secured Parties</u> pursuant to the Security Agreement," which independently
demonstrates BoA's duties under the Custodial Agreement inured to BNPP's benefit as a
Noteholder.  Ex. D § 20 at 13; <u>Int'l Multifoods Corp.</u>, 309 F.3d at 90-91.

property damage neither expected nor intended" by plaintiff did not cover plaintiff's intentional acts).

### C.    The Indemnification Provision Covers BNPP and BNP Paribas' Claims

BoA next argues that the indemnification provision in the Custodial Agreement only applies to third-party claims and does not cover BNPP and BNP Paribas' first-party claims against BoA.

BoA's intent to cover first-party claims is "clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances." Hooper Assocs., Ltd. v. AGS Computers, Inc., 548 N.E.2d 903, 904-06 (N.Y. 1989).  BNP Paribas and BNPP held their roles as Swap Counterparty and "affiliate" Noteholder at the time the Custodial Agreement was negotiated and executed, and both parties have held those roles ever since.  Section 17's indemnification of "each Swap Counterparty" and their "affiliates" would be wholly meaningless in this context, if the language exclusively covered third-party claims, since there was no conceivable "third-party" claim that could have been brought against either BNP Paribas as a Swap Counterparty, or BNPP as an "affiliate" and Noteholder that would have been "resulting from the Custodian's negligence, lack of good faith or willful misconduct or the performance of or other breach of its obligations" under the Custodial Agreement.  See Pfizer, Inc. v. Stryker Corp., 348 F. Supp. 2d 131, 146 (S.D.N.Y. 2004) (because third-party claims were implausible in context of defendant's breach of warranty, indemnification was read to include inter-party claims); Promuto v. Waste Mgmt., Inc., 44 F. Supp. 2d 628, 652 (S.D.N.Y. 1999) (where "it is difficult to imagine a third-party action that could be brought against plaintiffs as a result of" defendant's actions for which plaintiff bore no responsibility, "the defendant's obligation to indemnify plaintiffs for all damages . . . associated with an action between the parties can be

clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances") (internal quotation marks omitted).

Further, as BNP Paribas was the only Swap Counterparty with any "affiliate," the language in the first sentence extending the indemnity to BNP Paribas' "[a]ffiliates, their respective directors, officers, trustees, employees and agents and their respective successors and assigns" would be meaningless surplusage if limited to losses suffered by BNP Paribas as a Swap Counterparty, refuting any such construction of the provision. Pfizer, 348 F. Supp. 2d at 146; Promuto, 44 F. Supp. 2d at 651-52; Sagittarius Broad. Corp. v. Evergreen Media Corp., 663 N.Y.S.2d 160, 161 (N.Y. App. Div. 1997); see also Hooper, 74 N.Y.2d at 493 (interpretation of indemnification provision must "afford[] a fair meaning to all of the language employed by the parties in the contract and leave[] no provision without force and effect").

Finally, the broadly-worded text of Section 17 requires BoA to indemnify BNPP "against . . . any and all [] losses . . . incurred by . . . any Indemnified Party [] resulting from the Custodian's negligence . . . ." Ex. D § 17.  The reference to "any and all" losses "incurred by" a Swap Counterparty and its Affiliates in the context of a secured debt facility unmistakably refers to first-party losses by the Swap Counterparty and its affiliates, for such "losses" would make no sense in a "third-party" claim context, and the broadly-worded provision contains no references intrinsically limited to third-party claims.[28]  See Hogeland v. Sibley, Lindsay & Curr Co., 366 N.E.2d 263, 265-66 (N.Y. 1977) (indemnification for "any accident . . . whatsoever" did not

---

[28]  In illustrative contrast, Section 20 of the Custodial Agreement requires the Issuer to indemnify the Custodian for "penalties, actions, judgments, [and] suits" – potential third-party litigation or imposition references missing from Section 17 – and Section 20 excludes indemnity for such liabilities resulting from the Custodian's breach of the Custodial Agreement, indicating the parties knew how to explicitly reference third-party claims and exclude first-party claims where intended in the Custodial Agreement.  See Ex. D § 20 at 14.

exclude negligence claims against indemnitee absent an express limitation, where the language was "negotiated at arm's length" by "sophisticated business entities"); Levine v. Shell Oil Co., 269 N.E.2d 799, 802-03 (N.Y. 1971) (indemnification provision "against any and all claims, suits, loss, cost and liability" should be enforced as the clear intent of the parties to indemnify the indemnitee for "all claims, suits, loss, cost and liability" due to the "plain meaning of these words").  Courts have found similar indemnification clauses to cover first-party claims under similar circumstances.  See, e.g., Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 178-79 (2d Cir. 2005) (affirming district court's assessment of attorney's fees because "the broad language of the second provision, when read in conjunction with the first provision, indicates unmistakably, that the parties intended for the second provision to apply to actions of any kind or nature, including actions between the parties") (internal quotation marks and citation omitted); E*TRADE Fin. Corp. v. Deutsche Bank AG, 631 F. Supp. 2d 313, 391-92 (S.D.N.Y. 2009) (Sweet, J.) (holding indemnification provision included first-party claims within its scope because limiting provision to third-party claims would have been "plainly inconsistent" with other contract provisions); Pfizer, 348 F. Supp. 2d at 145-46; Promuto, 44 F. Supp. 2d at 651-52.

### D.   As Swap Counterparty BNP Paribas Has Direct Standing to Sue BoA

Section 25 of the Custodial Agreement specifically provides that BNP Paribas, as Swap Counterparty, is a "third-party beneficiar[y] to this Agreement and [is] entitled to the rights and benefits hereunder and may enforce the provisions hereof as if [it] were a party hereto."  Ex. D § 25.  New York law permits a parent corporation to sue and enforce a contractual duty that inured to the parent's subsidiary, even where the subsidiary was not a contracting party and was expressly barred from asserting any third-party beneficiary rights.  Control Data, 1998 WL 178775, at *2-*3.  This rule applies even where "the beneficiaries themselves could not sue

because they were not yet identified" and the "defendant's breach did not damage the plaintiff." Id. at *3.  Control Data, a case on which BoA relies, establishes that, irrespective of whether BNPP can enforce the Custodial Agreement as a third-party beneficiary or whether BoA's breach damaged BNP Paribas, BNP Paribas – an express third-party beneficiary with enforcement rights under the Custodial Agreement – can enforce BoA's custodial and indemnification duties for BNPP's benefit because the parties' bargain inured to BNPP's benefit as a noteholder and affiliate of BNP Paribas.  See Ex. D §§ 17, 25.

**IV.   BNPP HAS STANDING TO SUE UNDER THE MARCH LETTER AGREEMENT**

BoA contends that it has no liability under the March Letter Agreement because it is not a valid amendment to the Depositary Agreement and because it only covers claims by third parties and does not cover claims against BoA.  MTD at 62-63, 73-74.[29]  BoA is wrong on both accounts.  The March Letter Agreement is a separately enforceable agreement, which unambiguously confers the right to sue BoA for losses incurred as a result of BoA's negligent breach of the Depositary Agreement.

**A.    The March Letter Agreement is a Separately Enforceable Contract**

The March Letter Agreement is a separate and independently enforceable agreement. Indeed, the parties to the March Letter Agreement – BNP Paribas and BoA – are not the same as the parties to the Depositary Agreement – Ocala and BoA.  Thus, BoA's argument that the March Letter is not a "valid contract amendment" under Section 13 (Amendment and Modifications) of the Depositary Agreement is irrelevant.[30]

---

[29]  BoA fails to challenge BNPP's indemnification claim under the Depositary Agreement.  See FAC ¶¶ 171-76.

[30]  Although BNPP's claim for breach of the March Letter Agreement is not predicated on the construction of the March Letter Agreement as an amendment to the Depositary Agreement,

BoA's argument under the Depositary Agreement's integration clause is also irrelevant. BoA argues that the March Letter cannot be "a separate agreement on the same subject matter, because any such construction would violate the 'Entire Agreement' provision," MTD at 73, of the Depositary Agreement.  Section 23 ("Entire Agreement") of the Depositary Agreement is a standard integration clause.  Ex. C § 23.  Under New York law, integration clauses do not apply to separate agreements between different parties.  L.K. Station Group, LLC v. Quantek Media, LLC, 879 N.Y.S.2d 112, 116 (N.Y. App. Div. 2009) (integration provision applied only to signatories to the contract).  Moreover, integration clauses only apply to preclude alleged agreements made prior to the signing of the contract containing the integration clause – not those made subsequent to the written contract.  Getty Ref. & Mktg. v. Linden Maint. Corp., 562 N.Y.S.2d 721, 722 (N.Y. App. Div. 1990) ("[n]either the parol evidence rule nor the merger clause of the underlying contract prohibits proof of a subsequent additional agreement or of a subsequent modification of the original agreement"); Vysovsky v. Glassman, No. 01-Civ-2531, 2007 WL 3130562, at *7 (S.D.N.Y. Oct. 23, 2007) (integration clause in Subscription Agreement did not bar the enforcement of oral contracts negotiated after the signing of the agreement).

The enforceability of the March Letter Agreement against BoA also does not turn on

---

BoA is incorrect that the March Letter Agreement does not amend the Depositary Agreement. First, a contract provision requiring that an amendment bear the signature of "all of the parties to the original agreement is not dispositive." Karel v. Clark, 514 N.Y.S.2d 766, 767 (N.Y. App. Div. 1987) (denying motion to dismiss) (emphasis in original). A written amendment may be effective even if signed only by the party against whom enforcement is sought. DFI Commc'ns, Inc. v. Greenberg, 363 N.E.2d 312, 314-16 (N.Y. 1977). Thus, even though only BoA signed the March Letter Agreement, BoA is the only party to the March Letter Agreement against which enforcement is sought. It is equally irrelevant that the March Letter Agreement is not accompanied by written confirmation from rating agencies because partial performance renders an amendment valid where that performance clearly refers to the amendment. See Fairchild Warehouse Assocs., LLC v. United Bank of Kuwait, PLC, 727 N.Y.S.2d 153, 153 (N.Y. App. Div. 2001).

BNPP's standing to enforce the Depositary Agreement, because the March Letter Agreement only incorporates by reference BoA's duties as Depositary under the Depositary Agreement, but neither expressly, nor impliedly incorporates any other provision or limitation in the Depositary Agreement's integration or indemnification provisions.  See, e.g., Ex. E at 2 ("This letter is supplemental to . . . the Depositary's undertakings in Section 8(g) of the Depositary Agreement.").  The Depositary Agreement's amendment, integration and indemnification provisions thus provide no obstacle to enforcement of the March Letter Agreement, which is a separate and independent agreement.

## B.    The March Letter Agreement Confers First-Party Indemnification Rights on BNP Paribas and BNPP for Losses They Sustained

Even BoA recognizes that the March Letter Agreement expressly indemnifies both BNPP and BNP Paribas for the losses that they, not Ocala, sustained.[31]  See MTD at 73; Ex. E at 1 ("the Depositary hereby agrees to indemnify and hold harmless [BNP Paribas], its . . . affiliates [BNPP]"), 2 ("For the avoidance of doubt, the Depositary's undertakings herein extend to BNPP in its individual capacity, as [Swap Counterparty] . . . and (as applicable) as a holder of [the Notes].").  More importantly, the purpose and text of the March Letter Agreement clearly demonstrate the parties' intent that BoA indemnify BNP Paribas' and BNPP's first-party losses.

First, the March Letter Agreement was negotiated and executed for the explicit purpose of inducing BNP Paribas' and BNPP's continued participation in the Facility by ensuring they were indemnified for their losses caused by the Depositary's negligent breach of its duties under

---

[31]  Ultimately, the distinction between Ocala and BNPP or BNP Paribas losses is irrelevant.  BNPP's losses for which it seeks indemnification are the same losses that the Issuer suffered – loss of collateral due to BoA's negligence in performing its obligation, caused by BoA's negligence in performing its duties in the Ocala Transaction, including its duties under the Depositary Agreement.

the Depositary Agreement.[32]  See Hooper, 548 N.E.2d at 904-06 (courts should evaluate scope of indemnification provision by considering its language and the "purpose of the entire agreement and the surrounding facts and circumstances").

Second, the plain language of the March Letter Agreement evidences that BNPP and BNP Paribas sought and obtained recourse directly to BoA if BoA negligently performed its Depositary duties, especially BoA's explicitly-referenced duty to certify the borrowing base under Depositary Agreement Section 4(d).  See Ex. E at 1 ("The Depositary further acknowledges that the duties it performs under the Depositary Agreement (including its duties under Section 4(d)) play an important role in mitigating the risks that BNPP would otherwise incur through the Related Transactions.").

Third, at the time of these negotiations, there was no conceivable "third-party" claim that could have been brought against either BNP Paribas as Swap Counterparty or BNPP as Noteholder that would have been the "result" of the Depositary's negligent breach of its duties. This remains true at present.  Thus, the parties could not have intended the indemnification provision to cover only such unanticipated third-party claims, but instead clearly intended to cover BNP Paribas' and BNPP's first-party losses as well as any potential third-party claims, however remote.  See Pfizer, 348 F. Supp. 2d at 146; Promuto, 44 F. Supp. 2d at 652.

Finally, the text of the March Letter Agreement makes it "unmistakably" clear that BNPP and BNP Paribas had indemnification rights against BoA for both first-party and third-party

---

[32]  BoA's own cynicism supports this conclusion.  BoA claims that "one cannot but marvel at the timing with which BNP procured this Letter, which certainly suggests consciousness of a problem rather than innocent prescience."  MTD at 74.  Although BoA's stone throwing has not one iota of a factual basis, it confirms BoA's understanding that the only purpose of the March Letter was to protect BNPP and BNP Paribas from losses caused by the Depositary's negligent breach of its duties under the Depositary Agreement.

claims.  Mid-Hudson Catskill Rural Migrant Ministry, 418 F.3d at 178-79.  The March Letter

Agreement states as follows:

> As an inducement to BNP Paribas ("BNPP") to enter into, and/or continue its
> participation in, the Related Transactions (as defined below), **the Depositary
> hereby agrees to indemnify** and hold harmless BNPP, its officers, directors,
> controlling person and affiliates (collectively, the "Indemnified Persons") **against
> any and all claims, losses**, penalties, fines, forfeitures, reasonable legal fees and
> related costs and judgments, and any other costs, fees and expenses that any
> Indemnified Person may sustain **to the extent attributable to the Depositary's
> negligence, fraud, bad faith or willful misconduct in the performance of its
> duties under the Depositary Agreement (including without limitation its
> duties under Section 4(d) thereof)**.

Ex. E at 1 (emphasis added).  The next sentence goes on to state:

> The Depositary shall immediately notify BNPP if to its knowledge any claim is
> made by any person alleging the negligence, fraud, bad faith or willful
> misconduct of the Depositary under the Depositary Agreement and, **to the extent
> that any such claim is made against any Indemnified Person (and without
> limitation to the first sentence of this paragraph)**, the Depositary shall assume
> the defense of such claim and pay all expenses in connection therewith, including
> counsel fees, and promptly pay, discharge and satisfy any judgment or decree
> which may be entered against any Indemnified Person in respect of such claim.

Id. (emphasis added).

     The first sentence of the indemnification provision contains a broad indemnification

against any harm or loss caused by BoA's negligence in performing its duties under the

Depositary Agreement.  This broad language means exactly what it says:  BoA agreed to protect

BNP Paribas and its affiliates, which includes BNPP, from any harm or loss caused by BoA's

negligence in the performance of its duties as Depositary, and no limitation can be implied in this

language.  See Hogeland, 366 N.E.2d at 265-66; Levine, 269 N.E.2d at 802-03.

     The second sentence of the indemnification provision then makes clear that third-party

claims are covered by the March Letter Agreement in addition to first-party claims.  The phrase

"without limitation to the first sentence of this paragraph" can only be read to clarify that the

Depositary has agreed to certain obligations if a third-party claim is brought against BNP Paribas or BNPP, and those obligations do not limit the indemnity in the first sentence to just such claims – compelling the conclusion that the first sentence contemplates first-party claims within its scope.[33]  See Ex. E at 1.

New York law is clear that when an interpretation gives meaning to all of the provisions of an indemnification provision and the agreement containing it, an indemnification provision will be read to include first-party claims.  See Mid-Hudson Catskill Rural Migrant Ministry, 418 F.3d at 178-79; E*TRADE Fin. Corp., 631 F. Supp. 2d at 391-92.  As was true in Pfizer, 348 F. Supp. 2d at 146, "[t]he provisions treating third party claims would be surplusage if [the indemnity provision] did not refer also to claims between the parties themselves."  See also Promuto, 44 F. Supp. 2d at 651-52; Sagittarius Broad. Corp., 663 N.Y.S.2d at 161.  Accordingly, the purpose and text of the March Letter Agreement show BoA is obligated to indemnify BNP Paribas and BNPP for BoA's negligent breach of its duties under the Depositary Agreement.

## V.   THERE IS NO BASIS FOR EXCLUDING EVENTS AND INJURIES PRIOR TO JULY 20, 2009

BoA argues that even if it breached the Facility Documents between June 30, 2008 and July 20, 2009, its liability for those breaches is somehow absolved by the fact that it facilitated the continuation of the Ocala fraud by rolling BNPP's notes and falsely certifying the Borrowing

---

[33]  Similar reasoning applies to BoA's argument that BNPP does not have a first-party indemnification claim under the Security Agreement.  MTD at 74-75.  As with the March Letter Agreement, the limitation of the duty of the Collateral Agent in Section 8.05 of the Security Agreement to provide notice of "third-party" claims, rather than merely "claims," evidences that the indemnity offered in the first sentence must be read to include first-party claims; otherwise, the reference to third parties would be surplusage.  Ex. A § 8.05.  Additionally, as with the March Letter Agreement and Custodial Agreement, it is difficult to imagine what third-party claim could be brought against BNPP as a result of the "negligence, fraud, bad faith or willful misconduct" of the Collateral Agent, providing further evidence that first-party indemnification was intended.  Id.

Base Certificate on July 20, 2009.  MTD at 8, 75-77; <u>see also</u> FAC ¶ 42.  This argument fails for two independent reasons.

<u>First</u>, the relevance of BoA's pre-July 20, 2009 breaches and its knowledge of Ocala's insolvency during the lifetime of the Facility is either an evidentiary issue or a causation issue, neither of which can be determined on a motion to dismiss.[34]  <u>In re Morgan Stanley ERISA Litig.</u>, No. 07 Civ. 11285, 2009 WL 5947139, at *15 (S.D.N.Y. Dec. 9, 2009) (Sweet, J.) ("generally loss causation is an issue of fact and is thus not properly considered at this early stage in the proceeding") (internal quotation marks omitted).

<u>Second</u>, BoA's argument that "payment of the earlier notes extinguished any related contract claims as a matter of law," MTD at 8, misses the point.  BNPP is not suing on the notes.  Rather, BNPP's claims against BoA are for breach of the governing Facility Documents, which control and transcend each roll of the notes.  BoA executed the Facility Documents on June 30, 2008, and those documents still govern and control BoA's duties and responsibilities to Ocala and the Noteholders.  BoA's contractual duties did not cease on repayment of a particular note issue and recommence on the issuance of new notes, and for this reason, BoA did not enter into new Facility Documents for each roll of the notes.

---

[34]  Tellingly, none of the authorities BoA cites addresses the effect of repayment in light of causation issues at the pleading stage, because such an issue requires an evidentiary record and is impossible to resolve on a motion to dismiss.  <u>See</u> <u>Green v. Foley</u>, 856 F.2d 660, 661, 666 (4th Cir. 1988) (summary judgment); <u>Bank of Lexington v. Jack Adams Aircraft Sales, Inc.</u>, 570 F.2d 1220, 1225-26 (5th Cir. 1978) (same); <u>In re Spaniak</u>, 221 B.R. 732, 735 (Bankr. W.D. Mich. 1998) (same); <u>Landmark Land Co., Inc. v. Sprague</u>, 529 F. Supp. 971, 978-79 (S.D.N.Y. 1981) (same), <u>rev'd</u>, 701 F.2d 1065, 1070 (2d Cir. 1983) (reversing grant of summary judgment); <u>Great W. Bank v. Kong</u>, 90 Cal. App. 4th 28, 30, 32 (2001) (order on deficiency judgment); <u>Litwak v. Wolkenberg</u>, 515 N.Y.S.2d 559, 560 (N.Y. App. Div. 1987) (summary judgment); <u>In re Paradis' Estate</u>, 134 Me. 333, 186 A. 672, 675 (1936) (post-probate hearing).

The fact that the Facility Documents transcend each roll of the notes is underscored by Section 11.1 of the Indenture which provides for termination of the Indenture only after repayment of all notes <u>plus</u> delivery of all outstanding notes to the Indenture Trustee with written notice that no new debt would issue, which never occurred in this case.  <u>See</u> Ex. A § 10.07; Ex. C § 10(a); Ex. F1 § 11.1(a); Ex. E at 2; Ex. I § 11.1.[35]  Moreover, each of the relevant indemnification provisions expressly states that it survives the termination of the Facility.  <u>See</u> Ex. A § 8.05; Ex. C § 8(g); Ex. D § 17; Ex. E at 2.  Thus, temporary repayment of the notes had no effect on BoA's duties, which endured under the Facility Documents.

## <u>CONCLUSION</u>

For the foregoing reasons, BoA's motion to dismiss BNPP's and BNP Paribas' First Amended Complaint should be denied.

Dated:  June 4, 2010
Armonk, NY

BOIES, SCHILLER & FLEXNER LLP

<u>/s/ Robin A. Henry</u>
Robin A. Henry
Motty Shulman
Jack Wilson
333 Main Street
Armonk, New York 10504
Telephone:  914.749.8200
Facsimile:  914.749.8300
rhenry@bsfllp.com
mshulman@bsfllp.com
jwilson@bsfllp.com

Attorneys for Plaintiffs BNP
Paribas Mortgage Corporation and BNP Paribas

_____

[35] The Custodial Agreement permits the Issuer or the Custodian to terminate the Agreement with 30 days' notice and Rating Agency confirmation, but any such termination does not "affect or impair any of the rights, duties or obligations []of the Custodian with respect to any transaction occurring prior to such termination," and the Custodian's duties do not terminate until the Custodian has delivered any collateral in its possession to a new custodian, the Issuer or the Collateral Agent.  Ex. D § 21(f).

**CERTIFICATE OF SERVICE**

I hereby certify that on June 4, 2010 a true and correct copy of the foregoing Memorandum of Law in Opposition to Bank of America's Motion to Dismiss was filed electronically via ECF and served via Federal Express on the following:

Marc T.G. Dworsky
Munger, Tolles, & Olsen LLP
355 South Grand Avenue
Los Angeles, CA  90071-1560
Attorney for Defendant Bank of America, N.A.

/s/ Robin A. Henry_____
Robin A. Henry