UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

BNP PARIBAS MORTGAGE
CORPORATION and BNP PARIBAS,

                    Plaintiffs,

    - against -

BANK OF AMERICA, N.A.,

                  Defendant.

------------------------------------X

DEUTSCHE BANK AG,

                    Plaintiff,

    - against -

BANK OF AMERICA, N.A.,

                  Defendant.

------------------------------------X

09 Civ. 9783 (RWS)

OPINION

09 Civ. 9784 (RWS)

OPINION

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/23/11

A P P E A R A N C E S:

       Attorneys for Plaintiffs BNP Paribas
       Mortgage Corporation and BNP Paribas

       BOIES SCHILLER & FLEXNER LLP
       333 Main Street
       Armonk, NY  10504
       By:  Robin A. Henry, Esq.
           Motty Shulman, Esq.
           Jack Wilson, Esq.

Attorneys for Plaintiff Deutsche Bank AG

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
By:  William E. McDaniels, Esq.
     Stephen D. Andrews, Esq.
     Stephen P. Sorensen, Esq.
     Daniel M. Dockery, Esq.
     Katherine O'Connor, Esq.


Attorneys for Defendant Bank of America, N.A.

MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA  90071-1560
By:  Marc T.G. Dworsky, Esq.
     Kristin Linsley Myles, Esq.
     Gregory Weingart, Esq.
     Richard St. John, Esq.

KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY  10036
By:  Richard T. Marooney, Esq.

TABLE OF CONTENTS

I.      PRIOR PROCEEDINGS ........................................ 2

II.     THE FACTS ALLEGED ....................................... 3
        A.      Background ......................................... 3
        B.      The Facility Documents ............................ 10
                i.     The Base Indenture .......................... 10
                ii.    The Security Agreement ...................... 18
                iii.   The Depositary Agreement .................... 22
                iv.    The Custodial Agreement ..................... 24
                v.     The March 2009 Letter ....................... 28
        C.      Alleged Breaches ................................. 29

III.    THE APPLICABLE STANDARD ............................... 31

IV.     THE AMENDED COMPLAINTS STATE A CLAIM FOR BREACHES OF THE
        BASE INDENTURE AND BREACH OF FIDUCIARY DUTY ............. 33
        A.      The Complaints State a Claim under Section 10.4 of
                the Base Indenture ................................ 35
        B.      The Amended Complaints State a Claim for Breach of
                Section 9.1 of the Base Indenture ................. 48
        C.      The Amended Complaints State a Claim for Breach of
                Fiduciary Duty .................................... 51
        D.      DB's Claims under the Prior Version of  the Base
                Indenture and Other Facility Documents Fail as a
                Matter of Law ..................................... 53

V.      THE AMENDED COMPLAINTS STATE A CLAIM  FOR BREACH OF THE
        SECURITY AGREEMENT ..................................... 55
        A.      The Amended Complaints State a Claim that BoA
                Breached the Security Agreement by Transferring Funds
                for Prohibited Purposes ........................... 58
        B.      Plaintiffs State a Plausible Claim for Breach of the
                Security Agreement Based on BoA's Improper Post-Event
                of Default Conduct and Failure to Confirm the
                Borrowing Base Condition .......................... 65
        C.      The Amended Complaints also State a Claim that BoA
                Failed to Properly Segregate Collateral ........... 69

VI.     PLAINTIFFS LACK STANDING UNDER THE DEPOSITARY AND
        CUSTODIAL AGREEMENTS AND THE MARCH 2009 LETTER .......... 72
        A.      Plaintiffs Lack Standing to Sue for Breach of the
                Depositary Agreement .............................. 72
        B.      The BNP Plaintiffs Lack Standing to Sue under the
                March 2009 Letter ................................. 79
        C.      Plaintiffs Lack Standing to Sue for Breach of the
                Custodial Agreement ............................... 85

VII.   **PLAINTIFFS FAIL TO STATE A CLAIM FOR INDEMNIFICATION** .... 90
    A.   Plaintiffs' Indemnification Claims under the Custodial Agreement Fail ........................... 93
    B.   Plaintiffs' Indemnification Claims under the Depositary and Security Agreements Fail ........... 98

VIII.  **PLAINTIFFS LACK STANDING TO SUE BASED ON OCALA NOTES ISSUED BEFORE JULY 20, 2009** ........................... 100

IX.    **BNPP IS NOT A PROPER PARTY TO THIS ACTION** ............. 105

X.     **CONCLUSION** .......................................... 107

**Sweet, D.J.**

In these related actions, Defendant Bank of America, N.A. ("BoA" or "Defendant") has moved, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Amended Complaints filed by Plaintiffs BNP Paribas Mortgage Corporation ("BNP") and BNP Paribas ("BNPP") (collectively, the "BNP Plaintiffs") and Deutsche Bank AG ("DB"). For the reasons set forth below, the motion is granted as to the claims for breach of the Depositary Agreement, Custodial Agreement, and March 2009 Letter, as to the claims for indemnification, and as to claims relating to Ocala Notes issued prior to July 20, 2009, and denied as to all remaining claims.

As will become evident from what follows, these actions involve highly sophisticated financial institutions, which participated in various capacities in the residential mortgage industry prior to its recent collapse. They were, and are, represented by some of the most prominent law firms in the country whose very skilled advocates have been of great assistance to the Court, despite the contrary conclusions they have drawn from the complicated documents that created the relationships at issue.

1

## I.   PRIOR PROCEEDINGS

BNP and DB each filed initial Complaints against BoA on November 25, 2009, and each filed Amended Complaints on March 17, 2010.[1] BNP added BNPP, its parent company, as a new plaintiff in its Amended Complaint.

In its Amended Complaint, DB asserts eight causes of action for breach of contract, alleging that BoA breached the current and prior versions of four contracts that created and governed a facility for the origination, sale, and purchase of home mortgages through Taylor, Bean & Whitaker Mortgage Corp. ("TBW") and its wholly-owned subsidiary, Ocala Funding, LLC ("Ocala") (the facility hereafter referred to as the "Ocala Facility"). These contracts — the Security Agreement, the Depositary Agreement, the Custodial Agreement, and the Base Indenture — are described collectively as the "Facility Documents." In addition to its breach of contract claims, DB asserts a claim for breach of fiduciary duty and seeks indemnification under the current and prior versions of the Depositary, Security, and Custodial Agreements.

---

[1]     Hereafter, the Amended Complaint filed by DB will be referred to as the "DB AC" and the Amended Complaint filed by the BNP Plaintiffs will be referred to as the "BNP AC."

BNP does not bring any claims under the prior versions of the Facility Documents, but otherwise echoes DB's claims, with the addition of a claim for "Breach of Contract/ Indemnification" under a March 27, 2009 side letter (the "March 2009 Letter").

On August 30, 2010, BNP and DB filed new actions against BoA in the Southern District of Florida, in which BNP and DB allege two causes of action for conversion of certain mortgage loans and the sale proceeds of those loans. On November 17, 2010, the actions were transferred to the Southern District of New York and referred to this Court. On November 23, 2010, BoA filed a motion to dismiss both actions. The motion was heard on January 26, 2011, and remains <u>sub judice</u>.

The instant motions were heard and marked fully submitted on September 15, 2010.

## II.   THE FACTS ALLEGED

### A.   Background

This dispute arises generally from the multi-billion dollar collapse of TBW in late summer 2009. According to the

Amended Complaints, TBW was "the largest non-depositary residential mortgage lender in the United States" and the "twelfth-largest mortgage originator." (BNP AC ¶ 25; DB AC ¶ 2.) Its core business was "(i) originating, underwriting, processing and funding conforming, conventional, government-insured residential mortgage loans; (ii) the sale of mortgage loans into the 'secondary market' to government-sponsored enterprises such as Federal Home Loan Mortgage Corporation ("Freddie Mac"); and (iii) mortgage payment processing and loan servicing." (BNP AC ¶ 26.) In 2008, TBW was responsible for originating approximately $30 billion in new loans. (Id.) As of June 2009, it was servicing mortgages with unpaid principal balances in excess of $80 billion. (Id.)

TBW created Ocala in 2005 to provide short-term liquidity to TBW between the time of TBW's origination or purchase of mortgages and the sale of those mortgages, principally to Freddie Mac. (Id. ¶ 28.) Ocala raised cash by issuing liquidity notes in two series — Series 2005-1 Secured Liquidity Notes (the "2005-1 Notes") and Series 2008-1 Secured Liquidity Notes (the "2008-1 Notes") (collectively, the "Ocala Notes") — which were, at all times, secured by the cash proceeds of those notes and mortgages. (Id. ¶¶ 39, 43; DB AC ¶¶ 3, 7, 34.) BNP purchased $480.7 million of the Ocala Notes, and DB

4

purchased $1.2 billion. (See BNP AC ¶¶ 2, 40; DB AC ¶¶ 4, 11.)
The Ocala Notes "rolled over" at least once per month up to and
through July 20, 2009, the date of the final rollover before
TBW's collapse. (Id. ¶ 5.)

Ocala's assets were cash and mortgages, and its
liabilities were the Ocala Notes and subordinated notes,
totaling approximately $1.75 billion. (DB AC ¶¶ 11, 12, 47,
124.) The proceeds of the Ocala Notes were used to purchase
mortgages originated by TBW, which Ocala would in turn sell to
Freddie Mac or other mortgage purchasers. (Id. ¶ 40.) All
mortgages acquired from TBW and all proceeds from the sale of
those mortgages served as collateral securing the Ocala Notes.
(Id.) If certain conditions were satisfied, the proceeds could
be used by Ocala to purchase additional mortgages from TBW,
which it would then resell. (Id.)

TBW was Ocala's sole owner, its only member with an
economic interest, and the servicer of Ocala's loans. Notices
provided to Ocala were to be sent to TBW, and TBW signed the
Facility Documents on Ocala's behalf. (BoA Mem. 11.)

BoA served in several distinct but related capacities
for the Ocala Facility: as Indenture Trustee, Collateral Agent,

Depositary and Custodian. In its various capacities, BoA agreed to administer and regulate the flow of mortgages and cash in and out of Ocala, certify the solvency of Ocala prior to its issuance of Ocala Notes, promptly notify the Ocala noteholders of any Event of Default or Potential Event of Default, as defined in the Facility Documents, and shut down the Ocala Facility upon certain Events of Default. (DB AC ¶ 23.)

On or about August 3, 2009, TBW's offices were raided by law enforcement authorities, TBW stopped originating mortgages, and Freddie Mac terminated TBW's eligibility to sell and service Freddie Mac loans. (See DB AC ¶¶ 207-08.) On August 10, 2009, BoA declared an Event of Default under the Base Indenture. In the wake of TBW's collapse, Ocala has failed to repay, and indeed cannot repay, the money owed to DB and BNP, in their capacity as holders of the Ocala Notes. (See DB AC ¶ 214; BoA Mem. 1)

DB, BNP, and BNPP also served in multiple roles in TBW's mortgage operations, not just as holders of the Ocala Notes, but also as Swap Counterparties, Note Dealers, Qualified Counterparties and investment bankers for TBW. (BoA Mem. 11-15.)

6

DB and BNPP, the parent of BNP, served as Swap Counterparties under the Swap Agreements, to which BoA was not a party. Through the swap transactions, which consisted of a "front swap" with Ocala and a "back swap" with TBW, certain of Ocala's risks were transferred to the Swap Counterparties and from them onto TBW. Under the front swap, the Swap Counterparties agreed (1) to pay to Ocala the interest cost of its debt in exchange for the interest income Ocala earned on its mortgage loans and (2) to reimburse Ocala for any losses on the sale of its mortgage loans in exchange for receiving from Ocala any profits it earned on its loan sales. The back swaps mirror the front swaps. Under normal operations, if the Swap Counterparties received money from Ocala under the front swaps, they would forward that money to TBW; conversely, if they paid a net amount to Ocala under the front swaps, they would be reimbursed by TBW. According to BoA, the only funds not "round-tripped" between Ocala and TBW via the Swap Counterparties were the fees that DB and BNP Paribas retained for serving as Swap Counterparties. (See BoA Mem. 12-14.)

BoA contends that this arrangement was designed to help insulate Ocala from the risk of TBW's becoming insolvent by placing the Swap Counterparties between TBW and Ocala. Thus, according to BoA, DB and BNPP were paid substantial fees to

7

absorb TBW's credit risk under the Ocala program by agreeing to pay on the front swaps even if TBW failed to pay Ocala for its own obligations.

In their capacity as Swap Counterparties, DB and BNPP explicitly acknowledged and consented to the Purchase Agreement, a Facility Document not at issue in this litigation. The Purchase Agreement is an agreement between TBW and Ocala that provided the terms for the sale to Ocala of mortgages originated by TBW, and TBW's control of the purchase of those mortgages by Ocala. BoA, which was not a party to the Purchase Agreement, contends that the Purchase Agreement placed responsibility for many of the sale, purchase, and asset management functions within the Ocala Facility "squarely on TBW and Ocala." (BoA Mem. 11-12.)

In addition, Plaintiffs' affiliates, BNP Paribas Securities Corp. and Deutsche Bank Securities Inc., acted as Short-Term Note Dealers to market and sell the notes to investors, which ended up being their own affiliates, the Plaintiffs here. Plaintiffs' affiliates also served as the exclusive "Qualified Counterparties" under Ocala's loan sale agreements, which means they had the sole right to purchase

mortgage-backed securities that TBW received in payment for Ocala's mortgage loans.

Finally, both DB and BNP served as investment bankers for TBW. In the months before TBW was raided by the FBI, DB unsuccessfully represented TBW in its efforts to raise $300 million to purchase Colonial Bank.

The importance to the Ocala Facility of BoA, in its various roles, and of DB and BNPP, in their capacity as Swap Counterparties, was reflected in a July 13, 2009 Moody's ABCP Market Review, which notes that:

> The administration risk is further mitigated by the resources, capabilities and credit strength of Bank of America Corporation as the trustee, collateral agent, depositary and custodian to provide critical program support services, including: certifying the borrowing base and checking the delinquency triggers before the issuance of [Secured and callable notes]; checking in the loan files and creating a collateral transmittal report; and managing the orderly wind-down of the program.
>
>                        * * *
>
> Ocala's Prime-1 rating is not highly correlated to TB&W, which is unrated. Rather, Ocala relies on funds obtained under the market value swap and from the committed buyer to repay the notes. As a result, there is a high degree of correlation between the rating assigned to Ocala's SLNs [i.e., the notes at issue in this litigation] and the ratings of the swap counterparties, BNP Paribas and Deutsche Bank AG. If one of these entities loses its Prime-1 rating, Ocala's rating may also be negatively affected.

9

Moody's ABCP Market Review at 3, 4.

## B.   **The Facility Documents**

The rights and responsibilities of BoA, TBW, Ocala, DB and the BNP Plaintiffs with respect to the Ocala Facility are set out in the following Ocala Facility Documents: the 2008 Base Indenture (the "Base Indenture"); the 2008 Security Agreement (the "Security Agreement"); the 2005-1 Depositary Agreement (relating to the 2005-1 Notes and upon which the BNP Plaintiffs have sued) and 2008-1 Depositary Agreement (relating to the 2008-1 Notes and upon which DB has sued) (both referred to as the "Depositary Agreement"); the 2008 Custodial Agreement (the "Custodial Agreement"); and the March 2009 Letter.[2]

### i.   The Base Indenture

The Base Indenture is an agreement between Ocala and BoA,[3] which served as the Indenture Trustee. The Base Indenture

---

[2]    DB has brought separate claims for breach of the prior versions of four of these documents - specifically, the 2006 Base Indenture, the 2006 Security Agreement, the prior version of the 2005-1 Depositary Agreement, and the 2006 Custodial Agreement. Because DB has not alleged any material differences between the prior and recent versions of the Facility Documents, all references are to the 2008 versions of the Facility Documents, except where specifically noted.

[3]    BoA acquired LaSalle Bank National Association in 2007 and thereby assumed LaSalle's rights and obligations under the Facility Documents.

10

and its two Supplements, corresponding to the 2005-1 Notes and
2008-1 Notes, generally provided for the issuance of the Ocala
Notes and dictated the terms for the accrual and payment of
interest and principal for each series of Ocala Notes. The
Supplements required Ocala to use the proceeds from the Ocala
Notes only to acquire specified mortgage loans from TBW, to pay
amounts owing on maturing notes, and to make other payments "as
required by the Facility Documents." 2008-1 Supplement § 2.6;
2005-1 Supplement § 2.6.

The relevant and disputed portions of the Base
Indenture are set forth as follows:

Section 9.1 of the Base Indenture defines two types of
Indenture Events of Default. First, it defines several
discretionary Events of Default that permitted, but did not
require, BoA, as Indenture Trustee, to declare the Ocala Notes
due and payable and to instruct Ocala to cease its purchase of
mortgages. Id. § 9.1(a)-(e), (g)-(j), (m), and (s). One such
discretionary Event of Default was Ocala's "fail[ure] to comply
with any of its other agreements or covenants in, or provisions
of, the [Ocala Notes] or this Base Indenture," where such breach

---

Accordingly, where LaSalle was the named party in a Facility Document, they
are hereafter referred to as BoA.

"materially and adversely affects the interests of" DB and BNP, as noteholders. Id. § 9.1(e).

Second, it defines mandatory Events of Default that required BoA to declare the Ocala Notes due and payable and to instruct Ocala to cease purchasing mortgages. Id. § 9.1(f), (k), (l), (q), and (r). One such Event of Default was an Event of Bankruptcy, such as Ocala's insolvency. Id. § 9.1(f).

A Potential Event of Default is defined as "any occurrence or event which, with the giving of notice, the passage of time or both, would constitute an Event of Default." Id. at Schedule I (Definitions).

Section 9.1 of the Base Indenture also states that Ocala "shall provide prompt written notice" of any Indenture Event of Default to BoA, in its capacity as Indenture Trustee under the Base Indenture and as Collateral Agent under the Security Agreement, and Plaintiffs, as Note Dealers and Swap Counterparties. Id. § 9.1.

Section 9.1 also provides that "[n]otwithstanding anything in this Base Indenture to the contrary, in the event that an Indenture Event of Default . . . occurs and is

12

continuing," BoA shall provide Plaintiffs with written notice of such an event and shut down the Facility.

The Base Indenture sets forth representations and warranties of Ocala, as Issuer, including the representation that "[b]oth before and after giving effect to the transactions contemplated by this Base Indenture and the other Facility Documents, [Ocala] is solvent within the meaning of the Bankruptcy Code . . . and no Event of Bankruptcy has occurred with respect to [Ocala]." Base Indenture § 7.12. Ocala also covenanted that, "[p]romptly upon becoming aware of any Potential Event of Default or Event of Default under this Base Indenture, [Ocala] shall give . . . notice thereof" to BoA and other parties, including Plaintiffs in their capacity as Note Dealers and Swap Counterparties. Id. § 8.10(a). The Supplements to the Base Indenture expressly renewed these representations and warranties and specified that they were true with respect to the Series of notes to which each Supplement related, including the representation that there had been no Event of Default. See 2008-1 Supplement § 2.3(b) & (c); 2005-1 Supplement § 2.3(b) & (c). Ocala was required to renew these representations each time a new issuance of short-term notes was proposed — that is, each time the Ocala Notes rolled-over. See Depositary Agreements, Ex. C thereto at item 4.

13

Section 10.1 sets forth the following duties of BoA as Indenture Trustee:

(a) If an Event of Default has occurred and is continuing, the Indenture Trustee shall exercise such of the rights and powers vested in it by this Base Indenture and the Facility Documents, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs; provided, however, that the Indenture Trustee shall have no liability in connection with any action or inaction taken, or not taken, by it upon the deemed occurrence of an Event of Default of which a Trust Officer has not received written notice; and provided, further, that the preceding sentence shall not have the effect of insulating the Indenture Trustee from liability arising out of the Indenture Trustee's negligence or willful misconduct.

(b) Except during the occurrence and continuance of an Event of Default:

(i) The Indenture Trustee undertakes to perform only those duties that are specifically set forth in this Base Indenture or the Facility Documents and no others, and no implied covenants or obligations shall be read into this Base Indenture against the Indenture Trustee; and

(ii) In the absence of bad faith on its part, the Indenture Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Indenture Trustee and conforming to the requirements of this Base Indenture or the Facility Documents. However, in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Indenture Trustee, the Indenture Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Base Indenture. The Indenture Trustee shall examine the certificates

14

and opinions to determine whether or not they
conform to the requirements of this Base
Indenture or the applicable Facility Document
(but need not confirm or investigate the accuracy
of mathematical calculations or other facts
stated therein).

(c) Indenture Trustee may not be relieved from
liability for its own negligent action, its own
negligent failure to act, or its own willful
misconduct, except that:

> (i) This clause does not limit the effect of
> clause (b) of this Section 10.1.
>
> (ii) The Indenture Trustee shall not be liable
> for any error of judgment made in good faith by
> the Indenture Trustee, unless it is proved that
> the Indenture Trustee was negligent in
> ascertaining the pertinent facts.
>
> * * *
>
> (iv) The Indenture Trustee shall not be charged
> with knowledge of any default under any Facility
> Document, unless a Trust Officer of the Indenture
> Trustee receives written notice of such default.

(d) Notwithstanding anything to the contrary contained
in this Base Indenture or any of the Facility
Documents, no provision of this Base Indenture shall
require the Indenture Trustee to expend or risk its
own funds or incur any liability. The Indenture
Trustee may refuse to perform any duty or exercise any
right or power unless it receives indemnity
satisfactory to it against any loss, liability or
expense.

(Emphasis in original.)


        Section 10.2 sets forth the following rights of BoA as

Indenture Trustee:

    Except as otherwise provided by Section 10.1 hereof:

15

(a) Indenture Trustee may conclusively rely and shall
be fully protected in acting or refraining from acting
in good faith based upon any document or other
evidence provided to it believed by it to be genuine
and to have been signed by or presented by the proper
person.

* * *

(d) The Indenture Trustee shall not be liable for any
action it takes or omits to take in good faith which
it believes to be authorized or within its rights or
powers conferred upon it by the Base Indenture or the
Facility Documents.

(e) The Indenture Trustee shall be under no obligation
to exercise any of the rights or powers vested in it
by this Base Indenture, any Supplement or any Facility
Document, or to institute, conduct or defend any
litigation hereunder or in relation hereto, at the
request, order or direction of any of the Noteholders,
pursuant to the provisions of this Base Indenture, any
Supplement or any Facility Document, unless such
Noteholders shall have offered to the Indenture
Trustee security or indemnity satisfactory to the
Indenture Trustee against the costs, expenses and
liabilities which may be incurred therein or thereby;
nothing contained herein shall, however, relieve the
Indenture Trustee of the obligations, upon the
occurrence of a default by the Issuer (which has not
been cured or waived), to exercise such of the rights
and powers vested in it by this Base Indenture, any
Supplement or any Facility Document, and to use the
same degree of care and skill in their exercise as a
prudent person would exercise or use under the
circumstances in the conduct of such person's own
affairs.

(f) Indenture Trustee shall not be bound to make any
investigation into the facts or matters stated in any
resolution, certificate, statement, instrument,
opinion, report, notice, request, consent, order,
approval, bond or other paper or document, unless
requested in writing to do so by the Required Senior
Noteholders, the Series 2005- 1 Required Senior
Noteholders or the Series 2008- 1 Required Senior
Noteholders (or, if the Senior Notes have been paid in
full, the Required Subordinated Noteholders) of any

Series which could be adversely affected if the
Indenture Trustee does not perform such acts.

* * *

(i) The Indenture Trustee shall not be personally
liable for any action taken, suffered or omitted by it
in good faith and believed by it to be authorized or
within the discretion or rights or powers conferred
upon it by this Base Indenture.

(j) The right of the Indenture Trustee to perform any
discretionary act enumerated in this Base Indenture
shall not be construed as a duty, and the Indenture
Trustee shall not be answerable for other than its own
gross negligence or willful misconduct in the
performance of such act.

Section 10.4 provides for the performance by BoA of
certain specified duties, both before and after an Event of
Default. Specifically, Section 10.4 provides:

If an Event of Default or a Potential Event of Default
occurs and is continuing and if a Trust Officer of the
Indenture Trustee receives written notice or has
actual knowledge thereof, the Indenture Trustee shall
promptly provide the Collateral Agent, the
Noteholders, each Swap Counterparty, any Short Term
Note Dealers and each Rating Agency with notice of
such Event of Default or the Potential Event of
Default, if such Notes are represented by a global
note, by telephone, facsimile and electronic mail,
and, if such Notes are represented by Definitive
Notes, by first class mail.

Finally, Section 13.1 provides, in relevant part,
"[n]otwithstanding any provisions of this Base Indenture to the
contrary, the Indenture Trustee shall have no liability based

17

upon or arising from the failure to receive any notice required by or relating to this Base Indenture or the Notes."

      ii.    The Security Agreement

      BoA served as Collateral Agent under the Security Agreement, pursuant to which BoA opened and maintained Collateral Accounts to hold Ocala's assets. See Security Agreement § 5.01.

      The Security Agreement expressly "assigns, conveys, transfers, delivers and sets over unto [BoA] for the benefit of the Secured Parties . . . and hereby grants to [BoA] for the benefit of each Secured Party . . . a security interest in, control over, and lien on all of the [Assigned Collateral]," including all mortgages purchased through the Ocala Facility and all cash generated by the sale of such mortgages. Id. § 4.01. The Plaintiffs, as noteholders, are Secured Parties.

      Section 8.01 provides that "[t]he relationship between the Collateral Agent and each Secured Party is that of agent and principal only, and nothing herein shall be deemed to constitute the Collateral Agent a trustee for any Secured Party or impose

on the Collateral Agent any obligations other than those for which express provision is made herein."

Section 5.01 required BoA to establish and maintain, on behalf of the Secured Parties, a "Collateral Account," and two separate sub-accounts for the two different series of Ocala Notes. This section provides that

> [t]he Collateral Agent shall have complete dominion and control over the Collateral Account and the Issuer hereby agrees that only the Collateral Agent may make withdrawals from the Collateral Account; provided, however, that the Issuer . . . may request withdrawals from the Collateral Account in accordance with the terms of Section 5.03 hereof.

(Emphasis in original.)

Section 5.03 established two "waterfalls" for withdrawals: one for withdrawals on monthly "Payment Dates," id. § 5.03(b), and another for withdrawals on any other date, id. § 5.03(a). Each waterfall prioritized allowable purposes for withdrawals, such that higher priority obligations were entitled to full payment before other, lower-priority allowable payments. Id. Both waterfalls provided protective measures against the improper depletion of assets: (i) with the exception of certain transfers of funds to specific accounts maintained by BoA, amounts payable to DB and BNP, or amounts payable to BoA itself, the only purpose for which Ocala could request that BoA withdraw

19

funds from each of the sub-accounts was to purchase additional

mortgage loans; (ii) "no withdrawals from the Collateral Account

[were to] be made on any day" to purchase additional mortgages

unless Ocala's assets exceeded its liabilities; and (iii) such

withdrawals were to be made from the appropriate sub-accounts.

Id.


Section 5.03 also provides, in relevant part:

> Any instruction delivered by [Ocala] . . . pursuant to
> the provisions of the foregoing paragraph of this
> Section 5.03 shall be effective upon receipt of
> written, electronic or telephonic instructions
> (confirmed promptly in writing) from an Issuer
> Agent. . . .

> The Collateral Agent shall promptly comply with any
> such approved instructions made by [Ocala] . . . in
> accordance with the provisions of the foregoing
> paragraphs of this Section 5.03; provided that any
> withdrawal and transfer pursuant to an instruction
> received prior to 2:00 p.m. New York City time on any
> day shall be made on such day.

(Emphasis in original.)


Section 6.02 provides that "[i]f any Indenture Event

of Default under the Indenture shall have occurred and be

continuing," then BoA

> shall have, with respect to the Assigned Collateral,
> the Collateral Account and the Deposited Funds, in
> addition to any other rights and remedies which may be
> available to it at law or in equity or pursuant to
> this Agreement or any other contract or agreement, all
> rights and remedies of a secured party under any
> applicable version of the Uniform Commercial Code of

20

> the relevant jurisdictions relating to the Assigned
> Collateral, the Collateral Account and the Deposited
> Funds. . . .

The same section provides that BoA's

> sole duty with respect to the custody, safekeeping and
> physical preservation of the Assigned Collateral, the
> Collateral Account and the Deposited Funds in its
> possession shall be to deal with it in the same manner
> as the Collateral Agent deals with similar property
> for its fiduciary accounts generally, subject to
> Section 9-207 of the Uniform Commercial Code.

Section 8.01 sets forth the rights and duties of BoA
as Collateral Agent. It contains identical language to that in
the Base Indenture limiting the relationship between the BoA as
Collateral Agent and each Secured Party to "that of agent and
principal only." It states that the Security Agreement shall not
"impose on the Collateral Agent any obligations other than those
for which express provision is made herein" and that "[t]he
Collateral Agent shall be entitled to rely, and shall be fully
protected in such reliance, on any communication, direction,
instrument, resolution, certificate, affidavit, paper or other
document reasonably believed by it in its professional judgment
to be genuine and correct and to have been signed or sent by the
proper Person or Persons."

21

iii.    The Depositary Agreement


BoA served as Depositary under the Depositary
Agreement[4] between itself and Ocala, and in that capacity handled
the back-office mechanics of note issuances, such as
establishing and maintaining the bank accounts needed for the
issuance and payment of Ocala Notes. See Depositary Agreement
§ 2. Neither DB nor either of the BNP Plaintiffs is named as a
party or a third-party beneficiary of the Depositary Agreement.


Prior to the issuance of Ocala Notes, including any
roll-over of the Ocala Notes, BoA was responsible for certifying
that BoA had all the necessary information regarding Ocala's
assets and liabilities to certify that Ocala's assets exceeded
the total amount of its outstanding debt and that Ocala's assets
did in fact exceed its debts. Specifically, the Depositary
Agreement states the following:

> The Depositary shall not issue or deliver any Short
> Term Note unless it shall have received a completed
> certificate from an Issuer Agent on the Issuance Date,
> each in the form of [a Borrowing Base Certificate]
> . . . and the Depositary, upon review, determines it
> can (and it does) certify as to items (1) and (2)
> therein.

---

[4]     The two Depositary Agreements are identical in all material respects
and are therefore cited as a single agreement.

Id. § 4(d).[5] Items (1) and (2) of the Borrowing Base Certificate reflect the solvency requirements for Ocala. This solvency condition is referred to as the Borrowing Base Condition.

Section 11(j) provides that BoA "shall not be accountable for the use or application by [Ocala] of Short Term Notes or the proceeds thereof."  Section 11(l) provides that "[m]oney held by the Depositary in trust hereunder need not be segregated from other funds except to the extent required by law or the specific provisions hereof."

Section 15 of the Depositary Agreement, concerning successors and assign, reads as follows:

> This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that (a) except for the assignment by [Ocala] of its right, titles and interest hereunder to the Collateral Agent pursuant to Section 4.01(ii) of the Security Agreement and (b) except as provided in Section 16 hereof, no party hereto may assign any of its rights or obligations hereunder unless such party shall have obtained (i) the prior written consent of all parties hereto and (ii) the written confirmation of each of the Rating Agencies that such assignment will not result in a reduction or withdrawal of its then current rating, if any, of the Short Term Notes. This Agreement shall also inure to the benefit of the Indenture Trustee, which is hereby expressly declared

---

[5]     The BNP Plaintiffs contend that only "Issuer Agents," who were "authorized to act, and to give instructions and notices, on behalf of the Issuer," could provide and sign the Borrowing Base Certificates. Only three Ocala officers — Lee Farkas, Paul Allen, and Ray Bowman — were designated Issuer Agents. (See BNP AC ¶ 110.)

to be a third-party beneficiary hereof. Subject to the
foregoing, no Person not a party to this Agreement
shall be deemed to be a third-party beneficiary hereof
nor shall any Person be empowered to enforce the
provisions of this Agreement, except as set forth in
the preceding sentence and to the extent such Person
becomes a permitted successor or assign hereunder.

iv.    The Custodial Agreement

As Custodian under the Custodial Agreement, BoA agreed
to perform certain roles with respect to the maintenance of
physical mortgage loan files as the mortgages were purchased and
sold by Ocala. Neither DB nor either of the BNP Plaintiffs is
named as a party or a third-party beneficiary of the Custodial
Agreement.

Among other things, BoA assumed the responsibility of
reviewing the loan files to ensure that they complied with the
other Facility Documents and did not have any "documentary
deficiencies" such as "missing signature or other manifest
errors." Custodial Agreement § 4.

Though the mortgage loans were owned by Ocala, BoA was
obligated to "segregate on the books of the Custodian and
maintain continuous custody and control" of the mortgage files
"on behalf of and in trust for [Ocala] subject to the security

24

interest of the Collateral Agent." Id. § 6(b)(1). TBW and Ocala
had the right to remove the mortgage files from the Custodial
account in order to facilitate their sale to third parties such
as Freddie Mac. See id. § 6(c).

BoA was required to maintain a current list of loans
so that Ocala, the Collateral Agent, and the Plaintiffs, in
their capacity as noteholders, would know at all times the
nature and location of the mortgage notes, mortgages, and
assignments of mortgages held by BoA, as Custodian. Id. § 9.

Section 17 of the Custodial Agreement provides for
indemnification of the various parties to the agreement.
Specifically, Section 17 provides the following:

> The Custodian hereby agrees to indemnify the Issuer,
> the Seller, the Servicer, each Swap Counterparty,
> their respective Affiliates, their respective
> directors, officers, trustees, employees and agents
> and their respective successors and assigns (each, an
> "Indemnified Party") against, and agrees to hold them
> harmless from, any and all claims, losses,
> liabilities, obligations, damages, payments, costs and
> expenses (including, without limitation, reasonable
> legal fees and expenses arising in connection
> therewith) which may be imposed on, incurred by or
> asserted against any Indemnified Party and resulting
> from the Custodian's negligence, lack of good faith or
> willful misconduct or the performance of or other
> breach of its obligations hereunder; provided that the
> Custodian shall not be liable for any portion of any
> such amounts resulting from the negligence or
> misconduct of the Issuer. The indemnifications

25

contained herein survive any termination of this
Agreement. . . .

(Emphasis in original.)


         Section 19 of the Custodial Agreement sets forth

various protections concerning the Custodian, including the

following:

         (a) The Custodian shall have no duties or
         responsibilities except those that are specifically
         set forth herein, it being expressly understood that
         no duties or obligations shall be implied against the
         Custodian. Provided that the Custodian has followed
         the terms of this Agreement or the Issuer's
         instructions, the Custodian shall be under no
         responsibility or duty with respect to the disposition
         of any Mortgage Notes, Mortgages and Assignments of
         Mortgages while such Mortgage Notes, Mortgages or
         Assignments of Mortgages are not in its possession.

                         *  *  *

         (d) In the absence of bad faith on the part of the
         Custodian, the Custodian may conclusively rely, as to
         the truth of the statements and the correctness of the
         opinions expressed therein, upon any request,
         instructions, certificate, opinion or other document
         furnished to the Custodian reasonably believed by the
         Custodian to be genuine and to have been signed or
         presented by the proper party or parties and
         conforming to the requirements of this Agreement
         absent notice to the contrary. . . . [I]t is expressly
         understood that in the case of any Mortgage Note,
         Mortgage, Assignment of Mortgage or other documents or
         other request, instruction, document or certificate
         which by any provision hereof is specifically required
         to be furnished to the Custodian, the Custodian shall
         be under a duty to examine the same to determine
         whether or not it conforms to the requirements of this
         Agreement and to make the Certifications required by
         Section 4 of this Agreement.

                         *  *  *

                           26

(g) The duties and obligations of the Custodian shall only be such as are expressly set forth in this Agreement or as set forth in a written amendment to this Agreement executed by the parties hereto or their successors and assigns. In the event that any provision of this Agreement implies or requires that action or forbearance be taken by a party, but is silent as to which party has the duty to act or refrain from acting, the parties agree that the Custodian shall not be the party required to take the action or refrain from acting. In no event shall the Custodian have any responsibility to ascertain or take action except as expressly provided herein.

* * *

(i) Under no circumstances shall the Custodian be obligated to verify the authenticity of any signature on any of the documents received or examined by it in connection with this Agreement or the authority or capacity of any person to execute or issue such document, nor shall the Custodian be responsible for the value, form, substance, validity, perfection (other than by taking and continuing possession of the Mortgage Notes, Mortgages and Assignments of Mortgages), priority, effectiveness or enforceability of any such documents nor shall the Custodian be under a duty to inspect, review or examine the documents to determine whether they are appropriate for the represented purpose or that they have been actually recorded or that they are other than what they purport to be on their face.

(j) The Custodian shall have no duty to ascertain whether or not any cash amount or payment has been received by the Seller, the Servicer or any third person.

(k) The Custodian is not required to produce a borrowing base report or any other report detailing the value of the Mortgage Loans.


Section 20 provides that, "[n]otwithstanding anything to the contrary contained in this Agreement, the Custodian

27

hereby acknowledges and agrees that all the rights of [Ocala]

under this Agreement have been assigned to the Collateral Agent

for the benefit of the Secured Parties pursuant to the Security

Agreement."

Section 25 provides that "[t]he Swap Counterparties

are third-party beneficiaries to this Agreement and are entitled

to the rights and benefits hereunder and may enforce the

provisions hereof as if they were a party hereto."

v.    The March 2009 Letter

On March 27, 2009, BoA issued a letter to BNPP in

reference to the Depositary Agreement. The letter provides that

> [a]s an inducement to [BNPP] to enter into, and/or to
> continue its participation in [swap transactions and
> periodic purchases of the rolled-over 2005-1 Notes],
> the Depositary hereby agrees to indemnify and hold
> harmless BNPP, its officers, directors, controlling
> persons and affiliates (collectively, the "Indemnified
> Persons") against any and all claims, losses,
> penalties, fines, forfeitures, reasonable legal fees
> and related costs and judgments, and any other costs,
> fees and expenses that any Indemnified Person may
> sustain to the extent attributable to the Depositary's
> negligence, fraud, bad faith or willful misconduct in
> the performance of its duties under the Depositary
> Agreement (including, without limitation, its duties
> under Section 4(d) thereof). . . .

28

BoA, as Depositary, "further acknowledges that the duties it performs under the Depositary Agreement (including its duties under Section 4(d)) play an important role in mitigating the risks that BNPP would otherwise incur." BoA's undertakings in the March 2009 Letter "extend to BNPP in its individual capacity, as Series 2005-1 Swap Counterparty and (as applicable) as a holder of Series 2005-1 Short Term Notes."

The March 2009 Letter is signed by BoA, but is not signed by Ocala.

### C.    **Alleged Breaches**

The Amended Complaints allege that BoA had actual knowledge that Ocala was insolvent at least as early as January 25, 2008,[6] and nonetheless repeatedly and falsely certified the satisfaction of the Borrowing Base Condition and permitted Ocala to issue Ocala Notes in an amount greater than its assets, up to and through July 20, 2009, the last date on which the Ocala Notes rolled over. According to the Amended Complaints, on their face, each and every Certificate during this period of time reflected Ocala's insolvency, which constituted an Event of

---

[6]     DB alleges that BoA had actual knowledge as early as January 25, 2008. (See DB AC ¶¶ 85-86.) The BNP Plaintiffs allege that BoA had actual knowledge as early as June 30, 2008, the date on which BNP first purchased its secured notes. (See BNP AC ¶¶ 13, 138.)

Default or a Potential Event of Default under the Base
Indenture. In spite of this, BoA failed to notify Plaintiffs, in
violation of its duty to notify under Section 10.4 of the Base
Indenture. Instead, BoA continued to issue purportedly Secured
Notes roughly every thirty days during this period, in violation
of the Depositary Agreement, and permitted the continued
operation of the Ocala Facility, in violation of Section 9.1 of
the Base Indenture.

The Amended Complaints also allege that from at least
January 25, 2008 through August 3, 2009, BoA breached the
Security Agreement by transferring billions of dollars from the
Collateral Account and its sub-accounts for improper purposes
and upon the request of unauthorized persons, in violation of
Section 5.03 of the Security Agreement. They allege that BoA
failed to provide the required notice to Plaintiffs when making
such transfers, when those transfers constituted Potential
Events of Default under the Base Indenture.

The Amended Complaints allege that BoA violated its
duties as Custodian and Collateral Agent by failing to maintain
a "list of all Mortgage Loans with respect to which the
Custodian holds Mortgage Notes, Mortgages and Assignments of
Mortgages pursuant to" the Custodial Agreement, and by providing

30

Plaintiffs with reports that misrepresented that the Ocala
Facility was fully collateralized.

Finally, the BNP Plaintiffs have alleged that the
March 2009 Letter gives them standing to sue BoA for breaching
the Depositary Agreement by repeatedly and falsely certifying
Borrowing Base Certificates despite its actual knowledge of
Ocala's insolvency. The BNP Plaintiffs allege that BoA expressly
contracted in the March 2009 Letter to indemnify BNPP for any
losses sustained by it due to BoA's negligence in, among other
things, certifying the Ocala borrowing base.

Plaintiffs also seek to be indemnified under the
various Facility Documents for BoA's alleged negligence.

## III. THE APPLICABLE STANDARD

On a motion to dismiss pursuant to Rule 12, all
factual allegations in the complaint are accepted as true, and
all inferences are drawn in favor of the pleader. Mills v. Polar
Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). The issue
"is not whether a plaintiff will ultimately prevail but whether
the claimant is entitled to offer evidence to support the
claims." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378

(2d Cir. 1995) (quoting <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 235-36
(1974)).


     To survive a motion to dismiss pursuant to Rule
12(b)(6), "a complaint must contain sufficient factual matter,
accepted as true, to 'state a claim to relief that is plausible
on its face.'" <u>Ashcroft v. Iqbal</u>, -- U.S. --, 129 S. Ct. 1937,
1949 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544,
570 (2007)). Plaintiffs must allege sufficient facts to "nudge[]
their claims across the line from conceivable to plausible."
<u>Twombly</u>, 550 U.S. at 570. Though the court must accept the
factual allegations of a complaint as true, it is "not bound to
accept as true a legal conclusion couched as a factual
allegation." <u>Iqbal</u>, 129 S. Ct. at 1949 (quoting <u>Twombly</u>, 550
U.S. at 555).


     In New York, "[i]nterpretation of the contract is a
legal matter for the court and its provisions establish the
rights of the parties and prevail over conclusory allegations of
the complaint." <u>805 Third Ave. Co. v. M.W. Realty Assocs.</u>, 58
N.Y.2d 447, 451 (1983). If the "parties' intent is unambiguously
conveyed by the plain meaning of the agreements, then
interpretation is a matter of a law." <u>Aon Fin. Prods., Inc. v.
Société Générale</u>, 476 F.3d 90, 95-96 (2d Cir. 2007). "[W]here

the contract is clear and unambiguous on its face, the intent of
the parties must be gleaned from within the four corners of the
instrument." Fetner v. Fetner, 293 A.D.2d 645, 646 (N.Y. 2002)
(citing Nichols v. Nichols, 306 N.Y. 490, 496 (1954)). Whether
or not a contract is ambiguous is a matter of law, properly
decided on a motion to dismiss. See Crane Co. v. Coltec Indus.,
Inc., 171 F.3d 733, 737 (2d Cir. 1999).


IV.  **THE AMENDED COMPLAINTS STATE A CLAIM FOR BREACHES
     OF THE BASE INDENTURE AND BREACH OF FIDUCIARY DUTY**


         The amended complaints allege that BoA had "actual
knowledge" of Ocala's insolvency and other material breaches of
the Facility Documents by Ocala — each of which constituted an
Event of Default or Potential Event of Default and required BoA
to take certain actions under the Base Indenture — at least as
early as January 25, 2008, but failed to act until August 10,
2009. (See DB AC ¶¶ 103, 201; BNP AC ¶¶ 139-40.) BoA's alleged
actual knowledge is based on its receipt of Borrowing Base
Certificates provided by Ocala. According to Plaintiffs'
allegations, these Borrowing Base Certificates contained
information that revealed Ocala's insolvency, even though Ocala
stated on the face of the Certificates that it was solvent.
These misrepresentations by Ocala and other transfer requests

33

submitted by TBW also allegedly constituted material breaches of the Facility Documents. In addition to alleging that BoA had "actual knowledge," Plaintiffs argue that the Borrowing Base Certificates themselves constituted "written notice."

Plaintiffs allege two specific breaches of the Base Indenture: (1) that BoA breached its obligation under Section 10.4 to provide notice of these Events of Default and Potential Events of Default; and (2) that under Section 9.1 BoA was automatically required to shut down the Ocala facility once it had knowledge of Ocala's insolvency, but failed to do so. Plaintiffs also contend that BoA's fiduciary duties were triggered by actual knowledge or written notice of these Events of Default, and that BoA breached its fiduciary duties by failing to take reasonable and prudent steps to secure Ocala's assets.

In response, BoA argues that it is immunized from liability because, even if the Borrowing Base Certificates contained information from which BoA could have determined that Ocala was insolvent, the Base Indenture explicitly provides that BoA shall have "no liability" unless and until it receives formal "written notice" from Ocala. BoA also relies on language in the Base Indenture that says BoA "shall not be charged with

34

knowledge of any default under any Facility Document" unless it receives "written notice of such a default." BoA contends that it was first provided formal written notice of an Event of Default on August 5, 2009, and took prompt action in response to that notice. Thus, according to BoA, the plain language of the Base Indenture precludes liability for the breaches alleged by Plaintiffs, and the claims therefore fail as a matter of law.

### A. The Complaints State a Claim under Section 10.4 of the Base Indenture

Under Section 10.4 of the Base Indenture, BoA was obligated to notify Plaintiffs, as noteholders, of any Event of Default or any event that had the potential to ripen into an Event of Default:

> If an Event of Default or a Potential Event of Default occurs and is continuing and if a Trust Officer of the Indenture Trustee receives written notice or has actual knowledge thereof, the Indenture Trustee shall promptly provide . . . the Noteholders . . . with notice of such Event of Default or the Potential Event of Default.

Base Indenture § 10.4. Plaintiffs allege that BoA breached this provision by failing to notify them of Ocala's insolvency and other material breaches by Ocala, of which BoA had actual knowledge and/or had received written notice in the form of the

Borrowing Base Certificates, at least as early as January 25, 2008.

BoA does not argue that Plaintiffs fail to allege actual knowledge. Rather, BoA argues that even if it possessed this alleged actual knowledge, it is immunized from liability for its failure to take action because it did not receive written notice of either Ocala's insolvency or any other material breaches by Ocala until August 5, 2009, at which point it took all required actions. In support of this contention, BoA relies on three provisions of the Base Indenture: (1) Section 10.1(a), which states that BoA "shall have no liability" for any "action or inaction" with respect to an Event of Default unless and until it receives "written notice" thereof; (2) Section 10.1(c), which states that BoA "shall not be charged with knowledge of any default under and Facility Document" unless it receives "written notice of such a default"; and (3) Section 13.1, which states that BoA "shall have no liability based upon or arising from the failure to receive any notice required by or relating to this Base Indenture or the Notes."

Section 10.1(a), by its terms, applies only "[i]f an Event of Default has occurred and is continuing." Plaintiffs interpret this language to mean that this provision does not

36

apply to circumstances "prior to the declaration of an Event of
Default, when BoA had a duty to inform the Noteholders of a
Potential Event of Default" under Section 10.4. (BNP Opp. 14;
see DB Opp. 13-15.) In contrast, Section 10.1(b) establishes the
standard of conduct for BoA prior to the occurrence of an Event
of Default, namely to perform "those duties that are
specifically set forth in this Base Indenture or the Facility
Documents." Base Indenture § 10.1(b).

        Plaintiffs contend that the written notice limitation
of Section 10.1(a) does not apply to Potential Events of Default
because a Potential Event of Default is defined to include "any
occurrence or event which, with the giving of notice, the
passage of time or both, would constitute an Event of Default."
Instead, they argue that Section 10.1(b) should apply to BoA's
conduct. Specifically, Plaintiffs contend that the limitation of
Section 10.1(a) regarding notice to the Indenture Trustee does
not, and could not, apply to Potential Events of Default because
Potential Events of Default, by definition, cover only
circumstances in which the notice that would trigger an Event of
Default has not been given. A Potential Event of Default is "any
occurrence or event which, with the giving of notice, the
passage of time or both, would constitute an Event of Default."
Id. Thus, Section 10.1(a) does not apply when determining

37

whether BoA provided notice of a Potential Event of Default under Section 10.4. Rather, BoA's conduct in this circumstance is guided by Section 10.1(b). The question is whether BoA performed its express duties under the contract, and BoA is strictly liable for any breach of these duties as a matter of basic contract law. See Restatement (Second) of Contracts, ch. 11 introductory note, at 309 (1981) ("Contract liability is strict liability. It is an accepted maxim that pacta sunt servanda, contracts are to be kept. The obligor is therefore liable in damages for breach of contract even if he is without fault.").

BoA insists that this interpretation fails because an Event of Default does not require a declaration in order to occur or be occurring and because Ocala's insolvency was an actual Event of Default, not a Potential Event of Default. (See BoA Reply 6.) BoA argues that the other claimed Events of Default – breaches by TBW under the Purchase Agreement that allegedly triggered Sections 9.1(a) and (b) of the Base Indenture – were not Potential Events of Default because they automatically "ripened" into actual Events of Default without written notice. BoA also argues that Ocala's failure to provide notice of a Potential Event of Default to BoA precludes BoA from

38

being liable for Ocala's failure to provide required notices to BoA.

However, even if Ocala's insolvency and other material breaches automatically ripened into Events of Default, as BoA contends, the application of Section 10.1(a) upon an Event of Default provides no refuge for BoA because it expressly states that the written notice requirement "shall not have the effect of insulating the Indenture Trustee from liability arising out of the Indenture Trustee's negligence or willful misconduct." In other words, Plaintiffs allege that BoA is liable for action or inaction in the absence of written notice of an Event of Default where, as here, BoA acted without due care or engaged in misconduct.

Plaintiffs allege that BoA had actual knowledge of Ocala's insolvency, an Event of Default, and of other material breaches by Ocala, which were, at the very least, Potential Events of Default, but failed to notify Plaintiffs. Whether BoA's failure to act based on its alleged actual knowledge constituted negligence or willful misconduct, and therefore strips BoA of the exculpatory protections of Section 10.1(a), is a question of fact unsuited to resolution on this motion.

39

In its reply brief, BoA argues that this proviso regarding negligence by BoA "simply reaffirms that BoA's actions after receipt of written notice are subject to the standard of care specified in the first sentence" of Section 10.1(a). This interpretation relies on BoA's reading of the contract to insulate it from liability prior to receipt of formal written notice, a reading Plaintiffs contend is contradicted by the "actual knowledge" language of Section 10.4.

BoA also relies on Section 10.1(c)(iv) to limit the kind of negligence that might give rise to liability for BoA. Section 10.1(c)(iv) states that BoA "shall not be charged with knowledge of any default under any Facility Document, unless a Trust Officers of the Indenture Trustee receives written notice of such a default." However, Section 10.1(c) only addresses circumstances under which BoA may be "charged with knowledge" of a default, a phrase commonly understood to refer to the imputation of constructive knowledge in circumstances where actual knowledge is absent. See, e.g., Wash. Nat'l Ins. Co. v. Morgan Stanley & Co, Inc., No. 90 Civ. 3342, 1999 WL 461796, at *9 (S.D.N.Y. July 2, 1999) ("However, the issue is whether WNIC can be charged with knowledge of these articles even if no one at WNIC actually read them."). BoA's interpretation of Section 10.1(c) not only ignores the common meaning of the phrase

40

"charged with knowledge," but also places Section 10.1(c) in
direct opposition to Section 10.4, which expressly imposes a
duty on BoA to act if a Trust Officer "has actual knowledge" of
an Event of Default or Potential Event of Default.

BoA's attempt to nullify the effects of Section 10.4
and to read out the "actual knowledge" language is contrary to
well-established principles of contract construction. Section
10.4 treats actual knowledge and written notice as two distinct
concepts. If, as BoA argues, actual knowledge also requires
written notice, then there is no distinction between written
notice and actual knowledge and the Base Indenture's reference
to actual knowledge is superfluous and would read a conflict
into the contract. See Galli v. Metz, 973 F.2d 145, 149 (2d Cir.
1992) ("Under New York law an interpretation of a contract that
has the effect of rendering at least one clause superfluous or
meaningless . . . is not preferred and will be avoided if
possible." (internal quotation marks omitted)). "[W]here two
seemingly conflicting contract provisions reasonably can be
reconciled, a court is required to do so and to give both
effect." Perlbinder v. Bd. of Mgrs. of 411 E. 53rd St. Condo.,
886 N.Y.S.2d 378, 381 (N.Y. App. Div. 2009) (internal quotation
marks omitted); see also id. ("An interpretation that gives
effect to all the terms of an agreement is preferable to one

41

that ignores terms or accords them an unreasonable interpretation."); accord Restatement (Second) of Contracts § 236(a) (1979).

In the cases cited by BoA, unlike the Base Indenture in this case, the indentures at issue did not include provisions requiring the trustee to notify noteholders of potential events of default if the trustee obtained actual knowledge thereof. For example, in Argonaut Partnership v. Bankers Trustee Co., No. 96 Civ. 1970, 2001 WL 585519 (S.D.N.Y. May 30, 2001), the indenture provided that it was only written notice, not actual knowledge of a default that would trigger the trustee's duties. Id. at *2; see also Putnam High Yield Trust v. Bank of N.Y., 776 N.Y.S.2d 796, 796 (N.Y. App. Div. 2004) (indenture explicitly defined "actual knowledge" as requiring written notice and specified the content of a written notice); UBS Capital Am. II, LLC v. Highpoint Telecomms. Inc., No. 01 CIV. 8113, 2002 WL 377537, at *4-5 (S.D.N.Y. Mar. 8, 2002) (contract contained no "actual knowledge" provision and specified content of requisite written notice); Magten Asset Mgmt. Corp. v. Bank of N.Y., 841 N.Y.S.2d 219, 2007 WL 1326795, at *4-7 (N.Y. Sup. Ct. May 8, 2007) (contract contained no "actual knowledge" provision and required an "admission of inability to pay debts as they became due").

42

The only analogous case cited by BoA is In re National
Century Financial Enterprises, Inc., No. 2:03-md-1565, 2006 WL
2849784 (S.D. Ohio Oct. 3, 2006), in which the indentures at
issue required the trustee to deliver notices once it had actual
knowledge of a potential event of default. Id. at *6. In that
case, however, the court concluded that the issue of whether the
trustee had actual knowledge of a potential event of default
triggering an obligation to provide notice could not be resolved
on a motion to dismiss. Id.

Here, Plaintiffs have alleged that BoA had actual
knowledge of the default, an allegation against which Sections
10.1(a) and (c) cannot be a defense without reading the "actual
knowledge" language out of Section 10.4. Accordingly, it is a
plausible interpretation of the Base Indenture that neither
Section 10.1(a) nor Section 10.1(c) relieves BoA of its express
contractual obligation under Section 10.4. The question of
whether BoA had actual knowledge is a factual matter not
properly resolved on this motion.

DB also contends that BoA is precluded from arguing
that formal written notice was a condition precedent to its
obligations under Section 10.1 based on the "prevention
doctrine," because it was BoA's own breach that caused the

43

failure of this condition. See Semi-Tech Litig., LLC v. Bankers
Trust Co., 450 F.3d 121, 129 (2d Cir. 2006) (indenture trustee's
failure to inspect certificates may not excuse its failure to
comply with the duty to give notice of defaults that would have
been discovered had the indenture trustee inspected the
certificates); Bank of N.Y. v. Tyco Int'l Group, S.A., 545 F.
Supp. 2d 312, 324 n.81 (S.D.N.Y. 2008) ("[I]t has been
established for over a century that a party may not insist upon
performance of a condition precedent when its non-performance
has been caused by the party [it]self." (internal quotation
marks omitted)). DB contends that had BoA notified Plaintiffs of
Ocala's insolvency and other material breached by Ocala,
Plaintiffs would have been able to provide BoA with notice
confirming the Events of Default and instructing BoA to shut
down the Ocala Facility. Accordingly, as in Semi-Tech, BoA may
not insist on a written notice requirement where its own
breaches caused the failure of this requirement to be met. DB
argues that BoA not only failed to alert Plaintiffs of Events of
Default or Potential Events of Default, as required by Section
10.4, but it also provided false affirmative assurances to
Plaintiffs that the Ocala facility was fully collateralized.
(See DB AC ¶¶ 160-67.) In response, BoA argues that "[t]he
notice that would have satisfied the condition for liability on
BoA's part would have come from Ocala." (BoA Reply 12 n.5.)

However, even if notice from Ocala would have satisfied the
condition, notice from any of the Plaintiffs also would have
satisfied the condition, and they were in fact prevented from
providing such notice by BoA's alleged failure to provide notice
of Ocala's insolvency and material breaches, and by BoA's false
certifications of the Borrowing Base Certificates.

Furthermore, to the extent that written notice of an
Event of Default was required, Plaintiffs have alleged that BoA
did have written notice in the form of Borrowing Base
Certificates, which allegedly showed on their face that Ocala
was insolvent, and which BoA reviewed and certified on a monthly
basis, beginning at least as early as January 25, 2008. It was
BoA's certification of the Borrowing Base Certificates on which
Plaintiffs relied until August 2009. Additionally, DB has
alleged that BoA received various requests for transfers that
constituted written notice of material breaches of the Facility
Documents by Ocala. (See DB AC ¶¶ 85-94, 120-133, 143-150.)

BoA argues that the borrowing base certificates cannot
constitute written notice because "written notice" under the
Base Indenture can mean only formal written notice. (BoA Mem.
30-33.)

45

However, there is no requirement in the Base Indenture that "written notice" be "formal" or conform to the format and content of the letters provided by Plaintiffs to BoA in August 2009, which BoA cites as a "model of what one would expect such 'written notice' to be." (BoA Mem. 3.) Rather, Schedule I to the Base Indenture defines "written" or "in writing" as "any form of written communication, including, without limitation, by means of telex, telecopier device, computer, telegraph or cable." Formality is not required or implied by this definition, nor is it alleged that anything in the parties' prior conduct required formal written notice. See Phillips Petroleum Co. v. Rexene Corp., No. 95-1451, 1996 WL 137536, at *2 (Fed. Cir. Mar. 27, 1996) (unpublished) (holding provision requiring "written notice of . . . default" did not require "formal" or "heightened" notice, references to the agreement or its default provisions, or even the word "default" and refusing to imply such requirements in a commercial contract between sophisticated parties with equal bargaining power).

Section 13.1 of the Base Indenture, entitled "Notices," upon which BoA relies, states only that notice to the BoA must be delivered to a specific mailing address (defined to include a specific e-mail address). However, it does not specify the required contents of the notice. Plaintiffs allege that the

46

Borrowing Base Certificates were delivered to the representative

of BoA in accordance with Section 13.1 of the Base Indenture.

(See DB AC ¶¶ 83-88, 120-28.)


        In the Second Circuit, a trustee may not impose any

notice requirement higher than that set forth explicitly in the

indenture. See Meckel v. Cont'l Res. Co., 758 F.2d 811, 815 (2d

Cir. 1985) ("The indenture provided that notice be given by

first-class, postage prepaid mail. That is all the law required

Citibank to do."). To impose the additional requirement that

written notice take a particular "formal" form impermissibly

inserts additional terms in the Base Indenture. See Petracca v.

Petracca, 756 N.Y.S.2d 587, 588 (App. Div. 2003) (noting that

"[a] court may not write into a contract conditions the parties

did not include by adding . . . terms under the guise of

construction" and finding that a letter constituted notice of

termination).


        Ultimately, the question of whether the Borrowing Base

Certificates and transfer requests constituted sufficient

written notice under the Base Indenture is an issue of fact not

appropriate for resolution on a motion to dismiss. See generally

DeLago v. Robert Plan Corp., No. 04 Civ. 3193, 2006 WL 489845

(S.D.N.Y. Feb. 26, 2006) (whether letters constituted written

47

notice of default under terms of promissory notes could not be decided as matter of law).

**B.     The Amended Complaints State a Claim for Breach of Section 9.1 of the Base Indenture**

Independent of BoA's duties under Section 10.4, Plaintiffs allege that BoA was obligated to declare an Event of Default under Section 9.1 as soon as it became aware of Ocala's insolvency, but failed to do so. See Base Indenture § 9.1(f) & (h). The relevant provisions of Section 9.1 triggered BoA's obligation to shut down the Ocala facility, as set forth in sub-clauses (i)-(iii) of Section 9.1.

BoA argues that it has no liability for its failure to perform the obligations in sub-clauses (i)-(iii) of Section 9.1, even if it had actual knowledge of Ocala's insolvency, because Section 10.1(a) requires that BoA first have formal written notice. BoA also argues that it has no liability because the Section 9.1 provides that Ocala was expected to provide BoA with prompt notice of its insolvency to trigger the duties cited by Plaintiffs. (See BoA Mem. 28-29; BoA Reply 12.)

48

However, Section 9.1 provides that "[n]otwithstanding anything in this Base Indenture to the contrary, in the event that an Indenture Event of Default" resulting from Ocala's insolvency "occurs and is continuing," BoA is obligated to shut down the Facility and provide Plaintiffs with written notice of such an event. Under New York law, the language "[n]otwithstanding anything in this Base Indenture to the contrary" trumps all other provisions, including Section 10.1. See Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 90-91 (2d Cir. 2002) (holding that "'[n]otwithstanding anything herein contained to the contrary' . . . overrides any inconsistent language elsewhere" in the contract); see also N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.), 266 F.3d 112, 125 (2d Cir. 2001) ("additional 'notwithstanding anything contained herein' language plainly supersedes the broader Policy provisions"); L&B 57th St., Inc. v. E.M. Blanchard, Inc., 143 F.3d 88, 93 (2d Cir. 1998) ("Because . . . clause provides that its application is 'notwithstanding anything herein to the contrary,' it trumps the clause guaranteeing the payment of attorney's fees and other expenses.").

Here, the "notwithstanding" language precedes the provisions that require BoA to shut down the facility, which explicitly require BoA, once it has actual knowledge of Ocala's

49

insolvency, to instruct Ocala to cease the purchase of
mortgages, notify TBW of the Event of Default and otherwise wind
down the Ocala facility in accordance with the Base Indenture.
Plaintiffs contend that this language renders the exculpatory
provisions of Section 10.1 inapplicable.

This interpretation is consistent with the role of
Indenture Trustee to ensure the payment of secured bonds. "If
. . . an indenture trustee is under no enforceable obligation to
act prudently to preserve and manage the trust assets in the
event of default, and so to provide some reasonable assurance
that the bondholders eventually receive their due, it may be
asked whether the indenture does in fact secure the payment of
anything." Beck v. Mfrs. Hanover Trust Co., 632 N.Y.S.2d 520,
527 (App. Div. 1995).

Accordingly, DB and BNP, as noteholders, have stated a
claim for breach of Section 9.1 of the Base Indenture, which
requires BoA to perform the obligations set forth in sub-clauses
(i)-(iii) once it had actual knowledge of Ocala's insolvency.

50

C.   **The Amended Complaints State a
     <u>Claim for Breach of Fiduciary Duty</u>**

Plaintiffs have alleged that after the occurrence of
an Event of Default, namely Ocala's insolvency and/or other
allegedly material breaches of the Facility Documents by Ocala,
BoA's duties as Indenture Trustee expanded to include a
fiduciary duty to Plaintiffs, as secured holders of the Ocala
Notes, and that BoA breached its fiduciary duty by failing to
notify Plaintiffs and shut down the Facility, as set forth
above.

BoA argues that the claims for breach of fiduciary
duty fail for the same reasons that the claims for breach of the
Base Indenture fail: that BoA does not assume heightened duties
until there is an Event of Default, and shall have not liability
until it receives written notice of such an Event of Default,
including liability under any heightened fiduciary duty. BoA
also argues that the claim should be dismissed because "under
the specialized law relating to Indenture Trustees, no fiduciary
duties can be implied outside the terms of the Indenture." (BoA
Mem. 34.)

51