UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

BNP PARIBAS MORTGAGE
CORPORATION and BNP PARIBAS,

                    Plaintiffs,                    09 Civ. 9783 (RWS)

     - against -                                        OPINION

BANK OF AMERICA, N.A.,

                    Defendant.

------------------------------------X

DEUTSCHE BANK AG,

                    Plaintiff,

     - against -                                   09 Civ. 9784 (RWS)

BANK OF AMERICA, N.A.,                                  OPINION

                    Defendant.


------------------------------------X


A P P E A R A N C E S:


          Attorneys for Plaintiffs BNP Paribas
          Mortgage Corporation and BNP Paribas

          BOIES SCHILLER & FLEXNER LLP
          333 Main Street
          Armonk, NY  10504
          By:  Robin A. Henry, Esq.
               Motty Shulman, Esq.
               Jack Wilson, Esq.

Attorneys for Plaintiff Deutsche Bank AG

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
By:  William E. McDaniels, Esq.
     Stephen D. Andrews, Esq.
     Stephen P. Sorensen, Esq.
     Daniel M. Dockery, Esq.
     Katherine O'Connor, Esq.


Attorneys for Defendant Bank of America, N.A.

MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA  90071-1560
By:  Marc T.G. Dworsky, Esq.
     Kristin Linsley Myles, Esq.
     Gregory Weingart, Esq.
     Richard St. John, Esq.

KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY  10036
By:  Richard T. Marooney, Esq.

**Sweet, D.J.**

Third party defendant BNP Paribas Securities Corporation ("BNPPS") and third party defendant Deutsche Bank Securities, Inc. ("DBS") (collectively, the "Note Dealers" or the "Third Party Defendants") have moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the third party complaint (the "Complaint") of the defendant and third party plaintiff Bank of America ("BoA" or the "Third Party Plaintiff").  The third party motion to dismiss ("Third Party Motion to Dismiss") is granted and the Complaint is dismissed.

While the Third Party Motion to Dismiss was sub judice, the plaintiffs BNP Paribas Mortgage Corporation and BNP Paribas ("BNP") and Deutsche Bank AG ("DB") (collectively, the "Note Holders" or the "Plaintiffs") moved pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure to amend their first amended complaints ("FACs") and for leave to file their proposed second amended complaints ("SACs").  Upon the conclusions set forth below, the Plaintiffs' motion to amend ("Motion to Amend") is granted.

1

Once again, in this complicated dispute between major financial institutions arising out of the collapse of Taylor, Bean & Whitaker Mortgage Corp. ("TBW") and its subsidiary Ocala Funding LLC ("Ocala"), pleading issues have arisen with respect to the Third Party Motion to Dismiss.  According to BoA, the Complaint will serve to realign the parties by asserting claims for contribution arising out of negligence and breach of fiduciary duty.  According to BNPPS and DBS, the Complaint fails to state viable causes of action.

With respect to the Motion to Amend, according to the Plaintiffs, the liberal standard governing amendment of pleadings compels that the motion be granted.  According to BoA, the Motion to Amend has been unduly delayed, prejudices BoA, and should be denied on the basis of judicial economy.

Highly skilled advocates have again illuminated the conflicting positions.

I. **Prior Proceedings**

The Plaintiffs initiated these actions in November 2009, and alleged that (1) they had invested, collectively, over $1.6 billion in short-term notes issued by Ocala (the "Notes"),

2

a wholly-owned subsidiary of TBW that served as a funding
vehicle for TBW; (2) Ocala's assets were to have served as
collateral for the repayment of Plaintiffs' notes; (3) due to a
massive fraud by TBW, Ocala's assets were diverted or stolen by
TBW and others; and (4) BoA should be responsible for these
losses because it served as Indenture Trustee, Collateral Agent,
Depositary, and Custodian for the Ocala notes, and allegedly
breached its responsibilities under the corresponding facility
documents, which includes the Indenture, the Security Agreement,
the Depositary Agreement, and the Custodial Agreement
(collectively, the "Facility Documents"), by failing to protect
Ocala's collateral from the sort of wrongdoing that TBW
committed.

BoA moved to dismiss these complaints in February
2010.  In response, on March 17, 2010, the Plaintiffs filed
their FACs reasserting their initial claims, adding new claims
for breach of contract and breach of fiduciary duty, and
generally supplementing and refining their factual allegations.
In addition to their earlier theory that BoA had negligently
performed its contractual duties, the Plaintiffs' FACs asserted
that BoA had negligently provided them with incorrect Borrowing
Base Certificates, on which they allegedly relied in deciding to
"roll" their Ocala notes.

On April 30, 2010, BoA moved to dismiss the FACs and oral argument was heard on that motion on September 15, 2010. On March 23, 2011, this Court issued its ruling on BoA's motion in BNP Paribas Mortg. Corp. v. Bank of America, N.A., 778 F. Supp. 2d 375 (S.D.N.Y. 2011) (the "March Opinion").  The decision dismissed the Plaintiffs' contract claims under the Depositary Agreement and Custodial Agreement, but the Plaintiffs' indemnification claims and DB's claims under earlier versions of the Facility Documents were upheld.

On August 30, 2010, the Plaintiffs filed new actions against BoA in the Southern District of Florida, asserting claims for conversion of Ocala's assets and seeking to recover for their investment losses on their unpaid Ocala notes. Deutsche Bank AG v. Bank of America ("Deutsche II"), S.D. Fla. Civil Action No. 10-23124 and BNP Paribas Mortg. Corp. v. Bank of America ("BNP II"), S.D. Fla. Civil Action No. 10-23116 (collectively, the "Conversion Actions").  On November 17, 2010, the actions were transferred to the Southern District of New York and referred to this Court.  By opinion on August 30, 2011, the Plaintiffs' conversion claims were dismissed.  BNP Paribas Mortg. Corp. v. Bank of America, N.A., Nos. 10-8630 and 10-8299, 2011 WL 3847376 (S.D.N.Y. Aug. 30, 2011) (the "August Opinion").

4

The parties commenced discovery in April 2011.  BoA answered the Plaintiffs' FACs on June 8, 2011 and asserted several affirmative defenses.  The parties stipulated and agreed to complete document production by March 30, 2012, close fact discovery on November 16, 2012, and the time to amend pleadings was extended to December 17, 2012.

By letter of July 6, 2011, the Plaintiffs made a formal demand on BoA, as Indenture Trustee and Collateral Agent, to pursue claims against the Depositary, Custodian and Collateral Agent for breaches of the Depositary, Custodial and Security Agreements.  On August 6, 2011, BoA refused Plaintiffs' demands.

On June 22, 2011, BoA filed its Complaint against the Third Party Defendants.  The Third Party Motions were heard and marked fully submitted on January 25, 2012.

On December 29, 2011, the Plaintiffs filed the Motion to Amend, which was heard and marked fully submitted on April 4, 2012.

## II.  **The Applicable Standards**

5

The applicable standard for the determination of Rule 12(b)6 motions was set forth in the March Opinion and that standard is equally applicable on this motion.

The standard governing motions to amend is a "permissive" one that is informed by a "strong preference for resolving disputes on the merits." See Williams v. Citigroup Inc., 659 F.3d 208, 212-13 (2d Cir. 2011) (citing New York v. Green, 420 F.3d 99, 104 (2d Cir. 2005)); see also Pangburn v. Culbertson, 200 F.3d 65, 70 (2d Cir. 1999) (referring to the "relaxed standard" for motions to amend).  Rule 15(a) provides that leave to amend shall be "freely give[n] . . . when justice so requires."  Fed. R. Civ. P. 15(a)(2).

While the decision whether to grant or deny leave to amend is within the sound discretion of the district court, refusal to grant leave must be based on a valid ground.  Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962) ("outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion"); Acito v. IMCERA Grp., Inc., 47 F.3d 47, 55 (2d Cir. 1995) ("there must be good reason [for a district court] to deny the motion.").  Thus, the standard for leave to amend,

6

while permissive, is by no means "automatic." Klos v. Haskel,
835 F. Supp. 710, 715 (W.D.N.Y. 1993).  The Rule 15(a) standard
"is not a mechanical absolute and the circumstances and terms
upon which such leave is to be 'freely given' is committed to
the informed, careful judgment and discretion of the Trial Judge
as he superintends the development of a cause toward its
ultimate disposition." Freeman v. Continental Gin Co., 381 F.2d
459, 468 (5th Cir. 1967).

     Indeed, leave to amend should "only [be] given when
factors such as undue delay or undue prejudice to the opposing
party are absent." SCS Commc'ns, Inc. v. Herrick Co., Inc., 360
F.3d 329, 345 (2d Cir. 2004); see also Foman, 371 U.S. at 182
(stating that good reasons to deny leave include futility, bad
faith, undue delay, or undue prejudice to the opposing party).
Other factors that may be considered include the length of the
delay, the judicial and party resources that have been expended,
and any tactical behavior evident in the plaintiff's request for
leave to amend. See generally McCarthy v. Dun & Bradstreet, 482
F.3d 184, 200-01 (2d Cir. 2007); State Trading Corp. of India v.
Assuranceforeningen Skuld, 921 F.2d 409, 418 (2d. Cir. 1990).
Thus, generally stated, "if the plaintiff has at least colorable
grounds for relief," a district court may grant leave to amend
"unless the plaintiff is guilty of undue delay or bad faith or

7

unless permission to amend would unduly prejudice the opposing party." S.S. Silberblatt, Inc. v. E. Harlem Pilot Block - Bldg. 1 Hous. Dev. Fund Co., 608 F.2d 28, 42 (2d Cir. 1979).

### III. **THE THIRD PARTY MOTION TO DISMISS**

BNP is a sister subsidiary of the Third Party Defendant BNPPS and DB is the parent company of the Third Party Defendant DBS.  The Complaint alleges that the Third Party Defendants served as the exclusive Note Dealers for the Ocala notes involved in this action and were responsible for the promotion and marketing of the notes.  (Complaint ¶ 13, Private Placement Memorandum ("PPM") at 8-9).[1]  BoA contends that Ocala offered its Notes on a private placement basis in purported reliance upon Section 4(2) of the Securities Act of 1933 (the "Act") and the Securities and Exchange Commission's ("SEC") Regulation D, which exempts certain private securities transactions from the Section 5 registration requirements that form the core of the Act.  (PPM at 10; Memo Opp. at 5).

The Note Dealers' specific responsibilities were set out in a Short Term Note Dealer Agreement with Ocala (the "Note

---

[1]     The Note Dealers offered the PPM to the Court for consideration in connection with this Motion.

Dealer Agreement"). According to BoA, both the applicable
industry rules for Regulation D offerings and the Note Dealer
Agreement, which the Note Dealers concede governed their role in
the Ocala offering, required Ocala to prepare and the Note
Dealers to employ, a PPM that would furnish relevant information
to potential investors and "expressly offer an opportunity" for
prospective purchasers to "ask questions of and receive answers
from" Ocala and the Note Dealers concerning the notes.  (PPM at
iv; Memo Opp. at 5).

         BoA argues that the Third Party Defendants, as the
registered brokers and dealers of securities, undertook the duty
to conduct a reasonable investigation of the Notes and to ensure
that the Notes were suitable for purchase by an investor.
(Complaint ¶ 13).  According to BoA, by offering the Notes for
sale, the Third Party Defendants represented to their customers,
through the sale of securities to those customers, that a
reasonable investigation had been made and that their offering
of the Notes was based on that investigation.  (Id.)

         The Complaint alleges that the Note Holders' roles in
the Ocala facility gave them unique access to information from
TBW and Ocala and the continuing viability of Ocala's notes.
(Id. ¶¶ 15, 17).  It is not disputed for the purposes of this

motion, that the Note Dealers had actual knowledge of material
facts, not disclosed in the PPM, indicating a pattern by TBW of
manipulation and misrepresentation of Ocala's assets, including
a fraudulent $642.7 million "receivable" and admissions by TBW
that Ocala did not have the funds to repay the notes.  (Id. ¶¶
19-21).

The Complaint further alleges that, despite this
knowledge of serious undisclosed problems with Ocala's notes,
the Note Dealers did not conduct any further investigation and
instead continued to promote and market the Notes. (Id. ¶ 21).
BoA maintains that the Note Dealer Agreement prohibited the Note
Dealers from selling the notes if they received notice of facts
rendering any of the disclosures in the PPM materially false or
misleading.  (Memo Opp. at 6).  Accordingly, through its
Complaint, BoA seeks to realign this dispute in the event it is
found liable to the Plaintiffs and to obtain contribution from
BNPPS and DBS and its affiliates based on the Third Party
Defendants' negligence.  (Complaint ¶ 12).

## A) The BoA Claims For Contribution By The Third Party Defendants Based On Negligence Are Dismissed

Under New York law, to sustain a claim for negligence,
the plaintiff must show that the defendant owed the plaintiff a

10

cognizable duty of care, that the defendant breached that duty,
and that the plaintiff suffered damages as proximate result of
that breach.  King v. Crossland Sav. Bank, 111 F.3d 251, 255 (2d
Cir. 1997).  "To sustain a third-party cause of action for
contribution, a third-party plaintiff is required to show that
the third-party defendant owed it a duty of reasonable care
independent of its contractual obligations, or that a duty was
owed to the plaintiffs as injured parties and that a breach of
that duty contributed to the alleged injuries."  Siegl v. New
Plan Excel Realty Trust, Inc., 84 A.D.3d 1702, 1703, 922
N.Y.S.2d 899, 901 (App. Div. 2011) (citation omitted).  Thus, to
plead its third-party negligence claim, BoA must allege:  (i)
that BNPPS and DBS owed the Note Holders a cognizable duty of
care; (ii) that BNPPS and DBS breached that duty; and (iii) that
the Note Holders suffered damage as a proximate result of that
breach.  See DiBenedetto v. Pan Am World Serv., Inc., 359 F.3d
627, 630 (2d Cir. 2004); Pension Comm. of Univ. of Montreal
Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 198
(S.D.N.Y. 2006).


    BoA's allegation in support of a duty of care is that
"[b]y offering the Notes for sale" and "by virtue of its role as
a broker and dealer," BNPPS and DBS assumed substantial duties

11

to purchasers of the Ocala notes.   (Complaint ¶¶ 13, 24).
Specifically, BoA asserts that:

> By offering the Notes for sale, and by virtue of the
> special relationship that Third Party Defendants' role
> as note dealers and placement agents created between
> themselves and any purchasers of the Notes.   [BNPPS
> and DBS] represented to their customers through their
> sale of securities that a reasonable investigation had
> been made and that their offering and recommendation
> of the Notes was based on that investigation and
> assumed a concomitant duty to ensure that that
> representation was accurate.

A broker or dealer that lacks discretionary control
over investment decision usually has no duty of care that
extends beyond the execution of transactions.  See In re Refco
Securities Litigation, 759 F. Supp. 2d 301, 323 (S.D.N.Y. 2010)
("[W]here a broker does not have discretionary trading authority
over an account, the broker's only duty is the proper execution
of transactions upon explicit customer instructions."); Bissell
v. Merrill Lynch & Co., Inc., 937 F. Supp 237, 246 (S.D.N.Y.
1996) ("[T]he scope of affairs entrusted to a broker is
generally limited to the completion of a transaction.").   As
the Second Circuit explained, "a broker ordinarily has no duty
to monitor a nondiscretionary account, or to give advice to such
a customer on an ongoing basis."  De Kwiatkowski v. Bear,
Stearns & Co, Inc., 306 F.3d 1293, 1302 (2d Cir. 2002).

12

Moreover, "in the ordinary non-discretionary account, the broker's failure to offer information and advice between transactions cannot constitute negligence." Id. at 1306.

BoA alleges that the PPM prepared for the Notes contained an omission of a $642.7 million receivable due to Ocala from TBW, which the Note Dealers did not correct, disclose, properly conduct due diligence or refrain from selling. (Complaint ¶¶ 16, 17, 19). BoA, however, has not cited to a case establishing negligence on the facts alleged here. Instead, BoA contends that the duties that were violated may be gleaned from "industry standards and practice," third-party contractual undertakings, and the existence of an affiliate relationship. (Memo Opp. at 10-11).

BoA argues that the duties it alleges constitute industry standards and practices that may be derived from securities laws. As noted above, the Ocala note offering was made pursuant to Regulation D, which permits a limited exemption from the normal registration requirements of the Act. The SEC and the Financial Industry Regulatory Authority ("FINRA") recognized that this exemption could make Regulation D offerings susceptible to abuse, particularly where broker-dealers involved in the offering of the exempt securities fail to conduct due

diligence.  (Memo Opp. at 11-12).  In response to such concerns,
FINRA instructed its members that before selling a Regulation D
security, broker-dealers owe a duty of care to prospective
investors to conduct an appropriate investigation of the
security.  See FINRA, Regulatory Notice 10-22, 2010 WL 1625161,
at *3 (2010).  BoA contends that these industry rules recognize
that a broker-dealer must conduct reasonable due diligence and
maintain duties of care and candor to investigate.  (Memo Opp.
at 12).

However, courts have not imposed note dealers in a
private placement to any duty concerning statements made by an
issuer in a PPM.  Section 12(2) of the Act addresses the civil
liabilities that sellers of securities may face if they make
misrepresentations, by untruth or omission, in a prospectus or
in oral communications.  48 Stat. 84, as amended, 15 U.S.C. § 77
l(2).  In Gustafson v. Alloyd Co., the Supreme Court held that
documents in private placements, such as the PPM on which BoA's
claim is founded, do not come within the scope of Section 12(2).
513 U.S. 561, 582, 115 S. Ct. 1061, 131 L. Ed. 2d 1 (1995).  The
treatise BoA has relied upon to establish the standard of care
recognizes that in the wake of Gustafson, "an intermediary's
liability for disclosure deficiencies in a private placement"
must be "determined under Rule 10b-5," which "of course requires

14

the plaintiff to demonstrate scienter on the part of the
defendant," as opposed to "Section 12(a)(2)[,] . . . which . . .
is a 'negligence-based' remedy." CHARLES J. JOHNSON & JOSEPH
MCLAUGHLIN, CORPORATE FINANCE AND SECURITIES LAWS 7-58 (4th ed. 2011
Supp.).[2]

Following Gustafson, a district court in the Southern
District of Texas found that a broker in a private placement had
no duty to conduct "due diligence" or investigate the issuer or
the offering. In re Enron Corp. Sec., Derivative & ERISA
Litig.), 761 F. Supp. 2d 504, 572-73 (S.D. Tex. 2011).  While
BoA seeks to distinguish this case by characterizing it as
"applying Texas Blue Sky laws," (Memo Opp. at 16 n.7), the
plaintiffs in Enron asserted numerous claims, including several
claims under New York common law.  761 F. Supp. 2d at 517.

Courts in this district have also rejected similar
efforts to derive causes of action from securities regulations
premised on a negligence standard.  "[E]ach court that has
considered the question has concluded that mere negligent
violations of the NYSE [New York Stock Exchange] or NASD
[National Association of Securities Dealers] rules are not

_____

[2] BoA has not sought contribution for a violation of Rule 10b-5 or its most
closely-related common law analogue, fraud.

actionable in federal court; rather, to form the basis for
liability in damages, the broker's violations of the rules must
be 'tantamount to fraud.'"  Rolf v. Blyth Eastman Dillon & Co.,
424 F. Supp. 1021, 1041 (S.D.N.Y. 1977), aff'd, 570 F.2d 38 (2d
Cir. 1978) amended by, No. 77-7104, 1978 WL 4098, at *1 (2d Cir.
May 22, 1978) (per curiam).  "To meet this standard in this case
would mean that the violations operated as a fraud upon the
plaintiff and that the defendants acted with scienter, that is,
with intent to defraud or with willful and reckless disregard
for the truth or falsity of their representation . . . ."  Id.,
424 F. Supp. at 1041.

BoA seeks to meet this requirement by citing cases
brought by regulatory authorities rather than private
plaintiffs.  BoA cites to Hanly v. SEC, 415 F.2d 589 (2d Cir.
1969), as establishing the standard of care it advocates.  (See
Memo Opp. at 11, 12, 13 & n.6, 19).  However, Hanley was not an
action for damages by a private litigant, but rather a
disciplinary action by the SEC and addressed not a common law
standard of care, but the due diligence defense to Section 10(b)
and Rule 10b-5 securities fraud.  Id. at 596-97.  The Second
Circuit in Hanly also recognized that the standards in the two
contexts were different and that private plaintiffs may not
avail themselves of a "negligence" standard under the

16

regulations in question.  415 F.2d at 596-97 & n.13 (citing cases).

BoA has also cited case law that establishes the duties of "order-taker" brokers, who expressly recommend securities, to include all dealers in private placements because a broker's mere participation in a private placement constitutes a "recommendation," either explicit or implied, to make a purchase.  BoA cites to University Hill Foundation v. Goldman, Sachs & Co., for the proposition that sale of notes in a Regulation D offering "can fairly be said to imply . . . a good faith opinion that the Company was creditworthy."  422 F. Supp. 879, 893 n. 14 (S.D.N.Y. 1976).  In the same footnote, however, the court observed various distinguishable facts from the instant case, including that the customer directed Goldman Sachs to purchase a particular kind of commercial paper, but Goldman instead purchased a different kind of paper; that Goldman conceded in its pleadings that it had made a reasonable investigation and that both parties agreed that, in the context of the transaction, Goldman represented that it reasonably believed the issuer to be creditworthy.  Id.  The court concluded that "to allow the Foundation [plaintiff] to prevail by proving the falsity of the statement would border on making Goldman, Sachs an insurer of its issuers' soundness."  Id.

17

The other case BoA relies on for the proposition that participation constitutes recommendation is also inapposite because it arises in the context of NASD disciplinary hearing, not an action by a private plaintiff for damages, or for common law negligence, and there was an implicit finding of fraudulent conduct by the broker. See In the Matter of Dist. Bus. Conduct Comm. for Dist. No. 4 v. Everest Sec., Inc., 1994 WL 1067224 (NASD Sept. 2, 1994), aff'd 52 S.E.C. 958, 962-63 (Aug. 26, 2996), aff'd 116 F.3d 1235, 1238 n. 3 (8th Cir. 1997) (NASD found that the broker had violated NASD Rules of Fair Practice, Article III, Section 18 [now FINRA Rule 2020] which prohibits inducing a transaction "by means of any manipulative, deceptive or other fraudulent device or contrivance.").

At most, the SEC, FINRA, and NASD guidelines indicate that a duty of inquiry is triggered when a broker makes fraudulent statements to induce a sale or makes an affirmative recommendation to purchase, see Notice 10-22, at *1 n.3 ("A broker-dealer has a duty—enforceable under federal securities laws and FINRA rules—to conduct a reasonable investigation of securities that it recommends, including those sold in a Regulation D offering.") (citing disciplinary action of brokers making fraudulent statements and defrauding investors in private

placements).  "Recommendation" is defined to mean "encouraging
the particular customer(s) to purchase a security," such as by
sending or "pushing" specific investment suggestions that the
customer purchase or sell a security.  NASD, Notice to Members
01-23, 2001 WL 278614, at *4 (Mar. 19, 2001).

BoA has not made any allegations that the Note Dealers
encouraged DB or BNP to buy the Notes or otherwise told them to
make a purchase.  More significantly there is no duty, under the
industry notices and treatise cited by BoA, to investigate or
verify representations made in the PPM absent participation in
preparation of the PPM.  See Notice 10-22, at *4; JOHNSON &
MCLAUGHLIN at 7-79.

The Complaint suggests that BNPPS and DBS violated the
Note Dealer Agreement by selling the Notes when they had
notification of an untrue statement, albeit from TBW rather than
Ocala (Complaint ¶¶ 19, 20, 21).  BoA has not cited authority to
support the proposition that the violation of contractual rights
held by a party for its own benefit are transformed into common-
law duties enforceable in tort if the contracting party does not
avail itself of those rights.  In addition, BNP and DB
explicitly disavowed that they were relying on any advice from
BNPPS and DBS, representing that "it has made its own investment

19

decisions based upon its own judgment and upon any advice from
such advisers as it has deemed necessary and not upon any view
expressed by the Issuer [Ocala], the Dealers [BNPPS and DBS],
the Collateral Agent [BoA], or the Servicer [TBW]." (Memo. in
Support at 12 (citing the Subscription and Purchase Agreement
for Short Term Notes dated June 30, 2008 (the "Purchase
Agreement") ¶ 2(e)(iv))). Thus, the agreed upon waiver serves
to disclaim the Note Dealers' duty of care under FINRA
guidelines. See NASD Rule 2310(b) and NASD IM-2310-3. Courts
have enforced such disclaimers on the grounds that they address
reliance in pure negligence actions. See, e.g., Tulger
Contracting Corp. v. Star Bldg. Sys. Inc., No. 01-6853, 2002 WL
986994, at *2 (S.D.N.Y. May 14, 2002) (disclaimer of liability
for negligence was not unconscionable); Cirillo v. Slomin's
Inc., 768 N.Y.S.2d 759, 770 (N.Y. Sup. Ct. 2003) (exculpatory
clauses in contract precluded claims based on ordinary
negligence).

Finally, BNPPS and DBS have cited authority under New
York law demonstrating that contribution is not available for
claims arising out of breach of contract. See Morse/Diesel,
Inc. v. Trinity Indus., 859 F.2d 242, 249 (2d Cir. 1988)
(stating that the New York Court of Appeals has construed New
York's contribution statute as not permitting "contribution

20

between two parties whose potential liability to a third party is for economic loss resulting only from a breach of contract"); Fashion Shop LLC v. Virtual Sales Grp. Corp., 525 F. Supp. 2d 436, 445 (S.D.N.Y. 2007) (finding that "[c]ontribution is not, however, available in a breach of contract action.  New York law does not permit a party to seek contribution when the underlying liability is for breach of contract.") (internal citations omitted); Tempforce Inc. v. Mun. Hous. Auth. Of City of Schenectady, 222 A.D.2d 778, 779, 634 N.Y.S.2d 827 (3rd Dep't. 1995) (holding that "[i]t is well settled that a defendant may not seek contribution from other defendants where the alleged 'tort' is essentially a breach of contract.").

In its opposition, BoA has not challenged the Third Party Defendant's contention.  By its failure to respond, BoA has conceded this argument.  See Anti-Monopoly, Inc. v. Hasbro, Inc., 958 F. Supp. 895, 907 n.11 (S.D.N.Y. 1997) (noting that, "under New York state law, the failure to provide argument on a point at issue constitutes abandonment of the issue.").  For the reasons stated above, the Complaint has failed to state a claim for contribution arising out of breach of contract claim and is therefore dismissed.

**B)** **The BoA Claims For Breach Of Fiduciary Duty By The Third
Party Defendants Are Dismissed**

Under New York law, a breach of fiduciary duty claim
requires:  (1) the existence of a fiduciary relationship between
the parties; (2) a breach of the duty flowing from that
relationship; (3) defendant's knowing participation in the
breach; and (4) damages.  SCS Commc'ns, 360 F.3d at 342;
Henneberry v. Sumitomo Corp. of Am., 415 F. Supp. 2d 423, 459
(S.D.N.Y. 2006).

Counts III and IV of the Complaint allege that BNPPS
and DBS as broker-dealers and agents in the private placement of
the Notes owed and breached their fiduciary duties to the Note
Holders, and thus it follows that if BoA is held liable, then it
would be entitled to contribution from the Third Party
Defendants.

In their respective contracts, however, BNP and DB, as
investors, explicitly disclaimed any fiduciary duty owed them by
BNPPS or DBS, representing and warranting as follows:

> To induce the applicable Dealer [BNPPS or DBS] to
> accept this purchase, the Investor represents and
> warrants to, and agrees with, the Issuer [Ocala
> Funding, LLC] and the applicable Dealer as
> follows . . . (i) none of the Issuer, the Dealers, the

22

Collateral Agent [BoA] or the Servicer [TBW] is acting
as a fiduciary or financial investment adviser for the
Investor.

Purchase Agreement, ¶ 2(e)(i).  "It is axiomatic that a contract
is to be interpreted so as to give effect to the intention of
the parties as expressed in the unequivocal language employed."
Wallace v. 600 Partners Co., 86 N.Y.2d 543, 548, 634 N.Y.S.2d
669 (1995).  Thus, such disclaimers preclude a finding of a
fiduciary or other special relationship, absent special
circumstances.  See, e.g., Cooper v. Parsky, 140 F.3d 433, 439
(2d Cir. 1998) (dismissing the breach of fiduciary duty claim
because the waiver was sufficiently explicit and the plaintiffs
"may not sue upon a duty that was expressly excluded from the
Agreement."); Seippel v. Jenkens & Gilchrist, P.C., 341 F. Supp.
2d 363, 381-82 (S.D.N.Y. 2004) (finding that "[b]ecause
contractual disclaimers of fiduciary duty are effective in New
York, no fiduciary duty can arise from the relationship between
the [Plaintiff] and Deutsche Bank.").

Courts have repeatedly found no fiduciary duty between
the parties where "the Agreement contains a clear and
unambiguous disclaimer of a fiduciary relationship."  Summit
Props. Int'l, LLC v. Ladies Prof'l Golf Ass'n, No. 07-
10407(LBS), 2010 WL 2382405, at *7 (S.D.N.Y. June 14, 2010);

23

Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ.,
944 F. Supp. 1169, 1178 (S.D.N.Y. 1996) (holding that no
fiduciary relationship existed where the agreement "clearly and
unambiguously disclaims a fiduciary relationship."). Here, BNP
and DB have expressly acknowledged in written contracts that
BNPPS and DBS owed them no fiduciary duties.

BoA contends that the waivers of fiduciary duties
contained in the Purchase Agreement were "ineffective unless
accompanied by full disclosure." (Memo Opp. at 24). However,
the New York Court of Appeals in Centro Empresarial Cempresa
S.A. v. Am. Movil, S.A.B. de C.V., 952 N.E.2d 995, 1002 (N.Y.
2011) held that when sophisticated commercial entities negotiate
a broad release of fiduciary duties, "[t]hey cannot . . .
invalidate that release by claiming ignorance of the depth of
their fiduciary's misconduct." Id. In so ruling, the court
explicitly abrogated former decisions of lower courts that held
otherwise, including Blue Chip Emerald LLC v. Allied Partners,
Inc., 750 N.Y.S.2d 291, 294 (App. Div. 2002), on which BoA cites
and relies. BoA also cites to the National Association of
Securities Dealers' Notice to Members 01-23, 2001 WL 278614
(2001), to invalidate the contractual release, but no authority
has been cited to establish that a FINRA regulation would

24

supersede New York common law regarding a claim brought under New York common law.

Even putting aside the contractual disclaimer of a fiduciary relationship, for a fiduciary relationship to exist, a party must repose confidence in another and reasonably rely on the other's superior expertise or knowledge. Henneberry, 415 F. Supp. 2d at 459; Scott v. Dime Sav. Bank of N.Y., FSB, 886 F. Supp. 1073, 1078 (S.D.N.Y. 1995) ("New York courts typically focus on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first."). "Courts within this district have recognized that th[e] question [of whether a fiduciary relationship exists] is essentially a factual determination." Salomon Bros., Inc. v. Huitong Int'l Trust & Inv. Corp., 1996 WL 675795, at *2 (S.D.N.Y. Nov. 21, 1996).

BoA alleges that BNPPS and DBS had "far greater knowledge of information concerning Ocala's finances and operations than did BoA," (Complaint ¶ 15) and cites to Salomon Bros., 1996 WL 675795, at *2, for the proposition that if "a non-arms-length relationship is alleged as between a broker and client, the claim is not appropriately disposed of on a motion to dismiss." (Memo Opp. at 22). In Salomon Bros., however, the

25

defendant expressly alleged that "Salomon functioned as its broker in addition to acting as principal for Salomon's own account and benefit." Id. Here, while BoA alleges that the Third Party Defendants were "aware of day-to-day activities of Ocala and TBW, that they had "frequent communications with the principals of TBW[,]" and "enjoyed wide access" to TBW, these allegations do not demonstrate that BNP and DB reposed trust or confidence in BNPPS and DBS such that they gained a position of superiority over the Plaintiffs.

BoA also alleges that BNPPS and DBS each, "by virtue of its role as a broker and dealer of securities, and as a note dealer and placement agent, . . . owed fiduciary duties to purchasers [BNP and DB]." (Complaint ¶¶ 34, 39). However, "[t]here is no general fiduciary duty inherent in an ordinary broker/customer relationship." Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc., 157 F.3d 933, 940 (2d Cir. 1998); see also Moss v. Morgan Stanley Inc., 719 F.2d 5, 15 (2d Cir. 1983) (finding no fiduciary duty, for 10b-5 purposes, exists for broker-dealers simply by virtue of their status as market professionals); Bissell, 937 F. Supp. at 246 ("Under New York law, the mere existence of a broker-customer relationship is not proof of its fiduciary character."), aff'd, 157 F.3d 138 (2d Cir. 1998) (internal quotations omitted); Fekety v. Gruntal

26

& Co., 595 N.Y.S.2d 190, 190-91 (App. Div. 1993) ("[A] broker does not, in the ordinary course of business, owe a fiduciary duty to a purchaser of securities.");

The Third Party Defendants have cited to a number of cases dismissing complaints that allege a breach of fiduciary duty but fail to allege that the broker-dealer had discretionary trading authority (Memo Support at 8-9).  BoA has made no allegations that BNPPS or DBS had discretionary trading authority over their respective affiliate's brokerage accounts. "[W]here a broker does not have discretionary trading authority over an account, the broker's only duty is the proper execution of transactions upon explicit customer instructions."  In re Refco Sec. Litig., 759 F. Supp. 2d at 323; see de Kwiatkowski, 306 F.3d at 1305-06 (limiting a broker's fiduciary duty for non-discretionary accounts to the narrow task of consummating the transaction requested); Jordan v. UBS AG, 782 N.Y.S.2d 722, 723 (App. Div. 2004) ("Absent agreement to the contrary, not present here, a broker does not owe fiduciary duties to a purchaser of securities.").

BoA has contended that BNPPS and DBS were subject to a generalized fiduciary duty to disclose material information, but as de Kwiatkowski makes clear, the obligation of the broker is

27

only "to give honest and complete information when recommending a purchase or sale." De Kwiatkowski, 306 F.3d at 1302.   The cases cited by BoA establish that courts have allowed breach of fiduciary claims to proceed against non-discretionary brokers for failures to disclose only where a plaintiff alleged that (a) the broker failed to disclose a charge imposed by the broker itself in connection with executing the transaction, see Grandon v. Merrill Lynch & Co., No. 95-10742(SWR), 2001 WL 826092, at *10 (S.D.N.Y. July 20, 2001), or (b) the broker dispensed investment advice to the customer and the customer reasonably relied on this advice, see Keenan v. D.H. Blair & Co., 838 F. Supp. 82, 89 (S.D.N.Y. 1993); Barnes v. Printron, Inc., No. 93-5085(JFK), 1998 WL 778378, at *9 (S.D.N.Y. Nov. 5, 1998); EBC I, Inc. v. Goldman, Sachs & Co., 832 N.E.2d 26, 31-33, 5 N.Y.3d 11 (N.Y. 2005).   Here, BoA has not alleged that BNPPS or DBS provided any advice at all to the affiliates, let alone incomplete or misleading advice, nor does BoA plead reliance by the affiliates on any advice from BNPPS or DBS.

BoA also argues that the presence of corporate affiliate relationships is sufficient to establish a "closer than arms-length relationship," that might give rise to a fiduciary relationship.  de Kwiatkowski, 306 F.3d at 1308. However, the Second Circuit has recognized the "special

28

circumstances" that "render the client dependent." Id.  They include where "a client . . . has impaired faculties, or one who has a closer than arms-length relationship with the broker, or one who is so lacking is sophistication that de facto control of the account is deemed to rest in the broker." Id.  In such cases, the customer relies on the broker and the broker demonstrates the "requisite high degree of dominance" or the "broker has usurped actual control." Id. at 1308-09 (internal quotations omitted).  There is no indication in the Complaint that the affiliate relationship in this case rises to such a level.

For the reasons stated above, BoA's claims for contribution based on negligence and for breach of fiduciary duty by the Third Party Defendants are dismissed and the third party motion to dismiss is granted.

## IV.  **THE MOTION TO AMEND**

As described above, while several factors may serve as a good reason for a court to deny leave to amend, the rule is "interpreted liberally, [and] an amendment is normally permitted." Ohio Cas. Ins. Co. v. Transcontinental Ins. Co., No. 05-6432, 2006 WL 1540540, at *1 (S.D.N.Y. May 31, 2006).

29

Here, BoA has failed to demonstrate that granting leave to amend would cause undue delay, undue prejudice or should be denied based on judicial economy.  Accordingly, absent such factors, leave to amend is "freely given" and therefore granted.  See Foman, 371 U.S. at 182.

## A) **The Proposed Pleading**

The SACs include two types of additional claims. First, the SACs include additional causes of action alleging BoA's breaches of its contractual and fiduciary duties to the Plaintiffs.  Despite a direct demand from the Note Holders, BoA has refused, in writing, to bring contract and conversion claims or assign them to either the Note Holders or Ocala.  Second, the Plaintiffs allege alternative non-contractual theories of liability in response to BoA's assertion of various affirmative defenses.  In its answers to the FACs, BoA asserted for the first time in the instant litigation that because TBW executives were engaged in a fraud, the Plaintiffs could not enforce the contractual rights that this Court recognized in its March Opinion.  In the alternative, the Plaintiffs have alleged that tort and equitable claims would lie against BoA if such affirmative defenses were deemed meritorious in Counts VII through XII of the SACs (Counts VII though XIII for BNP's SAC).

30

**B) <u>Undue Delay Has Not Been Established</u>**

BoA argues that "there is no valid explanation for [Plaintiffs'] lengthy and calculated delay in offering their new claims." (BoA Opp. at 11). Courts have found undue delay where the "request to amend appears to be futile." <u>Zahra v. Town of Southold</u>, 48 F.3d 674, 686 (2d Cir. 1995) (affirming denial of motion to amend three months prior to trial where the amendment appeared futile); <u>In re GPC Biotech AG Secs. Litig.</u>, No. 07-06728, 2009 WL 5125130, at *5 (S.D.N.Y. Dec. 29, 2009) (finding an amendment futile where the "Plaintiffs' explanations for failing to uncover their errors earlier" were not satisfactory to the court, especially where the "delay could and should have been avoided."); <u>Bymoen v. Herzon, Heine, Geduld, Inc.</u>, No. 88-1796, 1991 WL 95387, at *2 (S.D.N.Y. May 28, 1991) (denying motion for leave to file a fourth amended complaint after the close of discovery and more than a month after response to a motion for summary judgment). Further, "where it appears that a plaintiff's purpose in asserting a new claim is his or her anticipation of an adverse ruling on the original claims, the court will deny leave to amend." <u>Bymoen</u>, 1991 WL 95387, at *1.

While these actions have been pending before this
Court for over two years, the circumstances that warrant
bringing the new causes arose after the March Opinion.  With
respect to the proposed claims regarding BoA's failure to bring
claims against itself, BoA did not conclusively refuse and
decline Plaintiffs' demands and offers of indemnity until August
6, 2011.  The formal demands and offers of indemnity to pursue
those claims also precluded a defense by BoA that the failure to
make those demands would serve as a basis for dismissal.

BoA filed its eighty-three affirmative defenses on
June 9, 2011 asserting its position that it had no contractual
obligations to the Plaintiffs or that the contracts under which
the Plaintiffs brought suit were void and unenforceable.  BoA's
affirmative defenses 2 though 19, for example, seek to absolve
BoA of liability based on the alleged misconduct of and
fraudulent inducement by Ocala or TBW, and also suggest that the
contracts may be entirely void.  Based on BoA's position, the
Plaintiffs now seek to pursue the proposed non-contractual
claims set forth in the SACs.  Counts VII through XII of the
SACs (Counts VII through XIII for BNP's SAC), for instance,
allege various tort and equitable claims intended to address
BoA's affirmative defenses.

32

Additionally, BoA's affirmative defense number 80 has construed the March Opinion as holding that the "Plaintiffs' damages, if any, are limited by the value of the Ocala collateral as of July 20, 2009." The Plaintiffs argue that BoA misconstrues the Court's ruling and that BoA misapprehends the significance of July 20, 2009 for the purposes of calculating damages. To address this affirmative defense, the Plaintiffs contend that the Note Holders "should be permitted to demonstrate as an alternate theory of liability that BoA negligently induced their purchase of Ocala notes on that date." (Memo Support at 11).

Until BoA filed its affirmative defenses on June 9, 2011, there was no indication that BoA would intimate the positions it now asserts. There is no indication that the delay could have been avoided, that the Plaintiff's purposefully withheld any claims or that the claims are now being asserted in anticipation of an adverse ruling on the original claims. See Bymoen, 1991 WL 95387, at *1-2. Accordingly, the request to amend is not futile and undue delay has not been established.

C) **Undue Prejudice To BoA Has Not Been Established And Judicial Economy Does Not Favor Denying the Motion**

33

An amendment may be deemed prejudicial when, among
other things, it would require the opposing party to "expend
significant additional resources to conduct discovery and
prepare for trial or significantly delay resolution of the
dispute." AEP Energy Servs. Gas Holding Co. v. Bank of America,
626 F.3d 699, 725-26 (2d Cir. 2010) (internal quotation marks
omitted). Courts have found no prejudice where an amendment did
not necessitate any additional discovery. See Ohio Cas. Ins.,
2006 WL 1540540, at *1 (finding that "this amendment does not
necessitate any further discovery because it arises from the
same transaction as the claims in the original complaint" and
therefore it would not prejudice the defendant or delay the
litigation); Too, Inc. v. Kohl's Dep't Stores, Inc., 210 F.
Supp. 2d 402, 406 (S.D.N.Y. 2002) (holding that there is no
prejudice in permitting amendment where the defendant does not
contest the plaintiff's claim that "no discovery is necessary
and that very little delay, if any, will result.").

Here, BoA has not established that it will suffer any
undue prejudice if leave to amend is granted. The additional
allegations and causes of action set forth in the SACs will not
require document discovery beyond what has already been agreed
to by the parties. The document production remains ongoing, and

34

the parties have agreed to extend the target date for the

production of documents to March 31, 2012.  In addition, no

depositions have been scheduled by either party and the deadline

for amending the pleadings is December 17, 2012.

BoA has stated that "[m]ost of the facts that

Plaintiffs now assert in support of their purported new claims

have been copied, nearly verbatim, from the FACs."  (BoA Opp. at

13).  The addition of certain legal theories does not establish

prejudice where, as here, there will be no impact on discovery

or BoA's ability to maintain a defense.  See, e.g., Cruz v.

Coach Stores, Inc., 202 F.3d 560, 569 (2d Cir. 2000) ("[I]n

opposing a Rule 15(b) amendment, a party cannot normally show

that it suffered prejudice simply because of a change in its

opponent's legal theory.")  (internal quotation marks omitted);

Taberna Capital Mgmt., LLC v. Jaggi, No. 08-11355, 2010 WL

1424002, at *2 (S.D.N.Y. Apr. 9, 2010) (permitting amendment

under Rule 15(a) notwithstanding defendant's argument that

proposed complaint "adds new legal theories and is likely to

expand the scope of discovery significantly" where defendant

failed to demonstrate that "this would prejudice his ability to

carry out his defense").  If the amendment of a pleading during

or after trial, as contemplated by Rule 15(b), does not

prejudice a defendant, then a similar amendment would not

prejudice a defendant where the scope of document production
encompasses the documents relevant to the proposed new causes of
action, and no depositions have been scheduled. See Jund v.
Town of Hempstead, 941 F.2d 1271, 1287 (2d Cir. 1991) (Rule
15(b) permitted amendment following trial where additional
claims "ar[o]se out of the scheme that was the focus of the
pleadings, the claims [were] directly related to the earlier
violation, and there was no undue prejudice to the defendants").

         In addition, BoA has poignantly noted that the
pleading motions to date have required in the neighborhood of
2,425 pages of submissions.  It is likely that the SACs may
produce additional submissions should BoA move to dismiss the
proposed additional claims.  BoA has also highlighted the
substantial resources this Court has invested in administering
the Plaintiffs' lawsuits to date and the time and cost
associated with an additional potential motion to dismiss.
Accordingly, BoA seeks the Court to deny leave based on the
"burden on the judicial system," "even if the amendment would
cause no hardship at all to the opposing party," See In re
"Agent Orange" Prod. Liability Litig., 220 F.R.D. 22, 25
(E.D.N.Y. 2004), quoting Perrian v. O'Grady, 958 F.2d 192, 195
(7th Cir. 1992).

"In determining the impact of granting leave on judicial economy, a court should consider how the amendment would affect the use of judicial resources and the impact on the judicial system." 3 MOORE'S FEDERAL PRACTICE § 15.15[1].  As has already been noted more than once, however, these actions present difficult and significant issues arising out of complicated transactions between major banks.  It is not surprising that skilled counsel for the parties will seek to exhaust any pleading nooks and crannies.  The possibility that BoA may make a future motion to dismiss is within BoA's control and such a possibility exists in every case where a complaint is amended.  In addition, allegations that "time, effort and money [are] expended" in litigating a matter does not usually rise to "substantial prejudice." Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993).  Contrary to BoA's contention, granting the leave to amend and allowing the Plaintiffs to bring the new claims contained in the SACs will not unduly prejudice BoA nor would it be an unfair burden on the judiciary.

## D) Leave Is Granted To File SACs Without Incorporation

BoA has challenged the reference in the proposed SACs which purport to incorporate allegations from Plaintiffs' pleadings in the Conversion Actions.  Although the cases cited

37

by BoA appear to sanction such a practice, Rule 8(a) requires a
plaintiff to identify the specific allegations that they seek to
incorporate.  See Bell Atlantic Corp. v. Twombly, 550 U.S. 544,
555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); see also
Fullerton v. Maynard, 943 F.2d 57, 1991 WL 166400, at *2 (10th
Cir. 1991) (incorporation by reference allowed only if
"reference to allegations in the prior complaint is direct and
specific"); DLJ Mortg. Capital, Inc. v. Kontogiannis, 726 F.
Supp. 2d 225, 234 (E.D.N.Y. 2010) (plaintiffs seeking to
incorporate other pleadings must provide "guidance as to which
specific allegations" are intended to be deemed incorporated);
Hinton v. Trans Union, LLC, 654 F. Supp. 2d 440, 447 (E.D. Va.
2009) ("wholesale incorporations of . . . prior complaints are a
misuse of the Rule 10(c) incorporation privilege").

        Contrary to BoA's contention that the Plaintiffs seek
wholesale incorporation of previously insufficient claims, the
Plaintiffs seek only to incorporate by reference the factual
allegations of the complaint of the Conversion Actions and not
the cause of action dismissed by this Court.  Because the
allegations of the complaint of the Conversion Actions have been
held insufficient, clarity and simplicity requires that the
specific factual allegations relied upon be set forth in the

SACs.  This outcome has been anticipated and accepted by the
Plaintiffs.  (Reply Memo at 10).

## V. **Conclusion**

Based upon the conclusions set forth above, the Third
Party Motion to Dismiss and the Plaintiffs' Motion to Amend are
granted.

It is so ordered.

New York, NY
June  4 , 2012

_____
ROBERT W.  SWEET

39