R E C E I V E D

OCT 0 1 2012

U.S.D.C.
WP

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

BNP PARIBAS MORTGAGE CORP. and
BNP PARIBAS,

                              Plaintiffs,

        v.

BANK OF AMERICA, N.A.,

                              Defendant.

---

Civil Action No. 09-CV-9783-RWS
Honorable Robert W. Sweet

## SECOND AMENDED COMPLAINT[1]

Plaintiff BNP Paribas Mortgage Corp. ("BNPP") for its Second Amended Complaint against Bank of America, N.A. ("Bank of America") alleges, upon information and belief, as follows:

### SUMMARY OF CLAIMS

1.      This is an action for breach of contract, breach of fiduciary duty, negligent misrepresentation and inducement, negligence, promissory estoppel, unjust enrichment and constructive trust resulting from: (i) Bank of America's improper issuance of $480.7 million of senior secured notes to BNPP; (ii) Bank of America's failure to secure and protect more than $480.7 million of collateral, in the form of cash and residential mortgage loans, which it was obligated to secure on behalf of BNPP; (iii) Bank of America's repeated misrepresentations and

---

[1] While reserving its right to appeal the dismissal of these claims, BNPP omits from this Second Amended Complaint the claims that the Court dismissed in its Order dated March 23, 2011 (the "March Order"). Similarly omitted from the Second Amended Complaint are the claims of BNP Paribas, which were dismissed by the Court's March Order and with respect to which BNP Paribas expressly reserves its right of appeal.

false certifications regarding the state of this collateral; and (iv) Bank of America's numerous post-default breaches of fiduciary duty, contract, and the duty of care.

2.      On June 30, 2008, Ocala Funding, LLC ("Ocala") issued a total of $1.75 billion of short-term, interest-bearing, secured notes (the "Secured Notes"). The purchasers of these Secured Notes (the "Noteholders") included BNPP and Deutsche Bank AG ("DB"). BNPP purchased Secured Notes with a face amount of $480.7 million.

3.      Ocala is a special-purpose entity that operated a mortgage warehousing and financing facility (the "Ocala Facility" or the "Facility"), which was created to provide short-term liquidity funding to Taylor, Bean & Whitaker Mortgage Corp. ("TBW") pending the sale of mortgages originated or purchased by TBW to the Federal Home Loan Mortgage Corporation ("Freddie Mac") and others. Upon receipt of payment for the loans, Ocala was to use the loan sale proceeds solely for the purposes of either repaying BNPP and the other Noteholders (whose money had financed their purchase) or purchasing additional loans from TBW.

4.      The Secured Notes "rolled over" at least once per month. On each "rollover" date, BNPP was repaid its principal investment in full. After BNPP was repaid, BNPP, in reliance upon Bank of America's regular representations and certifications that certain conditions were met, would purchase a new issuance of Secured Notes. Ocala did not repay the maturing notes out of its own assets, which were intended to be largely invested in mortgage loans throughout the life of the Ocala Facility. Instead, on each rollover date, Bank of America lent Ocala money sufficient to repay the Secured Notes maturing at that time. Bank of America was then repaid using the proceeds from the newly-issued Secured Notes purchased by BNPP. In total, BNPP purchased Secured Notes on at least sixteen separate occasions.

5.      The governing contracts (the "Ocala Facility Agreements") required that the Secured Notes be over-collateralized at all times.  Put simply, Ocala was required to hold at least $500 million of cash and mortgage loans as collateral for BNPP's $480.7 million of outstanding Secured Notes, and at least $1.75 billion of cash and mortgage loans as collateral for all the outstanding Secured Notes.

6.      To ensure the existence and maintenance of such security, Ocala contracted with Bank of America's LaSalle Global Trust Services division to serve as Collateral Agent, Custodian, Depositary and Indenture Trustee of the Ocala Facility.  In March 2008, Bank of America's marketing materials touted "LaSalle Global Trust Services [as] an industry-leading trustee, third party agent, and securities custodian with experience on more than $1.9 trillion in assets."

7.      As Collateral Agent, Custodian, Depositary and Indenture Trustee, Bank of America served as a gatekeeper for the Ocala Facility and was charged with, among other things: (i) securing and protecting the cash and mortgage loans collateralizing the Secured Notes; (ii) making certain that the Secured Notes were, in fact, over-collateralized, i.e., that Bank of America held collateral in the form of cash or mortgage loans of at least $1.75 billion, before issuing new Secured Notes or purchasing new mortgage loans; (iii) shutting down the Ocala Facility and promptly notifying BNPP if at any time Bank of America became aware that the Ocala Facility was under-collateralized and therefore insolvent; (iv) protecting, preserving, and recovering Ocala's assets as necessary; and (v) pursuing available claims for the benefit of the Noteholders in the event of default.

8.      Bank of America's performance of its contractual obligations was an essential condition to BNPP's willingness to purchase and subsequently reinvest in the Secured Notes.

Indeed, BNPP's reliance on Bank of America was confirmed by Bank of America itself in a letter to BNP Paribas dated March 27, 2009 (the "March Letter Agreement"). The March Letter Agreement expressly acknowledges that – as an "inducement to BNP Paribas [] to enter into, and/or continue its participation in" the Ocala Facility – Bank of America would indemnify BNPP against losses stemming from any failure by Bank of America to meet its contractual obligations. The March Letter Agreement highlights Bank of America's core contractual obligation to certify the over-collateralization of the Secured Notes prior to their issuance. Bank of America further recognized in the March Letter Agreement that "the duties it performs under the Depositary Agreement (including its duties under Section 4(d)) play an important role in mitigating the risks that BNPP would otherwise incur" through participation in the Ocala transaction.

9.       On August 3, 2009, federal agents raided TBW's offices. The next day, TBW was delisted as an approved seller of mortgage loans to Freddie Mac, which triggered a shut-down of the Ocala Facility and rendered the Secured Notes immediately due and payable.

10.       Since August 2009, BNPP has learned that – in direct violation of its duties – Bank of America failed to secure and protect BNPP's collateral, and instead allowed the vast majority of that collateral to leave the Ocala Facility. Moreover, BNPP has discovered that documents certified by Bank of America reflect its actual knowledge that the Ocala Facility was insolvent prior to, as well as at, the time of BNPP's investment. Yet, despite this knowledge, Bank of America continued to issue Secured Notes and failed to shut down the Facility or otherwise inform BNPP of Ocala's insolvency as required by the governing contracts.

11.       Specifically, BNPP has learned that as of August 5, 2009, when Ocala was finally shut down, at least 1,837 mortgage loans with a face amount of $374.9 million were not, as Bank

of America had represented as late as August 4, 2009, held by it as collateral for BNPP's $480.7 million of Secured Notes, and further that Bank of America held only $1.9 million of cash in the segregated collateral account that it was required to maintain on behalf of BNPP.

12.     Bank of America breached its obligations to BNPP by, among other things: (i) improperly transferring over $3.8 billion in cash from Ocala's collateral account at Bank of America to unauthorized accounts, including to Freddie Mac and Ginnie Mae custodial accounts that had no connection to Ocala; (ii) purchasing mortgage loans without authorization; (iii) commingling funds in contravention of the Ocala Facility Agreements; (iv) failing to secure the mortgage loans it held on behalf of BNPP; (v) improperly issuing new Secured Notes when Ocala was insolvent; (vi) failing both to declare an "Event of Default" in the Ocala Facility and to promptly inform BNPP of Ocala's insolvency; and (vii) failing to comply with its post-default duties to recover Ocala's assets.

13.     Among Bank of America's contractual duties was the certification of the collateral supporting the Secured Notes.  Under the Depositary Agreement, Bank of America was required to certify that Ocala's assets exceeded its liabilities and that the Facility was appropriately collateralized, i.e., that Bank of America was holding, on behalf of BNPP and other Noteholders, mortgage loans and cash worth at least $1.75 billion (the "Borrowing Base Condition").  The contractually required certification was memorialized in the form of a Certificate of Authorized Issuer Agent Concerning Short Term Note Issuance (the "Borrowing Base Certificate"). Representations and calculations in the Borrowing Base Certificate were required to be certified by Bank of America prior to the issuance or "roll" of the Secured Notes.

14.     On each date that Secured Notes were issued, Ocala prepared, and Bank of America certified, a Borrowing Base Certificate.  BNPP did not receive a copy of the Borrowing

Base Certificate certified by Bank of America on June 30, 2008, nor did it receive copies of the

Borrowing Base Certificates prepared by Ocala and certified by Bank of America for any of the

roll dates prior to the end of December 2008. Each of these certificates showed that Ocala had

collateral, in the form of cash and mortgages, worth only approximately $1 billion. Thus, on

their face the Borrowing Base Certificates certified by Bank of America prior to December 2008

showed the Ocala Facility to be insolvent and under-collateralized by over $700 million.

Although Bank of America knew – indeed it certified – that the Ocala Facility was insolvent, it

nonetheless failed to shut down the Ocala Facility or inform BNPP of Ocala's insolvency as was

contractually required under the Ocala Facility Agreements.

      15.     On December 12, 2008, BNPP asked Bank of America to begin sending it copies

of the Borrowing Base Certificates. Bank of America began providing the Borrowing Base

Certificates directly to BNPP in February 2009.

      16.     Unlike the Borrowing Base Certificates certified by Bank of America between

June and December 2008, which were not provided to BNPP and which showed only

approximately $1 billion of collateral and thus on their face reflected the insolvency of the Ocala

Facility, and hence the existence of an Event of Default, the Borrowing Base Certificate certified

by Bank of America on December 30, 2008 suddenly showed collateral valued at approximately

$1.85 billion, including more than $1.3 billion worth of mortgages, as well as cash. Remarkably,

this December 30, 2008 Borrowing Base Certificate purported to show that Ocala somehow

increased its assets by over $1 billion within the span of a single month. Moreover, each of the

Borrowing Base Certificates certified by Bank of America in 2009, after BNPP requested copies

of the certificates, showed collateral of between $1.75 billion and $1.85 billion. What prompted

these purportedly compliant Borrowing Base Certificates was not Ocala's sudden solvency, but

rather the demand of BNPP that it be provided copies of the Borrowing Base Certificates. Bank of America's execution of Borrowing Base Certificates repeatedly and negligently misrepresented to BNPP the mortgages owned by Ocala and Ocala's solvency.

17.     Bank of America certified Borrowing Base Certificates that falsely stated the value of Ocala's assets and falsely certified that the "Borrowing Base Condition" was satisfied on each of the following dates: January 16, 2009; February 20, 2009; March 20, 2009; April 20, 2009; May 20, 2009; June 22, 2009; June 30, 2009; and July 20, 2009. In so doing, Bank of America misrepresented Ocala's solvency.

18.     In addition, from December 17, 2008 to August 4, 2009, Bank of America misrepresented the state of Ocala's assets by delivering loan reports to BNPP employees several times each week. Bank of America knew or should have known that its representations in these loan reports were false because the mortgages or the proceeds thereof were owned or possessed by a third party, not Ocala.

19.     Bank of America knew that BNPP was relying on its representations – which were in fact misrepresentations – in deciding whether to roll over its Secured Notes.

20.     At no point did Bank of America inform BNPP that the pre-December 2008 Borrowing Base Certificates, which had not been shared with BNPP, showed the Facility to be insolvent. Nor did Bank of America alert BNPP to the fact that over $800 million of collateral inexplicably appeared on the Borrowing Base Certificate in the last two weeks of December 2008 (after BNPP asked for copies of the Borrowing Base Certificate).

21.     In truth, the Ocala Facility was grossly under-collateralized and thus insolvent. By way of example, the first Borrowing Base Certificate given by Bank of America to BNPP was for the February 20, 2009 roll of Secured Notes. It certified that Bank of America was holding

$510 million of collateral for BNPP's $480 million of Secured Notes, comprised of mortgage loans ($479 million) and cash ($31 million). This certification was false. As evidenced by contemporaneous Bank of America documents, as of February 20, 2009, it was holding less than $35 million of mortgage loans and less than $300,000 of cash in the BNPP collateral account.

22.     Had Bank of America adequately performed its contractual obligations or acted with reasonable care: (i) BNPP would not have purchased the Secured Notes on June 30, 2008, or on any of the subsequent roll dates; or (ii) BNPP's Secured Notes would be fully secured by $500 million of cash and mortgage loans as required by the Ocala Facility Agreements. As a direct and proximate result of Bank of America's breaches of its contractual duties and negligence, BNPP's Secured Notes are significantly under-collateralized, and Bank of America has failed to make payment to BNPP for its Secured Notes.

23.     Bank of America has continued to breach its obligations to BNPP in the period following TBW's collapse. After TBW was shut down, Bank of America made only limited efforts to recover Ocala assets. These efforts were inept and largely fruitless. Bank of America's disorganized efforts to recover the Ocala assets demonstrate that Bank of America simply did not know where the vast bulk of Ocala's assets were.

24.     Moreover, Bank of America, in its capacities as Indenture Trustee and Collateral Agent, has ongoing legal and contractual rights and obligations, as well as the fiduciary duty, to recover damages caused by itself in its individual capacity and in its capacities as Collateral Agent, Depositary and Custodian for the benefit of BNPP.

25.     BNPP has instructed Bank of America to bring claims in its capacities as Indenture Trustee and Collateral Agent against itself in its capacities as Collateral Agent, Custodian, Depositary, and in its individual capacity, and offered to provide an appropriate

indemnity in connection with any such litigation.  BNPP demanded, in the alternative, that Bank

of America assign any such claims directly to BNPP in order that BNPP could pursue them.

26.     Bank of America rejected these instructions and has both failed to commence any

litigation against itself and refused to assign the claims to BNPP.

27.     By refusing to follow instructions to bring these actions against itself or in the

alternative to assign the claims to BNPP, Bank of America is depriving BNPP of recoveries

available to pay its Secured Notes, and thus continuing to breach both its contractual and

fiduciary duties to BNPP.

## PARTIES

28.     BNP Paribas Mortgage Corp. is a Delaware corporation with its principal place of

business in New York, New York.  BNP Paribas Mortgage Corp. is a wholly-owned subsidiary of

Paribas North America Inc., which is wholly owned by BNP Paribas.

29.     Bank of America, N.A. is a National Banking Association with its principal place

of business located in Charlotte, North Carolina.  Bank of America is the successor in interest

through merger to LaSalle Bank N.A. ("LaSalle Bank") and LaSalle Global Trust Services

("LaSalle Trust").  Bank of America is authorized to engage in the business of banking in the

State of New York.  Bank of America has done and is doing business in the State of New York.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332(a) as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest

and costs, and is between citizens of different States.

31.     This Court has personal jurisdiction over Bank of America by virtue of its

business activity in this jurisdiction.

32.     Venue in this district is proper under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claim occurred here, the defendant is found in this district, and Bank of America has waived any objections to the laying of venue in the Southern District of New York.

## FACTUAL ALLEGATIONS

### I.     Taylor, Bean & Whitaker Mortgage Corp.

33.     Until it filed for bankruptcy on August 24, 2009, TBW was the largest non-depositary residential mortgage lender in the United States.  Headquartered in Ocala, Florida, TBW and its various subsidiaries had approximately 4,000 employees and were responsible for originating approximately $30 billion in new loans in 2008.  As of June 2009, TBW serviced mortgages with unpaid principal balances in excess of $80 billion.

34.     TBW's core business was:  (i) originating, underwriting, processing and funding conforming, conventional, government-insured residential mortgage loans; (ii) the sale of mortgage loans into the "secondary market" to government-sponsored enterprises such as Freddie Mac; and (iii) mortgage payment processing and loan servicing.

35.     TBW originated loans through mortgage brokers and purchased loans from correspondents.  TBW financed its loan originations with money obtained through "wet funding" credit lines maintained at Colonial Bank, as well as at other institutions.  Wet funding is the financing of mortgages before the mortgage note has been received and reviewed by the lender (i.e., when the ink on the mortgage note is still "wet").  By contrast, dry funding is the financing of mortgages after the mortgage note has been received and reviewed by the lender (i.e., after the ink on the mortgage note has "dried").

10

36.    TBW customarily sold the loans it originated and used the proceeds of those sales to pay down the wet funding credit line associated with the originated loans. This, in turn, would allow TBW to originate new loans using the wet funding credit line. Because TBW could not originate new loans until its wet funding credit line was paid down, TBW's mortgage origination capacity was constrained by the length of time it took to receive payment on the sale of its originated loans.

37.    TBW usually sold its originated mortgage loans to Freddie Mac in return for either cash or marketable mortgage-backed securities ("MBS") issued by Freddie Mac. As a general rule, for MBS transactions, it took up to 30 days for TBW to receive payment from Freddie Mac.

## II.    Ocala Funding, LLC

38.    In January 2005, TBW organized Ocala as a special-purpose, bankruptcy remote investment vehicle to provide liquidity funding for TBW's mortgage origination business. Ocala purchased loans originated by TBW pending the sale of those loans to Freddie Mac, thereby enabling TBW to reduce the payment time between origination and sale. This allowed TBW to maximize the utilization of its wet lending credit lines from Colonial Bank. By way of example, Ocala might purchase a TBW-originated loan within approximately 15 days after origination as compared to the typical 30 day wait for Freddie Mac to purchase a TBW-originated loan and deliver a MBS. This permitted TBW to increase the utilization of its wet funding credit lines from Colonial Bank.

39.    The Ocala Facility in which BNPP invested was only permitted to purchase dry, high-quality Freddie Mac conforming mortgages. Ocala was not permitted to fund or purchase

wet loans (i.e., loans for which the mortgage note had not yet been reviewed) or sub-prime mortgages.

40.     In June 2008, to make the Ocala Facility more attractive to potential investors, including BNPP, the Facility was restructured to reduce or eliminate the Noteholders' exposure to a variety of risks, including counterparty risk (the risk of Ocala or TBW not living up to its contractual obligations – also termed administrative or operational risk), interest rate risk (the risk of the mortgages changing in value because of interest rate movement), take out risk (the risk of not being able to sell Ocala-owned mortgages to Freddie Mac), and underwriting risk (the risk of the mortgages being less valuable than expected because of faulty underwriting).  Central to this effort was the role of Bank of America, one of the largest banks and mortgage lenders in the world, as Collateral Agent, Custodian, Depositary and Indenture Trustee for the Ocala Facility.

41.     Bank of America was granted exclusive possession and control of Ocala's cash and mortgages to give BNPP and the other Noteholders comfort that an investment grade commercial bank, and not TBW, was securing and protecting the Noteholders' collateral.  This service was necessary to eliminate Ocala and BNPP's counterparty risk to TBW, which did not have an investment grade credit rating, and to qualify Ocala's Short-Term Notes for an A-1+ rating from Standard & Poor's Ratings Services and a P-1 rating from Moody's Investors Service, Inc. ("Moody's").

42.     The significance of Bank of America's responsibilities in connection with the Ocala Facility was noted by Moody's, which stated that the administrative risk associated with the Secured Notes was "mitigated by the resources, capability and credit strength of Bank of America Corporation as the trustee, collateral agent, depositary and custodian to provide critical

12

program support services, including: certifying the borrowing base and checking the delinquency triggers before the issuance of [Secured Notes and callable notes]; checking in the loan files and creating a collateral transmittal report; and managing the orderly wind-down of the program." Moody's ABCP Market Review (July 13, 2009). Bank of America's credit strength was also important to Moody's and commercial paper purchasers because any loss or impairment of the Ocala collateral due to Bank of America's breaches of its duties would be recoverable from Bank of America's own assets.

43.     In addition to Bank of America's experience with mortgage warehousing facilities, Bank of America was also familiar with TBW and its operations. A Bank of America affiliate and TBW were parties to a Master Securities Forward Transaction Agreement dated June 19, 2008, and Bank of America and TBW were parties to various mortgage warehousing agreements completely separate from Ocala, including a Master Loan Participation and Sales Service Agreement and an MBS Custodial Agreement (the "Mortgage Relationship").

44.     In its various roles as Ocala's Collateral Agent, Custodian and Depositary, Bank of America was responsible for, among other things: (i) maintaining and securing the cash and mortgages owned by Ocala; (ii) certifying Ocala's borrowing base, i.e., certifying that Ocala had collateral in excess of its outstanding commercial paper obligations, before Ocala could issue new Secured Notes; and (iii) testing Ocala's borrowing base before it purchased new mortgage loans from TBW. As Indenture Trustee, Bank of America was also responsible for, among other things, declaring an Event of Default and shutting down the Ocala Facility if Bank of America became aware of Ocala's insolvency or a failure of various parties to abide by the terms of the Ocala Facility Agreements, and pursuing available claims for the benefit of Noteholders following an Event of Default.

45.   The typical Ocala transaction was intended to operate as follows:

(a)   TBW lent money to a homeowner by borrowing funds from its wet funding credit line with Colonial Bank. In exchange, TBW received a note and mortgage from the homeowner. At this point in the transaction, Colonial Bank's wet funding was secured by the mortgage note that TBW received (which was still wet because it had not yet been reviewed by Colonial Bank or any other lender).

(b)   TBW (through Colonial Bank) shipped the mortgage loan file to Bank of America, where it was reviewed and verified to confirm that it met Ocala's purchase requirements. While Bank of America was reviewing the mortgage loan file, Colonial Bank retained its security interest in the mortgage loan and Bank of America held the mortgage loan under a bailee letter.

(c)   Once Bank of America established that the mortgage loans conformed with the requirements of the Ocala Facility and that the Ocala Facility was sufficiently collateralized, i.e., that Ocala held sufficient cash and mortgage loans to repay its outstanding commercial paper including the Secured Notes, Bank of America paid for the mortgage loans by depositing funds in a designated TBW account at Colonial Bank (Account No. 8026069354). At that point Colonial Bank's security interest in the mortgage loans was released and Ocala took ownership of the mortgage loans, subject to the security interest of BNPP.

(d)   When a sale to Freddie Mac was arranged, Bank of America shipped the mortgage loans to Colonial Bank – in its capacity as custodian for Freddie Mac – for inspection and certification. Bank of America sent the loans to

Colonial Bank under a bailee letter that required the loans be paid for or returned to Bank of America within 15 days. Under the terms of the bailee letter, Bank of America, as Collateral Agent for Ocala, retained ownership of the loans until it received payment for them.

(e)     If the mortgage loans were approved for purchase by Freddie Mac, Freddie Mac purchased the mortgages by wiring funds or delivering MBS to accounts designated by Bank of America.

(f)     Once Bank of America received payment for the mortgages, it was required to deposit the funds in a segregated collateral account. The deposited funds then became available to repay Ocala's outstanding Secured Notes or to purchase additional mortgage loans.

46.     At all times, Bank of America was responsible for securing and protecting BNPP's collateral as it cycled from cash to mortgages and back to cash. Bank of America was thus necessarily responsible for tracking the cash in Ocala's accounts and the mortgage loans Ocala owned to make sure that, at all times, Ocala owned sufficient cash and mortgage loans to fully collateralize BNPP's Secured Notes.

### III.     Bank of America's Contractual Obligations Under the Ocala Agreements

47.     Beginning on June 30, 2008, Bank of America, through LaSalle Bank and LaSalle Trust, entered into the Ocala Facility Agreements with Ocala and BNPP. These contracts govern the responsibilities of Bank of America as Collateral Agent, Custodian, Depositary and Indenture Trustee for the Ocala Facility.

A.    The Security Agreement

48.    Ocala, Bank of America (through LaSalle Bank) as Indenture Trustee, and Bank of America (through LaSalle Bank) as Collateral Agent entered into a Second Amended and Restated Security Agreement dated as of June 30, 2008 (the "Security Agreement"). The stated purpose of the Security Agreement was to secure Ocala's obligations to BNPP and others under the Base Indenture, including, without limitation, the payment in full of principal and interest on the 2005-1 Notes. The Security Agreement governed Bank of America's obligations as Collateral Agent.

49.    Under the terms of the Security Agreement, Bank of America was contractually obligated to open and maintain certain segregated accounts for the 2005-1 Collateral and to otherwise secure Ocala's assets for the benefit of the Series 2005-1 Noteholders. Bank of America was given exclusive dominion and control over these collateral accounts and all mortgages or other assets owned by Ocala. See, e.g., Security Agreement §§ 4.01 and 5.01 et seq.

50.    To prevent the unauthorized disbursement of Ocala's funds, the Security Agreement provides that "the Issuer [Ocala] agrees that only the Collateral Agent [Bank of America] may make withdrawals from the Collateral Account; provided, however, that the Issuer [Ocala], the Indenture Trustee [Bank of America], the Series 2005-1 Depositary [Bank of America] and the Series 2008-1 Depositary [Bank of America] may request withdrawals from the Collateral Account in accordance with the terms of Section 5.03 hereof." Id. at § 5.01.

51.    Section 5.03 explains that, if there has been no Event of Default, "the Issuer [Ocala] (by an Issuer Agent)" may "instruct according to the Facility Documents the Collateral Agent [Bank of America] to withdraw" funds from the Collateral Account for various

enumerated purposes, including for the purchase of new mortgage loans.  Section 5.03 continues "provided, however, no withdrawals from the Collateral Account shall be made on any day" for the purchase of new mortgage loans if the 2005-1 Notes are not fully secured by cash and mortgages worth at least $500 million.

52.     Thus, Bank of America can only disburse funds from the collateral account if:  (i) there was no Event of Default; (ii) Bank of America receives an instruction from Ocala "by an Issuer Agent;" (iii) the withdrawal was for one of the purposes enumerated in § 5.03; and (iv) the Secured Notes were fully collateralized.  Id.

53.     Under the terms of the Security Agreement, any instruction delivered by Ocala for the purchase of new mortgage loans "shall be effective upon receipt of written, electronic or telephonic instructions (confirmed promptly in writing) from an Issuer Agent." Id. at § 5.03. Ocala's Certificate of Incumbency dated June 30, 2008 identifies Lee Farkas, Ocala's Chairman; Paul R. Allen, Ocala's CEO; and Ray Bowman, Ocala's President, as the Issuer Agents who were "authorized to act, and to give instructions and notices, on behalf of the Issuer [Ocala] hereunder." Id. at § 3.03.

54.     If Bank of America received authorized instructions from an Issuer Agent, Bank of America was entitled to rely on instructions "reasonably believed by it in its professional judgment to be genuine and correct," and Bank of America was required to "promptly comply with any such approved instructions made by the Issuer [Ocala], the Series 2005-1 Depositary [Bank of America] or the Series 2008-1 Depositary [Bank of America] in accordance with the provisions of the foregoing paragraphs of this Section 5.03." Id. §§ 8.01 and 5.03.

55.     Thus, Bank of America was not permitted – much less required – to blindly accept or follow instructions that it received from Ocala.  To the contrary, Bank of America was

required to exercise its independent professional judgment to assess any such request, including whether it was consistent with the governing contracts and should be approved. Bank of America was also obligated to ensure that no collateral left the Collateral Accounts without being replaced by other collateral of equal value.

56.     Bank of America, in its capacity as Collateral Agent, was required to "exercise any rights and remedies available to it under applicable law" following an Event of Default. Id. § 6.02. It was further required to "act in accordance with the written or electronic instructions received" from BNPP directing it to undertake any action permitted under the Security Agreement. Id. § 8.04.

57.     BNPP is a third-party beneficiary to the Security Agreement and is entitled to the rights and benefits under that agreement and may enforce the provisions of that agreement as if it were a party. See id. §§ 10.08 and 10.18.

**B.     The Custodial Agreement**

58.     Ocala, TBW, Bank of America (through LaSalle Bank), as Custodian, and Bank of America (through LaSalle Bank), as Collateral Agent, entered into a Second Amended and Restated Custodial Agreement dated as of June 30, 2008 (the "Custodial Agreement"). Under the terms of the Custodial Agreement, Bank of America was responsible for taking possession of, examining and securing the mortgages owned by Ocala.

59.     Pursuant to Section 8 of the Custodial Agreement, Bank of America, at the direction of Ocala, was authorized to deliver the mortgage files to a third-party purchaser, such as Freddie Mac or its agent "*provided* that any delivery of such Mortgage Note, Mortgage and Assignment of Mortgage is accompanied by a transmittal letter to be certified by the third-party purchaser substantially in the form attached hereto as Exhibit E and the Custodian [Bank of

America] shall collect all such transmittal letters certified by third-party purchasers." The transmittal letter permitted the prospective purchaser to take possession of the mortgage file for inspection, and required such purchaser to acknowledge the security interest granted to Bank of America for the benefit of BNPP. The prospective purchaser had 15 days to either remit the required sale proceeds to an account identified by Bank of America or return the mortgage file.

60.     As a party to the Custodial Agreement (through LaSalle Bank), Bank of America, as Collateral Agent, has the right to enforce the terms of the Custodial Agreement.

C.     **The Depositary Agreement**

61.     Ocala and Bank of America (through LaSalle Bank), as Depositary, entered into the Series 2005-1 Amended and Restated Depositary Agreement dated as of June 30, 2008 (the "Depositary Agreement").

62.     Bank of America (through LaSalle Bank), as Indenture Trustee, is a third-party beneficiary of the Depositary Agreement and may enforce its provisions. See Depositary Agreement at § 15.

63.     The Depositary Agreement required Bank of America to certify the Borrowing Base Condition, i.e., that Bank of America held cash and mortgages in excess of the outstanding 2005-1 Notes, before issuing new notes. Specifically, the Depositary Agreement (§ 4(d)) provided that Bank of America "shall not issue or deliver any Short Term Note unless it shall have received a completed certificate from an Issuer [Ocala] Agent on the Issuance Date, each in the form of Exhibit C attached hereto by 11:00 a.m. (New York City time) and the Depositary [Bank of America], upon review, determines that it can (and it does) certify as to items (1) and (2) therein." Critically, in "item 2" Bank of America certifies that the Secured Notes were over-collateralized as of the date of the certification.

64.     Under the terms of the Depositary Agreement (§ 2(b)), on any given maturity date, if Ocala did not have sufficient funds to repay BNPP or other Noteholders on the maturing Secured Notes, "the Depositary [Bank of America] may (but shall not be required to)" advance such funds to Ocala "by creating an overdraft in the Short Term Note Account." The Depositary Agreement also provides (§ 2(b)) that:

> the overdraft shall be treated (i) as an advance by LaSalle Bank National Association, in its individual capacity and not as Depositary hereunder, and (ii), for all purposes of this Agreement, the Indenture and the Security Agreement, as Short Term Notes due and payable on the following Business Day.  Interest shall accrue and be payable from, and including, the date of the overdraft, until payment in full, at a rate agreed to by the Issuer and LaSalle Bank National Association (or, if no such agreement is reached on the date of the overdraft, at a rate determined by LaSalle Bank National Association consistent with its customary overdraft rate determination practices).

65.     On each roll date, beginning on July 21, 2008, Bank of America provided liquidity to Ocala to facilitate the roll by entering an overdraft, advancing funds, or otherwise effectively providing an intra-day loan, which allowed Bank of America, on behalf of Ocala, to repay the maturing notes owned by BNPP and other Noteholders.  Bank of America subsequently repaid itself for each such intra-day loan with funds paid by BNPP and other Noteholders for the newly repurchased Secured Notes.

**D.      The March Letter Agreement**

66.     On March 27, 2009, BNP Paribas and Bank of America entered into a written agreement "[a]s an inducement to BNP Paribas [] to enter into, and/or to continue its participation in" the Ocala Facility.

67.     In the March Letter Agreement, Bank of America expressly recognized that its duties under the Depositary Agreement, including its certification of the Borrowing Base

Certificate, "play an important role in mitigating the risks that [BNP Paribas] would otherwise incur through the Related Transactions."

E.   **The Base Indenture**

68.   Ocala and Bank of America (through LaSalle Bank), as Indenture Trustee, entered into a Second Amended and Restated Base Indenture (the "Base Indenture") dated as of June 30, 2008.  Ocala and Bank of America (through LaSalle Bank), as Indenture Trustee and paying agent, also entered into a Second Amended and Restated Series 2005-1 Short Term Note Supplement to the Second Amended and Restated Base Indenture ("Indenture Supplement") dated as of June 30, 2008.

69.   The Base Indenture provides that Ocala "shall use the proceeds of Notes solely for one or more of the following purposes:  (a) to pay the Issuer's [Ocala's] Obligations when due, in accordance with the Security Agreement; and (b) to acquire Mortgage Loans from the Seller [TBW]."  Id. § 8.28; Indenture Supplement § 2.6.

70.   The Base Indenture further provides that "[i]f an Event of Default or a Potential Event of Default occurs and is continuing and if a Trust Officer of the Indenture Trustee [Bank of America] receives written notice or has actual knowledge thereof, the Indenture Trustee [Bank of America] shall promptly provide" among others, BNPP, "with notice of such Event of Default or the Potential Event of Default."  Base Indenture at § 10.4.

71.   The Base Indenture specifies numerous Events of Default, including the:  (i) insolvency of Ocala; (ii) "failure on the part of the Seller [TBW] to observe or perform in any material respect any material covenants or agreements of the Seller [TBW] under the Mortgage Loan Purchase Agreement which failure continues unremedied for a period of fifteen (15) days after written notice or actual knowledge thereof;" and (iii) failure of Ocala "to comply with any

of its other agreements or covenants in, or provisions of, the Notes of a Series or this Base Indenture and the failure to so comply materially and adversely affects the interests of the Noteholders of any Series and continues to materially and adversely affect the interests of the Noteholders of such Series for a period of fifteen (15) days after the earlier of (i) the date on which the Issuer [Ocala] obtains knowledge thereof or (ii) the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Issuer [Ocala] by the Indenture Trustee [Bank of America] or to the Issuer [Ocala] and the Indenture Trustee [Bank of America] by the Required Senior Noteholders, the Series 2005-1 Required Senior Noteholders or the Series 2008-1 Required Senior Noteholders." Id. at § 9.1.

72.    Upon the occurrence of an Event of Default, the Indenture Trustee is required to "exercise such of the rights and powers vested in it by this Base Indenture and the Facility Documents, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." Id. at § 10.1(a).

73.    Further, in the event of the occurrence of an "Event of Bankruptcy" involving Ocala – which is defined to include insolvency – Bank of America is required to, among other things, automatically instruct Ocala to cease purchasing mortgage loans. Id. at § 9.1; Definitions List, p. 11.

74.    Bank of America, in its capacity as Indenture Trustee, is obligated to exercise its "rights and powers" under the Base Indenture following an Event of Default, and to "use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." Id. at § 10.2(e). Bank of America must institute litigation, upon instruction from the Noteholders, if offered "security or

indemnity satisfactory to the Indenture Trustee against the costs, expenses, and liabilities which may be incurred therein or thereby." Id.

75.     The Base Indenture specifically provides for the holder of notes to be a beneficiary under the Base Indenture. See Base Indenture at § 13.8.

### F.     The May Letter Agreement

76.     On May 5, 2009, Bank of America, in its capacities as Collateral Agent and Indenture Trustee, sent a letter to BNP Paribas, Ocala and TBW (the "May Letter Agreement"). The May Letter Agreement recognized that, in connection with the sale of loans to Freddie Mac, Bank of America is "required to execute and deliver" a Freddie Mac Form 996E (Warehouse Lender Release of Security Interest), in which it "agrees to relinquish any and all right, title or interest that it may have in" the mortgage loans.

77.     The May Letter Agreement went on to "confirm that, notwithstanding the execution and delivery by the Collateral Agent or the Indenture Trustee of a Form 996E or any similar document, the Collateral Agent and the Indenture Trustee do not intend to release, and are not releasing, the proceeds of the sale of the related Sale Assets [i.e., the mortgage loans] from the lien of the Security Agreement, and such proceeds shall be subject to the lien of the Security Agreement."

### G.     The Purchase Agreement

78.     Ocala and TBW entered into the Second Amended and Restated Mortgage Loan Purchase and Servicing Agreement dated June 30, 2008 (the "Purchase Agreement"), which provides for the purchase of mortgage loans by Ocala as well as the management, servicing and control of the mortgage loans owned by Ocala.

79.     Delivery of the Purchase Agreement to Bank of America, as Indenture Trustee, is a condition precedent to the issuance of the Secured Notes.  Indenture Supplement § 2.1(b).

80.     Section 14.1 of the Purchase Agreement specifically provides that: "Purchaser [Ocala] hereby assigns, conveys, transfers, delivers and sets over unto the Collateral Agent [Bank of America] for the benefit of the Secured Parties [BNPP and the other Noteholders], all of its right, title and interest in, to and under, whether now owned or existing, or hereafter acquired, this Purchase Agreement."

81.     Section 14.1 of the Purchase Agreement also provides that:

the Purchaser [Ocala] and the Seller [TBW] shall each treat the Collateral Agent [Bank of America] as the Purchaser [Ocala] under this Purchase Agreement and each consent to such assignment and acknowledge that the Collateral Agent [Bank of America] shall enjoy the Purchaser's [Ocala's] rights under this Purchase Agreement pursuant to the provisions of this <u>Section 14.1</u>.  Without limiting the generality of the foregoing, the Purchaser [Ocala] and the Seller [TBW] shall each report to and correspond and communicate with the Collateral Agent [Bank of America] and in all other regards treat the Collateral Agent [Bank of America] as the purchaser hereunder with respect to the Mortgage Loans.

82.     Section 14.1 of the Purchase Agreement concludes: "All amounts due the Purchaser [Ocala] under this Purchase Agreement shall be remitted to the Collateral Agent [Bank of America] in accordance with the Collateral Agent's [Bank of America's] instructions and in accordance with this Purchase Agreement."

## IV.     BNPP Purchases Ocala-Issued Notes

83.     Pursuant to Section 2.8 of the Base Indenture, Ocala issued Master Notes registered in the name of Cede & Co., which is the partnership nominee of The Depository Trust Company ("DTC"), a securities depository.  BNPP is the beneficial owner of the Secured Notes issued under the Master Notes, as reflected on the books of a direct participant of DTC maintaining an account with DTC.  Cede & Co. has executed an assignment of rights to BNPP.

84.      On June 30, 2008, Ocala issued $1.6825 billion of Secured Notes in the form of asset backed short-term notes. The notes were issued in two series of senior notes consisting of the: (i) Series 2005-1 Short-Term Notes in the amount of $480.7 million (the "2005-1 Notes"); and (ii) Series 2008-1 Short-Term Notes in the amount of $1,201.8 million (the "2008-1 Notes"). The $1.6825 billion of commercial paper issued by Ocala was senior to $67.5 million of subordinated term notes for a total Facility of $1.75 billion.

85.      The Secured Notes had short maturities. After June 30, 2008, the Noteholders agreed that maturity of the Secured Notes would be thirty days.

86.      On June 30, 2008, BNPP purchased the entire Series 2005-1 Short-Term Notes with a face amount of $480.7 million from Bank of America as Depositary for Ocala. The Secured Notes purchased by BNPP on June 30, 2008 matured on July 21, 2008, and were subsequently rolled into another note issuance with a maturity date of August 20, 2008.

87.      Since June 30, 2008, Bank of America as Depositary for Ocala has issued an additional 15 Series 2005-1 Short Term Notes with maturity dates of August 20, 2008; September 22, 2008; October 20, 2008; November 20, 2008; December 22, 2008; December 30, 2008; January 16, 2009; February 20, 2009; March 20, 2009; April 20, 2009; May 20, 2009; June 22, 2009; June 30, 2009; July 20, 2009; and August 20, 2009.

88.      The short maturity of the Secured Notes meant that the entire $1.6825 billion due under the Secured Notes came due every month. Because Ocala's assets were intended to consist mostly of illiquid mortgages, Ocala was not expected to have the full amount of cash available to repay maturing Secured Notes on the monthly maturity dates. Ocala thus required a liquidity facility or intra-day loan to facilitate the rollover of Secured Notes.

89.     Bank of America provided a liquidity facility to facilitate the rollover, and made intra-day loans to Ocala every rollover date up to and including July 20, 2009. In essence, on the morning of each rollover date, Bank of America would advance the cash to pay BNPP on the maturing Secured Notes, and then would repay itself from the proceeds of BNPP's purchase of newly-issued Secured Notes that afternoon. Bank of America fully repaid itself for each and every such intra-day loan it made to Ocala.

90.     On each maturity date through July 20, 2009, Ocala repaid BNPP $480.7 million for the Secured Notes maturing that day. On that same day, in a separate transaction, BNPP purchased the entirety of each new Series 2005-1 Short Term Notes issued by Bank of America on behalf of Ocala. BNPP's Secured Notes were secured by a perfected first-priority security interest in certain collateral including cash and mortgages owned by Ocala and secured and maintained by Bank of America (the "2005-1 Collateral"), as Collateral Agent, on behalf of BNPP. The 2005-1 Collateral included, among other things: (i) cash held by Bank of America in a segregated 2005-1 collateral sub-account and in a commingled collateral account; and (ii) mortgage loans and any proceeds thereof assigned to the 2005-1 Series owned by Ocala that were pending sale to Freddie Mac or other purchasers.

91.     BNPP's Secured Notes were further secured by an over-collateralization requirement that prevented Bank of America from purchasing mortgages for Ocala or issuing new notes if Bank of America did not hold 2005-1 Collateral worth at least $500 million.

92.     In connection with BNPP's purchase of Secured Notes, BNP Paribas simultaneously entered into various swap transactions with Ocala and TBW to hedge certain risks associated with its Ocala investment.

93.     In making its decisions to "roll over" its investment in Ocala, BNPP relied upon the representations and certifications by Bank of America that the Borrowing Base Condition was satisfied and that the Notes were fully collateralized and secured.

94.     The final rollover of the Secured Notes was on July 20, 2009. On the morning of July 20, 2009, Bank of America provided liquidity to Ocala by entering an overdraft, advancing funds, or otherwise effectively providing Ocala an intra-day loan of $1.6825 billion and used these funds to repay amounts owed to the two main Noteholders, BNPP and DB, under the Secured Notes that matured on July 20, 2009. On that same day, BNPP and DB purchased $1.6825 billion worth of new Secured Notes, and Bank of America used the proceeds from these sales to repay itself for its loan to Ocala earlier that day.

V.  ·  **An Event of Default is Declared in the Ocala Facility**

95.     On August 3, 2009, agents from the Federal Bureau of Investigation's Office of the Special Inspector General for the Troubled Asset Relief Program and the Inspector General of the Department of Housing and Urban Development ("HUD") raided the offices of Colonial Bank and TBW. At that time, Colonial Bank was also the subject of a criminal probe by the Department of Justice, at least in part due to accounting irregularities related to its mortgage warehouse lending division.

96.     Pursuant to certain HUD regulations as well as agreements with Ginnie Mae, Freddie Mac and other lenders, TBW was required to deliver year-end audited financial statements to these agencies and lenders. Deloitte LLP served as TBW's auditor. According to the Federal Deposit Insurance Corporation (the "FDIC"), Deloitte uncovered evidence of possible fraud and expressed concerns to TBW regarding TBW's failure to provide information and documentation. Deloitte thereafter ceased its audit.

97.     On August 4, 2009, HUD suspended TBW's HUD/FHA origination and underwriting approval. In a press release announcing this suspension, HUD stated that this action was taken as a result of, among other things, its discovery that TBW's auditor ceased its financial examination after discovering certain irregular transactions that raised concerns of fraud, and that TBW failed to disclose, and falsely concealed, that it was the subject of two examinations into its business practices in the past year.

98.     In addition, on or about August 4, 2009, Freddie Mac terminated TBW's eligibility to sell loans and service over $50 billion of Freddie Mac loans.

99.     The suspension and terminations by these agencies made it impossible for TBW to continue in business, and on August 5, 2009, TBW closed its mortgage-lending operations.

100.     On August 5, 2009, BNPP provided notice to Ocala, TBW, Bank of America and others that, because TBW had ceased to be an approved seller with Freddie Mac, an Automatic Termination Event had occurred under the June 30, 2008 Second Amended and Restated Mortgage Loan Purchase and Servicing Agreement, which prohibited Ocala from purchasing additional loans from TBW. BNPP further instructed Bank of America to take note of the Termination Event and "to perform its respective duties as Collateral Agent, Custodian, Indenture Trustee and Paying Agent accordingly."

101.     On August 10, 2009, Bank of America sent Ocala, TBW, BNPP and others a Notice of Potential Indenture Event of Default, Indenture Event of Default and Acceleration that "(i) declare[d] the principal and premium (if applicable) and accrued or accreted interest in respect of the Notes to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Issuer, anything contained in the Base Indenture or Series Supplements or in any

Note to the contrary notwithstanding; (ii) instruct[ed] the Issuer to cease purchasing Mortgage Loans; (iii) instruct[ed] the Issuer and the Depositary to cease issuing Short Term Notes; and (iv) notifie[d] the Servicer and the Seller that an Indenture Event of Default has occurred."

102.    On August 11, 2009, the FDIC issued a Temporary Order to Cease and Desist requiring Colonial to obtain prior written approval from the Regional Director of the Atlanta Regional Office of the FDIC before engaging in any transaction with TBW.  Three days later, Colonial was closed and the FDIC was appointed receiver.

103.    Also on August 11, 2009, Bank of America provided Colonial Bank with a Demand for Documents and Proceeds, which revoked any outstanding bailee letters and terminated all of Colonial Bank's rights to hold possession of the mortgage loans in trust and as custodian, agent, and bailee on behalf of Ocala.

104.    On August 12, 2009, Bank of America filed an action in the United States District Court for the Southern District of Florida titled <u>Bank of America National Association v. Colonial Bank and John Doe #1-10,</u> No. 09-CV-22384 (AJ) (the "Colonial Action") seeking, among other things, to recover:  (i) "the proceeds paid by Freddie Mac to Colonial Bank" for mortgage loans owned by Ocala; and (ii) mortgage loans delivered to Colonial Bank that were not purchased by Freddie Mac.  Shortly thereafter, Bank of America, at the direction of the Secured Noteholders (including BNPP), obtained a temporary restraining order enjoining Colonial Bank from disposing of the mortgages or their proceeds.

105.    On August 14, 2009, the Alabama State Banking Department closed Colonial and appointed the FDIC as its receiver.

106.    On August 24, 2009, TBW filed a voluntary petition for bankruptcy in the Middle District of Florida under Chapter 11 of the Bankruptcy Code.

Case 1:09-cv-09783-RWS   Document 94   Filed 10/01/12   Page 30 of 91

## VI.    Bank of America Refuses to Make Payment

107.    On August 14, 2009, BNPP demanded that Ocala immediately pay the outstanding principal amount of the 2005-1 Notes plus accrued or accreted interest and demanded that Bank of America in its various capacities apply "all funds and any other amount or property held for, whether as collateral or otherwise, or otherwise attributable to the Series 2005-1 Notes" in accordance with the payment priorities specified in the Security Agreement.

108.    To date, Bank of America has refused to make payments to BNPP as required by the Security Agreement.  Although more than two years have passed since Bank of America declared an Event of Default, Bank of America still claims that it is "in the process of determining the appropriate next steps in light of the occurrence of an Indenture Event of Default." See Bank of America's Notice Regarding Monthly Noteholders' Statement and Distribution of Funds.

109.    On September 14, 2009, David B. Rich, III, Bank of America's Assistant General Counsel – Corporate Law, confirmed to BNPP that "less than US$75 million remains on account" in the Ocala Facility and "less than US$1.9 million, only, is contained in BNP Paribas' collateral sub-account."

## VII.    Bank of America's Breaches of Its Contractual Obligations

110.    Bank of America breached its contractual obligations to BNPP by, among other things:  (i) improperly transferring over $3.8 billion from Ocala's account at Bank of America to unauthorized accounts at Colonial Bank and Bank of America; (ii) purchasing mortgage loans without authorization; (iii) commingling funds in contravention of the Ocala Facility Agreements; (iv) failing to secure the mortgage loans it held on behalf of BNPP; (v) improperly issuing new Secured Notes on June 30, 2008 and thereafter when it certified Ocala was

30

insolvent; (vi) failing to shut down the Ocala Facility and promptly inform BNPP and others of Ocala's insolvency; and (vii) refusing, even after the declaration of an Event of Default, to pursue and recover Ocala's assets. As a result of these breaches, the Secured Notes were (and remain) under-collateralized, which has resulted in significant losses to BNPP.

### A.   **Bank of America's Improper Fund Transfers**

111.    In its role as Collateral Agent, Bank of America was charged with protecting the cash and mortgages in which BNPP held a security interest. Section 5.03 of the Security Agreement provides a limited list of permitted "Withdrawals and Transfers from the Collateral Account." Specifically, Section 5.03 allows Bank of America to withdraw and transfer funds from the collateral account, under certain circumstances, for payment on its hedging transactions, to Bank of America as Depositary and for the purchase of additional Series 2005-1 mortgage loans.

112.    Documents received by BNPP after August 2009 reflect that Bank of America regularly breached its obligations and responsibilities under the Security Agreement and Base Indenture by: (i) transferring funds to accounts at Colonial Bank established for purposes other than purchasing Series 2005-1 mortgage loans; (ii) transferring funds from Ocala accounts at Bank of America to a TBW account at Bank of America; and (iii) transferring funds out of the Ocala Facility without approved instructions from Ocala.

> (1)   Bank of America's Improper Fund Transfers to TBW
>        Accounts at Colonial Bank

113.    A review of Bank of America's bank records shows that, since June 30, 2008, Bank of America improperly transferred over $3.8 billion from the Ocala collateral account (Account No. 722493.4) and subaccounts (Account Nos. 722493.15 and 722493.17) at Bank of

America to accounts at Colonial Bank other than TBW's mortgage warehouse account designated in the bailee letters under which Bank of America received the mortgage loans.

114.    The over $3.8 billion of improper fund transfers to Colonial Bank include:

(a)    Over $830 million that was improperly transferred from the Ocala collateral account to a restricted TBW account titled "FHLMC P&I Custodial Account," which was used to accumulate principal and interest for loans serviced by TBW for Freddie Mac.

(b)    Approximately $675 million that was improperly transferred from the Ocala collateral account to a restricted TBW account titled "Colonial Custodial Funds Clearing Account," which was used for the initial deposit of funds relating to mortgages serviced by TBW.

(c)    Over $445 million that was improperly transferred from the Ocala collateral account to a TBW account titled "Colonial Master Account," which was used to fund loans made to settlement agents (i.e., the title company or attorney closing the loan for TBW).

(d)    Over $58 million that was improperly transferred from the Ocala collateral account to a TBW account titled "Colonial Operating," which was used to fund TBW's operating expenses.

(e)    $2.5 million that was improperly transferred from the Ocala collateral account to a restricted TBW account titled "Colonial ITF Henley Holdings Account," which was used to accumulate principal and interest relating to loans serviced by TBW for Henley Holdings LLC.

115.     The fact that these wire transfers were improper and for purposes other than purchasing mortgage loans was known to Bank of America.  On their face, Ocala's wire transfer requests to Bank of America plainly disclosed that the funds were being transferred to improper accounts, including Freddie Mac and Ginnie Mae custodial accounts and were often matched by incoming transfers of the exact or nearly the exact amount.

116.     Moreover, Bank of America's bank records show that between June 30, 2008 and August 4, 2009, Bank of America wired over $1 billion from Ocala's collateral account to Colonial Bank and other banks in whole dollar amounts (e.g., $5,000,000) that bear no relationship or correlation to mortgage loans or groups of mortgage loans purportedly purchased by Ocala.  These wire transfers include $50 million transferred to Platinum Bank, a bank owned by TBW, and transfers of several hundred million dollars to restricted servicing accounts that TBW maintained at Colonial Bank.

(2)     Bank of America's Improper Fund Transfers to a TBW
Account at Bank of America

117.     Bank of America's bank records also show that beginning in early July 2008, Bank of America improperly transferred over $1.7 billion of cash from Ocala-related collateral accounts to a TBW account at Bank of America identified in Bank of America's bank records as Acct. No. 722347.2 ("the 722347.2 Account").

118.     Of the $1.7 billion of cash that was improperly transferred from the Ocala-related accounts at Bank of America to the TBW account at Bank of America, over $465 million was improperly transferred from the 2005-1 Collateral subaccount.

119.     A review of the 722347.2 Account bank statement provided to BNPP by TBW (after August 2009) indicates that many of the mortgages that were purchased by TBW with

Ocala funds from this account were subsequently resold to Ocala and paid for by Ocala a second time.

120.   By way of example:

(a)   On April 17, 2009, Bank of America improperly transferred $501,140.97 from the 2005-1 Collateral subaccount to TBW's 722347.2 Account at Bank of America.

(b)   On that same day (April 17, 2009), TBW used the $501,140.97 that was improperly transferred by Bank of America to the 722347.2 Account to purchase two loans: (i) loan no. 3054299 with a face amount of $400,000 was purchased for $402,725.34; and (ii) loan no. 3162664 with a face amount of $98,000 was purchased for $98,415.63.

(c)   On that same day (April 17, 2009), TBW sent loan nos. 3054299 and 3162664 to Bank of America for purchase by Ocala. According to Bank of America's records, Ocala purchased those loans from TBW for $399,712.50 (loan no. 3054299) and $97,505.10 (loan no. 3162664).

(d)   As a result of Bank of America's improper fund transfers, Ocala paid twice for the same mortgage loans. In the first instance TBW used Ocala's funds from the 722347.2 Account to purchase mortgage loans. Those loans were then resold to Ocala, at which time Ocala paid for the loans a second time.

121.   Bank of America's improper withdrawals and transfers from the Ocala accounts breached its contractual obligations and directly and proximately caused BNPP's losses by, among other things, causing the 2005-1 Notes to be under-collateralized.

(3)   Bank of America's Failure To Obtain Approved Instructions

122.    Under the terms of the Ocala Facility Agreements, Bank of America was only permitted to transfer funds out of the Ocala collateral accounts upon the "approved instructions" of an Issuer Agent "in accordance with the provisions" of Section 5.03 of the Security Agreement.  Security Agreement § 5.03.  As of June 30, 2008, the Issuer Agents of Ocala were Lee Farkas, Paul R. Allen and Ray Bowman.  See Ocala Funding, LLC Certificate of Incumbency dated June 30, 2008.

123.    On June 30, 2008, at 3:45 pm, Matthew Smith, a Trust Officer at Bank of America, informed Sean Ragland and Desiree Brown of TBW that the funds BNPP paid for the Secured Notes were in Ocala's accounts.  Within one minute, Desiree Brown sent an e-mail to Mark Medina, a Trust Officer at Bank of America, requesting his "review and approval" of a $76.5 million wire transfer from the 2005-1 subaccount to Colonial Bank.  Although Desiree Brown was not an employee of Ocala or listed as an authorized Issuer Agent under the Facility documents signed that very day, Mark Medina responded "Approved," and wired $76.5 million from the 2005-1 subaccount to Colonial Bank.

124.    Less than two hours later, Desiree Brown sent Mark Medina another e-mail requesting his "review and approval" for a $236.7 million wire transfer from the 2008-1 subaccount to Colonial Bank.  As with the prior transfer, Mark Medina responded "Approved" and wired the funds.

125.    Since June 30, 2008, Bank of America has transferred billions of dollars out of the Ocala collateral account at the instruction of various TBW employees, including, but not limited to, Alicia Ard, Carla Washburn, Donna Skuhrovec, Desiree Brown and Rishi Thakur.  None of these individuals is listed as authorized Issuer Agents in Ocala's Certificate of

Incumbency and, with the exception of Donna Skuhrovec, who was Ocala's Vice President of Shipping, none of these individuals was even an officer of Ocala. Notwithstanding these facts, Bank of America "approved" these unauthorized instructions and wired billions of dollars out of the Ocala collateral account.

**B.      Bank of America's Improper Purchase of Mortgage Loans**

126.      Pursuant to the Security Agreement, Bank of America was only authorized to purchase additional mortgage loans on behalf of Ocala: (i) "so long as no Indenture Event of Default shall have occurred and then be continuing;" and (ii) after it tested the Borrowing Base Condition and determined that BNPP's 2005-1 Notes were properly collateralized. Security Agreement § 5.03.

127.      Section 5.03 of the Security Agreement provides that "no withdrawals from the Collateral Account shall be made on any day" for the purposes of purchasing additional mortgage loans unless the Borrowing Base Condition has been satisfied such that the 2005-1 Notes were secured by cash and mortgages worth at least $500 million. Thus, Bank of America was contractually required to ensure that _no_ money ever left the collateral accounts unless and until it confirmed that the collateral supporting BNPP's Secured Notes totaled at least $500 million.

128.      Bank of America regularly breached this requirement by transferring funds to Colonial Bank and other banks when the Borrowing Base Condition was not satisfied and when BNPP's 2005-1 Notes were not secured by sufficient collateral to meet the requirements of Section 5.03 of the Security Agreement.

129.      As discussed below, for the period between June 30, 2008 and December 22, 2008, Bank of America certified on a monthly basis that the Ocala Facility was under-

collateralized, which not only forbade Bank of America from purchasing additional mortgage loans, but also required Bank of America to automatically declare an Event of Default and shut down the Ocala Facility. These certifications were executed by Matthew Smith, a Bank of America Trust Officer. Subsequently, for the period between December 30, 2008 and July 20, 2009, Bank of America's internal bank records and documents show that Bank of America misrepresented to BNPP that the Borrowing Base Condition was satisfied when – in fact – the Ocala Facility was under-collateralized by hundreds of millions of dollars and therefore insolvent.

130.    Bank of America's approval of the purchase of mortgage loans when an Event of Default was occurring and when the Borrowing Base Condition was not met breached its contractual obligations and directly and proximately caused BNPP's losses by, among other things, causing the 2005-1 Notes to be under-collateralized.

### C.    Bank of America's Commingling of Collateral

131.    The Security Agreement requires Bank of America to establish and maintain a "special purpose trust account in the name of and under the control of, the Collateral Agent on behalf of the Secured Parties." Security Agreement § 5.01. The account is specifically referenced in the Security Agreement as Account No. 722493.4. Bank of America was also required to establish separate sub-accounts for funds securing the 2005-1 Collateral and funds securing the 2008-1 Collateral. See id.

132.    Bank of America was required to deposit into the 2005-1 Collateral sub-account, among other funds, "the net proceeds from the sale of the Series 2005-1 Short Term Notes" and "all monies received by or on behalf of [Ocala] as proceeds from the sale or securitization of Series 2005-1 Mortgage Loans." Id. See also Custodial Agreement § 14.1.

133.    Bank of America's bank records show that it failed to segregate the 2005-1 Collateral into the 2005-1 subaccount and that Bank of America regularly commingled the 2005-1 Collateral with other monies.

### D.    Bank of America's Failure to Secure BNPP's Collateral

#### (1)    Bank of America's Duty to Secure the Mortgage Loans

134.    As Collateral Agent and Custodian, Bank of America was charged with protecting the mortgage loans and cash securing BNPP's Secured Notes. Central to this responsibility is the duty to know what mortgage loans are owned by Ocala, when those mortgages were purchased by Ocala and when the mortgages were sold and no longer owned by Ocala.

135.    The Ocala Facility has detailed requirements for how mortgages are to be transferred and purchased by Bank of America, how those mortgages are sold and how monies received from the sale of the mortgages are to be maintained. The Ocala Facility Agreements also require Bank of America to comply with various reporting requirements to confirm the identity, value, ownership and location of the mortgage loans.

136.    For example, the Custodial Agreement requires that all loans purchased by Bank of America be accompanied by a Transfer Supplement containing detailed information about the particular mortgage loans. Bank of America was also required to provide (upon request) a List of Loans reflecting "a list of all Mortgage Loans with respect to which the Custodian holds Mortgage Notes, Mortgages and Assignments of Mortgages" and denoting "any Mortgage Loans paid off, repurchased, sold or otherwise released by the Custodian" since June 30, 2008. Custodial Agreement § 9.

137.    Moreover, the Custodial Agreement requires any mortgage loans sent to Freddie Mac or other purchasers to be accompanied by a bailee letter in the form of Exhibit E to the Custodial Agreement.  The bailee letter used by Bank of America provided that within 15 days of Colonial Bank's receipt of a loan and its corresponding loan documents, Colonial Bank – in its capacity as custodian for Freddie Mac – was obligated to either:  (i) remit to Bank of America the proceeds of the loans purchased by Freddie Mac; or (ii) return to Bank of America all loans that Freddie Mac declined or refused to purchase.

138.    Thus, Bank of America was obligated to keep track of which mortgage loans Ocala owned, which mortgage loans were purchased by Freddie Mac, when those mortgage loans were purchased by Freddie Mac (i.e., when Bank of America received the proceeds of the loans from Freddie Mac) and whether any loans remained at Colonial Bank for more than 15 days without being purchased by Freddie Mac.

139.    Bank of America breached its duty to secure the mortgage loans by failing to correctly record which loans it owned on behalf of Ocala and when mortgages were sold to Freddie Mac and no longer owned by Ocala.  This breach is underscored by Bank of America's regular issuance of reports falsely misrepresenting the loans owned by Ocala on behalf of BNPP.

(2)    Bank of America Misrepresented the Collateral It Held For BNPP

140.    Bank of America generated regular reports about the mortgage loans and cash it purportedly held on behalf of BNPP.  These reports provided assurance to BNPP that Bank of America held sufficient collateral to repay BNPP's Secured Notes.

141.    Beginning in December of 2008, on almost every business day, Bank of America sent an e-mail with attached status reports directly to BNPP employees including Avi Pemper purporting to list the Ocala collateral held on behalf of BNPP.  Each such e-mail attached

three reports, two of which, the "Dry Loans" Report and the "Shipped Report" purported to list the collateral held on behalf of BNPP.

142.    The Shipped Report contained a list of mortgage loans purportedly owned by Ocala that were shipped to Freddie Mac's agent (Colonial Bank) for review pending their purchase by Freddie Mac. On any given day, the Shipped Report contained more than 1,900 loans with a face amount in excess of $380 million and represented the vast majority of the collateral purportedly securing BNPP's Secured Notes.

143.    The Shipped Reports that Bank of America sent to BNPP misrepresented the collateral securing BNPP's Secured Notes by including mortgage loans that were no longer owned by Ocala. For example, the August 4, 2009 Shipped Report provided by Bank of America to BNPP listed 2,043 loans with a face amount of $417.7 million purportedly owned by Ocala. However, contemporaneous Bank of America documents (executed by Matthew Smith), which BNPP has since obtained, reflect that 90% of those loans (1,837 mortgages with a face amount of $374.9 million) had previously been purchased by Freddie Mac and were no longer owned by Ocala.

144.    A review of Bank of America's Shipped Reports going back to December 2008 indicates that each of the approximately 160 Shipped Reports provided to BNPP falsely misrepresented the loans owned by Ocala, thereby overstating the collateral securing BNPP's Secured Notes.

145.    Bank of America also sent weekly e-mails to Avi Pemper titled "BNP Eligible Cash," which purported to report on cash collateral securing BNPP's Secured Notes.

146.    Bank of America's misrepresentations in the Shipped Reports and other documents breached its contractual obligations and directly and proximately caused BNPP's

losses by, among other things, failing to alert BNPP that the Ocala Facility was insolvent and that BNPP's Secured Notes were under-collateralized.

## VIII.   Bank of America Falsely Certifies the Borrowing Base

147.     Under the terms of the Base Indenture, Indenture Supplement and Depositary Agreement, before issuing or delivering any 2005-1 Notes, Bank of America was required to review and certify the Borrowing Base Condition by certifying various items on the Borrowing Base Certificate.

148.     The Borrowing Base Certificate certified that "the assets of Ocala Funding LLC exceed its liabilities and that Ocala Funding LLC is in compliance with the terms specified in the Depositary Agreement." Bank of America was specifically required to certify items (1) and (2) on the Borrowing Base Certificate, which were the amounts of outstanding Secured Notes and Ocala-owned collateral that secured the outstanding Secured Notes.

149.     In certifying the Borrowing Base Condition, Bank of America was required to certify two things: first, that it had sufficient information to certify solvency, and second, that the solvency condition was satisfied.

150.     Bank of America understood the purpose of certifying the Borrowing Base Condition. A summary of the Ocala Facility attached to an internal Bank of America e-mail dated August 5, 2009 stated that "[a]t each CP role [sic] a borrowing base test (exhibit C) is done to make sure that enough cash and loans are on hand to support any new CP being issued."

151.     To certify the Borrowing Base Certificate, Bank of America by necessity had to certify the funds on deposit in the collateral account and other accounts it maintained, and the outstanding purchase price of the mortgage loans in the custody and control of Bank of America on behalf of BNPP.  Bank of America knew that it could not satisfy its certification

responsibility merely by rubber-stamping documents provided by TBW.  According to a summary of Bank of America's policies for administering the Ocala Facility attached to an internal Bank of America e-mail dated July 30, 2007, it was Bank of America's responsibility upon each rollover to "[f]ill out the exhibit C spreadsheet according to the directions **and make sure the test is passed.**" (Emphasis added.)

152.    Bank of America had possession of the information required to accurately certify the Borrowing Base Condition.  Cash was deposited in an account at Bank of America and the mortgage notes were either held in Bank of America's vaults or listed on the schedule accompanying Bank of America's bailee letters to Colonial Bank acting as Freddie Mac's agent. Bank of America knew or should have known which loans were owned by Ocala and which loans were sold to Freddie Mac because Freddie Mac required Bank of America to sign a document (Form 996E) relinquishing Bank of America's rights to mortgage loans upon payment by Freddie Mac, and Bank of America received payment from Freddie Mac for the purchased loans.

153.    Although the calculation of the Borrowing Base Condition was straightforward, a Bank of America trust officer responsible for certifying it admitted that he was "[n]ot sure what all the [borrowing base] calculations mean."  He and others at Bank of America nevertheless proceeded to certify these calculations and the satisfaction of the Borrowing Base Condition.

(1)  The June 2008 – December 22, 2008 Borrowing Base Certificates

154.    On June 30, 2008, and each roll date thereafter, Bank of America was required to certify the Borrowing Base Certificate prior to issuing new Secured Notes.  Initially, these Borrowing Base Certificates were not provided to BNPP.

155.     The June 30, 2008 Borrowing Base Certificate certified by Bank of America

shows that Bank of America was holding only $251.2 million of cash, capitalized interest and

mortgages on behalf of Ocala.  This is far less than the $1.75 billion of Secured Notes issued by

Bank of America on June 30, 2008, even accounting for an additional cash infusion of

approximately $780 million that Ocala received from BNPP and DB for the sale of Secured

Notes issued on June 30, 2008.  Moreover, each of the Borrowing Base Certificates certified by

Bank of America between June 30, 2008 and December 22, 2008, showed that Ocala was

insolvent insofar as it held significantly less cash and mortgages than the $1.75 billion of

outstanding Secured Notes.  As shown in the following chart, on each of the note issuance dates

between June 30, 2008 and December 22, 2008, Bank of America certified that the Ocala Facility

was underfunded by between $450 and $700 million.

| Date | Mortgages | Cash and Capitalized Interest | Total Mortgages, Cash and Capitalized Interest | Under Collateralization |
|------|-----------|-------------------------------|-----------------------------------------------|-------------------------|
| 6/30/2008 | $173,283,640 | $860,722,813 | $1,034,006,454 | (715,978,546) |
| 7/21/2008 | $679,808,482 | $361,132,174 | $1,040,940,656 | (709,044,344) |
| 8/20/2008 | $907,859,601 | $125,876,842 | $1,033,736,443 | (716,248,557) |
| 9/22/2008 | $802,614,055 | $233,613,949 | $1,036,228,004 | (713,756,996) |
| 10/20/2008 | $902,937,474 | $131,518,778 | $1,034,456,252 | (715,528,749) |
| 11/20/2008 | $946,607,096 | $96,922,679 | $1,043,529,775 | (706,455,225) |
| 12/22/2008 | $970,376,234 | $332,989,841 | $1,303,366,075 | (445,543,515) |

156.     Under the terms of the Depositary Agreement, Bank of America was required to

certify the Borrowing Base Certificate before the issuance or roll of new Secured Notes.

Additionally, under the Base Indenture, Bank of America was required to automatically shut

down the Ocala Facility and promptly notify BNPP and the other Noteholders if Ocala became

43

insolvent or was under-collateralized.  If Bank of America had performed its contractual duties, including by automatically shutting down the Ocala Facility and promptly notifying BNPP as it was contractually required to do, BNPP would not have been harmed.

(2)  The December 30, 2008 – July 2009 Borrowing Base Certificates

157.  On December 12, 2008, in connection with its roll of the Secured Notes, BNPP requested that Bank of America begin providing BNPP with a copy of the Borrowing Base Certificate certified by Bank of America upon the issuance of new Secured Notes.

158.  On December 30, 2008, for the first time since BNPP purchased Secured Notes on June 30, 2008, Bank of America executed a Borrowing Base Certificate that on its face showed the Ocala Facility to be fully collateralized.  Although there were no new investments in the Ocala Facility in December 2008, the December 30, 2008 Borrowing Base Certificate shows that the Ocala Facility suddenly had $1.85 billion of cash and mortgages, $546.4 million more than it had only eight days earlier.

159.  Bank of America knew or should have known that the December 30, 2008 certification was false for two reasons.  First, it would have been impossible for Ocala to increase its total assets by more than $1 billion in one month.  The Ocala Facility Agreements established a "closed system" in which the total value of the Facility's assets could not change significantly absent a corresponding change in the total value of Secured Notes issued.  Bank of America knew, however, both through its role as Depositary and from the Borrowing Base Certificates that the total value of Secured Notes issued had remained constant from November 2008 to December 2008.  Second, the $1.85 billion total stated in the Borrowing Base Certificate purported to include $1.3 billion in mortgages owned by Ocala.  Yet the value of the mortgages actually owned by Ocala as of December 30, 2008, which either were in Bank of America's vault

44

or had been delivered pursuant to Bank of America bailee letters, was substantially less than $1.3 billion.

160.     The Borrowing Base Certificates certified by Bank of America on subsequent roll dates, and provided by Bank of America to BNPP, also showed the Ocala Facility to be fully collateralized. Bank of America's certifications of these Borrowing Base Certificates were false. Moreover, Bank of America had possession of all the information necessary for it to determine the accuracy of the Borrowing Base Certificates.

161.     By way of example, Bank of America's final certification was on July 20, 2009. In that certification (signed by Matthew Smith), Bank of America certified that as of July 20, 2009, Bank of America held mortgage loans worth over $474 million and $28 million of cash as collateral for BNPP's $480.7 million of Secured Notes. In reality, as of July 20, 2009, Bank of America's own internal documents, also executed by Matthew Smith, show that over $290.4 million of mortgage loans purportedly owned by Ocala had already been sold to Freddie Mac and, accordingly, Bank of America was holding mortgage loans with a value of less than $190 million on behalf of BNPP. Moreover, Bank of America's bank records show that as of July 20, 2009, Bank of America was holding only $1.7 million in the segregated 2005-1 Collateral account.

162.     A review of Bank of America's bank records and Forms 996E signed by Matthew Smith reveals that Bank of America's Borrowing Base Certificates for prior months were similarly false.

163.     Bank of America thus certified and provided BNPP with false Borrowing Base Certificates, which Bank of America could and should have checked against its own records prior to certification. Additionally, prior to December 30, 2008, Bank of America certified

Borrowing Base Certificates that on their face reflected the insolvency of the Ocala Facility. These actions constitute a breach of the Base Indenture and Depositary Agreement.

164.     As expressly recognized by Bank of America in the March Letter Agreement, Bank of America's certification of the Borrowing Base Condition was an "inducement to BNP Paribas [] to enter into, and/or, to continue its participation" in the Ocala transactions.  Had BNPP known that Bank of America's certification of the borrowing base was false or that its 2005-1 Notes were not secured by the 2005-1 Collateral, it would neither have purchased the 2005-1 Notes nor, thereafter, would it have continued its participation in the Ocala Facility.  By failing to shut down the Ocala Facility upon its insolvency and later executing false certifications of the Borrowing Base Certificate, Bank of America breached its contractual obligations and proximately caused BNPP's injuries.

**IX.     Bank of America Converts Ocala Loans for Its Own Benefit**

165.     On March 31, 2009, Bank of America and TBW entered into a Forward Purchase Agreement pursuant to which Bank of America agreed to purchase TBW's beneficial interest in pools of mortgages in return for consideration to be paid to Bank of America.  On May 4, 2009, Bank of America and TBW amended and restated this Forward Purchase Agreement (as amended, the "Bank of America-TBW Forward Purchase Agreement").  Pursuant to that Agreement, Bank of America in its personal capacity asserted improper dominion and control over 852 Ocala-owned loans listed on Exhibit 1 hereto (previously filed with this Court as Schedule A to the Conversion Action) (the "BNPP Loans"), the combined value of which exceeds $190 million.

166.     Ocala used funds provided by BNPP to purchase the BNPP Loans and granted a security interest in those loans to Bank of America in its capacity as Collateral Agent to secure

Ocala's obligations to BNPP under the Secured Notes. Bank of America, in its capacity as Collateral Agent, had perfected its first-priority security interest in the BNPP Loans by, among other things, taking possession of them.

167.    Bank of America represented in writing to BNPP on various occasions that the BNPP Loans were held by Bank of America and were securing Ocala's obligations to BNPP under the Secured Notes.

168.    Bank of America also has reaffirmed on numerous occasions, including in two judicial proceedings, that the BNPP Loans are still property of Ocala and that the loans remain subject to a perfected first-priority security interest in favor of Bank of America as Collateral Agent.

(a)    In an August 11, 2009 letter to Colonial Bank, Bank of America demanded the return of the BNPP Loans (as well as other loans) and reiterated that "[p]ending the return of the documents or payment of the proceeds with respect to the mortgage loans, our security interest therein shall remain in full force and effect and you [Colonial Bank] shall hold possession thereof for the benefit of the secured parties [i.e., BNPP and others]." This letter was signed by Bank of America as Indenture Trustee, Collateral Agent and Custodian of Ocala.

(b)    On August 12, 2009, Bank of America commenced the Colonial Action asserting its ownership interest in numerous loans, including the BNPP Loans. In the Colonial Action, Bank of America asserted that the "[l]oans are the property of Bank of America as collateral agent for secured parties [i.e., BNPP and others]." Compl., Colonial Action 25, 47. The BNPP Loans are listed

specifically by loan number on Schedule A to Bank of America's Complaint in the Colonial Action.

(c)     On August 24, 2009, Bank of America commenced another action in the United States District Court for the Southern District of Florida titled Bank of America National Association v. Taylor, Bean & Whitaker Mortgage Corporation and John Does #1-10, No. 09-CV-22478 (AJ) (the "TBW Action"). In that action, Bank of America once again asserted Ocala's ownership interest in numerous loans, including the BNPP Loans. Specifically, Bank of America asserted that the BNPP Loans "are the property of Bank of America as collateral agent for secured parties [i.e., BNPP and others]." Compl., TBW Action  50, 57. The BNPP Loans are listed specifically by loan number on Schedule A to Bank of America's Complaint in the TBW Action.

169.    After Bank of America in its capacity as Collateral Agent took possession of the BNPP Loans, Bank of America sent the BNPP Loans to Colonial (acting as Freddie Mac's custodian) for certification and sale to Freddie Mac, accompanied by Bank of America bailee letters, which reaffirmed that the BNPP Loans "constitute a portion of the Assigned Collateral (as defined in the Security Agreement)" and that "[e]ach of the Mortgage Notes, Mortgages and Assignments of Mortgages is subject to a security interest in favor of the Collateral Agent for the benefit of the Secured Parties [i.e., BNPP] . . . ."

170.    Although the Bank of America bailee letters required that the purchase price for the BNPP Loans be sent to the Ocala Funding Collateral Account (Acct. No. 722493.4) at Bank of America, and explicitly provided that "until payment therefore is received, the aforesaid

security interest therein will remain in full force and effect," the purchase price for the BNPP Loans was never sent to this account.

171.    Instead, at the same time that Bank of America in its capacity as Collateral Agent was representing to BNPP that it held the BNPP Loans for the benefit of BNPP – and while the BNPP Loans remained subject to the security interest held by Bank of America as Collateral Agent – Bank of America reacquired the BNPP Loans from TBW under the Bank of America-TBW Forward Purchase Agreement for Bank of America's own benefit.

172.    By doing so, Bank of America, in its own capacity and not as an agent of Ocala or BNPP, asserted dominion and control over the BNPP Loans inconsistent with both Ocala's ownership of the loans and the perfected first-priority security interest in favor of Bank of America as Collateral Agent.

173.    Bank of America subsequently sold nearly all of the BNPP Loans to Freddie Mac and received from Freddie Mac the sale proceeds for the BNPP Loans. At no time did Bank of America or Freddie Mac pay Ocala or BNPP for the BNPP Loans or otherwise send the BNPP Loans, sale proceeds of the BNPP Loans or the value of the sale proceeds to Ocala or to Bank of America as Collateral Agent.

174.    Bank of America's conduct has deprived Bank of America, as Collateral Agent, and/or Ocala of more than $190 million in collateral that otherwise would have been available to the Collateral Agent and/or Ocala to apply in payment of the Secured Notes held by BNPP.

175.    On August 30, 2012, Ocala assigned to Bank of America all right, title and interest in and to any or any potential claim or cause of action relating to the loans set forth in the complaints captioned BNP Paribas Mortgage Corporation v. Bank of America, N.A., Case 1:10-cv-23116 (United States District Court, Southern District of Florida, Miami Division) and

Deutsche Bank AG v. Bank of America, N.A., Case 1:10-cv-08299 (United States District Court, Southern District New York), including without limitation any such claim or cause of action for conversion or related action relating to such loans (collectively, the "Ocala Claims").

176.    On September 6, 2012, Bank of America assigned the Ocala Claims to DB and BNPP.

## X.    Bank of America Continues To Breach Its Contractual and Fiduciary Duties Following TBW's Collapse

177.    In the wake of TBW's collapse, Bank of America had continuing contractual and fiduciary duties to secure and protect the Ocala collateral, including by pursuing litigation designed to recover assets for the benefit of BNPP.

178.    Bank of America both acknowledged and accepted this responsibility when it brought suit against Colonial Bank within days of TBW's collapse, as well as when it subsequently brought suit against TBW.

179.    Bank of America reaffirmed its responsibility in its recently-filed amended complaint in Bank of America, N.A., as indenture trustee, custodian, and collateral agent for Ocala Funding, LLC v. Federal Deposit Insurance Corporation, No. 10-CV-01681-JEB (D.D.C.), which stated (at n.1) that Bank of America in its capacity as Indenture Trustee is "authorized pursuant to the terms of the Facility Documents . . . to pursue recovery of losses incurred by Ocala Funding, LLC, including losses incurred by all investors in the Ocala Funding commercial paper facility and by the Trustee itself."

180.    Bank of America was willing to pursue claims against Colonial Bank, TBW, and later the FDIC, in order to secure and protect the Ocala collateral. But Bank of America has refused to advance the claims that it could pursue against itself.

181.   Specifically, there are meritorious claims against Bank of America for breaches of the Security Agreement, the Custodial Agreement, and the Depositary Agreement, as well as for the conversion of Ocala loans for Bank of America's own benefit:

(a)   <u>Claim Under the Security Agreement</u>:  Bank of America is liable for breaching the Security Agreement by failing to secure and protect the Ocala collateral, including by:  (i) improperly transferring funds from Ocala's accounts at Bank of America to unauthorized accounts at Colonial Bank and Bank of America; (ii) purchasing mortgage loans without authorization; (iii) commingling funds; and (iv) failing to adequately secure the mortgage loans it owned on behalf of BNPP.

(b)   <u>Claim Under the Custodial Agreement</u>:  Bank of America is liable for breaching the Custodial Agreement by failing to maintain continuous custody and control of Ocala mortgages subject to the Collateral Agent's security interest, including by:  (i) releasing mortgages to third-party purchasers without transmittal letters in the form specified by Exhibit E to the Custodial Agreement and/or by failing to collect from the third parties the executed transmittal letters; (ii) failing to ensure that prospective third-party purchasers to whom it had transmitted loans for purchase either returned the mortgages or remitted payment for the mortgages within the fifteen-day time period set forth in the required transmittal letter; (iii) failing to obtain and/or keep records adequate to identify the mortgages purchased by Ocala and held by Bank of America; (iv) failing to obtain and/or keep records adequate to demonstrate that Colonial had released its security interest in mortgages for which Bank of America transferred payment to Colonial and of which Bank of America took possession on behalf of Ocala; (v) failing to ensure that with respect to mortgages released by Bank of America to third-party purchasers as

51

bailees, Bank of America recovered either the mortgages or the proceeds from the sale of the mortgages; and (vi) failing to perform its daily reporting obligations.

(c)     Claim Under the Depositary Agreement:  Bank of America is liable for breaching the Depositary Agreement, including by: (i) falsely certifying on a monthly basis that the Borrowing Base Condition was satisfied pursuant to Section 4(d) of the Depositary Agreement, including at times when Bank of America knew that Ocala was insolvent and that the Borrowing Base Condition had not been satisfied; and (ii) improperly issuing on a monthly basis new Secured Notes pursuant to Section 4(d) of the Depositary Agreement, including at times when Bank of America knew that Ocala was insolvent and that the Borrowing Base Condition had not been satisfied.

(d)     Conversion Claim:  Bank of America is liable for conversion because it took possession of the BNPP loans subject to Ocala's superior security interest for its own benefit, without payment.

182.     In its motion to dismiss the First Amended Complaint filed in this action, Bank of America argued successfully that BNPP lacked standing to bring claims against Bank of America for breaches of the Custodial Agreement and the Depositary Agreement.

183.     In its motion to dismiss the Complaint in the Conversion Litigation, Bank of America argued successfully that BNPP lacked standing to bring a claim against Bank of America for conversion of the BNPP loans.

184.     Bank of America, in its capacity as Indenture Trustee, has standing to bring claims for breaches of the Depositary Agreement, breaches of the Security Agreement, and conversion of the BNPP loans.  Section 10.2(e) of the Base Indenture obligates Bank of America, as Indenture Trustee, to exercise its rights and powers following an Event of Default, and to do

so with the care and skill of a prudent person. Section 10.2(e) of the Base Indenture further obligates Bank of America, as Indenture Trustee, to exercise its rights and powers, including its right to institute litigation, upon instruction from the Noteholders, if offered adequate indemnity against the costs, expenses, and liabilities it might incur.

185.    Bank of America, in its capacity as Collateral Agent, has standing to bring claims for breaches of the Custodial Agreement and for conversion of the BNPP loans. Section 6.02 of the Security Agreement obligates Bank of America, as Collateral Agent, to exercise any right or remedy available to it if so directed by the Noteholders following an Indenture Event of Default. Section 8.04 of the Security Agreement obligates Bank of America, as Collateral Agent, to obey written instructions of the Noteholders directing Bank of America, as Collateral Agent, to exercise any action it is permitted to take under the Security Agreement.

186.    In a letter dated July 6, 2011, BNPP instructed Bank of America to bring claims in its capacities as Indenture Trustee and Collateral Agent against itself in its capacities as Collateral Agent, Custodian, Depositary, and in its individual capacity.

187.    BNPP's July 6, 2011 letter offered to provide Bank of America with an appropriate indemnity in connection with the pursuit of these claims.

188.    In a letter dated August 6, 2011, Bank of America rejected BNPP's instructions and "respectfully decline[d] the demands" set forth in BNPP's July 6 letter. Bank of America thus seeks to preclude the pursuit of viable claims against it that could and should be pursued for the benefit of the Noteholders.

189.    At the same time, Bank of America has continued to refuse to pay the $480.7 million plus interest due to BNPP under the Secured Notes.

## FIRST CAUSE OF ACTION
### (Breach of Contract – Security Agreement: Failures Regarding Collateral)

190.    Plaintiff repeats and realleges all prior paragraphs as if set forth here in full.

191.    Plaintiff asserts this claim on its own behalf and as the assignee of Cede & Co.

192.    Under the terms of the Security Agreement, Bank of America was contractually obligated to open and maintain certain segregated accounts for the collateral securing BNPP's Secured Notes.  Security Agreement § 5.01.

193.    Under the terms of the Security Agreement, Bank of America was given exclusive dominion and control over the collateral accounts and all mortgages or other assets owned by Ocala.  Id. §§ 4.01 and 5.01 et seq.

194.    Under the terms of the Security Agreement, Bank of America was only permitted to disburse Ocala's funds "in accordance with the terms of Section 5.03 hereof."  Id. § 5.01.

195.    Section 5.03 of the Security Agreement states that "no withdrawals from the Collateral Account shall be made on any day" for the purchase of new mortgage loans if BNPP's Secured Notes are not fully secured by cash and mortgages worth at least $500 million.  Security Agreement § 5.3.

196.    Under the terms of the Security Agreement, Bank of America was entitled to rely on instructions it received from Ocala only if the instructions were from an Issuer Agent and "reasonably believed by it in its professional judgment to be genuine and correct and to have been signed or sent by the proper Person or Persons."  Id. § 8.01.

197.    Under the terms of the Security Agreement, Bank of America was required to "promptly comply with any such approved instructions made by the Issuer [Ocala], the Series 2005-1 Depositary [Bank of America] or the Series 2008-1 Depositary [Bank of America]" only

if they were made by an Issuer Agent "in accordance with the provisions of the foregoing paragraphs of this Section 5.03." Id. § 5.03.

198.    Under the express terms of the Security Agreement, Bank of America is liable for negligence, fraud, bad faith or willful misconduct in the performance of its duties. Id. § 8.01.

199.    As set forth in this Second Amended Complaint, Bank of America breached its obligations under the Security Agreement by, among other things:  (i) improperly transferring funds from Ocala's account at Bank of America to unauthorized accounts at Colonial Bank and Bank of America; (ii) purchasing mortgage loans without authorization; (iii) commingling funds; and (iv) failing to adequately secure the mortgage loans it owned on behalf of BNPP.

200.    Had Bank of America adequately performed its contractual obligations, BNPP's Secured Notes would be fully secured by $500 million of cash and mortgage loans.  As a direct and proximate cause of Bank of America's breach of its contractual duties and its failure to protect and secure BNPP's collateral, BNPP's Secured Notes are significantly under-collateralized and Bank of America has failed to make payment to BNPP for its Secured Notes.

201.    BNPP is a third-party beneficiary to the Security Agreement and is entitled to the rights and benefits under that agreement and may enforce the provisions of that agreement as if it were a party. See id. §§ 10.08 and 10.18.

### SECOND CAUSE OF ACTION
#### (Breach of Contract – Base Indenture: Events of Default)

202.    Plaintiff repeats and realleges all prior paragraphs as if set forth here in full.

203.    Plaintiff asserts this claim on its own behalf and as the assignee of Cede & Co.

204.    Under the terms of the Base Indenture, Ocala is required to "use the proceeds of Notes solely for one or more of the following purposes:  (a) to pay the Issuer's Obligations when

due, in accordance with the Security Agreement; and (b) to acquire Mortgage Loans from the Seller." Base Indenture § 8.28; Indenture Supplement § 2.6.

205.     Under the terms of the Base Indenture, "[i]f an Event of Default or a Potential Event of Default occurs and is continuing and if a Trust Officer of the Indenture Trustee [Bank of America] receives written notice or has actual knowledge thereof, the Indenture Trustee [Bank of America] shall promptly provide," among others. BNPP and BNP Paribas, "with notice of such Event of Default or the Potential Event of Default." Base Indenture § 10.4.

206.     Under the terms of the Base Indenture, upon the occurrence of an Event of Default, the Indenture Trustee is required to "exercise such of the rights and powers vested in it by this Base Indenture and the Facility Documents, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." Id. at § 10.1(a).

207.     Bank of America breached the Base Indenture by, among other things, failing to ensure that the Ocala Facility satisfied the Borrowing Base Condition before issuing new Secured Notes, using the proceeds of the Secured Notes for unauthorized purposes, failing to automatically shut down the Ocala Facility upon actual knowledge of Ocala's insolvency and failing to promptly notify BNPP, BNP Paribas and the others of an Event of Default or Potential Event of Default.

208.     Moreover, after Ocala was insolvent and an Event of Default had thus occurred, Bank of America breached the Base Indenture by engaging in transactions with Ocala and TBW, which have injured or may injure BNPP and other Noteholders. These transactions include, but are not limited to: (i) Bank of America's repeated extension and repayment of intra-day loans to Ocala when Ocala was insolvent; and (ii) Bank of America's Mortgage Relationship with TBW.

209.     BNPP, as a Noteholder, is an intended beneficiary of the Base Indenture and is expressly recognized as a third-party beneficiary of the Base Indenture. Base Indenture § 13.8.

210.     As a direct and proximate cause of Bank of America's breach of its obligations under the Base Indenture, BNPP has been damaged in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**(Breach of Fiduciary Duty)**

211.     Plaintiff repeats and realleges all prior paragraphs as if set forth here in full.

212.     Plaintiff asserts this claim on its own behalf and as the assignee of Cede & Co.

213.     Bank of America owed BNPP and the other Noteholders a duty to act in the best interest of BNPP and the other Noteholders and a duty to exercise the same degree of care and skill that a prudent person would exercise or use in the conduct of such person's own affairs. Bank of America also owed BNPP and the other Noteholders a duty to act free from any conflicting personal interest.

214.     Bank of America breached these duties by among other things failing to ensure that the Ocala Facility satisfied the borrowing base test before issuing new notes, using the proceeds of the Secured Notes for unauthorized purposes, failing to automatically shut down the Ocala Facility upon actual knowledge of Ocala's insolvency and failing to promptly notify BNPP of an Event of Default or Potential Event of Default.

215.     Moreover, after Ocala was insolvent and an Event of Default occurred, Bank of America breached the Base Indenture by engaging in transactions with Ocala and TBW which have injured or may injure BNPP and other Noteholders. These transactions include, but are not limited to: (i) Bank of America's repeated extension and repayment of intra-day loans to Ocala when Ocala was insolvent; and (ii) Bank of America's Mortgage Relationship with TBW.

216.     As a direct and proximate cause of Bank of America's breach of its obligations under the Base Indenture, BNPP has been damaged in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**(Breach of Contract – Security Agreement: Failures To Sue)**

217.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

218.     Plaintiff asserts this claim on its own behalf and as the assignee of Cede & Co.

219.     Bank of America, in its capacity as Collateral Agent, had the obligation to bring available claims for the benefit of the Noteholders following an Event of Default.

(a)     Pursuant to Section 6.02 of the Security Agreement, Bank of America, as Collateral Agent, is required to exercise any rights or remedies available to it under applicable law following an Indenture Event of Default and upon an instruction from the Noteholders.

(b)     Pursuant to Section 8.04 of the Security Agreement, Bank of America, as Collateral Agent, is required to follow the written instructions of the Noteholders directing it to exercise any action it is permitted to take under the Security Agreement.

(c)     BNPP was designated as a third-party beneficiary of the Security Agreement in Section 10.08, and is entitled to enforce its terms against Bank of America, as Collateral Agent.

220.     Bank of America, in its capacity as Collateral Agent, has standing to bring claims for (i) breach of the Custodial Agreement; and (ii) conversion of Ocala loans.

(a)     Bank of America, in its capacity as Collateral Agent, is a party to the Custodial Agreement.

58

221.    A meritorious claim exists against Bank of America in its capacity as Custodian for breach of the Custodial Agreement.

(a)    Pursuant to Section 19(c) of the Custodial Agreement, Bank of America is liable for actions taken or omitted to be taken by it as Custodian that are negligent, in bad faith, or that constitute misconduct.

(b)    Under the terms of the Custodial Agreement, Bank of America was responsible for taking possession of, examining, and securing the mortgages owned by Ocala and was authorized to deliver the mortgage files to a third-party purchaser, such as Freddie Mac or its agent "*provided* that any delivery of such Mortgage Notes, Mortgage and Assignment of mortgage is accompanied by a transmittal letter to be executed by the third-party purchaser substantially in the form attached hereto as Exhibit E and the Custodian [Bank of America] shall collect all such transmittal letters executed by third-party purchasers." Custodial Agreement § 8.

(c)    Under the terms of the Custodial Agreement, "[w]hile the Mortgage Loans are owned by the Issuer [Ocala], and subject to the security interest of the Collateral Agent [Bank of America], as the case may be, the Custodian [Bank of America] shall:  i. segregate on the books of the Custodian [Bank of America] and maintain continuous custody and control of the Mortgage Notes, Mortgages and Assignments of Mortgages on behalf of and in trust for the Issuer [Ocala] subject to the security interest of the Collateral Agent [Bank of America]." Id. § 6(b)(i).

(d)    Consistent with Bank of America's duty to "maintain continuous custody and control of the" mortgages on behalf of Ocala, Bank of America provided BNPP with daily reports of the loans that Bank of America held as collateral for BNPP's Secured

Notes.  However, each of the approximately 160 Shipped Reports provided by Bank of America to BNPP falsely misrepresented the loans owed by Ocala and overstated the collateral securing BNPP's Secured Notes.

(e)      Bank of America failed to collect the bailee transmittal letters executed by third-party purchasers as it was required to under the Custodial Agreement.

(f)      Bank of America did not "maintain continuous custody and control of the" mortgages owned by Ocala as required by the Custodial Agreement.  Id.

(g)      Bank of America was negligent in the performance of its obligations under the Custodial Agreement.

(h)      As a result of its contractual breaches and negligent performance of its duties, Bank of America, as Custodian, directly and proximately caused the loss of collateral in which the Collateral Agent had or should have had a security interest for the benefit of BNPP, and thus deprived the Collateral Agent of collateral which otherwise would have been available to the Collateral Agent to apply in payment of the Secured Notes held by BNPP.

222.      A meritorious claim exists against Bank of America in its individual capacity for conversion of the BNPP loans.

(a)      The BNPP Loans and the sale proceeds thereof are subject to a perfected first-priority security interest in favor of Bank of America, as Collateral Agent for the benefit of BNPP.

(b)      Bank of America, in its own capacity and not as Collateral Agent for the benefit of BNPP, has wrongfully asserted dominion and control over the BNPP Loans and

the sale proceeds thereof, and has converted the BNPP Loans and the sale proceeds thereof.

(c)    Bank of America's dominion and control over the BNPP Loans and the sale proceeds thereof is inconsistent with the rights of Bank of America, as Collateral Agent for the benefit of BNPP, in the BNPP Loans and the sale proceeds thereof.

(d)    Bank of America's disbursement of the sale proceeds of the BNPP Loans to Bank of America, in its own capacity, and not as Collateral Agent for the benefit of BNPP, is inconsistent with the rights and duties of Bank of America, as Collateral Agent for the benefit of BNPP, in the sale proceeds of the BNPP Loans.

(e)    Bank of America's conduct has deprived Bank of America, as Collateral Agent, of at least $190 million in collateral that otherwise would have been available to the Collateral Agent to apply in payment of the Secured Notes held by BNPP.

223.    In a letter dated July 6, 2011, BNPP instructed Bank of America to bring claims in its capacity as Collateral Agent against itself in its capacities as Custodian and in its individual capacity. BNPP's July 6, 2011 letter offered to provide Bank of America with an appropriate indemnity in connection with the pursuit of these claims.

224.    On August 6, 2011, Bank of America declined to act in accordance with BNPP's instructions.

225.    Bank of America's failure to pursue claims in its capacity as Collateral Agent to recover for breach of the Custodial Agreement and conversion, as directed by BNPP, constituted a breach of Sections 6.02 and 8.04 of the Security Agreement.

226.     Bank of America's breaches of its contractual duties have improperly deprived BNPP of a potential source of recovery and have thus directly and proximately caused the loss of at least a substantial portion of BNPP's investment in the Secured Notes.

### FIFTH CAUSE OF ACTION
#### (Breach of Contract – Base Indenture: Failures To Sue)

227.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

228.     Plaintiff asserts this claim on its own behalf and as the assignee of Cede & Co.

229.     Bank of America, in its capacity as Indenture Trustee, had the obligation to bring available claims for the benefit of the Noteholders following an Event of Default.

(a)     Pursuant to Section 10.2(e) of the Base Indenture, Bank of America, as Indenture Trustee, is obligated to exercise its rights and powers following an Event of Default, and to do so with the same care and skill as would a prudent person.

(b)     Section 10.2(e) of the Base Indenture further obligates Bank of America, as Indenture Trustee, to exercise its rights and powers, including its right to institute litigation, upon instruction for the Noteholders, if offered adequate indemnity from the Noteholders.

230.     Bank of America, in its capacity as Indenture Trustee, has standing to bring claims for (i) breach of the Depositary Agreement; (ii) breach of the Security Agreement; and (iii) conversion of Ocala loans.

(a)     Bank of America, in its capacity as Indenture Trustee, is a third-party beneficiary of the Depositary Agreement.  Depositary Agreement § 15.

(b)     Bank of America, in its capacity as Indenture Trustee, is a party to the Security Agreement.

(c)     BNPP was designated as a third-party beneficiary of the Base Indenture in Section 13.8, and is entitled to enforce the terms of the Base Indenture against Bank of America, as Indenture Trustee.

231.     A meritorious claim exists against Bank of America in its capacity as Depositary for breach of the Depositary Agreement.

(a)     Pursuant to Section 8(d) of the Depositary Agreement, Bank of America, as Depositary, is liable for actions taken or omitted to be taken by it as Depositary that are negligent, fraudulent, in bad faith, or that constitute willful misconduct.

(b)     Pursuant to Section 11(d) of the Depositary Agreement, Bank of America, as Depositary, is liable for errors in judgment made in good faith by a responsible officer if Bank of America was negligent in ascertaining the pertinent facts or in making such judgment based on available facts.

(c)     Bank of America, as Depositary, breached its duties under the Depositary Agreement and was negligent in performing these duties, including by:  (i) falsely certifying on a monthly basis that the Borrowing Base Condition was satisfied pursuant to Section 4(d) of the Depositary Agreement, including at times when Bank of America knew that Ocala was insolvent and that the Borrowing Base Condition had not been satisfied; and (ii) improperly issuing on a monthly basis new Secured Notes pursuant to Section 4(d) of the Depositary Agreement, including at times when Bank of America knew that Ocala was insolvent and that the Borrowing Base Condition had not been satisfied.

(d)     Because the Borrowing Base Condition was not, in fact, satisfied despite Bank of America's certifications that it was, maturing Secured Notes could not have been

63

paid without Bank of America's advancement of the funds necessary to pay the

Noteholders. Bank of America's repayment to itself with the proceeds of the subsequent

improper issuance of new Secured Notes resulted in little or none of the proceeds from

the issuance actually being deposited in the Collateral Account. Because Bank of

America issued the new Secured Notes in breach of the Depositary Agreement, Bank of

America has forfeited any contractual right it might otherwise have had under the

Depositary Agreement to retain the proceeds of the Secured Notes for its own benefit.

For example, Bank of America breached the Depositary Agreement by improperly

retaining for its own benefit most of the $480.7 million in proceeds resulting from

BNPP's purchase of Secured Notes on July 21, 2001, instead of depositing those

proceeds in the Collateral Account.

       (e)     As a result of its breaches of the Depositary Agreement, Bank of America,

as Depositary, directly and proximately caused the loss of BNPP's investment in the

Secured Notes.

     232.     As set forth in the First Cause of Action above, there is a meritorious claim for

breach of the Security Agreement.

     233.     As set forth in the Fourth Cause of Action above, there is a meritorious claim

against Bank of America in its individual capacity for conversion of Ocala loans.

     234.     In a letter dated July 6, 2011, BNPP instructed Bank of America to bring claims

in its capacity as Indenture Trustee against itself in its capacities as Depository, Collateral Agent

and in its individual capacity. In accordance with Section 10.2(e) of the Base Indenture, BNPP

offered to provide Bank of America with an appropriate indemnity in connection with the pursuit

of these claims.

235.     On August 6, 2011, Bank of America declined to act in accordance with BNPP's instructions.

236.     Bank of America's failure to bring such claims in its capacity as Indenture Trustee, as directed by BNPP, constituted a breach of Section 10.2(e) of the Base Indenture.

237.     Bank of America's breaches of its contractual duties directly and proximately caused the loss of the Ocala collateral and have thus improperly deprived BNPP of a potential source of recovery and at least a substantial portion of BNPP's investment in the Secured Notes.

**SIXTH CAUSE OF ACTION**
**(Breach of Fiduciary Duty: Failures to Sue)**

238.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

239.     Plaintiff asserts this claim on its own behalf and as the assignee of Cede & Co.

240.     Bank of America, as Indenture Trustee, owes BNPP fiduciary duties, including a duty of care and a duty of undivided loyalty.

241.     As set forth in the Fifth Cause of Action above, Bank of America in its capacity as Indenture Trustee had the ability to bring meritorious claims for breach of the Depositary Agreement, breach of the Security Agreement, and conversion of Ocala loans, but refused to bring such claims.

242.     A prudent trustee acting with undivided loyalty to the interests of BNPP would have brought such claims.

243.     Bank of America, however, has a conflict of interest because bringing claims for breaches of Depositary Agreement and the Security Agreement and for conversion of Ocala loans would require it to sue itself.

244.    Bank of America's ongoing failure to pursue lawsuits in its capacity as Indenture Trustee to recover against itself constitutes a breach of its fiduciary duties of care and undivided loyalty.

245.    Bank of America's breaches of its fiduciary duties have directly and proximately caused the loss of at least a substantial portion of BNPP's investment in the Secured Notes.

**SEVENTH CAUSE OF ACTION**
**(Negligence)**

246.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

247.    Plaintiff asserts this claim on its own behalf and as the assignee of Cede & Co.

248.    Bank of America had an extra-contractual duty to exercise care in its conduct with respect to the Ocala Facility, based in part on its post-default duties to BNPP.

249.    Each of the relevant Ocala Facility Agreements contained language clearly establishing liability for intentional misconduct or negligence by Bank of America:

(a)    Pursuant to Section 4.10 of the Security Agreement, Bank of America, as Collateral Agent, is liable for negligent actions taken or omitted to be taken by it.

(b)    Pursuant to Section 8.01 of the Security Agreement, Bank of America, as Collateral Agent, is liable for actions taken or omitted to be taken by it that are negligent, fraudulent, in bad faith, or that constitute willful misconduct.

(c)    Pursuant to Section 10.1 of the Base Indenture, Bank of America, as Indenture Trustee, is liable for negligence or willful misconduct following an Event of Default.

(d)     Pursuant to Section 19(c) of the Custodial Agreement, Bank of America, as Custodian, is liable for actions taken or omitted to be taken by it as Custodian that are negligent, fraudulent, in bad faith, or that constitute willful misconduct.

(e)     Pursuant to Section 6(b)(i) of the Custodial Agreement, Bank of America, as Custodian, is liable for any loss of the mortgages, mortgage notes, or mortgage assignments resulting from Bank of America's negligence or misconduct.

(f)     Pursuant to Sections 8(d) and 11(n) of the Depositary Agreement, Bank of America, as Depositary, is liable for actions taken or omitted to be taken by it as Depositary that are negligent, fraudulent, in bad faith, or that constitute willful misconduct.

(g)     Pursuant to Section 11(d) of the Depositary Agreement, Bank of America, as Depositary, is liable for errors in judgment made by a responsible Bank of America officer in good faith if Bank of America was negligent in ascertaining the pertinent facts or in making such judgment based on available facts.

250.     Negligence pervaded virtually every aspect of Bank of America's involvement in the Ocala Facility.  Bank of America trust officers received, reviewed and certified Borrowing Base Certificates that, on their face, demonstrated that the Ocala Facility was insolvent by hundreds of millions of dollars.  On the basis of those negligent certifications, Bank of America regularly issued new Secured Notes that, had it acted with any care at all, it would not have issued.  Ocala was rendered insolvent because Bank of America treated with utter disregard the collateral that was committed to its control, custody and care.  On the one hand, Bank of America took in loans and identified them as collateral in which it held a security interest on behalf of BNPP, even though it had not disbursed payment as required pursuant to the bailee letters from

Colonial that accompanied those loans. On the other hand, Bank of America disbursed funds from the Collateral Account to destinations and in amounts bearing no relationship to the purposes for which such disbursements could possibly be appropriate or authorized. By the same token, Bank of America released loans in its possession pursuant to bailee letters but failed to ensure that it either received payment for those loans or else retrieved the loans themselves.

251.     As the acknowledged "gatekeeper" through which all Ocala loans and all Ocala funds moved, Bank of America had in its possession all of the information necessary to establish that Ocala was insolvent and that the transfers of loans and funds that Bank of America effectuated at Ocala's behest were dissipating the collateral that Bank of America represented to BNPP was securing in full BNPP's investment. And yet Bank of America did nothing except enable the further dissipation of that collateral.

252.     In short, Bank of America failed to meet its duty of care.

253.     BNPP's losses were a direct and reasonably foreseeable result of Bank of America's negligent conduct.

254.     Bank of America's negligent conduct directly and proximately caused the loss of at least a substantial portion of BNPP's investment in the Secured Notes.

### EIGHTH CAUSE OF ACTION
#### (Negligent Misrepresentation / Inducement)

255.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

256.     Plaintiff asserts this claim on its own behalf and as the assignee of Cede & Co.

257.     A special relationship existed between BNPP and Bank of America that gave rise to a duty of care on the part of Bank of America to provide correct information to BNPP.

Bank of America's status as a post-default indenture trustee with fiduciary duties provided an additional basis for that duty of care.

258.     Pursuant to Section 8.01 of the Security Agreement, the relationship between Bank of America, as Collateral Agent, and BNPP was that of "agent and principal." As an agent, Bank of America occupied a special position of trust and confidence with regard to BNPP, its principal.

259.     In its roles as Indenture Trustee, Collateral Agent, Depositary, and Custodian, Bank of America was directly involved with (and in fact executed) all transfers of collateral into and out of the Ocala Facility. Bank of America had unique knowledge about whether Ocala was solvent and BNPP's investment was collateralized and access to all information necessary to establish the collateral it held on behalf of Ocala and BNPP. Bank of America was the only entity with direct access to such information. Thus, Bank of America was the only party that could represent to BNPP whether BNPP's investments were collateralized and the Facility was solvent.

260.     Beginning in December of 2008, on almost every business day, Bank of America sent an e-mail with attached status reports directly to BNPP employees including Avi Pemper purporting to list the Ocala collateral held on behalf of BNPP. Each such e-mail had attached three reports, two of which, the "Dry Loans" Report and the "Shipped Report" purported to list the collateral held on behalf of BNPP. Attached as Exhibit 2 hereto is a chart that identifies the date of each such report and the total value of collateral reported by Bank of America to be in its control.

261.     Each of these daily reports was false and substantially overstated the amount of collateral that securitized BNPP's investment, usually by hundreds of millions of dollars.

262.     BNPP reasonably relied upon these false reports in making investment decisions with regard to the Ocala Facility. These reports induced BNPP into purchasing Secured Notes. For example, on July 17, 2009 a Dry Report and Shipped Report were sent by a Bank of America employee, Stella Ledniowski, to several BNPP employees, including Avi Pemper. Those reports incorrectly showed BNPP's Secured Notes to be fully collateralized. Had those reports accurately represented the collateral securing the Secured Notes, BNPP would not have purchased $480.7 million in new Secured Notes on July 20, 2009.

263.     Separately, Bank of America also provided copies of the executed Borrowing Base Certificates to Avi Pemper, a BNPP employee, on a monthly basis.

264.     BNPP reasonably relied upon these Borrowing Base Certificates and Bank of America's certifications thereof in making investment decisions with regard to the Ocala Facility. On a monthly basis, including on June 20, 2009 and July 20, 2009, Exhibit C reports were provided by Matt Smith or Matthew Auxier to Avi Pemper of BNPP, showing the Facility to be solvent. On July 20, 2009, BNPP's purchase of $480.7 million in new Secured Notes was executed. Had the Exhibit C reports received from Matt Smith, accurately portrayed the solvency of the Ocala Facility, BNPP would not have purchased $480.7 million in new Secured Notes on July 20, 2009.

265.     Bank of America's reference in the March Letter Agreement to "the duties [Bank of America] in its capacity as Depositary performs under the Depositary Agreement (including its duties under Section 4(d)) play an important role in mitigating the risks that BNPP would otherwise incur" was a false representation that Bank of America was in fact performing its duties under the Depositary Agreement. Had Bank of America not falsely represented that it

was performing its duties under the Depositary Agreement, BNPP would not have purchased $480.7 million in new Secured Notes on July 20, 2009.

266. Bank of America again represented to BNPP in a February 6, 2009 meeting attended by Bank of America employees including Matt Smith and BNPP employees including Avi Pemper that Matt Smith was responsible for confirming that Ocala remained properly collateralized.

267. Further, given the full context of the relationship between Bank of America and BNPP, Bank of America's issuance of Secured Notes on July 20, 2009 was intended by Bank of America as a representation that these Secured Notes were fully collateralized and the Ocala Facility was solvent, and BNPP reasonably relied upon Bank of America's issuance of Secured Notes as such a representation when it purchased $480.7 million in new Secured Notes, including on July 20, 2009.

268. Bank of America's negligent misrepresentations induced BNPP's investments and directly and proximately caused the loss of at least substantial portion of BNPP's investment in the Secured Notes.

### NINTH CAUSE OF ACTION
#### (Unjust Enrichment)
#### (in the alternative)

269. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

270. Plaintiff asserts this claim on its own behalf and as the assignee of Cede & Co.

271. This claim is made only in the alternative to BNPP's claims for Breach of Contract, in the event the Ocala Facility Agreements are deemed to be void for any reason.

272.     Bank of America has been enriched at the expense of BNPP.  On July 20, 2009, BNPP transferred $480.7 million to Bank of America via The Depository Trust Company ("DTC").  Bank of America kept for its own benefit most or all of those funds.  Specifically, Bank of America applied those funds to its own account in satisfaction of the loan it made to Ocala in order to enable payment on the Secured Notes that matured on July 20, 2009.

273.     Bank of America has been unjustly enriched as a result.  Upon lending funds to Ocala to permit payment of the Ocala CP that matured on July 20, 2009, Bank of America became an unsecured creditor of Ocala.  Ocala would not have been able to repay that loan – it was insolvent because Bank of America had failed to perform its promises and enabled the dissipation of the collateral.  In the event that the Ocala Agreements are deemed void for any reason, Bank of America would have had no contractual right to retain these funds for its own account.

274.     As between whether those funds should go to Bank of America to compensate it for its intra-day loan or to BNPP to compensate it for its investment, it is inequitable for Bank of America to retain the funds.  Bank of America held itself out as performing certain duties that would have preserved the collateral that was supposed to secure BNPP's investment.  Bank of America's failure to perform these duties caused the loss of the collateral, and therefore, as between the parties, Bank of America should bear the loss.  Furthermore, Bank of America made false statements to BNPP regarding the state of the collateral on which BNPP relied in transmitting the funds to Bank of America; it would be inequitable under such circumstances for Bank of America to retain the funds.

## TENTH CAUSE OF ACTION
### (Constructive Trust)
### (in the alternative)

275.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

276.    Plaintiff asserts this claim on its own behalf and as the assignee of Cede & Co.

277.    This claim is made only in the alternative to BNPP's claims for Breach of Contract, in the event the Ocala Facility Agreements are deemed to be void for any reason.

278.    Although not necessary in order to prevail on this claim, BNPP shared a confidential and/or fiduciary relationship with Bank of America in its role as Collateral Agent and/or Indenture Trustee.

279.    Bank of America made a series of clear and unambiguous promises in the Ocala Agreements. These promises are detailed above, including in the First, Second, Fourth and Fifth Causes of Action.

280.    In reliance upon those promises, BNPP transferred to Bank of America (by way of DTC) $480.7 million on July 20, 2009. Among the promises BNPP relied upon when making this transfer was Bank of America's promise that commercial paper would not issue unless sufficient collateral existed to satisfy the Borrowing Base Condition, and Bank of America's promise that the collateral would be maintained within Bank of America's control, to be transferred out of the Facility by Bank of America only under specific conditions ensuring that BNPP's investment would remain fully secured.

281.    Bank of America has retained for its own benefit most or all of the $480.7 million that BNPP transferred on July 20, 2009. Specifically, Bank of America applied those

funds to its own account in satisfaction of the loan it made to Ocala in order to enable payment on the Secured Notes that matured on July 20, 2009.

282.     Bank of America has been unjustly enriched as a result.  Upon lending funds to Ocala to permit payment of the Secured Notes that matured on July 20, 2009, Bank of America became an unsecured creditor of Ocala.  Ocala would not have been able to repay that loan – it was insolvent because Bank of America had failed to perform its promises and enabled the dissipation of the collateral.  In the event that the Ocala Facility Agreements are deemed void for any reason, Bank of America would have had no contractual right to retain these funds for its own account.

283.     As between whether those funds should go to Bank of America to compensate it for its intra-day loan or to BNPP to compensate it for their investment, it is inequitable for Bank of America to retain the funds.  Bank of America put itself forward as performing certain duties that would have preserved the collateral that was supposed to secure BNPP's investment.  Bank of America's failure to perform these duties caused the loss of the collateral, and therefore, as between the parties, Bank of America should bear the loss.  Furthermore, Bank of America made false statements to BNPP regarding the state of the collateral on which BNPP relied in transmitting the funds to Bank of America; it would be inequitable under such circumstances for Bank of America to retain the funds.

## ELEVENTH CAUSE OF ACTION
### (Promissory Estoppel)
### (in the alternative)

284.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

285.     Plaintiff asserts this claim on its own behalf and as the assignee of Cede & Co.

286.    This claim is made only in the alternative to BNPP's claims for Breach of Contract, in the event the Ocala Facility Agreements are deemed to be void for any reason.

287.    Bank of America made a series of clear and unambiguous promises in the Ocala Facility Agreements. These promises are detailed above, including in the First, Second, Fourth, and Fifth Causes of Action.

288.    It was reasonably foreseeable to Bank of America that BNPP would rely on Bank of America's promises in making its investment decisions concerning the Secured Notes. Indeed, the primary purpose of Bank of America's promises – and indeed, the Ocala Facility in general – was to induce reliance by BNPP and other investors so that they would invest in the Secured Notes. Bank of America was aware that BNPP and other Noteholders would rely upon its promises, as the Noteholders were expressly designated as third-party beneficiaries to the Base Indenture and the Security Agreement, and independent ratings agencies such as Moody's specifically identified the significance to potential investors of Bank of America's promises to perform certain duties with respect to the Ocala Facility.

289.    Bank of America has continuously reaffirmed these promises through its conduct. During the entire course of BNPP's investment in the Ocala Facility, Bank of America projected the appearance that it was performing the duties it had promised to perform. Bank of America did so by communications, such as reports indicating that it was in control of adequate collateral to secure BNPP's investment, as well as by actions, such as taking receipt and maintaining control of the funds invested by BNPP. Indeed, even following the collapse of TBW, Bank of America has continued to assert authority to act in the roles defined in the Ocala Facility Agreements.

290.     BNPP relied upon Bank of America's promises.  BNPP invested $480.7 million in Secured Notes that it would not have otherwise invested but for Bank of America's promise to serve as Indenture Trustee, Collateral Agent, Custodian, and Depositary for the Ocala Facility.

291.     Bank of America failed to perform its promises, as detailed in the above Causes of Action, and as a direct result caused the loss to BNPP of its investment.

### TWELFTH CAUSE OF ACTION
**(Negligence – Performance of an Assumed Duty)**
**(in the alternative)**

292.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

293.     Plaintiff asserts this claim on its own behalf and as the assignee of Cede & Co..

294.     This claim is made only in the alternative to BNPP's claims for Breach of Contract, in the event the Ocala Facility Agreements are deemed void for any reason.

295.     Bank of America did in fact undertake to perform professional services, including those described in the Ocala Facility Agreements.  Bank of America created and maintained the critical accounts, accepted mortgages into the Facility and released them from the Facility, certified the Borrowing Base Condition on a monthly basis, and issued reports to BNPP purporting to show the collateral securitizing their investment.

296.     BNPP invested in reliance upon Bank of America's promises, and was rendered considerably more vulnerable than it otherwise would have been but for Bank of America's apparent performance of its duties.  This was entirely foreseeable, given the nature of the duties Bank of America gave the appearance of performing.  Accordingly, Bank of America was obligated to exercise a duty of care in its conduct.

297.     As set forth in the above Causes of Action, Bank of America's performance of the various duties it assumed to perform failed to satisfy the standard of care, and these failures directly and proximately caused the loss of Plaintiffs' investment.

## THIRTEENTH CAUSE OF ACTION
### (Conversion)
### (in the alternative)

298.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

299.     Plaintiff asserts this claim as the assignee of Bank of America, which was in turn the assignee of Ocala.

300.     The BNPP Loans and/or the sale proceeds thereof were owned by Ocala.

301.     Bank of America, in its own capacity and not acting as Collateral Agent for the benefit of BNPP, has wrongfully asserted dominion and control over the BNPP Loans and/or the sale proceeds thereof, and has thereby converted the BNPP Loans.

302.     Bank of America's dominion and control over the BNPP Loans and/or the sale proceeds thereof was inconsistent with the rights of Ocala in the BNPP Loans and/or the sale proceeds thereof.

303.     Bank of America's sale of the BNPP Loans and retention of the sale proceeds thereof for its own account is inconsistent with the rights and duties of Ocala with respect to the BNPP Loans and the sale proceeds thereof.

304.     By reason of the foregoing, Ocala has been damaged by Bank of America in an amount not less than $190 million.

## FOURTEENTH CAUSE OF ACTION
### (Promissory Estoppel – March Letter Agreement)

305.    Plaintiff repeats and realleges all prior paragraphs as if set forth here in full.

306.    Plaintiff asserts this claim on its own behalf and as the assignee of Cede & Co..

307.    In the March Letter Agreement, Bank of America expressly recognizes that its duties under the Depositary Agreement, including its certification of the Borrowing Base Certificates, "play an important role in mitigating the risks that [BNPP] would otherwise incur through the Related Transactions."

308.    In the March Letter Agreement, Bank of America made a clear and unambiguous promise to "agree to indemnify and hold harmless BNP Paribas, its officers, directors, controlling persons and affiliates [including BNPP] (collectively, the 'Indemnified Persons') against any and all claims, losses, penalties, fines, forfeitures, reasonable legal fees and related costs and judgments, and any other costs, fees and expenses that any Indemnified Person may sustain to the extent attributable to the Depositary's negligence, fraud, bad faith or willful misconduct in the performance of its duties under the Depositary Agreement (including, without limitation, its duties under Section 4(d) thereof.)"

309.    It was reasonably foreseeable to Bank of America that BNPP would rely on Bank of America's promise in making its investment decisions concerning the Secured Notes. Indeed, the March Letter Agreement expressly acknowledged that the promise contained in it was an "inducement to BNP Paribas [] to enter into, and/or continue its participation in" the Ocala Facility.

310.    BNPP did in fact rely upon Bank of America's promise.  BNPP invested $480.7 million in Secured Notes that it would not have otherwise invested but for Bank of America's

promise to indemnify BNPP against losses it sustained as a result of Bank of America's negligence in the performance of its duties under the Depositary Agreement.

311.     As set forth in the Sixth Cause of Action above, Bank of America breached its obligations under the Depositary Agreement by falsely certifying the Borrowing Base Certificates.

312.     As a direct and proximate result of Bank of America's breach of its contractual duties, BNPP's Secured Notes are significantly under-collateralized, Bank of America has failed to make payment to BNPP for its Secured Notes and BNPP has been damaged.

313.     By reason of the foregoing, BNPP has been damaged by Bank of America in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, BNPP demands judgment in its favor against Bank of America as follows:

A.       An award of compensatory damages and other damages available by law in an amount to be determined at trial, with interest, at the maximum amount permitted by law;

B.       An award of attorneys' fees, costs and other expenses as permitted by law; and

C.       Such other and further relief as the Court may deem just and proper.

October 1, 2012
Armonk, New York

BOIES, SCHILLER & FLEXNER LLP

Robin A. Henry
Motty Shulman
Jack Wilson
333 Main Street
Armonk, New York 10504
Telephone:  914.749.8200
Facsimile:  914.749.8300
rhenry@bsfllp.com
mshulman@bsfllp.com
jwilson@bsfllp.com
*Attorneys for Plaintiffs BNP Paribas Mortgage Corporation and BNP Paribas*

# Exhibit 1

Case 1:10-cv-23116-XXXX   Document 1-3   Entered on FLSD Docket 08/30/2010   Page 2 of 5

### Schedule A

| # | TBW Loan # | # | TBW Loan # | # | TBW Loan # | # | TBW Loan # |
|---|---|---|---|---|---|---|---|
| 1 | 3160270 | 61 | 3326250 | 121 | 3350370 | 181 | 3330577 |
| 2 | 3273427 | 62 | 3326947 | 122 | 3350588 | 182 | 3336173 |
| 3 | 3278761 | 63 | 3326963 | 123 | 3350664 | 183 | 3336681 |
| 4 | 3340707 | 64 | 3327175 | 124 | 3351840 | 184 | 3337034 |
| 5 | 3345191 | 65 | 3327277 | 125 | 3352998 | 185 | 3337516 |
| 6 | 2533171 | 66 | 3327563 | 126 | 3353769 | 186 | 3337523 |
| 7 | 3052968 | 67 | 3327799 | 127 | 3354184 | 187 | 3337811 |
| 8 | 3113622 | 68 | 3327814 | 128 | 3355347 | 188 | 3338494 |
| 9 | 3161279 | 69 | 3327970 | 129 | 3355800 | 189 | 3339896 |
| 10 | 3181556 | 70 | 3328646 | 130 | 3355963 | 190 | 3340824 |
| 11 | 3190562 | 71 | 3329336 | 131 | 3355996 | 191 | 3340861 |
| 12 | 3191858 | 72 | 3329784 | 132 | 3356563 | 192 | 3340961 |
| 13 | 3227251 | 73 | 3330023 | 133 | 3357063 | 193 | 3341004 |
| 14 | 3227587 | 74 | 3330630 | 134 | 3358006 | 194 | 3341481 |
| 15 | 3234419 | 75 | 3330927 | 135 | 3358252 | 195 | 3342140 |
| 16 | 3235858 | 76 | 3330997 | 136 | 3365039 | 196 | 3342166 |
| 17 | 3250434 | 77 | 3332590 | 137 | 3366062 | 197 | 3344418 |
| 18 | 3255830 | 78 | 3333569 | 138 | 3368001 | 198 | 3344671 |
| 19 | 3262758 | 79 | 3333645 | 139 | 3373276 | 199 | 3344818 |
| 20 | 3268215 | 80 | 3333827 | 140 | 3376589 | 200 | 3347462 |
| 21 | 3270707 | 81 | 3334010 | 141 | 3376992 | 201 | 3349477 |
| 22 | 3271657 | 82 | 3334477 | 142 | 3387166 | 202 | 3350078 |
| 23 | 3272734 | 83 | 3335250 | 143 | 3389037 | 203 | 3350554 |
| 24 | 3277145 | 84 | 3335588 | 144 | 3411468 | 204 | 3351148 |
| 25 | 3278172 | 85 | 3335770 | 145 | 7127133 | 205 | 3351262 |
| 26 | 3278373 | 86 | 3336397 | 146 | 3137428 | 206 | 3351285 |
| 27 | 3279180 | 87 | 3336468 | 147 | 3148124 | 207 | 3358661 |
| 28 | 3280711 | 88 | 3336652 | 148 | 3158436 | 208 | 3359794 |
| 29 | 3281300 | 89 | 3337290 | 149 | 3162972 | 209 | 3360669 |
| 30 | 3281400 | 90 | 3337948 | 150 | 3163352 | 210 | 3360834 |
| 31 | 3289925 | 91 | 3338647 | 151 | 3191168 | 211 | 3365750 |
| 32 | 3293759 | 92 | 3338805 | 152 | 3225270 | 212 | 3366249 |
| 33 | 3296678 | 93 | 3338987 | 153 | 3225394 | 213 | 3367594 |
| 34 | 3297044 | 94 | 3339456 | 154 | 3227869 | 214 | 3372159 |
| 35 | 3299570 | 95 | 3339512 | 155 | 3233186 | 215 | 3373248 |
| 36 | 3299814 | 96 | 3339735 | 156 | 3260134 | 216 | 3378889 |
| 37 | 3300707 | 97 | 3339862 | 157 | 3274260 | 217 | 3379722 |
| 38 | 3301948 | 98 | 3340209 | 158 | 3283374 | 218 | 3381610 |
| 39 | 3303879 | 99 | 3340337 | 159 | 3293867 | 219 | 3383424 |
| 40 | 3306878 | 100 | 3341452 | 160 | 3300262 | 220 | 3388745 |
| 41 | 3308161 | 101 | 3341649 | 161 | 3303674 | 221 | 3395471 |
| 42 | 3308252 | 102 | 3342043 | 162 | 3305127 | 222 | 3396149 |
| 43 | 3309072 | 103 | 3342250 | 163 | 3307157 | 223 | 3399345 |
| 44 | 3309188 | 104 | 3342540 | 164 | 3311847 | 224 | 7128027 |
| 45 | 3310368 | 105 | 3342732 | 165 | 3312940 | 225 | 7128319 |
| 46 | 3310944 | 106 | 3343027 | 166 | 3313170 | 226 | 7128468 |
| 47 | 3311041 | 107 | 3343125 | 167 | 3313175 | 227 | 7128497 |
| 48 | 3311451 | 108 | 3344412 | 168 | 3313383 | 228 | 7130128 |
| 49 | 3311922 | 109 | 3344453 | 169 | 3314425 | 229 | 7130296 |
| 50 | 3313447 | 110 | 3345042 | 170 | 3316571 | 230 | 7130454 |
| 51 | 3313918 | 111 | 3345384 | 171 | 3316638 | 231 | 3228067 |
| 52 | 3316328 | 112 | 3345525 | 172 | 3317811 | 232 | 3251433 |
| 53 | 3317915 | 113 | 3345892 | 173 | 3318568 | 233 | 3255190 |
| 54 | 3318621 | 114 | 3346175 | 174 | 3321951 | 234 | 3261801 |
| 55 | 3318943 | 115 | 3347519 | 175 | 3323653 | 235 | 3287816 |
| 56 | 3319375 | 116 | 3347532 | 176 | 3327680 | 236 | 3290135 |
| 57 | 3321379 | 117 | 3347690 | 177 | 3328031 | 237 | 3290732 |
| 58 | 3321432 | 118 | 3348100 | 178 | 3328981 | 238 | 3298012 |
| 59 | 3325079 | 119 | 3349728 | 179 | 3329470 | 239 | 3300311 |
| 60 | 3325142 | 120 | 3350307 | 180 | 3329492 | 240 | 3307745 |

## Schedule A

| # | TBW Loan # | # | TBW Loan # | # | TBW Loan # | # | TBW Loan # |
|---|---|---|---|---|---|---|---|
| 241 | 3312664 | 301 | 3361372 | 361 | 3330464 | 421 | 3326668 |
| 242 | 3318478 | 302 | 3361771 | 362 | 3332945 | 422 | 3327537 |
| 243 | 3319514 | 303 | 3361838 | 363 | 3333307 | 423 | 3327991 |
| 244 | 3321116 | 304 | 3362718 | 364 | 3334236 | 424 | 3329623 |
| 245 | 3322151 | 305 | 3363903 | 365 | 3335540 | 425 | 3334359 |
| 246 | 3325000 | 306 | 3365034 | 366 | 3336493 | 426 | 3334394 |
| 247 | 3325185 | 307 | 3365865 | 367 | 3336655 | 427 | 3336454 |
| 248 | 3325932 | 308 | 3369127 | 368 | 3336700 | 428 | 3336791 |
| 249 | 3327647 | 309 | 3371777 | 369 | 3336829 | 429 | 3337669 |
| 250 | 3328353 | 310 | 3372464 | 370 | 3337333 | 430 | 3337730 |
| 251 | 3328955 | 311 | 3375738 | 371 | 3337395 | 431 | 3339613 |
| 252 | 3329100 | 312 | 3375741 | 372 | 3337679 | 432 | 3340547 |
| 253 | 3331052 | 313 | 3376437 | 373 | 3338341 | 433 | 3340892 |
| 254 | 3332739 | 314 | 3381154 | 374 | 3338413 | 434 | 3342401 |
| 255 | 3332816 | 315 | 3387791 | 375 | 3338914 | 435 | 3343796 |
| 256 | 3335673 | 316 | 3388806 | 376 | 3339594 | 436 | 3345702 |
| 257 | 3335689 | 317 | 3388830 | 377 | 3339646 | 437 | 3345985 |
| 258 | 3336566 | 318 | 3390993 | 378 | 3340103 | 438 | 3346119 |
| 259 | 3337300 | 319 | 3415980 | 379 | 3340586 | 439 | 3346128 |
| 260 | 3337690 | 320 | 7126448 | 380 | 3340852 | 440 | 3347895 |
| 261 | 3338004 | 321 | 7128415 | 381 | 3341035 | 441 | 3349400 |
| 262 | 3338440 | 322 | 3024010 | 382 | 3341227 | 442 | 3354344 |
| 263 | 3338585 | 323 | 3076903 | 383 | 3341434 | 443 | 3356222 |
| 264 | 3339455 | 324 | 3080245 | 384 | 3342478 | 444 | 3357569 |
| 265 | 3339466 | 325 | 3203865 | 385 | 3343299 | 445 | 3357776 |
| 266 | 3339899 | 326 | 3208400 | 386 | 3343400 | 446 | 3359696 |
| 267 | 3340160 | 327 | 3232823 | 387 | 3344877 | 447 | 3360040 |
| 268 | 3340435 | 328 | 3254134 | 388 | 3344906 | 448 | 3360961 |
| 269 | 3340596 | 329 | 3265219 | 389 | 3345018 | 449 | 3363669 |
| 270 | 3341042 | 330 | 3277363 | 390 | 3345329 | 450 | 3371979 |
| 271 | 3342029 | 331 | 3278716 | 391 | 3345440 | 451 | 3375564 |
| 272 | 3342110 | 332 | 3279090 | 392 | 3338252 | 452 | 3380127 |
| 273 | 3342175 | 333 | 3280025 | 393 | 3351072 | 453 | 3380616 |
| 274 | 3342210 | 334 | 3292245 | 394 | 3351324 | 454 | 3385176 |
| 275 | 3342641 | 335 | 3299358 | 395 | 3352616 | 455 | 3389216 |
| 276 | 3343029 | 336 | 3299954 | 396 | 3358890 | 456 | 3390957 |
| 277 | 3344966 | 337 | 3300452 | 397 | 3383571 | 457 | 3391159 |
| 278 | 3345025 | 338 | 3303860 | 398 | 3398819 | 458 | 3395088 |
| 279 | 3345256 | 339 | 3310976 | 399 | 7129542 | 459 | 7129411 |
| 280 | 3345935 | 340 | 3311567 | 400 | 2947267 | 460 | 2970184 |
| 281 | 3346118 | 341 | 3312734 | 401 | 3150287 | 461 | 2568640 |
| 282 | 3346313 | 342 | 3313793 | 402 | 3192424 | 462 | 3123003 |
| 283 | 3346797 | 343 | 3315387 | 403 | 3223225 | 463 | 3227777 |
| 284 | 3350454 | 344 | 3316836 | 404 | 3278992 | 464 | 3254897 |
| 285 | 3351257 | 345 | 3317076 | 405 | 3286892 | 465 | 3300298 |
| 286 | 3351437 | 346 | 3317883 | 406 | 3292900 | 466 | 3310092 |
| 287 | 3353240 | 347 | 3318826 | 407 | 3299182 | 467 | 3310772 |
| 288 | 3353548 | 348 | 3319239 | 408 | 3300084 | 468 | 3312613 |
| 289 | 3354339 | 349 | 3321637 | 409 | 3302807 | 469 | 3315330 |
| 290 | 3354387 | 350 | 3324066 | 410 | 3303936 | 470 | 3315498 |
| 291 | 3354743 | 351 | 3324988 | 411 | 3310313 | 471 | 3321470 |
| 292 | 3355200 | 352 | 3325488 | 412 | 3312161 | 472 | 3325511 |
| 293 | 3355462 | 353 | 3328049 | 413 | 3313791 | 473 | 3328401 |
| 294 | 3355888 | 354 | 3328864 | 414 | 3314256 | 474 | 3330458 |
| 295 | 3355961 | 355 | 3329206 | 415 | 3316146 | 475 | 3336080 |
| 296 | 3355973 | 356 | 3329354 | 416 | 3316268 | 476 | 3337243 |
| 297 | 3356064 | 357 | 3329405 | 417 | 3316533 | 477 | 3338945 |
| 298 | 3356522 | 358 | 3329747 | 418 | 3317745 | 478 | 3339750 |
| 299 | 3356618 | 359 | 3330306 | 419 | 3319706 | 479 | 3341565 |
| 300 | 3357560 | 360 | 3330443 | 420 | 3323977 | 480 | 3343407 |

## Schedule A

| # | TBW Loan # | # | TBW Loan # | # | TBW Loan # | # | TBW Loan # |
|---|---|---|---|---|---|---|---|
| 481 | 3345243 | 541 | 3341074 | 601 | 3311406 | 661 | 3371780 |
| 482 | 3346040 | 542 | 3341706 | 602 | 3314125 | 662 | 3371808 |
| 483 | 3346339 | 543 | 3341764 | 603 | 3316923 | 663 | 3373014 |
| 484 | 3347590 | 544 | 3342309 | 604 | 3317423 | 664 | 3389520 |
| 485 | 3348226 | 545 | 3344238 | 605 | 3319117 | 665 | 3391397 |
| 486 | 3349101 | 546 | 3344459 | 606 | 3321782 | 666 | 3392165 |
| 487 | 3350092 | 547 | 3344669 | 607 | 3323487 | 667 | 3401066 |
| 488 | 3354177 | 548 | 3346238 | 608 | 3323719 | 668 | 3139422 |
| 489 | 3354415 | 549 | 3348707 | 609 | 3324529 | 669 | 3162397 |
| 490 | 3355378 | 550 | 3352395 | 610 | 3328396 | 670 | 3267008 |
| 491 | 3358059 | 551 | 3352618 | 611 | 3329821 | 671 | 3270144 |
| 492 | 3358138 | 552 | 3354128 | 612 | 3329864 | 672 | 3272150 |
| 493 | 3358449 | 553 | 3354153 | 613 | 3330152 | 673 | 3274301 |
| 494 | 3363636 | 554 | 3355447 | 614 | 3330160 | 674 | 3290625 |
| 495 | 3363991 | 555 | 3355555 | 615 | 3330539 | 675 | 3307669 |
| 496 | 3366653 | 556 | 3355562 | 616 | 3330939 | 676 | 3311770 |
| 497 | 3367613 | 557 | 3355824 | 617 | 3332468 | 677 | 3312789 |
| 498 | 3367848 | 558 | 3356129 | 618 | 3335129 | 678 | 3318146 |
| 499 | 3374592 | 559 | 3356462 | 619 | 3336812 | 679 | 3321714 |
| 500 | 3374605 | 560 | 3357765 | 620 | 3337889 | 680 | 3322217 |
| 501 | 3375924 | 561 | 3359223 | 621 | 3338082 | 681 | 3323799 |
| 502 | 3382739 | 562 | 3359762 | 622 | 3338131 | 682 | 3327073 |
| 503 | 3383728 | 563 | 3363244 | 623 | 3339656 | 683 | 3328717 |
| 504 | 3384162 | 564 | 3363996 | 624 | 3339697 | 684 | 3329782 |
| 505 | 3384622 | 565 | 3364403 | 625 | 3339874 | 685 | 3336761 |
| 506 | 3389699 | 566 | 3365233 | 626 | 3341005 | 686 | 3336964 |
| 507 | 2730892 | 567 | 3365344 | 627 | 3342117 | 687 | 3337365 |
| 508 | 3085498 | 568 | 3365888 | 628 | 3342124 | 688 | 3338080 |
| 509 | 3085556 | 569 | 3366927 | 629 | 3342265 | 689 | 3340750 |
| 510 | 3187095 | 570 | 3367728 | 630 | 3344181 | 690 | 3341157 |
| 511 | 3229651 | 571 | 3370888 | 631 | 3344810 | 691 | 3346392 |
| 512 | 3237486 | 572 | 3372614 | 632 | 3344938 | 692 | 3347157 |
| 513 | 3249266 | 573 | 3374517 | 633 | 3346408 | 693 | 3347375 |
| 514 | 3249506 | 574 | 3375829 | 634 | 3346501 | 694 | 3350183 |
| 515 | 3254718 | 575 | 3383818 | 635 | 3347860 | 695 | 3358260 |
| 516 | 3285471 | 576 | 3385027 | 636 | 3348808 | 696 | 3358501 |
| 517 | 3297235 | 577 | 3388611 | 637 | 3348982 | 697 | 3358771 |
| 518 | 3308042 | 578 | 3389300 | 638 | 3350099 | 698 | 3363548 |
| 519 | 3309128 | 579 | 3390076 | 639 | 3351185 | 699 | 3363561 |
| 520 | 3311091 | 580 | 3390196 | 640 | 3351879 | 700 | 3364787 |
| 521 | 3311718 | 581 | 3393623 | 641 | 3353799 | 701 | 3365118 |
| 522 | 3313402 | 582 | 3394459 | 642 | 3356140 | 702 | 3367224 |
| 523 | 3314482 | 583 | 3400914 | 643 | 3356183 | 703 | 3367329 |
| 524 | 3316503 | 584 | 3402408 | 644 | 3359633 | 704 | 3369867 |
| 525 | 3325074 | 585 | 3403192 | 645 | 3359662 | 705 | 3370003 |
| 526 | 3328350 | 586 | 3414998 | 646 | 3360549 | 706 | 3372884 |
| 527 | 3329166 | 587 | 7128294 | 647 | 3361075 | 707 | 3376269 |
| 528 | 3329561 | 588 | 2972817 | 648 | 3361215 | 708 | 3379028 |
| 529 | 3330790 | 589 | 2995199 | 649 | 3361830 | 709 | 3382324 |
| 530 | 3330907 | 590 | 3156467 | 650 | 3363109 | 710 | 3382524 |
| 531 | 3333092 | 591 | 3161612 | 651 | 3364103 | 711 | 3385593 |
| 532 | 3335630 | 592 | 3188323 | 652 | 3364616 | 712 | 3386143 |
| 533 | 3336105 | 593 | 3189221 | 653 | 3365028 | 713 | 3389926 |
| 534 | 3336432 | 594 | 3256252 | 654 | 3365075 | 714 | 3391067 |
| 535 | 3337016 | 595 | 3273114 | 655 | 3365211 | 715 | 3395557 |
| 536 | 3338738 | 596 | 3291040 | 656 | 3365974 | 716 | 3398461 |
| 537 | 3339371 | 597 | 3292229 | 657 | 3366296 | 717 | 3400573 |
| 538 | 3339453 | 598 | 3299218 | 658 | 3369548 | 718 | 3407461 |
| 539 | 3340361 | 599 | 3299409 | 659 | 3370411 | 719 | 3407969 |
| 540 | 3341056 | 600 | 3306876 | 660 | 3370722 | 720 | 3407991 |

## Schedule A

| #   | TBW Loan # | #   | TBW Loan # | #   | TBW Loan # |
| --- | --- | --- | --- | --- | --- |
| 721 | 3432122 | 781 | 3413199 | 841 | 3361391 |
| 722 | 3291018 | 782 | 3432682 | 842 | 3363803 |
| 723 | 3310817 | 783 | 7129709 | 843 | 3364428 |
| 724 | 3314863 | 784 | 3096371 | 844 | 3369661 |
| 725 | 3341919 | 785 | 3151372 | 845 | 3369749 |
| 726 | 3342077 | 786 | 3172238 | 846 | 3370090 |
| 727 | 3345789 | 787 | 3252049 | 847 | 3371738 |
| 728 | 3354879 | 788 | 3254557 | 848 | 3373263 |
| 729 | 3358352 | 789 | 3304692 | 849 | 3375920 |
| 730 | 3358831 | 790 | 3319283 | 850 | 3376070 |
| 731 | 3361774 | 791 | 3323512 | 851 | 3398924 |
| 732 | 3372438 | 792 | 3329329 | 852 | 3387253 |
| 733 | 3374957 | 793 | 3335574 | | |
| 734 | 3375087 | 794 | 3337031 | | |
| 735 | 3376514 | 795 | 3337747 | | |
| 736 | 3377336 | 796 | 3339406 | | |
| 737 | 3386482 | 797 | 3339755 | | |
| 738 | 3387270 | 798 | 3343710 | | |
| 739 | 3389396 | 799 | 3344025 | | |
| 740 | 3390053 | 800 | 3345727 | | |
| 741 | 3391152 | 801 | 3346225 | | |
| 742 | 3395518 | 802 | 3347653 | | |
| 743 | 7123689 | 803 | 3352068 | | |
| 744 | 3079874 | 804 | 3353743 | | |
| 745 | 3223807 | 805 | 3358438 | | |
| 746 | 3254680 | 806 | 3359634 | | |
| 747 | 3300361 | 807 | 3359782 | | |
| 748 | 3316720 | 808 | 3363396 | | |
| 749 | 3316905 | 809 | 3363686 | | |
| 750 | 3320752 | 810 | 3369609 | | |
| 751 | 3323047 | 811 | 3370857 | | |
| 752 | 3332573 | 812 | 3372063 | | |
| 753 | 3336859 | 813 | 3372578 | | |
| 754 | 3339892 | 814 | 3380707 | | |
| 755 | 3341924 | 815 | 3382795 | | |
| 756 | 3347047 | 816 | 3386956 | | |
| 757 | 3351535 | 817 | 3388622 | | |
| 758 | 3353759 | 818 | 3388929 | | |
| 759 | 3359944 | 819 | 3388947 | | |
| 760 | 3361093 | 820 | 3390376 | | |
| 761 | 3362448 | 821 | 3391000 | | |
| 762 | 3365929 | 822 | 3392566 | | |
| 763 | 3366335 | 823 | 3394199 | | |
| 764 | 3369826 | 824 | 3394905 | | |
| 765 | 3370156 | 825 | 3396304 | | |
| 766 | 3371211 | 826 | 3398631 | | |
| 767 | 3371657 | 827 | 3402114 | | |
| 768 | 3373617 | 828 | 3408869 | | |
| 769 | 3375163 | 829 | 3412395 | | |
| 770 | 3376569 | 830 | 3418300 | | |
| 771 | 3379862 | 831 | 3431691 | | |
| 772 | 3380445 | 832 | 7130719 | | |
| 773 | 3381367 | 833 | 7131384 | | |
| 774 | 3382865 | 834 | 3317112 | | |
| 775 | 3387538 | 835 | 3361509 | | |
| 776 | 3388776 | 836 | 2819184 | | |
| 777 | 3392723 | 837 | 3300315 | | |
| 778 | 3393039 | 838 | 3342661 | | |
| 779 | 3398422 | 839 | 3359678 | | |
| 780 | 3402397 | 840 | 3360629 | | |

# Exhibit 2

Exhibit 2 - 'Ocala BNP Paribas Status Reports' from Bank of America to BNPP Concerning Ocala Funding LLC Collateral

| Date | Bank of America Employee Who Sent The Report | Shipped Loan Amount | Dry Loan Amount | Total Loan Amount |
|---|---|---|---|---|
| 12/17/2008 | William Dohr | $784,683,512 | $28,445,551 | $813,129,063 |
| 12/19/2008 | William Dohr | $800,174,305 | $54,227,097 | $854,401,402 |
| 12/22/2008 | William Dohr | $805,618,605 | $64,382,833 | $870,001,438 |
| 12/23/2008 | William Dohr | $826,652,257 | $43,349,181 | $870,001,438 |
| 12/24/2008 | William Dohr | $833,216,347 | $36,785,091 | $870,001,438 |
| 12/26/2008 | William Dohr | $849,038,515 | $70,394,358 | $919,432,873 |
| 12/29/2008 | William Dohr | $863,873,715 | $55,559,158 | $919,432,873 |
| 12/30/2008 | William Dohr | $1,082,868,182 | $35,580,175 | $1,118,448,357 |
| 12/31/2008 | William Dohr | $1,090,375,802 | $36,226,425 | $1,126,602,227 |
| 1/2/2009 | William Dohr | $494,666,511 | $33,566,075 | $528,232,586 |
| 1/5/2009 | William Dohr | $499,714,681 | $42,043,015 | $541,757,696 |
| 1/6/2009 | Stella Ledniowski | $506,038,031 | $37,665,215 | $543,703,246 |
| 1/7/2009 | Stella Ledniowski | $517,982,461 | $29,204,085 | $547,186,546 |
| 1/8/2009 | Stella Ledniowski | $522,045,011 | $30,739,057 | $552,784,068 |
| 1/9/2009 | Stella Ledniowski | $518,012,361 | $29,860,557 | $547,872,918 |
| 1/12/2009 | Stella Ledniowski | $526,806,251 | $22,001,167 | $548,807,418 |
| 1/13/2009 | Stella Ledniowski | $527,328,051 | $24,903,765 | $552,231,816 |
| 1/14/2009 | Stella Ledniowski | $519,732,171 | $24,141,365 | $543,873,536 |
| 1/15/2009 | Stella Ledniowski | $520,414,771 | $24,249,315 | $544,664,086 |
| 1/16/2009 | Stella Ledniowski | $518,594,519 | $23,094,767 | $541,689,286 |
| 1/19/2009 | Stella Ledniowski | $518,594,519 | $23,094,767 | $541,689,286 |
| 1/20/2009 | Stella Ledniowski | $553,760,592 | $17,701,435 | $571,462,027 |
| 1/21/2009 | Stella Ledniowski | $574,382,781 | $27,994,640 | $602,377,421 |
| 1/22/2009 | Stella Ledniowski | $579,949,793 | $25,864,428 | $605,814,221 |
| 1/23/2009 | Stella Ledniowski | $567,695,488 | $24,033,485 | $591,728,973 |
| 1/26/2009 | Stella Ledniowski | $518,700,770 | $21,403,685 | $540,104,455 |
| 1/27/2009 | Stella Ledniowski | $644,694,642 | $25,497,335 | $670,191,977 |
| 1/28/2009 | Stella Ledniowski | $512,912,035 | $28,003,335 | $540,915,370 |
| 1/29/2009 | Stella Ledniowski | $489,570,843 | $31,624,985 | $521,195,828 |
| 1/30/2009 | Stella Ledniowski | $485,927,194 | $31,709,385 | $517,636,579 |
| 2/2/2009 | Stella Ledniowski | $486,998,943 | $25,750,235 | $512,749,178 |
| 2/3/2009 | Stella Ledniowski | $470,010,821 | $23,072,835 | $493,083,656 |
| 2/4/2009 | Stella Ledniowski | $467,393,521 | $65,968,964 | $533,362,485 |
| 2/5/2009 | Stella Ledniowski | $473,303,511 | $41,486,970 | $514,790,481 |
| 2/6/2009 | Stella Ledniowski | $503,842,281 | $70,004,361 | $573,846,642 |
| 2/9/2009 | Stella Ledniowski | $527,723,214 | $41,918,485 | $569,641,699 |
| 2/10/2009 | Stella Ledniowski | $466,124,380 | $13,511,000 | $479,635,380 |
| 2/11/2009 | Stella Ledniowski | $465,824,380 | $69,549,800 | $535,374,180 |
| 2/12/2009 | Stella Ledniowski | $465,243,509 | $26,083,050 | $491,326,559 |
| 2/13/2009 | Stella Ledniowski | $465,446,397 | $15,785,012 | $481,231,409 |
| 2/16/2009 | Stella Ledniowski | $465,446,397 | $15,785,012 | $481,231,409 |
| 2/17/2009 | Stella Ledniowski | $473,928,347 | $7,895,062 | $481,823,409 |
| 2/18/2009 | Stella Ledniowski | $474,179,647 | $7,643,762 | $481,823,409 |
| 2/19/2009 | Stella Ledniowski | $474,701,647 | $7,433,762 | $482,135,409 |
| 2/20/2009 | Stella Ledniowski | $467,446,283 | $10,525,952 | $477,972,235 |
| 2/23/2009 | Stella Ledniowski | $467,548,283 | $13,425,752 | $480,974,035 |
| 2/24/2009 | Stella Ledniowski | $467,914,658 | $14,336,287 | $482,250,945 |
| 2/25/2009 | Stella Ledniowski | $464,918,783 | $16,647,587 | $481,566,370 |
| 2/26/2009 | Stella Ledniowski | $465,394,783 | $16,567,087 | $481,961,870 |
| 2/27/2009 | Stella Ledniowski | $465,394,783 | $16,567,087 | $481,961,870 |
| 3/2/2009 | Stella Ledniowski | $463,636,133 | $47,911,152 | $511,547,285 |

| Date | Bank of America Employee Who Sent The Report | Shipped Loan Amount | Dry Loan Amount | Total Loan Amount |
|---|---|---|---|---|
| 3/3/2009 | Stella Ledniowski | $464,012,849 | $16,143,962 | $480,156,811 |
| 3/4/2009 | Stella Ledniowski | $464,402,349 | $17,197,962 | $481,600,311 |
| 3/5/2009 | Stella Ledniowski | $465,095,449 | $66,372,137 | $531,467,586 |
| 3/6/2009 | Stella Ledniowski | $467,277,796 | $74,459,469 | $541,737,265 |
| 3/9/2009 | Stella Ledniowski | $529,300,565 | $64,023,269 | $593,323,834 |
| 3/10/2009 | Stella Ledniowski | $469,109,770 | $46,607,174 | $515,716,944 |
| 3/11/2009 | Stella Ledniowski | $469,396,809 | $44,538,535 | $513,935,344 |
| 3/12/2009 | Stella Ledniowski | $466,460,135 | $15,914,480 | $482,374,615 |
| 3/13/2009 | Stella Ledniowski | $467,136,355 | $25,287,260 | $492,423,615 |
| 3/16/2009 | Stella Ledniowski | $467,142,341 | $16,604,360 | $483,746,701 |
| 3/17/2009 | Stella Ledniowski | $471,723,091 | $14,374,360 | $486,097,451 |
| 3/18/2009 | Stella Ledniowski | $473,218,441 | $8,938,310 | $482,156,751 |
| 3/19/2009 | Stella Ledniowski | $475,176,391 | $6,980,360 | $482,156,751 |
| 3/20/2009 | Stella Ledniowski | $467,260,616 | $10,905,460 | $478,166,076 |
| 3/23/2009 | Stella Ledniowski | $469,165,266 | $13,396,360 | $482,561,626 |
| 3/24/2009 | Stella Ledniowski | $473,019,216 | $38,627,795 | $511,647,011 |
| 3/25/2009 | Stella Ledniowski | $471,784,700 | $11,267,310 | $483,052,010 |
| 3/26/2009 | Stella Ledniowski | $472,075,350 | $25,742,060 | $497,817,410 |
| 3/27/2009 | Stella Ledniowski | $475,215,170 | $8,131,010 | $483,346,180 |
| 3/30/2009 | Stella Ledniowski | $472,828,670 | $26,538,310 | $499,366,980 |
| 3/31/2009 | Stella Ledniowski | $476,353,485 | $24,628,210 | $500,981,695 |
| 4/1/2009 | Stella Ledniowski | $475,140,445 | $23,403,725 | $498,544,170 |
| 4/2/2009 | Stella Ledniowski | $472,821,145 | $12,844,975 | $485,666,120 |
| 4/3/2009 | Stella Ledniowski | $475,708,070 | $32,511,790 | $508,219,860 |
| 4/6/2009 | Stella Ledniowski | $460,189,480 | $21,371,880 | $481,561,360 |
| 4/7/2009 | Stella Ledniowski | $480,226,510 | $15,332,350 | $495,558,860 |
| 4/8/2009 | Stella Ledniowski | $475,476,820 | $8,523,120 | $483,999,940 |
| 4/9/2009 | Stella Ledniowski | $474,367,720 | $9,683,495 | $484,051,215 |
| 4/10/2009 | Stella Ledniowski | $472,447,420 | $11,007,295 | $483,454,715 |
| 4/13/2009 | Stella Ledniowski | $472,521,920 | $10,676,009 | $483,197,929 |
| 4/14/2009 | Stella Ledniowski | $472,641,170 | $11,085,259 | $483,726,429 |
| 4/15/2009 | Stella Ledniowski | $472,838,429 | $10,316,561 | $483,154,990 |
| 4/16/2009 | Stella Ledniowski | $473,598,429 | $9,666,561 | $483,264,990 |
| 4/17/2009 | Stella Ledniowski | $474,007,709 | $10,080,861 | $484,088,570 |
| 4/20/2009 | Stella Ledniowski | $468,130,009 | $11,537,633 | $479,667,642 |
| 4/21/2009 | Stella Ledniowski | $474,286,659 | $7,923,333 | $482,209,992 |
| 4/22/2009 | Stella Ledniowski | $474,862,659 | $7,347,333 | $482,209,992 |
| 4/23/2009 | Stella Ledniowski | $450,710,914 | $34,772,435 | $485,483,349 |
| 4/24/2009 | Stella Ledniowski | $416,568,914 | $36,116,285 | $452,685,199 |
| 4/27/2009 | Stella Ledniowski | $393,663,234 | $9,224,233 | $402,887,467 |
| 4/28/2009 | Stella Ledniowski | $380,638,834 | $10,532,226 | $391,171,060 |
| 4/29/2009 | Stella Ledniowski | $384,233,984 | $28,314,364 | $412,548,348 |
| 4/30/2009 | Stella Ledniowski | $387,201,227 | $59,240,039 | $446,441,266 |
| 5/1/2009 | Stella Ledniowski | $405,720,415 | $78,822,611 | $484,543,026 |
| 5/4/2009 | Stella Ledniowski | $435,660,675 | $49,045,301 | $484,705,976 |
| 5/5/2009 | Stella Ledniowski | $444,343,215 | $15,330,046 | $459,673,261 |
| 5/6/2009 | Stella Ledniowski | $449,010,113 | $44,310,448 | $493,320,561 |
| 5/7/2009 | Stella Ledniowski | $443,546,970 | $64,684,481 | $508,231,451 |
| 5/8/2009 | Stella Ledniowski | $449,508,604 | $33,680,328 | $483,188,932 |
| 5/11/2009 | Stella Ledniowski | $441,061,320 | $12,769,638 | $453,830,958 |
| 5/12/2009 | Stella Ledniowski | $401,436,757 | $51,868,432 | $453,305,189 |
| 5/13/2009 | Stella Ledniowski | $404,684,157 | $75,001,618 | $479,685,775 |
| 5/14/2009 | Stella Ledniowski | $442,319,783 | $37,399,192 | $479,718,975 |

| Date | Bank of America Employee Who Sent The Report | Shipped Loan Amount | Dry Loan Amount | Total Loan Amount |
|---|---|---|---|---|
| 5/15/2009 | Stella Ledniowski | $469,078,611 | $29,642,654 | $498,721,265 |
| 5/18/2009 | Stella Ledniowski | $463,075,061 | $59,343,366 | $522,418,427 |
| 5/19/2009 | Stella Ledniowski | $438,792,884 | $38,037,518 | $476,830,402 |
| 5/20/2009 | Stella Ledniowski | $467,709,171 | $14,375,431 | $482,084,602 |
| 5/21/2009 | Stella Ledniowski | $467,985,171 | $14,099,431 | $482,084,602 |
| 5/25/2009 | Stella Ledniowski | $472,065,271 | $65,206,691 | $537,271,962 |
| 5/26/2009 | Stella Ledniowski | $420,966,086 | $65,206,691 | $486,172,777 |
| 5/27/2009 | Stella Ledniowski | $475,327,112 | $18,340,115 | $493,667,227 |
| 5/28/2009 | Stella Ledniowski | $469,707,432 | $17,289,195 | $486,996,627 |
| 5/29/2009 | Stella Ledniowski | $477,152,606 | $10,843,821 | $487,996,427 |
| 6/1/2009 | Stella Ledniowski | $476,477,286 | $62,136,816 | $538,614,102 |
| 6/2/2009 | Stella Ledniowski | $427,457,401 | $75,479,736 | $502,937,137 |
| 6/3/2009 | Stella Ledniowski | $452,294,896 | $35,164,931 | $487,459,827 |
| 6/4/2009 | Stella Ledniowski | $477,656,766 | $10,975,310 | $488,632,076 |
| 6/5/2009 | Stella Ledniowski | $479,075,486 | $24,387,570 | $503,463,056 |
| 6/8/2009 | Stella Ledniowski | $464,279,666 | $22,791,070 | $487,070,736 |
| 6/9/2009 | Stella Ledniowski | $478,449,446 | $16,626,280 | $495,075,726 |
| 6/10/2009 | Stella Ledniowski | $478,941,566 | $17,358,610 | $496,300,176 |
| 6/11/2009 | Stella Ledniowski | $484,479,956 | $20,622,617 | $505,102,573 |
| 6/12/2009 | Stella Ledniowski | $480,184,719 | $17,557,356 | $497,742,075 |
| 6/15/2009 | Stella Ledniowski | $487,831,955 | $65,275,274 | $553,107,229 |
| 6/16/2009 | Stella Ledniowski | $431,658,514 | $65,460,244 | $497,118,758 |
| 6/17/2009 | Stella Ledniowski | $487,618,829 | $10,687,429 | $498,306,258 |
| 6/18/2009 | Stella Ledniowski | $489,587,328 | $42,663,780 | $532,251,108 |
| 6/19/2009 | Stella Ledniowski | $456,123,270 | $75,128,670 | $531,251,940 |
| 6/22/2009 | Stella Ledniowski | $451,765,428 | $40,410,260 | $492,175,688 |
| 6/23/2009 | Stella Ledniowski | $463,962,088 | $58,630,141 | $522,592,229 |
| 6/24/2009 | Stella Ledniowski | $454,449,948 | $44,636,696 | $499,086,644 |
| 6/25/2009 | Stella Ledniowski | $483,127,889 | $34,010,145 | $517,138,034 |
| 6/26/2009 | Stella Ledniowski | $469,571,221 | $28,001,560 | $497,572,781 |
| 6/29/2009 | Stella Ledniowski | $489,921,161 | $7,651,620 | $497,572,781 |
| 6/30/2009 | Stella Ledniowski | $490,616,661 | $6,344,120 | $496,960,781 |
| 7/1/2009 | Stella Ledniowski | $467,415,765 | $71,584,559 | $539,000,324 |
| 7/2/2009 | Stella Ledniowski | $449,739,587 | $47,071,709 | $496,811,296 |
| 7/3/2009 | Stella Ledniowski | $449,739,587 | $47,071,709 | $496,811,296 |
| 7/6/2009 | Stella Ledniowski | $490,334,726 | $6,476,570 | $496,811,296 |
| 7/7/2009 | Stella Ledniowski | $489,690,326 | $33,224,870 | $522,915,196 |
| 7/8/2009 | Stella Ledniowski | $462,943,268 | $59,244,195 | $522,187,463 |
| 7/9/2009 | Stella Ledniowski | $465,329,663 | $35,679,695 | $501,009,358 |
| 7/10/2009 | Stella Ledniowski | $487,998,531 | $17,885,420 | $505,883,951 |
| 7/13/2009 | Stella Ledniowski | $483,082,497 | $15,139,720 | $498,222,217 |
| 7/14/2009 | Stella Ledniowski | $491,622,667 | $7,125,100 | $498,747,767 |
| 7/15/2009 | Stella Ledniowski | $490,718,627 | $35,876,306 | $526,594,933 |
| 7/16/2009 | Stella Ledniowski | $464,827,551 | $50,716,480 | $515,544,031 |
| 7/17/2009 | Stella Ledniowski | $469,223,597 | $23,588,474 | $492,812,071 |
| 7/20/2009 | Stella Ledniowski | $485,629,223 | $8,619,150 | $494,248,373 |
| 7/21/2009 | Stella Ledniowski | $485,629,223 | $11,020,060 | $496,649,283 |
| 7/22/2009 | Stella Ledniowski | $487,716,373 | $14,824,110 | $502,540,483 |
| 7/23/2009 | Stella Ledniowski | $485,388,733 | $12,846,200 | $498,234,933 |
| 7/24/2009 | Stella Ledniowski | $490,979,933 | $7,750,750 | $498,730,683 |
| 7/27/2009 | Stella Ledniowski | $491,257,433 | $7,268,750 | $498,526,183 |
| 7/28/2009 | Stella Ledniowski | $491,820,183 | $8,556,370 | $500,376,553 |
| 7/29/2009 | Stella Ledniowski | $490,720,683 | $8,556,370 | $499,277,053 |

| Date | Bank of America Employee Who Sent The Report | Shipped Loan Amount | Dry Loan Amount | Total Loan Amount |
|---|---|---|---|---|
| 7/30/2009 | Stella Ledniowski | $490,810,283 | $8,466,770 | $499,277,053 |
| 7/31/2009 | Stella Ledniowski | $492,852,323 | $18,972,350 | $511,824,673 |
| 8/3/2009 | Stella Ledniowski | $442,187,998 | $19,060,350 | $461,248,348 |
| 8/4/2009 | Stella Ledniowski | $417,727,899 | $33,580,422 | $451,308,321 |
| 8/5/2009 | Stella Ledniowski | $417,727,899 | $33,580,422 | $451,308,321 |
| 8/6/2009 | Stella Ledniowski | $406,129,274 | $33,392,422 | $439,521,696 |
| 8/7/2009 | Stella Ledniowski | $406,129,274 | $33,392,422 | $439,521,696 |
| 8/10/2009 | Stella Ledniowski | $406,129,274 | $33,392,422 | $439,521,696 |
| 8/11/2009 | Stella Ledniowski | $406,041,274 | $33,480,422 | $439,521,696 |
| 8/12/2009 | Stella Ledniowski | $406,041,274 | $33,480,422 | $439,521,696 |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BNP PARIBAS MORTGAGE CORP. and
BNP PARIBAS,

        Plaintiffs,

    v.

BANK Of AMERICA, N.A.,

Defendant.

Civil Action No. 09-CV-9783-RWS
Honorable Robert W. Sweet

## CERTIFICATE OF SERVICE

    I, Jack Wilson, declare under penalty that on October 1, 2012, the foregoing
Second Amended Complaint was served upon the below counsel via email.

        Munger, Tolles & Oson LLP
        Marc T.G. Dworsky
        Kristin Linsley Myles
        Gregory Weingart
        Richard St. John
        355 South Grand Avenue
        Los Angeles, CA 90071-1560
        Attorneys for Defendant Bank of America, N.A.

October 1, 2012
Armonk, New York

By: _Jack Wilson_