**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

BNP PARIBAS MORTGAGE
CORPORATION and BNP PARIBAS,

                    Plaintiffs,

         -against-

BANK OF AMERICA, N.A.,

                    Defendant.

Civil Action No. 09-CV-9783-RWS

------------------------------------------------------------------------x
------------------------------------------------------------------------x

DEUTSCHE BANK AG,

                    Plaintiff,

         -against-

BANK OF AMERICA, N.A.,

                    Defendant.

Civil Action No. 09-CV-9784-RWS

------------------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF BANK OF AMERICA'S**
**MOTION TO COMPEL PRODUCTION OF DOCUMENTS IN RESPONSE TO**
**BANK OF AMERICA'S SUBPOENA FOR DOCUMENTS TO FREDDIE MAC**

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................................. 1

II. BACKGROUND .................................................................................................................. 2

III. ARGUMENT ....................................................................................................................... 6

    A. The Loan Level Data BoA Has Requested is Reasonably Calculated to Lead to the Discovery of Admissible Evidence .................. 6

    B. Freddie Mac Has Not Established that Producing Loan-Level Data Would Be Unduly Burdensome ................................................................. 7

    C. The Documents Sought By BoA's Requests Are Reasonably Calculated to Lead to the Discovery of Admissible Evidence .................. 9

    D. Freddie Mac's Burden Argument With Respect to BoA's Document Requests Should Be Rejected ................................................. 14

IV. CONCLUSION .................................................................................................................. 16

-ii-

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*,
 262 F.R.D. 293 (S.D.N.Y. 2009) ................................................................................6

*Capitol Records, Inc. v. Mp3tunes, LLC*,
 261 F.R.D. 44 (S.D.N.Y. 2009) ................................................................................15

*Condit v. Dunne*,
 225 F.R.D. 100 (S.D.N.Y. 2004) ................................................................................6

*Daval Steel Prods. v. M/V Fakredine*,
 951 F.2d 1357 (2d Cir.1991)......................................................................................6

*Oppenheimer Fund, Inc. v. Sanders*,
 437 U.S. 340 (1978)....................................................................................................6

**FEDERAL RULES**

F.R.C.P. 26(b)(1) ..............................................................................................................6

F.R.C.P. 26(b)(2)(C)(iii) ...................................................................................................6

**TREATISES**

9 Moore's Federal Practice ¶ 45.51[4] (3d ed. 2009)........................................................6

I.       **INTRODUCTION**

This case concerns a $1.75 billion mortgage fraud perpetrated by Taylor Bean & Whitaker Mortgage Corp. ("TBW") and Colonial Bank. Wittingly or unwittingly, Freddie Mac was a key player in this fraudulent scheme: It purchased the vast majority of the hundreds of thousands of mortgages that flowed through the fraudulent TBW investment vehicle at issue in this case, including almost all of the mortgages that were supposed to have been pledged as collateral to back Plaintiffs' investments. Because those mortgages had been sold to Freddie and were not, as TBW represented, available as Plaintiffs' collateral, Plaintiffs lost most of their $1.75 billion investment when TBW collapsed.

Notwithstanding its central role in this massive fraud, Freddie Mac has refused to undertake reasonable efforts to collect and produce documents relevant to this litigation. Indeed, it has refused to undertake almost any efforts at all. It has refused to review or produce any emails. It has refused to produce data from its systems concerning its purchase of mortgages from the TBW investment vehicle at issue in this case. It has even refused to collect and produce any paper documents concerning its relationship with the perpetrators of the fraudulent scheme, beyond a few agreements. A year and a half after receiving BoA's subpoena, and following extensive efforts to meet and confer, Freddie has produced just a few hundred documents, almost all of which it had previously produced elsewhere. Moreover, while Freddie Mac had long indicated that it would be willing to produce some data concerning the loans it purchased, it recently demanded for the first time that BoA drop its document requests in their entirety before it would produce *any* loan-level data whatsoever. Freddie Mac has also flatly rejected all of

1

BoA's attempts to compromise and limit Freddie Mac's burden by proposing a limited set of search terms and custodians for electronic documents.

Because the information sought by BoA's requests is clearly relevant to the claims and defenses in this case, and because Freddie Mac has not articulated any coherent burden argument or other valid reason for refusing to produce it, BoA's motion should be granted.

## II.   BACKGROUND

This case arises from a massive mortgage-related fraud committed by Taylor, Bean & Whitaker Mortgage Corp. ("TBW") and Colonial Bank. TBW was a home mortgage operation whose business was to originate new mortgages and sell them to the Federal Home Loan Mortgage Corporation ("Freddie Mac"), the third party here. Colonial Bank served as TBW's bank and agent, and also, simultaneously, served as agent for Freddie Mac.

In order to create liquidity for its mortgage origination business, TBW formed a wholly owned subsidiary, Ocala Funding, LLC ("Ocala"). BoA served in various administrative roles for the Ocala facility. Ocala issued short-term notes purchased by the Plaintiffs in this case, Deutsche Bank AG ("DB") and BNP Paribas Mortgage Corporation ("BNPP"). Ocala used the proceeds from these notes to purchase TBW-originated mortgages, which were supposed to serve as collateral for the notes. Ocala would then sell the mortgages to Freddie Mac and use the proceeds to pay off the notes as they came due or to purchase additional mortgages from TBW. Over the course of its long and profitable relationship with TBW, Freddie acquired the "vast majority" of the approximately 350,000 mortgages that moved through the Ocala facility, worth tens of billions of dollars, with TBW servicing over $50 billion in Freddie-Mac-owned loans

prior to August of 2009.[1]  *See* Ex. B (Addendum to Proof of Claim of Federal Home Loan Mortgage Corporation) at 1-2; Ex. C (Final Reconciliation Report of Debtor Taylor, Bean & Whitaker Corp.) at 58-60.

At the height of the mortgage crisis, as both TBW and Colonial were collapsing, Colonial conspired with TBW to double- and triple-pledge mortgages, looted the Ocala facility, and committed other crimes in a desperate move to try to save the two institutions.  The ploy failed, TBW and Colonial imploded, and the looting of Ocala was revealed.  Officers of TBW and Colonial have been convicted of conspiracy and fraud and are serving prison sentences, TBW is in bankruptcy, and Colonial is in receivership.  Meanwhile, Ocala cannot repay the Plaintiffs' notes because TBW and Colonial stole its assets and sold them, primarily, to Freddie Mac.  For example, an investigation by TBW and its restructuring staff concluded that of the approximately 9,000 loans that were supposed to compose Ocala's collateral at the time of TBW's collapse, over 7,000 had in fact been sold by TBW to Freddie Mac.  Ex. C at 7, 66.

Plaintiffs have therefore sued BoA seeking to be made whole for TBW's and Colonial's fraud, to the tune of some $1.75 billion.  The FDIC as receiver for Colonial has also brought suit against BoA in the District of Columbia, alleging that BoA improperly allowed certain of the double and triple pledged loans to be sold to Freddie Mac without first ensuring that Ocala had paid Colonial for those loans.  BoA has raised a number of affirmative defenses to Plaintiffs' claims, including that the contracts at issue

---

[1] On September 6, 2011, at Freddie Mac's request, BoA provided Freddie Mac with the list of more than 350,000 loans that BoA identified as having moved through the Ocala facility over the course of its existence. Ex. A (Sept 6, 2011 email from counsel for BoA to counsel for Freddie Mac).

are entirely or partially void on account of TBW's fraud. Among the key issues in these cases are the nature of TBW's fraud and the Plaintiffs' knowledge of TBW's fraudulent activities and understanding of Ocala's operations.

In addition to being the ultimate purchaser of almost all the loans that moved through the Ocala facility over the course of its existence, Freddie Mac played other significant roles in connection with Ocala. For example, Freddie Mac considered purchasing Ocala notes and making other investments in connection with TBW, and engaged in extensive discussions in connection with these potential transactions with one of the Plaintiffs right up until the point of TBW's collapse. *See*, *e.g.*, Ex. D (Dec. 16, 2008 email from Freddie Mac to DB discussing potential purchase by Freddie Mac of Ocala commercial paper); Ex. E (July 2009 draft agreement between Freddie Mac and DB Securities for Freddie Mac purchase of $450 million of Ocala commercial paper). Freddie Mac also made various promises and assurances to Plaintiffs about the Ocala facility as part of inducing Plaintiffs to purchase Ocala CP. *See*, *e.g.*, Ex. F (Dec. 5, 2008 email from Freddie Mac to BNP discussing a "carve out to have Ocala funding deliver loans in the event of a TBW bankruptcy"); *id*. (indicating that TBW's "daily servicing back up data" "has been tested by Freddie Mac's auditors").

In light of these significant roles, BoA served a subpoena on Freddie Mac on August 10, 2011.[2] The subpoena sought various Freddie Mac forms and records regarding its purchase of Ocala loans, Freddie Mac's communications with the Plaintiffs or Colonial regarding the Ocala facility, documents concerning Colonial's role as Freddie

---

[2] Freddie Mac and BoA have agreed that any dispute regarding this subpoena will be heard in the Southern District of New York. *See* Ex. G (Aug. 23, 2011 email from counsel for BoA counsel for Freddie Mac).

4

Mac's custodian, and documents concerning any knowledge Freddie may have had or investigation Freddie may have done into the fraud perpetrated by TBW and Colonial.

In response to BoA's subpoena, Freddie Mac agreed to produce only its custodial agreements with Colonial Bank and some 781 documents that it had already collected and produced in connection with the TBW bankruptcy. Ex. H (Freddie Mac's Responses and Objections to BoA's Document Subpoena); Decl. ¶ 2. These documents relate to only approximately 7,000 loans whose ownership was disputed in August of 2009 when the Ocala facility collapsed, out of the more than 350,000 loans that BoA has identified as having moved through the Ocala facility. Ex. C at 7.

Throughout a lengthy meet and confer process, Freddie Mac has refused to produce anything more. While it has articulated no valid basis for that refusal, it has taken various meritless positions, including that the basic loan level data sought by BoA is unavailable or would be unduly burdensome to produce, Ex. I (Feb. 14, 2013 letter from counsel for BoA to counsel for Freddie Mac); that the documents sought by BoA are irrelevant to the claims and defenses in this case, Decl. ¶ 3; and that Freddie Mac should be excused from its discovery obligations because it is in conservatorship, Ex. H at 3-4. More recently, Freddie Mac has taken yet another position, announcing that it will produce the loan level data that BoA has requested only if BoA agrees to abandon the remainder of its document requests. Decl. ¶ 3-4; Ex. I at 1. This offer gives the lie to Freddie Mac's contention that the loan-level data is too burdensome to produce, and reveals Freddie Mac's discovery tactics for what they are: stonewalling designed to cause BoA to forego discovery of relevant and discoverable documents in Freddie Mac's possession.

### III. ARGUMENT

Under Federal Rule 26(b)(1), BoA is entitled to information "relevant to any party's claim or defense" and "reasonably calculated to lead to the discovery of admissible evidence." F.R.C.P. 26(b)(1). "This obviously broad rule is liberally construed." *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir.1991) (*citing Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)); *see also Condit v. Dunne*, 225 F.R.D. 100, 105 (S.D.N.Y. 2004) ("Although not unlimited, relevance, for purposes of discovery, is an extremely broad concept."). The court can limit discovery where "the burden or expense of the proposed discovery outweighs its likely benefit," F.R.C.P. 26(b)(2)(C)(iii), but "[a] party objecting to a subpoena on the ground of undue burden generally must present an affidavit or other evidentiary proof of the time or expense involved in responding to the discovery request." *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 262 F.R.D. 293, 300 (S.D.N.Y. 2009) (*quoting* 9 Moore's Federal Practice ¶ 45.51[4] (3d ed. 2009). The information BoA has sought from Freddie Mac is clearly discoverable under the liberal standard of Rule 26(b)(1), and Freddie Mac has articulated no burden argument to weigh against that discoverability. Accordingly, BoA's motion should be granted.

### A. The Loan Level Data BoA Has Requested is Reasonably Calculated to Lead to the Discovery of Admissible Evidence

As discussed above, Plaintiffs' claims in this action allege that BoA failed to properly track the flow of cash and loans through the Ocala facility, thus allowing the Ocala facility to become undercollateralized through TBW's double and triple pledging of mortgages—including TBW's sale to Freddie Mac of loans that were supposed to still

6

belong to Ocala.³  Critical to this case, therefore, are the details concerning which loans that were supposed to be owned by Ocala were sold to Freddie Mac, when that happened, and whether Ocala was paid for those loans.

Freddie has basic loan-level data concerning its purchase of Ocala loans that will address these issues.  That data unquestionably is highly relevant to the Plaintiffs' claims in this case.  Indeed, Plaintiffs have subpoenaed the very same loan-level information from Freddie Mac, Ex. J (Plaintiffs' Jul. 21, 2011 Subpoena to Freddie Mac), and Freddie Mac has never attempted to articulate any argument that this loan level data is not relevant.  Rather, Freddie Mac's refusal to produce this information rests on specious burden arguments that it has since undermined by offering to produce the data if BoA drops its other requests.

## B. Freddie Mac Has Not Established that Producing Loan-Level Data Would Be Unduly Burdensome

BoA has identified the loans it believed passed through Ocala and to Freddie by loan number, borrower, and amount, and has narrowed its requests to Freddie Mac to only four pieces of information with respect to each loan: (1) the date of settlement; (2)

---

³ *See* BNPP's Second Amended Complaint, ("BNPP SAC") ¶ 7 (alleging that BoA should have notified BNPP and shut down the facility if "at any time Bank of America became aware that the Ocala Facility was under-collateralized"); DB's Second Amended Complaint ("DB SAC") ¶ 9 (similar); BNPP SAC  ¶ 12 (BoA improperly transferred cash to "Freddie Mac and Ginnie Mae custodial accounts"); ¶ 18 (BoA delivered loan reports that were false because the mortgages or the proceeds thereof were possessed by Freddie Mac and others); ¶ 138 ("Bank of America was obligated to keep track of which mortgage loans Ocala owned, which mortgage loans were purchased by Freddie Mac, when those mortgage loans were purchased by Freddie Mac (i.e. when Bank of America received the proceeds of the loans from Freddie Mac)"); ¶ 139 (BoA failed "to correctly record . . . when mortgages were sold to Freddie Mac") DB SAC ¶ 184 (similar).

7

the funds or securities remitted by Freddie Mac; (3) the recipient to which funds were remitted; and (4) (if available) the identified beneficiary of any such funds or securities. Ex. K (Sep. 13, 2011 email from counsel for BoA to counsel for Freddie Mac); Ex. I at 1. Freddie Mac's own documents indicate that a report containing this information can be generated automatically. For example, a Freddie Mac document titled "Selling Mortgages to Freddie Mac for Cash" instructs sellers and servicers with access to Freddie Mac's selling system how to generate reports containing precisely the type of information that BoA and Plaintiffs seek here. Ex. L at 10-14 (Ex. A to May 17, 2012 letter from counsel for DB to counsel for Freddie Mac). Thus, it would appear from Freddie Mac's own documents that the data BoA is seeking can be generated with little to no burden to Freddie Mac, much less any "undue" or "unreasonable" burden.

Despite repeated questioning, Freddie Mac has refused to provide an affidavit explaining why the requested loan level data cannot be automatically generated. Its only response has been that because TBW has been "terminated" for more than two years as a servicer & seller in its systems, it is no longer possible to use the programs detailed in its documentation to obtain the requested data, and that instead "programs will have to be written" to extract that data at some unidentified but allegedly undue burden and expense. Ex. I at 1.

It strains credulity that information which was once available at the push of a button is now so burdensome to obtain that it cannot be produced. Moreover, any suggestion that this data would be too burdensome for Freddie Mac to produce is belied by Freddie Mac's recent offer to produce the data if BoA agrees to drop the rest of its

8

document requests.  Freddie Mac should be ordered to produce the loan level data that BoA has requested.

> ### C. The Documents Sought By BoA's Requests Are Reasonably Calculated to Lead to the Discovery of Admissible Evidence

BoA has served ten requests for production on Freddie Mac, seeking various categories of documents:  (1) documents concerning the Ocala facility and its loans, including documents concerning the sale of those loans (RFP No. 1); (2) communications between Freddie and DB, BNPP, or Colonial Bank concerning TBW or the Ocala facility (RFP Nos. 2-4); (3) documents concerning Colonial Bank's role as Freddie Mac's custodian (RFP Nos. 5-7); and (4) documents concerning Freddie Mac's knowledge of or inquiry into fraud or wrongdoing at TBW (RFP Nos. 8-10).  Ex. M (BoA's Aug. 10, 2011 Subpoena to Produce Documents to Freddie Mac).  In response to these requests, Freddie Mac has agreed to produce only documents relating to "certain of the Ocala Loans" that were previously produced by Freddie in the TBW bankruptcy, and a handful document custodian agreements between Freddie Mac, TBW, and Colonial Bank.  Ex. H.   BoA's requests and Freddie Mac's responses are set forth in Exhibit H.  Each of BoA's requests is reasonably calculated to lead to the discovery of admissible evidence, and Freddie Mac should be compelled to produce documents in response.

1. <u>Documents Concerning Ocala or the Ocala Loans (RFP No. 1)</u>

BoA's RFP No. 1 seeks "all documents concerning Ocala Funding or the Ocala Loans," including:

> (a) "documents concerning the purchase or sale of Ocala Loans, including any Freddie Mac forms" concerning such loans;

9

(b) documents "concerning monies, securities or consideration of any form paid by Freddie Mac to Ocala Funding" or "to any person for Ocala Loans";

(c) documents "produced by You to any third party . . . in connection with this litigation, or any proceeding or investigation, including the criminal trial of Lee Farkas"; and

(e) documents "concerning servicing advances to Freddie Mac concerning the Ocala Loans."[4]

In response to this request, Freddie Mac has agreed to produce only some 781 "documents related to certain of the Ocala Loans that were previously produced … in connection with [TBW's] bankruptcy [c]ase."

As discussed above, Plaintiffs in this case allege that BoA failed to properly track the flow of cash and loans through the Ocala facility, thus allowing the Ocala facility to become undercollateralized through TBW's double and triple pledging of mortgages and misuse of Ocala's cash—including TBW's sale to Freddie Mac of loans that were supposed to still belong to Ocala and TBW's use of Ocala cash to pay servicing advances to Freddie Mac.  Freddie Mac's records of the circumstance of those sales and payments, as sought by sections 1(a), (b), and (e) of RFP No.1, are not only relevant but indeed critical to this case, and Freddie Mac has never argued otherwise.  And documents concerning Ocala or TBW produced by Freddie Mac in connection with other proceedings related to Ocala, including the criminal trial of Lee Farkas and the bankruptcy of TBW, are relevant to BoA's affirmative defenses based on the fraud perpetrated by TBW and Colonial, as well as the ownership and movement of loans that moved through the Ocala facility.  This is demonstrated by the handful of documents

---

[4] RFP No. 1 also includes a request for "all communications between you and BoA, and all Documents concerning such communications." BoA withdraws this portion of its request.

from the TBW bankruptcy that Freddie Mac has already produced, which include, for example, "Freddie Mac Loan Purchase Statements" describing pools of loans and when and where the funds for purchase of those loans were transmitted.

      2.      Communications With Plaintiffs (RFP Nos. 2-3)

BoA's RFP No. 2 seeks "All communications between [Freddie Mac] and Deutsche [Bank] concerning Ocala Funding or TBW, and all Documents concerning such communications." RFP No. 3 makes the same request with respect to communications between Freddie Mac and BNPP. Freddie Mac has not agreed to produce any documents in response to these requests.

The documents sought by these requests are plainly relevant to the claims and defenses at issue in this case. As discussed above, representatives of Freddie Mac communicated with Plaintiffs about TBW and Ocala on a number of occasions, including by negotiating the potential purchase of Ocala commercial paper and by making promises and assurances to Plaintiffs about the Ocala facility. *See*, *e.g.*, Ex. F (Dec. 5, 2008 email from Freddie Mac to BNP discussing a "carve out to have Ocala funding deliver loans in the event of a TBW bankruptcy"); Ex. D (Dec. 16, 2008 email from Freddie Mac to DB discussing potential purchase by Freddie Mac of Ocala commercial paper). Any such communications bear directly on Plaintiffs' understanding of various aspects of the Ocala facility, including BoA's and TBW's role therein and the risks associated with Ocala. That understanding is highly disputed and important in this case. In addition, it is no answer that DB and BNPP should have produced any such communications because Freddie Mac may have memorializations of telephone or in-person conversations with Plaintiffs or internal discussions of these communications that Plaintiffs themselves

11

would not possess. *See*, *e.g.*, Ex. N (Apr. 27, 2009 calendar invitation from Freddie Mac to DB for a meeting to discuss "Freddie-OCALA Funding CP Program Next Step").

       3.     <u>Colonial's Role as Freddie Mac's Custodian (RFP Nos. 4-6)</u>

RFP No. 4 seeks "All communications between [Freddie Mac] and Colonial concerning Ocala Funding or TBW, and all Documents concerning such communications." RFP No. 5 seeks "All engagement letters entered into with Colonial Bank concerning Colonial Bank serving as [Freddie Mac's] custodian for any Ocala Loans," and RFP No. 6 seeks "[a]ll Documents concerning Colonial Bank's role as [Freddie Mac's] custodian for any Ocala Loans." In response, Freddie Mac has agreed to produce only "custodian agreements between Freddie Mac, TBW, and Colonial Bank."

As BoA has indicated to Freddie Mac, *see* Ex. O (Jul. 18, 2012 letter from counsel for BoA to counsel for Freddie Mac), the broader scope of documents beyond the actual custodian agreements may include proposals, summaries, presentations, or the like concerning how Freddie Mac's relationship with Colonial was established and maintained, as well as communications demonstrating how those relationships operated in practice. Such documents are relevant to understanding Freddie Mac's and Colonial's respective roles with respect to the Ocala facility, which is critical to understanding how the fraud was perpetrated. That in turn is relevant to BoA's affirmative defenses based on TBW and Colonial's fraud, as well as Plaintiff's allegations concerning the nature of TBW's and Colonial's wrongdoing and whether BoA could and should have detected and prevented it. They may also be probative of how reasonable actors in the industry would have viewed the structure of the Ocala facility and the roles and responsibilities of the various parties involved.

       4.     <u>Colonial's Other Roles for Freddie Mac (RFP No. 7)</u>

12

RFP No. 7 seeks "All Documents concerning any other role Colonial Bank served in with respect to Your purchase of Ocala Loans." In response, Freddie Mac has stated that it is "unaware of any documents responsive to this request."

If, despite reasonable inquiry and a diligent search, Freddie Mac has been unable to locate any documents responsive to this request, it should say so. Freddie Mac's response that it is simply "unaware" of any responsive documents suggests that it has not performed a reasonable and diligent inquiry with respect to this request, as required.

5. <u>Freddie Mac's Understanding of TBW's Malfeasance (RFP No. 8-10)</u>

RFP No. 8 seeks documents "concerning any wrongdoing, impropriety, malfeasance, or fraud at TBW, including all Documents concerning any investigation or inquiry related to wrongdoing, impropriety, malfeasance, or fraud at TBW." RFP No. 9 seeks documents "concerning any audit, due diligence, or investigation of TBW performed after January 1, 2002," and RFP No. 10 seeks documents "concerning any reports or complaints received by You or the Office of Federal Housing Enterprise Oversight about potential wrongdoing, impropriety, malfeasance, or fraud at TBW." Freddie Mac has not agreed to produce any documents responsive to these requests.

As discussed above, how TBW carried out its fraud is critical both to Plaintiffs' allegations concerning BoA's duties and ability to prevent that fraud and to BoA's affirmative defenses. Documents reflecting Freddie Mac's understanding of TBW's wrongdoing and the propriety of TBW's operations are likely to lead the discovery of information relevant to understanding the fraud. They may also be probative of how reasonable actors in the industry would have responded to information about Ocala and TBW, and in particular whether or not that information should have been viewed as an indication of fraud.

13

### D. Freddie Mac's Burden Argument With Respect to BoA's Document Requests Should Be Rejected

Moreover, BoA has proactively attempted to limit any burden on Freddie Mac imposed by these requests by proposing specific search terms and custodians that it would accept as a reasonable effort to locate, review, and produce responsive electronic documents. BoA first provided those criteria in April 2012, and after further negotiation, Freddie Mac has represented that they result in a total population of approximately 110,000 documents. See Ex. P (Apr. 17, 2012 email from counsel for BoA to counsel for Freddie Mac); Ex. Q (Jun. 29, 2012 email from counsel for BoA to counsel for Freddie Mac); Ex. R (Nov. 27, 2012 email from counsel for BoA to counsel for Freddie Mac). By way of comparison, Deutsche Bank, BNP Paribas, and BoA have collectively produced almost 1.7 million documents in this case. Decl. ¶ 5. And other third parties have made productions larger in size than that contemplated here. Deloitte & Touche, for example, has produced approximately 170,000 documents in response to BoA's subpoena. Decl. ¶ 6. Deloitte served as TBW's auditor but had more limited involvement with the Ocala facility than Freddie Mac and had a much smaller financial connection to TBW in comparison to Freddie Mac's multi-billion-dollar relationship. Likewise, TBW has voluntarily produced almost 3 million documents without even being served with a subpoena. Decl. ¶ 7.

To further reduce Freddie Mac's burden, BoA has proposed that Freddie Mac simply review these 110,000 "hits" for privilege and produce the non-privileged documents to BoA. Although this procedure would likely result in a set of documents that is both under- and over--inclusive, BoA would be willing to accept such a collection and review of electronic documents as a way of alleviating the burden on Freddie Mac.

14

*See Capitol Records, Inc. v. MP3tunes, LLC*, 261 F.R.D. 44, 50 (S.D.N.Y. 2009) (compelling search of documents hitting on plaintiff's search terms where those terms were relevant to one or more claims).  Furthermore, to the extent even this simple privilege review would be burdensome, BoA would be willing to agree to a reasonable "clawback" arrangement whereby Freddie Mac could make its documents available to BoA without conducting a full privilege review of the full set and without waiving privilege; after a period of time for review and selection of relevant material by BoA, Freddie Mac could then conduct a full privilege review on just that subset of documents.  In sum, BoA is willing to agree to a set of procedures that would result in minimal burden on Freddie Mac.

Freddie Mac has refused this compromise on multiple occasions, and has refused to work to narrow further the set of 110,000 documents, but has never articulated any valid reasons for doing so.  Decl. ¶ 8.  Instead, Freddie Mac has offered various quibbles that do not withstand scrutiny.  For example, Freddie Mac has complained that the requests and search terms are overbroad because they cover TBW's operations and relationships with Freddie Mac unrelated to the Ocala facility, when only the Ocala facility is relevant to this litigation.  But as Freddie Mac concedes, Freddie Mac, TBW, and Colonial did not distinguish between money and loans flowing through the Ocala facility and other TBW activity.  Ex. O at 3.  Moreover, TBW's and Colonial's fraud involving Ocala was part of a broader fraudulent scheme to hide asset shortfalls, and cannot be understood in isolation; through double-pledging, kiting, and other mechanisms, TBW's and Colonial's fraudulent activities directed at Ocala were entwined

15

with malfeasance involving other facilities and parties.  Ex. C at 15-17.  It is thus entirely necessary for BoA's requests to seek documents related to TBW, and not just to Ocala.

Accordingly, BoA requests that the Court order Freddie Mac to produce, no later than 30 days following the Court's order:

(A) For each of the loans identified in BoA's email to Freddie Mac of September 6, 2011, electronic data showing:  (1) the date of settlement; (2) the funds or securities remitted by Freddie Mac; (3) the recipient to which funds were remitted; and (4) (if available) the identified beneficiary of any such funds or securities;

(B)  All non-privileged paper documents responsive to BoA's document requests; and

(C) Either:  (1) all non-privileged electronic documents responsive to BoA's requests, or (2) the non-privileged electronic documents responsive to the list of search terms and custodians attached hereto as Exhibit P (Apr. 17, 2012 email from counsel for BoA to counsel for Freddie Mac).

## IV.   CONCLUSION

For the reasons set forth in this memorandum, the Court should enter an order compelling Freddie Mac to produce loan-level data and documents as described above.

Dated:   April 19, 2013                    Respectfully submitted,

By: */s/ David H. Pennington*

MUNGER, TOLLES & OLSON LLP
Marc T. G. Dworsky
Kristin L. Myles
Gregory D. Phillips
Richard St. John
David H. Pennington
355 South Grand Avenue, Thirty-Fifth Floor
Los Angeles, CA  90071-1560
(213) 683-9100

*Attorneys for Bank of America, N.A.*

20457539.3

16

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of April, 2013, the Notice of Motion to Compel Production of Documents in Response to Bank of America's Subpoena to Freddie Mac, the Memorandum of Law in support thereof, and the accompanying Declaration of David H. Pennington and the exhibits thereto, all submitted herewith, were served by hand delivery on:

>Kyle A. Lonergan
>McKool Smith, P.C.
>One Bryant Park, 47th Floor
>New York, NY 10036
>Telephone: (212)-402-9425
>Fax: (212) 402-9444
>
>*Attorneys for Federal Home Loan Mortgage Corporation*

                 */s/ David H. Pennington*

20637322.1