UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

BNP PARIBAS MORTGAGE
CORPORATION and BNP PARIBAS,

                    Plaintiffs,                 09 Civ. 9783 (RWS)

     - against -                                    OPINION

BANK OF AMERICA, N.A.,

                    Defendant.

------------------------------------X

DEUTSCHE BANK AG,

                    Plaintiff,                 09 Civ. 9784 (RWS)

     - against -                                    OPINION

BANK OF AMERICA, N.A.,

                    Defendant.

------------------------------------X

A P P E A R A N C E S:


          Attorneys for Plaintiffs BNP Paribas
          Mortgage Corporation and BNP Paribas

          BOIES SCHILLER & FLEXNER LLP
          333 Main Street
          Armonk, NY  10504
          By:  Robin A. Henry, Esq.
               Motty Shulman, Esq.
               Jack Wilson, Esq.

<u>Attorneys for Plaintiff Deutsche Bank AG</u>

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
By:  William E. McDaniels, Esq.
     Stephen D. Andrews, Esq.
     Stephen P. Sorensen, Esq.
     Daniel M. Dockery, Esq.
     Katherine O'Connor, Esq.


<u>Attorneys for Defendant Bank of America, N.A.</u>

MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA  90071-1560
By:  Marc T.G. Dworsky, Esq.
     Kristin Linsley Myles, Esq.
     Gregory Weingart, Esq.
     Richard St. John, Esq.

KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY  10036
By:  Richard T. Marooney, Esq.

1

**Sweet, D.J.**

Defendant Bank of America, N.A. ("BoA" or "Defendant") has moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss counts four through twelve of the second amended complaints ("Second Amended Complaints") filed by Plaintiffs' BNP Paribas Mortgage Corporation ("BNP") and BNP Paribas ("BNPP") (collectively, the "BNP Plaintiffs") and Deutsche Bank AG ("DB") and count fourteen of the BNP Plaintiffs' Second Amended Complaint.  For the reasons set forth below, the motion is granted.

The highly skilled advocates on each side have once again been of great assistance to the Court in illuminating the complex set of issues involved.

## I. *PRIOR PROCEEDINGS*

The Plaintiffs initiated these actions against BoA on November 25, 2009, and each filed Amended Complaints on March 17, 2010.[1]  Plaintiffs' initial complaint alleged that (1) they had invested, collectively, over $1.6 billion in short-term notes issued by Ocala (the "Ocala Notes"), a wholly-owned

---

[1] Hereafter, the Amended Complaint filed by DB will be referred to as the "DB AC" and the Amended Complaint filed by BNP in its contracts case will be referred to as the "BNP AC" (collectively, "Plaintiffs' FACs").

subsidiary of Taylor, Bean & Whitaker Mortgage Corp. ("TBW") that served as a funding vehicle for TBW; (2) Ocala's assets were to have served as collateral for repayment of Plaintiffs' notes; (3) due to a massive fraud by TBW, Ocala's assets were diverted or stolen by TWB and others; and (4) BoA should be responsible for these losses because it served as Indenture Trustee, Collateral Agent, Depositary, and Custodian for the Ocala notes, and in such capacities allegedly breached its responsibilities under the corresponding facility documents, which includes the Base Indenture, the Security Agreement, the Depositary Agreement, and the Custodial Agreement (collectively, the "Facility Documents"), by failing to protect Ocala's collateral from the sort of wrongdoing that TBW committed.

BoA moved to dismiss these complaints on February 5, 2010. In response, Plaintiffs filed their First Amended Complaints (the "FACs") reasserting their initial claims, adding new claims for breach of contract and breach of fiduciary duty, and generally supplementing and refining their factual allegations. Further, in addition to their earlier theory that BoA had negligently performed its contractual duties, the Plaintiffs' FACs asserted that BoA had negligently provided them with incorrect Borrowing Base Certificates, on which Plaintiffs allegedly relied in deciding to "roll" their Ocala notes.

3

On April 30, 2010, BoA moved to dismiss the FACs and oral argument was heard on that motion on September 15, 2010.  On March 23, 2011, this Court issued its ruling on BoA's motion in *BNP Paribas Mortg. Corp. v. Bank of America, N.A.*, 778 F.Supp.2d 375 (S.D.N.Y. 2011) (the "March Opinion").  The decision dismissed (1) Plaintiffs' contract claims for lack of standing under the Depositary Agreement, the Custodial Agreement and the March 2009 Letter; (2) Plaintiffs' indemnification claims; and (3) all claims relating to Ocala Notes issued prior to July 20, 2009.  The decision upheld all remaining claims.

On August 30, 2010, the Plaintiffs filed new actions against BoA in the Southern District of Florida, asserting claims for conversion of Ocala's assets and seeking to recover for their investment losses on their unpaid Ocala notes. *Deutsche Bank AG v. Bank of America* ("Deutsche II"), S.D. Fla. Civil Action No. 10-23124 and *BNP Paribas Mortg. Corp. v. Bank of America* ("BNP II"), S.D. Fla. Civil Action No. 10-23115 (collectively, the "Conversion Actions").  On November 17, 2010, the actions were transferred to the Southern District of New York and referred to this Court.  On August 30, 2011, this Court dismissed Plaintiffs' conversion claims.  *BNP Paribas Mortg. Corp. v. Bank of America, N.A.*, Nos. 10-8630 and 10-8299, 2011 WL 3847376 (S.D.N.Y. Aug. 30, 2011) (the "August Opinion").

4

The parties commenced discovery in April 2011.  BoA answered the Plaintiffs' FACs on June 8, 2011 and asserted several affirmative defenses.  The parties stipulated and agreed to complete document production by March 30, 2012, close fact discovery on November 16, 2012 and extended the time to amend pleadings to December 17, 2012.

On July 6, 2011, Plaintiffs made a formal demand by letter on BoA, as Indenture Trustee and Collateral Agent, to pursue claims against the Depositary, Custodian and Collateral Agent for breaches of the corresponding Depositary, Custodial and Security Agreements.  On August 6, 2011, BoA refused Plaintiffs' demands.

On June 22, 2011, BoA filed its Complaint against Third party defendant BMP Paribas Securities Corporation ("BNPPS") and third party defendant Deutsche Bank Securities, Inc. ("DBS") (collectively, the "Note Dealers" or the "Third Party Defendants"), and the motions were heard and marked fully submitted on January 25, 2012.  On December 29, 2011, Plaintiffs filed the motion to amend, which was heard and marked fully submitted on April 4, 2012.  On June 5, 2012, this Court issued its ruling on BoA's Complaint against the Third Party Defendants and Plaintiffs' Motion to Amend in *BNP Paribas Mortg. Corp. v. Bank of America, N.A.*, 866 F.Supp.2d 257 (S.D.N.Y. 2012) (the

"June Opinion").  The decision dismissed BoA's Complaint in its entirety and granted Plaintiffs' motion to amend and file the Second Amended Complaint.

Plaintiffs filed their Second Amended Complaints ("BNP SAC" and "DB SAC") (collectively, the "SACs") on October 1, 2012, reasserting their initial surviving claims and adding allegations of (1) BoA failing to "sue itself" or assign its claims; (2) negligence and negligent misrepresentation; and (3) contingent quasi-contract claims.

On January 15, 2013, BoA filed a motion to dismiss counts four through twelve of the Plaintiffs' SACs and BNP's Fourteenth Cause of Action.  This motion was heard and marked fully submitted on May 1, 2013.

Separately, on March 15, 2013 BoA filed a motion in limine to (1) admit testimony regarding advice of third party's counsel; and (2) exclude inquiry into privileged communications with outside counsel.  The parties resolved this motion on May 1, 2013.

## II.  BACKGROUND

Familiarity with the general background of this case and prior litigation between the parties is assumed.  The

6

allegations as described in the contract cases are repeated in part as relevant to the issues presented by the instant motions.

This dispute arises generally from the multi-billion dollar collapse of TBW in late summer 2009.  According to the Amended Complaints, TBW was "the largest non-depositary residential mortgage lender in the United States" and the "twelfth-largest mortgage originator." (BNP AC ¶ 25; DB AC ¶ 2.) Its core business was: "(i) originating, underwriting, processing and funding conforming, conventional, government-insured residential mortgage loans; (ii) the sale of mortgage loans into the 'secondary market' to government-sponsored enterprises such as Federal Home Loan Mortgage Corporation ("Freddie Mac"); and (iii) mortgage payment processing and loan servicing." (BNP AC ¶ 26; DB AC ¶ 3.)

TBW created Ocala in 2005 to provide short-term liquidity to TBW between the time of TBW's origination or purchase of mortgages and the sale of those mortgages, principally to Freddie Mac. (BNP AC ¶ 28; DB AC ¶ 5.) Ocala raised cash by issuing liquidity notes in two series: Series 2005-1 Secured Liquidity Notes (the "2005-1 Notes") and Series 2008-1 Secured Liquidity Notes (the "2008-1 Notes") (collectively, the "Ocala Notes"); which were, at all times, secured by the cash proceeds of those notes and mortgages. (BNP AC ¶¶ 39, 43; DB AC ¶¶ 3, 7,

7

34.) BNP purchased $480.7 million of the Ocala Notes, and DB purchased $1.2 billion. (*See* BNP AC ¶¶ 2, 40; DB AC ¶¶ 4, 11.) The Ocala Notes "rolled over" at least once per month up to and through July 20, 2009, the date of the final rollover before TBW's collapse. (BNP AC ¶ 5; DB AC ¶ 13.)

BoA served in several distinct but related capacities for the Ocala Facility: as Indenture Trustee, Collateral Agent, Depositary and Custodian. In its various capacities, BoA agreed to administer and regulate the flow of mortgages and cash in and out of Ocala, certify the solvency of Ocala prior to its issuance of Ocala Notes, promptly notify the Ocala noteholders of any Event of Default or Potential Event of Default, as defined in the Facility Documents, and shut down the Ocala Facility upon certain Events of Default. (BNP AC ¶ 10; DB AC ¶ 23.)  The rights and responsibilities of BoA are set out in the following Ocala Facility Documents: the 2008 Base Indenture (the "Base Indenture"); the 2008 Security Agreement (the "Security Agreement"); the 2005-1 Depositary Agreement (relating to the 2005-1 Notes and upon which the BNP Plaintiffs have sued) and 2008-1 Depositary Agreement (relating to the 2008-1 Notes and upon which DB has sued) (both referred to as the "Depositary

Agreement"); the 2008 Custodial Agreement (the "Custodial Agreement"); and the March 2009 Letter.[2]

On or about August 3, 2009, TBW's offices were raided by law enforcement authorities, TBW stopped originating mortgages, and Freddie Mac terminated TBW's eligibility to sell and service Freddie Mac loans. (See DB AC ¶¶ 207-08.) On August 10, 2009, BoA declared an Event of Default under the Base Indenture. In the wake of TBW's collapse, Ocala has failed to repay, and indeed cannot repay, the money owed to DB and BNP, in their capacity as holders of the Ocala Notes. (See DB AC ¶ 21; BoA Mem. at 1.)

## A. *Additional Allegations in the SACs*

The SACs assert new allegations, including that BoA, in direct violation of its duties under the relevant agreements, failed to securely protect Plaintiffs' collateral and instead allowed the vast majority of that collateral to leave the Ocala Facility.  (BNP SAC ¶ 10; DB SAC ¶ 19.)  Plaintiffs allege that BoA continued to issue Secured Notes and failed to shut down the

---

[2] DB has brought separate claims for breach of the prior versions of four of these documents—specifically, the 2006 Base Indenture, the 2006 Security Agreement, the prior version of the 2005-1 Depositary Agreement, and the 2006 Custodial Agreement. Because DB has not alleged any material differences between the prior and recent versions of the Facility Documents, all references are to the 2008 versions of the Facility Documents, except where specifically noted.

Facility or otherwise inform Plaintiffs of Ocala's insolvency as required by the governing contracts, despite actual knowledge that the Ocala Facility was insolvent at least as early as January 25, 2008.[3]

The SACs also allege that BoA repeatedly and falsely misrepresented the satisfaction of the Borrowing Base Condition and permitted Ocala to issue Ocala notes in an amount greater than its assets, up to and through July 20, 2009, the last date on which the Ocala Notes rolled over. According to the SACs, on their face, each and every Certificate during this period of time—and each one directly certified by BoA—reflected Ocala's insolvency, which constituted an Event of Default or a Potential Event of Default under the Base Indenture. Despite these certificates showing insolvency, Plaintiffs' allege that they did not receive copies of the Borrowing Base Certificates prepared by Ocala and certified by BoA for any of the roll dates prior to the end of December 2008. (BNP SAC ¶ 14.) Instead, the SACs assert that BoA began sending Borrowing Base Certificates only in February 2009, after Plaintiffs requested such copies, but that these Borrowing Base Certificates, unlike those

---

[3] DB alleges that BoA had actual knowledge as early as January 25, 2008. (See DB AC ¶¶ 85-86.) The BNP Plaintiffs allege that BoA had actual knowledge as early as June 30, 2008, the date on which BNP first purchased its secured notes. (See BNP AC ¶¶ 13, 138.)

certified by BoA between June and December 2008 and not provided to Plaintiffs, falsely showed Ocala to be solvent. (BNP SAC ¶ 17; DB SAC ¶ 22.) Plaintiffs allege that in issuing these inaccurate Borrowing Base Certificates, from December 17, 2008 to August 4, 2009, BoA repeatedly and negligently misrepresented the state of Ocala's assets by delivering false loan reports to Plaintiffs. (*Id.*) Plaintiffs represent that BoA knew or should have known that its representations in these reports were false, and that Plaintiffs were relying on BoA's representations in deciding whether to roll over the Secured Notes (BNP SAC ¶ 18; DB SAC ¶ 22.)

Moreover, the SACs allege that at no point did BoA inform Plaintiffs that the pre-December 2008 Borrowing Base Certificates, which had not been shared with Plaintiffs, showed the Facility to be insolvent. According to Plaintiffs, had BoA adequately performed its contractual obligations or acted with reasonable care, (i) Plaintiffs would not have purchased the Secured Notes on June 30, 2008 or any of the subsequent roll dates; or (ii) Plaintiffs' Secured Notes would be fully secured as required by the Ocala Facility Agreements. (BNP SAC ¶ 22; DB SAC ¶ 33.)[4] Plaintiffs' state that as a direct and proximate

_____

[4] More specifically, the SACs allege that BoA served as gatekeeper for the Ocala Facility and, as Collateral Agent, Custodian, Depositary and Indenture Trustee, was charged with, among other things: (i) securing and protecting

result of BoA's breaches of its contractual duties and
negligence, Plaintiffs' Secured Notes are significantly under-
collateralized and BoA has failed to make payment to Plaintiffs
for their Secured Notes.  (*Id.*)

In addition, Plaintiffs allege that BoA made "intra-day
loans" to Ocala on each day that the Ocala notes matured,
including July 20, 2009, which purportedly enabled Ocala to
repay maturing notes.  These loans allegedly made BoA an
unsecured creditor of Ocala, at least until it was repaid the
same day with funds received from Plaintiffs' purchase of new
notes. (*See* BNP SAC ¶¶ 269-74; DB SAC ¶¶ 350-55.) According to
Plaintiffs, this allowed BoA to profit unjustly at Plaintiffs'
expense.  (*Id.*)

Finally, the SACs allege that BoA has continued to breach
its obligations to Plaintiffs in the period of time following
TBW's collapse.  Plaintiffs maintain that BoA, in its capacities

---

the cash and mortgage loans collateralizing the Secured Notes; (ii) making
certain that the Secured Notes were, in fact, over-collateralized; (iii)
shutting down the Ocala Facility and promptly notifying BNPP if at any time
BoA became aware that the Ocala Facility was under-collateralized and
therefore insolvent; (iv) protecting, preserving and recovering Ocala's
assets as necessary; and (v) pursing available claims for the benefit of
Noteholders in the event of default. (BNP SAC ¶ 7; DB SAC ¶¶ 13-15.)  The BNP
SAC further alleges that BoA's performance of contractual obligations was an
essential condition to BNPP's willingness to purchase and subsequently
reinvest in the Secured Notes, as shown from the March Letter Agreement
expressly acknowledging that BoA would indemnify BNPP against losses stemming
from any failure by BoA to meet its contractual obligations.  (BNPP SAC ¶ 8.)

12

as Indenture Trustee and Collateral Agent, has ongoing legal and
contractual rights and obligations, as well as its fiduciary
duty to recover damages caused by itself in its individual
capacity and in its capacities as Collateral Agent, Depositary
and Custodian for the benefit of Plaintiffs. (BNP SAC ¶ 24; DB
SAC ¶ 31.)  Plaintiffs allege that they have instructed BoA to
bring claims in its capacities as Indenture Trustee and
Collateral Agent against itself in its role as Collateral Agent,
Custodian, Depositary and in its individual capacity, or in the
alternative, assign any such claims directly to Plaintiffs.  The
SACs allege that in refusing to bring or assign such claims as
instructed, and in making only limited efforts to recover
Ocala's assets, BoA is depriving Plaintiffs of recoveries
available to pay their Secured Notes and thus continuing to
breach both its contractual and fiduciary duties to Plaintiffs.
(BNP SAC ¶ 23; ¶ 27; DB SAC ¶ 18; ¶ 32.)

## III.    STANDARD OF REVIEW

On a motion to dismiss pursuant to Rule 12(b)(6), all
factual allegations in the complaint are accepted as true, and
all inferences are drawn in favor of the pleader. *Mills v. Polar
Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir. 1993). The issue
"is not whether a plaintiff will ultimately prevail but whether
the claimant is entitled to offer evidence to support the

claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir. 1995) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 235-36 (1974)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). Plaintiffs must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." *Twombly,* 550 U .S. at 570. Though the court must accept the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 555).

## IV.  *PLAINTIFFS' CLAIMS THAT BoA FAILED TO "SUE ITSELF" OR ASSIGN CLAIMS AGAINST ITSELF TO PLAINTIFFS ARE DISMISSED*

Plaintiffs allege in their Fourth, Fifth and Sixth Causes of Action that BoA failed either to "sue itself" or to assign claims against itself, or in the alternative pursue one of numerous options identified by Plaintiffs.

14

## A. *Plaintiffs' Claims that BoA Failed to "Sue Itself" Fail as a Matter of Law*

Plaintiffs allege that BoA had contractual duties as Collateral Agent (under the Security Agreement) and as Indenture Trustee (under the Base Indenture) to sue itself in its other capacities for breaches of the Custodial and Depositary Agreements, respectively, (*see* BNP SAC ¶¶ 217-26; DB SAC ¶¶ 275, 288, 294 (alleged breaches of the Security Agreement) and BNP SAC ¶¶ 227-37; DB SAC ¶¶ 296-316 (alleged breaches of the Indenture)), and that it breached those duties by failing to bring suit against itself for these alleged claims.

Defendant contends that dismissal of these claims is appropriate on two grounds: because the law does not permit BoA to bring adversarial claims against itself or because the relevant Facility Documents do not require, or even allow, BoA to sue itself.

First, BoA argues that Plaintiffs' "sue yourself" theories are against clearly established federal and state law that "courts do not recognize purportedly adversarial claims brought by a party against itself" as a general rule. *See, e.g.*, *Globe & Rutgers Fire Ins. Co. v. Hines*, 273 F. 774, 777 (2d Cir. 1921) ("It is elementary that the same person cannot be both plaintiff and defendant in the same action."); *Trs. Of the First Society*

15

*of the Methodist Episcopal Church v. Stewart*, 27 Barb. 553 (N.Y. Sup. Ct. 1858) ("No party can be both plaintiff and defendant in the same action."); *South Spring Hill Gold-Min. Co. v. Amador Medean Gold-Min. Co.*, 145 U.S. 300, 301 (1892) (dismissing appeal after defendant and plaintiff corporations merged to become one entity). This rule is based on core constitutional principles that federal courts "are limited by the case-or-controversy requirement of Art. III to adjudication of actual disputes between adverse parties." *Richardson v.* Ramirez, 418 U.S. 24, 36 (1974). The New York Constitution is in accord. *See Rosenzweig v. N.Y. State Surrogate's Court*, 255 N.Y.S.2d 618, 620 (Sup. Ct. 1965) ("[T]here is a constitutional requirement of an actual controversy between parties . . . The presence of a real controversy is a necessary prerequisite to the exercise of the judicial function in rendering a determination.").[5]

---

[5] In addition, Defendant identifies diverse areas of the law where courts have rejected "sue yourself" claims. *See, e.g., Phoenix Ins. Co. v. Erie & W. Transp. Co.*, 117 U.S. 312, 322 (1886) (where two ships owned by one person collided, insurer of injured ship could not recover against tortfeasor ship "because the assured, the owner of both ships, could not sue himself"); *Hyman v. N.Y. Stock Exchange, Inc.*, 848 N.Y.S.2d 51, 53 (1st Dep't 2007) (rejecting the "confounding possibility that a shareholder of a corporation could bring a derivative ction on behalf of the corporation against the corporation itself"); *Tassinare v. Am. Nat'l Ins. Co.*, 32 F.3d 220, 224 (6th Cir. 1994) (where employer and plan fiduciary were the same party, any lawsuit was "totally illusory.").

The Second Circuit has extended this rule even where a party acts in differing capacities. *See Globe & Rutgers*, 273 F. at 777 ("[T]he rule has been applied where the same person sues and defends in different capacities."); *see also Teachers Ins. & Annuity Ass'n v. CRIMI MAE Servs. Ltd.*, 681 F. Supp. 2d 501, 508 (S.D.N.Y. 2010) (corporation could not be expected to sue its subsidiary even in its role as independent trust servicer); *Redevelopment Agency v. City of Berkeley*, 80 Cal. App. 3d 158, 165 (1978) (contrary to public policy "for one person to control both sides of litigation" even when party sues in one capacity and defends in another). Thus, in *Bederman v. Moskowitz*, 139 N.Y.S.2d 352 (Sup. Ct. 1955), the court held that a plaintiff suing for conversion in her individual capacity could not be made a defendant in her representative capacity as executrix. *Id.* at 353. Similarly, in *Cruden v. Bank of New York*, 957 F.2d 961 (2d Cir. 1992), the court held that the demand requirement in a bond indenture agreement could not apply to lawsuits against the trustee itself because "it would be absurd to require the debenture holders to ask the Trustee to sue itself." *Id.* at 968; *see also RJ Capital, S.A. v. Lexington Capital Funding III, Ltd.*, No. 10 Civ. 25 (PGG), 2011 WL 3251554, at *8 (S.D.N.Y. July 28, 2011) (rejecting position that plaintiff

17

should "demand that the Trustee initiate proceedings against itself").

Plaintiffs respond that the instant case should be treated as an exception to the general rule because here, BoA would be suing itself solely in a representative capacity, having no beneficial or economic interest in the outcome of the litigation. (Memo Opp. at 2-3.) However, the two cases cited by Plaintiffs in support of this proposition are inapposite: in *Banco Nacional de Cuba*, no party attempted to sue itself or hold another party liable for failing to sue itself[6] and in *Interstate Commerce Comm'n*, the parties at issue were federal agencies, which required alternate rules and precedent than is applied to standard commercial entities such as here.[7]  *See Banco Nacional de Cuba v. Chase Manhattan Bank*, 505 F. Supp. 412 (S.D.N.Y. 1980) (dicta noting "[t]he most that can be derived from the . .

---

[6] At most, *Banco Nacional de Cuba* acknowledges a narrow line of cases allowing a trustee to sue itself in specific circumstances, which are not applicable here. *See Banco Nacional de Cuba v. Chase Manhattan Bank*, 505 F. Supp. 412 (S.D.N.Y. 1980).

[7] As Defendant establishes, separate rules and precedent apply to agencies in the Federal Government. *See, e.g.*, Michael Herz, *United States v. United States: When Can the Federal Government Sue Itself?*, 32 Wm. & Mary L. Rev. 893, 906 (1991) ("[T]he usual bar on litigation by one person against herself does not apply to the federal government.  Monolithic though the United States can appear, to deem it one person as a litigant is absurdly formalistic."). Furthermore, in *U.S. v. ICC*, 337 U.S. 426 (1949) cited by Plaintiffs, the question turns on whether the government agency has independent litigating authority, specifically recognizing the United States as a unique entity with the need to be vindicated in separate capacities.  *See id.*

. cases is that the New York trustee may well have become an entity separate from himself, so that he can sue himself by separate counsel")[8]; *United States v. Interstate Commerce Comm'n*, 337 U.S. 426 (1949) (agencies of U.S. government allowed to sue each other in different capacities).

Plaintiffs, moreover, fail to cite a single case establishing breach of contract or breach of fiduciary duty against a party for failing to sue itself.  Nor does the case law Plaintiffs do cite establishing the ability of a party to possess distinct legal capacities provide refuge from the established rule that a party may not generally bring claims against itself.  *See, e.g.*, *Globe & Rutgers*, 273 F. at 777 (rule against one party suing itself "has been applied where the same person sues and defends in different capacities").  Additionally, the Supreme Court has established that a corporation lacks standing to sue itself even if it is not the economic beneficiary of the action.[9]  *See South Spring Hill Gold-*

---

[8] Plaintiffs quote language in the opinion that is dicta, and not referenced or affirmed in the corresponding appellate decision.  *See Banco Nacional de Cuba v. Chase Manhattan Bank*, 658 F.2d 875 (2d Cir. 1981).

[9] None of Plaintiffs' cases establishing that BoA would not be the economic beneficiary to the suit and that BoA would be serving distinct legal capacities actually involve a party forcing a corporation to sue itself under a contract or because of its fiduciary duty. (Memo. Opp. at 2-3.)  Instead, Plaintiffs' cases involve either a party merely serving in complex capacities, *see NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG), 2012 WL 5895786, at *2-3 (S.D.N.Y. Nov. 21, 2012), or an entity

*Min Co. v. Amador Meadean Gold-Min. Co.*, 145 U.S. 300, 301
(1892) (when plaintiff mining company owned defendant, even if
not the economic beneficiary of the suit, "the litigation has
ceased to be between adverse parties, and the case therefore
falls within the rule applied where the controversy is not a
real one.").

Second, BoA asserts that the Facility Documents do not
include any contractual language stating or implying that BoA is
required to sue itself, and alternatively that the Facility
Documents cannot create an obligation which the law does not
permit.

In their SACs, Plaintiffs rely on various provisions in the
Security Agreement and Base Indenture to establish a duty by BoA
to "sue itself" for violating the Depositary and Custodial
Agreements: (1) Section 6.02 of the Security Agreement, which
states that BoA, as Collateral Agent, must exercise any right or
remedy available to it if so directed by the Noteholders
following an Indenture Event of Default; (2) Section 8.04 of the
Security Agreement, which states that BoA must obey written
instructions of Noteholders "except as expressly provided herein

---

attempting to quiet title in a non-adversarial way, *see Purvin v. Grey*, 64
N.Y.S.2d 266, 267 (Sup. Ct. Kings Cnty. 1946).  Neither situation is
analogous here.

or in the Indenture"; (3) Section 10.2(e) of the Base Indenture, which states that BoA "upon the occurrence of a default . . . exercise such of the rights and powers vested in it by this Base Indenture, any Supplement or any Facility Document, and to use the same degree of care and skill in their exercise as a prudent person would exercise or under the circumstances in the conduct of such person's own affairs."(DB SAC ¶ 276; ¶ 277; ¶ 299.)

Plaintiffs maintain that these provisions establish a clear duty by BoA to exercise all rights and powers as Indenture Trustee and Collateral Agent to protect the interests of the Noteholders against the Depositary and Custodian's breaches of duties, including "suing itself." (Memo Opp. at 13.) Plaintiffs maintain that any alternative interpretation would render the contract meaningless to protect the Noteholders' interests in remedying harms caused by breaches of the Depositary and Custodial Agreements by BoA.[10]

BoA contends that, to the contrary, the contractual language cited by Plaintiffs limits BoA's actions to those available under the law or those provided for in the relevant Facility Documents, none of which anywhere mentions or purports

---

[10] Plaintiffs simultaneously acknowledge that BoA "plainly understands" that it has an obligation to file suit to protect the Noteholders, because it has already done so in connection with the Ocala Transaction. (Memo Opp. at 14 n.11.)

to confer upon BoA the right to "sue itself." Section 6.02 of

the Security Agreement, for instance, limits BoA to exercise

only rights and remedies "available to it under the applicable

law." Similarly, Section 8.04 of the Security Agreement, also

cited by Plaintiffs, restricts BoA to actions "permitted to take

hereunder," which BoA argues cannot include that which is

legally impermissible. In Section 10.2(e) of the Base

Indenture, the language instructs the Indenture Trustee to

"exercise such of the rights and powers vested in it by this

Base Indenture, any Supplement or any Facility Document." The

"applicable law" does not allow a party to be forced to sue

itself, and the Facility Documents likewise do not anywhere

impose such a requirement on the Trustee or Custodian.[11]

---

[11] Plaintiffs' impossibility defense argument is inapposite. Plaintiffs'
argue that BoA cannot invoke an impossibility defense where BoA foresaw such
impossibility and was legally responsible for creating it. (Memo Opp. at 6-
7.) But an impossibility defense applies only after a contract obligation is
agreed to and the event occurs that makes it impossible for one party to
perform. See Restatement (Second) of Contracts § 261 ("Where, after a
contract is made, a party's performance is made impracticable without his
fault by the occurrence of an event the non-occurrence of which was a basic
assumption on which the contract was made, his duty to render that
performance is discharged unless the language or the circumstances indicate
the contrary."); see also United States v. Winstar Corp., 518 U.S. 839, 905
(1996) ("[I]f the risk was foreseeable there should have been provision for
it in the contract, and the absence of such a provision gives rise to the
inference that the risk was assumed."). Here, however, Defendant argues that
there was never any obligation in these contracts for BoA to sue itself; not
that it is now impossible to do so. Indeed, no such provision was agreed to
in the Facility Documents. Relatedly, Defendant's separate argument, that
reading such a requirement into the contract would be "absurd" because the

BoA also contends that to adopt Plaintiffs' reading of these contract provisions, and finding a requirement that BoA sue itself, would produce a result that is "absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." *In re Lipper Holdings, LLC,* 766 N.Y.S.2d 561, 562 (1st Dep't 2003) (citations omitted); *see also Law Debenture Trust Co v. Maverick Tube Corp.,* 595 F.3d 458, 467 (2d Cir. 2010) (interpretation may not "strain the contract language beyond its reasonable and ordinary meaning")(internal quotations and citations omitted); *Cruden,* 957 F.2d at 968 ("[I]t would be absurd to require the debenture holders to ask the Trustee to sue itself.); *Ellington Credit Fund,* 837 F. Supp. 2d at 186 ("[T]here is 'an important different between asking the trustee to sue itself—an "absurd" requirement [the Court] presumes the parties did not intend—and asking it to sue a third party, even when the investor alleges wrongdoing by the trustee."). Regardless of the absurdity of such an interpretation, had the parties intended for such rights, they could and should have contracted for them. *See March Opinion,* 778 F. Supp. 2d at 410 ("The parties undoubtedly knew how to confer standing [upon] Plaintiffs in different capacities when they wished to do

---

law prohibits such an action, cannot constitute an impossibility argument. The impossibility defense therefore does not apply.

so."). [12]  Because the Facility Documents do not explicitly or
implicitly contain any such requirement, Plaintiffs' claim that
BoA is required to sue itself fails.

### B. *BoA Does Not Have a Duty to Assign Claims Against Itself as a Matter of Law*

In the alternative to Defendant "suing itself," Plaintiffs
maintain that BoA had a duty to assign claims for breaches of
the Custodial and Depositary Agreements directly to Plaintiffs.

Plaintiffs cite a number of cases establishing that under
New York law, where an assignor assigns his right to pursue a
claim to the assignee, the assignee is the "real party in
interest" and has standing to assert the injury in fact suffered
by the assignor regardless of the likelihood of success of the
claim.  *Hosp. for Joint Diseases v. Travelers Prop. Cas. Ins.
Co.*, 879 N.Y.2d 1291, 1296-97 (N.Y. 2007); *see also LaSala v.
Needham & Co.*, No. 04-Civ. 9237(SAS), 2006 WL 452024, at *4-5
(S.D.N.Y. Feb. 24, 2006); *Vt. Agency of Natural Res. v. United
States ex rel. Stevens*, 529 U.S. 765, 773 (2000). Further,
Plaintiffs allege that BoA has agreed in writing not to dispute

---

[12] With respect to the Custodial and Depositary Agreements specifically,
Plaintiffs do not have standing under these documents.  Plaintiffs may not
then attempt to enforce those agreements through rights for which they did
not contract.  *See Nationwide Auction Co. v. Lynn*, No. 90 Civ. 7643, 1996 WL
148489, at *11 (S.D.N.Y. Apr. 1, 1996) ("To allow a third party to enforce a
promise of which it was not an intended beneficiary would run contrary to
well-settled law.).

the validity of such an assignment to Noteholders and alternatively would be equitably estopped from so doing. (*See* Memo Opp. at 11-12.) Finally, Plaintiffs contend that Section 15 of the Depositary Agreement and Section 20 of the Custodial Agreement each allows BoA to assign its rights under the Facility Documents.[13]

But putting aside the rights of an assignee to bring a claim, or whether BoA would challenge such an assignment, an assignor may not in the first place "confer any greater rights than at the time of such assignment he had himself." *Squire v. Greene*, 52 N.Y.S. 1013, 1017-18 (2d Dep't 1898). In *West Penn Admin., Inc. v. Pittsburgh Nat'l Bank*, 433 A.2d 896 (Pa. Super. 1981), the Pennsylvania appellate court rejected plaintiff assignee's attempt to sue a bank because the assignment had come from that same bank: "It is axiomatic that a party may not sue himself. . . [and] an assignment does not confer upon the assignee any greater right, power, or interest than that

---

[13] Plaintiffs contend that to prevail, BoA must establish that it "had or has no contractual or fiduciary duty to take any other prudent action to vindicate the interests of the Noteholders . . . [or] deny the Noteholders their bargained-for protections under the Facility Documents." (*Id.* at 12-13.) This does not, however, support Plaintiffs' claim that BoA is required under the agreements to sue itself or assign its claims. To the contrary, BoA has already filed separate suit in protection of the Noteholders with respect to the Ocala transaction. (Memo Opp. at 14 n.11.)

possessed by the assignor." *Id*. at 901 (internal citations omitted).

Nor could the Facility Documents, as Plaintiffs suggest, reasonably be read as obligating BoA to assign claims against itself to third parties that were neither parties to, nor intended third-party beneficiaries of, the Custodial or Depositary Agreements. *See Shirai v. Blum*, 239 N.Y. 172, 179 (1924). Indeed, the Base Indenture in Section § 10.1(b)(i) makes clear that the Indenture Trustee "undertakes to perform only those duties that are specifically set forth in this Base Indenture of the Facility Documents and no others, and no implied covenants of obligations shall be read into this Base Indenture against the Indenture Trustee." The Facility Documents do not include any requirement that BoA as Custodian or Trustee should or must sue itself for breaches of the Depositary and Security Agreements, or assign these claims should they arise. Furthermore, to the extent Plaintiffs allege that BoA's fiduciary duty under the Security Agreement and Base Indenture required it to sue itself or assign those claims, fiduciaries, as discussed above, are under no obligation to sue themselves on behalf of their beneficiaries. *See Tassinare*, 32 F.3d at 224. This applies even where the fiduciary is acting in differing capacities, and is particularly appropriate where, as

26

here, the relevant documents do not even include any such
requirement of the fiduciary. *See id.*

### C. Defendant is Not Obligated to Pursue Alternate Options as Identified by Plaintiffs

In the event that the Defendant is found incapable of
commencing litigation against itself or assigning its claims,
Plaintiffs contend that Defendant should still be equitably
estopped from "seeking to nullify the promises upon which the
Noteholders relied and which BoA, through its conduct, misled
the Notehodlers into believing it would honor if the time ever
came for it to do so." (Memo Opp. at 15.)[14]  Plaintiffs maintain
that BoA is therefore obligated, regardless of the above claims,
to pursue one of many options to ensure its duties as Indenture
Trustee and Collateral Agent or resolve conflicts of interest,
including: appointing a separate trustee or resigning;
petitioning the Court to resolve conflicts of interest; and
resolving its claims against the Depositary internally.

Plaintiffs' arguments continue to rest on the unsupported
position that Plaintiffs were misled into believing that

---

[14] Plaintiffs allege specifically that (1) Defendant misled Noteholders into
believing it would adequately perform its duties; (2) that BoA would not have
been retained if it disclosed its belief that it was immune from suit; (3)
that BoA knew or should have known it would be in a position it believed made
it incapable of carrying out its duties; and (4) that the Noteholders relied
upon Defendant's misrepresentations and omissions, and as such equitable
estoppel is appropriate.

27

Defendant would sue itself because the Facility Documents anticipated and required such actions.  No language in any of the Facility Documents reasonably supports this proposition, and the parties undoubtedly knew how to contract for or allow such claims.  The parties instead restricted claims to those provided for in the "Base Indenture . . . [or] any Supplemental or Facility Document."  *See* Base Indenture § 10.2(e).  This deliberate choice by the "sophisticated, counseled parties dealing at arm's length" in a "multimillion dollar transaction" to not contract for such rights must be given effect. *Chimart Assocs. v. Paul,* 66 N.Y.2d 570, 574-75(1986).[15]

Furthermore, in their opposition, Plaintiffs do not challenge BoA's contentions that certain of the "sue yourself" claims should be dismissed as duplicative.[16]  By their failure to

---

[15] This is particularly true here where the controlling agreement contains an integration clause specifying that the written document is the "entire agreement" between the parties on the subject. *See* Depositary Agreement § 23.

[16] Defendant identifies claims based on Plaintiffs' "sue itself" theory as improperly duplicative of claims already pled in the SACs. First, BoA moves to dismiss as duplicative all "sue yourself" claims duplicating Plaintiffs' existing claims for breach of the Security Agreement, which do not depend on a sue yourself theory but arise from the same facts and allege the same damages. (*See* DB SAC ¶ 311 ("As set forth in Count I above, BoA breached its contractual duties as Collateral Agent under the Security Agreement."); BNP SAC ¶ 232 (same)).  Second, Plaintiffs allege that BoA failed to sue itself for conversion under three Facility Documents—allegedly breaching the Security Agreement, the Base Indenture, and its fiduciary duties—as well as a standalone conversion claim in their Thirteenth Causes of Action.  Defendant argues that these conversion claims, which merely duplicate Plaintiffs' breach of contract claims, are improper and should be dismissed.  *See*

respond, Plaintiffs have conceded this argument. *See Anti-*
*Monopoly, Inc. v. Hasbro, Inc.,* 958 F. Supp. 895, 907 n. 11
(S.D.N.Y. 1997) (noting that, "under New York state law, the
failure to provide argument on a point at issue constitutes
abandonment of the issue."). For the reasons stated above, the
Complaint has failed to state a claim that BoA breached its
fiduciary or contractual duties in failing to "sue itself" or
assign its claims and is therefore dismissed.

### V. *PLAINTIFFS' CLAIMS OF NEGLIGENCE ARE DISMISSED*

Under New York law, to sustain a claim for negligence, the
plaintiff must show that the defendant owed the plaintiff a
cognizable duty of care, that the defendant breached that duty,
and that the plaintiff suffered damages as proximate result of
that breach. *King v. Crossland Sav. Bank,* 111 F.3d 251, 255 (2d
Cir. 1997). "To sustain a third-party cause of action for
contribution, a third-party plaintiff is required to show that
the third-party defendant owed it a duty of reasonable care
independent of its contractual obligations, or that a duty was
owed to the plaintiffs as injured parties and that a breach of
that duty contributed to the alleged injuries." *Siegl v. New*

---

*Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 341 (S.D.N.Y. 2004);
*ESI, Inc. v. Coastal Power Prod., Co.*, 995 F. Supp. 419, 433 (S.D.N.Y. 1998).
Plaintiffs fail to respond to either of these arguments.

*Plan Excel Realty Trust, Inc.,* 84 A.D.3d 1702, 1703, 922
N.Y.S.2d 899, 901 (App. Div. 2011) (citation omitted). Thus, to
plead its third-party negligence claim, Plaintiffs must allege:
(i) that BoA owed Plaintiffs a cognizable duty of care; (ii)
that BoA breached that duty; and (iii) that Plaintiffs suffered
damage as a proximate result of that breach. *See DiBenedetto v.
Pan Am World Serv., Inc.,* 359 F.3d 627, 630 (2d Cir. 2004);
*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am.
Sec., LLC,* 446 F.Supp.2d 163, 198 (S.D.N.Y. 2006).

Defendant contends that Plaintiffs' Seventh and Eighth
Causes of Action fail to state a claim for negligence for two
related reasons: (1) New York law generally does not allow a
tort claim to be predicated on a breach of contract but requires
some independent duty that Plaintiffs here have failed to
establish and (2) Plaintiffs' claims are barred by New York's
economic loss rule.

First, to plead a tort claim, a plaintiff must allege an
independent duty that "spring[s] from circumstances extraneous
to, and not constituting elements of, the contract." *Clark-
Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 390
(1987); *see also BNP Paribas Mortg. Corp. v. Bank of America,
N.A.,* No. 10 Civ. 8630 (RWS), 2011 WL 3847376, at *6 n.5
(S.D.N.Y. Aug. 30, 2011) ("It is well established that a tort

claim cannot be predicated on a mere breach of contract, but may only succeed if the plaintiff alleges the violation of an independent duty."); *JPMorgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 401 (S.D.N.Y. 2004) ("If the only interest at stake is that of holding the defendant to a promise, the courts have said that the plaintiff may not transmogrify the contract into one for tort.").

In their SACs, Plaintiffs allege that "[n]egligence pervaded virtually every aspect of the Bank of America's involvement in the Ocala Facility" (BNP SAC ¶ 250; DB SAC ¶ 338), including BoA's allegedly "negligent certifications" of Borrowing Base Certificates and "negligent disbursements" of Ocala funds. (*Id.*) These duties, which BoA purportedly committed negligently, are specifically contracted for in the relevant Facility Documents. New York law makes clear that "the allegedly tortuous conduct must be such that there would be liability even if no contract existed." *Robehr Films, Inc. v. Am. Airlines, Inc.*, No. 85 Civ. 1072 (RPP), 1989 WL 111079, at *8 n.4 (S.D.N.Y. Sept. 19, 1989); *see also Deutsche Bank Secs., Inc. v. Rhodes*, 578 F. Supp. 2d 652, 670 (S.D.N.Y. 2008) ("[C]ourts have found that in actions involving the contractual duties of corporations and financial institutions, a negligence action may not be maintained and parties must proceed under a

31

contract theory."). Plaintiffs fail to identify any duty by BoA independent of those contracted for in the Facility Agreements.

Second, Plaintiffs seek the same damages under their negligence claims as under their contract claims in the Amended Complaints: payment on the Ocala notes they purchased on July 20, 2009. In addition to these claims failing because they improperly convert contract claims into tort claims, where plaintiffs allege primarily economic loss as an injury in a tort claim, "the usual means of redress is an action for breach of contract; a tort action for economic loss will not lie." *In re Adelphia Communications Corp.,* No. 02-41729, 2007 WL 2403553, at *9 (Bankr. S.D.N.Y. Aug. 17, 2007) (citation omitted); *Dean v. Barrett Homes, Inc.*, 968 A.2d 192, 202, 406 N. J. Super. 453 (N.J. Super. Ct. App. Div. 2009) (describing standards similar for motion to dismiss purposes). The purpose of this rule is:

> [T]o keep contract law from drown[ing] in a sea of tort ...
> [and with this goal in mind] New York courts restrict
> plaintiffs who have suffered economic loss, but not
> personal or property injury, to an action for the benefits
> of their bargains. Thus, [i]f the damages suffered are of a
> type remediable in contract, a plaintiff may not recover in
> tort.

*Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.,* 244 F.R.D. 204, 220 (S.D.N.Y. 2007) (quotation marks and citations omitted); *see also Dean,* 968 A.2d at 202. "Moreover, by preventing the encroachment of tort law into the domain of

32

contract, the economic loss doctrine protects parties' abilities
to allocate risk by mutual agreement and thereby form reliable
expectations about their potential financial exposure with
respect to the duties and liabilities that they have
contractually assumed." *Travelers Cas. and Sur. Co. v. Dormitory
Authority—State of New York,* 734 F.Supp.2d 368, 379 (S.D.N.Y.
2010). *See also Alloway v. General Marine Indus. L.P.,* 149 N.J.
620, 628 (N.J. 1997) (economic loss doctrine allows parties to
allocate risk).

     As stated by the New York Court of Appeals,

> [A] defendant may be liable in tort when it has breached a
> duty of reasonable care distinct from its contractual
> obligations, or when it has engaged in tortious conduct
> separate and apart from its failure to fulfill its
> contractual obligations. The very nature of a contractual
> obligation, and the public interest in seeing it performed
> with reasonable care, may give rise to a duty of reasonable
> care in performance of the contract obligations, and the
> breach of that independent duty will give rise to a tort
> claim. Where a party has fraudulently induced the plaintiff
> to enter into a contract, it may be liable in tort, or
> where a party engages in conduct outside the contract but
> intended to defeat the contract, its extraneous conduct may
> support an independent tort claim. Conversely, where a
> party is merely seeking to enforce its bargain, a tort
> claim will not lie.

*New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 316 (N.Y.
1995).

     Plaintiffs respond that neither of Defendant's arguments is
applicable here.  Instead, Plaintiffs allege that because the

Facility Documents explicitly carve out claims of negligence, Plaintiffs' negligence claims are not precluded either by their contract claims or barred by the economic loss doctrine. (Memo. Opp. at 22.) Plaintiffs cite two cases in support of this theory: *Burns v. Del. Charter Guarantee & Trust Co.*, 805 F. Supp. 2d 12 (S.D.N.Y. 2011) and *Grund v. Del. Charter Gaurantee & Trust Co.*, 788 F. Supp. 2d 226 (S.D.N.Y. 2011).

Both *Burns* and *Grund* arise from the same underlying dispute where plaintiffs, a group of individuals who entered into Self-Directed Individual Retirement Trust Agreements (the "SIRTAs") with defendants Principal Financial Group and Delaware Charter Guarantee & Trust Company, directed investments to Westgate Funds which later proved to be a Ponzi scheme. *See generally id.* In both *Burns* and its companion case *Grund*, the defendant moved to dismiss negligence claims on the grounds that they were duplicative of the contract claims and that they were barred by the economic loss rule. The contracts at issue both contained a provision that the defendant "shall not be liable for any act or omission made in connection with the Trust except for its intentional misconduct or negligence." *Burns*, 805 F. Supp. 2d at 26; *Grund* 788 F. Supp. 2d at 247. Based on that language, this Court concluded that the contract "explicitly carve[d] out claims of negligence from its coverage" and because "the purpose

34

of the economic loss doctrine is to allow parties to allocate risk . . . it would be improper to apply the economic loss doctrine to dismiss Plaintiffs' tort claims."   *Id.*

Plaintiffs compare the above language in *Burns* and *Grund* with language in the Security Agreement and Base Indenture to show that here, the Facility Documents likewise "explicitly carve out claims of negligence from their coverage."  (Memo. Opp. at 24.)  Section 4.10 of the Security Agreement, for example, states that the Collateral Agent shall not be liable "for any action taken or omitted to be taken by it . . . relative to any of the Assigned Collateral, except for its own negligence, fraud, bad faith or willful misconduct."  Section 8.01 similarly states that "[n]either the Collateral Agent, nor any of its respective directors, officers, employees, affiliates or agents, shall be liable to any Secured Party or the Issuer for any action taken or omitted to be taken by it or them hereunder, or in connection herewith, except for its own negligence, fraud, bad faith or willful misconduct."

However, both *Burns* and *Grund* can be distinguished from the facts at issue here on multiple grounds.  First, in *Burns* and *Grund,* which dealt with a non-negotiated form contract, there was no provision explicitly limiting duties to those specified in the contract.  Here, Section 8.01 in the Security Agreement

35

precludes any independent duties: "nothing herein shall be deemed . . . to impose on the Collateral Agent any obligations other than those for which express provision is made herein." The Security Agreement applies to all Facility Documents.[17]   Just as where in *Burns* and *Grund* it would have been improper to apply the economic loss doctrine at the expense of the parties' purposeful allocation of risk, it would be similarly improper here to override the limiting provisions of the Facility Agreements to create independent tort duties.

Second, plaintiffs in *Burns* and *Grund* relied on distinct, independent duties aside from those in the applicable contract; independent duties that Plaintiffs here have not established. *See New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 316 (N.Y. 1995) (holding that "defendant may be liable in tort when it has breached a duty of reasonable care *distinct* from its contractual obligations," because a "tort obligation is a duty imposed by law . . . 'apart from and independent of promises made and therefore apart from the manifested intention of the parties' to a contract") (emphasis added).

---

[17] As Plaintiffs acknowledge, the contracts "must be read as a whole" and "should be read as one."  (Memo Opp. at 13 n.9.)

Plaintiffs' attempt to compare the independent duties present in *Burns* and *Grund* to the duties present here.  In *Burns*, the Court identified duties beyond the contract that arose from Defendant's position "as a trustee with expertise in IRA custodianship," including the "duty to investigate in light of red flags," "to obtain and hold documents," "to send accurate reports on asset values," and "to maintain preserve, and monitor the trust assets in order to prevent wrongful dissipation." *Burns*, 805 F. Supp. 2d at 26.  Plaintiffs contend that these duties identified in *Burns* parallel the allegations Plaintiffs have made in the instant case.  (*See* DB SAC ¶ 327 (alleging "BoA utterly disregarded obvious 'red flags' or 'storm clouds,'" "BoA acted with utter disregard to the collateral committed to its control, custody, and care," and "BoA trust officers received, reviewed, and certified borrowing base certificates that, on their face, demonstrated that the Ocala Facility was insolvent by hundreds of millions of dollars."); (BNP ¶ 239 (same)). However, unlike in *Burns* and *Grund*, here, all of the specified duties cited in Plaintiffs' SACs arise out of the same contract language upon which Plaintiffs have already been given leave to bring contract claims under the Security Agreement and Base Indenture; Plaintiffs thus fail to identify any duties independent of or extraneous to the contracts at issue.  *BNP*

37

*Paribas Mortg. Co.*, 778 F. Supp. 2d at 410 (Plaintiffs are allowed to bring a claim for losses "caused by BoA's negligence under the Security Agreement or the Base Indenture"); *see also Clark-Fitzpatrick, Inc.*, 70 N.Y.2d at 389 (1987) (New York law establishes that negligence claims must be dismissed where there is no violation of a "legal duty independent of the contract.")

Finally, *Burns* and *Grund* involved individuals with no independent expertise or knowledge of the investments comparable to that of the trustee, which created a duty beyond that in the contract. *Burns*, 805 F. Supp. 2d at 26. Plaintiffs here, in contrast, are sophisticated commercial parties who have similar expertise to BoA and had reasonable access to the same information as did the Defendant. Plaintiffs have therefore failed to establish any independent duty allowing their tort claims to proceed. *See Fed. Housing Fin. Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 334 (S.D.N.Y. 2012) ("[C]ourts regularly hold as a matter of law that an arm's length business arrangement between sophisticated and experienced parties cannot give rise to a 'special relationship.'"); *see also City of Syracuse v. Loomis Armored US, LLC*, No. 5-11 Civ. 744 (MAD), 2012 WL 4491119, at *23-24 (N.D.N.Y. Sep. 28, 2012); *King County v. IKB Deutsche*

*Industriebank AG*, 863 F. Supp. 2d 288, 303 (S.D.N.Y. 2012)
("[T]he presence of a contract or a financial transaction that
is 'in the nature of contract' can be a strong indicator that a
plaintiff was not owed a legal duty separate and apart from
obligations bargained for and subsumed within the
transaction."); *Winnick*, 350 F. Supp. 2d at 401 ("[I]n
commercial contexts in which a contract exists, the duty
attendant to the special relationship 'must spring from
circumstances extraneous to, and not constituting elements of
the contract.'").[18]

---

[18] Plaintiffs argue that New York courts have long recognized that the same
conduct can give rise to actions sounding in both tort and contract, as long
as there is a separate duty arising outside of a contract.  As an initial
matter, as discussed above, no such independent duty exists in this case.
Further, neither of the two cases Plaintiffs cite establishes an independent
tort duty supported by the same underlying conduct as the parallel contract
claim.  In *Mandelbatt v. Devon Stores, Inc.*, 521 N.Y.S.2d 672, 676 (1st Dep't
1987), the claims at issue were breach of fiduciary duty and intentional
interference with prospective economic advantage under the contract; not a
tort and contract claim arising from the same underlying duties as provided
for in the contract.  In *Brink's Inc. v. City of New York*, 717 F.2d 700, 704-
05 (2d Cir. 1983), the "Second Circuit concluded that the defendant was
estopped from challenging the plaintiff's maintenance of both a breach of
contract and a negligence claim—and the resulting punitive damages award—not
because of the presence of an independent duty, but because "throughout the
case Brink's jury accepted the view that this was a negligence case." *See id.*
at 705; *see also City of Syracuse v. Loomis Armored US, LLC*, No. 5-11 Civ.
744 (MAD), 2012 WL 4491119, at *23-24 (N.D.N.Y. Sep. 28, 2012) (finding that
unlike in *Brink's*, here defendant was explicitly challenging plaintiff's
ability to assert both breach of contract and negligence claims; because
plaintiff failed to allege a violation of duty independent from the contract,
the negligence claim must fail).

Because Plaintiffs therefore cannot rely on the Facility
Documents as carving out separate negligence claims, and for the
reasons stated above, Plaintiffs' negligence claims are
dismissed.

## VI.  *PLAINTIFFS' NEGLIGENT MISREPRESENTATION CLAIMS ARE DISMISSED*

The elements of negligent misrepresentation are that (1)
the defendant had a duty as a result of a special relationship
to give correct information; (2) the defendant made a false
representation that he or she should have known was incorrect;
(3) the defendant knew that the plaintiff desired the
information for a serious purpose; (4) the plaintiff intended to
rely and act upon it; and (5) the plaintiff reasonably relied on
it to his or her detriment. *Hydro Investors, Inc. v. Trafalgar
Power Inc.,* 227 F.3d 8, 20 (2d Cir. 2000). Moreover,
"[n]egligent misrepresentation is a type of fraud and, as such,
is subject to Rule 9(b)'s heightened pleading standard." *Maalouf
v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4770(SAS), 2003 WL
1858153, at *4 (S.D.N.Y. Apr. 10, 2003) (citing *Simon v.
Castello,* 172 F.R.D. 103, 105 (S.D.N.Y. 1997)).

In assessing claims for negligent misrepresentation, courts
in this district have applied the heightened pleading standards
of Rule 9(b). *See Ebusinessware, Inc. v. Technology Services
Group Wealth Management Solutions, LLC,* No. 08 Civ. 9101, 2009

WL 5179535, at *13 (S.D.N.Y. Dec. 29, 2009) (applying Rule 9(b) while noting that the Second Circuit has yet to determine if Rule 9(b) applies to negligent misrepresentation claims); *AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC,* 254 F.Supp.2d 373, 389 (S.D.N.Y. 2003) ("A claim for negligent misrepresentation must also satisfy the requirements of Rule 9(b)."); *In re Marsh & McLennan Cos. Sec. Litig.,* 501 F.Supp.2d 452, 495 (S.D.N.Y. 2006) ("Negligent misrepresentation claims must be pleaded with particularity pursuant to Rule 9(b)"). "To satisfy the pleading requirements of Rule 9(b), a complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Wood v. Applied Research Assocs., Inc.,* 328 Fed.Appx. 744, 747 (2d Cir.2009) (citations and internal quotation marks omitted).

According to Plaintiffs, three broader sets of misrepresentations were made by BoA: (1) daily collateral reports that overstated the collateral securing Plaintiffs' investments; (2) monthly borrowing Base Certificates that also overstated that collateral; and (3) BoA's issuance of notes on behalf of Ocala, which, according to Plaintiffs, effectively constituted a representation that their investments were fully

41

collateralized.  (*See* BNP SAC ¶¶ 260-64, 267; DB SAC ¶¶ 343-48.)
Plaintiffs allege that each of these misrepresentations was made
in the course of BoA's performance of duties under the Custodial
and Depositary Agreements.  For example, BNP alleges that BoA's
"misrepresentations in the [daily] Shipped Reports and other
documents breached its contractual obligations" (BNP SAC ¶ 146)
and that "[u]nder the terms of the Depositary Agreement, [BoA]
was required to certify the Borrowing Base Certificates." (BNP
SAC ¶ 156.)  DB similarly alleges that BoA provided these
reports "[i]n connection with its duties under the Custodial
Agreement" (DB SAC ¶ 162) and that BoA "breached its duties
under the Depositary Agreement . . . [by] falsely certifying
that the Borrowing Base Condition was satisfied pursuant to §
4(d) of the Depositary Agreement." (DB SAC ¶ 307.)  Both
Plaintiffs also specifically allege that BoA breached the
Depositary Agreement by issuing the July 20, 2009 notes.  (BNP
SAC ¶ 63 (alleging that "[t]he Depositary Agreement required
[BoA] to certify the Borrowing Base Condition . . . before
issuing new notes); DB SAC ¶ 264 (citing BoA's duty, "as
Depositary, to cease issuing Ocala Notes").)

    As an initial matter, Plaintiffs' claims fail for the same
reason as their negligence claims: they improperly attempt to
transform contract duties into tort duties, *see LaSalle Bank,*

*N.A. v. Citicorp Real Estate Inc.*, No. 02 Civ. 7868 (HB), 2003
WL 1461483, at *4 (S.D.N.Y. Mar. 21, 2003) (dismissing negligent
misrepresentation claim and noting "problem of invoking tort law
for claims that sound in contract"); *McMahan & Co. v. Bass*, 673
N.Y.S.2d 19 (1st Dep't 1998) (dismissing negligent
misrepresentation claim where 'alleged tortuous conduct [was]
innate to the performance of the contract"); and their claims
are barred by the economic loss rule, *see Cherny v. Emigrant
Bank*, 604 F. Supp. 2d 605, 609 (S.D.N.Y. 2009) (dismissing
negligent misrepresentation claim pursuant to economic loss
rule). Moreover, Plaintiffs were neither parties to, nor
intended beneficiaries of, the Custodial and Depositary
Agreements.  Plaintiffs thus lack standing to pursue any claims
arising from misrepresentations made pursuant to these
documents. *See Travelers Cas. & Sur. Co. v. Dormitory Auth.*,
734 F. Supp. 2d 368, 379-80 (S.D.N.Y. 2010) (quoting *Parrott v.
Coopers & Lybrand L.L.P.*, 95 N.Y.2d 479, 483 (2000)).

Plaintiffs acknowledge that negligent misrepresentation
claims are inappropriate where a contract between the two
parties required the representation in question.  Plaintiffs
contend instead that their claim does not arise out of either
the Custodial or Depositary Agreements, but from "actual privity
of contract between the parties or a relationship so close as to

43

approach that of privity." *Travelers Cas. & Sur. Co.*, 734 F.
Supp. 2d at 378-80.  Plaintiffs maintain that no duty was owed
under the contracts to provide Noteholders with such information
as alleged in the Complaint, but rather that "having chosen to
make representations to the Noteholders outside the scope of the
required contracts, BoA was obligated to exercise reasonable
care given the special relationship that existed between it and
the Noteholders." (Memo Opp. at 21.)  More specifically,
Plaintiffs allege that the independent "special relationship"
existed between the parties both through the principal-agent
relationship established under the Security Agreement and
because of BoA's unique or specialized expertise regarding the
collateral.  (Memo. Opp. at 21.)  Plaintiffs rely on language in
Section 8.01 of the Security Agreement which states that BoA and
Plaintiffs had a relationship of "agent and principal", as well
as on cases holding that a "special relationship may be
established by 'persons who possess unique or specialized
expertise, or who are in a special position of confidence and
trust with the injured party such that . . . negligent
misrepresentation is justified." *Mandarin Trading v.
Wildenstein*, 944 N.E.2d 1104, 1109 (N.Y. 2011).

Both of Plaintiffs' grounds to establish a "special
relationship" independent of the contracts are barred by the

44

Subscription and Purchase Agreement, which governed Plaintiffs'

purchase of the notes and in which Plaintiffs expressly

disclaimed any such relationship:

> In connection with the purchase of the Notes: (i) none of
> the Issuer, the Dealers, the Colalteral Agent or the
> Servicer is acting as a fiduciary or financial or
> investment adviser for the Investor; (ii) the Investor has
> conducted its own due diligence and investigation with
> respect to its investment in the Notes . . . and the
> Investor is not relying (for purposes of making any
> investment decision or otherwise) upon any advice,
> counselor representations (whether written or oral) of the
> Issuer, the Dealers, the Collateral Agent or the Servicer;
> (iii) none of the Issuer, the Dealers, the Collateral Agent
> or the Servicer has given to the Investor (directly or
> indirectly through any other person) any assurance,
> guarantee, or representation whatsoever as to the expected
> or projected success, profitability, return, performance,
> result, effect, consequence or benefit (including legal,
> regulatory, tax, financial, accounting, or otherwise) of
> its purchase; (iv) the Investor has consulted with its own
> legal, regulatory, tax, business, investment, financial and
> accounting advisers to the extent it has deemed necessary,
> and it has made its own investment decisions based upon its
> own judgment and upon any advice from such advisers as it
> has deemed necessary and not upon any view expressed by the
> Issuer, the Dealers, the Collateral Agent or the Servicer;
> and (v) the Investor has evaluated the rates, prices or
> amounts and other terms and conditions of the purchase and
> sale of the Notes with a full understanding of all of the
> terms, conditions and risks thereof (economic and
> otherwise), and is capable of assuming and willing to
> assume (financially and otherwise) these risk and (vi) the
> Investor is a sophisticated investor.

Subscription & Purchase Agmt. For Short Term Notes.

In *HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59 (1st Dep't

2012), the Court held that identical language precluded a

special relationship under New York law and therefore barred a

negligent misrepresentation claim as a matter of law. *See id.*
at 76 ("The parties expressly agreed that they were dealing with
each other at arm's length, that UBS was not acting as HSH's
financial or investment advisor[,] and that HSH was 'not relying
upon any advice, counsel or representations . . . of [UBS.]' As
a matter of law, therefore, HSH cannot allege that it had a
'special relationship' with UBS upon which a negligent
misrepresentation claim may be predicated."); *see also*
*Landesbank Baden-Wurttemberg v, Goldman, Sachs & Co.*, 478 Fed.
App'x. 679, 682 (2d Cir. 2012) (affirming dismissal of negligent
misrepresentation claim due to disclaimer of special
relationship).

In addition, the language in the Subscription and Purchase
Agreement also disclaims any reliance upon the alleged
misrepresentations. "[A] party cannot justifiably rely on a
misrepresentation that is specifically disclaimed in an
agreement." *JM Vidal, Inc. v. Texdis USA, Inc.*, 764 F. Supp. 2d
599, 623 (S.D.N.Y. 2011) (citations omitted). Here, Plaintiffs
acknowledged, among other things, that they had "conducted
[their] own due diligence" and were "not relying upon any
advice, counsel or representations" from BoA. Section 8.01 of
the Security Agreement also provided that BoA "makes no warranty
or representation to [Plaintiffs] . . . and shall not be

46

responsible for any statements, warranties or representations made in or in connection with this Agreement or any other document relating to the Assigned Collateral." Such disclaimers of the risks of complex commercial transactions between "sophisticated parties" may appropriately bar a claim for negligent misrepresentation as a matter of law. *See, e.g.*, *MBIA Ins. Co.*, 916 N.Y.S.2d at 54 (no reasonable reliance "in light of specific disclaimers in the contracts, executed following negations between the parties, all sophisticated business entities, providing that plaintiff Lacrosse would not rely on defendants' advice, that it had the capacity to evaluate the transactions, and that is understood accepted the risks").[19]

Independently, and even if the Subscription and Purchase Agreement were not applicable, courts have not found "unique or specialized knowledge" or relationships of special "confidence or trust" where all parties are "highly sophisticated players in the mortgage-backed securities market.'" *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 928 N.Y.S.2d 229, 230 (1st Dep't

---

[19] Plaintiffs at oral arguments asserted that the Subscription and Purchase Agreement, dated June 30, 2008, applied only to the initial purchases of the Ocala notes, and not to the subsequent reports at issue here. However, this Court has already applied this agreement prospectively in determining that Plaintiffs disclaimed any fiduciary duty owed to them by the Note Dealers. *See BNP Paribas Mortg. Corp.*, 866 F. Supp. 2d at 268. In any event, even if the Subscription and Purchase Agreement only applied to the initial purchase of the Ocala notes, Plaintiffs' claim would still fail for failure to establish any independent "special relationship" owed to Plaintiffs by BoA.

2010) ("[T]he fact that, with regard to the securities at issue in this case, the defendants had greater knowledge of the underlying loan files and the practices of third-party due diligence providers is not sufficient to establish a 'special relationship' where parties are 'highly sophisticated players in the mortgage-backed securities market.'"); see also Fed. Housing Fin. Agency v. UBS Americas, Inc., 858 F. Supp. 2d 306, 334 (S.D.N.Y. 2012)("[C]ourts regularly hold as a matter of law that an arm's length business arrangement between sophisticated and experienced parties cannot give rise to a 'special relationship.'"). Plaintiffs here have explicitly acknowledged their status as "sophisticated investors." (See Section 8.01 of the Security Agreement.) Further, "[n]othing more than knowledge of the particulars of [a] company's business—and of the true situation underlying the misrepresentations pertaining to that business . . . [does] not constitute the type of 'specialized knowledge' that is required in order to impose a duty of care in the commercial context." Winnick, 350 F. Supp. 2d at 402. [20]

---

[20] Plaintiffs argue that BoA was the only disinterested party that could have known whether Plaintiffs' investments were collateralized. Plaintiffs also argue that regardless, whether BoA did have such unique access to knowledge raises a dispute on the merits and cannot be resolved on a motion to dismiss. Regardless of whether BoA had unique access, as shown above, courts have routinely found as a matter of law that "greater knowledge" or "knowledge of the particulars of a company's business" cannot give rise to a "special

48

Moreover, Section 8.01 of the Security Agreement, upon which Plaintiffs rely in establishing an agency relationship, specifies that "[t]he relationship . . . is that of agency and principal only, and nothing herein shall be deemed to constitute the Collateral Agent a trustee for any Secured Party or impose on the Collateral Agent any obligations other than those for which express provision is made herein."  Even if this provision were to be construed as allowing an agency relationship, it cannot extend such a relationship to Plaintiffs under the Depositary and Custodial Agreements, which Plaintiffs lack standing to enforce.

Finally, even if Plaintiffs' claims are not based on the Custodial or Depositary Agreements, the deliberate choice of the parties to deny Plaintiffs standing under these documents evidences the lack of any intended "special relationship." Plaintiffs cannot allege a duty of care in tort, much less from a special relationship, to transform their prohibited contract claims into tort claims, which would give them those prohibited rights.[21] *See Winnick*, 350 F. Supp. 2d at 401 ("Without the

relationship" when the contract is between sophisticated commercial entities. *See, e.g.*, *MBIA Ins. Corp.*, 928 N.Y.S.2d at 230; *Winnick*, 350 F. Supp. 2d at 402.

[21] Plaintiffs also contend that the collateral and depositary solvency reports BoA provided to Plaintiffs were voluntarily given and not connected to any contractual duty and as such give rise to an independent duty and special

49

obligation imposed [by the contract], the defendants would be under no obligation to use special care to provide accurate financial information to the Banks; indeed, if not for the existence of the contract, they would have had no relationship to the Banks whatsoever."). For the reasons stated above, Plaintiffs' negligent misrepresentation claims are dismissed.

## VII. *PLAINTIFFS' QUASI-CONTRACT CLAIMS ARE DISMISSED*

In the alternative to their contract claims and in the event that the Ocala Facility Agreements are deemed to be void *ab initio*, Plaintiffs' Ninth, Tenth, Eleventh and Twelfth Causes of Action allege quasi-contract claims: unjust enrichment, constructive trust, promissory estoppel, and negligent

---

relationship. (BNP SAC ¶¶ 343-348.) Plaintiffs allege that in undertaking to issue these reports, BoA created a duty to use due care to properly represent the stated collateral. (*Id.*) However, whether Plaintiffs were the contracted for recipients of BoA's obligations under the contracts does not change the fact that BoA did in fact have these contractual duties. Thus, Plaintiffs not being parties to the contract does not alter the rule that an obligation under contract cannot be transformed into a tort. *See King County v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288, 303 (S.D.N.Y. 2012) ("[T]he doctrine may apply even when there is no contract at all between the parties. Rather, the presence of a contract or a financial transaction that is 'in the nature of contract' can be a strong indicator that a plaintiff was not owed a legal duty separate and apart from obligations bargained for and subsumed within the transaction."). Moreover, to the extent Plaintiffs' theory is that the alleged misrepresentations arose from duties created by contracts the Plaintiffs do have standing to enforce, any such claim should be dismissed as duplicative of their pending contract claims. "If the duty between the parties arose out of a contract, such that the contract required a correct representation, then any misrepresentation must be pled as a breach of contract, not as a tort claim for negligent misrepresentation." *Madison Capital Co., LLC v. Alasia, LLC*, 615 F. Supp. 2d 233, 240 (S.D.N.Y. 2009).

performance of an assumed duty.  (BNP SAC ¶ 271; DB SAC ¶ 352.)
BNP also alleges, in its Fourteenth Cause of Action, promissory
estoppel with respect to the March 27, 2009 Letter Agreement.
(BNP SAC ¶ 271.)

### A. *Plaintiffs' Fail to State a Claim for Unjust Enrichment*

Under New York law, a claim of unjust enrichment "requires
simply an allegation that (1) the defendant was enriched, (2)
the enrichment was at the plaintiff's expense, and (3) the
defendant's retention of the benefit would be unjust." *M'Baye v.
World Boxing Ass'n.,* No. 05-9581(DC), 2006 WL 2090081, at *5
(S.D.N.Y. July 28, 2006). "The notion of unjust enrichment
applies where there is no contract between the parties."
*Maryland Cas. Co. v. W.R. Grace & Co.,* 218 F.3d 204, 212 (2d
Cir. 2000). Thus, generally, quasi-contractual relief, such as
unjust enrichment, is not permitted when an express agreement
exists that governs the dispute between the parties. *See Clark-
Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 388
(1987) (citations omitted).

However, "[w]hile a party generally may not simultaneously
recover upon a breach of contract and unjust enrichment claim
arising from the same facts, it is still permissible to plead
such claims as alternative theories." *Singer v. Xipto Inc.,* ---

F.Supp.2d ----, 2012 WL 1071274, at *8 (S.D.N.Y. Mar. 20, 2012);
see also Wilk v. VIP Health Care Servs., Inc., No. 10-
5530(ILG)(JMA), 2012 WL 560738, at *5 (E.D.N.Y. Feb. 21, 2012)
(noting that "while it is true that a claim for quantum meruit
or unjust enrichment is precluded when a valid contract
governing the same subject matter exists between the parties, a
quantum meruit claim may be alleged alongside a breach of
contract claim.").

Plaintiffs base their unjust enrichment claim on Ocala's
repayment to BoA of alleged intra-day loans, which purportedly
enabled Ocala to repay maturing notes and left BoA unsecured
until it was repaid the same day with funds received from
Plaintiffs' purchase of new notes. (See BNP SAC ¶¶ 269-74; DB
SAC ¶¶ 350-55.) More specifically, Plaintiffs allege that Ocala
was insolvent for a significant period of time prior to the
declaration by BoA of an Event of Default in August 2009, and
the only three reasons why commercial paper was able to roll
during this time was (1) BoA's failure to perform its
contractual duties, as alleged in the Complaints; (2) BoA's
payments of the intra-day loans and subsequent retention of
amounts received from issuance of new Notes and (3) BoA's
misrepresentations to Plaintiffs that the facility was fully
collateralized. (Memo. Opp. at 27-28.)

Defendant contends that even if such intra-day loans were issued,[22] Plaintiffs were on notice that Ocala funds might be used to satisfy intra-day loans made by BoA to Ocala because this was expressly authorized in the Depositary Agreement: "It is understood that the Depositary may (but shall not be required to) make such a [short-term] deposit before the Depositary receives the proceeds of the sale [of the newly issued notes] in immediately available funds, by creating an overdraft in the Short Term Note Account." *See Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 56-57 (2d Cir. 2011) (no unjust enrichment where plaintiff was aware of agreement providing for transfer from third party to defendant).

Plaintiffs respond that, as a threshold matter, these claims are brought in the event that the Ocala Agreements "are deemed void for any reason" and therefore these agreements may not be used to justify actions by BoA.  In addition, Plaintiffs contend that BoA has not shown that the intra-day loans actually followed the procedure of the Depositary Agreement, and to the extent BoA wishes to argue it satisfied these relevant requirements, this is a factual matter not appropriately decided

---

[22] Defendant maintains that Plaintiffs have not provided evidentiary support, as required by Fed. R. Civ. P. 11(b)(3), to establish that BoA made intra-day loans to Ocala.  Defendant reserves its right to pursue sanctions under Rule 11, but alleges that regardless of Plaintiffs' lack of evidentiary support, Plaintiffs' allegations fail to state a claim for unjust enrichment.

53

at this stage of the proceedings.  Finally, Plaintiffs emphasize that their claim turns on the fact that Plaintiffs did not have notice of the insolvency of the Ocala notes, not on whether Plaintiffs had notice that the intra-day loans might be issued.

Regardless of whether the Depositary Agreement is ultimately deemed void, unjust enrichment claims may not lie where, as here, plaintiffs were on notice of the underlying actions constituting unjust enrichment.  *See Diesel Props S.R.L.*, 631 F.3d at 56-57 (no unjust enrichment were plaintiff had knowledge of an agreement between defendant and third party and had no superior right to funds transferred between defendant and third party); *see also Ringier Am., Inc. v. Land O'Lakes, Inc.*, 106 F.3d 825, 829 (8th Cir. 1997) (no unjust enrichment where plaintiff was aware of contractual relationship between third party and defendant and because it received its benefit of the bargain).  Plaintiffs do not cite a single case contrary to this rule.[23]

Moreover, though Plaintiffs acknowledge the rule that repayment of a debt cannot be unjust enrichment, *see, e.g.*, *B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474, 477 (7th Cir.

---

[23] Plaintiffs' contention that the issue turns on Plaintiffs' notice of the insolvency is unsupported.  The notice requirement in unjust enrichment turns on the underlying actions constituting the supposed unjust actions: here, whether Plaintiffs were aware of the possibility of intra-day loans.

54

2005) (no unjust enrichment where debtor repaid certain

obligations with money furnished by other creditors); *United

States v. Goforth*, 465 F.3d 740, 734 (6th Cir. 2006)

("[R]repayment by the [debtor] of the $250,000 loan from a

[creditor] was simply the fulfillment of a contractual

obligation, and it conferred no 'benefit.'"), they attempt to

narrow the rule to only repaid creditors that are "innocent."

(Memo. Opp. at 29.)  However, the one case Plaintiffs cite in

support of this theory is inapposite and does not undermine the

fact that Plaintiffs were on notice of these loans. *Hughes v.

BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290, 304 (S.D.N.Y.

2006).  In *Hughes*, plaintiffs had no agreement with defendants

or any knowledge of defendants having an agreement separately

with the third party.  Instead, the Court found that if

defendants in that case inappropriately took investments

plaintiffs intended for the third party, the agreement between

defendants and the third party, which was completely unknown to

the plaintiffs, did not preclude unjust enrichment.  This case

is not applicable here, where BoA had a separate agreement

allowing for intra-day loans of which Plaintiffs were aware.

Finally, Plaintiffs still received the "benefit of [their]

bargain" and have not pled any facts showing that BoA was

"enriched" at Plaintiffs' expense.  *United States v. Goforth*,

55

465 F.3d 740, 734 (6th Cir. 2006).  For the reasons stated above, Plaintiffs' unjust enrichment claim is dismissed.

### B. *Plaintiffs are not Entitled to the Remedy of a Constructive Trust*

Under New York law, "in order to establish a constructive trust claim, there generally must be proof of: (1) a confidential or fiduciary relation, (2) a promise, express or implied, (3) a transfer made in reliance on that promise, and (4) unjust enrichment. *Bankers Sec. Life Ins. Soc'y v. Shakerdge,* 49 N.Y.2d 939, 428 N.Y.S.2d 623, 406 N.E.2d 440, 440–41 (N.Y. 1980) (citations omitted); *see also Cerabono v. Price,* 7 A.D.3d 479, 775 N.Y.S.2d 585, 585 (App. Div. 2004).  "[A]s an equitable doctrine its application to particular circumstances is susceptible of some flexibility."  *Id.*

As an initial matter, as discussed above, Plaintiffs have failed to state a claim for unjust enrichment and thus cannot meet the fourth element necessary to establish the need for a constructive trust.  As Plaintiffs acknowledge, courts recognize the "key factor" for the establishment of a constructive trust to be unjust enrichment.  *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 353 (2d Cir. 1992); *see also In re First Cent. Fin. Corp.*, 377 F.3d 209, 212 (2d Cir. 2004) ("The fourth

element is the most important, because 'the purpose of the
constructive trust is prevention of unjust enrichment.'").

In addition, Plaintiffs fail to identify any independent
relationship necessary to enforce a constructive trust.
Plaintiffs offer no support to justify their statement that
their allegations establish a "confidential or fiduciary
relationship" between the parties.  (Memo. Opp. at 30.)
Plaintiffs cite to BoA's role as "Collateral Agent" under the
Security Agreement as establishing a confidential or fiduciary
relationship, but Plaintiffs cannot rely on agreements which for
the purposes of this claim are void by assumption.  Plaintiffs
also maintain that establishment of a confidential or fiduciary
relationship is not necessary and that an agency relationship,
created here by the Security Agreement, is sufficient.[24]
However, Plaintiffs cite no cases where Courts imposed a
constructive trust on the basis of a principal and agent

---

[24] Section 8.01 of the Security Agreements, however, contradicts Plaintiffs'
efforts to establish any independent principal-agent relationship and instead
provides that: "[t]he relationship between the Collateral Agent and each
Secured Party is that of agent and principal only, and nothing herein shall
be deemed to constitute the Collateral Agent trustee for any Secured Party or
impose on the Collateral Agent any obligations other than those for which
express provision is made herein" and "except as required by the specific
terms of this Agreement, the Collateral Agent shall have no duty to exercise
any rights, power, remedy or privilege granted to it hereby." (BNP SAC ¶ 278;
DB SAC ¶ 359.)

relationship and in particular none dealing with sophisticated
corporate entities.[25]

For the reasons stated above, Plaintiffs have failed to
plead the elements required for a constructive trust and their
claim is therefore dismissed.

### C. *Plaintiffs' Promissory Estoppel Claims Fail as a Matter of Law*

"In New York, promissory estoppel has three elements: 'a
clear and unambiguous promise; a reasonable and foreseeable
reliance by the party to whom the promise is made; and an injury
sustained by the party asserting the estoppel by reasons of his
reliance.'" *Arcadian,* 884 F.2d at 73, quoting *Esquire Radio &
Elecs., Inc. v. Montgomery Ward & Co.,* 804 F.2d 787, 793 (2d
Cir. 1986), *quoting Restatement (Second) of Contracts* § 90
(1981); accord, *Zucker v. Katz,* 708 F.Supp. 525, 533 (S.D.N.Y.
1989); *Triology Variety Stores, Ltd. v. City Products Corp.,* 523
F.Supp. 691, 699 (S.D.N.Y. 1981); *D & N Boening, Inc. v. Kirsch*

---

[25] The two cases cited by Plaintiff that purportedly support a constructive
trust based on an agency relationship do not establish such a rule.  In
*Halper v. Homestead Building & Loan Ass'n,* 59 N.Y.S.2d 689 (N.Y. Sup. Ct.
1944), the Court ultimately dismissed the constructive trust claim and listed
principal and agent in dicta as an example that might suffice under alternate
circumstances.  In *Edwards v. Horsemen's Sales Co.,* the court imposed a
constructive trust on funds that an auctioneer obtained from the sale of
plaintiff's property, specifically finding that "[t]he auctioneer . . . is in
a fiduciary position, and has a duty to overturn the proceeds of the action
in full." 148 Misc. 2d 212, 214 (N.Y. Sup. Ct. 1989).

*Beverages, Inc.,* 471 N.Y.S.2d 299 (2d Dep't), *aff'd,* 63 N.Y.2d
449, 472 N.E.2d 992 (1984); *Reprosystem, B.V. v. SCM Corp.,* 727
F.2d 257, 264 (2d Cir. 1984).

In support of their claim, Plaintiffs incorporate the
alleged "promises" that underlie their First, Second, Fourth and
Fifth Causes of Action.  (*See* BNP SAC ¶ 287; DB SAC ¶ 368.)

Plaintiffs' first two allegations, grounded in Counts I and
II, are based on promises purportedly made by BoA in the
Security Agreement and Base Indenture.  More specifically,
Plaintiffs' First Cause of Action alleges that BoA breached
promises in Sections 4.10 and 8.01 of the Security Agreement by
failing to keep accurate records to establish the security
interest it held on behalf of Plaintiffs and by failing to
obtain written confirmation that Colonial Bank had released any
security interest it had in mortgages for which BoA had paid.
(*See* BNP SAC ¶¶ 288-89; DB SAC ¶¶ 255-56.)  Plaintiffs also
allege that BoA breached promises in Sections 5.03(a)&(b) of the
Security Agreement by making transfers at Ocala's request for
improper purposes, transferring funds when it knew that Ocala
was insolvent, not properly segregating mortgages and funds
between the BNP and DB sub-accounts, and acting on requests by
TWB employees who were not authorized.  Plaintiffs' Second Cause
of Action alleges that BoA breached its promises in failing to

59

perform additional functions specified under the Base Indenture after Ocala's insolvency and material breaches, which Plaintiffs maintain constituted Events of Default. (*See* Memo. at 31.)

Plaintiffs contend that because this Court has already upheld Counts I and II, Plaintiffs have adequately alleged a duty by Defendant under those agreements and a corresponding breach of that duty. *See BNP Paribas Mortg. Co.*, 778 F. Supp. 2d at 394-408. However, in *In re Gulf Oil/Cities Service Tender Offer Litig.*, 725 F. Supp. 712, 735 (S.D.N.Y. 1989), the Court held that because the contract provisions at issue did not establish a clear promise by the defendant, and because "[p]romissory estoppel is a narrow doctrine designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcement-for example, the Statute of Frauds or a failure of consideration," the promissory estoppel claims should be dismissed. *See also Bank of Dade v. Reeves,* 257 Ga. 51 (1987) ("These parties entered into a contract the consideration of which was a mutual exchange of promises. The promises exchanged were bargained for. Promissory estoppel is not present."). Promissory estoppel is similarly inappropriate here, where the terms of the contract—regardless of establishing a cause of action—are not "clear and unambiguous" promises and where sophisticated parties entered

60

into a bargained for contract. Furthermore, as Defendant argues, if the promises BoA made to Ocala are unenforceable because TBW procured them by fraud, Plaintiffs cannot remedy that unenforceable status because they are "innocent." *See Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 313 (2d Cir. 1990) ("[T]hird party beneficiaries generally are subject to defenses that the promisor could raise in a suit by the promise. That is, they step into the shoes of the promise.").

Plaintiffs' latter two claims, their Fourth and Fifth Causes of Action, are based on BoA's alleged failures to sue itself under the Security Agreement and Base Indenture.  As discussed above, the Facility Documents, and in particular the Custodial and Depositary Agreements which Plaintiffs do not have standing to enforce, cannot be seen to impose a clear promise that BoA would sue itself or assign its claims. *See Infra Part IV.A; see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 195 (2d Cir. 2003) ("In assessing the reasonableness of a plaintiff's alleged reliance, [courts are] to consider the entire context of the transaction, including factors such as complexity and magnitude, the sophistication of the parties, and the content of any agreements between them.). Plaintiffs respond that in *Henneberry*, the Court allowed a third party, an unintended beneficiary of the promise, to assert

61

promissory estoppel at the motion to dismiss stage. *See*
*Henneberry v. Sumitomo Corp.*, No. 04 Civ. 2128 (PKL), 2005 WL
991772, at *6 (S.D.N.Y. Apr. 27, 2005). However, in *Henneberry*,
the individual plaintiff pled an adequate, unambiguous promise
and even there the Court was careful to establish that third
parties who are not intended beneficiaries of the contract can
assert promissory estoppel only "in the rarest of situations."
*Id.* Such precedent is not applicable here, where commercially
sophisticated Plaintiffs have already been found to lack
standing to enforce, or rely on, the contract language upon
which their promissory estoppel claim is predicated.[26]  Because
Plaintiffs have not adequately plead the required elements of
their promissory estoppel claims, this Court does not address
the issue of whether Plaintiffs "reasonably relied" on the
promises Plaintiffs assert BoA breached.

For the reasons stated above, Plaintiffs' promissory
estoppel claims are dismissed.

---

[26] This reasoning also applies to BNP's separate promissory estoppel claim
based on the March letter Agreement. (*See* BNP SAC ¶¶ 305-13.)  Because
Plaintiffs lack standing to enforce or rely on this Agreement, and they have
established no independent "promise" on which to base their claim, their
promissory estoppel claim fails. *BNP Paribas Mortg. Co.*, 778 F. Supp. 2d at
412 ("Furthermore, even if the BNP Plaintiffs could bring a claim for
indemnification under the March 2009 Letter, the language of the
indemnification clause is limited to claims brought by third-parties, not
claims by the indemnitee against the indemnitor.")

**D. *Plaintiffs' Claim for Negligent Performance of an Assumed Duty is Barred under New York Law***

Plaintiffs' last quasi-contract claim, in their Twelfth Cause of Action, alleges negligent performance of an assumed duty. (*See* DB SAC ¶¶ 373-78.)  More specifically, Plaintiffs allege that whether or not BoA was obligated to do so, BoA did undertake to perform professional services—such as creating and maintaining critical accounts, accepting mortgages into and releasing them from the Ocala facility, certifying the borrowing base on a monthly basis and issuing monthly reports to DB and BNPP purporting to show the collateral securitizing their investment—and failed to perform these duties under a reasonable standard of care.  (DB SAC ¶ 360; BNPP SAC ¶ 279.)

Under New York law, breach of a contractual duty to render services does not give rise to tort liability in favor of a third party except in three circumstances, only one of which is applicable here: where the plaintiff detrimentally relies upon the continued performance of the contracting party's duties. *See Espinal v. Melville Snow Contractors, Inc.*, 98 N.Y.2d 136, 140 (2002); *Kaehler-Hendrix v. Johnson Controls, Inc.*, 871 N.Y.S.2d 359 (2d Dep't 2009).  This exception, however, requires a showing of physical harm and is not satisfied by pure economic loss. *See Morgan Stanley & Co. v. KP Morgan Chase Bank, N.A.*, 645 F. Supp. 2d 248, 257 (S.D.N.Y. 2009) ("Under New York law, a

claim for negligence can only be made when the actions of the defendant have caused physical harm to the plaintiff or the plaintiff's property.").[27]

In addition, "a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.  This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract." *Clark-Fitzpatrick, Inc.*, 70 N.Y.2d at 389 (citations omitted). Plaintiffs argue that BoA "voluntarily assume[d]" the duty to perform these functions and as such should be "held liable for negligence in the performance of that duty." *Morgan Stanley & Co.*, 645 F. Supp. 2d at 256.  Plaintiffs simultaneously acknowledge that this claim would arise only if the Court were to hold that the "complex contractual scheme" entered into by "sophisticated financial entities" was null and void.  (Memo. Opp. at 35.) However, Plaintiffs do not establish any independent duty BoA voluntarily undertook outside of those

---

[27] None of the three cases Plaintiffs cite to contradict Defendant's contention that physical harm is required establishes Plaintiffs' position. *Morgan Stanley*, 645 F. Supp. at 256; *Brown v. Stinson*, 821 F. Supp. 910, 915-16 (S.D.N.Y. 1993); *Coll. Auxiliary Servs. Of State Univ. Coll. at Plattsburgh, Inc. v. Slater Corp.*, 456 N.Y.S.2d 512, 513-14 (1982).  In *Morgan Stanley & Co* as well as *Brown*, physical harm was established.  *See id.* In *Coll. Auxiliary Servs.*, the issue turned on whether a professional food services company was liable to a student dining facility based on rates it commended before the two parties entered a contract, and did not discuss the issue or nature of harm.

specified in the contract; to the contrary, Plaintiffs'
allegations, all stemming from duties specifically outlined in
the Facility Documents, make "it clear that the duty . . .
arose out of the [contract]." *Willow Run Foods Inc. v. New York
Restaurant Group*, No. 3:06-CV-0425, 2006 WL 1228853, at *1320
(N.D.N.Y. May 4, 2006). Where a plaintiff merely reasserts
duties already specified in a contract, as here, the plaintiff
is "simply attempting to dress up a contract claim in negligence
clothing" and the claim may fail as a matter of law. *See id.*[28]

For the reasons stated above, Plaintiffs' claim of
negligent performance of an assumed duty is dismissed.

---

[28] Defendant also argues that no policy reason exists here, where parties are
highly sophisticated commercial entities, to impose an extra-contractual
duty. (Memo. Reply at 18.); *see also Espinal*, 98 N.Y.2d. at 139-40 (noting
"policy-laden" nature of recognizing duties to non-contracting third
parties). Defendant contends instead that Plaintiffs should bear the risk
that their contractual counterparties will not perform or will void the
contracts through fraud. Unlike an employee who slipped and fell due to
negligent ice removal, *see id*, or a commercial tenant whose costumes were
destroyed due to a negligent sprinkler, *see Eaves Brooks Costume Co. v.
Y.B.H. Realty Corp.*, 76 N.Y.2d 220 (1990), where extra-contractual duties may
be appropriate, Plaintiffs here cannot end-run their carefully bargained for
contractual allocation of risk by enforcing these same contractual
obligations as tort claims.

## VIII.   CONCLUSION

Based upon the conclusions set forth above, Defendant's Motion to Dismiss is granted in its entirety.

It is so ordered.

New York, NY
~~May~~ June 4, 2013

_____
ROBERT W. SWEET
U.S.D.J.

66